AARON SPOLIN (State Bar No. 310379)
ClientMail@SpolinLaw.com
SPOLIN LAW P.C.
11500 W. Olympic Blvd., Suite 400
Los Angeles, CA 90064
(310) 424-5816
(310) 312-4551

Attorney for Petitioner

# IN THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

HOUSTON MICHAEL BOJI,

        Petitioner,

   vs.

HEATHER SHIRLEY, as Acting Warden, Wasco State Prison,

        Respondent.

Case No.: 22-2410

**Petitioner Houston Michael Boji's Verified Petition for Writ of Habeas Corpus by a Person in State Custody Under 28 U.S.C. § 2254.**

Petitioner, Houston Michael Boji (hereinafter "Petitioner"), through undersigned counsel, files this Verified Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, and in support thereof, avers as follows:

## A. Procedural History

1. Petitioner is Houston Michael Boji.

2.      Petitioner is unlawfully confined in the Wasco State Prison pursuant to a judgment of the Superior Court of California for Riverside County in *People v. Boji,* case number RIF1502741.

3.      Petitioner is currently unlawfully confined in the Wasco State Prison, 701 Scofield Avenue, Wasco, CA 93280.

4.      Heather Shirley is the acting warden of the Wasco State Prison.

5.      On June 20, 2016, the People filed an information charging Petitioner with murder. (P.C. § 187(a).)

6.      The People also alleged that Petitioner personally discharged a firearm causing death or great bodily injury. (P.C. §§ 12022.53(d) and 1192(c)(8).)

7.      Trial commenced on June 18, 2018, and on July 17, 2018, the jury found Petitioner guilty of second-degree murder and found true the special allegation.

8.      On September 7, 2018, the trial court sentenced Petitioner to 40 years to life imprisonment.

9.      On September 10, 2018, Petitioner filed a timely notice of appeal.

10.     On October 26, 2020, the California Court of Appeal for the Fourth District, Division Two, affirmed the judgment.

11.     On December 3, 2020, Petitioner filed a petition for review in the California Supreme Court, which was denied on January 13, 2021.

**B.      Factual History**

12.     The following facts are largely replicated from Petitioner's opening brief on direct appeal:

*The People's Case*

The People first called Ana McCauley. Ms. McCauley testified that in 2015 she lived in Moreno Valley California with her son, one Nicholas McCauley. (I RT 57.) Mr. McCauley was aged 18 years and had graduated high school and she knew his friends. (I RT 58-61.) Petitioner was one of Mr. McCauley's friends and he was like a second son to her, and she knew him for approximately 2-3 years' time. (I RT 62.)

On one occasion, Petitioner asked her how she felt about homosexual people and she said she was not bothered by it and Petitioner said that his father would kill him if he believed that he (Petitioner) were a homosexual. (I RT 64.) On one occasion, Ms. McCauley saw a text message between Petitioner and her son wherein Petitioner texted, "I will shoot you," and, "you fucking cunt," and, "I find you and make you my bitch," and a depiction of then presidential candidate Donald Trump and the words, "it's going to be huge." (I RT 73-75.) Ms. McCauley spoke with her son about these messages and her son told her not to worry inasmuch as he was no longer friends with Petitioner. (I RT 76.) On November 10, 2015, her son was in bed, and she left the home for work at roughly 8:00-8:15am. (I RT 76-77.) When

she pulled out in her car, she observed a vehicle that was similar to Petitioner's car, but she thought that it was a neighbor's car. (I RT 78.) She testified that she always left her back door open so that the dogs could go in and out and that everyone she knew, including Petitioner, was aware of this habit. (I RT 80-81.) She testified that she was aware that Petitioner had access to firearms and that she did not want her son to have access to firearms because he was bipolar. (I RT 86.)

The People also called Gabriella Miller. Ms. Miller testified that, on November 10, 2015, at roughly 8:30am, she was at home and was awakened by the sound of someone pounding on her door and calling for help because, according to this person, his friend had been shot. (I RT 153.) She never saw the person's face but described him to the 9-1-1 dispatcher as being a white male in his 20s. (I RT 154-155.)

The People also called Fernando Juarez. He testified that, on November 10, 2015, he was at home and heard banging on his front door and he saw Petitioner asking for help. (I RT 163.) He followed Petitioner to the McCauley abode and, once inside, he saw that Mr. McCauley was not breathing. (I RT 169.) Mr. Juarez called 9-1-1. (1 RT 165.) Petitioner told Mr. Juarez that Mr. McCauley had shot himself. (I RT 166.) Mr. Juarez saw a shotgun on Mr. McCauley's bed with two casings about one foot away. (I RT 170.) Petitioner was holding Mr. McCauley and crying. (I RT

171.) After calling 9-1-1, he waited with Petitioner outside and Petitioner was crying a lot and almost collapsed. (I RT 184-185.)

The People also called Adam Kurylowicz. He testified he was a Riverside County Deputy with seven years' experience and that he was the lead investigator on the case. (I RT 193-194.) He testified he saw Mr. McCauley lying on the floor on his back with a gunshot wound. (I RT 194-195.) Thereafter, he contacted Petitioner. (I RT 196.) He testified that Petitioner was covered in blood and that Petitioner's zipper on his pants was unzipped. (I RT 197-198.) Mr. Kurylowicz saw a shotgun in the house in a soft zipper case with the butt of the weapon exposed. (I RT 198-199.)

He spoke with Petitioner at the scene and audio recorded the conversation, which was played for the jury. Petitioner told Mr. Kurylowicz that Mr. McCauley was depressed and had been hospitalized due to mental illness. Petitioner said he came to Mr. McCauley's home around 8:45 a.m. to take Mr. McCauley skeet shooting and Mr. McCauley was still in his boxers and he asked Petitioner to let him get dressed; so Petitioner went to get a Diet Pepsi and when Petitioner was out of the room, he heard the gunshot. (III CT 583-586.) Petitioner never said that he threatened Mr. McCauley or shot Mr. McCauley. (I RT 202.) He testified that Petitioner was frantic and emotional, and over defense objection, Mr. Kurylowicz was permitted to state that, in his estimation, Petitioner's emotional state was not convincing. (I RT 205-206, 212.)

The People also called Jason Corey. Mr. Corey testified that he was a Riverside County Investigator with 23 years' experience. (I RT 222.) Mr. Corey testified that he searched the "crime scene" and recovered one spent shotgun shell casing. (I RT 242.) He testified that Petitioner's vehicle was parked near Mr. McCauley's home and that he recovered no evidence from the interior of the vehicle. (II RT 258-260.) He testified that he examined the shotgun and that it was not loaded. (I RT 262.)

The People called Paul Grotefend. He testified he was a Riverside County Deputy with four years' experience. (II RT 293.) Mr. Grotefend testified that his duties involve examining digital devices. (II RT 294-295.) He examined three devices in the instant matter and recounted SMS messages that had been sent from Petitioner to Mr. McCauley. (II RT 301.) One message from Petitioner to Mr. McCauley said that Mr. McCauley gave Petitioner a cold sore in his mouth. (II RT 305.) Another from Petitioner said to Mr. McCauley, "Imma shoot you I swear," and "I'm serious, I will shoot you when I see you mother fucker." (II RT 307.) Petitioner sent another message to Mr. McCauley, "what is up in the hood you faggot." (II RT 312.) Mr. Grotefend testified that Petitioner sent another message that read, "I make you my bitch." (II RT 314.) In toto, 2,800 pages of messages were extracted and a total of 296 SMS messages were sent between Mr. McCauley and Petitioner. (II RT 354.)

The People also called Ron White, who testified that he was a Riverside County Deputy assigned to patrol and with 13 years' experience. (II RT 368.) He responded to the scene and contacted Petitioner and observed that Petitioner had blood and flesh on his face and clothing and that the zipper on Petitioner's pants was down. (II RT 369-382.) He followed Petitioner into Mr. McCauley's abode and Petitioner tried to give Mr. McCauley chest compressions. (II RT 382.) Mr. White testified that Mr. McCauley appeared to be dead when he arrived. (II RT 376.)

The People called Allison Hunt, who testified she was a forensic pathologist with the Riverside County Sheriff's Department. (II RT 396.) She testified she conducted the autopsy on Mr. McCauley on November 12, 2015, and she described Mr. McCauley as having been 6 feet 7 inches tall and weighing 249 pounds. (II RT 398.) She testified that Mr. McCauley's right arm had a shotgun entry wound and that the pellets traveled back out of his arm and into his chest. (II RT 400-401.) Specifically, she testified that the path the shot took was into the arm near the elbow and then through the arm, shattering the humerus and into Mr. McCauley's chest. (II RT 408.) She observed no defense wounds and no stippling (i.e., pinpoint injuries caused by unburned powder striking the skin) on Mr. McCauley's body. (II RT 409, 412.) She observed that the plastic wadding from the shotgun shell was embedded in Mr. McCauley's right arm. (II RT 418-419.) She determined the cause of death was blood loss from being shot in the heart and lungs. (II RT 424.) She testified that the

manner of death was homicide. (II RT 432.) She testified that, in her opinion, it was not suicide, since, physiologically, it would not have been possible for Mr. McCauley to have pulled the trigger and shot himself at the angle that would have been required in order to produce the wounds she observed. (II RT 432.)

The People also called one Samuel Murillo. Mr. Murillo testified that he was in county jail and that he was there with Petitioner for a period of time. (II RT 472-473.) He testified that, while he was confined to the county jail, he had roughly 10 conversations with Petitioner and that Petitioner had been charged with murder. (II RT 4 73.) He testified that, on one occasion, Petitioner told him that he (Petitioner) and his friend were going shooting and that the friend loaded the shotgun and handed it to Petitioner and the weapon discharged. (II RT 475.) On another occasion, Petitioner told him that he and his friend sent SMS messages to one another and that one text said that Petitioner had a sexually transmitted disease and that Petitioner was "a faggot," and Petitioner sent an SMS message back saying he would shoot the friend. (II RT 475-476.) Mr. Murillo testified that Petitioner was concerned that law enforcement authorities would find those SMS messages. (II RT 475-476.) Mr. Murillo testified that Petitioner never said to him that he shot his friend on purpose. (II RT 4 79.)

The People also called Edwin Baeza. He testified he was a Riverside County Sheriff's Investigator and that he searched Petitioner's home and found roughly 30

firearms and cartridges. (II RT 502.) He testified that none of the firearms were possessed illegally. (II RT 508.)

The People called Andrew Boji, who testified he was Petitioner's father and that he trained Petitioner how to shoot firearms. (II RT 517.)

*Defense Case*

The defense called James Crump, who testified that he knew both Petitioner and Mr. McCauley and knew they were friends and that he had seen them the weekend before this incident and observed no animosity between them. (III RT 555-556.)

The defense also called Petitioner. He testified that he had been in county jail since the incident in November 2015. (III RT 562.) He testified that he met Mr. McCauley when they were in high school and that they were best friends. (III RT 562-563.) He testified that they went fishing, hiking, jogging, shooting, and played basketball together. (III RT 563.) Petitioner denied there was ever any sort of romantic relationship between the two of them. (III RT 564.) He testified that he has been around firearms since he was 16 years of age and that his father had taught him about firearms and firearm safety. (III RT 565-566.)

On November 10, 2015, he had college class, but he cut class to meet Mr. McCauley. (Ill RT 569.) He acknowledged that he sent the SMS messages referenced during the prosecution's case, but he insisted that they were just kidding

around and that the reference to "killing" each other was from video games. (Ill RT 573-57 4.) He said that he had made videos of himself fooling around with firearms in a manner that his father would not approve of because what he was doing was not safe. (III RT 580.)

On November 10, 2015, he made plans to go skeet shooting with Mr. McCauley and to show him a new shotgun. (III RT 588-589.) Petitioner testified that Mr. McCauley was lying down, and that Petitioner was showing him the shotgun and fooling around with it and there were shells in the shotgun and that he "racked" the shotgun to expel them, and he thought they had all been expelled but when he and Mr. McCauley were laughing Petitioner touched the trigger and there was a shell inside the shotgun, and it discharged. (III RT 590-591.) He testified that he never wanted to hurt Mr. McCauley and that he told the officers about suicide because he was panicked. (III RT 599, 717.) He testified that he was interviewed by police for 8-15 hours and that he was not able to recall specifics. (III RT 717.)

*People's Rebuttal*

The People recalled Ana McCauley, who testified she observed Mr. McCauley lying flat in bed. (III RT 763.)

The People also called Lesandro Dean. He testified he interviewed Petitioner over 8-10 hours' time and that Petitioner got breaks during interview. (III RT 765-

766.) He testified that Petitioner gave him two different versions of what happened to Mr. McCauley. (III RT 767.)

### C.    Claims for Relief

### I.    Claim One

13.    Paragraphs 1 through 12 are hereby incorporated by reference.

14.    Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments where the trial court erroneously permitted the prosecution to introduce Petitioner's statement to law enforcement made outside the residence.

15.    Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

16.    The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim One is hereby incorporated by reference.

### II.    Claim Two

17.    Paragraphs 1 through 16 are hereby incorporated by reference.

18.    Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments where the trial court erroneously

permitted the prosecution to introduce Petitioner's statements to law enforcement made at the police station.

19.     Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

20.     The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Two is hereby incorporated by reference.

## III.   Claim Three

21.     Paragraphs 1 through 20 are hereby incorporated by reference.

22.     Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments where the trial court limited cross-examination as to the decedent's mental health issues.

23.     Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

24.     The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Three is hereby incorporated by reference.

## IV.   Claim Four

25.   Paragraphs 1 through 24 are hereby incorporated by reference.

26.   Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments where the trial court erred in permitting a prosecution law enforcement witness to opine whether Petitioner's emotional state was sincere.

27.   Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

28.   The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Four is hereby incorporated by reference.

## V.   Claim Five

29.   Paragraphs 1 through 28 are hereby incorporated by reference.

30.   Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments where the trial court erred in permitting a prosecution law enforcement witness to refer to the location where the decedent was found as a "crime scene."

31.     Because   Petitioner's   current   incarceration   is   unlawful   and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

32.     The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Five is hereby incorporated by reference.

**VI.     Claim Six**

33.     Paragraphs 1 through 32 are hereby incorporated by reference.

34.     Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments where the trial court erred in limiting defense evidence and cross-examination of a prosecution witness.

35.     Because   Petitioner's   current   incarceration   is   unlawful   and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

36.     The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Six is hereby incorporated by reference.

**VII.    Claim Seven**

37.     Paragraphs 1 through 36 are hereby incorporated by reference.

38.    Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments where the trial court failed to declare a mistrial after the jury was permitted to see a transcript referencing Petitioner's polygraph examination.

39.    Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments where the trial court erred in limiting defense evidence and cross-examination of a prosecution witness.

40.    Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

41.    The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Seven is hereby incorporated by reference.

**VIII.    Claim Eight**

42.    Paragraphs 1 through 41 are hereby incorporated by reference.

43.    Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments where the prosecutor committed prosecutorial misconduct in appealing to the passion and prejudices of the jury.

44.     Because   Petitioner's   current   incarceration   is   unlawful   and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

45.     The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Eight is hereby incorporated by reference.

**IX.    Claim Nine**

46.     Paragraphs 1 through 45 are hereby incorporated by reference.

47.     Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments where the cumulative prejudicial effect of the above errors denied Petitioner the right to a fair trial.

48.     Because   Petitioner's   current   incarceration   is   unlawful   and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

49.     The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Nine is hereby incorporated by reference.

**X.    Claim Ten**

50.     Paragraphs 1 through 49 are hereby incorporated by reference.

51.   Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments due to the ineffectiveness of counsel at trial.

52.   Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

53.   The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Ten is hereby incorporated by reference.

**XI.   Claim Eleven**

54.   Paragraphs 1 through 53 are hereby incorporated by reference.

55.   Petitioner was denied his federal constitutional right to due process under the Fifth, Sixth, and Fourteenth Amendments due to police and prosecutorial misconduct.

56.   Because Petitioner's current incarceration is unlawful and unconstitutional, this Honorable Court should grant the within Writ and release Petitioner.

57.   The portion of the attached Memorandum of Points and Authorities, including all facts and arguments therein, related to Claim Eleven is hereby incorporated by reference.

**D.    Prayer for Relief**

WHEREFORE, Petitioner respectfully requests that this Honorable Court:

1.    Take judicial notice of the transcripts[1], records, and files in Houston
      Michael Boji: Riverside County, case number RIF1502741; California
      Court of Appeal, Fourth District, Division Two, case number E071285;
      California Supreme Court case number S265898.

2.    Order Respondent and the People of California to file and serve a
      certified copy of the record on appeal and show cause why Petitioner is
      not entitled to the relief sought;

3.    Grant a hearing to enable Petitioner to satisfy his remaining burden of
      proof, namely that the error had a substantial and injurious effect or
      influence in determining the jury's verdict;

4.    Find that the state court unreasonably determined the facts and
      unreasonably applied clearly established Federal law;

5.    Grant this Petition for Writ of Habeas Corpus; and

6.    Grant Petitioner any additional, appropriate relief as ordered by this
      Honorable Court.

---

[1] Some of the pertinent transcripts are attached hereto as Exhibit B.

1

2      Dated: March 25, 2022                      Respectfully submitted,

3

4                                                 SPOLIN LAW P.C.

5

6                                      By:    /s/ Aaron Spolin

7                                             Attorney for the Petitioner

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **<u>VERIFICATION</u>**

I, Aaron Spolin, hereby declare as follows:

I am an attorney admitted to practice law in the State of California. I represent Petitioner herein, who is confined and restrained of his liberty at the Wasco State Prison in Kern County. I have read the foregoing Petition for Writ of Habeas Corpus and am informed and believe the allegations therein are true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 25, 2022, at Los Angeles, California.


<u>/s/ Aaron Spolin</u>
Aaron Spolin

1  AARON SPOLIN (State Bar No. 310379)
   ClientMail@SpolinLaw.com
2  SPOLIN LAW P.C.
   11500 W. Olympic Blvd., Suite 400
3  Los Angeles, CA 90064
   (310) 424-5816
4  (310) 312-4551
5
6  Attorney for Petitioner
7
8
9      **IN THE UNITED STATES DISTRICT COURT FOR THE**
       **CENTRAL DISTRICT OF CALIFORNIA**
10
11                                    )
                                      )  Case No.: 22-2410
12 HOUSTON MICHAEL BOJI,              )
                                      )
13           Petitioner,             )   **Petitioner Houston Michael Boji's**
                                      )  **Memorandum in Support of Verified**
14      vs.                          )   **Petition for Writ of Habeas Corpus by a**
                                      )  **Person in State Custody Under 28 U.S.C.**
15 HEATHER SHIRLEY, as Acting Warden, )  **§ 2254.**
16 Wasco State Prison,                )
                                      )
17           Respondent.             )
                                      )
18 ─────────────────────────────────)
19
20      Petitioner, through counsel Aaron Spolin, hereby submits the following
21 Memorandum of Points and Authorities in support of his Petition, filed pursuant to
22 28 U.S.C. § 2254.
23
24
25
26
27
28 ─────────────────────────────────────────────────────
       VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 1

# TABLE OF CONTENTS

Table of Authorities ................................................................. 5

1.   Statement of the Case ................................................. 14

2.   Law and Argument ...................................................... 14

   A.   Habeas Standards ................................................. 14

   B.   Timeliness ............................................................ 16

   C.   Exhaustion ........................................................... 18

   D.   Substantive Claims ............................................. 19

   I.   Claim One—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the Trial Court Erroneously Permitted the Prosecution to Introduce Petitioner's Statement to Law Enforcement Made Outside the Residence. ...................... 19

   II.   Claim Two—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the Trial Court Erroneously Permitted the Prosecution to Introduce Petitioner's Statement to Law Enforcement Made at the Police Station............................ 29

   III.   Claim Three—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where

the Trial Court Erroneously Limited Cross Examination Regarding the

Decedent's Mental Health Issues. ................................................................. 31

IV.    Claim Four—Petitioner Was Denied His Federal Constitutional Right

to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where

the Trial Court Erroneously Permitted a Prosecution Law Enforcement

Witness to Opine Regarding the Sincerity of Petitioner's Emotional State. .. 37

V.    Claim Five—Petitioner Was Denied His Federal Constitutional Right to

Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the

Trial Court Erroneously Permitted a Prosecution Law Enforcement Witness to

Refer to the Location Where the Decedent Died as a "Crime Scene." ........... 40

VI.    Claim Six—Petitioner Was Denied His Federal Constitutional Right to

Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the

Trial Court Erroneously Limited Defense Evidence and Cross-Examination of

a Prosecution Witness. ................................................................................. 41

VII.    Claim Seven—Petitioner Was Denied His Federal Constitutional Right

to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where

the Trial Court Failed to Declare a Mistrial After the Jury Was Permitted to

See a Transcript Referencing Petitioner's Polygraph Examination. ............... 46

VIII.   Claim Eight—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the Prosecutor Committed Misconduct in Appealing to the Passions and Prejudices of the Jury. ...................................................................... 47

IX.   Claim Nine—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the Cumulative Prejudicial Effect of all Above Errors Deprive Petitioner of Due Process. ................................................................................ 49

X.   Claim Ten—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Due to Counsel's Ineffectiveness at Trial. ................................................................. 51

XI.   Claim Eleven—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Due to Police and Prosecutorial Misconduct. ................................................. 81

Conclusion .............................................................................. 85

Certificate of Service .............................................................. 86

# TABLE OF AUTHORITIES

## Cases

Abatti v. Superior Court, 112 Cal.App.4th 39 (2003) .............................................. 68

*Alcorta v. Texas*, 355 U.S. 28 (1957) ..................................................................... 82

Alford v. Superior Court, 29 Cal.4th 1033 (2003) .................................................. 70

*Alford v. United States,* 282 U.S. 687 (1931) ......................................................... 34

*Baker v. Barbo,* 177 F.3d 149 (3d Cir. 1999) ........................................................ 80

*Baldwin v. Reese,* 541 U.S. 27 (2004) .................................................................... 18

*Baylor v. Estelle,* 94 F.3d 1321 (9th Cir. 1996) ..................................................... 58

Becerrada v. Superior Court, 131 Cal.App.4th 409 (2005) ..................................... 69

*Bell v. Cone,* 535 U.S. 685 (2002) ......................................................................... 15

*Berkemer v. McCarty,* 468 U.S. 420 (1984) ........................................................... 24

*Bouchillon v. Collins,* 907 F.2d 589 (5th Cir. 1990) ............................................. 80

*Bowen v. Roe* (1999) 188 F.3d 1157........................................................................ 17

*Brecht v. Abrahamson*, 507 U.S. 619 (1993)..................................................... 42, 48

*Brown v. Mississippi,* 297 U.S. 278 (1936) ........................................................... 20

*Cam v. Calderon,* 165 F.3d 1223 (9th Cir. 1999) ................................................... 58

*Chambers v. Mississippi*, 410 U.S. 284 (1973) ................................................. 42, 43

*Chavez v. Martinez,* 538 U.S. 760 (2003)............................................................... 25

*Cooper v. Dupnik,* 963 F.2d 1220 (9th Cir. 1992)................................................... 25

*Coy v. Iowa,* 487 U.S. 1012 (1988) .......................................................................... 31

*Crane v. Kentucky*, 476 U.S. 683 (1986)................................................................... 41

*Culombe v. Connecticut,* 367 U.S. 568 (1961) ................................................... 20, 21

*Darden v. Wainwright*, 477 U.S. 168 (1986)....................................................... 48, 49

*Davis v. Alaska,* 415 U.S. 308 (1974)............................................................ 32, 33, 34

*Delaware v. Fensterer,* 474 U.S. 15 (1985) ............................................................. 32

*Delaware v. Van Arsdall,* 475 U.S. 673 (1986)......................................... 32, 33, 34, 35

*Dickerson v. United States,* 530 U.S. 428 (2000) ................................. 20, 21, 22, 23

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) ..................................................... 38

*Douglas v. Alabama,* 380 U.S. 415 (1965)............................................................... 31

*Drayden v. White*, 232 F.3d 704 (9th Cir. 2000) ..................................................... 48

*Edwards v. Carpenter,* 529 U.S. 446 (2000) ........................................................... 18

*Estelle v. McGuire*, 502 U.S. 62 (1991) ................................................................... 38

*Fikes v. Alabama,* 352 U.S. 191 (1957)..................................................................... 26

Garcia v. Superior Court, 42 Cal.4th 63 (2007) ....................................................... 68

*Garden Grove Police Dept. v. Superior Court,* 89 C.A.4th 430 (2001)................. 67

*George v. Camacho,* 119 F.3d 1393 (9th Cir. 1997) ................................................ 25

*Giglio v. United States,* 405 U.S. 150 (1972) ..................................................... 82, 83

*Greene v. Fisher*, 565 U.S. 34 (2011)........................................................................ 15

*Greenwald v. Wisconsin,* 390 U.S. 519 (1968)......................................................... 24

Haggerty v. Superior Court, 117 Cal.App.4th 1079 (2004) ................................... 70

*Harrington v. Richter,* 562 U.S. 86 (2011) ............................................................. 14

*Hein v. Sullivan*, 601 F.3d 897 (9th Cir. 2010)...................................................... 49

*Hinojosa v. Superior Court,* 55 C.A.3d 692 (1976) ............................................. 67

*Holmes v. South Carolina*, 547 U.S. 319 (2006) .................................................. 43

*Howes v. Fields,* 565 U.S. 499 (2012) ................................................................... 28

*Hull v. Kyler,* 190 F.3d 88 (3d Cir. 1989)............................................................. 79

Hurd v. Superior Court, 144 Cal.App.4th 1100 (2006) ............................... 70, 71, 72

*In re Alvernaz,* 2 Cal.4th 924 (1992) ..................................................................... 78

*In re Cordero,* 46 Cal.3d 161 (1988) ..................................................................... 57

In re Edward S., 173 Cal.App.4th 387 (2009) ........................................................ 55

In re Hall, 30 Cal.3d 408 (1981) ....................................................................... 55, 57

In re Neely, 6 Cal.4th 901 (1993) ........................................................................... 56

*In re Noday,* 125 Cal.App.3d 507 (1981) ............................................................. 56

*In re Saunders*, 2 Cal.3d 1033 (1970).................................................................. 53

*In re Sixto,* 48 Cal.3d 1247 (1989) ...................................................................... 57

*Jamal v. VanDeKamp*, 926 F.2d 918 (9th Cir. 1991) .............................................. 38

*Kelly v. Small*, 315 F.3d 1063 (9th Cir. 2003)....................................................... 19

*LaJoie v. Thompson,* 217 F.3d 663 (9th Cir. 2000)............................................... 36

Lavallee v. Justices in Hampden Sup. Ct., 442 Mass. 228 (2004) ......................... 56

*MacFarlane v. Walter,* 179 F.3d 1131 (9th Cir. 1999) ............................................ 16

*Miller v. Fenton,* 474 U.S. 104 (1985) ...................................................... 20

*Miranda v. Arizona,* 384 U.S. 436 (1966) ...................................................... passim

*Montana v. Egelhoff,* 518 U.S. 37 (1996) ...................................................... 42

*Mooney v. Holohan,* 294 U.S. 103 (1935) ...................................................... 81, 82

*Moses v. Payne,* 555 F.3d 742 (2009) ...................................................... 16

*Napue v. Illinois,* 360 U.S. 264 (1959) ...................................................... 82, 83

*Nevada v. Jackson,* 569 U.S. 505 (2013) ...................................................... 43

*Nix v. Whiteside,* 475 U.S. 157 (1986) ...................................................... 80

*Northern Mariana Islands v. Mendiola,* 976 F.2d 475 (9th Cir. 1992) ................. 25

O'Brien v. Dubois, 145 F.3d 16 (1st Cir. 1998) ...................................................... 16

*O'Sullivan v. Boerckel,* 526 U.S. 838 (1999) ...................................................... 18

*Olden v. Kentucky,* 488 U.S. 227 (1988) ...................................................... passim

*Oregon v. Elstad,* 470 U.S. 298 (1985) ...................................................... 23

*Pate v. Robinson,* 383 U.S. 373 (1966) ...................................................... 80

*Payne v. Tennessee,* 501 U.S. 808 (1991) ...................................................... 38

*Pennsylvania v. Ritchie,* 480 U.S. 39 (1987) ...................................................... 32

People v. Collins, 115 Cal.App.4th 137 (2004) ...................................................... 69

*People v. Day,* 2 Cal.App.4th 405 (1992) ...................................................... 57

*People v. Fosselman,* 33 Cal.3d 572 (1983) ...................................................... 77

People v. Frierson, 25 Cal.3d 142 (1979) ........................................................ 55, 57

*People v. Hunt,* 174 Cal.App.3d 95 (1985) ........................................................ 77

People v. Johnson, 118 Cal.App.4th 292 (2004) .................................................. 69

*People v. Jones*, 186 Cal.App.4th 216 (2010) ...................................................... 55

*People v. Ledesma*, 43 Cal.3d 171 (1987) ................................................ 51, 55, 57

*People v. McAlpin,* 53 Cal.3d 1289 (1991) ........................................................ 74

*People v. McCary,* 166 Cal.App.3d 1 (1985) .................................................. 76, 77

People v. Mooc, 26 Cal.4th 1216 (2001) ........................................................ 67, 68

*People v.* Nguyen, 151 Cal.App.4th 1473 (2007) ........................................ 71, 72, 73

*People v. Patterson,* 2 Cal.5th 885 (2017) ........................................................ 52

*People v. Pennington,* 66 Cal.2d 508 (1968) ...................................................... 81

People v. Samuels, 36 Cal.4th 96 (2005) ............................................................ 70

*People v. Savvides,* 1 N.Y.2d 554 (1956) ............................................................ 83

People v. Thimmes, 138 Cal.App.4th 1207 (2006) .............................................. 56

People v. Watson, 46 Cal.2d 818 (1956) .............................................................. 70

*Pitchess v. Superior Court,* 11 C.3d 531 (1974) ............................................ passim

*Pointer v. Texas,* 380 U.S. 400 (1965) ................................................................ 31

*Renderos v. Ryan*, 469 F.3d 788 (9th Cir. 2006) ................................................ 48

*Riley v. Payne,* 352 F.3d 1313 (9th Cir. 2003) .................................................. 54

*Rock v. Arkansas*, 483 U.S. 44 (1987) ........................................................ 35, 43

*Roman v. Estelle,* 917 F.2d 1505 (9th Cir. 1990) .................................................... 18

*San Jose v. Superior Court (Michael B.),* 5 C.4th 47 (1993) ................................ 67

*Sanders v. Ratelle,* 21 F.3d 1446 (9th Cir. 1994) .................................................. 57

*Schell v. Witek,* 218 F.3d 1017 (9th Cir. 2000) ...................................................... 58

*Schneckloth v. Bustamonte,* 412 U.S. 218 (1973) .................................... 20, 21, 24

*Seidel v. Merkle*, 146 F.3d 750 (9th Cir. 1998) ...................................................... 57

*Shaw v. Terhune*, 380 F.3d 473 (9th Cir. 2004) ..................................................... 48

*Sims v. Georgia,* 389 U.S. 404 (1967) ................................................................... 26

*Smith v. Phillips*, 455 U.S. 209 (1982) .................................................................. 48

*Strickland v. Washington,* 466 U.S. 668 (1984) ........................................... passim

*Taylor v. Illinois*, 484 U.S. 400 (1988) .................................................................. 42

*Thompson v. Keohane,* 516 U.S. 99 (1995) ............................................................ 28

*United States v. Berry,* 627 F.2d 193 (9th Cir.1980) ............................................. 50

*United States v. Espinosa,* 827 F.2d 604 (9th Cir. 1987) ....................................... 38

*United States v. Green,* 648 F.2d 587 (9th Cir.1981) ............................................. 50

*United States v. Hibler,* 463 F.2d 455 (9th Cir.1972) ............................................ 50

*United States v. Kim,* 292 F.3d 969 (9th Cir. 2002) .......................................... 27, 28

*United States v. Schoneberg,* 396 F.3d 1036 (9th Cir. 2005) ................................. 36

*United States v. Wallace,* 848 F.2d 1464 (9th Cir.1988) ........................................ 50

*Vasquez v. Hillary,* 474 U.S. 245 (1986) ............................................................... 18

*Warrick v. Superior Court*, 35 Cal.4th 1011 (2005) .......................................... 68, 69

*Washington v. Secretary Pa. Dept. of Corrections*, 801 F.3d 160 (3d Cir. 2015).. 39

*Washington v. Texas*, 388 U.S. 14 (1967) .................................................. 42, 43, 44

*Williams v. Taylor,* 529 U.S. 362 (2000) ........................................................ 15, 39

*Withrow v. Williams,* 507 U.S. 680 (1993) ............................................................ 21

*Wood v. Alaska,* 957 F.2d 1544 (9th Cir. 1992) ................................................... 35

*Yarborough v. Alvarado,* 541 U.S. 652 (2004) ...................................................... 15

*Yarborough v. Gentry,* 540 U.S. 1 (2003) ............................................................. 51

**Statutes**

28 U.S.C. § 2244(d)(1) ........................................................................................ 17

28 U.S.C. § 2244(d)(2) ........................................................................................ 17

28 U.S.C. § 2254 ................................................................................................. 14

28 U.S.C. § 2254(d) ...................................................................................... 14, 16

28 U.S.C. § 2254(d)(1) .................................................................................. 15, 16

28 U.S.C. § 2254(d)(1)-(2) ................................................................................. 16

28 U.S.C. § 2254(d)(2) ........................................................................................ 39

28 U.S.C. § 2254(e)(1) ........................................................................................ 16

28 U.S.C. 2254(b)(1)(A) ..................................................................................... 18

California Code of Evidence § 352 ..................................................................... 35

California Evidence Code § 1043(b)(3) ............................................................... 67

California Evidence Code § 350 ................................................................ 45

California Evidence Code § 351.1 ............................................................. 47

California Evidence Code § 351.1(a) ........................................................ 46

P.C. 1367(a) ............................................................................................. 80

## Other Authorities

ABA Standards for Criminal Justice Prosecution Function and Defense Function

   (3d ed. 1993) ....................................................................................... 54

Nat. Legal Aid & Defender Assoc., Performance Guidelines for Criminal Defense

   Representation (NLADA 1995) Guideline 4.1 .................................... 55

O'Hara, Fundamentals of Criminal Investigation 112 (1956) ................... 22

## Rules

Fed. R. Evid. 402 .................................................................................... 45

R.P.C. 1.1(a) ........................................................................................... 52

R.P.C. 1.2(a) ........................................................................................... 52

R.P.C. 1.3(a) ........................................................................................... 52

R.P.C. 1.4(a)(1)-(4) ................................................................................. 53

R.P.C. 1.4(b) ........................................................................................... 53

R.P.C. 2.1 ................................................................................................ 53

R.P.C. 3.1(b) ........................................................................................... 53

U.S.Sup.Ct. Rule 13.1 ............................................................................. 18

**Constitutional Provisions**

California Constitution, Article I, Section 15 ........................................................ 84

U.S. Const., 14th Amend. ................................................................... passim

U.S. Const., 5th Amend. ..................................................................... passim

U.S. Const., 6th Amend. ..................................................................... passim

U.S. Const., 8th Amend. ......................................................................... 84

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. § 2254)

**1.      Statement of the Case**

Petitioner hereby incorporates paragraphs 1-57 of his Verified Petition for Writ of Habeas Corpus by a Person in State Custody, above, which includes the statement of facts.

**2.      Law and Argument**

**A.      Habeas Standards**

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Harrington v. Richter,* 562 U.S. 86, 97 (2011). The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under 28 U.S.C. § 2254(d)(1), a state court's decision is "contrary to . . . clearly established Federal law," as determined by the United States Supreme Court, "if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell v. Cone,* 535 U.S. 685, 694 (2002). A state court's decision "involve[s] an unreasonable application of[ ] clearly established Federal law" as determined by the U.S. Supreme Court, within the meaning of § 2254(d)(1), "if the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts" or "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor,* 529 U.S. 362, 407 (2000). The Supreme Court has underscored that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410 (emphasis in original). Accordingly, this Honorable Court may not grant habeas relief if "fairminded jurists could disagree over whether" the state court's decision was correct. *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004).

The governing law is the law that existed at the time the state court rendered its decision. *Greene v. Fisher*, 565 U.S. 34, 40 (2011). With regard to Ninth Circuit Court of Appeals opinions, such may be persuasive authority for purposes of

determining whether a particular state court decision is an "unreasonable application" of Supreme Court law, and also may help to determine what law is "clearly established." *See MacFarlane v. Walter,* 179 F.3d 1131, 1139 (9th Cir. 1999) (looking to Ninth Circuit caselaw to confirm that Supreme Court case clearly establishes a legal rule); citing *O'Brien v. Dubois,* 145 F.3d 16, 25 (1st Cir. 1998) (holding that "to the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness *vel non* of the state court's treatment of the contested issue").

As to whether the state court unreasonably determined the facts in light of the evidence presented, the statement of facts from the last reasoned state court decision "is afforded a presumption of correctness that may be rebutted only by clear and convincing evidence." *Moses v. Payne,* 555 F.3d 742, 746 n. 1, 751 (2009), citing 28 U.S.C. § 2254(d)(1)-(2) & (e)(1).

**B.    Timeliness**

Pursuant to 28 U.S.C. § 2254(d), a "1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2254(d)(1). The limitation period shall run from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(1)-(2).

Petitioner respectfully submits that his instant petition is timely. On September 7, 2018, the trial court sentenced Petitioner to 40 years to life imprisonment. On September 10, 2018, Petitioner filed a timely notice of appeal. On October 26, 2020, the California Court of Appeal for the Fourth District, Division Two, affirmed the judgment. On December 3, 2020, Petitioner filed a petition for review in the California Supreme Court, which was denied on January 13, 2021.

Therefore, Petitioner's judgment of sentence became final on April 13, 2021, 90 days after the California Supreme Court denied his petition for review on direct appeal and Petitioner refrained from petitioning the United States Supreme Court for writ of certiorari. *Bowen v. Roe*, 188 F.3d 1157, 1158-59 (9th Cir. 1999);

U.S.Sup.Ct. Rule 13.1. Petitioner timely files the instant petition before April 13, 2022.

## C.    Exhaustion

Pursuant to 28 U.S.C. 2254(b)(1)(A), "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State[.]" Claims must be raised in accordance with state procedural rules. *Edwards v. Carpenter,* 529 U.S. 446, 453 (2000). Fundamental to federal habeas is the principle that the highest state court should be given a fair opportunity to first rule on the petitioner's claims. *O'Sullivan v. Boerckel,* 526 U.S. 838, 847 (1999) (exhaustion requires presentation to highest state court where presentation is part of the state's ordinary appellate procedure). Appellate issues are only exhausted to the extent that the particular issue is included in a petition for review to the California Supreme Court. *Roman v. Estelle,* 917 F.2d 1505, 1506 (9th Cir. 1990). The federal claim must be "fairly presented" to the state courts. *Baldwin v. Reese,* 541 U.S. 27 (2004). Additional evidence may be admitted that does not "fundamentally alter" the claim originally presented to the state courts. *Vasquez v. Hillary,* 474 U.S. 245, 260 (1986).

Petitioner raised claims one through nine in the California Court of Appeal and the California Supreme Court, which addressed the claims on the merits. Thus,

the claims are exhausted and subject to the AEDPA. Petitioner has not yet exhausted claims ten or eleven. Along with the instant petition, Petitioner files an application for a stay pursuant to *Kelly v. Small*, 315 F.3d 1063 (9th Cir. 2003), while he exhausts his remedies in state court with respect to claims ten and eleven.

**D.    Substantive Claims**

**I.     Claim   One—Petitioner   Was   Denied   His   Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the Trial Court Erroneously Permitted the Prosecution to Introduce Petitioner's Statement to Law Enforcement Made Outside the Residence.**

Petitioner respectfully submits that the State court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The California State courts identified the correct, governing legal rule but unreasonably applied it to the facts. Further, for the reasons set forth below, Petitioner has forwarded clear and convincing evidence that the last reasoned state court decision is not entitled to the presumption of correctness.

"Over time, our cases recognized two constitutional bases for the requirement that a [statement] be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth

Amendment." *Dickerson v. United States,* 530 U.S. 428 (2000), at 433. Whereas the Fifth Amendment by its text safeguards the individual against being "compelled in any criminal case to be a witness against himself," U.S. Const., 5th Amend., the due process protection stems from the principle that "tactics for eliciting inculpatory statements must fall within the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness," *Miller v. Fenton,* 474 U.S. 104, 110 (1985); *see also id.* at 109 ("[C]onfessions procured by means 'revolting to the sense of justice' [can]not be used to secure a conviction" (quoting *Brown v. Mississippi,* 297 U.S. 278, 286 (1936))).

The due process protection is embodied in a voluntariness inquiry that asks "whether a defendant's will was overborne" by looking at the "totality of all the surrounding circumstances." *Dickerson, supra,* at 434 (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973)); *see also Schneckloth, supra,* at 225–26 ("Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." (quoting *Culombe v. Connecticut,* 367 U.S. 568, 602 (1961))). The assessment of the totality of the circumstances may include consideration of the length and location of the interrogation; evaluation of the maturity, education, physical and mental condition

of the defendant; and determination of whether the defendant was properly advised of his *Miranda* rights. *Miranda v. Arizona,* 384 U.S. 436 (1966); *Withrow v. Williams,* 507 U.S. 680, 693–94 (1993). Thus, by its nature, the voluntariness inquiry requires a case-by-case assessment, leading courts to grapple with the application of voluntariness principles in a variety of circumstances. *See Schneckloth, supra,* at 224 ("[Confession] cases yield no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen. 'The notion of "voluntariness,"' Mr. Justice Frankfurter once wrote,' is itself an amphibian.'" (quoting *Culombe, supra,* at 604–605)).

*Miranda* considered the Supreme Court's longstanding voluntariness jurisprudence in the then-new context of modern police custodial interrogations. This context "brought with it an increased concern about confessions obtained by coercion." *Dickerson, supra,* at 434–35. Drawing from police manuals and texts used by law enforcement, *Miranda* described the practices used by police officers during these interrogations to induce a suspect to confess:

> The texts ... stress that the major qualities an interrogator should possess are patience and perseverance. One writer describes the efficacy of these characteristics in this manner:
>
> "In the preceding paragraphs emphasis has been placed on kindness and stratagems. The investigator will, however, encounter many situations where the sheer weight of his personality will be the deciding factor. Where emotional appeals and tricks are employed to no avail, he must rely on an oppressive atmosphere of dogged persistence. He must interrogate steadily and without relent, leaving

the subject no prospect of surcease. He must dominate his subject and overwhelm him with his inexorable will to obtain the truth. He should interrogate for a spell of several hours pausing only for the subject's necessities in acknowledgment of the need to avoid a charge of duress that can be technically substantiated. In a serious case, the interrogation may continue for days, with the required intervals for food and sleep, but with no respite from the atmosphere of domination. It is possible in this way to induce the subject to talk without resorting to duress or coercion. The method should be used only when the guilt of the subject appears highly probable."

*Miranda, supra,* at 450–51 (quoting O'Hara, Fundamentals of Criminal Investigation 112 (1956)). The Court concluded: "It is obvious that such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner . . . . An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak." *Id.* at 457, 461. As the Court later described the holding of *Miranda,* premised on the quoted observations, "[w]e concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements." *Dickerson, supra,* at 435.

The *Miranda* Court thus considered how to safeguard against involuntary confessions at a time when inherent pressure permeated an increasingly common investigation methodology. The due process voluntariness inquiry provided a measure of protection but required case-by-case analysis. If a certain category of cases—those involving confessions during custodial interrogations—shared the

characteristic of inherent pressure, a uniform check at the front end of the interrogation—the *Miranda* warnings, rooted in the Fifth Amendment privilege against compelled self-incrimination—could be more effective and efficient than the due process back-end check. In cases in which this procedural safeguard was not satisfied, any statements made must be suppressed. *Miranda, supra,* at 444. *Miranda* thus established an irrebuttable "presumption of coercion" for unwarned statements made during custodial interrogations. *See Oregon v. Elstad,* 470 U.S. 298, 307 (1985).

This prophylactic requirement admittedly sweeps in noncoerced statements, and in that respect is broader than the due process voluntariness requirement. *See Miranda, supra,* at 457 ("In these cases [decided in *Miranda*], we might not find the defendants' statements to have been involuntary in traditional terms."); *see also Dickerson, supra,* at 444 (reaffirming *Miranda* while recognizing that "[t]he disadvantage of the *Miranda* rule is that statements which may be by no means involuntary, made by a defendant who is aware of his 'rights,' may nonetheless be excluded and a guilty defendant go free as a result.").

The Supreme Court nonetheless concluded that two aspects of the *Miranda* rule outweigh the concerns raised by its overbreadth. First, it is a bright-line rule and thus easier for law enforcement and courts to apply than the voluntariness analysis. *See Dickerson, supra,* at 444 (noting that the totality of the circumstances inquiry

"is more difficult than *Miranda* for law enforcement officers to conform to, and for courts to apply in a consistent manner"). Second, and more significantly for our purposes, the overbreadth was considered by the Court to be the lesser of two evils. "In *Miranda,* the Court noted that reliance on the traditional totality-of-the-circumstances test raised a risk of overlooking an involuntary custodial confession, a risk that the Court found unacceptably great when the confession is offered in the case in chief to prove guilt." *Id.* at 442 (internal citations omitted).

Critically, *Miranda's* overinclusiveness in suppressing some noncoerced confessions made after inadequate warnings does not apply equally in the other direction: Warnings and a waiver are *not* dispositive of a confession's voluntariness. *See id.* at 444 ("The requirement that *Miranda* warnings be given does not, of course, dispense with the voluntariness inquiry."); *Berkemer v. McCarty,* 468 U.S. 420, 433 n. 20 (1984) ("We do not suggest that compliance with *Miranda* conclusively establishes the voluntariness of a subsequent confession."). Moreover, when analyzing the voluntariness of a confession following *Miranda* warnings, the delivered warnings, even if sufficient to satisfy *Miranda's* prophylactic rule, must be examined in detail, as they are part of the circumstances pertinent to the voluntariness inquiry. *See Schneckloth, supra,* at 226 (listing "the lack of any advice to the accused of his constitutional rights" as a possible factor in the voluntariness analysis); *Greenwald v. Wisconsin,* 390 U.S. 519, 521 (1968) (per curiam)

(considering "the lack or inadequacy of warnings as to constitutional rights" in voluntariness analysis).

In *Northern Mariana Islands v. Mendiola,* 976 F.2d 475 (9th Cir. 1992), *overruled on other grounds by George v. Camacho,* 119 F.3d 1393 (9th Cir. 1997) (en banc), for example, the Ninth Circuit declined to decide whether the questionable *Miranda* warnings alone warranted suppression of the defendant's subsequent confession. *Id.* at 483. Instead, the Court considered the weakness of the warnings as part of the voluntariness analysis, noting that "*Miranda* rights were administered to Mendiola in a manner that was confusing and affirmatively misleading," a fact that contributed to the finding that his confession was involuntary. *Id.* at 485–86. Similarly, in *Cooper v. Dupnik,* 963 F.2d 1220 (9th Cir. 1992) (en banc), *overruled on other grounds by Chavez v. Martinez,* 538 U.S. 760 (2003), a § 1983 action, the interrogating officer

> fully advised Cooper of his *Miranda* rights, but deliberately turned the advisement into what he hoped Cooper would perceive as a joke. [Officer] Barkman's psychological ploy was designed to make Cooper ignore the warnings, and begin to talk. Barkman intended to undercut Cooper's Constitutional right not to talk to the Task Force by complying with *Miranda*'s safeguards in form only, not in spirit or in substance.

*Id.* at 1228. In concluding that Cooper stated a cause of action based on a coercive interrogation resulting in involuntary statements, the Court noted that "Cooper was advised improperly of his *Miranda* rights. Police officers may not make a mockery of our Constitutional law by turning an advisement of rights into a persiflage." *Id.* at

1248; *see also Sims v. Georgia,* 389 U.S. 404, 406–07 (1967) (per curiam) (holding—in a case in which evidence suggested defendant was subjected to physical violence, had been in police custody for eight hours without access to friends or counsel, and was of limited education and mental capacity—that "[u]nder such circumstances the fact that the police may have warned petitioner of his right not to speak is of little significance"); *Fikes v. Alabama,* 352 U.S. 191, 193, 197 (1957) (finding confession involuntary, and noting that the interrogating officer's "testimony that he repeatedly advised petitioner 'that he was entitled to counsel and his various rights' must be viewed in the light of the facts concerning petitioner's" schizophrenia and limited education).

The individualized examination of *Miranda* warnings in a voluntariness analysis relates back to the underlying purpose of the *Miranda* warnings, to mitigate the inherent pressure in police interrogations:

> In order to combat these pressures [inherent in a custodial interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.

*Miranda, supra,* at 467. The warning that a suspect has the right to remain silent

> is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere. It is not just the subnormal or woefully ignorant who succumb to an interrogator's imprecations, whether implied or expressly stated, that the interrogation will continue until a confession is obtained....

*Id.* at 468 (footnote omitted). The warning that anything the suspect says can be used against him in court serves in substantial part to ensure that the suspect is aware of the seriousness of the situation:

> This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest.

*Id.* at 469. Where the warnings, although technically accurate, are conveyed in such a way as to undermine the suspect's "aware[ness] that he is faced with a phase of the adversary system," *id.,* and are further weakened by "[express] imprecations ... that the interrogation will continue until a confession is obtained," *id.* at 468, those circumstances can be pertinent in appraising the totality of the circumstances concerning the voluntariness of any ensuing confession.

Finally, custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). *See United States v. Kim,* 292 F.3d 969, 973 (9th Cir. 2002) ("An officer's obligation to give a suspect *Miranda* warnings before interrogation extends only to those instances where the individual is 'in custody.'" (internal citation omitted)). In determining whether a suspect was in custody, "[t]wo discrete

inquiries are essential...." *Thompson v. Keohane,* 516 U.S. 99, 112 (1995). First, a court must determine "what [objective] circumstances surround [ed] the interrogation...." *Id.* Second, a court must decide whether "a reasonable person [in those objective circumstances would] have felt he or she was not at liberty to terminate the interrogation and leave." *Id.; see also Howes v. Fields,* 565 U.S. 499 (2012) (setting forth a non-exhaustive list of factors that are pertinent to the determination whether a reasonable person would have believed he could freely walk away from the interrogators); *Kim, supra,* at 974 (same).

Here, the interrogation occurred outside of the scene where the decedent had just shot himself and Petitioner was still covered in the decedent's blood. The police immediately directed Petitioner's movement and restricted him from leaving, ordering him to stand on the sidewalk. Petitioner complied. Another police officer then ordered Petitioner to sit on the curb until an officer was available to speak with him. Petitioner again complied. A third police officer then came and conducted a recorded interrogation of Petitioner.

The police officer's questions were necessarily designed to elicit an incriminating response from Petitioner since someone had died and Petitioner was the only individual with the decedent when he shot himself. The police were clearly attempting to goad Petitioner into admitting involvement in the death as it would be more salacious for them. Although Petitioner's car was nearby, a reasonable person

in Petitioner's position would not have felt free to leave based on the police officers' conduct and questioning. Accordingly, he was clearly in custody and subjected to an interrogation for purposes of *Miranda*, but the police never administered his rights. Thus, the government failed to rebut the presumption that the statements were coerced. It is beyond cavil that failure to obey an officer's request will typically be met with an unpleasant response. Accordingly, Petitioner's statements at the scene should have been suppressed, and this Honorable Court should grant the within Writ and release Petitioner.

**II.   Claim Two—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the Trial Court Erroneously Permitted the Prosecution to Introduce Petitioner's Statement to Law Enforcement Made at the Police Station.**

Petitioner respectfully submits that the State court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The California State courts identified the correct, governing legal rule but unreasonably applied it to the facts. Further, for the reasons set forth below, Petitioner has forwarded clear and convincing evidence that the last reasoned state court decision is not entitled to the presumption of correctness.

After taking Petitioner's statement at the scene as set forth above, police placed Petitioner in the patrol car and took him to the police station. Police did not permit Petitioner to wash the decedent's blood off, which was covering him. Further, Petitioner was extremely distraught while at the scene to the point where he almost collapsed. Petitioner was taken to the sheriff's station and was not permitted to drink water for two or three hours although he told officers several times that he was thirsty. Petitioner was interrogated there, and then driven to San Bernardino where he was required to submit to a polygraph. This took over two to two- and one-half hours. The whole procedure lasted roughly 12 hours during which time Petitioner was not provided with the bare necessities of life—food or water. Petitioner indicated at the beginning of the interaction, and repeated it several times throughout the course thereof, that he was hungry and thirsty.

Thus, it is clear that the police engaged in coercive and manipulative tactics after taking Petitioner into custody which overbore his ability to act volitionally, intelligently, or knowingly. Petitioner was a mere 18 years old with no prior experience with the criminal justice system, let alone police interrogation. Petitioner's statements were not voluntarily given. Accordingly, this Honorable Court should grant the within Writ and release Petitioner.

**III.    Claim Three—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the Trial Court Erroneously Limited Cross Examination Regarding the Decedent's Mental Health Issues.**

Petitioner respectfully submits that the State court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The California State courts identified the correct, governing legal rule but unreasonably applied it to the facts. Further, for the reasons set forth below, Petitioner has forwarded clear and convincing evidence that the last reasoned state court decision is not entitled to the presumption of correctness.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const., 6th Amend. This right, which is incorporated by the Fourteenth Amendment so as to apply to state prosecutions, *Pointer v. Texas,* 380 U.S. 400, 403 (1965), "guarantees the defendant [not only] a face-to-face meeting with witnesses appearing before the trier of fact," *Coy v. Iowa,* 487 U.S. 1012, 1016 (1988), but also the right to cross-examine those witnesses. *Pointer, supra,* at 404, 406-07; *Douglas v. Alabama,* 380 U.S. 415, 418 (1965) ("[A] primary interest secured by [the Confrontation Clause] is the right of cross-examination....").

Thus, as is relevant here, "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed ... 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.'" *See Delaware v. Van Arsdall,* 475 U.S. 673, 680 (1986) (quoting *Davis v. Alaska,* 415 U.S. 308, 318 (1974)); *see also Olden v. Kentucky,* 488 U.S. 227, 231 (1988) (per curiam) (quoting *Van Arsdall, supra,* at 680).

"[T]he right to cross-examine includes the opportunity to show [not only] that a witness is biased, [but also] that the testimony is exaggerated or [otherwise] unbelievable." *Pennsylvania v. Ritchie,* 480 U.S. 39, 51-52 (1987) (plurality); *see also Delaware v. Fensterer,* 474 U.S. 15, 22 (1985) (per curiam) ("[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose [testimonial] infirmities[such as forgetfulness, confusion, or evasion] through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony."); *Davis, supra,* at 316 ("[T]he cross-examiner is ... permitted to delve into the witness' story to test the witness' perceptions and memory, [and] ... has traditionally been allowed to impeach, i.e., discredit, the witness.").

Thus, cross-examination may implicate the Sixth Amendment without implying conscious or malicious fabrication on the part of the witness so long as it

otherwise bears on the witness's reliability or credibility. *See Van Arsdall, supra,* at 680. For example, in *Davis,* the defendant sought to cross-examine a prosecution witness regarding the fact that, at the time he identified the defendant to the police, he was on probation after having been adjudicated a juvenile delinquent. *Davis, supra,* at 309-11. In so doing, the defense sought to show not that the prosecution witness consciously or maliciously lied, but that he might have made a "hasty and faulty identification" of the defendant to shift suspicion away from himself, or that he might have been subject to "undue pressure" from the police resulting from fear of possible probation revocation. *Id.* at 311, 317-18. The Supreme Court held that the precluded cross-examination came within the ambit of the Sixth Amendment. *Id.* at 317-18.

Cross-examination may implicate the Sixth Amendment even if it is not certain to affect the jury's assessment of the witness's reliability or credibility. *See Davis, supra,* at 317 (refusing to "speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted th[e] [defendant's] line of reasoning had counsel been permitted to fully present it," but nevertheless concluding that the trial court violated the defendant's Sixth Amendment right to cross-examination by precluding the proffered cross-examination). Rather, it is sufficient that a jury "might reasonably" have questioned the witness's reliability or credibility in light of the cross-examination. *Van Arsdall, supra,* at 679; *see also Olden, supra,* at 232

(1988) (quoting *Van Arsdall, supra,* at 680); *Van Arsdall, supra,* at 680 (holding that the defendant "state[d] a violation of the Confrontation Clause" where "[a] reasonable jury might have received a significantly different impression of [the prosecution witness's] credibility had [the defendant's] counsel been permitted to pursue his proposed line of cross-examination"); *Davis, supra,* at 319 (concluding that the trial court violated the defendant's Sixth Amendment right to cross-examination where "[s]erious damage to the strength of the State's case would have been a real possibility had [the defendant] been allowed to pursue [the proffered] line of inquiry").

Even where cross-examination bears on the reliability or credibility of a witness and sufficiently so such that a jury might reasonably question such reliability or credibility, the cross-examination must nevertheless be "appropriate":

> It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the [reliability or credibility] of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

*See Van Arsdall, supra,* at 679; *see also Olden, supra,* at 232 (same); *Davis, supra,* at 316 (noting that cross-examination is "[s]ubject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation"); *Alford v. United States,* 282 U.S. 687, 694 (1931) (holding that a trial court "may exercise a

reasonable judgment in determining when [a] subject [on cross-examination] is exhausted" and has "a duty to protect [the witness] from questions which go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate"); *Wood v. Alaska,* 957 F.2d 1544, 1549-54 (9th Cir. 1992) (explaining that even relevant cross-examination may properly be excluded if its probative value is outweighed by other legitimate interests).

Rather significantly, however, these restrictions must be "reasonable," *Van Arsdall, supra,* at 679, and "may not be arbitrary or disproportionate to the purposes they are designed to serve." *Lucas, supra,* at 151 (quoting *Rock, supra,* at 56). For example, in *Van Arsdall,* although the Supreme Court noted that trial courts may impose "reasonable limits" on cross-examination, it nevertheless held that the trial court there violated the defendant's Sixth Amendment right to cross-examination when, pursuant to the equivalent of California Code of Evidence § 352, it prohibited "*all* inquiry" about an event that the State conceded had taken place and that a jury "might reasonably" have found bore on the witness's reliability or credibility. *Van Arsdall, supra,* at 676, 679 (emphasis in original).

Likewise, in *Olden,* the Supreme Court acknowledged that a trial court may impose "reasonable limits" on cross-examination, but, in the very same breath, concluded that the limitation there, again, pursuant to the equivalent of California Code of Evidence § 352, was "beyond reason" because mere "[s]peculation" as to

the prejudicial effect of precluded cross-examination could not justify its exclusion where it had "such strong potential to demonstrate the falsity of [the prosecution witness's] testimony." *Olden, supra,* at 230, 232. The Ninth Circuit too has held that precluding cross-examination in certain circumstances was unreasonable, arbitrary or disproportionate. *E.g., United States v. Schoneberg,* 396 F.3d 1036, 1042 (9th Cir. 2005) (holding that the trial court was "erroneous" in characterizing the precluded cross-examination as irrelevant and misleading and, thus, concluding that "we cannot sustain the limitation on cross examination as an exercise of permissible discretion"); *cf. LaJoie v. Thompson,* 217 F.3d 663, 671-73 (9th Cir. 2000) (concluding that the exclusion of evidence pursuant to a state rape shield law was arbitrary and disproportionate to the purposes served by the rape shield law and, thus, that the exclusion of the evidence was an unreasonable application of clearly established law as determined by the Supreme Court).

Here, the prosecution, through direct examination of decedent's mother, opened the door to the fact that she did not want the decedent to be anywhere near guns because he was bipolar. This necessarily suggested that the victim may have harmed himself if he had been given access to firearms by virtue of his bipolar diagnosis,[2] thus suggesting that he may have shot himself. Those with bipolar

---

[2] https://www.webmd.com/bipolar-disorder/guide/bipolar-disorder-suicide/

disorder are at a greater risk of suicide than the general population.[3] Accordingly, there was an extremely high likelihood that permitting Petitioner to explore the contours of the decedent's bipolarity would have prevented the jury with facts that would have borne on its determination as to whether Petitioner or the decedent was the actor and was thus a crucial inquiry to safeguard Petitioner's due process rights. Indeed, there was evidence at trial that the decedent shot himself. It was thus extremely prejudicial in that Petitioner was prevented from presenting a defense to the jury and demonstrating that he is innocent. Accordingly, this Honorable Court should grant the within Writ and release Petitioner.

**IV.    Claim Four—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the Trial Court Erroneously Permitted a Prosecution Law Enforcement Witness to Opine Regarding the Sincerity of Petitioner's Emotional State.**

Petitioner respectfully submits that the State court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The California State courts identified the correct, governing legal rule but unreasonably applied it to the facts. Further, for the reasons set forth below,

---

[3] *Id.*

Petitioner has forwarded clear and convincing evidence that the last reasoned state court decision is not entitled to the presumption of correctness.

Federal law does not permit law enforcement officers to offer expert testimony encompassing a defendant's mental state or condition if it encompasses an ultimate issue to be resolved by the trier of fact. *United States v. Espinosa*, 827 F.2d 604, 612 (9th Cir. 1987). Similarly, a witness may not give a direct opinion on the defendant's guilt or innocence. *Id.*

Even if the error were cast as a state law error, the effects of a state law error, or an adverse event that does not violate state law, may "so infuse the trial with unfairness as to deny due process of law" under the Fifth, Sixth, and Fourteenth Amendments. *Estelle v. McGuire*, 502 U.S. 62, 75 (1991), citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Where a defendant challenges a state procedural issue, the reviewing court must evaluate whether "the state proceedings satisfied due process." *Jamal v. VanDeKamp*, 926 F.2d 918, 919 (9th Cir. 1991). Similarly, where "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991).

Further, a writ may be granted in circumstances where the state adjudication of the claim resulted in a decision, such as the decision in Petitioner's case, that was based on an unreasonable determination of the facts in light of the evidence

presented in the state court proceeding. 28 U.S.C. § 2254(d)(2). Finally, a writ will issue where the "state court identifies the correct governing legal rule . . . but . . . unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor,* 529 U.S. 362, 407 (2000); *Washington v. Secretary Pa. Dept. of Corrections*, 801 F.3d 160 (3d Cir. 2015) (clear applications of Supreme Court precedent to different factual situations can be an application of 'clearly established federal law').

Here, Deputy Kurylowicz's testimony was inadmissible. The admission of the instant testimony was tantamount to the admission of expert testimony concerning the ultimate issue to be determined by the jury—Petitioner's guilt or innocence. Testifying whether he believed Petitioner's reaction to the decedent's death at the scene is the same as testifying as to whether the jury should believe that the decedent shot himself or not. Deputy Kurylowicz did not provide any factual observations regarding Petitioner's demeanor, only a conclusion without any reasoning as to how he arrived at that conclusion. This testimony undermined Petitioner's right to present a defense at trial. Accordingly, this Honorable Court should grant the within Petition and release Petitioner.

**V.   Claim Five—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the Trial Court Erroneously Permitted a Prosecution Law Enforcement Witness to Refer to the Location Where the Decedent Died as a "Crime Scene."**

Petitioner respectfully submits that the State court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The California State courts identified the correct, governing legal rule but unreasonably applied it to the facts. Further, for the reasons set forth below, Petitioner has forwarded clear and convincing evidence that the last reasoned state court decision is not entitled to the presumption of correctness.

As set forth above, Investigator Corey referred to the location of the decedent's death as a crime scene, thus impermissibly allowing the People to admit expert testimony concerning the ultimate issue to be determined by the jury—Petitioner's guilt or innocence. By labeling the location of the decedent's passing a "crime scene," this implied to the jury that someone other than the decedent was responsible for his death. However, the only issue at trial was whether Petitioner or decedent was responsible for decedent's death. This was the ultimate issue to be determined by the jury. This testimony undermined Petitioner's right to present a

defense at trial. Accordingly, this Honorable Court should grant the within Petition and release Petitioner.

## VI.   Claim Six—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the Trial Court Erroneously Limited Defense Evidence and Cross-Examination of a Prosecution Witness.

Petitioner respectfully submits that the State court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The California State courts identified the correct, governing legal rule but unreasonably applied it to the facts. Further, for the reasons set forth below, Petitioner has forwarded clear and convincing evidence that the last reasoned state court decision is not entitled to the presumption of correctness.

The United States Constitution gives a criminal defendant the right to present a defense. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations omitted). The Compulsory Process Clause of the Sixth Amendment preserves the right of a defendant in a criminal trial to have compulsory process for

obtaining a favorable witness. *Washington v. Texas*, 388 U.S. 14, 19 (1967). The Sixth Amendment right to present relevant testimony "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973); *Taylor v. Illinois*, 484 U.S. 400, 410-11 (1988) (right to compulsory process is not absolute). A defendant "'does not have an unfettered right to offer [evidence] that is incompetent, privileged or otherwise inadmissible under standard rules of evidence.'" *Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (plurality opinion) (alteration in original) (quoting *Taylor*, *supra,* at 410). Even relevant evidence may be excluded on account of certain evidentiary rules. *See Id.* at 42. "[T]o say that the right to introduce relevant evidence is not absolute is not to say that the Due Process Clause places *no* limits upon restriction of that right"; rather, it means that the defendant has the heavy burden to show that the decision to exclude evidence "'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Id.* at 42-43 (citation omitted). Even if the exclusion of evidence was a constitutional error, habeas relief is not available unless the erroneous exclusion had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

"Only rarely [has the Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of

evidence." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013). In *Jackson*, the Supreme Court identified four cases where it had found such a violation: *Holmes v. South Carolina*, 547 U.S. 319 (2006); *Rock v. Arkansas*, 483 U.S. 44 (1987); *Chambers v. Mississippi*, 410 U.S. 284 (1973); and *Washington v. Texas*, 388 U.S. 14 (1967).

In *Holmes v. South Carolina*, 547 U.S. 319 (2006), the Supreme Court held that a criminal defendant's right to present a defense was violated by an evidence rule under which a defendant could not introduce proof of third-party guilt if the prosecution had introduced forensic evidence that, if believed, would strongly support a guilty verdict. The constitutional problem was that the general rule (i.e., allowing a defendant to offer evidence of third-party guilt if the evidence was inconsistent with his own guilt and was not speculative) had been "radically" changed by the South Carolina Supreme Court to be contingent on the strength of the prosecution's case. *Id.* at 328. As a result of the state court's radical change in the rule, the rule ceased to rationally serve the end that the general rule was "designed to promote, i.e., to focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues." *Id.* at 330.

In *Rock v. Arkansas*, 483 U.S. 44, the Supreme Court held that Arkansas' *per se* rule excluding all hypnotically enhanced testimony was unconstitutional when used to restrict a defendant's right to testify. There, the Court explained that "[a]

State's legitimate interest in barring unreliable evidence does not extend to *per se* exclusions that may be reliable in an individual case. Wholesale inadmissibility of a defendant's testimony is an arbitrary restriction on the right to testify in the absence of clear evidence by the State repudiating the validity of all posthypnosis recollections." *Id.* at 61.

In *Chambers v. Mississippi*, 410 U.S. 284, the Supreme Court held that the defendant was denied a fair trial when the state's evidentiary rules prevented him from calling witnesses who would have testified that another witness made trustworthy, inculpatory statements on the night of the crime. It was the combination of the rigid application of the State's evidence rules and the fact that the proffered evidence bore considerable assurances of trustworthiness and reliability that led to the due process violation in *Chambers*. *See Id.* at 302-03. The Supreme Court specifically pointed out that its holding did not "signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures." *Id.*

The challenged rule in *Washington v. Texas,* 388 U.S. at 15, provided that principals, accomplices and accessories in the same crime could not be used as witnesses for each other. This rule violated a defendant's right to compulsory process because "the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had

personally observed, and whose testimony would have been relevant and material to the defense." *Id.* at 23.

The requirement that evidence must be relevant to be admissible is a fundamental rule of evidence and is found in both the Federal Rules of Evidence and the California Evidence Code. *See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible"); California Evidence Code § 350 ("No evidence is admissible except relevant evidence").

Here, the trial court prohibited Petitioner from cross-examining Paul Grotefend regarding the extent of the text messages recovered between Petitioner's and decedent's phones. To wit, Grotefend testified that there were 296 messages spanning 2,800 pages between the two phones. Petitioner sought to cross-examine Grotefend on specific messages contained therein, but the trial court overruled Petitioner's request and directed Petitioner to wait until his case in chief to present the messages in question. The trial court prohibited the jury from seeing evidence of the other text messages which demonstrate that the purported threats were in reality just snippets of chummy video game related banter between two close friends. The act of killing each other referred to the fact that the two played multiplayer war-style video games where the object is to kill one another for amusement. The court sustained the prosecution's objections to the admission of these text messages which deprived Petitioner of the right to present a defense and cross-examine the witnesses

against him. Accordingly, this Honorable Court should grant the within Writ and release Petitioner.

## VII. Claim Seven—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the Trial Court Failed to Declare a Mistrial After the Jury Was Permitted to See a Transcript Referencing Petitioner's Polygraph Examination.

Petitioner respectfully submits that the State court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The California State courts identified the correct, governing legal rule but unreasonably applied it to the facts. Further, for the reasons set forth below, Petitioner has forwarded clear and convincing evidence that the last reasoned state court decision is not entitled to the presumption of correctness.

Evidence Code § 351.1(a) states:

Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court, unless all parties stipulate to the admission of such results.

References to the results of a polygraph examination, an offer to take a polygraph examination, or a refusal to take such a test are disfavored and constitute inadmissible evidence in a criminal proceeding, absent a stipulation by counsel. *See* Cal. Evid. Code § 351.1.

Here, the trial court erroneously permitted the prosecution to admit in rebuttal a transcript of Petitioner's polygraph examination, denying Petitioner's motion for a mistrial. As stated above, this removed the question of guilt or innocence from the jury's mind since whether Petitioner shot decedent or whether decedent shot himself was the only issue presented at trial. Accordingly, this Honorable Court should grant the within Writ and release Petitioner.

**VIII.    Claim Eight—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the Prosecutor Committed Misconduct in Appealing to the Passions and Prejudices of the Jury.**

Petitioner respectfully submits that the State court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The California State courts identified the correct, governing legal rule but unreasonably applied it to the facts. Further, for the reasons set forth below,

Petitioner has forwarded clear and convincing evidence that the last reasoned state court decision is not entitled to the presumption of correctness.

Prosecutorial misconduct warrants habeas relief only if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Renderos v. Ryan*, 469 F.3d 788, 799 (9th Cir. 2006) (citation omitted). The Ninth Circuit has interpreted *Darden* as requiring a two-step inquiry: whether the prosecutor's actions were improper and, if so, whether they "infected" the trial and rendered it "fundamentally unfair." *Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000) (citation omitted). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Relief is limited to cases in which the petitioner can establish that the prosecutorial misconduct resulted in actual prejudice under *Brecht*, requiring the alleged error to have had a substantial and injurious effect or influence on the verdict. *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004).

The Ninth Circuit has explained that in determining whether a prosecutor's comment rendered a trial constitutionally unfair, a reviewing court may consider whether the comment misstated the evidence, whether the judge admonished the jury to disregard the comment, whether the comment was invited by defense counsel in its summation, whether defense counsel had an adequate opportunity to rebut the

comment, the prominence of the comment in the context of the entire trial, and the weight of the evidence. *Hein v. Sullivan*, 601 F.3d 897, 912–13 (9th Cir. 2010) (citing *Darden*, 477 U.S. at 182).

Here, in closing argument, the prosecutor impermissibly inflamed the jury's passions by focusing on the death of the decedent and not the legal tenants of the case by stating the jury was not able to see the decedent every day during trial like it was able to see Petitioner. This comment does not forward any tenable argument or comment on the evidence presented during trial and is a non-sequitur. It distracted the jury from the legal propositions relevant to the case and instead inflamed the jury's passions, causing the jury to render a verdict based on passion, the very definition of prejudice.

## IX. Claim Nine—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Where the Cumulative Prejudicial Effect of all Above Errors Deprive Petitioner of Due Process.

Petitioner respectfully submits that the State court's adjudication of this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, and based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The California State courts identified the correct, governing legal rule but unreasonably applied it to the facts. Further, for the reasons set forth below,

Petitioner has forwarded clear and convincing evidence that the last reasoned state court decision is not entitled to the presumption of correctness.

In some cases, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant. *See United States v. Green,* 648 F.2d 587 (9th Cir.1981). Where, as here, there are a number of errors at trial, "a balkanized, issue-by-issue harmless error review" is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant. *United States v. Wallace,* 848 F.2d 1464, 1476 (9th Cir.1988). In those cases where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors. *United States v. Berry,* 627 F.2d 193 (9th Cir.1980), *cert. denied,* 449 U.S. 1113 (1981). "This is simply the logical corollary of the harmless error doctrine which requires us to affirm a conviction if there is overwhelming evidence of guilt." *Id.* at 201; *see also United States v. Hibler,* 463 F.2d 455 (9th Cir.1972).

The combined effect of the above errors was to prohibit Petitioner from presenting a viable defense which the jury would have weighed along with the prosecution's case. Through the above evidentiary errors and instances of misconduct, the issue of guilt or innocence was removed from the jury and the jury

1
2
was convinced to render a verdict based on passion. Accordingly, this Honorable

Court should grant the within Writ and release Petitioner.

3
4
5
**X.     Claim Ten—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Due to Counsel's Ineffectiveness at Trial.**

6
7
8
9
10
11
12
13
The Sixth Amendment guarantees a criminal defendant's right to the effective assistance of counsel. *Yarborough v. Gentry,* 540 U.S. 1, 5 (2003) (per curiam). This right is violated when defense counsel's performance falls below an objective standard of reasonableness under prevailing professional norms, and counsel's errors seriously prejudice the defendant. *Strickland v. Washington,* 466 U.S. 668, 687 (1984).

14
15
16
17
18
19
Under both the United States Constitution and the California Constitution, a defendant's right to counsel does not merely consist of a right to "some bare assistance" of counsel; rather, a defendant has a right "to *effective* assistance." *People v. Ledesma*, 43 Cal.3d 171, 215 (1987) (emphasis in original).

20
21
22
23
24
25
26
27
In order to demonstrate ineffective assistance of counsel, Petitioner first "must show that counsel's performance was deficient" and second "must show that the deficient performance prejudiced the defense." *Id*. In order to establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland, supra,* at 688. In order to demonstrate prejudice, Petitioner must show that "there is a reasonable probability

28

that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland, supra,* at 694.

Thus, claims of ineffective assistance of counsel are evaluated pursuant to a two-step process:

> First, the court must determine whether counsel's representation fell below an objective standard of reasonableness, as judged by prevailing professional norms. Second, the court must determine whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

*People v. Patterson,* 2 Cal.5th 885, 900 (2017) (internal citations omitted).

Pursuant to the California Rules of Professional Conduct ("R.P.C."), a lawyer shall not intentionally, recklessly, with gross negligence, or repeatedly fail to perform legal services with competence. R.P.C. 1.1(a). A lawyer shall abide by a client's decisions concerning the objectives of representation and shall reasonably consult with the client as to the means by which they are to be pursued. R.P.C. 1.2(a). The client has the ultimate authority to determine the purposes to be served by legal representation. *Id.*, Comment, § 1. A lawyer shall not intentionally, repeatedly, recklessly, or with gross negligence fail to act with reasonable diligence in representing a client. R.P.C. 1.3(a). A lawyer shall: (1) promptly inform the client of any decision or circumstance with respect to which disclosure of the client's information is required; (2) reasonably consult with the client about the means by

which to accomplish the client's objectives in the representation; (3) keep the client reasonably informed about significant developments relating to the representation, including properly complying with reasonable requests for information and copies of significant documents when necessary to keep the client so informed; and (4) advise the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the rules. R.P.C. 1.4(a)(1)-(4).

A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation. R.P.C. 1.4(b). In representing a client, a lawyer shall exercise independent professional judgment and render candid advice. R.P.C. 2.1. A lawyer for the defendant in a criminal proceeding may defend the proceeding by requiring that every element of the case be established. R.P.C. 3.1(b).

It is well settled that trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland, supra,* at 691. Counsel has a "duty to conduct careful factual and legal investigations and inquiries with a view to developing matters of defense in order that he may make informed decisions on his client's behalf both at the pleading stage and at trial." *In re Saunders*, 2 Cal.3d 1033, 1043-44 (1970) (citations omitted).

> We have held that "a lawyer who fails adequately to investigate, and to introduce into evidence, evidence that demonstrates his client's factual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance."

*Riley v. Payne,* 352 F.3d 1313, 1318 (9th Cir. 2003).

Standard 4–4.1(a) of the ABA's Standards for Criminal Justice Prosecution Function and Defense Function states:

> Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of facts constituting guilt or the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty.

ABA Standards for Criminal Justice Prosecution Function and Defense Function (3d ed. 1993), p. 181.

Commentary to this standard, which is entitled "*The Importance of Prompt Investigation,*" emphasizes that "[e]ffective investigation by the lawyer has an important bearing on competent representation at trial, for without adequate investigation the lawyer is not in a position to make the best use of such mechanisms as cross-examination or impeachment of adverse witnesses at trial or to conduct plea discussions effectively." *Id.* at 183. The ABA commentary states that "[f]ailure to make adequate pretrial investigation and preparation may also be grounds for finding ineffective assistance of counsel." *Ibid.,* citing *Strickland, supra,* at 691. Standards

promulgated by the National Legal Aid and Defender Association similarly provide that "[c]ounsel has a duty to conduct an independent investigation regardless of the accused's admissions or statements to the lawyer of facts constituting guilt" and emphasize that "[t]he investigation should be conducted as quickly as possible." Nat. Legal Aid & Defender Assoc., Performance Guidelines for Criminal Defense Representation (NLADA 1995) Guideline 4.1.

The foregoing standards describe an investigatory responsibility that has long been imposed on criminal defense counsel by federal and state courts. *People v. Jones*, 186 Cal.App.4th 216, 237–39 (2010). The *Strickland* court described the duty of such counsel "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland, supra,* at 691. The California Supreme Court has made clear the right of a criminal defendant to expect not just that his counsel will undertake those actions that a reasonably competent attorney would undertake, but as well "that before counsel undertakes to act at all he will make a rational and informed decision on strategy and tactics *founded on adequate investigation and preparation.*" *People v. Ledesma, supra,* at 215, italics added, citing *In re Hall*, 30 Cal.3d 408, 426 (1981); *People v. Frierson,* 25 Cal.3d 142, 166 (1979); and *Strickland, supra,* at 690–691; accord, *In re Edward S.,* 173 Cal.App.4th 387, 407 (2009) ["a defense attorney who fails to investigate potentially exculpatory evidence, including evidence that might be used to impeach prosecution

witnesses, renders deficient representation"]; *People v. Thimmes,* 138 Cal.App.4th 1207, 1212 (2006) ["standard of reasonable competence requires defense counsel to diligently investigate the case"].)

As stated in *In re Neely,* 6 Cal.4th 901 (1993), a case involving ineffective assistance in connection with a motion to suppress evidence, "[i]n order to render reasonably competent assistance, a criminal defense attorney should investigate carefully the possible grounds for seeking the suppression of incriminating evidence, explore the factual bases for defenses that may be available to the defendant, and otherwise pursue diligently those leads indicating the existence of evidence favorable to the defense. [Citations.]" *Id.* at 919. The reason the duty to investigate must be discharged promptly is so witnesses can be interviewed while events are fresh in their memories. As has been said, "[t]he effects of the passage of time on memory or the preservation of physical evidence are so familiar that the importance of *prompt* pretrial preparation cannot be overstated." *Lavallee v. Justices in Hampden Sup. Ct.*, 442 Mass. 228 (2004), italics added.

To determine whether a defendant was deprived of adequate representation due to defense counsel's failure to call a witness, there must be a showing that the testimony of said witness was material, necessary, or admissible and that defense counsel did not exercise proper judgment in failing to call him. *In re Noday,* 125 Cal.App.3d 507 (1981).

If defense counsel fails to call an exculpatory witness, counsel's assistance may be found to be constitutionally deficient. *People v. Day,* 2 Cal.App.4th 405 (1992) (defense counsel failed to investigate and call evidence to substantiate a claim of battered women's syndrome); *Sanders v. Ratelle,* 21 F.3d 1446 (9th Cir. 1994) (writ of habeas corpus issued in circumstances where defense counsel failed to investigate and call the culprit who had confessed to the crime); *In re Hall,* 30 Cal.3d 408 (1981) (defense counsel failed to investigate and to call exculpatory witnesses).

California courts have repeatedly found that defense counsel's failure to introduce expert evidence to support a defense theory constitutes deficient performance in circumstances where defense counsel did not make sufficient inquiries to make an informed tactical decision. *In re Cordero,* 46 Cal.3d 161 (1988); *People v. Ledesma,* 43 Cal.3d 171 (1987); *People v. Frierson,* 25 Cal.3d 142 (1979). In fact, in many of the cases where a court has ruled that a defendant was deprived of his or her constitutional right to the effective assistance of counsel or where the court ordered an evidentiary hearing, the basis for the claim stemmed from an inadequate investigation into forensic evidence and/or expert testimony. *People v. Day,* 2 Cal.App.4th 405 (1992) (defense counsel's failure to investigate expert testimony); *Seidel v. Merkle*, 146 F.3d 750 (9th Cir. 1998) (defense counsel's failure to investigate PTSD); *In re Sixto,* 48 Cal.3d 1247 (1989) (defense counsel failed to adequately test for PCP usage and blood alcohol level); *Baylor v. Estelle,* 94 F.3d

1321 (9th Cir. 1996) (Defense counsel's failure to introduce evidence of inconsistent blood type); *Cam v. Calderon,* 165 F.3d 1223 (9th Cir. 1999) (evidentiary hearing ordered with respect to defense counsel's failure to investigate neurotoxins exposure); *Schell v. Witek,* 218 F.3d 1017 (9th Cir. 2000) (evidentiary hearing ordered with respect to defense counsel's failure to consult an independent fingerprint expert).

The judgment and sentence were imposed, rendered, and sustained in violation of the United States Constitution in that trial and appellate counsel's failure to effectively investigate, uncover, and present evidence of Petitioner's innocence deprived Petitioner of the effective assistance of counsel.

The People's theory of the case was that Petitioner shot McCauley since McCauley purportedly gave Petitioner a cold sore. However, there was a dearth of physical evidence supporting such a theory, and counsel was on notice of the People's theory of the case by virtue of their charging Petitioner with an intentional act. Thus, counsel had a constitutional and ethical duty to investigate and present all evidence set forth below demonstrating that the decedent shot himself, and that the two were not romantically involved.

The People presented Ana McCauley, the decedent's mother, to suggest that Petitioner was homosexual and feared his father finding out. (I RT 64.) Ana also testified to purportedly menacing text messages she claimed that Petitioner sent to

the decedent (I RT 73-75), although the text messages in question were innocent in nature and constituted chummy video game related banter between friends (III RT 573-574).

Moreover, Ana's testimony was compatible with all innocent explanations that Petitioner presented since she testified that she observed the decedent, prior to his death, lying face down on the bed. (III RT 763.) Petitioner informed trial counsel, and ultimately testified at trial, that the decedent had been lying down on the bed when the gun accidentally discharged in Petitioner's hands. (III RT 590-591.) Moreover, Ana revealed that the decedent was not to be around firearms due to his mental health concerns. (I RT 86.)

There was extensive evidence that the shooting was accidental. Petitioner immediately sought help from multiple surrounding neighbors for the decedent as soon as the gun went off and was extremely distraught to the point of almost losing consciousness. (I RT 153, 163, 171, 184-185.) He continued to attempt to render emergency resuscitative aid while police arrived. (II RT 382.)

Petitioner did not implicate himself in the first statement he made about the incident to Gabriella Miller, that the decedent had been shot. (I RT 153.) Petitioner's second account of the events, made to Fernando Juarez shortly after his statement to Miller, expounded upon the account he related to Miller by stating that the decedent shot himself. (I RT 166.) When Officer Kurylowicz responded to the scene,

Petitioner informed the officer that the decedent had been hospitalized due to mental health concerns. (III CT 583-586.) This version was detailed. (*Id*.)

Trial counsel was ineffective for failing to retain the services of a competent mental health expert where Petitioner alerted him, and the investigation reports revealed, that the decedent had been previously hospitalized due to his mental health issues, namely bipolar disorder, demonstrating that he was a danger to himself and/or others. This necessarily suggested that the victim may have harmed himself if he had been given access to firearms by virtue of his bipolar diagnosis,[4] thus suggesting that he may have shot himself. Those with bipolar disorder are at a greater risk of suicide than the general population.[5]

This would have bolstered Petitioner's argument at trial and on appeal that the court should have permitted him to cross-examine the decedent's mother with regard to the full extent of the victim's mental health concerns as she already stated that he was not to be around firearms for that very reason. Accordingly, trial counsel's ineffectiveness in failing to investigate Petitioner's matter led to his unsuccessful challenge to Ms. McCauley's testimony.

Investigator Jason Corey recovered one spent shotgun shell, as well as the shotgun, from the room and determined that the shotgun was unloaded (I RT 262),

---

[4] https://www.webmd.com/bipolar-disorder/guide/bipolar-disorder-suicide.
[5] *Id*.

which corroborated Petitioner's trial testimony that he racked all of the shells out of the gun, but one remained, unbeknownst to Petitioner, which then accidentally discharged while the decedent was lying down. (III RT 590-591.) All of his versions were compatible and established his innocence.

The People attempted to admit irrelevant and highly prejudicial text messages that Petitioner and the decedent exchanged to prove a motive. (II RT 305, 307, 312, 314, 352.) However, as set forth above, the text messages in question were innocent in nature and constituted chummy video game related banter between friends. (III RT 573-574).

The People admitted extremely prejudicial testimony from Allison Hunt, a forensic pathologist who conducted the decedent's autopsy and who, although not tendered or admitted as a firearms expert, offered inadmissible expert opinion that based on the nature of the wounds, the victim could not have inflicted them himself. (II RT 432.) Hunt offered no analysis of her reasoning, and her conclusion had no basis in reality, let alone in the evidence presented in this case. Hunt was essentially permitted to offer a conclusion as to the ultimate issue in this case, the shooter's identity, thus removing the question from the jury in derogation of Petitioner's due process rights.

Trial counsel failed to investigate the firearms and autopsy evidence in this case to demonstrate the untenable nature of Allison Hunt's conclusions. Trial

counsel was ineffective for failing to retain a gunshot autopsy expert and firearms expert for the following reasons. Hunt, who was not tendered or admitted as a firearms expert, opined that the victim's injuries suggested that the victim would not have been able to shoot himself. (II RT 432.) Hunt did not offer any reasoning in support of her bald allegations. Further, Hunt was not qualified to offer such an opinion and she does not have a sufficient basis of knowledge. Indeed, the victim was significantly larger than the average individual standing at 6 feet and 7 inches and was extremely slender; thus, his arms would be exponentially longer than the average male's who stands at 5 feet and 6 inches. (II RT 398.) Further, there was plastic wadding from a shotgun shell embedded in the decedent's skin which also supports the theory that he shot himself. (II RT 418-419.) Trial counsel was thus ineffective for failing to investigate and rebut this point at trial since it undermined Petitioner's defense at trial although it was not worthy of evidentiary weight. Trial counsel was ineffective for failing to present expert testimony to demonstrate such readily available exculpatory evidence.

Finally, the People offered Samuel Murillo whose testimony was devoid of evidentiary value since he was a jailhouse informant. (II RT 472-476.) Counsel failed to effectively investigate and challenge Samuel Murillo. Jailhouse informants are inherently uncredible where they offer testimony against fellow inmates that will help the prosecution, regardless of the veracity of the testimony, as well as result in

consideration in the informant's own criminal matter. As set forth above, the text messages in question were innocent in nature and constituted chummy video game related banter between friends. (III RT 573-574.) Moreover, Murillo did not disprove that the shooting was accidental. (II RT 479.) The top online multiplayer video game, "PUBG: Battlegrounds"—and the majority of cooperative or multiplayer video games, i.e., "Call of Duty," etc.—involve killing other individuals. (Orland, Kyle (July 6, 2018). "Valve leaks Steam game player counts; we have the numbers". *Ars Technica*. Archived from the original on July 10, 2018. Retrieved September 20, 2018.)

Had trial counsel effectively investigated, presented, and argued the evidence against Petitioner, the result of the proceedings would have been different in that trial counsel would have revealed myriad evidence demonstrating Petitioner's innocence. This evidence would have shifted the jury in favor of acquittal, and thus counsel's dereliction of duty prejudiced Petitioner.

Petitioner requested prior to trial that counsel employ the services of an effective private investigator to investigate the above allegations and evidence against Petitioner, as well as the evidence that Petitioner provided to trial counsel. Petitioner informed counsel that he was not homosexual and provided him with individuals who could have testified to this fact. Trial counsel failed to investigate or present any of these witnesses. Had trial counsel acted in a reasonable manner, he

would have uncovered extensive evidence of Petitioner's innocence. By permitting the People to gild the proverbial lily, trial counsel failed to subject the People's evidence to meaningful adversarial testing.

Trial counsel further failed to investigate evidence regarding the innocent nature of the text messages sent between Petitioner and the decedent which the People misrepresented to the jury. Petitioner informed trial counsel that the texts in question amounted to typical banter between friends, and the references to killing were regarding popular war-style multiplayer video games that the two frequently played. Trial counsel was ineffective in failing to effectively establish this fact at trial. The People attempted to use these text messages, which they casted to mean something sinister, to prove that Petitioner intended to kill the decedent. The texts in question do not stand for the propositions the People attempted to suggest, and counsel was ineffective in failing to rebut this. Trial counsel was ineffective for failing to investigate and retain a communications and technology experts to demonstrate the above propositions, which were beyond the ken of the jury.

Had trial counsel effectively investigated Petitioner's case as set forth above, he would have mounted a successful challenge to Adam Kurylowicz's tremendously prejudicial and impermissible opinion testimony at trial that Petitioner's extremely distraught emotional state after the decedent had been shot was not convincing. (I RT 205-206, 212.) Kurylowicz was not tendered or qualified as an expert in human

psychology, and the question of whether an individual's emotions are sincere or circumstantial is not beyond the ken of a layperson. Further, Kurylowicz's testimony was extremely unreliable where it conflicted with all of the witnesses' accounts who interacted with Petitioner following the shooting and observed his extremely distraught emotional state. Indeed, Petitioner almost lost consciousness. (I RT 163, 165, 184-185, 205-206.) Thus, this testimony was inadmissible and extremely prejudicial, and counsel was ineffective for failing to exclude it at trial.

Petitioner also requested that trial counsel investigate the following evidence and witnesses, which would have revealed exculpatory evidence of Petitioner's innocence; however, trial counsel failed to do so—Nicholas McCauley (I RT 57-62); Ana McCauley (I RT 64, 73-75); Mr. Boji's instant messages to Nicholas (I RT 73-75; II RT 301, 354, 475-476); Gabriella Miller (I RT 154-155); Fernando Juarez (I RT 163, 165, 169-171, 184-185); the recovered Mossberg 12-gauge shotgun (I RT 262); the six recovered shells (*Id.*); the 911 calls (I RT 165, 184-185); Sherriff Deputy Ron White (I RT 368-382); Sherriff Deputy Adam Kurylowicz (I RT 193-194, 196-199, 202, 205-206, 211); the taped interview of Petitioner (III CT 583-586); victim's cell phone (I RT 73-75); the technology investigator (II RT 293-295, 301, 305, 307, 312, 314, 354); the victim's autopsy and forensic pathologist Allison Hunt (II RT 396, 398, 400-401, 408-409, 412, 418-419, 424, 432); Petitioner's polygraph test (I RT 33); investigator Edwin Baeza (II RT 502, 508); James Crump

(III RT 555-556); Sherriff Deputy Paul Grotefend (II RT 293-295, 301, 305, 307, 312, 3124, 354); Detective Lesandro Dean (III RT 765-766); Petitioner's father, Andrew Boji (II RT 517); and Sherriff Investigator James Corey (I RT 222, 242, 258-260, 262).

Based on the above instances of improper police action, false evidence, and coercion, counsel was ineffective for failing to file a *Pitchess v. Superior Court,* 11 C.3d 531 (1974) motion.

In *Pitchess v. Superior Court,* 11 C.3d 531 (1974), defendant, charged with battery on several deputy sheriffs, obtained a subpoena duces tecum directing the sheriff to produce investigative records from the administrative services bureau, a sheriff's department internal unit that inquires into citizen complaints of official misconduct. After unsuccessfully seeking to quash the subpoena, the sheriff petitioned for mandamus. The court rejected the sheriff's contention that the affidavits supporting the subpoena duces tecum failed to demonstrate "good cause" with the specificity required by the relevant provisions of the Code of Civil Procedure. The court concluded that allowing an accused the right to discover this information is based on the fundamental proposition that an accused is entitled to a fair trial and an intelligent defense in light of all relevant and reasonably accessible information.

The *Pitchess* rule has been applied in a number of decisions. (See *San Jose v. Superior Court (Michael B.),* 5 C.4th 47, 54, 55 (1993) [in delinquency proceeding, juvenile may discover outcome of disciplinary proceeding against arresting officer]; *Hinojosa v. Superior Court,* 55 C.A.3d 692, 696 (1976) [arrested defendants intended to rely on self-defense theory to rebut charges of attacking police officers; thus, "[e]vidence of bigotry or a proclivity for violence on the part of the officers involved in the alleged assault would be material and relevant to the petitioners' defense"]; *Garden Grove Police Dept. v. Superior Court,* 89 C.A.4th 430, 433 (2001) [*Pitchess* motion may be used to discover information to impeach officer's credibility; use is not limited to altercations between police officers and arrestees]).

The California Supreme Court has "recognized that a criminal defendant may, in some circumstances, compel the discovery of evidence in the arresting law enforcement officer's personnel file that is relevant to the defendant's ability to defend against a criminal charge." *People v. Mooc,* 26 Cal.4th 1216, 1219 (2001). The *Pitchess* discovery procedure has two steps. First, the party must file a written motion describing the type of records sought, supported by "[a]ffidavits showing *good cause* for the discovery or disclosure sought, *setting forth the materiality thereof to the subject matter involved in the pending litigation* and stating upon reasonable belief that the governmental agency identified has the records or information from the records." Evid. Code § 1043(b)(3), italics added; *Mooc, supra,*

at 1226. "This good cause showing is a 'relatively low threshold for discovery.' [Citation.]" *Garcia v. Superior Court,* 42 Cal.4th 63, 70 (2007) ("*Garcia*").

Assertions in the affidavits "may be on information and belief and need not be based on personal knowledge [citation], but the information sought must be requested with sufficient specificity to preclude the possibility of a defendant's simply casting about for any helpful information [citation]." *Mooc, supra,* at 1226. As such, "a declaration by counsel on information and belief is sufficient to state facts to satisfy the 'materiality' component of that section. [Citation.]" *Abatti v. Superior Court,* 112 Cal.App.4th 39, 51 (2003).

In *Warrick v. Superior Court,* 35 Cal.4th 1011 (2005), the California Supreme Court clarified the materiality showing required for discovery for personnel records at trial.

> Although the standard of good cause has a "relatively low threshold" (*Warrick, supra,* 35 Cal.4th at p. 1019), the materiality element nonetheless requires a specific showing that there is 'a logical link between the defense proposed and the pending charge,' and an explanation of 'how the discovery being sought would support such a defense or how it would impeach the officer's version of events.' (*Id.* at p. 1021.) The showing of materiality must also include presentation of a "plausible factual foundation" for the proposed defense, that is, "a specific factual scenario of officer misconduct that is plausible when read in light of the pertinent documents" (*id.* at p. 1025); "one that might or could have occurred ... because it presents an assertion of specific police misconduct that is both internally consistent and supports the defense proposed to the charges. A defendant must also show how the information sought could lead to or be evidence potentially admissible at trial." (*Id.* at p. 1026.) (*Hurd v. Superior Court*

(2006) 144 Cal.App.4th 1100, 1111-1112 (*Hurd*); see also *People v. Hustead* (1999) 74 Cal.App.4th 410, 417 [*Pitchess* motion proper for issue relating to officer credibility].)

The second step in a *Pitchess* motion occurs if the trial court finds good cause for discovery of personnel records. Thereafter, the court conducts an in camera review of the pertinent documents to determine which, if any, are relevant to the case, typically disclosing only identifying information concerning those who filed complaints against the officers. *Warrick, supra,* at 1019; *Becerrada v. Superior Court,* 131 Cal.App.4th 409, 414 (2005).

> "The trial court may not disclose complaints more than five years old, the 'conclusions of any officer' who investigates a citizen complaint of police misconduct, or facts 'so remote as to make [their] disclosure of little or no practical benefit.' [Citations.] Typically, the trial court discloses only the names, addresses, and telephone numbers of individuals who have witnessed, or have previously filed complaints about, similar misconduct by the officer. [Citation.] That practice 'imposes a further safeguard to protect officer privacy where the relevance of the information sought is minimal and the officer's privacy concerns are substantial .' [Citation.]" (*Warrick, supra,* 35 Cal.4th at p. 1019.)

Absent a showing of good cause, an officer's personnel records are not relevant to any issue in the case. *People v. Collins,* 115 Cal.App.4th 137, 151 (2004). Even upon a showing of good cause, the defendant is only entitled to information that the court, after the in camera review, concludes is relevant to the case. *People v. Johnson,* 118 Cal.App.4th 292, 300 (2004).

"The relatively relaxed standards for a showing of good cause under [Evidence Code] section 1043, subdivision (b)-'materiality' to the subject matter of the pending litigation and a 'reasonable belief' that the agency has the type of information sought-insure the production for inspection of all potentially relevant documents. The in camera review procedure and disclosure guidelines set forth in [Evidence Code] section 1045 guarantee, in turn, a balancing of the officer's privacy interests against the defendant's need for disclosure." (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 84; *Brant v. Superior Court* (2003) 108 Cal.App.4th 100, 106.)

The trial court has broad discretion in ruling on both the good cause and disclosure components of a *Pitchess* motion, and its ruling will not be disturbed absent an abuse of that discretion. *Alford v. Superior Court,* 29 Cal.4th 1033, 1039 (2003); *Haggerty v. Superior Court,* 117 Cal.App.4th 1079, 1086 (2004). However, even if the defendant made a sufficient showing of good cause such that the trial court abused its discretion in denying the *Pitchess* motion, reversal is not required unless the defendant can show the error was prejudicial under the standard of *People v. Watson,* 46 Cal.2d 818, 836 (1956). *People v. Samuels,* 36 Cal.4th 96, 110 (2005).

Most *Pitchess* motions are brought as part of a pretrial process as defense counsel is preparing defenses for trial. However, a *Pitchess* motion may be brought in the context of posttrial motions, and a posttrial *Pitchess* motion is subject to a different analysis of good cause and materiality. For example, in *Hurd, supra,* 144 Cal.App.4th 1100, the defendant filed a posttrial *Pitchess* motion in support of a petition for writ of habeas corpus. *Id.* at 1105. *Hurd* held such a motion was

statutorily authorized, but the defendant was required to show the requested records were material to his habeas corpus petition, rather than to his defense to the underlying prosecution. *Id.* at 1105, 1108. *Hurd* held a *Pitchess* motion must "set[ ] forth the materiality [of the desired personnel records] to the subject matter involved in the pending litigation...." *Id.* at 1110, italics omitted.

> "We deem the litigation to which the discovery must be material within the meaning of [Evidence Code] section 1043 to be the habeas corpus proceeding that has been or will be initiated by petitioner's habeas corpus petition. We deem the scope of the *Pitchess* discovery available ... to be that justified by such current materiality to claims cognizable on habeas corpus." (*Id.* at p. 1111.)

*Hurd* held the defendant was not entitled to discovery because the desired personnel records were immaterial to his posttrial claims, which themselves were not even cognizable on habeas corpus. *Id.* at 1112-1114.

In *People v. Nguyen,* 151 Cal.App.4th 1473 (2007), the court addressed a posttrial *Pitchess* motion. The defendant therein was convicted of bribery and filed a posttrial *Pitchess* motion to gather evidence for a new trial motion based upon ineffective assistance of trial counsel. *Id.* at 1475. The defendant claimed trial counsel was ineffective for failing to file a pretrial *Pitchess* motion to gather evidence to impeach the detectives who conducted the bribery investigation. The trial court reviewed the detectives' personnel records for evidence they had solicited bribes, made false arrests, submitted false police reports, or committed perjury. After

reviewing the records, the trial court found there was nothing contained in the records to lead the court to believe the defendant did not receive a fair trial. *Id.* at 1476. The defendant subsequently filed a new trial motion and claimed the trial court should have disclosed the personnel records. The trial court denied the motion and found the requested personnel records were immaterial to the new trial motion because the records did not support an ineffective assistance claim. *Id.* at 1475, 1476.

The trial court held:

I did find that there was material that would have been disclosed prior to trial, but looking back in retrospect after trial, *it's the court's conclusion that that evidence was of such little probative value* that number one, it probably would not have been admitted to begin with, but second of all, it would not have made a difference in the outcome of this trial. It would not have raised a reasonable doubt concerning that particular officer's testimony. (*Id.* at p. 1476, italics added.)

*Nguyen* held the trial court correctly denied the posttrial *Pitchess* motion. *Nguyen* noted that a *Pitchess* motion requires the moving party to demonstrate the materiality of the requested information to the pending litigation, and acknowledged there was a relatively low threshold for discovery. *Nguyen* further noted the disputed issue in the context of a posttrial *Pitchess* motion was what constituted the "pending litigation" to which the detective's personnel records would have been material. *Nguyen, supra,* at 1477. In answering that question, *Nguyen* held that *Hurd's* analysis of the issue applied "with equal force here." *Id.* at 1478.

After defendant was convicted, the 'pending litigation' to which the requested records had to be material *was his new trial motion claiming ineffective assistance.* [Citations.] To prevail on this claim, defendant would have to show a 'reasonable probability' that competent performance would have led to a different result. [Citation.] *Thus, the proper standard for reviewing defendant's posttrial Pitchess motion was whether a reasonable probability existed that disclosure of the requested records would have led to a different result at trial.* (*Id.* at p. 1478, italics added.)

*Nguyen* held the trial court applied the correct standard by reviewing the defendant's posttrial *Pitchess* motion "through the lens of his new trial motion claiming ineffective assistance-this was the only litigation pending at the time." *Nguyen, supra,* at 1478.

By statute, a *Pitchess* motion compels disclosure of police personnel records only if they are material to the pending litigation. Because defendant had already been convicted, *the pending litigation was his new trial motion. Thus, the court correctly considered whether the requested records were material to his ineffective assistance claim.* The court did not abuse its discretion by concluding the requested records were immaterial to this claim. (*Id.* at p. 1475, italics added.)

*Nguyen* held the defendant had the burden of showing the trial court abused its discretion and that disclosure of the personnel records would have led to a different result at trial. *Nguyen, supra,* at 1478.

As set forth in Petitioner's suppression motion and direct appeal, the police failed to administer *Miranda* warnings during custodial interrogations of Petitioner they conducted and overbore his will by interviewing him for over 12 hours, at various locations, without providing him the bare necessities of life such as food or

water although he indicated throughout the interrogation that he was hungry and thirsty. Had trial counsel effectively investigated and prepared Petitioner's case as set forth above, Petitioner's suppression motion would have been successful, thus casting significant doubt upon the candor of the officers in this case. Thus, a *Pitchess* motion would have indubitably been successful and would have reaved exculpatory information casting significant doubt upon the credibility and integrity of the investigation. Given their willful and wanton acts in this matter, it is extremely unlikely that this would have been the officers' first instance of misconduct, and their personnel files would have confirmed this and cast significant doubt upon their testimony.

Trial counsel failed to effectively communicate with Petitioner or review discovery with him. Trial counsel failed to include Petitioner and use the above evidence he provided her in constructing a defense. (*Id.*) In addition to the above evidence, Petitioner provided trial counsel with myriad fact and character witnesses, but trial counsel never investigated or presented these witnesses, merely quipping that the prosecutor would bring in bad character evidence without specifying what that evidence would be. (*Id.*) Counsel told Petitioner that character evidence was of no evidentiary weight, although character evidence may in and of itself raise a reasonable doubt as to a defendant's guilt. *People v. McAlpin,* 53 Cal.3d 1289 (1991).

Trial counsel's lack of preparation for trial manifested in counsel's actual deficient performance at trial and inured to Petitioner's detriment. Counsel neglected to deliver an opening argument, thus failing to avail herself of the concept of primacy and giving the jury the first opportunity to hear Petitioner's side of the story. This had a rippling effect through the rest of trial as counsel failed to effectively subject the People's case to meaningful adversarial testing, and thus failed to present evidence or arguments regarding Petitioner's glaring innocence.

Trial counsel was ineffective during Andrew Boji's testimony at trial and failed to highlight the importance thereof. (II RT 517-518.) Andrew, Petitioner's father, testified that he was trained extensively in how to use all of the guns he owned, as well as firearm safety, and trained Petitioner in firearm safety and the use of those firearms as well. (*Id*.) Andrew was confident enough in his son's knowledge and safety that he provided Petitioner with two guns of his own with which Petitioner would shoot skeet. (II RT 518.) Trial counsel was ineffective in failing to strategically cross-examine Andrew, for some inexplicable reason highlighting only that Andrew did not give Petitioner permission to use the gun with which the victim shot, which did not advance Petitioner's defense in any manner. (II RT 520.) Trial counsel then went on a tangent with regard to how Andrew spent the morning with his daughters, necessitating a relevance objection from the prosecution, which was sustained. (II RT 521.) Trial counsel was again successfully objected to while

attempting to bring in matters outside the scope of direct, evidencing the meandering and circuitous nature of her examination. (II RT 522-523.)

Andrew's testimony was paramount in demonstrating that had Petitioner handled the gun that day, he would not have done so in a reckless or negligent manner and thus did not have the requisite mental state to sustain his convictions. Trial counsel failed to avail herself of this testimony. Counsel only spent 25 minutes preparing Petitioner to testify at trial, although Petitioner's testimony was of the utmost importance to his defense due to the lack of significant physical evidence in this case. Petitioner was at a loss while preparing with counsel as counsel had neglected to investigate or prepare any of the evidence or witnesses that Petitioner had provided her, prejudicially and significantly limiting the scope of Petitioner's testimony.

Based on the above instances of counsel's deficient stewardship, Petitioner lost faith in counsel's abilities to effectively defend his case. Thus, despite his innocence, Petitioner asked counsel to negotiate for a plea deal on his behalf to minimize the potential sentencing exposure Petitioner would face.

Where a defendant has been denied the effective assistance of counsel in entering a plea of guilty, he is entitled to reversal and an opportunity to withdraw his plea if he so desires. *People v. McCary,* 166 Cal.App.3d 1 (1985). To be valid, guilty pleas must be based upon a defendant's full awareness of the relevant circumstances

and the likely consequences of his action. *Id*. at 9. California courts undertake a two-tier analysis to determine adequacy of counsel. *People v. Hunt,* 174 Cal.App.3d 95, 104-05 (1985).

First, the defendant must show that trial counsel failed to act in a manner expected of reasonably competent attorneys acting as diligent advocates. *Id.* Second, she must establish that counsel's acts or omissions resulted in withdrawal of a potentially meritorious defense. *People v. Fosselman,* 33 Cal.3d 572, 581 (1983). Even if counsel's failure does not result in withdrawal of a defense, ineffectiveness may be proven by establishing "that it is reasonably probable a determination more favorable to the defendant would have resulted in the absence of counsel's failings." *Fosselman, supra,* at 584.

When a defendant expresses a desire to plead guilty, her counsel must investigate carefully all factual and legal defenses to her. *Hunt, supra,* at 104-05. Prejudice occurs if counsel's acts or omissions adversely affect defendant's ability to knowingly, intelligently, and voluntarily decide to enter a plea of guilty. *People v. McCary, supra*, at 1, 10. If counsel's acts or omissions appear to result in defendant's entering a plea under the influence of "mistake, ignorance or inadvertence or any other factor overreaching defendant's free and clear judgment" which would justify withdrawal of her plea, she was ineffectively represented by counsel. *Ibid*.

To assist in deciding the ineffectiveness prongs, analysis of the State Bar Rules of Professional Conduct and the American Bar Association's Standards for Criminal Justice provide guidelines for determining the prevailing norms of practice relating to advising a defendant as to the decision whether to reject an offered plea bargain and proceed to trial. *In re Alvernaz,* 2 Cal.4th 924, 937 (1992). Under these guidelines, defense counsel must communicate accurately to a defendant the terms of any offer made by the prosecution and inform the defendant of the consequences of rejecting it, including the maximum and minimum sentences which may be imposed in the event of a conviction. *Id.,* citing I ABA Standards for Criminal Justice, The Defense Function, std. 4–5.1 & commentary; rule 3–510, Rules of Prof. Conduct of State Bar.

Based on the above weaknesses in the People's case and the desirability to conserve overburdened judicial and prosecutorial resources, Petitioner was an excellent candidate for a deal. Petitioner had no criminal history. Counsel failed to negotiate any deal on Petitioner's behalf, and the result was a sentence of 40 years to life imprisonment.

Finally, counsel was ineffective for failing to employ a mental health professional to investigate the role that Petitioner's extremely distraught emotional state played at the time of the shooting and afterward or ensure that Petitioner was able to understand the nature of the proceedings against him or meaningfully assist

in his defense. Petitioner was distraught to the point of losing consciousness and collapsing while at the scene, and this traumatic experience indelibly tainted Petitioner's psyche.

Trial counsel knew, or reasonably should have known, that Petitioner was displaying signs of mental illness. Despite these obvious indicators of mental illness, trial counsel prejudicially failed to request a competency hearing. Counsel was ineffective in this case because his failure to request a competency hearing caused Petitioner to be deprived of his Sixth Amendment right to counsel. *Strickland v. Washington, supra,* at 668. In fact, counsel's conduct in failing to request such a hearing so undermined the proper functioning of the adversarial process that Petitioner's trial should not be relied upon as having produced a just result due to Petitioner's mental illness. There is a reasonable probability that, but for counsel's errors, the rest of the proceeding would have been different. *Id.* at 694.

To prove that he was prejudiced by counsel's deficient performance, Petitioner does not have to prove that he was definitely incompetent—he "must only establish that there was a reasonable probability that he was." *Hull v. Kyler,* 190 F.3d 88, 110 (3d Cir. 1989). Regardless of whether Petitioner was in fact guilty or innocent, "his constitutional right to effective counsel would be violated if he were convicted . . . when there was a reasonable probability that he was incompetent to stand trial." *Id.* at 105. The courts have made clear that this is not a "stringent"

standard. *Baker v. Barbo*, 177 F.3d 149, 154 (3d Cir. 1999), citing *Nix v. Whiteside*, 475 U.S. 157 (1986). The applicable standard in cases such as these is less stringent than a preponderance standard. *Bouchillon v. Collins,* 907 F.2d 589, 595 (5th Cir. 1990).

In the instant case, there was significant evidence that Petitioner, who was in an extreme state of emotional distress, was not mentally competent during the shooting or the pretrial and trial phases of his case due to his mental illness. In light of these circumstances, trial counsel's failure to request a competency hearing cannot possibly have been a tactical decision. As the Court recognized in *Bouchillon, supra,* at 597, "It must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has notice of the client's history of mental problems."

Trial counsel's failure to request a competency hearing in this case led Petitioner, who was mentally incompetent, proceed to trial, with the result being a 40 to life sentence. Of course, "it has long been established that the conviction of an accused person while he is legally incompetent violates due process." *Pate v. Robinson*, 383 U.S. 373, 377 (1966). P.C. 1367(a) provides that a defendant is mentally incompetent to stand trial when, "as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational

matter." "[U]nder section 1368 of the Penal Code, the trial court has no power to proceed with the trial once a doubt arises as to the sanity of the defendant. In trying a defendant without first determining at a hearing his competence to stand trial, the court both denie[s] to defendant a substantial right [citations omitted] and pronounces judgment on him without jurisdiction to do so. In such cases, the error is *per se* prejudicial." *People v. Pennington,* 66 Cal.2d 508, 521 (1968). "[O]nce a doubt has arisen as to the competence of the defendant to stand trial, the trial court has no jurisdiction to proceed with the case against the defendant without first determining his competence in a section 1368 hearing, and the matter cannot be waived by defendant or his counsel." *Id.*; *Pennington, supra,* at 518.

## XI.   Claim Eleven—Petitioner Was Denied His Federal Constitutional Right to Due Process Under the Fifth, Sixth, and Fourteenth Amendments Due to Police and Prosecutorial Misconduct.

The prosecutor's constitutional duty to correct false testimony is based on principles similar to those underlying the duty to disclose exculpatory evidence. In *Mooney v. Holohan*, 294 U.S. 103 (1935), the United States Supreme Court first held that a prosecutor's use of false testimony could constitute a denial of due process.

> [Due process] is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by a state to procure the conviction and imprisonment of a

defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.

*Id.* at p. 112.

*Mooney* involved a knowing and intentional use of perjured testimony, which was related directly to the defendant's commission of the charged crime. *Id.* Subsequently, the United States Supreme Court has expanded *Mooney* to cover perjury not suborned by the prosecutor (*Alcorta v. Texas*, 355 U.S. 28 (1957)), perjured statements not dealing with a substantive element of the prosecution's case (*Napue v. Illinois,* 360 U.S. 264 (1959)), and situations where the prosecutor did not know the testimony to be false, provided the prosecutor should have had that knowledge (*Giglio v. United States,* 405 U.S. 150 (1972)).

Particularly instructive is *Napue v. Illinois, supra,* in which a prosecution witness falsely testified he had not received any promise of lenient treatment in exchange for his testimony, and the prosecutor failed to correct the false testimony. The High Court reversed the conviction.

The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend . . . .

> It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth . . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.

*Napue v. Illinois, supra,* at 269–270, quoting *People v. Savvides,* 1 N.Y.2d 554, 557 (1956).

Also instructive is *Giglio v. United States, supra,* in which the High Court held even when the trial prosecutor is not aware of a promised benefit made to a witness, the trial prosecutor is still obliged to correct the witness's false testimony that there was no promise.

> [W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government. [Citation omitted.] To the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it.

*Giglio v. United States, supra,* at 154.

In closing argument, the prosecutor impermissibly inflamed the jury's passions by focusing on the death of the decedent and not the legal tenants of the case by arguing that the jury was not able to see the decedent every day during trial like it was able to see Petitioner. This comment does not forward any tenable

argument or comment on the evidence presented during trial and is a non-sequitur. It distracted the jury from the legal propositions relevant to the case and instead inflamed the jury's passions, causing the jury to render a verdict based on passion, the very definition of prejudice.

Additionally, the police committed misconduct by not conducting any forensic testing in this matter, electing instead to break down Petitioner's will to resist through improper police tactics and depriving Petitioner of the necessities of life—food and water—for extended periods of time. Had the police conducted DNA testing on the decedents blood and the blood that covered Petitioner, as well as for fingerprints, shoe size, and other forms of evidence at the crime scene, it would have demonstrated that Petitioner did not kill the decedent. (Exhibit A.) Thus, the investigation in this matter did not result in a conviction which comports with due process.

Petitioner has been deprived of his fundamental constitutional right to his life and liberty without due process of the law in violation of the Sixth and Fourteenth Amendments to the United States Constitution and in violation of Article I, Section 15, of the California Constitution, which also guarantees Petitioner's right to due process. The restriction on Petitioner's liberty is illegal and contravenes his Eighth Amendment right against "cruel and unusual punishment." Petitioner has no other adequate remedy at law as the within Petition is based on material not included in

the trial record, and the issues presented in this Petition are only reviewable by a consideration of the facts presented in this Petition.

## CONCLUSION

WHEREFORE, based on the foregoing, this Honorable Court should grant Petitioner's Petition for Writ of Habeas Corpus.

Dated: March 25, 2022                              Respectfully submitted,


SPOLIN LAW P.C.


/s/ Aaron Spolin
By:    _____
Aaron Spolin
Attorney for the Petitioner

1  AARON  SPOLIN  (State Bar No. 310379)
   ClientMail@SpolinLaw.com
2  SPOLIN  LAW P.C.
   11500 W. Olympic Blvd., Suite 400
3  Los Angeles, CA 90064
   (310) 424-5816
4  (310) 312-4551

5

6  Attorney for Petitioner

7

8           IN  THE  UNITED  STATES  DISTRICT  COURT  FOR  THE
9              CENTRAL  DISTRICT  OF  CALIFORNIA

10                                    )
11                                    )   Case No.:
                                      )
12  HOUSTON  MICHAEL  BOJI,           )
                                      )   **Exhibits**
            Petitioner,               )
13                                    )
       vs.                            )
14                                    )
                                      )
15  HEATHER  SHIRLEY,  as Acting Warden, )
   Wasco State Prison,                )
16                                    )
            Respondent.               )
17                                    )
                                      )
18

19

20

21

22

23

24

25

26

27

28

───────────────────────────────────────────────
EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS

# EXHIBIT A

Information Regarding Crime Scene Investigation



## Laboratory Services

Home • About Us • Laboratory Services • Forensic Science Communications • Back Issues • July 2000 • Hairs, Fibers, Crime, and Evidence, Part 3, by Deedrick...



# FORENSIC SCIENCE COMMUNICATIONS

July 2000 - Volume 2 - Number 3

**FSC Links**

- Table of Contents
- Meetings and Conferences
- Editors
- Back Issues

- About FSC
- Instructions for Authors
- Search

- FBI Laboratory

- Current Issue

Hairs, Fibers, Crime, and Evidence Part 3: Crime and Evidence

**Douglas W. Deedrick**

Unit Chief
Trace Evidence Unit
Federal Bureau of Investigation
Washington, DC

**Introduction | Crime Scene Search | Evidence Collection | Evidence Handling Procedures**
**Protocol for Evidence Processing in the FBI Laboratory**
**Examination Conclusions**

**Introduction**

The manner in which a crime scene is searched is determined by the type of crime, the location of the scene, details concerning events of the crime, the time of day, the number of people available for the search, and available equipment. Inasmuch as hair and fiber evidence can play a role in most cases involving violent crime, serious consideration should be given to collecting it properly. Once the crime has been committed, little time remains before hair and fiber evidence will be lost or contaminated. The importance of securing the crime scene cannot be overstated.

**Crime Scene Search**

When physical contact occurs between two individuals, objects, or individuals and objects, there is a likelihood of transfer of hair and fiber evidence. This likelihood is dependent on the nature of the contact, the duration of the contact, and the nature of the contacting surfaces. The direct transfer of hairs from the head of an individual to the clothing of another individual is called a primary transfer. When hairs have already been shed and are transferred to an individual, it is called secondary transfer. Fibers are transferred in a similar manner. When fibers are transferred from the fabric of an individual's clothing to the clothing of another individual, it is called a primary transfer. As these same fibers are transferred to other objects during subsequent contacts, secondary transfers are occurring.

It is important for crime scene investigators to understand the mechanisms of primary and secondary transfer. As trace evidence can be transferred during the commission of a crime, it can also be transferred during the search process. Hairs and fibers can not only be picked up inadvertently by investigators, they can be inadvertently deposited at the crime scene. The following are considerations at the crime scene:

- Elimination hair and/or fiber samples may need to be obtained from personnel conducting the search.
- Prioritize the order of evidence collection. Collect large items first and then proceed to the trace evidence. USE CAUTION WHEN WALKING THE CRIME SCENE.
- Once the trace evidence is collected via vacuuming, taping, or tweezing, take blood samples, remove bullets, dust for fingerprints, and so on.
- Processing the crime scene for fingerprints prior to trace evidence collection is not recommended because it can

  - Inadvertently transfer trace evidence onto the clothing of the technicians,
  - Move trace evidence, and/or
  - Contaminate trace evidence with dusting powder.

**Evidence Collection**

The following are suggestions for collecting evidence from crime scenes such as houses, apartments, and vehicles:

- Photograph all evidence prior to removing it.
- Remove larger items or debris from carpeting or walk areas prior to other examinations. Consider wearing disposable booties.
- Collect large items, such as clothing, and place them in separate paper bags. Keep an accurate evidence log. One person should collect and bag the items while another person labels the bags and records the items in the log.
- Do not place all clothing items from a suspect in one paper bag, nor all items from a victim in another

- Do not place all clothing items from a suspect in one paper bag, nor all items from a victim in another bag. Bag each item separately.
- Never put suspect items and victim items in contact with one another. The person collecting the suspect's items should not be the same person that collects the victim's items. If this must occur, personnel must change their clothing and collect the evidence at a different time to avoid contamination.
- Bedding should be carefully handled to avoid loss of hairs and fibers. Each item should be placed in a separate bag.
- Floor surfaces should be vacuumed for possible trace evidence. Some crime scene investigators use tape to secure trace evidence; however, tape is generally difficult to work with at the scene and in the laboratory. Smaller surfaces such as chairs and car seats can be taped or vacuumed.
- Ensure that carpet, pet hair, and other standards that might have transferred to a suspect or victim are collected.
- Always process for fingerprints after collecting trace evidence.
- Collect all possible known fiber samples from a vehicle. These may be obtained from the carpet, door panels, headliner, seats, floor mats, and trunk.

The following suggestions pertain to different types of items recovered at the crime scene:

| | |
|---|---|
| **Hats:** | Package all hats in separate paper bags. Use care when collecting baseball-style caps with adjustable plastic headbands—the bands are an excellent source for fingerprints. |
| **Shoes:** | Shoes are an excellent source of fiber evidence, blood stains, and shoe print comparisons. Shoes worn by a suspect can deposit fibers from a vehicle he or she exited at a crime scene and can also pick up fibers from the scene and then deposit them in another location. |
| **Socks:** | Socks worn by a homicide victim can provide invaluable fiber and hair evidence. Many times the victim is transported by vehicle. Contact with the interior surfaces of a vehicle can cause hairs and fibers to collect on the socks. It may be necessary to obtain elimination samples of the carpeting of the victim's car or residence to avoid the possibility of a coincidental match. |
| **Fingernails:** | Use care when scraping or clipping the fingernails of a victim or suspect. DNA on the hands or tools of the medical personnel can contaminate the material and influence the DNA results. |
| **Hairs in the hands of the victim:** | Hairs found in the hands of the victim usually belong to the victim. Rarely are the hairs similar to the suspect's known hairs; nevertheless, these must be collected and submitted for analysis. |
| **Pubic and head hair combings:** | Pubic and head hair combings should always be taken in violent crimes. Foreign hairs as well as fibers can be recovered from these samples. If a hat is recovered at the crime scene and a suspect is identified soon, it may be possible to find fibers similar to those in the hat in the suspect's hair. |
| **Known hair samples:** | Thorough random samples should be taken from the head and pubic regions of a suspect(s) and victim(s). Twenty-five full-length hairs, pulled and combed from different areas of the head and pubic regions, are generally considered an adequate representation of an individual's hair characteristics. |
| **Weapons:** | Weapons recovered at a crime scene should always be searched for trace evidence before processing for fingerprints. |
| **Doors and windows:** | Doors and windows should be searched for trace evidence if they are possible points of entry or exit. |

**Evidence Handling Procedures**

Once the evidence has been collected, there are several recommendations or considerations when

Once the evidence has been collected, there are several recommendations for consideration when packaging it for transmittal to the laboratory. Clothing items must be packaged in separate sealed paper bags—not plastic. To avoid contamination, clothing items from the suspect should never be handled in the same area in which items from the victim are handled. All damp or blood-soaked items must be air-dried in a room away from air movement and traffic. Drying paper placed under damp clothing items should be submitted separately.

Submit individual hairs and fibers in clean paper or in an envelope with sealed corners. The primary paper or envelope should be placed inside a secondary sealed envelope with all corners taped. Many times individual hairs identified on items of clothing are not removed or secured. These hairs may move or be lost, so it is recommended that they be removed and placed in an envelope (first noting where they were removed).

If a floor surface is vacuumed, the debris should be placed on a white sheet of paper (8 x 11 inches) and folded at the corners. This paper should be placed in a heat-sealed or resealable plastic bag.

**Protocol for Evidence Processing
in the FBI Laboratory**



When evidence is received in the Trace Evidence Unit, the case is assigned to an examiner. The examiner will read the incoming communication to determine the nature of the offense, the names of the suspects and victims, and the types of requested examinations. It is important to have an understanding of the offense to help determine the course of action in the Laboratory. Contact between family members or friends would be treated differently, as the transfer of trace evidence would be more likely in these cases.

**Collecting trace evidence
using scraping and picking
techniques**



In the Unit, there are three processing rooms designed for debris collection. Debris is collected through a combination of picking, scraping, and sometimes taping. Whereas taping is considered by some laboratories to be a preferred technique, it can be time-consuming and tedious and can present a storage problem for the tape collections. Vacuuming is not recommended for clothing items. The clothing of a victim is processed in a room other than the room in which the suspect's clothing is processed. The collected debris is placed in pillboxes and examined with a stereobinocular microscope. Hairs and fibers are mounted on glass microscope slides for identification and comparison purposes.

**Collecting trace evidence
with a vacuum**

**Examination Conclusions**



When a questioned hair exhibits the same microscopic characteristics as the known hairs of an individual, the hair could have originated from that individual. If the questioned hair is microscopically dissimilar to the known hair standard, it cannot be associated with the individual. Different people generally have different hair characteristics, but differences in microscopic characteristics can also be the result of time and alteration. Known hair samples should be collected from individuals as soon as possible to the date of the crime. As time passes, microscopic characteristics can change, and the individual may alter the color with dyes.

**Stereomicroscopic
examination**

If a fiber exhibits the same microscopic and optical properties as a known fabric, the fiber could have originated from that fabric. Although it is not possible to say that a fiber originated from a particular fabric,

fiber matches are not insignificant. Because of the many different types of fibers and fabrics and the many

fiber matches are not insignificant. Because of the many different types of fibers and the many different ways they can be colored, the likelihood of finding coincidental matches is low. It is possible, however, to positively say that a torn piece of fabric originated from another fabric if the torn edges match.

For more information about trace evidence and the recovery of evidence from crime scenes, see the Hairs and Fibers and Crime Scene Search sections of the *Handbook of Forensic Services.*

**To Hair Evidence**

**To Fiber Evidence**

Accessibility | eRulemaking | Freedom of Information Act | Legal Notices | Legal Policies and Disclaimers | Links | Privacy Policy | USA.gov | White House
FBI.gov is an official site of the U.S. government, U.S. Department of Justice

Close

# EXHIBIT B

Transcripts

```
 1              RIVERSIDE, CALIFORNIA; DECEMBER 21, 2017

 2              BEFORE THE HONORABLE HELIOS J. HERNANDEZ

 3         THE COURT:  Houston Boji, RIF1502741.

 4         MR. MOORE:  Jeff Moore for Mr. Boji, present, in

 5    custody, standing next to the wall.

 6         MS. MACDONALD:  Meghan MacDonald for Sharunne

 7    Foster.

 8         MR. MOORE:  We have two issues before the Court.

 9         We're here for a TRC and we'll be setting a trial date

10    in mid January, January 12th.

11         We're also here for a motion to compel which was filed

12    by the defense with the Court.

13         The People are submitting on that.

14         MS. MACDONALD:  Correct.

15         THE COURT:  So first, on the jury trial, you have a

16    right to a trial within 60 calendar days of your Information

17    arraignment, give it up so we can have your jury trial on

18    January 12th, which is a Friday, and, therefore, the last day

19    is January 22nd.

20         You okay with that?

21         THE DEFENDANT:  Yes, your Honor.

22         THE COURT:  Now, the second thing on the discovery.

23    Do you have it to give it over?  DA?

24         MS. MACDONALD:  It's not something we're going to just

25    give over.

26         MR. MOORE:  It's -- your Honor, it's -- there was a

27    polygraph given in this case.

28         THE COURT:  I read your stuff.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 11

```
 1              MR. MOORE:  My understanding is that the DA's office
 2    is not currently in possession.  I'm asking they get possession
 3    and turn it over.
 4              THE COURT:  Okay.  And -- well, that happens pretty
 5    much in every bit of evidence, law enforcement has it, they
 6    give it to you, and you give it to the defense attorney.  You
 7    have to get it.  You have to turn it over to the defense
 8    attorney, otherwise this 541-day-old case will get
 9    embarrassingly older.
10              Any questions?
11              MS. MACDONALD:  No.
12              THE COURT:  That is the order of the Court.
13              Thank you.
14                        (Proceedings concluded.)
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

REPORTER'S CERTIFICATE

```
PEOPLE OF THE STATE OF CALIFORNIA, )
                                   )
                         Plaintiff,)
             vs.                   )   Case No. RIF1502741
                                   )
HOUSTON MICHAEL BOJI,              )
                                   )
                         Defendant.)
_____)
```

        I, HELEN LEE, Certified Shorthand Reporter, No. 11991, hereby certify:

        On December 21, 2017, in the county of Riverside, state of California, I took in stenotype a true and correct report of the testimony given and proceedings had in the above-entitled case, pages 3-4, and that the foregoing is a true and accurate transcription of my stenotype notes and is the whole thereof.

DATED:  Riverside, California, November 28, 2018

                      *Helen Lee*
           _____
                HELEN LEE, CSR No. 11991

HELEN LEE, CSR

```
1                      RIVERSIDE, CALIFORNIA; JUNE 25, 2018

2                      BEFORE THE HONORABLE SAMUEL DIAZ, JR.

3              THE COURT:  All right.  On the record in the matter of

4    People versus Houston Boji.

5              MR. MOORE:  Good morning, Your Honor.

6              THE COURT:  RIF1506343 (sic).

7              Parties, please state your appearances.

8              MS. BLUMENTHAL:  Virginia Blumenthal and Jeff Moore on

9    behalf of Mr. Boji, who is present in court in custody.

10             MS. FOSTER:  Sharunne Foster for the People.

11             THE COURT:  All right.  The matter is set for a 402

12   hearing.  The Court has reviewed for this 402 hearing the

13   following exhibits:  Actually, they were interrogations of the

14   defendant.  That's Exhibit No. 263-A, 266-A, 265-A, 264-A, and

15   262-A.  The Court reviewed all of those video interrogations.

16   There were some transcripts.  The Court, basically, watched the

17   interrogations in chambers.

18             The Court also reviewed the following cases.  The Court

19   conducted its own research on the matter.  The Court reviewed

20   People versus Winbush, W-i-n-b-u-s-h, 2 Cal.5th 402.  It's a

21   2017 case.

22             The Court also reviewed Price versus Superior Court,

23   25 Cal.4th 1046, a 2001 case.  And the Court also reviewed

24   United States versus Hayden, H-a-y-d-e-n.  The Court does not

25   have the citation on its fingertips right now.

26             When it comes to Miranda warnings and interrogations,

27   admissions, according to People versus Winbush, W-i-n-b-u-s-h,

28   the burden of proof is on the People, and it's preponderance of
```

1    the evidence.

2         Basically which -- I only reviewed the one that when he

3    was arrested and taken to the interrogation room.  Apparently,

4    there was some other that was provided to me, but I did not

5    review them.  This has to do with a polygraph exam.  Those I

6    didn't review, because it wasn't really in your defense 402, or

7    maybe it didn't lay out specific enough.  I just assumed that

8    this 402 was just going to be the one that he was initially

9    arrested, taken to the police station, and I think he was there

10   for over 10, 11, 12 hours.

11        MR. MOORE:  Well, actually, Your Honor, just for

12   clarification, the polygraph happened during that 10 to 12

13   hours, 12 hours plus.  He was transported at one point from the

14   station in Moreno Valley to San Bernardino.  The recordings

15   about the transport to and from Moreno Valley were provided, as

16   well as the recording of the polygraph, which was part of that

17   ongoing interrogation, so.

18        THE COURT:  I'm sorry.  I just focused on the

19   interrogation at the Moreno Valley, in that room that he was in.

20        MR. MOORE:  Sure.

21        THE COURT:  I focused on that.  They did mention

22   San Bernardino.  There was a forensic nurse that came in there.

23   There were people that were swabbing, taking a DNA sample, but I

24   did not review the one from the poly -- that was when he was

25   taken from Moreno Valley to San Bernardino.  I didn't know that

26   was part of it, the motion.

27        MR. MOORE:  Sure.  They were actually submitted as

28   separate exhibits.  I believe they were marked as defense

1    exhibits, but that was just the actions of the clerk, because I

2    handed them to her as opposed to Miss Foster, and that was just

3    because we had the transcripts made.

4         And then there was also an initial contact by

5    Kurylowicz at the scene.  That was the initial contact where he

6    was detained and questioned somewhat briefly by investigator,

7    I'm sorry, Deputy Kurylowicz.

8         THE COURT:  Well, that one I did not review.  Which

9    exhibit was that?

10        MR. MOORE:  That was also submitted.  I believe it's

11   labeled as a defense exhibit, for whatever reason.

12        THE COURT:  I didn't review any of the defense

13   exhibits.

14        All right.  I did review the first couple of hours in

15   the interrogation room.  The defendant did admit at one point in

16   the interrogation that he felt he wasn't free to leave.  He was

17   placed in the back of the patrol car, and he thought he wasn't

18   free to leave.  And at one point, this is a couple of hours in

19   the middle of it, that's when one of the investigators read the

20   defendant his Miranda warnings, and the defendant continued to

21   speak.

22        MR. MOORE:  That's correct.

23        THE COURT:  So I don't know if he was given Miranda

24   warnings at the scene.  I'm assuming he wasn't.  But I didn't

25   review any statements that he made or did not make at the scene.

26   I didn't -- I didn't review any of those statements.  I don't

27   know if you're planning to exclude any of those statements.

28        MR. MOORE:  Yes.  That was part of my 402s as well.

1    THE COURT:  All right.  I didn't review that statement,
2  I'm sorry.
3    MS. FOSTER:  I think that statement is about 16
4  minutes.  And my understanding from the defense's 402 motions is
5  that No. 2 on page 3 of their 402 is exclusively regarding
6  whether or not he was in custody or whether it was custodial for
7  that first statement.  Is that correct?
8    MR. MOORE:  No.
9    MS. FOSTER:  Oh, No. 1, I'm sorry.
10   MR. MOORE:  No. 1 on page 2.
11   MS. FOSTER:  No. 1 on page 2 is completely about that
12  first statement at the scene, whether or not it was custodial.
13   MR. MOORE:  Correct.  It's our contention that the
14  statement by Mr. Boji at the sheriff's station, while there were
15  some initial statements that were taken outside of Miranda, the
16  general -- the gist of the contention with regard to the
17  interrogations at the station or at the polygraph have to do
18  with the coercing of this and the voluntariness of this, the
19  interrogation.
20   THE COURT:  All right.  I'll have to take a look at
21  the -- at that 16 minute.  What defense exhibit was that, so I
22  could be more focused?
23   Do you want to show that to defense, because it's his
24  motion?
25   THE CLERK:  Okay.
26   MR. MOORE:  So the on-scene interrogation is Exhibit C,
27  and C-1 is the transcript.  And then the polygraph is Exhibit B.
28  And the drive recordings are Exhibit A.

1          THE COURT:  All right.

2          All right.  I'll take a look at that during the lunch

3     hour.

4          MR. MOORE:  Okay.

5          THE COURT:  All right.  Basically the standard under

6     *Winbush* is totality of the circumstances.  I did review several

7     hours of the one that he was in the Moreno Valley station.  He

8     said at the beginning when he came in -- I'm just giving you the

9     Reader's Digest version of the facts, what I gathered it to be.

10         MR. MOORE:  Sure.

11         THE COURT:  He was in the interrogation room.  He said

12    he was thirsty.  They didn't give him any water at the

13    beginning.  There was small talk.  He was telling the

14    investigators about his family.  He played -- he was a wrestler.

15    Little small talk.  Nothing really about the case in itself.

16         They told him he couldn't get cleaned up right away

17    because there is protocols.  And then one by one there was a

18    nurse that came in, and then there was a gentleman that came in

19    and conducted some DNA swab.  And then the investigator started

20    talking to him, and they did ask him, did you feel free that

21    when you were placed in the back of the patrol car, did you feel

22    free that you were free to leave?  The defendant said, "No."

23    The investigator stopped.

24         Now, this is not at the beginning.  There was a lot of

25    small talk going on.  There was a lot of things going on at the

26    beginning, but there wasn't really any admission or confession

27    prior to any Miranda warning.

28         At one point they did allow him to clean up.  At one

1    point they did take him to the restroom.  At one point he did

2    fall asleep.  It was dark for a while in that interrogation

3    room.  Lights were turned off.  So he was sleeping.  He was

4    allowed to drink water.  They took him to the restroom.  They

5    didn't feed him.  He said he was hungry, but I think it was

6    about 10, 11, 12, 13 hours that he actually got something to eat

7    at that point.

8              MR. MOORE:  Correct.

9              THE COURT:  That's pretty much what I looked at thus

10   far.

11             MR. MOORE:  And I'd note that while he was allowed to

12   sleep for a while, whenever the lights went off, at least after

13   that initial time that the lights went off, the investigators

14   were quick to come in and trigger the motion sensor to make sure

15   the lights were on in the room.

16             THE COURT:  Right.  At one point the lights were turned

17   off.  The investigators had to turn the light switch.  The

18   defendant, you could see him sleeping at some point on the

19   floor, another point in the chair.  The interrogation did stop.

20   It wasn't continuous.  There was portions where they left, left

21   him alone.  So that's pretty much what I observed thus far.

22             MR. MOORE:  Yes.

23             THE COURT:  All right.  So let me take a look at the

24   lunch hour.  We'll bring this up.  I don't want to make any

25   decisions yet, because I don't have the complete picture.

26             MR. MOORE:  Yes, Your Honor.

27             THE COURT:  I'll review C-1 and A and B during my lunch

28   hour.  It might be, you know, hopefully, I'll have enough time.

```
 1            And, once again, the burden is on the People that these
 2    statements were made voluntarily by preponderance of the
 3    evidence, okay?
 4            MS. FOSTER:  Yes, Your Honor.
 5            THE COURT:  I'm sorry.  I thought I had the complete
 6    picture.
 7            MR. MOORE:  It's quite all right.  It's just a
 8    miscommunication.
 9            THE COURT:  Okay.
10            So we have a couple of minutes.  You could still begin
11    jury selection.
12              (Jury voir dire conducted, not transcribed.)
13                  (Proceedings were held out of the
14                   presence of the prospective jurors:)
15            THE COURT:  All right.  Out of the presence of the
16    jury.  The jury, the prospective jurors have left.
17            The Court has reviewed the transcript of Exhibit B-1.
18    It looks like I'm not going to be able to make any rulings on
19    the 402 today, so we'll take those issues tomorrow.  But I have
20    to take a look at the video.  But I did read the transcript of
21    B-1 so far and there is other ones I still have to read.  I
22    still have to read A and C-1, so I'll need to take time to do
23    that and review the video.  All right.
24            Anything else from the defense?
25            MS. BLUMENTHAL:  Yes.  But this doesn't have to be on
26    the record.
27            THE COURT:  We will go off the record.
28                      (Noon recess.)
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 20

1          THE COURT:  Back on the record out of the presence of

2    the jury.

3          And, Counsel, would you waive your client's presence

4    just briefly?

5          MS. BLUMENTHAL:  Yes.  So waived.

6          MR. MOORE:  Yes.

7          THE COURT:  The Court did have an opportunity to review

8    not only the transcript but also the CD, the video file of the

9    actual polygraph, the drive to the polygraph, and the

10   transcript.  The only thing the Court has not yet reviewed is

11   Exhibit C, which is the transcript.  I don't know what it is.  I

12   think this is when the officer first arrived.

13         MR. MOORE:  The scene interview with Deputy Kurylowicz,

14   Your Honor.

15         THE COURT:  All right.  And the Court tried to play the

16   CD of that audio.  It's corrupt, or it doesn't allow me to play,

17   so the Court's not going to be -- I actually listened to it, but

18   the Court will be able to review the transcript.  So if you want

19   me to review the actual CD, this one is not playable.

20   Something -- I called IT, and they said they're not able to get

21   it to be played.

22         MR. MOORE:  I'll have one brought over.

23         THE COURT:  All right.  And I think that's it.

24         (Jury voir dire conducted, not transcribed.)

25             (Proceedings were held out of the

26             presence of the prospective jurors:)

27         THE COURT:  All right.  Miss Blumenthal, anything else

28   we need to put on the record?

```
 1            MS. BLUMENTHAL:  No, Your Honor.

 2            MS. FOSTER:  Nothing.

 3            THE COURT:  All right.  So what time can we meet?  I'm

 4       going to listen to the last portion the last audiotape, and

 5       that's Defense C.  I re-reviewed the last transcript.  What time

 6       can we come in with all these issues, so the Court is provided

 7       all these issues?  9 o'clock?  8:45?

 8            MR. MOORE:  You tell me, Judge.

 9            THE COURT:  All right.  8:50.

10            MR. MOORE:  8:53.

11            THE COURT:  No.  8:50 ready to go.

12            Okay.  I'd, like I said, I already reviewed -- there is

13       numerous hours.  I already reviewed -- I had saw it.  I got a

14       good gist of what's going on.

15            MR. MOORE:  Thank you.  Just for the record, I did

16       provide a second copy of that disk, which I believe this one

17       will work.  It's been tested.  And your clerk returned the

18       original version I provided to you.  I still have it.

19            THE COURT:  Yes, and that one was not put -- I could

20       not play it on -- in chambers.

21            THE CLERK:  I did not mark the new one.  I just changed

22       the sleeves.  Is that okay?  Or should it be marked differently?

23            MS. FOSTER:  That's fine.

24            MS. BLUMENTHAL:  That's fine.

25            THE COURT:  By way of stipulation, that's all right by

26       all parties.  That will be allowed, then.

27            MS. FOSTER:  I just wanted to make sure, I did send

28       over opposition to the 402s.  I don't know if the Court is in --
```

```
 1            THE COURT:  I have not reviewed it.  I have seen it.

 2            MS. FOSTER:  I emailed to Brenda, the defense, and she

 3   said she was going to give it to the Court, as well as I filed

 4   it.

 5            THE CLERK:  How long ago?

 6            MS. FOSTER:  Friday.

 7            THE COURT:  Well, make sure.

 8            MS. FOSTER:  I'll make sure to give that to you.

 9            THE COURT:  I'll make sure I get it before I leave here

10   today.

11            All right.  Thank you.  Court's in recess.  Adjourned

12   for the day.  Thank you.

13                      (Proceedings concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

```
 1                RIVERSIDE, CALIFORNIA; JUNE 26, 2018

 2              BEFORE THE HONORABLE SAMUEL DIAZ, JR.

 3         THE COURT:  Back on the record in the matter of People

 4    versus Houston Boji, RIF1605448 (sic).  All parties are present.

 5    The jurors are not present.

 6         At this time the Court will conduct the 402 hearing.

 7    The Court has reviewed the People's opposition to the

 8    defendant's 402 motion, which was filed, I believe, yesterday

 9    afternoon.  The Court reviewed it yesterday afternoon before

10    leaving.

11         At this time we'll take the defense 402.  Which issues

12    would you like to discuss first?

13         MR. MOORE:  We can start with -- well, we can just go

14    in order.  The Kurylowicz statement is first regarding Miranda

15    issue that I raised, and I believe the Court had a chance to

16    review the transcript of the recording from that.

17         THE COURT:  Yes.  The Court did review the recording

18    and the transcript of that interview.

19         MR. MOORE:  And what I'd state is I'd make a

20    representation to the Court that according to the police reports

21    in this matter, prior to Deputy Kurylowicz's interview, Mr. Boji

22    was directed to sit on the curb and wait for law enforcement to

23    speak to him by one of the initial responding officers.

24         THE COURT:  For the record, that was not in the

25    transcript.  So the Court just reviewed the transcript itself

26    and the audio, but that was not part of the transcript that

27    the -- so this is a new offer of proof that the defendant was

28    told to sit down.  I didn't have that information.  Of course,
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 24

1    I'm not privy to the police report.

2            MR. MOORE:  Correct.  I mentioned it in the statement

3    of facts.  And I understand that that's not evidence at this

4    point.

5            THE COURT:  Is there a stipulation so the Court could

6    accept that as a fact?

7            MS. FOSTER:  Can you point me to which report that is?

8            MR. MOORE:  Can we have just a moment, Your Honor?

9            MS. FOSTER:  If that's Mr. Moore's representation, I

10   will accept that representation.

11           THE COURT:  Well, you have to stipulate to those facts,

12   because I just heard the audiotape, but that, the audiotape, the

13   recording doesn't discuss about him ordering to sit down.

14   Basically starts picking up the conversation between him and the

15   defendant, the officer, discussing about how long he's been

16   there, 20, 25 minutes at the scene prior to the police arriving

17   or being interviewed.

18           MR. MOORE:  I think we can stipulate.  And I'll just --

19   what I'll do is I'll read the relevant section from the report

20   in and we'll stipulate to that as the --

21           THE COURT:  All right.  Well, I need to know whether or

22   not he was ordered to sit down, or was he asked "Can you sit

23   down"?  I mean, this is very important, because it's whether or

24   not the defendant feels that he's free to leave.

25           Now, obviously, once he's at the station, it became

26   very clear to the Court, after reviewing the audio, one of the

27   investigators asked him, "Hey, how did you get to the police

28   station?"  And he said, "Well, they put me in the back of the

1    police car."  "Did you feel free to leave?"  And the defendant

2    said, "No."  But at that point the Miranda was given.

3            MS. FOSTER:  Yes.

4            THE COURT:  So that's kind of the gist of what happened

5    at the Moreno Valley station.

6            So do we need to conduct a formal hearing and have the

7    officer come in, or are both of you going to stipulate?  Because

8    it's important for the Court, was he ordered to sit down and not

9    leave, or was he casually told, hey, stick around.  Sit down?

10           MS. FOSTER:  And based on my reading of the report, I

11   think that what is taking place is the officers are doing an

12   initial investigation, so they're asking all the witnesses to

13   stay in place.  I don't think any -- every witness on the scene,

14   if I read that correctly, the two people that called 911 were

15   told to stay in one section, and then the defendant was told to

16   sit on the curb, and then the officer went and conducted an

17   interview of the two people that called 911, and then an officer

18   came over and interviewed the defendant.  I think that's an

19   exact recitation of what occurred.

20           MR. MOORE:  Well --

21           THE COURT:  If you want to read this and then read

22   what's relevant, if both of you stipulate, then I'll take that

23   as testimony, as evidence, then, if both of you stipulate to it.

24           MR. MOORE:  Okay.  There's two sections I'm going to

25   read.  So I'm just going to ask for the Court's indulgence,

26   because it starts out ambiguous, and then I believe it's

27   resolved.  And we can discuss it.

28           This is from Officer Zimolzak's report.  And it was

Christine M. DiCaro, CSR                                                    17

1    never bates stamped for some reason or another.  It was not in

2    my discovery, but it was provided in discovery.

3         He states:  "As I was approaching the above-listed

4    residence, I saw Deputy White talking with the subject, Houston

5    Boji, near the front porch area.  Deputy White and Boji were

6    standing facing each other during a short conversation.  While

7    walking towards them, I noticed Boji's face and clothing were

8    covered in blood.  Deputy White walked into the residence,

9    leaving Boji near the front door.  I was unable to hear their

10   conversation.

11        "I walked directly up to Boji and asked him if he was

12   injured.  Boji responded by saying 'No.'  I asked Boji to stand

13   and wait on the sidewalk until I returned from assisting Deputy

14   White.  I saw Boji walk toward the sidewalk, and I entered the

15   residence to assist Deputy White."

16        So that's the first section.  After he talks about

17   assisting Deputy White, Deputy Zimolzak then writes:

18        "I then walk back to Boji and advised him to have a

19   seat on the curb and wait until someone talks to him.  Boji

20   complied with my order and sat down on the curb.  I walked away

21   from Boji and approached other witnesses."

22        And now I'm no longer reading.  It was at that point or

23   soon thereafter that Deputy Kurylowicz approached him and took a

24   statement.

25        So by the language of the report, it was couched as an

26   order and actually confirmed as an order in the report.  If the

27   Court is more comfortable, or if the People are willing to

28   stipulate, I'd ask for a formal hearing where we talk to Deputy

1    Zimolzak about how he ordered Mr. Boji to sit.

2              THE COURT:  Do you stipulate to those facts?

3              MS. FOSTER:  Yes, Your Honor.

4              THE COURT:  The Court will accept that stipulation.

5    And, for the record, the Court did review the transcript and the

6    recording that's Exhibit C and C-1.

7              Now, are there any statements that you, People want to

8    elicit from that first interview?  I mean, maybe this is moot,

9    we don't need to get into it if there is nothing that you plan

10   to use at the scene.

11             MS. FOSTER:  Well, no, I do intend to elicit the

12   statement that you heard, that was played for you at the scene

13   from Deputy Kurylowicz.

14             THE COURT:  That the defendant was conducting CPR?

15   Just give me a little -- is that the statements you want to

16   elicit, that the defendant was assisting the victim, conducting

17   CPR, that's how he got blood all over him?  Is that pretty

18   much --

19             MS. FOSTER:  And the fact that the defendant claims

20   initially that the victim committed suicide.  That's what he

21   volunteered in the 911 call, as well as he volunteered to Deputy

22   Kurylowicz at the scene.

23             THE COURT:  Can you refresh the Court's memory of what

24   page?  I mean, the Court did not review the 911 tape, by the

25   way.  That was not provided.

26             MR. MOORE:  The defendant did not make a 911 call.

27             THE COURT:  I'm sorry, the defendant.

28             MR. MOORE:  Well, no.  The defendant did not make a 911

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 28

```
 1    call.
 2            THE COURT:  Yes.  It was a neighbor, I believe.
 3            MR. MOORE:  Yes.  I believe page 2 of the transcript,
 4    line 25 is the first time that the statement is made.
 5            THE COURT:  Yes.  I thought it was just charged was
 6    just more of an accident the way I read it from the beginning.
 7    It was more of an accident.
 8            But, anyway, there was -- so you want to use those
 9    statements?
10            MS. FOSTER:  Yes, Your Honor.
11            THE COURT:  All right.
12            And the defendant was not placed in handcuffs during
13    the interview.  Can we stipulate to that?
14            MR. MOORE:  Yes, Your Honor.
15            MS. FOSTER:  Yes, Your Honor.
16            THE COURT:  All right.  People have the burden.  That's
17    pursuant to People versus -- that's pursuant to the Winship case
18    that I cited yesterday.  Let me see if I have my notes here.
19            MR. MOORE:  It's Winbush, Your Honor.
20            THE COURT:  Winbush.  W-i-n-b-u-s-h.  It's a 2017 case.
21            All right.  People?
22            MS. FOSTER:  The first thing I'd like to argue about to
23    the Court is that based on, and we're just talking about the
24    Kurylowicz statement at the scene?
25            THE COURT:  Correct.
26            MS. FOSTER:  Based on the nature of that interview, the
27    Court can, after having listened to it, could hear the tone of
28    the conversation.  It was not coercive in nature, it was not
```

1   pressure in nature, and it did not appear to even be an

2   interrogation.  What it appeared to be was a scene interview

3   similar to what they conduct with any other witness at the

4   scene, at a crime scene.

5        It's also clear in that interview that it does not

6   appear that the defendant is a suspect at that time.  So what

7   we're determining here is whether or not this was custodial in

8   nature.  And being detained for the purposes of beginning an

9   investigation is different than being in custody for a custodial

10  interrogation.

11       I cited several cases for the Court, and they were also

12  cited in the defense's motion, and I think they're easily

13  distinguishable from the case at bar.  But I did want to point

14  to a couple of facts in our current case that are different.

15       Defendant is the one who is the only person on scene.

16  The only witness to what occurred.  So when officers arrive,

17  he's the only person to interview to determine what happened to

18  the victim in that case.  He initially tells officers that there

19  was a suicide.  And so based on the nature of that recording, it

20  sounds as if officers were trying to investigate a suicide.

21       Let me pinpoint a couple of things for the Court.

22       Give me one moment, Your Honor.

23       There are several places, and I'll point you to page

24  10, lines 29 through 44 where the defendant's discussing stating

25  that the victim was in a poor mood, that he had been fighting

26  with his mother, and that they were just hanging out to go

27  shooting.

28       On page 11 the defendant goes into some background on

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 30

1     the victim's mental health and medication.

2            On page 12 of the transcript the defendant talks about

3     any medications he's taking, which suggests to the officer that

4     the victim's suicide was because of issues that he was having

5     with the victim's mother.

6            So based on the officer's questions and responses to

7     the defendant's statements, it's clear that the officers are not

8     investigating a murder at that point, they believe they're

9     investigating a suicide.

10           And I also want to talk about the environment that was

11    created.  So the defendant, if you recall during the recording,

12    you could hear several dogs barking.

13           THE COURT:  Yes.  And I think either the defendant had

14    a dog, or someone had a dog.  It was kind of confusing, because

15    there was a brief discussion of what to do with the dog.

16           MS. FOSTER:  Yes.  And so based on the audio recording,

17    it's clear that the defendant's holding the -- some dog at the

18    time of his interview.  And I think that's also an indication

19    that it's not a custodial interrogation.  If it was a custodial

20    interrogation, based on the cases that we've seen in the court's

21    history, you wouldn't be free to be carrying a pet.

22           THE COURT:  And I think he was holding on to the dog.

23    The inference was he was holding on, or holding on to the dog

24    during part of the interview, at least.

25           MS. FOSTER:  Yes, Your Honor.  As well as there is a

26    point in the interview where the officers have a discussion with

27    him, as you mentioned, about putting the dogs away.  And they

28    indicate that he has his keys, ask him if he has his keys and

1    tell him he can put them into the car.

2                THE COURT:  All right.

3                MS. FOSTER:  Which further goes to indicate that this

4    is not a custodial interview where they have detained him and he

5    is being subject to a custodial interrogation.

6                Furthermore, they moved to different locations in front

7    of the house trying to make sure the defendant has shade at the

8    time that they're interviewing him.  And the only thing that he

9    is not allowed to do is reenter the crime scene, which makes

10   sense because that crime scene is now being investigated and

11   contained.

12               The defense mentions *People versus Anderson*, and that

13   case I distinguish in my motion, in my opposition motion,

14   because in *Anderson* there's threats of coercion and false

15   promises of leniency.  There was none of that in the current

16   case.

17               THE COURT:  All right.  Defense?

18               MS. FOSTER:  Same in *Mincey versus Arizona*.  The

19   defendant at the time of the interview was in excruciating pain.

20   They still made him write out his statement.  He was in and out

21   of consciousness.

22               I'm sorry.  Do you mind if I grab some water?

23               I also distinguish *Lyman versus Illinois*, *People versus

24   Thompson*.

25               The Court referred to *Hayden* as one of the Court's

26   cases that the Court had cited.  And the Court in *Hayden* tells

27   you -- tells us, gives us guidance on what to look for.  The

28   language used to summon the individual.  Here Mr. Boji was not

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 32

1   summoned to the scene, he was the person who initiated the 911

2   call on the scene, and he was the only witness at the scene, and

3   remained at the scene when officers arrived.

4        *Hayden* also says the extent to which the defendant was

5   provided the evidence of their guilt.  There was no discussion

6   of Mr. Boji's guilt during his interview at the crime scene,

7   because at that point officers are not investigating him for

8   guilt, they believe they're investigating a suicide.

9        Three.  The physical surroundings of the interrogation.

10  This is in a -- on a public street.  There is other people

11  around.  As we heard, the officer in the stipulation tells two

12  other people to step aside while he interviews Mr. Boji.

13       It's in front of the victim's home.  The surroundings

14  are that the defendant's car is very nearby.  At one point

15  during the interview, they ask Mr. Boji if he has someone to

16  come there for him.

17       The duration of this detention is about 20 minutes, so

18  it's very brief.  And the degree of pressure applied to detain

19  the individual, the only pressure we see to detain him was being

20  ordered to sit in front of the house until he's done

21  interviewing the other witnesses.

22       So I don't think that this case at all falls in line

23  with *Hayden* or any of the cases that led up to that, because

24  there is no harassful environment that would push someone to be

25  forced to make statements, incriminating statements against

26  themselves.  And what's more indicative of that is the fact that

27  Mr. Boji does not make any incriminating statements towards

28  himself.  As a matter of fact, all he's doing is creating an

1    alibi the entire time, not feeling any pressure to admit any

2    part of his guilt.

3          THE COURT:  The Court did read the factors in *U.S.*

4    *versus Hayden*.

5          All right.  Defense?

6          MR. MOORE:  So I think we're kind of mixing up two

7    different analyses here.  This is a simple Miranda issue.  So

8    the issues before the Court are:  Was this an interrogation?

9    And I would submit to the Court that it was.  The second

10   question was:  Was it a custodial interrogation?  Was defendant

11   effectively in custody at the time?

12         And what I would point out was, is that according to

13   stipulation, he was ordered to stay at the scene, ordered to sit

14   in a specific place.  He, apparently, did.  When he was

15   approached by the officers, he was immediately, or the

16   interrogation immediately commenced with no reading of his

17   Miranda rights.

18         While he was not further restrained through the

19   application of handcuffs, it's clear throughout the entirety of

20   the interview, the interrogation, that he was being controlled.

21   He understood -- from his questions, he understood that he was

22   under the control of those deputies.  He was asking permission

23   to do things that he would normally be able to do, whether it

24   was put the dogs in the car, or at one point, and I direct you

25   to page 13, he does state that he's kind of thirsty, and the

26   officer says that they're not going to let him drink at the

27   time.

28         He is directed to sit down, and he complies.  He's then

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 34

1    directed to stand up so they can take some photographs, which

2    they do.

3            And, also, he asks permission to stand somewhere out of

4    the sun.  And while they initially, and this is on page 13 as

5    well towards the bottom.  While they initially say "You can go

6    stand by the tree," then they backtrack and just say you're

7    going to have to tough it out, basically.  I'm paraphrasing.

8    For the time being, because they don't want you near anything

9    that you might touch.

10           At that point it's very clear that he is being

11   interrogated.  He's under the direct control of the deputy.  And

12   most importantly, he recognizes that control.  He understands

13   that he's not free to do the things that he would normally be

14   able to do voluntarily.

15           I think another important factor to note is at this

16   point in time this is the last time that Mr. Boji is,

17   effectively, out of handcuffs.  He's later put in the police

18   car.  He's transported.  And he's either in the police station

19   or in handcuffs for basically the remainder of, well, until now.

20   This is two-and-a-half years later.  He hasn't been out of the

21   custody of the sheriff's department since that moment that he

22   was directed to sit down on the curb by Deputy Zimolzak.

23           So the outcome, while it's not determinative, it does

24   confirm that, from the defense's perspective, that he was in

25   custody at this time, and that custody has never been lifted

26   since.

27           And I'd submit.

28           THE COURT:  All right.  At this time the Court's going

1    to make a finding that the defendant was not in custody at the

2    time at the scene of the incident.  That, basically, the

3    officers came to the scene.  They don't know what's going on.

4    They talked to the defendant.  The defendant says he was full of

5    blood because "I was, basically, giving my friend CPR."

6           Once again, also he had some pets.  I don't know if he

7    had a dog or two, but he was allowed to keep the dog.  There

8    were discussions about him putting the dog in the car.  That

9    means he still had some access to the keys, or just to hold on

10   to the dog.  That was pretty much the discussion.  Defendant

11   wasn't placed in handcuffs.  I don't believe he was in custody

12   at the time, so, therefore, Miranda did not have to be given.

13          However, the moment he was placed in the patrol car in

14   the backseat and he was taken to the Moreno Valley police

15   station, and when the -- and there was a lot of discussion, a

16   lot of small talk.  At one point the investigator, I forgot

17   which investigator it was.  In the video it was an

18   African-American man.  And he said to the defendant, "How did

19   you get to the police station?"  And the defendant said, "They

20   put me in the back of the patrol car."  "Did you feel like you

21   were free to leave?"  And it was very clear the defendant said,

22   "No."

23          At one point -- at that point the investigator stopped

24   and gave him his Miranda.  I know I'm ahead of myself.  This is

25   what I gathered from the evidence.  Miranda warnings were given,

26   and then it seemed like it was an implied waiver because the

27   defendant started talking.  That's pretty much the gist.

28          Now, is the People trying to elicit the statements that

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 36

1    were made before Miranda or not?

2           MS. FOSTER:  In between the scene, like the moment he's

3    in the patrol car and then to Miranda there is no statements

4    that we're seeking to elicit.

5           THE COURT:  Because there was a lot of small talk

6    occurring before Miranda was given.

7           MS. FOSTER:  Yes.

8           THE COURT:  At the interrogation room.

9           MS. FOSTER:  Yes, Your Honor.

10          THE COURT:  So you're not seeking any of that small

11   talk that he was wrestling or school or none of that?

12          MS. FOSTER:  No, Your Honor.

13          THE COURT:  All right.

14          So I already made my ruling for the first part.  The

15   Court finds the defendant was not in custody until he was placed

16   in the back of the patrol car.

17          Now, what statements are you wishing to, Mr. Moore,

18   once he's at the police station?

19          MR. MOORE:  Yes.

20          THE COURT:  Are you arguing that Miranda wasn't given

21   properly?  Are you arguing that there was no implied or

22   expressed waiver?  Or your argument is basically, hey, Miranda

23   was given but this interrogation took too long, or it was more

24   psychological.  It was coercion at one point and then became

25   involuntary.  I need to hash out your argument.

26          MR. MOORE:  The thrust of my argument is that the

27   statement after Miranda was involuntary due to the coercive, the

28   cumulative coercive nature of the interrogation, and the fact

1    that he had already been speaking to, as the Court observed an

2    investigator who was doing at least some questioning of the

3    defendant for a good period of time prior to the giving of

4    Miranda.  And that was identified as Detective Rodriguez was the

5    primary person that he was interacting with prior to Miranda

6    being given by Detective Dean.

7         THE COURT:  Right, but the People are not seeking any

8    of those statements.

9         MR. MOORE:  Okay.  Fair enough.  I do think it is -- it

10   goes to the cumulative nature of the coerciveness of the

11   interrogation.

12        THE COURT:  Let me just clarify.  So your argument is

13   that there was no express or implied waiver, or is your

14   argument, okay, I can see that there was an implied waiver, but

15   the statements were made and over time it was coerced?  I need

16   to hash out that specific issue.

17        MR. MOORE:  Well, the -- I think the recitation of

18   Miranda wasn't perhaps verbatim, the one that's printed on the

19   card.  It did strike me that the only major omission was that if

20   he couldn't afford an attorney, one would be provided to him

21   prior to the ordering -- prior to the commencement of any

22   questioning was my recollection of the defect in Miranda.  So

23   I'd argue that it was a defective Miranda.

24        But beyond that, if the Court finds that the Miranda

25   warning, as given, was sufficient, I believe there was an

26   implied waiver.  And this is on, it's an unlabeled evidence

27   tape, and I don't have the exhibit number.  And it's on page 8,

28   line 3.  Starts with "Okay, Houston."  That's where the Mirandas

1    are given.  And from the bottom right it's labeled as track 2.

2              THE COURT:  All right.

3              All right.  I am going to make a finding at this time

4    that Miranda was given and it was an implied waiver, because the

5    defendant didn't really say, yes, I wanted to talk to you, he

6    just started talking, and so I'm going to assume that was an

7    implied waiver, a valid implied waiver for the record, for the

8    ruling.

9              MR. MOORE:  Understood.  And it is, just so we're

10   clear, Detective Dean does confirm that Mr. Boji did understand

11   the rights that had been read to him.  He doesn't ask for an

12   explicit waiver, but, unfortunately, under the current state of

13   the law, I believe an implied waiver is sufficient for Miranda,

14   assuming the Miranda warning was adequate.

15             So at this point we have a young man.  He states he's

16   19 in the interview.  He's left high school.  He's attending

17   college, but he doesn't have a college degree.  He doesn't talk

18   about any work history.  He appears to be unemployed and lives

19   at home with his parents.

20             So we have a young, relatively unworldly man who's

21   being interrogated after the loss, through whatever mechanism,

22   of what he represents to be his best friend.  He's sitting there

23   covered in his friend's blood.  He's denied access to the

24   bathroom initially to wash off.  I don't believe he states he

25   needs to go to the bathroom, but he does ask to wash off at

26   least once and probably several times.

27             THE COURT:  And he did make a request for water.

28             MR. MOORE:  Right.  He made a request for water, and

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 39

1    that was initially denied as well.

2         And over the course of the interview, and I'll talk

3    about it as a whole, he's not fed until hours later and after

4    the polygraph.  So at this point he's been at the station or in

5    police custody for at least 12 hours, since the relatively early

6    morning hours, mid morning hours of that day, and not having

7    been fed, getting water or soda on a periodic basis after he was

8    allowed to clean off.  He's been stripped of his clothes.  He's

9    dressed in a white jumpsuit at one point.

10        He is being interrogated, and while the interrogation

11   is relatively even toned, especially early on, it's -- one of

12   the things that stood out was the investigator starts telling

13   him about the law.  And he says, basically, in this situation

14   there were three possibilities:  Suicide, accident, or murder.

15   And if it's suicide, and I believe the actual statement was:  If

16   it's suicide, it's suicide.  If it's an accident, it's an

17   accident, but if it's murder, you go to prison.

18        And on page 57 of what's identified as track 2 on

19   the -- on the transcripts, he actually states, "If you actually

20   point a gun at someone and pull the trigger and you kill them,

21   that's murder."

22        These are inaccurate statements of law.  He entirely

23   leaves out, I mean, we'll just ignore self-defense for a moment,

24   because that would make an affirmative defense, but he doesn't

25   talk about mistake of fact.  He doesn't talk about, more

26   importantly, the concepts of manslaughter.  He is basically

27   separating the potential stories out in an oversimplified and

28   very coercive manner.

1          He is telling the defendant, telling Mr. Boji that if

2    this is a situation where the gun was pointed at the decedent

3    and the trigger was pulled, it has to be murder.  That's the

4    only potential outcome.  And that's simply not true.  There are

5    multiple, many situations where someone could point a gun at

6    another person and intentionally pull the trigger, or

7    accidentally pull the trigger and it's not murder.

8          So when you put together everything that was said and

9    done over the course of this entire day into the next, this is

10   an extremely coercive situation, environment and pattern of

11   questioning, and I would argue that it renders the entirety of

12   the statements involuntary.

13          THE COURT:  All right.  The interrogation wasn't

14   consistent, though, constant.  There were periods of time when

15   the defendant was given water, and that was at the Moreno Valley

16   police station.  He was allowed to use the restroom at the

17   Moreno Valley police station.  He was allowed to rest.  It's not

18   very comfortable.  There is basically a couple of tables, a

19   table, two chairs.  And he was seen at one point sleeping on the

20   floor, falling asleep on the chair.  It wasn't -- this

21   interrogation wasn't constant for 13 hours.  There were lapses

22   of time where the defendant was allowed to use the restroom,

23   wash himself, wash the blood off.

24          A nurse came in, took blood, another individual came in

25   and took, I believe, a swab.  I believe his fingerprint was

26   taken.  So that's what I was looking at.  I was looking at

27   whether the tactics that were used, was it, you know, constantly

28   pounding him over and over?  I didn't get that from this

1    interrogation.

2           He was hungry.  He did say he was hungry.  They didn't

3    give him any food until after the -- after leaving

4    San Bernardino.  They took him to San Bernardino, and once at

5    San Bernardino there was a polygrapher.  And he was there two

6    hours, two-and-a-half hours according to what I watched on the

7    tape.  Even then there was a lapse in time where the individual

8    conducting the test would leave, leave him alone for about 10,

9    15 minutes where he could relax.  As a matter of fact, in one of

10   the videos you see him breathing, sighing.

11          And on the way back they started talking about food.

12   And they actually gave him a choice of either Taco Bell or Jack

13   in the Box, and the defendant picked Taco Bell.

14          MR. MOORE:  Well, I don't believe that's tantamount to

15   torture, I mean, those two options.

16          THE COURT:  Actually, I'm fond of Taco Bell.

17          MR. MOORE:  I object.

18          THE COURT:  You know, I looked at *Winbush*.  *Winbush*

19   talks about you got to look at everything.  You got to look at

20   the totality of the circumstances.  And there's another case,

21   *People versus Neal*, which I didn't cite, which I'll be citing

22   today.  It's a 2003, *People versus Neal*, N-e-a-l, 31 Cal.4th 63.

23   It's actually page 83 through 84.  In that particular case

24   defendant wasn't provided any type of food, and it was more than

25   24 hours.  I believe in that particular case it was close to 36

26   hours.

27          We don't have that situation here.  I know he was

28   thirsty.  Eventually they gave him water, I think the second or

1    third hour. During the interrogation, they gave him water. He

2    wanted to use the restroom, he used the restroom. The officers

3    left the room a couple of times. He was allowed to rest. The

4    lights were off at one point for a period of time. Defendant

5    was in complete darkness. When they turned on the lights, he

6    was sleeping on the floor.

7         So my understanding of the current status of the law

8    under the totality of the circumstances under *Winbush*, I don't

9    find this too coercive, no.

10        MR. MOORE: I understand. And I would point out that

11    in *Winbush* one of the points that the Court cited or rested,

12    relied upon was that *Winbush* had actually had his Miranda rights

13    read to him on multiple occasions, and every time he waived.

14    And those waivers occurred both orally and in writing. So this

15    wasn't just a situation where there was one implied waiver by a

16    young inexperienced man, this was multiple occasions where the

17    defendant waived his Miranda rights affirmatively.

18        THE COURT: Right, but at the San Bernardino station, I

19    believe the polygrapher, and let me quote him. He kept -- I

20    think he asked the defendant twice. I don't have the exact

21    language here. Let me see if I can find it.

22        Basically -- I don't have it here, but basically he

23    said to the defendant, "Young man, you can stop this at any

24    time. Just let me know, and I'll page the deputies." He asked

25    him twice. So he gave him the opportunity too at

26    San Bernardino. And I don't know if this gentleman is an

27    officer or detective. That wasn't very clear to me. But it was

28    told to the defendant at San Bernardino, hey, young man, if you

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 43

1    don't want to do this, or at any time you don't want to go
2    through this or finish this, or it was some gist to that.  It's
3    in the record.  It's part of the record.
4              MR. MOORE:  Right.
5              THE COURT:  Let me know and I'll stop.
6              So under the totality of the circumstances.  I am going
7    to read the language from *Winbush*, because I did read that very
8    carefully.  "A confession, voluntariness depends upon the
9    totality of the circumstances in which it was made.  Relevant
10   factors include the crucial element of police coercion, the
11   length of the interrogation, the location, it's -- " and I can't
12   pronounce this word, c-o-n-t-i-n-u-i-t-y, as well as the
13   defendant's maturity.
14             I do believe the defendant was 18 at the time?
15             MR. MOORE:  He was.  He was 19.
16             THE COURT:  He did said he was at one point worked with
17   the Police Explorers.  He was a Police Explorer Cadet, something
18   like that, for a very short time, I think it was two or three
19   months.  So he was exposed to law enforcement tactics, law
20   enforcement.
21             "Physical condition and mental health.  No single
22   factor is dispositive."
23             All right.  And I think under *Winbush* they also discuss
24   *Neal*.
25             The 12-hour period on September 11th was not one of
26   continuous interrogation.  We don't have a continuous
27   interrogation here.  He was allowed to rest.  He was allowed to
28   use the restroom.  He was allowed to leave that room.  He was

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 44

1    taken to San Bernardino.  So under the totality of

2    circumstances, the Court finds that the statements were made

3    voluntarily.  The People met its burden under preponderance of

4    the evidence.

5         MR. MOORE:  And, Your Honor, just a point of

6    clarification.  You cited to *People versus Price*, I believe it

7    was, or at least the *Price* matter.

8         THE COURT:  Yes.  Let me see where -- let me look

9    through my notes.

10        MR. MOORE:  I just wanted -- was looking for

11   clarification as to what the --

12        THE COURT:  All right.  *Price versus Superior Court*.

13   With regard to specific of a lengthy interrogation, it was

14   ruled -- overruled on another ground.  *Price versus Superior

15   Court*, the California Supreme Court rejected defendant's

16   argument that approximately eight hours of actual

17   interrogation -- we don't have that here -- over a 12-hour

18   period was unduly lengthy and thus coercive.

19        MR. MOORE:  That must be a different citation than the

20   one that I got.

21        THE COURT:  All right.  Well, I'm using *Winbush* as the

22   controlling case.

23        MR. MOORE:  Understood.  Understood.

24        THE COURT:  My decision is basically based on *Winbush*,

25   and, of course, I looked at *Neal*, because *Neal* talks about food.

26   And in this particular case the defendant did say he was hungry

27   and he wanted food.  So the Court also is citing *People versus

28   Neal*.

```
1            MS. FOSTER:  Thank you.

2            MR. MOORE:  Okay.

3            THE COURT:  Next issue?

4            MR. MOORE:  I think it just had to do with the

5    criminalist.

6            And the People provided some additional information in

7    their response, including a declaration.  I'd object to that as

8    hearsay at this point.  It's -- and I do have a copy of the

9    criminalist's report for the Court to review, if the Court would

10   like, but in his report the criminalist describes his -- what

11   he's doing, and he's basically taking the shotgun and firing it

12   at a piece of paper.

13           THE COURT:  Right.

14           MR. MOORE:  But he admits in his own report that he was

15   unable to compare the size of the hole left in the paper to the

16   size of the hole left in the decedent's arm, because the image

17   that he was provided of the decedent's arm, the scale was,

18   meaning the ruler, was in a different plane than the wound

19   itself, so he was unable to determine accurately the size of the

20   wound.  And he admits again in his report that the paper is not

21   analogous to human flesh with regard to the conclusions that

22   he's drawing.  And I do understand that to a degree this goes to

23   weight, not to admissibility.

24           THE COURT:  Right.

25           MR. MOORE:  However, I would also point out that this

26   doesn't seem to be an adequately scientific approach to the

27   conclusions that he's attempting to draw and the expert opinion

28   that he's weighing or that he's making.  And it's, I would note
```

1    to the Court, that even in their response, at least not that I

2    noticed, the People cited no cases in which this particular

3    tactic or procedure was validated by any particular court.

4         She says that, or in the statement to which I'm

5    objecting, the affidavit, he puts forward several purportedly

6    scholarly or professional documents that he's relying upon or

7    which validate this particular method, that none of them are

8    court cases, and none of them have been testified to, and some

9    of them don't even seem to apply to this particular procedure

10   just based on their title.

11        THE COURT:  Right.  I think your argument at the

12   beginning was more this is a *Kelly/Frye* issue, and I kind of

13   disagree with that.  I think it goes to weight versus

14   admissibility whether this gentleman can testify under Evidence

15   Code section 801 as an expert.  That's a totally different issue

16   whether it's *Kelly/Frye*, the method of the testing.

17        I think this is more of a weight versus admissibility

18   whether this gentleman has the right credentials to testify as

19   an expert and give his opinion in this particular type of case.

20   That's a separate issue.  And I'm not ready to rule on that

21   because I don't have any information other than the CV.  I don't

22   know how many of these tests he's conducted before, if he's used

23   this method before.  I have no idea.

24        But as this being a new scientific method, I don't

25   think this is a *Kelly/Frye* issue per se.  So if your argument

26   this should be a *Kelly/Frye* issue, the Court's going to make a

27   ruling at this time that it's not a *Kelly/Frye* issue per se.

28   However, whether this gentleman can testify as to what he tested

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 47

1   and what he did, that's a different issue, and the Court's not
2   ruling on that at this point.
3          MR. MOORE:  Okay.  And I kind of raised both of them in
4   the alternative in my moving papers.  I understand the Court's
5   ruling as to the *Kelly/Frye*, so I'll just leave it at that.
6          THE COURT:  And if we need to have a formal hearing as
7   to his qualifications and have you an opportunity to
8   cross-examine him, that's appropriate, because the Court has to
9   make a determination under Evidence Code section, I'm sorry, I
10  believe it's 801 that he can testify as an expert, the Court has
11  to make that finding.
12         And the Court's going to take that under submission or
13  reserve at this time, but I am going to -- I am going to require
14  more additional information, probably have him come in and give
15  the Court his qualifications and how he rendered his opinion and
16  all that stuff.
17         MS. FOSTER:  And so I was prepared for that.  The
18  reason I didn't bring him in today is because he is up north.
19  And I believe there is some issue with him flying, so he's
20  driving down for testimony.  With the Court's permission, I
21  would appreciate if we could do that 402 hearing prior to the
22  day that he testifies, the morning of the day he testifies, or
23  the day before he testifies.
24         THE COURT:  I'd like to do it the day before.
25         MS. FOSTER:  Okay.
26         THE COURT:  Because it's only fair to the defense.
27  Also, in preparation of, you know, cross-examination.  So I'm
28  going to order a 402 hearing on the Court's own motion, have him

 1    testify.  I need some more information.

 2            MR. MOORE:  Thank you.

 3            MS. FOSTER:  Yes, Your Honor.

 4            MR. MOORE:  And then my final issue has to do with a

 5    drawing that was taken from Mr. Boji's cell.

 6            THE COURT:  I have not looked at it, so I'll need to

 7    take a look at it.  My tentative is that is too -- it is

 8    prejudicial.  So that's my tentative.  It will be excluded under

 9    352.  That's my tentative.  I'm giving you -- can you -- can I

10    take a look at it?  Can it be marked as an exhibit?

11            MR. MOORE:  It can be.  I didn't know if the People

12    were even intending to elicit it.

13            THE COURT:  Okay.  Are you?

14            MS. FOSTER:  Well, Your Honor, depends on the testimony

15    of Mr. Samuel Murrillo and how he's cross-examined.  So in my

16    case in chief there is no reason to elicit that drawing, but if

17    it's questioned.  So Samuel Murrillo, so for the Court's

18    background, is one of the witnesses that I'm calling.  He was an

19    inmate that was in custody at the point that the defendant was

20    in custody.  And the defendant made some statements to him

21    regarding the death of Nicholas McCauley.

22            If there is any cross-examination that calls into doubt

23    whether or not he actually contacted the defendant, and the

24    defendant's the correct person who made those statements to him,

25    Mr. Murrillo told the officers that this drawing -- about this

26    drawing, described it and said it was in the defendant's cell.

27    And when the officers later conducted a cell search, that

28    drawing was found inside the defendant's cell.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 49

1          So the only purpose of that drawing would be if

2    Mr. Murrillo was impeached regarding whether or not it's true

3    that he contacted and spoke to the defendant.  And otherwise it

4    is a -- I don't see any way that I would -- that it's relevant

5    for my initial questioning of him.

6               THE COURT:  What exhibit?  Court exhibit --

7               THE CLERK:  It's D, as in David.

8               THE COURT:  Court Exhibit D.

9          All right.  The Court has reviewed Court Exhibit D.

10   The Court will not allow it in the People's case in chief.  This

11   happened, I think, I believe it was December 31st, a few months

12   later.

13              MR. MOORE:  Right.

14              THE COURT:  After the defendant was arrested.

15              MR. MOORE:  Right.

16              THE COURT:  And this was in the county jail, I believe.

17         So at this time I do find at this time prejudicial, but

18   I'll allow you to reopen, but it won't be allowed at this time.

19              MS. FOSTER:  Yes, Your Honor.

20              THE COURT:  All right.  Under 352.

21              MR. MOORE:  Thank you.

22              THE COURT:  Too prejudicial.

23         All right.  Anything else?

24              MR. MOORE:  Not from defense.

25              THE COURT:  All right.

26         Anything from the People?

27              MS. FOSTER:  The People set forth a few.

28              THE COURT:  All right.  Let me take a look.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 50

1            Why don't you start.

2            MS. FOSTER:  And I don't know if there is any intention

3    by the defense to bring out that the defendant took a lie

4    detector test.  I know there were some experts that were

5    interviewed, at least I was told by my predecessor, and so my

6    first request is that there be no mention of the lie detector

7    test or the defendant's willingness to take the lie detector

8    test.

9            THE COURT:  All right.  I don't think that's

10   admissible.

11           MR. MOORE:  No.  351.5.

12           THE COURT:  Yes.  So that's -- that will be the Court's

13   ruling not to allow that.

14           MS. FOSTER:  Then my second request was regarding any

15   drug use.  I had mentioned mental history, but I'm going to

16   remove that request, because I think it's inevitable that some

17   discussions, since the defendant mentioned suicide, so some

18   discussion of the victim's mental history will probably --

19           THE COURT:  Right.  Because if you're going to elicit

20   such statement, the defendant's statement that it was a suicide,

21   it's only fair that defendant could bring up that it was -- that

22   he believed the defendant -- that the victim might have suffered

23   some type of mental illness.

24           MS. FOSTER:  That would lead to that suicide.

25           THE COURT:  Right.

26           MS. FOSTER:  So more specifically on this one, then,

27   I'm just asking to exclude any mention of drug use, and that's

28   why I had in my proposed questions I wasn't sure of what the

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 51

1    Court's ruling.  So those two things go hand in hand, if there
2    is nothing being mentioned of drug use.
3         THE COURT:  Right.  I didn't gather that from any of
4    the defendant's statements.  I didn't gather that from the scene
5    that there was cocaine laying all over the ground or anything
6    like that.
7         MR. MOORE:  No.  I believe in some of his statements he
8    does mention that the decedent had some history of some drug
9    use.  And he does mention at one point that they had smoked
10   marijuana together the day before.  But in terms of whether or
11   not it was involved in this case or relevant to it, I don't
12   think we have an argument that it is.
13        THE COURT:  All right.  The Court's ruling is that it's
14   not probative.  It's going to confuse the jury, confuse the
15   issues in this case.  The Court will not allow any drug use
16   between any of the defendant or the victim in this case.
17        MS. FOSTER:  And then I wanted to put the Court on
18   notice regarding the evidence of a romantic relationship between
19   the victim and the defendant, and my purpose is in requesting
20   the admission of that evidence and why it's relevant.  And I
21   cited to you *People versus Hall*, which the Court goes into
22   detail as to why it's well settled in cases that motive is
23   always material in a homicide case.  And my assertion is that
24   this romantic relationship is the motive behind the murder of
25   Mr. McCauley.
26        THE COURT:  Defense?
27        MR. MOORE:  Your Honor, the People have a purported
28   statement from the defendant to Mr. Murrillo in which he pauses

Christine M. DiCaro, CSR

43

 1    for that, or one of the scenarios that he put forth about the

 2    circumstances of the death had to do with Mr. McCauley rejecting

 3    some homosexual advances.

 4            I'd say that we need to wait until Mr. Murrillo

 5    testifies.  That's absolutely inconsistent with everything else

 6    the defendant has ever said in this case.  He denied it

 7    repeatedly to the police officers.  We have simply an

 8    uncorroborated statement from Mr. Murrillo.  And if that is what

 9    he is testifying to, it's a statement of the defendant regarding

10    the circumstances of the murder, or the homicide.  But I don't

11    have much more to say.  I object to it.

12            THE COURT:  All right.

13            MS. FOSTER:  And may I be heard a little further, Your

14    Honor, just on that?

15            THE COURT:  Well, your argument just basically is am I

16    allowed to just present such evidence.

17            MS. FOSTER:  Yes.

18            THE COURT:  Obviously, if it's relevant evidence and

19    there is no exception, I mean, any objection, but, I mean,

20    you're acting in good faith.  Your question is:  Can I be

21    allowed to present?  I'm not going into how you're going to

22    present it, it's whether or not you could even present it.  And

23    the Court believes that she is allowed to present it, because

24    she's allowed to provide the jury a theory of the case and

25    motive.  If there is a motive, then this is a proper motive to

26    present to the jury.  How she presents it, that's a different

27    question.

28            MR. MOORE:  Well, and that's one of the things that I'm

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 53

1    somewhat leery of is while Mr. Murrillo has purportedly the

2    statement directly from Mr. Boji, that's the only evidence that

3    is anything more than pure speculation.  There are a lot --

4    there is a lot -- throughout the investigation there is quite a

5    bit of speculation as to whether or not there was some sort of

6    homosexual requited or unrequited relationship between the

7    decedent and Mr. Boji, but there is absolutely no --

8    nonspeculative evidence other than what Mr. Murrillo has to say.

9            THE COURT:  People?

10           MS. FOSTER:  Well, just further state that in addition

11   defense's argument limits it to Mr. Murrillo, but there's text

12   messages directly from the defendant that are indicative of a

13   sexual relationship.  I think the trigger for the entire

14   shooting is the defendant's first statement that the victim gave

15   him a painful cold sore in his mouth, and then the victim's lack

16   of response triggers the statements that say where the defendant

17   threatens to kill the victim.  And then, of course, four days

18   later he does, in fact, kill the victim.

19           THE COURT:  At this time the Court will allow it as

20   long as it's of the -- the evidence comes in is admissible.

21           MR. MOORE:  Yes, Your Honor.

22           MS. FOSTER:  And then the next thing I put forth in my

23   motion was to each disclose any expert witnesses.  I'm not aware

24   of whether or not defense has any expert witnesses.  I didn't

25   get the witness list until after this motion was written, but I

26   did not see any experts on the list, so I will assume there is

27   none, and I can withdraw that.

28           MR. MOORE:  At this point we have absolutely no

1    intention of calling an expert.

2              THE COURT:  All right.

3              MR. MOORE:  And we would, of course, alert the Court

4    and Counsel if that changes at any time.

5              MS. FOSTER:  I have nothing further.

6              THE COURT:  All right.  Let's bring the jury in.

7              (Discussion regarding jurors, not transcribed.)

8              THE CLERK:  Your Honor, I'm sorry.  Real quick.

9    Miss Foster indicated yesterday that she had filed that

10   opposition, and I know you mentioned on the record that it was

11   filed.  It has not been filed.  I did receive it by email, a

12   copy of it when I was out last week.  I found it in my email,

13   but it has not been officially filed.

14             THE COURT:  All right.  The Court will order it filed,

15   and it will be filed with today's date.

16             Actually, I reviewed it yesterday afternoon, so it will

17   be filed -- ordered filed yesterday's date, which is June 25th.

18             THE CLERK:  Okay.  Thank you.

19             THE COURT:  And you did receive a copy of it,

20   Mr. Moore?

21             MR. MOORE:  On Friday afternoon, yes.

22             THE COURT:  Okay.  Thank you.

23             (Jury voir dire conducted, not transcribed.)

24                     (Proceedings concluded.)

25

26

27

28

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 55

```
 1              RIVERSIDE, CALIFORNIA; JUNE 28, 2018

 2              BEFORE THE HONORABLE SAMUEL DIAZ, JR.

 3         THE COURT:  All right.  On the record in the matter of

 4    People versus Boji.  The Court received a lot of exhibits

 5    yesterday from an officer, or deputy, and one of the exhibits,

 6    and, I'm sorry, I don't --

 7              THE CLERK:  Did she give you a list?

 8         THE COURT:  It's the shotgun, and that's Exhibit No. --

 9    do you recall, Miss Foster, right offhand?  Because there is a

10    lot of exhibits.  There is a huge exhibit list.

11              MR. MOORE:  It's Exhibit 281, Your Honor.

12         THE COURT:  All right.  Thank you.  Exhibit 281 is the

13    shotgun.  The shotgun is in a box.  And I was informed yesterday

14    that we need to secure that weapon.  And because it's in a box,

15    it was unable to be secured in a gun locker.  At this time it is

16    locked up inside the courtroom.

17         Is there any objection if we take the shotgun out of

18    the exhibit, out of the box and place the shotgun in a gun

19    locker?  People?

20              MS. FOSTER:  No, Your Honor.

21              THE COURT:  Defense?

22              MR. MOORE:  No objection.

23         THE COURT:  And just keep the stipulation as to chain

24    of custody?  Defense?

25              MR. MOORE:  Yes.

26              THE COURT:  People?

27              MS. FOSTER:  I'm sorry?

28              THE COURT:  Chain of custody?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 56

```
 1              MS. FOSTER:  Yes, Your Honor.

 2              THE COURT:  All right.

 3              MR. MOORE:  And with regard to this portion of it, but,

 4    I mean, I saw it brought into the courtroom yesterday.  I

 5    believe it was Investigator Corey.

 6              THE COURT:  Okay.

 7              MR. MOORE:  And I'd stipulate that at this point the

 8    chain of custody is not broken by the removal from the box and

 9    placing it in a locker.

10              THE COURT:  All right.  Thank you.

11         And then we'll just have a formal, and then I'll read

12    three or four jury instructions, and then we'll start opening

13    statements.  Just make sure the ELMO is working and all that.

14              MS. FOSTER:  And just so the Court is aware, there is a

15    Spanish language interpreter that will be interpreting for the

16    victim's family in the back of the courtroom.

17              THE COURT:  All right.

18              A SPANISH INTERPRETER:  Good morning, Your Honor.

19              THE COURT:  Good morning.  That's fine.

20         If you can't hear, let us know, all right?

21              A SPANISH INTERPRETER:  Okay.

22              MS. FOSTER:  And the other thing I wanted to address

23    probably with the deputy.

24              A COURT ADVOCATE:  I already did.

25              MS. FOSTER:  All right.  Fine.

26                   (Brief pause in proceedings.)

27              THE COURT:  All right.  Back on the record.  There was

28    a request by one of the parties at this time?
```

1            MR. MOORE:  Yeah.  I believe there is a joint request

2    to make a motion to exclude witnesses.

3            MS. FOSTER:  I do not make that request, and the reason

4    being that the defendant's father is on the witness list and the

5    mother is also on the witness list.  I understand the

6    sensitivity of this particular situation, so I'm fine.  But if

7    the defense does make that request, I would submit on that.

8            THE COURT:  Is the defense making that request at this

9    time?

10           MR. MOORE:  Well --

11           THE COURT:  If there is no request, then the Court has

12   nothing to rule on.

13           MR. MOORE:  I guess I'll withdraw it.

14           THE COURT:  Then there is nothing to rule.

15           All right.  Thank you.

16           If you change your mind, let me know.

17       (Proceedings were held in the presence of the jury:)

18           THE COURT:  Good morning, everyone.

19               (All jurors responded "Good morning.")

20           THE COURT:  All right, ladies and gentlemen of the

21   jury, I'm going to give you some instructions.  There is a lot

22   of instructions, a lot of law throughout this trial.  I'm going

23   to give you some at the beginning just to assist you.  And at

24   this time I will give you some of the instructions.

25           You have been given notebooks.  All of you have

26   notebooks and pens?

27               (All jurors responded "Yes.")

28           THE COURT:  All right.  You have been given notebooks

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 58

1    and will be taking notes during the trial.  You my use your

2    notes during deliberations.  Your notes are for your own

3    individual use to help you remember what happened during the

4    trial.  Please keep in mind that your notes may be inaccurate or

5    incomplete.

6          If there is a disagreement about the testimony at

7    trial, you may ask the court reporter's record be read to you.

8    It is the record that must guide your deliberations, not your

9    notes.  You must accept the court reporter's record as accurate.

10         Please do not remove your notes from the jury room or

11   from the court.

12         At the end of the trial, your notes will be collected

13   and they will be destroyed.

14         The fact that a criminal charge has been filed against

15   the defendant is not evidence that the charge is true.  You must

16   not be biased against the defendant just because he has been

17   arrested, charged with a crime, or brought to trial.

18         A defendant in a criminal case is presumed to be

19   innocent.  This presumption requires that the People prove a

20   defendant guilty beyond a reasonable doubt.  Whenever I tell you

21   the People must prove something, I mean they must prove it

22   beyond a reasonable doubt.

23         Proof beyond a reasonable doubt is proof that leaves

24   you with an abiding conviction that the charge is true.  The

25   evidence need not eliminate all possible doubt because

26   everything in life is open to some possible or imaginary doubt.

27         In deciding whether the People have proved their case

28   beyond a reasonable doubt, you must impartially compare and

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 59

1    consider all the evidence that has been received throughout the

2    entire trial.  Unless the evidence proves the defendant guilty

3    beyond a reasonable doubt, he is entitled to an acquittal and

4    you must find him not guilty.

5         Evidence is the sworn testimony of witnesses, the

6    exhibits admitted into evidence, and anything else I will tell

7    you to consider as evidence.

8         Nothing that the attorneys say is evidence.  Their

9    opening statements and closing arguments, the attorneys discuss

10   the case, but their remarks are not evidence.  Their questions

11   are not evidence.  Only the witnesses' answers are evidence.

12   The attorneys' questions are significant only if they help you

13   to understand the witnesses' answers.  Do not assume that

14   something is true just because one of the attorneys asked a

15   question that suggested it was true.

16        During the trial, the attorneys will object to

17   questions or move to strike answers given by the witnesses.  I

18   will rule on the objections according to the law.  If I sustain

19   an objection, you must ignore the question.  If the witness was

20   not permitted to answer, do not guess what the answer might have

21   been or why I ruled as I did.  If I ordered testimony stricken

22   from the record, you must disregard it and you must not consider

23   that testimony for any purpose.

24        You must disregard anything you see or hear when the

25   court is not in session, even if it's done or said by the

26   parties or witnesses.

27        The court reporter is making a record of everything

28   that's said during the trial.  If you decide that it's

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 60

1   necessary, you may ask that the court reporter's record be read

2   to you.  You must accept the court reporter's record.

3        Facts may be proved by direct or circumstantial

4   evidence or by a combination of both.  Direct evidence can prove

5   a fact by itself.  For example, if a witness testifies that he

6   saw it raining outside before he came into the courthouse, that

7   testimony is direct evidence that it was raining.

8        Circumstantial evidence may also be called indirect

9   evidence.  Circumstantial evidence does not directly prove the

10  fact to be decided, but is evidence of another fact or a group

11  of facts from which you may logically and reasonably conclude

12  the truth of the fact in question.  For example, if a witness

13  testifies that he saw someone come inside wearing a raincoat

14  covered with drops of water, that testimony is circumstantial

15  evidence, because it may support a conclusion that it was

16  raining outside.

17       Both direct and circumstantial evidence are acceptable

18  types of evidence to prove or disprove the elements of a charge,

19  including intent, mental state and acts necessary to a

20  conviction.  Neither is necessarily more reliable than the

21  other.  Neither is entitled to a greater weight than the other.

22  You must decide whether a fact in issue has been proved based on

23  all the evidence.

24       The People must prove not only the defendant did the

25  act charged, but also that he acted with a particular intent

26  and/or mental state.  The instruction for that crime is

27  explained in a -- is explained in another instruction.  An

28  intent and/or mental state may be proved by circumstantial

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 61

1    evidence.

2            Before you may rely on circumstantial evidence to

3    conclude that a fact necessary to find the defendant guilty has

4    been proved, you must be convinced that the People have proved

5    each fact essential to that conclusion beyond a reasonable

6    doubt.

7            Also, before you may rely on circumstantial evidence to

8    conclude that the defendant had the required intent and/or

9    mental state, you must be convinced that the only reasonable

10   conclusion supported by the circumstantial evidence is that the

11   defendant had the required intent or mental state.

12           If you could draw two or more reasonable conclusions

13   from the circumstantial evidence, and one of those reasonable

14   conclusions supports a finding the defendant did not have the

15   required intent, and another reasonable conclusion supports a

16   finding the defendant did not, you must conclude that the intent

17   or mental state was not proved by the circumstantial evidence.

18   However, when considering circumstantial evidence, you must only

19   accept reasonable conclusions and reject any that are

20   unreasonable.

21           You alone must judge the credibility or believability

22   of the witnesses.  In deciding whether testimony is true and

23   accurate, use your common sense and experience.  You must judge

24   the testimony of each witness by the same standards, setting

25   aside any bias or prejudice you may have.

26           You may believe all, part, or none of a witness's

27   testimony.  Consider the testimony of each witness and decide

28   how much of it you believe.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 62

1          In evaluating a witness's testimony, you may consider
2     anything that reasonably tends to prove or disprove the truth or
3     accuracy of that testimony.  Among the factors that you may
4     consider are:
5          How well could the witness see, hear, or otherwise
6     perceive the things about which the witness testified?
7          How well was the witness able to remember and describe
8     what happened?
9          What was the witness's behavior while testifying?
10         Did the witness understand the questions and answer
11    them directly?
12         Was the witness's testimony influenced by a factor such
13    as bias, prejudice, a personal relationship with someone
14    involved in the case, or a personal interest in how the case is
15    decided?
16         What was the witness's attitude about the case or about
17    testifying?
18         Did the witness make a statement in the past that is
19    consistent or inconsistent with his testimony?
20         How reasonable is the testimony when you consider all
21    the other evidence in the case?
22         Did other evidence prove or disprove any fact about
23    which the witness testified?
24         Did the witness admit to being untruthful?
25         Do not automatically reject testimony just because of
26    inconsistencies or conflicts.  Consider whether the differences
27    are important or not.  People sometimes honestly forget things
28    or make mistakes about what they remember.  Also, two people may

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 63

1   witness the same event yet see or hear it differently.

2          If you decide that a witness deliberately lied about

3   something significant in this case, you should consider not

4   believing anything that witness says.  Or, if you think the

5   witness lied about some things but told the truth about others,

6   you may simply accept that part that you think is true and

7   ignore the rest.

8          If you do not believe a witness's testimony that he or

9   she no longer remembers something, that testimony is

10  inconsistent with the witness's earlier statement on that

11  subject.

12          All right.  At this time, People, ready to proceed?

13          MS. FOSTER:  Yes, Your Honor.

14          THE COURT:  You may proceed.

15          MS. FOSTER:  May I enter the well?

16          THE COURT:  Yes.

17      (Opening statement by Ms. Foster, not transcribed.)

18          THE COURT:  Defense?

19          MR. MOORE:  Your Honor, at this time the defense will

20  be reserving opening.

21          THE COURT:  All right.  Thank you.

22          I'm sorry.  Are you requesting an investigating officer

23  in this case?

24          MS. FOSTER:  Yes, Your Honor.

25          THE COURT:  Can you introduce the investigating officer

26  to the jury, please?

27          MS. FOSTER:  This is Investigating Officer DeLasandro

28  Dean.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 64

```
 1              THE COURT:  All right.  Thank you.
 2              All right.  At this time, People, call your first
 3    witness.
 4              MS. FOSTER:  Thank you, Your Honor.  The People call
 5    Miss Ana McCauley.
 6              THE CLERK:  Remain standing.  Raise your right hand.
 7              Do you solemnly state that the evidence you shall give
 8    in this matter shall be the truth, the whole truth, and nothing
 9    but the truth, so help you God?
10              THE WITNESS:  I do.
11              THE CLERK:  Please have a seat.
12              For the record, please state your first and last name,
13    spelling first and last name for the Court.
14              THE WITNESS:  Ana, A-n-a, McCauley, M-c-C-a-u-l-e-y.
15              THE COURT:  People?
16              MS. FOSTER:  Thank you.
17                             ANA McCAULEY,
18    called as a witness by and on behalf of the Plaintiff, having
19    been first duly sworn, was examined and testified as follows:
20                          DIRECT EXAMINATION
21    BY MS. FOSTER:
22        Q.   Good morning, Miss McCauley.
23        A.   Good morning.
24        Q.   Just pull that microphone a little closer.
25              And just quickly explain, when we do testimony, we
26    can't both speak over each other, because the woman in front of
27    you, who is about two feet away, is typing what each of us is
28    saying.  So if you can let myself and Counsel ask our questions,
```

Christine M. DiCaro, CSR                                    56

 1    and just kind of pause and then answer, so we don't speak over

 2    each other, okay?

 3         A.    Okay.

 4         Q.    Miss McCauley, where did you live in November of 2015?

 5         A.    In Moreno Valley.  25964 Soaring Seagull Lane.

 6         Q.    And who lived there with you in 2015?

 7         A.    My son and I.

 8         Q.    And what is your son's name?

 9         A.    Nicholas McCauley.

10         Q.    And I'm going to show you what's been marked for

11    identification as People's Exhibit 283.

12              MS. FOSTER:  May I approach?

13              THE COURT:  Yes, you may.

14         Q.    BY MS. FOSTER:  Do you recognize the person depicted in

15    this photograph?

16         A.    Yes, I do.

17         Q.    And who is that?

18         A.    That is my only son.

19         Q.    Nicholas McCauley?

20         A.    Nicholas McCauley.

21              MS. FOSTER:  Showing defense counsel.

22              And displaying it for the jury.

23         Q.    BY MS. FOSTER:  At times I may ask you questions.  Is

24    the screen on in front of you?

25         A.    Yes.

26         Q.    How long had you lived at the -- at your residence on,

27    I'm sorry, Soaring Seagull?

28         A.    Yes.  Since 2005.

```
 1        Q.    And how old was your son in November of 2015?

 2        A.    He was 18 years old.

 3        Q.    Did anyone else live at that residence with the two of

 4   you?

 5        A.    No.

 6        Q.    In November of 2015 was anyone staying at the residence

 7   with you?

 8        A.    No.

 9        Q.    Can you describe the style of your home?  Is it a

10   one-story or two-story?

11        A.    It's a one-story.

12        Q.    How many bedrooms and bathrooms?

13        A.    It has two bathrooms and four bedrooms.  It's actually

14   three rooms and a bonus room.

15        Q.    And did Nicholas occupy one of those bedrooms?

16        A.    Yes, he did.

17        Q.    I'm going to show you what's been marked for

18   identification as People's 284.

19              MS. FOSTER:  And I'm showing defense counsel.

20              May I approach?

21              THE COURT:  Yes.

22        Q.    BY MS. FOSTER:  I'm going to show you what purports to

23   be a layout of your home.  Can you take a look at it and tell me

24   if it's accurate?

25        A.    It's accurate.

26        Q.    So you say you live in a one-story home.  And I'm

27   showing you Exhibit 284.  You said that's an accurate depiction

28   of your home?
```

1        A.    Yes, it is.

2        Q.    On that floor plan of your home, can you describe for

3   us where the entry is?

4        A.    The -- well, the entry is right at the front.

5        Q.    And I see you pointing.  The deputy is about to give

6   you a laser pointer to use.

7        A.    Okay.

8        Q.    And if you can point at the screen behind you?

9        A.    That is the front entrance.

10       Q.    That's the front door of your house?

11       A.    Yes.

12       Q.    And then what do you see when you walk into the front

13  door?

14       A.    The living room is here, and this is the doors to my

15  son's room.

16       Q.    And then if you proceed past the living room, what's

17  there?

18       A.    This is the kitchen and family room area, and there is

19  a sliding glass door here.

20       Q.    And what does the sliding glass door lead to?

21       A.    Leads to the backyard.

22       Q.    And if you shift around that what appears to be a

23  hallway, what's over there?

24       A.    This is the hallway.  There is my master bedroom.  This

25  is the east bedroom, which we call Nicholas's second bedroom.

26  This is the guest room, and this is Nicholas's room, and there

27  is a bathroom.

28       Q.    Thank you.

```
 1            Can you describe the street that you live on?  Is it a
 2   residential neighborhood?
 3       A.   Yes, it is a residential neighborhood.  It's a double
 4   cul-de-sac.
 5       Q.   Since you've been there a while, do you know your
 6   neighbors?
 7       A.   Yes.
 8       Q.   And you said it's a double cul-de-sac.  What do you
 9   mean?
10       A.   I mean when you come into our street, it doesn't go
11   towards any other street.  It's only one way in and one way out.
12       Q.   I'm going to show you what's been marked for
13   identification as People's 41.
14            MS. FOSTER:  I'm showing defense counsel.
15       Q.   BY MS. FOSTER:  Do you recognize what's depicted in
16   People's 41?
17       A.   Yes, I do.
18       Q.   And what do you see in 41?
19       A.   Well, I'm seeing the cul-de-sac that I live on.  And
20   this appears to be my house.
21            That's coming in.
22       Q.   So this is your side of the cul-de-sac?
23       A.   Okay.  This is the front?
24            I'm sorry.  I'm turned around when I'm looking at it.
25       Q.   Okay.  Can you tell what it is now?
26       A.   Yes.  I just -- it depends on if this is Lasselle
27   Street, then I would be -- I want to be clear.
28            MS. FOSTER:  I'm holding in my hand what's been marked
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 69

```
 1    for identification as People's 45.
 2              Showing defense counsel.
 3              May I approach?
 4              THE COURT:  Yes.
 5        Q.    BY MS. FOSTER:  Do you recognize what's depicted in
 6    People's 45?
 7        A.    Yeah.  My house is right there.
 8        Q.    Do you recognize it?
 9        A.    Yes, I recognize my home.
10        Q.    You said you recognize your home.  Can you use the
11    laser pointer to describe for us where that is in People's 45?
12              I'm sorry.  We can't hear you.
13        A.    Oh.  I believe this is my house right here.
14        Q.    Okay.  And are you circling this area here?
15        A.    Yes, because this would be Iris, and this would be
16    Lasselle, so this would be my home.
17        Q.    When you say "double cul-de-sac," you're saying in
18    either direction it's a dead end?
19        A.    Dead end both ways.  Only one way in.
20        Q.    Now, it was just you and your son living there.  You
21    said he was about 18 years old?
22        A.    Yes.
23        Q.    At the time, correct?
24        A.    Yes.
25        Q.    Had he already finished school?
26        A.    He just graduated high school.
27        Q.    Did you know a lot of his friends?
28        A.    I do.
```

1    Q.   Did you know one of his friends named Houston Boji?

2    A.   Yes.

3    Q.   Do you see him in the courtroom today?

4    A.   Yes, I do.

5    Q.   Can you direct for the record where he's seated and

6    what he's wearing?

7    A.   He's wearing a blue suit.  He's sitting between both

8    defense attorneys.

9         MS. FOSTER:  May the record reflect the witness has

10   identified the defendant?

11        THE COURT:  Yes.

12   Q.   BY MS. FOSTER:  How long have you known the defendant?

13   A.   Since his sophomore year of high school, I believe.

14   Q.   So how long would that be?

15   A.   Including the last two-and-a-half years?

16   Q.   No.  From at the point of November of 2015?

17   A.   Between two to three years, I believe.  Could have been

18   a little less.

19   Q.   How did you know him?

20   A.   He was my son's best friend.

21   Q.   And you say he's your son's best friend.  Did you have

22   your own relationship with him?

23   A.   Yes, I did.

24   Q.   How would you describe your relationship with him at

25   that time?

26   A.   It was a very close relationship.  I only have one

27   child, so I considered him like a second son to me.

28   Q.   Did he ever talk to you privately?

```
 1       A.   Yes, he did.

 2       Q.   Did he ever confide in you?

 3       A.   Not directly.  Indirectly he did.

 4       Q.   What was the defendant's relationship with Nicholas?

 5       A.   What I knew was the fact that they were best friends.

 6       Q.   How often would they hang out together?

 7       A.   They were hanging out pretty often the last few months.

 8       Q.   What do you mean by "pretty often"?

 9       A.   Well, I have to go to work, and I would come home

10   sometimes during my lunch break, and he would be there.

11       Q.   And by "he," are you referring to the defendant?

12       A.   I'm referring to Houston and Nicholas would be there.

13       Q.   Do you know what kind of activities they did?

14       A.   Well, yeah.  I know they liked to go to concerts, and I

15   know they liked to go driving.  Houston had a very nice car.

16   They liked to go hiking.

17       Q.   How often in that time period of 2015 would the

18   defendant come to your home?

19       A.   I would say an average of about, that I saw, that I

20   know for a fact, probably about once, maybe twice a week.

21       Q.   From your knowledge of their relationship, did they

22   appear to be very close friends?

23       A.   They were very close.

24       Q.   Now, you mentioned that the defendant would confide in

25   you somewhat indirectly?

26       A.   Yes.

27       Q.   Did he ever talk to you about sexuality?

28       A.   Yes, he did.
```

1      Q.    And what did he say?

2            Well, before you answer that, when was that?

3      A.    That would have been a few months before.  I don't have

4      an exact date, but a few months before my son passed away.

5      Q.    And where were you when you had this discussion?

6      A.    We were sitting by the computer.

7      Q.    And was it at your home?

8      A.    At my home in the family room.

9      Q.    And what, if anything, did he say?

10     A.    He just asked me how I felt about homosexuality.

11     Q.    And how did you respond?

12     A.    I said that if my son were gay, for example, that I

13     would have no problem with it.  That I love him regardless.

14     That it would take me a moment to adjust, but I would not have a

15     problem with it.

16     Q.    And what did he say?

17     A.    He said, "My dad would kill me."

18     Q.    Did he say anything else about that?

19     A.    No.

20     Q.    What was the tone of that conversation?

21     A.    It was serious.

22     Q.    Were you personally aware of whether or not there was

23     any romantic relationship between your son and the defendant?

24     A.    I never saw anything personally.  I suspected.

25           MS. BLUMENTHAL:  Objection.  Strike the last portion of

26     that sentence as being nonresponsive.  Also speculation.

27           THE COURT:  It does call for speculation.  Not enough

28     foundation.  If there was an answer, it will be stricken.

```
 1        Q.   BY MS. FOSTER:  Did you believe there to be a
 2   romantic -- romantic feelings between the defendant and your
 3   son?
 4             MS. BLUMENTHAL:  Objection.  Calls for speculation
 5   without further foundation.
 6             THE COURT:  Lacks foundation at this time.  Sustained.
 7             MS. FOSTER:  May I be heard, Your Honor?
 8             THE COURT:  Yes.  On this issue I'll have the attorneys
 9   and the court reporter in the back.
10             MS. FOSTER:  Actually, Your Honor, I think I can ask
11   the question a different way and avoid that.
12             MS. BLUMENTHAL:  Your Honor, I still would like to go
13   on the record.
14             THE COURT:  All right.  Let's go in the back.
15        (Proceedings were held out of the presence of the jury:)
16             THE COURT:  All right.  Out of the presence of the
17   jury.
18             We did not have any 402 issues on this, so I thought
19   there was not going to be any main -- any issue.  But go ahead.
20             MS. FOSTER:  I think we did have a 402 on homosexuality
21   and the relationship.
22             THE COURT:  Yes.
23             MS. FOSTER:  So I think my question is poorly worded
24   the way it is, because it calls for her answer.  And I was going
25   to rephrase the question to say, so that we can lay foundation
26   before she gives an answer.
27             THE COURT:  Correct.
28             MS. FOSTER:  That's all.
```

| | |
|---|---|
| 1 | THE COURT:  Yes. |
| 2 | MS. BLUMENTHAL:  My concern is trying to do a preempt |
| 3 | so we're not living back here.  Everything I read, her statement |
| 4 | that she's given to law enforcement and so on is she may have |
| 5 | had some suspicion, but that's it.  She saw nothing.  No one |
| 6 | told her anything.  And I think that is 352.  I think it is |
| 7 | speculation, calling for speculation on her behalf. |
| 8 | THE COURT:  Well, I'm pretty familiar with Rules of |
| 9 | Evidence.  If foundation has been met, I will hear.  If there is |
| 10 | an objection, I will hear it.  If foundation has not been met, |
| 11 | then I'll make the appropriate ruling based upon the question. |
| 12 | MS. FOSTER:  All right. |
| 13 | THE COURT:  All right.  Thank you. |
| 14 | So at this time reask or rephrase your question.  At |
| 15 | this time the Court's making a finding that there is |
| 16 | insufficient foundation for an opinion. |
| 17 | We're off the record. |
| 18 | (Proceedings were held in the presence of the jury:) |
| 19 | THE COURT:  All right.  Back on the record. |
| 20 | Please rephrase the question. |
| 21 | Q.   BY MS. FOSTER:  I'm talking about things you observed, |
| 22 | okay? |
| 23 | A.   Okay. |
| 24 | Q.   Was there anything that you specifically observed that |
| 25 | would indicate the defendant had romantic feelings for your son? |
| 26 | A.   Not through observation directly. |
| 27 | Q.   Anything you heard? |
| 28 | A.   Yes. |

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 75

1      Q.   And what was that?  Well, no.  Let me back up.  Was

2   it -- who did you hear it from?  From the defendant?

3      A.   No.

4      Q.   In November of 2015, where were you working?

5      A.   At Landmark Middle School.

6      Q.   And how far is that school from your home?

7      A.   It's less than three miles.

8      Q.   How long does it take you to get to work each day?

9      A.   Between five and ten minutes.

10     Q.   An did you work Monday through Friday?

11     A.   Yes.  I'm a teacher.

12     Q.   In November of 2015 did you and your son share a phone

13  plan?

14     A.   Yes.

15     Q.   And can you describe how that worked?

16     A.   I had taken away his phone, so I gave him a phone that

17  was only for text and talk.  So mine is the one that you can

18  access social media on, so I would let him use my phone.

19     Q.   So you're saying you took your son's phone away from

20  him?

21     A.   At one point.

22     Q.   And your phone had connection to the Internet?

23     A.   Yes.  His phone only had, you know, calling and text.

24     Q.   So since your phone is the one that could access social

25  media, did your son borrow your phone often?

26     A.   Yes.

27     Q.   Would you ever see any of his messages?

28     A.   I did.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 76

1       Q.    Inside of your phone did you have your contacts names?

2       A.    I have some contacts names, yes.

3       Q.    So through your phone did you have access to Nicholas's

4  text messages?

5       A.    I couldn't get them every time, only the Instant

6  Messenger I saw.

7       Q.    So describe your access to his text messages.  Text

8  messages.

9       A.    He would forget sometimes to turn off, you know, sign

10  out, I guess, and when I got the phone, I'd be able to look

11  through it.

12      Q.    And look through what?  What are you describing?

13      A.    Through anything that was left through a message or his

14  Instant Messenger, I would check out.

15      Q.    And around November of 2015, around November 6th

16  through the 10th of 2015, did you access some of Nicholas's

17  instant messages?

18      A.    I did.

19      Q.    Okay.  And did you see messages from the defendant?

20      A.    Yes, I did.

21      Q.    And how did you know they were from the defendant?

22      A.    I believe the name was on there, because I wouldn't

23  have thought it was him otherwise.

24      Q.    Did you also see text messages at that time?

25      A.    Yes, I did.

26      Q.    Just a moment.

27      A.    Oh, sorry.

28      Q.    Did you also see text messages from the defendant at

```
 1   that time?

 2       A.   Yes.

 3            MS. BLUMENTHAL:  At this time I'm going to object as to

 4   hearsay and lack of foundation.

 5            THE COURT:  I believe sufficient foundation has been

 6   provided under Evidence Code section 1400, 1401.

 7       Q.   BY MS. FOSTER:  And how did you see the text messages?

 8       A.   I had the phone and I accidentally hit a button without

 9   even knowing what it was on there and it opened up.

10       Q.   And you said you had the phone.  Who's phone did you

11   have?

12       A.   I had my phone.

13       Q.   So you saw text messages from your phone, and you saw

14   the Instagram from your phone after Nicholas had had it; is that

15   correct?

16       A.   Yes.

17       Q.   The text messages that you saw, were they dated and

18   timed?

19       A.   Yes, they were.

20       Q.   The Instagram messages that you saw, were they also

21   dated and timed?

22       A.   Yes, they were.

23            MS. BLUMENTHAL:  Same objection.  Lack of foundation.

24            THE COURT:  Overruled.  1401 Evidence Code.

25       Q.   BY MS. FOSTER:  Did you have an opportunity to read the

26   text messages?

27       A.   I did.

28            MS. FOSTER:  Referring defense counsel to People's
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 78

```
1    Exhibit 288, 289, 290, and 291.
2           THE COURT:  I'm sorry.  I don't have that.  What are
3    the numbers again?
4           MS. FOSTER:  288, 289, 290, and 291.
5           THE COURT:  Thank you.
6           MR. MOORE:  We'll be objecting for foundation and
7    hearsay.
8           THE COURT:  Overruled.
9           MS. FOSTER:  May I approach?
10          THE COURT:  Yes.
11     Q.   BY MS. FOSTER:  I'm going to show you People's Exhibits
12   288 through 291.  Can you just take a look at them?
13          Are Exhibits 288 and through 291 true and accurate
14   depiction of the text messages you saw?
15     A.   I saw the instant messages.
16          MR. MOORE:  Nonresponsive, Your Honor.
17          THE COURT:  I'm sorry.  It is nonresponsive.  If there
18   was an answer, it will be stricken.
19     Q.   BY MS. FOSTER:  Are 288 through 291 copies of the text
20   messages you saw?
21     A.   I don't think I saw those text messages.
22          MS. FOSTER:  Showing defense counsel what's been marked
23   as 285 through 287.  Showing defense counsel.
24          May I approach?
25          THE COURT:  Yes.
26     Q.   BY MS. FOSTER:  Do you recognize what's marked as 285
27   through 287?
28     A.   Yes, I do.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 79

1      Q.   Now, just so we're clear, you spoke about text

2   messages, but did you see text messages?

3      A.   I don't recall seeing text messages.

4      Q.   Did you tell officers that you had text messages?

5           MS. BLUMENTHAL:  Objection.  Calls for hearsay.

6           THE COURT:  Overruled.

7           THE WITNESS:  I might have mistaken and said

8   "Messenger" for text messages, because I wasn't on Instant

9   Messenger.

10     Q.   BY MS. FOSTER:  And can you describe what your cell

11  phone looked like?

12     A.   It's just a block phone, not expensive.

13     Q.   And what did Nicholas's phone look like?

14     A.   Also a blocked phone, not expensive.

15     Q.   And when I showed you People's Exhibits 288 through

16  291, did you recognize the phone itself?

17     A.   I didn't see the phone.  I didn't look at the phone.

18          MS. FOSTER:  May I approach?

19          THE COURT:  Yes.

20          THE WITNESS:  It was my old phone, so I don't remember

21  if this is my old phone.

22     Q.   BY MS. FOSTER:  So, no, you didn't recognize the phone?

23     A.   Not immediately.

24     Q.   After having looked at the photographs again, do you

25  recognize it?

26     A.   I recognize the messages.

27          I'm sorry.  I don't understand the question.

28     Q.   Now, you say you recognize what's depicted in People's

```
 1   285, 286, and 287?

 2           MR. MOORE:  I'm going to object to publication at this

 3   point.

 4           THE COURT:  I haven't seen those, so can you show them

 5   to the witness, please?

 6           MS. FOSTER:  I did.

 7           THE COURT:  All right.

 8           MS. FOSTER:  And she identified them.

 9           THE COURT:  All right.  Overruled.

10       Q.   BY MS. FOSTER:  And you said you recognized 285, 286,

11   and 287?

12       A.   Yes.  Text messages.

13       Q.   Were they a true and accurate depiction of what you

14   observed in November of 2015?

15       A.   Yes.

16           MR. MOORE:  I'm going to object to foundation, hearsay.

17           THE COURT:  Overruled.

18       Q.   BY MS. FOSTER:  I'm showing you first is Exhibit 285.

19   Do you recognize Exhibit 285?

20       A.   Yes.

21       Q.   Where did you first see what's depicted in Exhibit 285?

22       A.   On my phone.

23       Q.   And where did you see it on your phone?

24       A.   I believe it was Instant Messenger.

25       Q.   And the way that it looks in Exhibit 285 is how it

26   looked on the screen on the phone?

27       A.   Exactly.

28       Q.   And did you see a name depicted on it?
```

1       A.    Houston Boji.

2       Q.    Similar to 285?

3       A.    Yes.

4       Q.    And then do you see the messages on Exhibit 285?

5       A.    Yes.

6       Q.    Now, on what day did you look at these Instagram

7    messages?  Instant messages?

8       A.    I believe I saw them the next day.  I believe it was

9    Saturday.

10      Q.    And the first message appears to be on November 6th.

11   Did you read that message?

12      A.    Yes, I did.

13      Q.    And the depiction shows the words "I will shoot you"?

14      A.    Yes.

15      Q.    Is that what you read?

16      A.    Yes.

17      Q.    Then on November 6th it depicts 8:41 p.m.; is that

18   correct?

19            As the next time?

20      A.    Yes.

21      Q.    And do you see the message "You fucking cunt"?

22      A.    Yes.

23      Q.    And then on November 7th at 8:32 p.m. did you see the

24   next message "Tonight"?

25      A.    Yes.

26      Q.    Did you also see the message on November 7th at 10:45

27   p.m. that says "Bro"?

28      A.    Yes.

1      Q.    Did you see the messages on November 8th?

2      A.    On the date I didn't see them.  I saw them all

3   together.

4      Q.    So you saw the messages that are depicted on the screen

5   on November 8th?

6      A.    I actually saw the messages after the incident.

7      Q.    And did that message accurately reflect what's in 285,

8   "Oh, shiz"?

9      A.    Can you repeat the question?

10      Q.    And is that message accurately reflected on Exhibit 285

11   as saying "Oh," and then it has "Shiz" with about ten "I"s; is

12   that correct?

13      A.    Yes.

14      Q.    I'm showing you Exhibit 286.  Is Exhibit 286 an

15   accurate depiction of what you saw when you observed your phone?

16      A.    Yes, it is.

17      Q.    And does it, again, have the name of the person?

18      A.    Yes.

19      Q.    Was that, again, Houston Boji?

20      A.    Yes.

21      Q.    And on November 8th do you see the message "Oh, shiz"

22   at the top?

23      A.    Yes, I do.

24      Q.    And then you see on November 8th a message on the

25   opposite side at 8:56 that says "Bro"?

26      A.    Yes.

27      Q.    Did you type the message "Bro"?

28      A.    No.

```
 1        Q.    Who else had access to your phone besides you?

 2        A.    My son Nicholas.

 3        Q.    Anyone else?

 4        A.    Nobody else.

 5        Q.    Between November 6th and November 10th, did anyone else

 6   have access to your phone?

 7        A.    No.

 8        Q.    On November 8th, do you see -- did you see the message

 9   at 9:06 p.m. "Tonight"?

10        A.    Yes.

11        Q.    And on November 8th, the one I'm showing you now,

12   People's Exhibit 287, do you remember seeing what's depicted on

13   People's 287?

14        A.    Yes, I do.

15        Q.    And was it marked "Houston Boji" at the top like

16   depicted in People's 287?

17        A.    Yes.

18        Q.    And did it say on November 8th at 9:25 p.m. "I find you

19   and make you my bitch"?

20        A.    Yes.

21        Q.    And with a depiction of Donald Trump saying "It's going

22   to be huge"?

23        A.    Yes.

24        Q.    What did you do after observing these messages?

25        A.    I talked to Nicholas.

26        Q.    And did you end up calling the police?

27        A.    No.

28        Q.    Why not?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 84

1      A.   I talked to Nicholas, and he told me --

2           MS. BLUMENTHAL:  Objection.  Hearsay.

3           MS. FOSTER:  Subsequent conduct.  Not for the truth.

4           THE COURT:  Overruled.

5           THE WITNESS:  And he said not to worry, that they were

6      no longer friends.

7      Q.   BY MS. FOSTER:  Between November 6th and November 10th,

8      did you see the defendant at your house?

9      A.   I don't recall that, no.

10     Q.   After you observed the text messages, did you see the

11     defendant at your house?

12     A.   Oh, no.

13     Q.   After you observed the text messages, did you see

14     personally Nicholas talking to the defendant?

15     A.   No.

16          MS. FOSTER:  May I have one moment, Your Honor?

17          THE COURT:  Yes.

18     Q.   BY MS. FOSTER:  I'm going to direct you to the date of

19     November 10th.

20          What was the first thing you remember doing on November

21     10th, 2015?

22     A.   I got up and started getting ready for work.

23     Q.   And about what time did you get up?

24     A.   I get up around 6 a.m.

25     Q.   And during that time before you went to work, did you

26     see your son?

27     A.   I did.

28     Q.   And about what time did you leave the house to go to

1    work?

2        A.    I leave between like 8:10 and 8:15.

3              Usually.

4        Q.    And you said, "usually."  Was November 10th about the

5    same?

6        A.    Yeah.

7              Yes.

8        Q.    You say you saw your son.  Where did you see him at?

9        A.    He was sleeping in his room.

10       Q.    Was anyone else in the house at that time?

11       A.    No.

12       Q.    What does your son sleep in?

13       A.    Can you repeat that?

14       Q.    What did he sleep in?

15       A.    In his bed.

16       Q.    Did he wear pajamas, or how was he dressed that day?

17       A.    Boxer shorts.

18       Q.    Was he dressed only in boxer shorts?

19       A.    Yes.

20       Q.    When you saw your son that morning, was he up getting

21   ready?

22       A.    No.

23       Q.    What was he doing?

24       A.    He was sleeping.

25       Q.    Did you speak to him?

26       A.    Yes.

27       Q.    Based on your conversation, did you have the impression

28   that he was getting ready to go somewhere?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 86

```
 1      A.    No.

 2            MS. BLUMENTHAL:  Objection.  Calls for speculation.

 3            THE COURT:  Overruled.  The answer will remain.

 4      Q.    BY MS. FOSTER:  At any time while you were inside your

 5   house, did the defendant come over?

 6      A.    No.

 7      Q.    After you speak to your son, is that around the time

 8   that you leave?

 9      A.    It was earlier than the time I left.

10      Q.    So on November 10th what time do you pull out of your

11   driveway to go?

12      A.    I always leave to work no later than 8:20 and usually

13   not earlier than 8:10.  So between that time.

14      Q.    At the time that you pulled out -- let me ask you,

15   which way do you travel to your job?  Like what major streets do

16   you take?

17      A.    I take Iris.

18      Q.    When you left your house, did you notice anything

19   unusual?

20      A.    I thought that a neighbor had bought a car.

21      Q.    What made you think that?

22      A.    Because it looked just like Houston's on the other side

23   of the block.

24      Q.    Had you seen the defendant's car before?

25      A.    Yes.

26      Q.    On how many occasions?

27      A.    Oh, I can't put a number to it.

28      Q.    More than five?
```

Christine M. DiCaro, CSR                    78

```
1      A.   More than five, definitely.

2      Q.   I'm going to show you what's been marked for

3    identification as People's Exhibit 38.

4           MS. FOSTER:  May I approach?

5           THE COURT:  Yes.

6      Q.   BY MS. FOSTER:  Do you recognize People's Exhibit 38?

7      A.   Yes.

8      Q.   And what is depicted in People's 38?

9      A.   It is Houston's car.

10          MS. FOSTER:  I'm showing defense counsel.

11     Q.   BY MS. FOSTER:  The car that you saw on your street,

12   did it look like what's depicted in People's 38?

13     A.   Yes.

14     Q.   And where exactly did you see it?

15     A.   On the opposite end of the cul-de-sac.

16     Q.   I'm going to show you again People's 45.  Can you use

17   the laser to show us where you saw that car?

18     A.   Over here.

19     Q.   And you're pointing to this area where my pen is; is

20   that correct?

21     A.   Yes.

22     Q.   I'm going to put a "C."  Is that "C" in the accurate

23   area?

24     A.   Yeah.  It would have been around that curve.

25     Q.   Did you stop and go check out the car?

26     A.   No.

27     Q.   And what did you do next?

28     A.   I just went to work.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 88

1    Q.   Over the time that you've known the defendant, had he
2    ever spent the night at your house during a workday?
3    A.   I think so.
4    Q.   To your knowledge, was he familiar with when you left
5    for work?
6    A.   Yes.
7         MS. BLUMENTHAL:  Objection.  Calls for speculation as
8    phrased.
9         THE COURT:  Overruled.
10   Q.   BY MS. FOSTER:  And how would he know that?
11   A.   He knew my schedule.
12        MS. BLUMENTHAL:  Objection, Your Honor.  Calls for
13   speculation.
14        THE COURT:  I'm sorry.  Overruled.  I'm sorry.
15        THE WITNESS:  That's okay.
16        THE COURT:  I'm sorry.  Can you ask the question again?
17   Q.   BY MS. FOSTER:  And how would he know that?
18   A.   He knew my work schedule.
19   Q.   You told him or --
20   A.   Because he would be there when I came home during my
21   prep sometimes.  Or lunch.
22   Q.   Were there other little quirks about the way you left
23   your house that was familiar between you and Nicholas and
24   Houston?
25   A.   I leave the back door open for the dogs.
26   Q.   How often do you do that?
27   A.   Every day.
28   Q.   You said Nicholas and the defendant know that.  How

1    would they know that?

2        A.   Because --

3             MS. BLUMENTHAL:  Objection.  Same thing.  Calls for

4    speculation as phrased.

5             THE COURT:  If you want to rephrase it and lay the

6    foundation first.

7        Q.   BY MS. FOSTER:  Was anybody ever there when you would

8    leave the back door open for the dogs?

9        A.   Yes.

10       Q.   Would you tell them that you're leaving the back door

11   open for the dogs?

12       A.   It was common knowledge.

13       Q.   On November 10th, 2015, did you leave the back door

14   open for the dogs?

15       A.   Yes, I did.

16       Q.   At the time that you left your home, did your son

17   appear to have any injuries to him?

18       A.   No.

19       Q.   About what time did you arrive to work on November

20   10th?

21       A.   I believe around 8:20, 8:25.

22       Q.   And about what time were you contacted by officers?

23       A.   I don't remember the exact time.  It was before noon.

24   I was on my prep period.

25       Q.   Were you personally familiar with the defendant having

26   guns?

27       A.   Yes.

28       Q.   Had you seen him with a gun before?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 90

```
 1        A.   Yes.

 2        Q.   Had he brought a gun to your home before?

 3        A.   Yes.

 4        Q.   Was he allowed to bring guns to your home?

 5        A.   No.

 6        Q.   What type of gun did he bring to your home?

 7             If you recall?

 8        A.   I don't know what type of gun it was.

 9        Q.   When he brought the gun to your home, did you see it?

10        A.   I did.

11        Q.   And how did you see it?

12        A.   I thought it was a musical instrument, so I had him

13   open it.

14        Q.   Was it small or large?

15        A.   It was a large gun.

16        Q.   Had you seen that gun before?

17        A.   No.

18        Q.   Did the defendant tell you who it belonged to?

19        A.   He said it was a new gun.

20        Q.   Did he say whether it was his?

21        A.   I wasn't under that impression.

22        Q.   Did he tell you whose it was?

23        A.   No.

24        Q.   At some point were you taken to the police station?

25        A.   Yes, I was.

26        Q.   Were you interviewed by the police?

27        A.   Yes, I was.

28        Q.   Were you truthful with the police?
```

```
 1        A.   Yes.

 2        Q.   Did you give them access to your cell phones?

 3        A.   Yes, I did.

 4        Q.   Did you direct them where they could find them?

 5        A.   Yes.

 6             MS. FOSTER:  May I have one moment, Your Honor?

 7             THE COURT:  Yes.

 8        Q.   BY MS. FOSTER:  Did you see your son alive again after

 9   November 10th, 2015?

10        A.   No, I didn't.

11             MS. FOSTER:  I have nothing further.

12             THE COURT:  Cross-examination?

13             MS. BLUMENTHAL:  Thank you, Your Honor.

14                        CROSS-EXAMINATION

15   BY MS. BLUMENTHAL:

16        Q.   Good morning, Miss McCauley.

17        A.   Good morning.

18        Q.   My heart goes out to you.

19        A.   Thank you.

20        Q.   Kind of like you lost two sons.

21        A.   Yes.

22             MS. FOSTER:  Objection.  Counsel is narrating.

23             THE COURT:  Sustained.

24        Q.   BY MS. BLUMENTHAL:  Does it feel like you've lost two

25   sons?

26             MS. FOSTER:  Objection.  Relevance.

27             THE COURT:  Sustained.

28        Q.   BY MS. BLUMENTHAL:  Now, you were very, very close to
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 92

```
 1   Houston Boji, weren't you?
 2       A.   Yes.
 3       Q.   And how long have you been close to him?
 4       A.   I would say I knew him for around two years.  Closer
 5   towards the end.
 6       Q.   You say "towards the end."  What are we talking, last
 7   six months to a year?
 8       A.   Six months to a year.
 9       Q.   Now, during the time, are you aware of how your son and
10   Houston met each other?
11       A.   I was told by Nicholas how they met.
12       Q.   Okay.  Did they go to the same school?
13       A.   Same high school.
14       Q.   Is that your understanding of how they met?
15       A.   Yes.
16       Q.   And initially did they -- it takes a while but then
17   slowly did they become close friends?
18       A.   Yes.
19       Q.   Now, I believe you testified on direct that Houston
20   would come over to your home once or twice a week on a regular
21   basis?
22       A.   He was coming more often just a couple of months
23   before.
24       Q.   Okay.  So it seemed like it was getting more frequent
25   that he would come over?
26       A.   Yes.
27       Q.   And would it always be while you were home?
28       A.   No.  I think -- I don't know if I was at home.
```

1    Q.   Okay.  So you would hear sometimes that Houston would
2    come over, and you'd hear that from your son?
3    A.   Yes.
4    Q.   Like, "Houston came over today"?
5    A.   Yes.
6    Q.   Would that be a fair statement?
7    A.   Yes.
8    Q.   Okay.  And during the time -- when did your son
9    graduate?  Now, this happened November of 2015.  Did your son
10   graduate in June of 2015?
11   A.   It was in May, the graduation, I believe.
12   Q.   In May of 2015?
13   A.   Yes.
14   Q.   And was he home during most of the day?
15   A.   Yes.
16   Q.   Now, you and Houston would have discussions about your
17   son; is that right?
18   A.   Yes.
19   Q.   And there was a lot of times that you were concerned
20   about him?
21   A.   Yes.
22   Q.   And why was that?
23        MS. FOSTER:  I'm going to object.  Relevance and
24   outside the scope.
25        THE COURT:  Sustained on relevance.
26   Q.   BY MS. BLUMENTHAL:  Your son went to shooting ranges
27   with Houston; isn't that correct?
28   A.   I knew about one time, yes.

1    Q.    You knew about one time.

2          And it was very open; is that correct?

3    A.    For the one time.  It's the only time I knew of.

4    Q.    Okay.  So if there were other times that they went to

5    shooting ranges together, you were unaware of that?

6    A.    Yes, I would have been unaware.

7    Q.    Okay.  Now, do you know approximately when it was that

8    they went to shooting ranges together, or that they went that

9    one time that you are aware of?

10   A.    I couldn't put a date to it.  It was warm.  I believe

11   about a year before, or longer than that.  Before his senior

12   year, maybe.

13   Q.    Okay.  You're not positive?

14   A.    I'm not positive.

15   Q.    Somewhere -- would saying somewhere between six months

16   to a year before he passed, would that be accurate?

17   A.    Yeah.  Or maybe even a little longer than that.

18   Q.    Or maybe even a little longer.

19         And did you put a stop to that?

20   A.    Yes.

21   Q.    And why was that?

22   A.    Because I didn't want my son to have access to weapons.

23   Q.    And why was that?

24         MS. FOSTER:  Objection.  Relevance.

25         THE COURT:  Overruled.

26         THE WITNESS:  Can you repeat the question?

27   Q.    BY MS. BLUMENTHAL:  And why was that?

28   A.    Because my son suffered from bipolar disorder.

1    Q.   Okay.  So your son had some issues; is that a fair

2  statement?

3    A.   He was sick.

4    Q.   Okay.  He was sick.  And he suffered from bipolar

5  disorder?

6    A.   Yes.

7    Q.   And that had been in -- you had talked to Houston about

8  this; isn't that right?

9         MS. FOSTER:  I'm going to object to this line of

10  questioning as it's outside the scope and relevance.

11         THE COURT:  All right.  I'm sorry, ladies and

12  gentlemen.  Let's take a quick ten-minute break at this time.

13         Keep an open mind.  Remember, do not talk about the

14  case.  Do not conduct any research or share information.  Keep

15  an open mind.  Court's in recess until 10:40.  10:40.

16         You could step down.

17     (Proceedings were held out of the presence of the jury:)

18         THE COURT:  All right.  I'll have the lawyers and court

19  report in the back.  Court's in recess.

20         (The following proceedings were held in chambers.)

21         THE COURT:  All right.  Back on the record out of the

22  presence of the jury.

23         There was an objection as to relevance as to this line

24  of questioning.  I'm assuming the line of questioning is mental

25  illness or bipolar?

26         MS. FOSTER:  Yes.  And I believe, and correct me if I

27  misunderstood the Court's order, I believe the Court said that

28  if they were using suicide as a defense, that the mental illness

1    is relevant --

2            THE COURT:  Yes.

3            MS. FOSTER:  -- in our last discussion.

4            I don't believe there is any offer of proof or anything

5    that they're using suicide as a defense, and I haven't gotten

6    anything to indicate that, as well as every medical personnel

7    that reviewed the victim's body says it's physically impossible.

8            So I guess if there is an offer of proof that suicide

9    is a defense and that's why his mental illness is relevant, then

10   it would be relevant.  But if there isn't, then I don't see how

11   mental illness is relevant in this case, except for the fact the

12   defendant tries to say it in his lie about suicide.

13           THE COURT:  Right.  At this time we don't have any

14   evidence that this was a suicide by way of the witness.

15           Miss Blumenthal?

16           MS. BLUMENTHAL:  Your Honor, one of the things that she

17   discussed is that they had gotten closer.  And I think that if

18   I'm allowed to continue questioning, she had discussed these

19   issues with Houston on how he was getting worse as time was

20   going by.

21           THE COURT:  Hold on.  Is your offer of proof that this

22   witness is going to testify that the defendant -- that the

23   victim attempted to commit suicide or had thoughts of suicide?

24           MS. BLUMENTHAL:  No.

25           THE COURT:  Then sustained on relevance.

26           MS. BLUMENTHAL:  May I please protect the record, then,

27   on one of the things they talked about, that she talked, pulled

28   out on direct is that they were getting closer, and they're

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 97

1   going to start speculating now about a homosexual relationship.

2         I'm proposing that she kept talking to Houston about

3   how sick her son was and how concerned she was about him,

4   because he was getting a little more unstable.  And because of

5   that, they became closer friends, not sexually, but because she

6   was sharing with Houston her concern about him.

7         THE COURT:  That's a collateral issue, and the Court

8   will exercise its discretion if the testimony is that this

9   victim had thoughts of committing suicide, because his mental

10  illness, once again, we did not have any.  This is the first

11  time the Court is previewing any of this evidence.  So the Court

12  is taking it one step at a time.  If the cross-examination

13  cannot elicit one way or the other the defendant was thinking --

14  I'm sorry.  The victim was thinking of committing suicide or had

15  suicide thoughts --

16        MS. BLUMENTHAL:  Okay.

17        THE COURT:  -- then it's not relevant.

18        MS. BLUMENTHAL:  Okay.

19        THE COURT:  If you anticipate -- once again, I don't

20  have the police reports.  I don't have any of what this witness

21  is going to testify to.  I'm just anticipating issues.  If the

22  questions -- if the questions are going to be answered in a way

23  that she was concerned that the son maybe had thoughts of

24  suicide or ending his life, then it becomes relevant.

25        MS. BLUMENTHAL:  I believe she will say that.

26        MS. FOSTER:  I just want to know how his thoughts of

27  suicide are relevant if it's not suicide, if suicide is not part

28  of this case.  If he tried to commit suicide a year later or a

 1    year earlier or a month earlier or six months earlier, how is

 2    that relevant to what happened on this date when suicide isn't

 3    possible?

 4         THE COURT:  The defense is allowed to present evidence

 5    if they -- if one of the theories of the case, if it's supported

 6    by an offer of proof that a suicide, that -- I think it is

 7    relevant.  There is some probative value, and the defense is

 8    allowed to present it.  Whether the jury believes it or not is a

 9    different story.

10         MS. FOSTER:  And I believe Miss Blumenthal is not

11    saying she is presenting suicide as a defense.  The Court can

12    inquire.  But she's not saying suicide.  I'm sorry.  I don't

13    want to cut you off.

14         THE COURT:  No.  I don't think she's required to tell

15    me what the defense is at this time.

16         MS. FOSTER:  But there is no offer of proof that there

17    is any defense of suicide, that there is any indication that

18    this was a suicide.  I don't think there is any offer of proof

19    that there is any form of indication of suicide.

20         It sounds to me like what she's saying is, she's saying

21    that the mother, she wants to get out that the mother told him

22    that he was going to commit suicide, and then that's why the

23    defendant got close to him, not that it has anything to do with

24    him actually trying to commit suicide that day.  That's what

25    she's saying.

26         THE COURT:  Well, the defendant's statement is that the

27    victim committed suicide.

28         MS. FOSTER:  And then he changed it and admits it's a

```
 1   lie.

 2              THE COURT:  It was an accident, yes.

 3              MS. FOSTER:  Yes.  And so there is no defense that this

 4   was actually a suicide.  If it were a question of whether or not

 5   it was actually a suicide, the Court's a hundred percent right,

 6   it should come in and they should hear it, but right now --

 7              THE COURT:  What's the offer of proof?

 8              MS. FOSTER:  That --

 9              THE COURT:  What is she going to say?  I have no clue.

10              MS. FOSTER:  That it's possible he was -- she may say

11   that he was 5150 like months before.

12              MS. BLUMENTHAL:  A few months.

13              MS. FOSTER:  Before his 18th birthday.

14              THE COURT:  So he was suffering from some type of

15   mental illness?

16              MS. BLUMENTHAL:  Yes.

17              MS. FOSTER:  And that he went to a mental hospital for,

18   I think, a short stint, she says.

19              MS. BLUMENTHAL:  Over two weeks.

20              MS. FOSTER:  That he had some different diagnosis.  But

21   it's --

22              MS. BLUMENTHAL:  And that she shared it with the

23   defendant.

24              MS. FOSTER:  And that it was four or five different

25   times, I don't recall, she saying she shared it with Houston

26   until this testimony, however, now we're having -- we're

27   introducing into the trial mental illness for the victim, when

28   we do have from the defendant there was no fight between them,
```

```
 1    there was -- the victim never took any physical action towards
 2    him, and that it was not a suicide.
 3          THE COURT:  All right.  At this time the Court says
 4    it's beyond the scope of cross-examination.  At this time it's
 5    beyond the scope of cross-examination.
 6          MS. BLUMENTHAL:  Your Honor, if I can just for purposes
 7    of protecting my record.  One of the things they're trying to
 8    bring out is they got close so they suspected a homosexual
 9    relationship.  I'm allowed to offer other reasons that they got
10    close, otherwise I have nothing to defend on a homosexual
11    relationship, other than they got close, because mom was
12    encouraging him to help her to help her son out, not because
13    they were gay, not because they were homosexuals.  There are
14    other explanations for it that mother herself is the one who
15    created.
16          But right now we've allowed the prosecution to say, oh,
17    I suspected because they got so close and everything, and I'm
18    not being allowed to offer any other reasons under
19    cross-examination as to why they got close.
20          MS. FOSTER:  And I would say at this point it is beyond
21    the scope of direct examination, and that is something that she
22    can put on in her case separately.
23          In addition to that, I think the Court could limit it.
24    Already the Court has brought out that allowed her to bring out
25    that he had mental illness, that he was bipolar.  And she can
26    say that.  They can make the argument they got closer because of
27    that.  This witness cannot say why the two boys got closer.
28          MS. BLUMENTHAL:  But you already allowed them to say
```

1   that they did, and I think I'm allowed -- she's the one who

2   brought it out on direct.  I think I can cross-examine in that

3   area on why they got close.  She already brought it out.

4          MS. FOSTER:  I did not bring it out why they got close.

5   I just said they are close friends.  She can't say.

6          THE COURT:  My ruling -- I'm going to cut this.  My

7   ruling remains.  Thank you.

8          MS. BLUMENTHAL:  Then I am going to move to exclude

9   witnesses, and I'm going to ask to have her ordered back and put

10  her on for our case in chief.

11         THE COURT:  And you may.  I said that on the record.

12  If there is a request, I will entertain that request.  I will --

13  at this time is there a defense request to exclude all

14  witnesses?

15         MS. BLUMENTHAL:  Yes.

16         THE COURT:  At this time the People -- the Court will

17  grant that request.  All witnesses will be excluded.  The

18  attorneys are to admonish the witnesses at this time.

19         MS. FOSTER:  Thank you, Your Honor.

20         THE COURT:  Thank you.

21         MS. BLUMENTHAL:  Thank you.

22                      (Recess.)

23      (Proceedings were held in the presence of the jury:)

24         THE COURT:  Back on the record.  All parties are

25  present.  All jurors are present.

26         Defense?

27         MS. BLUMENTHAL:  Thank you.

28      Q.   BY MS. BLUMENTHAL:  Back to your conversation when you

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 102

1    testified that Mr. -- that Houston had said -- asked you about

2    what you would think if your son were dead; is that correct?

3         A.   Yes.

4         Q.   And was that his direct question to you?

5         A.   Yes.

6         Q.   And at the time that Houston asked that question, you

7    thought your son had a girlfriend; isn't that correct?

8         A.   No.  He didn't actually have a girlfriend during that

9    time.

10        Q.   When -- he did have some girlfriend along the way?

11        A.   Oh, yes.

12        Q.   And he had a girlfriend -- do you recall when it was

13   that Houston asked you that question?

14        A.   I don't have an exact time for that.

15        Q.   When I ask those kinds of questions, I'm not asking for

16   exact time, I'm kind of asking for a general time frame.

17        A.   It would have been months before.

18        Q.   Months before?

19        A.   November 10th, yes.

20        Q.   Okay.  So we're talking, it could have been during the

21   summer or even before; is that a fair statement?

22        A.   Yeah.  It could have even been in September, I just --

23        Q.   Okay.  Now, you thought that Houston had a girlfriend;

24   is that correct?

25        A.   Yes.

26        Q.   And you had discussions with him about that?

27        A.   Yes.

28        Q.   And, in fact, you saw the remnants of what you thought

1    his girlfriend had done?

2            MS. FOSTER:  I'm going to object as --

3            THE WITNESS:  I don't understand.

4        Q.   BY MS. BLUMENTHAL:  Well, you thought you saw a hickey

5    on his neck that his girlfriend had given him?

6        A.   I don't understand what you're asking.  If I saw the

7    hickey?

8        Q.   Yes.

9        A.   Yes.

10       Q.   Okay.  And --

11           MS. FOSTER:  I'm going to object as calls for

12   speculation as to who gave it to him.

13           THE COURT:  Assuming facts not in evidence.  Sustained.

14       Q.   BY MS. BLUMENTHAL:  Okay.  You had a discussion

15   regarding how he got that; is that correct?

16           MS. FOSTER:  Objection.

17       Q.   BY MS. BLUMENTHAL:  The answer is yes or no.

18           MS. FOSTER:  Withdrawn.

19           THE WITNESS:  I remember talking about it, but I'm not

20   clear on whether it was to him or to Nicholas.

21       Q.   BY MS. BLUMENTHAL:  Okay.  You say "him or to

22   Nicholas," meaning who you had the discussion with?

23       A.   I believe it was with Houston.

24       Q.   Okay.  You believe it was with Houston.

25           After the discussion, thereafter, it was your opinion

26   that Houston had a girlfriend; is that right?

27       A.   Yes.

28       Q.   Okay.  And that was your opinion -- when did you have

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 104

1    that discussion with Houston?

2        A.   Which discussion?

3        Q.   I'm sorry.   The hickey discussion?

4        A.   I don't have a time date of that at all.   I just

5    remember he walked in with one and I might have made a joke

6    about it.

7        Q.   Okay.   And I understand.

8             In the time frame that that happened, can you give a

9    generalized time frame?

10       A.   I'm going from November 10th, okay?

11       Q.   That's correct.

12       A.   It wasn't -- I don't believe it was a full year.

13       Q.   Okay.

14       A.   It would have been less than a year.

15       Q.   Less than a year.

16            Now, during that time, Houston would come over

17   frequently; is that right?

18       A.   Yes.

19       Q.   In fact, one of the last times that you saw Houston was

20   actually over the weekend, late Saturday night, early Sunday

21   morning before your son passed away; is that right?

22       A.   That is correct.

23       Q.   Okay.   And this is after the time that you read these

24   text messages; isn't that correct?

25       A.   No.   I saw the text messages after that time.

26       Q.   After that time.

27            So when you saw the dates on the text messages, those

28   text messages had been sent before he came over, correct?

 1     A.   Yes, but in my mind it was the week before.  I could be

 2   wrong.

 3     Q.   Okay.  Do you recall telling law enforcement that the

 4   Saturday before your son passed away, late Saturday night, early

 5   Sunday morning, Houston came over to your house?

 6     A.   I remember telling them that, but I'm not -- I don't

 7   remember which of the two weekends it was.

 8     Q.   Okay.  Do you recall your son leaving with him on that

 9   early Sunday morning before he passed away?

10     A.   Yes.

11     Q.   And you recall the Sunday before he passed away,

12   Houston and your son went out together, like 12:15 Sunday

13   morning, correct?

14     A.   No.  It wasn't Sunday morning.

15     Q.   It was Saturday night?

16     A.   The last time that I saw him come over was Friday night

17   to Saturday morning.

18     Q.   Okay.  Do you recall telling law enforcement that you

19   didn't see your son until approximately 5 a.m. on Sunday

20   morning?

21     A.   I remember telling them 5 a.m.  I don't remember what

22   day it was.

23     Q.   Okay.  But when you look at the text messages, those

24   text messages were sent before your son and Houston went out

25   together; isn't that correct?

26          MS. FOSTER:  I'm going to object as compound and vague

27   as to which messages.

28          THE COURT:  Can you rephrase the question.  It is

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 106

```
 1    vague.

 2              MS. BLUMENTHAL:  Sure.

 3              THE COURT:  It is vague.

 4        Q.   BY MS. BLUMENTHAL:  The messages, the beginning of the

 5    messages that I'm going to show you that you were asked

 6    questions about on direct examination --

 7        A.   Right.

 8        Q.   -- do you remember those?

 9        A.   (Nodded yes.)

10        Q.   Okay.  Isn't it true that those text messages were sent

11    before Houston and your son went out together that weekend?

12        A.   I don't recall whether it was that weekend or the

13    weekend before.

14        Q.   Okay.  Now, when you -- and you don't recall it on

15    today's date, correct?

16        A.   Right.

17        Q.   Okay.  When you were speaking to law enforcement -- do

18    you remember speaking with law enforcement?

19        A.   Yes.

20        Q.   You had numerous conversations with them?

21        A.   Yes.

22        Q.   Is that a fair statement?

23        A.   Yes.

24        Q.   In fact, you were upset at that point in time?

25             That you were speaking with law enforcement, correct?

26        A.   Yes.

27        Q.   Well, you were distraught?

28        A.   I was in shock.
```

1    Q.   Is that a fair statement?

2    A.   Yes.

3    Q.   Okay.  Because at the point in time that you were

4  speaking with law enforcement, you were not able to get from

5  them whether your son was dead or alive?  Is that a fair

6  statement to say?

7    A.   Yes.

8    Q.   Okay.  And you were upset with them?

9    A.   Yes.

10    Q.   Because they wouldn't give you any straight answers;

11  isn't that right?

12    A.   I wouldn't say I was upset with them, I was worried.

13    Q.   You were worried and you were stressed?

14    A.   Yes.

15    Q.   Okay.  And during that time that you were talking with

16  them, and that would be on the day you were talking to them the

17  morning that your son passed away, talking with law enforcement

18  that is?

19    A.   Yes.

20    Q.   Okay.  And they were asking you questions about your

21  son and Houston's relationship with each other?

22    A.   Yes.

23    Q.   And it was during that time period that you were

24  telling them about Houston and your son going out together, like

25  they were -- half the night they were gone out together?

26    A.   Yes.

27    Q.   And was your memory fresher then about which weekend it

28  was than what it is on today's date?

1        A.   I would imagine so, but I was also in shock.

2        Q.   Okay.  You were in shock, but if you were telling them

3    that it just happened, would that have been accurate?

4             In other words, when I say "it just happened that they

5    had just gone out together a couple days before"?

6        A.   I know that they went out on a Friday night.  I am not

7    clear whether it was that Friday night or the week before.

8        Q.   When you initially read those text messages, it was

9    your opinion that they were joking and teasing each other; isn't

10   that correct?

11       A.   No.

12       Q.   Did you ever say that?

13       A.   I could have said that I didn't take them seriously at

14   the moment.

15       Q.   Okay.  What I'm saying, when you first read them, you

16   didn't take them seriously; isn't that correct?

17       A.   Actually, they scared me.

18       Q.   Okay.  Did you tell law enforcement at the time that

19   you didn't think they were serious?

20            That when you first read those text messages, did you

21   tell law enforcement you didn't think they were serious, you

22   thought they were joking?

23       A.   I could have said that, yes, but I don't recall either

24   way.

25       Q.   You could have said that, is what you're saying?

26       A.   Sure.

27       Q.   Okay.  And that's because there is some truth to that;

28   isn't that correct?

```
 1          MS. FOSTER:  I'm going to object as to vague as to
 2    what --
 3          THE WITNESS:  No.  No.
 4          MS. FOSTER:  -- she's referring to.
 5          THE COURT:  Overruled.
 6    Q.    BY MS. BLUMENTHAL:  Now, you stated that you and your
 7    son had shared a phone; is that right?
 8    A.    Yes.
 9    Q.    And the reason for that was because his phone wouldn't
10    get text messages, or he couldn't use social media?
11    A.    I had stopped paying for that.
12    Q.    You had stopped paying for that on his phone?
13    A.    Yes.
14    Q.    And so he would ask to use your phone?
15    A.    Yes.
16    Q.    And you also said that you took his phone away?
17    A.    That's what I meant, that I had taken my -- his old
18    phone away that had text messaging, and he had one that only had
19    call and text, not --
20    Q.    Now, there were times when you and your son would --
21    would share your phone.  In other words, you would both be
22    getting text messages on there?
23    A.    Yes.
24    Q.    And people who were sending text messages, unless you
25    said something, would not know who had the phone that day?
26    Would that be a fair statement?
27    A.    Yes.
28    Q.    Okay.  And, in fact, there were times that you received
```

1    text messages in from Houston; isn't that correct, when you had
2    the phone?
3        A.   Only the ones to me.  I don't recall seeing text
4    messages.
5        Q.   Do you remember him sending a text, for example, that
6    said, "Bro," and you responded back and said, "No.  This is
7    Ana"?
8        A.   Oh, yes, I remember that one.
9        Q.   Okay.  So it was apparent to you, at least by some of
10   the communications you had, that Houston would have known by
11   your contacting him that you were reading your son's text
12   messages?
13          MS. FOSTER:  Objection.  Speculation as to what Houston
14   would know.
15          THE COURT:  Sustained.
16       Q.   BY MS. BLUMENTHAL:  Now, your phone had text messages;
17   is that correct?
18       A.   Yes.
19       Q.   Tell me the difference between that and Instant
20   Messenger?
21       A.   Well, text messages you send through text through the
22   phone number, and Instant Messenger is a separate type of
23   application.
24       Q.   Okay.  It's a separate application.
25          Now, what did your phone have on it?
26       A.   My phone had the ability to text, to instant message
27   and all of that, I just didn't use it at the time.
28       Q.   Okay.  And what were -- what was the form of

 1    communication that was used that you saw between Houston and

 2    your son?

 3        A.   The one that I saw was the one that's on Instant

 4    Messenger.

 5        Q.   On Instant Messenger.

 6             Had you read other messages between Houston and your

 7    son on Instant Messenger on your phone?

 8        A.   I don't recall that.  I could have.

 9        Q.   Okay.  You could have.

10             You didn't keep it a secret that you could read those

11    messages, did you?

12        A.   I did.

13        Q.   And why did you do that?

14        A.   I didn't want my son to know that I was checking.

15        Q.   Okay.  And when Houston had sent a text that said,

16    "Bro," you interpreted that he was trying to communicate with

17    your son, correct?

18        A.   Yes.

19        Q.   That's what they would call each other?

20        A.   Right.

21        Q.   Is "Bro"?

22        A.   Yes.

23        Q.   And you sent back an instant message saying, that said,

24    "No.  This is Ana"; is that right?

25        A.   I thought it was a text, but it could be an instant

26    message.

27        Q.   Could you tell the difference immediately by looking at

28    your phone?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 112

1      A.   I know now.

2      Q.   I understand that you know now.  At that point in time

3    could you?  Or did you?

4      A.   I knew how to text, so I believe it was a text.

5      Q.   You believe.  Are you sure?

6      A.   No.  I couldn't be sure.

7      Q.   Okay.  But you did let -- you did let Houston know --

8    well, would your son be receiving text messages on your phone

9    versus instant message?

10      A.   Well, no, that doesn't -- I don't know if he would.  I

11    know that he received them on his phone.

12      Q.   Okay.

13      A.   He might have received them on mine.  I don't know

14    that.

15      Q.   Okay.  If someone were sending your son a text on his

16    cell phone number, that would not appear on your phone, would

17    it?

18      A.   No.

19      Q.   Okay.  So the only way it would appear on your phone is

20    if someone sent him an instant message, correct?

21      A.   Correct.

22      Q.   Okay.  So if Houston were to have sent your son, would

23    have sent Nicholas a text message and said, "Bro," you would not

24    have been able to respond to that?

25      A.   Not unless my son was using my phone at the time, no, I

26    couldn't.

27      Q.   If your son were using your phone at the time, you

28    wouldn't have it to respond to?

1        A.    Exactly.

2        Q.    Okay.  So the only way if you had your phone --

3        A.    Um-hum.

4        Q.    -- you have your phone and Houston is sending Nicholas

5   some sort of communication, the only way that you would see it

6   on your phone is if he sent it through Instant Messenger?

7        A.    Correct.

8        Q.    So if Houston had sent, so he sent through Instant

9   Messenger a communication to your son that says, "Bro," you

10  remember that, and you responded, "No, this is Ana"?

11       A.    I remember responding that, yes.

12       Q.    Do you recall when that -- when that happened?

13       A.    Oh, that would have been, I don't recall, but that

14  seems like further away, like.

15       Q.    But you're not sure?

16       A.    But I'm not sure.  No.  There is no way.

17       Q.    So it would appear, at least, that if you're responding

18  "This is Ana," that the person receiving it would know that you

19  could be reading the instant messages, correct?

20            MS. FOSTER:  Objection.  Vague as to time.

21            THE COURT:  Overruled.

22            MS. FOSTER:  When.

23            THE COURT:  Overruled.

24            THE WITNESS:  At the time it could have been Instant

25  Messenger or it could have been text, I don't know.

26       Q.    BY MS. BLUMENTHAL:  How would you have read his text?

27       A.    If he had texted through my phone.

28       Q.    Having your phone number?

Christine M. DiCaro, CSR                                          105

1     A.    Right.

2     Q.    Okay.  If he's texting to -- didn't he normally send

3  instant messages to Nicholas?

4     A.    The text messages, I would imagine so, yes.

5     Q.    No.  I'm talking instant messages.  Didn't he normally

6  use those to communicate?

7          MS. FOSTER:  I'm going to object as speculation.

8          MS. BLUMENTHAL:  I'll withdraw that question.

9          THE COURT:  Overruled.

10     Q.    BY MS. BLUMENTHAL:  Was there more than one

11  communication that you had with Houston on Instant Messenger on

12  your phone?

13     A.    I don't recall.

14          Probably.

15     Q.    Did you respond to him on Instant Messenger more than

16  once on your phone?

17     A.    I could have.

18     Q.    Okay.  So it would be apparent, then, that he would

19  know if he's sending messages to your son, you could be reading

20  them or have access to them?

21          MS. FOSTER:  Objection to that conclusion as calls for

22  speculation.

23          THE COURT:  Does call for speculation.  Sustained.

24     Q.    BY MS. BLUMENTHAL:  Now, at one time, is it true that

25  you actually did not take those messages seriously until after

26  the time that your son had been shot?

27     A.    I had taken them -- I was worried about them.

28     Q.    Did you talk to Houston about them?

1      A.    No.

2      Q.    Did you see Houston at all between the time that you

3    read them and the time that your son passed?

4      A.    I read them after I saw Houston.

5      Q.    To the best of your recollection, when you read the

6    dates, they were sent -- some were sent before you saw Houston,

7    although, you did not read them; is that correct?

8      A.    No, that's correct.

9      Q.    Okay.  So some would have been sent before you saw

10   Houston, you would have seen Houston, and then you would have

11   read the messages?

12     A.    If that was a Friday night, then, yes.

13     Q.    Okay.  And Houston and your son went out?

14     A.    Yes.

15     Q.    And they -- what time -- do you recall what time

16   Houston came to your house?

17     A.    He actually showed up a little bit after midnight.

18     Q.    Showed up a little bit after midnight?

19     A.    Um-hum.

20     Q.    And like about 12:15 or so in the morning?

21     A.    I know it was after midnight but not quite 1 p.m.

22     Q.    Okay.  And was your son up?

23     A.    No.  He was asleep.

24     Q.    What happened at that time?

25     A.    I thought that he was expecting Houston, and I told him

26   to come in and wake him up.

27     Q.    Okay.  So you thought your son was expecting him, and

28   you did not know at that time one way or the other, you just

```
 1   assumed that he was?
 2       A.   I assumed that, yeah, that Houston had been late coming
 3   over and my son fell asleep.
 4       Q.   Okay.
 5       A.   Speculation.
 6       Q.   Because that had happened in the past?
 7       A.   Yes.
 8       Q.   Okay.  And your son -- Houston comes in and what does
 9   he do?
10            What do you see him do?
11       A.   He went straight to my son's room.
12       Q.   Okay.  And at some point in time did Houston and your
13   son leave the house?
14       A.   I heard the door close again.
15       Q.   Okay.  And did you kind of hear them go out?
16       A.   Yes.
17       Q.   Okay.  And you know about what time that was?
18       A.   No.
19       Q.   Okay.  Was it -- do you know -- let me ask you this:
20   Do you know how much after Houston had arrived that they left?
21       A.   No.  I only remember the return time.
22       Q.   Okay.  What time do you recall -- so at some point in
23   time they did leave?
24       A.   Yes.
25       Q.   And you had fallen asleep, I take it?
26       A.   Yes.
27       Q.   So Houston comes over a little after midnight.  At some
28   point in time you kind of hear them leave, you think.  You're
```

 1   not sure of the time; is that fair?

 2       A.   Fair.

 3       Q.   Okay.  What time do they then return?

 4       A.   About 5 a.m.

 5       Q.   About 5 a.m.

 6            Your son was alive, obviously, when they returned?

 7       A.   Yes.

 8       Q.   And when he got back, what did he do, your son?

 9       A.   He went to sleep.

10       Q.   Okay.  Did Houston come into the house with him?

11       A.   No.

12       Q.   And that was on -- is your testimony that was on

13   Saturday morning?

14       A.   No.  Houston came over the week before.

15       Q.   Okay.

16       A.   I might have been unclear what I told them, but it was

17   the week before.  I'm pretty clear on that.

18       Q.   To the best of your recollection, did Houston and

19   Nicholas see each other at all the weekend before your son

20   passed?

21       A.   No.  I don't remember them seeing each other.

22       Q.   Do you recall what your activities were that weekend,

23   the weekend before your son passed?

24       A.   Cleaning the house, doing the laundry.  What I usually

25   do.

26       Q.   Okay.  And you're doing that on the base of what you

27   usually do?

28       A.   Yes.

```
 1        Q.    Okay.  So you don't have a specific recollection?

 2        A.    No.

 3        Q.    Okay.  Were you gone from the house at all that

 4   weekend, the weekend before your son passed?

 5              If you recall?

 6        A.    It would have been to the market.

 7        Q.    And you're saying that's because that's what you would

 8   normally do?

 9        A.    Correct.

10        Q.    Not that you have a specific recollection of that

11   weekend?  Would that be a fair statement?

12        A.    Right.  But it was a regular weekend.

13        Q.    Okay.  Regular weekend you normally go to the market,

14   and you're basing your testimony off of your normal habit?

15        A.    Correct.

16        Q.    Okay.  Now, during the year before, a year, six months

17   before your son passed, would you come home frequently during

18   your lunch break?

19        A.    Yes.

20        Q.    When you were working?

21        A.    Yes.

22        Q.    Did you teach summer school?

23        A.    No.

24        Q.    So you would have been home all day during that time or

25   on an overall basis?

26        A.    I would have been home in June.

27        Q.    And July?

28        A.    And July.
```

```
 1        Q.    Okay.  In August does school start back up?

 2        A.    School starts in August.

 3        Q.    Now, you yourself did a lot of activities with Houston?

 4        A.    Yes.

 5        Q.    And could you describe the type of activities that you

 6   would do?

 7              MS. FOSTER:  Objection.  Relevance.

 8              THE COURT:  Sustained.

 9        Q.    BY MS. BLUMENTHAL:  Did you do those with Nicholas and

10   with Houston together?

11        A.    Yes.

12        Q.    Okay.  And could you see their relationship with each

13   other?

14        A.    Yes.

15        Q.    And when was the last time that you went on -- went on

16   an outing of any kind with Houston?

17        A.    The last time that I recall going out with Houston and

18   Nicholas would have been the weekend of my son's 17th birthday.

19        Q.    On his 17th birthday.  So that would have been a year

20   before?

21        A.    Yes.

22        Q.    And when is your son's birthday?

23        A.    July 30th.

24              1997.

25        Q.    And at the time he passed, he was 18; is that correct?

26        A.    Yes.

27        Q.    So had it been a year, a little over a year since you

28   had yourself had done anything with Houston?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 120

1     A.   I know we'd go to concerts, but I don't recall that we

2  went to one together that year.

3     Q.   Okay.  When you say "we would go to concerts," what do

4  you mean?

5     A.   I mean, my son and Houston, or they would go to a

6  concert and I would go to a concert and meet up with other

7  people.

8     Q.   Okay.  Now, you trusted Houston, correct?

9     A.   I trusted Houston.

10    Q.   In fact, he was the only one of your son's friends you

11  would allow in your house when you were not there?

12    A.   Yes.

13    Q.   And that had gone on for how long?

14    A.   Up until I saw the text message.

15    Q.   Up until you saw the text message?

16    A.   The instant message.

17    Q.   Pardon me?

18    A.   The Instant Messenger.

19    Q.   Up until you saw the Instant Messenger.  And you saw

20  the Instant Messenger how many days before your son passed?

21    A.   I saw it on that weekend, because I spoke to my son

22  about it that Sunday.

23    Q.   Just a minute.  I'm just asking how many days before

24  your son passed did you read those messages?

25    A.   Two to three days.

26    Q.   Two to three days.

27         And how long had it been going on that Houston was the

28  only one of your son's friends that you would allow in your

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 121

1  home?

2      A.   Oh, for -- that's when I'm not home.  For --

3      Q.   Correct.  But how long had that been going on?

4      A.   There wasn't a beginning time, I just allowed Houston

5  in the home.

6      Q.   You allowed Houston in the home, but it got to the

7  point after a while that Houston was the only one of your son's

8  friends you allowed there?

9      A.   I always didn't want my son to bring friends over if I

10 wasn't home.

11     Q.   Okay.  Now, but Houston was different in your mind?

12     A.   Yes.

13     Q.   And why was that?

14     A.   Because I cared for him.

15     Q.   You cared for him, you trusted him?

16     A.   I trusted him.

17     Q.   And in your mind you felt that he had your son's best

18 interest at heart?

19     A.   Yes.

20     Q.   And you had discussions with him about that?

21     A.   Yes.

22     Q.   I'm not saying what they were, but just that you had?

23     A.   Yes.

24     Q.   And do you recall the last time you had such a

25 discussion with him?

26     A.   It would have been before October.

27     Q.   Before October?

28     A.   Or in October.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 122

1      Q.   In October.

2           Now, you made a comment on direct examination that

3    Houston was not allowed to bring any firearms into your house;

4    is that correct?

5      A.   Correct.

6      Q.   And why was that?

7      A.   I don't want firearms in my home.

8      Q.   And why was that?

9      A.   I never had firearms in my home.

10     Q.   Well, there had been a previous time that Houston had

11   brought over a firearm; isn't that correct?

12     A.   Correct.

13     Q.   And how long before this incident did that happen?

14     A.   I don't know.  It would have been around the

15   springtime.

16     Q.   Around the springtime.  So six months or less before

17   your son passed, correct?

18     A.   Yes.

19     Q.   And were you home at the time he brought that gun in?

20     A.   I asked him to show me what was in the case.

21     Q.   Okay.  I'm saying, were you home?

22     A.   Yes.

23     Q.   Okay.  So where were you when Houston, on this one

24   time, this previous time that he brought a gun into your home,

25   where were you when he brought the gun into the house?

26     A.   I would have been towards the back of the house,

27   because I remember I was coming out and saw him carrying

28   something.

1      Q.   And what was he carrying?

2      A.   It was a type of bag, and I assumed it was a musical

3  instrument.

4      Q.   You assumed it was a musical instrument as opposed to a

5  gun case?

6      A.   Of course.

7      Q.   And did you ask him what was in it?

8      A.   I did.

9      Q.   And what did -- did you eventually learn what was in

10  it?

11      A.   Yes.

12      Q.   And what did you find out was in it?

13      A.   It was a gun.

14      Q.   Did you ever look at that gun?

15      A.   I did.

16      Q.   And do you know, was it a small gun?  Was it a shotgun

17  style, longer gun?

18      A.   It wasn't a shotgun style, but it was a larger gun.

19      Q.   When you say "larger gun," what do you mean?

20           Are you -- let me back up.  Are you familiar with

21  firearms?

22      A.   No.

23      Q.   Okay.  Do you know the difference between a shotgun and

24  a rifle?

25      A.   To me they're similar.

26      Q.   Okay.  If I had a shotgun and a rifle side by side,

27  would you be able to tell me which is which?

28      A.   I don't think so.

1      Q.   Okay.  So you don't know if it was a shotgun or not,

2    then, I take it?

3           That on the time that he brought the gun into your

4    house that was in a case?

5      A.   It looked more like an automatic-weapon type.

6      Q.   It was more like an automatic weapon.

7           Do you know what automatic weapons look like?

8      A.   From the television.

9      Q.   From the television.  Other than that, did you ask him

10   what kind of gun it was?

11     A.   I don't recall that.

12     Q.   Okay.  So based upon what you've seen on TV, you came

13   to the conclusion you thought it was an automatic weapon?

14     A.   I came to that conclusion later.

15     Q.   You came to that conclusion later when you were

16   watching TV?

17     A.   Um-hum.

18     Q.   Is that correct?

19     A.   Well, yes.

20     Q.   Okay.

21          Now, did he hesitate in showing you what was in that

22   case that he had brought into your house?

23     A.   No.  I insisted.  I wanted to see what was in there.

24     Q.   Did he hesitate?

25     A.   He opened it.

26     Q.   You said, "I want to know -- " he said there was a gun

27   in there, and you said, "I want to see it"?

28     A.   I don't recall him saying it was a gun.  I recall him

1    opening and showing me what it was.

2        Q.   So you asked him -- did you ask him what was in the

3    case?

4        A.   I don't recall that.  I could have.

5        Q.   Okay.  And he opened it for you to see what was in the

6    case, correct?

7        A.   Yes.

8        Q.   And you looked at it and it was a gun of some sort?

9        A.   Yes.

10       Q.   And you said to him that you did not want guns in your

11   house?

12       A.   Correct.

13       Q.   Now, at that point in time had your son already gone to

14   the gun range with Houston?

15       A.   Yes, I believe so.

16       Q.   Okay.  And are you aware if they had gone to the gun

17   range more than once?

18       A.   No.

19       Q.   It's your belief -- you only have knowledge of them

20   going one time?

21       A.   With the family, yes.

22       Q.   And when you say "with the family," what do you mean?

23       A.   I mean, the only time I gave him permission was with

24   Mr. Boji, because there was an adult.

25       Q.   Okay.  Because there was an adult present?

26       A.   Exactly.

27       Q.   And that's Houston's father?

28       A.   Yes.

1     Q.   And you knew that Houston's father would be present, so
2  you felt it was okay for your son to go with them?
3     A.   Exactly.
4     Q.   So you gave permission, correct?
5     A.   Yes.
6     Q.   Now, you don't know if your son -- you don't have any
7  information one way or the other if your son had ever gone to a
8  gun range again?
9     A.   No, I don't.
10    Q.   Would that be a fair statement?
11    A.   That's fair.
12    Q.   Did you ever tell Houston he was not welcome at your
13 home?
14    A.   No.
15    Q.   Now, let me go to the -- you stated that you thought
16 you saw Houston's car?
17    A.   In the morning.  Peripherally.
18    Q.   Pardon me?
19    A.   Yeah, like from the side of my --
20    Q.   You thought you saw his -- now, when did you -- at the
21 moment you saw it, did you think that was Houston's car, or did
22 this come to you later on after you found out that Houston had
23 been at your house?
24    A.   No.  At the moment I just thought, you know, I drove by
25 thinking my neighbor bought a new car.
26    Q.   Okay.  Now --
27         There we go.
28         If we take a look, this is the double cul-de-sac that

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 127

1    you discussed, correct?

2            THE COURT:  I'm sorry.  What exhibit is that?

3            MS. BLUMENTHAL:  I apologize.  Thank you, Your Honor.

4    No. 45.

5        Q.   BY MS. BLUMENTHAL:  What's been marked for

6    identification as Exhibit No. 45, we see in the center of there,

7    almost at the center of that what appears to be a double

8    cul-de-sac.  That is the road that comes into your area, and a

9    cul-de-sac on either end; is that correct?

10       A.   Yes.

11       Q.   Where did you see the car that you thought your

12   neighbor got a new car?

13       A.   I was driving this way.

14            Down over here.

15       Q.   Okay.  Now, where -- I need you to describe that for

16   the record.  You were indicating an area, as we look at the

17   photograph, that is the left, far end of that, of the

18   cul-de-sac; is that correct?

19       A.   Yes.  Yes.

20       Q.   The cul-de-sac on the left-hand side, the far end down

21   towards the bottom of that cul-de-sac?

22       A.   Yes.

23       Q.   And where do you live in relationship to that?

24       A.   (Indicating.)

25       Q.   Okay.  You're indicating, it looks like the second or

26   third house, or second house into the cul-de-sac, actually, the

27   first one inside the cul-de-sac itself; is that correct?

28       A.   Yes.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 128

1    Q.    On the other cul-de-sac?

2    A.    Right.

3    Q.    That is the right-hand side cul-de-sac.

4          And where was that car that you saw, you thought the

5    neighbor got a new car?  Where was it parked?

6          Show the general area.  Was it in the driveway?  Was it

7    on the street?

8    A.    No.  I saw -- I just remember seeing a car there that

9    made me think, oh, the neighbor bought a new car.

10   Q.    Okay.  And when you first saw the car, did it remind

11   you of anything?

12   A.    Later it did.

13   Q.    Okay.  Later, not at that moment?

14   A.    At that moment I just turned and thought, you know, the

15   neighbor got a car.  It looks like Houston's car.

16   Q.    Okay.  And you proceeded to go out, I take it?

17   A.    I went to work.

18   Q.    Okay.  So you go out the cul-de-sac area; is that

19   right?

20   A.    Yes.

21   Q.    And where do you park your car when you're at home?

22   A.    In the garage.

23   Q.    In the garage.

24         So somebody driving by your house would not know if you

25   were home or not, I take it?

26   A.    No.  You can't see my car.

27   Q.    Well, that's -- and that's what I'm getting to.  If

28   they were going to see if you were home by the base of whether

1   or not your car was there, they would not know just driving by

2   your house, because you parked your car in the garage when

3   you're home?

4       A.   Yes.

5       Q.   Is that correct?

6       A.   Yes.

7       Q.   Okay.  So how many times, if at all, has Houston been

8   at your house when you have left to go to work in the morning?

9       A.   I only see him when I come home.

10      Q.   Okay.  You've never seen him in the mornings; is that

11  correct?

12           In other words, when you're at work and Houston is at

13  your house, that's because you have come home at lunchtime or

14  after you're done with teaching that day and Houston is at your

15  house, correct?

16      A.   Correct.

17      Q.   Okay.  Have you ever seen Houston there in the mornings

18  when you had left?

19      A.   That I can't remember, so I would say, no.

20      Q.   Okay.  In other words, you don't recall ever seeing

21  Houston there in the mornings as you were leaving to go to work?

22      A.   Correct.

23      Q.   Okay.  And you leave to go to work approximately 8:15?

24      A.   Yes.

25      Q.   Do you ever vary in the time that you go to work?

26      A.   I'm pretty -- let me say, I have a strict schedule for

27  myself.

28      Q.   Okay.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 130

```
 1      A.   So it does vary, but it's not -- it doesn't vary very
 2   much or often.
 3      Q.   Okay.  You're a creature of habit, basically?
 4      A.   Exactly.
 5      Q.   Okay.  And you leave the house almost every day at 8:15
 6   or thereabouts, unless you've got some extra assignments you've
 7   got to do when you get to the classroom early?
 8      A.   Yes.
 9      Q.   And so out of a month time period, you're going to
10   leave at, the house, at generally the exact same time except for
11   maybe two days out of the month.  Would that be an estimate?
12      A.   Unless I'm running late.  Sometimes I leave a little
13   later, but my habit is 8:10 to 8:15.
14      Q.   Okay.
15      A.   Sometimes a couple minutes later.
16      Q.   Now, the messages that we saw on Instant Messenger --
17           I'm going to show you these.  This is 285 for
18   identification.  And is that exactly how it appeared on your
19   phone?
20      A.   Yes.
21      Q.   Did you take pictures of what was on your phone?
22      A.   I did.
23      Q.   And what did you do with those?
24      A.   They're on my phone.
25      Q.   The pictures are on your phone?
26      A.   I took them later.
27      Q.   You took them later.  Okay.
28           And were these copies of the pictures that you took?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 131

```
 1        A.   It looks like it.

 2        Q.   Did you -- let me ask you this:  Did you send the

 3   pictures to anyone?

 4        A.   I showed them to someone interviewing me, or to an

 5   attorney.  I showed them to someone that I was talking to

 6   regarding the case.

 7        Q.   Okay.  Like a deputy DA?

 8        A.   Could have been, yes.

 9        Q.   Okay.  There were some previous deputy DA's on the

10   case?

11        A.   Correct.

12        Q.   And that's who you showed them to?

13        A.   I believe so.

14        Q.   Is that your testimony?

15        A.   Yes.

16        Q.   And when you showed those to the deputy DA, what

17   happened thereafter with the photographs?  Did you send them to

18   someone?

19        A.   I would imagine I showed them to a couple of people.

20        Q.   Okay.

21        A.   But I don't recall sending them to anyone in

22   particular.

23        Q.   Okay.  You don't recall sending them to anyone?

24        A.   Unless the detective.

25        Q.   Pardon me?

26        A.   Unless the detective or someone like that.

27        Q.   Do you have a recollection of sending them to anyone?

28        A.   Not a specific person, but I'm sure I sent it.
```

1          This was, you know, two-and-a-half years ago.

2     Q.   Pardon me?

3     A.   I said, "This was two-and-a-half years ago," so I

4  assume.

5     Q.   And I understand, that's why I ask for estimations in

6  what you recall.

7     A.   And that's why I assume.  I probably did send them to

8  someone, but I don't know that.

9          MS. BLUMENTHAL:  If I might have a moment, Your Honor?

10          THE COURT:  Yes.

11     Q.   BY MS. BLUMENTHAL:  Now, the morning that your son

12  passed, we'll go to that.  Do you recall what time you left that

13  morning?

14     A.   It would have been my usual time, usually between 10

15  and 10-15, or up to 10-20, but no later.

16     Q.   Okay.

17     A.   I don't think.

18     Q.   And do you recall, did you talk to your son that

19  morning?

20     A.   I did.

21     Q.   And what did you and he -- what was the discussion?

22     A.   He yelled, I ran to see what was wrong, and the dog was

23  bothering him in his room.

24     Q.   Okay.  Now, you had a dog, correct?

25     A.   Three dogs.

26     Q.   You had three dogs.  And were they normally indoors at

27  night?

28     A.   Yes.

1      Q.    Okay.  And you hear your son yell; is that right?

2            It was a pretty loud yell?

3      A.    Yes.

4      Q.    He sounded irritated?

5      A.    I thought he was having a nightmare, so, yes.

6      Q.    You thought he was having a nightmare, so it was kind

7   of a scary yell?

8      A.    Yes.

9      Q.    I presume.

10           And you were very concerned about him at that time,

11   correct?

12     A.    Well, I just went to check.

13     Q.    Okay.  It was a loud enough yell that you got

14   concerned?

15     A.    Enough that I went to his room, yes.

16     Q.    Okay.  You go into the room.  What do you see?

17     A.    He said, "Get the dogs out of here.  They're bothering

18   me.  I'm sleeping."

19     Q.    Okay.  And where did you see your son at that time?

20     A.    He was on the bed.

21     Q.    When you say "on the bed," could you describe?

22     A.    He was laying on his bed closest to the door that comes

23   in through the hall.

24     Q.    Okay.

25     A.    And he was -- that's the side he sleeps on.

26     Q.    And was he lying on his stomach or on his back?

27     A.    I remember seeing his leg to the right, so I believe he

28   was on his back.

1      Q.   Okay.  So what you're saying is that you remember his

2  leg being out underneath the covers?

3      A.   Yeah.  I don't know if that was before or after, but --

4      Q.   Okay.  But that's what you recall, at least when you go

5  into the room, is he's lying on his back, leg out from

6  underneath the covers, which is why you think he's laying on his

7  back?

8      A.   Right.

9      Q.   Okay.  And where do you see the dog or dogs?

10     A.   They were just playing in there, so I took them out

11  except for one.

12     Q.   Okay.  Could you see what he was wearing at that time?

13     A.   He goes to bed in boxer shorts.

14     Q.   Okay.  He goes -- could you see what he was -- okay.

15  He goes -- his normal nighttime attire is boxer shorts?

16     A.   Yes.

17     Q.   Could you see the boxer shorts?

18     A.   I could see his leg and I could see his chest.

19     Q.   Okay.  You could see his legs and chest, so if you

20  could see his chest, then he would be lying on his back?

21     A.   Yeah, because it was, I believe, the chest and a leg.

22     Q.   Both legs or one?

23     A.   I would see one.

24     Q.   And I'm just talking about that morning?

25     A.   Yeah, and I'm not perfectly clear on that.

26     Q.   I understand.  I understand.

27          Now, was he under any blankets?

28     A.   He had a blanket across his midsection.

1        Q.   He had a blanket there.

2             Now, do you recall any of the officers ever asking you

3   what he was wearing?

4        A.   I'm sure they did.

5        Q.   Do you recall ever saying that "I have no idea, because

6   he was under a blanket"?

7        A.   I don't remember saying that, but I'm sure that I could

8   have said that, because there was a blanket covering his

9   midriff.

10       Q.   Okay.  And so did he appear to be wearing any sort of

11  shirt?

12       A.   No.

13       Q.   Did he appear to be wearing any sort of longer pants?

14       A.   No.

15       Q.   And so when you take the dogs out, do you say anything

16  to him at that time?

17       A.   No.  I just closed the door and left Sweet Pea in

18  there.

19       Q.   And left Sweet Pea?

20       A.   Left one of his dogs.

21       Q.   The one dog named Sweet Pea that was inside his room?

22       A.   Yes.

23       Q.   And the last time that you saw him is you were taking

24  the dogs out.  Did he appear to still be awake then?

25       A.   No.  I thought he had fallen back asleep, because when

26  I took them out of the room, he was awake, but there was a time

27  between the time I took them out of the room and the time I left

28  to work.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 136

1     Q.    And was his door open to his bedroom there?

2     A.    It was closed.

3     Q.    It was closed.

4           So the last time you saw him was he awake or asleep?

5     A.    The last time I saw him, I talked to him, he was wake,

6     but then when I left, I believe he was asleep.

7     Q.    And why did you believe that?

8     A.    Because he's a deep sleeper, and I just assumed he fell

9     back asleep.

10    Q.    Okay.  You assumed that.  You didn't see him, though?

11    A.    Right.

12    Q.    Is that fair?

13    A.    That is fair.

14    Q.    Okay.  And that's what I'm trying to get at, what you

15    actually saw.

16          So the last conversation, actually, that you had with

17    him was he was complaining about the dogs?

18    A.    Yes.

19    Q.    When you walked in, were they on his bed?

20    A.    That I don't recall.  I think they were just running

21    through.

22    Q.    Just running through creating havoc kind of thing?

23    A.    Yes.

24          MS. BLUMENTHAL:  I have no further questions at this

25    time, Your Honor.

26          THE COURT:  Redirect?

27          MS. FOSTER:  Yes, Your Honor.  May I have one moment?

28          THE COURT:  Yes.

```
 1                    REDIRECT EXAMINATION
 2   BY MS. FOSTER:
 3       Q.   All right.  Miss McCauley, I'm going to follow up on a
 4   few things from cross-examination, okay?
 5       A.   Okay.
 6       Q.   Now, you talked some about your son's cell phone?
 7       A.   Yes.
 8       Q.   And you said earlier that you couldn't recall exactly
 9   what it looked like; is that correct?
10       A.   Correct.
11       Q.   Do you recall what color the phone was?
12       A.   Black.
13       Q.   Do you recall the phone number to the phone?
14       A.   Starts with 902 and there is a 56 in there.
15       Q.   That's what you remember?
16       A.   Right now at this moment.  I'm sure I will remember it
17   later.
18       Q.   Do you recall telling officers about that phone?
19       A.   Yes.
20       Q.   Do you recall giving officers that phone?
21       A.   I remember they came for phones, but I don't know if I
22   gave it to them or they already had it.
23       Q.   And would the phone have been a ZTE?  Do you recall
24   that, a brand?
25            MS. BLUMENTHAL:  Objection.  Leading.
26            THE WITNESS:  Is what?
27            THE COURT:  I'm sorry.  What was the objection?
28            MS. BLUMENTHAL:  Leading.
```

```
 1              THE COURT:  It is leading.  Sustained.
 2       Q.   BY MS. FOSTER:  Do you recall what brand the phone was?
 3       A.   No.  It was a GoPhone.
 4       Q.   I'm going to come back to some questions about the
 5  phone.
 6              The day that you spoke to officers, how did that
 7  encounter first take place?
 8       A.   At my work.
 9       Q.   Okay.  So what happened?
10              You were at work and what happened?
11       A.   The counselor came to where I was making copies and
12  asked me to go into the library.
13       Q.   And when you went, did you go into the library?
14       A.   I did.
15       Q.   And who was there when you went there?
16       A.   I saw police officers.
17       Q.   And what did they tell you?
18              MS. BLUMENTHAL:  Objection.  Calls for hearsay.
19              THE COURT:  Overruled.
20              THE WITNESS:  I was in shock because I -- immediately
21  when I saw police, I was afraid something was wrong.
22              MS. BLUMENTHAL:  Your Honor, objection.  Nonresponsive
23  answer.  Move to strike.
24              THE COURT:  If there was an answer, it will be
25  stricken.
26       Q.   BY MS. FOSTER:  And what happened when -- what did they
27  tell you, the officers in the library?
28              MS. BLUMENTHAL:  Objection.  Calls for a narrative as
```

1    phrased.

2          THE COURT:  Overruled.

3          THE WITNESS:  They asked me questions.

4    Q.   BY MS. FOSTER:  About?

5    A.   About my house and my son.

6    Q.   At some point did they take you to the police station?

7    A.   Yes.

8    Q.   From the time that they -- you saw them in the library

9    to the time they took you to the police station, did they tell

10   you that your son had died?

11   A.   I believe he had died, yes.

12   Q.   You said you believed he had died.  Did they tell you

13   he had died?

14   A.   They said they needed DNA tests first.

15   Q.   When you go to the police station, were you placed in

16   an interview room?

17   A.   Yes, I was.

18   Q.   And were you interviewed by a detective?

19   A.   Yes.

20   Q.   And is that the office of the detective that's in the

21   courtroom today?

22   A.   That's one, yes.

23   Q.   Did they tell you that there was a deceased person

24   inside your house?

25         MS. BLUMENTHAL:  Objection.  Leading.

26         THE COURT:  Overruled.

27         THE WITNESS:  Yes.

28   Q.   BY MS. FOSTER:  Did they tell you who that was?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 140

```
 1        A.   They said they believed it was my son.
 2        Q.   Now, is this information that you found out prior to
 3   the actual lengthy interview you had?
 4             MS. BLUMENTHAL:  I'm going to object as to assuming
 5   facts not in evidence and leading.
 6             THE COURT:  Overruled.
 7             THE WITNESS:  That day is pretty blurry.  I know that I
 8   was told.  And if you can repeat the question, because I don't
 9   remember exactly what else you asked.
10        Q.   BY MS. FOSTER:  Let me ask you the next question.
11        A.   Okay.
12        Q.   When you were being interviewed by the officers, were
13   you distraught?
14        A.   I was in shock.
15        Q.   Did you believe your son was dead?
16        A.   Yes.
17        Q.   Were you crying at that -- at any points during that?
18        A.   If I did, I don't recall that.
19        Q.   Were you rambling?
20        A.   Yes.
21             MS. BLUMENTHAL:  Objection.  Leading.
22             THE COURT:  Overruled.
23        Q.   BY MS. FOSTER:  Were you worried?
24        A.   Yes.
25        Q.   Do you think that, knowing yourself, you were in --
26   were you in your best state of mind at the time that you were
27   being interviewed by the officers?
28        A.   No.
```

1    Q.   Have you had time to think about the events, or did you
2  have time to think about the events of November 6th through
3  November 10th afterwards, after calming down?
4    A.   I remembered, yes, what I had seen that weekend.
5    Q.   When you talk about the last time you saw the
6  defendant, are you clear as to when was the last time you saw
7  the defendant?
8    A.   I'm clear of the last time I talked to him, and then
9  when I left, he was in his room.
10    Q.   The defendant?
11    A.   Yeah.  Oh, no, the defendant, I'm sorry.
12    Q.   I'm asking are you clear as to when the last time you
13  saw the defendant?
14    A.   It would have been that Friday or the previous Friday.
15    Q.   Okay.  So if you told officers on the day of the
16  interview --
17    A.   Um-hum.
18    Q.   -- that it was that Friday, was that accurate?
19         MR. MOORE:  Objection.  Speculation.  Leading.
20         THE COURT:  Overruled.
21         MR. MOORE:  Facts not in evidence.
22         THE WITNESS:  I would imagine what I told them was, in
23  my mind, was exactly what I remembered at that time.
24    Q.   BY MS. FOSTER:  So was that accurate?
25         MR. MOORE:  Well, speculation.
26         THE COURT:  I'll allow it.  Overruled.
27         THE WITNESS:  It's accurate that I saw him Friday night
28  at my home.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 142

1     Q.    BY MS. FOSTER:  Okay.  And do you recall which one?

2     A.    No.

3     Q.    You said on cross-examination it's possible that you

4    told the officer you didn't take the text seriously.  Do you

5    recall saying that?

6     A.    I took the text seriously enough to speak to my son.

7          So I could have said that.

8     Q.    When you saw the text, were you shocked?

9     A.    I was shocked.

10     Q.    At some point did you find out that your son had been

11   shot?

12     A.    Yes.

13     Q.    Did you take the text seriously then?

14     A.    Absolutely.

15          MS. BLUMENTHAL:  Objection.  Relevance.  After the

16   fact.

17          THE COURT:  Sustained.  If there was an answer, it will

18   be stricken.

19     Q.    BY MS. FOSTER:  You told -- did you tell officers about

20   the text messages?

21     A.    I told them that something had come up that I had seen,

22   yes.

23     Q.    Now, you said you took the text serious enough to speak

24   to your son.  Do you recall saying that?

25     A.    Yes.

26     Q.    After you spoke to your son, were you under the

27   impression that they were no longer friends?

28     A.    My son assured me that he was no longer his friend.

1          MS. BLUMENTHAL:  Objection.  Hearsay.

2          Move to strike.

3          THE COURT:  Affect upon the listener.  Overruled.

4      Q.   BY MS. FOSTER:  Now, you described on cross-examination

5  your son's bedroom.  Do you recall that?

6      A.   Yes.

7      Q.   And you said that you saw him on his bed?

8      A.   Yes.

9      Q.   And can you describe for us where his bed is in

10  association to that bedroom?

11     A.   His bed is against the wall next to a door that leads

12  to the hall.

13     Q.   Now, I previously showed you People's Exhibit 284.  Do

14  you see your son's bed depicted in People's 284?

15     A.   Yes.

16     Q.   I'm showing what's been marked as People's Exhibit 2.

17          MS. FOSTER:  Showing defense counsel.

18          May I approach?

19          THE COURT:  Yes.

20          I'm sorry.  What exhibit is that again?

21          MS. FOSTER:  Exhibit 2.

22          THE COURT:  Thank you.  You may approach.

23     Q.   BY MS. FOSTER:  I'm going to show you what's been

24  marked for identification as Exhibit 2, and I wanted to ask you

25  if that is a true and accurate depiction of your son's bed

26  November 10th, 2015, okay?  Take your time.

27          Do you recognize your son's bed depicted in People's

28  Exhibit 2?

 1      A.   Yes.

 2      Q.   And is that where it was, similar to how it was

 3  situated when you left on November 10th?

 4      A.   Yes.

 5      Q.   Let me know when you're ready.

 6      A.   Can I get a Kleenex?

 7           Thank you.

 8      Q.   Do you need a moment?

 9      A.   I think I'll be okay.

10      Q.   Sorry.  Trying to get a clear picture of where your son

11  was laying --

12      A.   Yes.

13      Q.   -- when you left the house.

14           Can you tell us where on the bed your son -- you last

15  saw your son?

16      A.   His head was on this side, his body was laying this

17  way, his feet were on this end.

18      Q.   And you said you saw him lying on his back?

19      A.   I think it was his back or his stomach.  He sleeps both

20  ways.  But the last second I saw him, his leg was out, so I

21  believe he was on his back.

22      Q.   And would that be with the right side of his body to

23  the edge of the bed?

24      A.   His right side would have been here, and his left side

25  of the body there.

26      Q.   Now, do you see in Exhibit 2 the item marked next to

27  the tag No. 23?

28           Do you see that item there?

```
 1        A.   Yes.
 2             MS. FOSTER:  I have in my hand what's been marked for
 3   identification as People's 1.  I'm showing defense counsel.
 4             May I approach?
 5             THE COURT:  Yes.
 6        Q.   BY MS. FOSTER:  Do you recognize People's 1?
 7        A.   That is my house phone.
 8        Q.   Do you recognize it?
 9        A.   Yes, I do.
10        Q.   What is depicted in People's 1?
11        A.   That's my house phone.
12        Q.   And is that a true and accurate depiction of the phone,
13   the house phone in your house?
14        A.   Yes.
15        Q.   And when you left on November 10th, do you recall that
16   phone being in that room?
17        A.   No.
18        Q.   And was that a cordless phone?
19        A.   Yes.
20             MS. FOSTER:  I'm holding in my hand what's been marked
21   for identification as People's Exhibit 5.  I'm showing defense
22   counsel.
23             May I approach?
24             THE COURT:  Yes.
25        Q.   BY MS. FOSTER:  I'm going to ask you to look at the
26   bottom left side of People's 5, and see if you can recognize
27   what's depicted there?
28        A.   The bottom left?  That's his cell phone.
```

```
1        Q.    Okay.  Do you recognize what's depicted in People's 5?
2        A.    Yes.
3        Q.    I'm showing you what's depicted at the bottom right of
4   People's 5.  Sorry.  Bottom left of People's 5.  Do you see that
5   item marked 21?
6        A.    Yes.
7        Q.    And what is that?
8        A.    My son's phone.
9        Q.    Before you said you couldn't exactly recall what his
10  phone looked like.  Do you remember saying that?
11       A.    Yes.
12       Q.    Is this a true and accurate depiction of how his phone
13  looked?
14       A.    I believe that was the last one he had, yes.  He had
15  two.
16       Q.    I'm sorry?
17       A.    I know there was two at that time, so.
18       Q.    And is this phone -- where is this phone plugged in?
19       A.    To the wall behind his bed.
20       Q.    Are you familiar where he used to plug or charged his
21  phone?
22       A.    On the wall behind his bed.
23       Q.    Now that you had an opportunity to look at People's
24  Exhibit 5, I'm going to show you again People's Exhibit 288.
25             MS. FOSTER:  May I approach?
26             THE COURT:  Yes.
27       Q.    BY MS. FOSTER:  Having looked at People's 5, is your
28  recollection refreshed as to what your son's phone looked like?
```

1    A.   Yes.

2    Q.   What your son's phone looked like, I apologize?

3    A.   Yes.

4    Q.   Looking again at People's 288, does that appear to be

5    the same phone that was charging in Nicholas's room?

6         MS. BLUMENTHAL:  Objection.  Calls for speculation.

7         THE COURT:  Overruled.

8         THE WITNESS:  Yes.

9    Q.   BY MS. FOSTER:  I think during cross-examination you

10   were asked again about the time you left, and you said 10 to

11   10-15.  Did you mean 8:10 or 10 a.m.?

12   A.   No.  8:10.

13   Q.   To 8:15?

14   A.   Yes.  Or a couple minutes after.

15   Q.   You also talked about on cross-examination how Nicholas

16   was dressed?

17   A.   Yes.

18   Q.   To your knowledge, at the times that you've seen the

19   defendant and Nicholas hanging out together, have you ever seen

20   Nicholas hanging out in his boxers?

21   A.   When?

22   Q.   When he's hanging out with the defendant?

23   A.   Only I'm thinking when he spent the night.

24   Q.   No other time?

25   A.   I'm sure Nicholas, he would have been seen in his

26   boxers.

27   Q.   I'm going to show you what's been marked for

28   identification as People's 153.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 148

```
 1          MS. FOSTER:  And I'm showing defense counsel.
 2     Q.   BY MS. FOSTER:  Do you recall what Nicholas's boxers
 3   looked like?
 4     A.   No.  They were all checkered.
 5     Q.   They were checkered boxers?
 6     A.   Most of them.
 7          MS. FOSTER:  May I approach?
 8          THE COURT:  Yes.
 9     Q.   BY MS. FOSTER:  Do you recognize what's depicted in
10   People's 153?
11     A.   Yes.
12     Q.   And what is depicted in People's 153?
13     A.   My son's undershorts.  His boxers.
14     Q.   Do you recognize this as the shorts your son would
15   sleep in?
16     A.   Yes.
17     Q.   It's the type of shorts he slept in between November
18   9th to November 10th?
19     A.   Yes.
20     Q.   There was some discussion about your -- that you
21   trusted the defendant?
22     A.   Yes.
23     Q.   And that you trusted to have him have your son's best
24   interest at heart.  Do you remember me asking that question?
25     A.   Yes.
26     Q.   Did you trust him after you saw the instant messages?
27     A.   No.
28     Q.   In the times that you looked at instant messages to
```

1    Nicholas on your phone, did you ever see anyone else writing the

2    messages like "I will shoot you"?

3         A.    No.

4              MS. FOSTER:  One moment, Your Honor.

5                         (Brief pause.)

6              MS. FOSTER:  I have nothing further.

7              THE COURT:  All right, ladies and gentlemen, we're

8    going to take our noon recess.

9              Remember, do not talk about the case or about any of

10   the people or any subject involved in it with anyone, including

11   the other jurors.  Do not conduct any research.  Keep an open

12   mind.

13             Court is in recess until 1:25.  1:25.

14      (Proceedings were held out of the presence of the jury:)

15             THE COURT:  Anything we need to put on the record at

16   this time?

17             MS. FOSTER:  Yes, Your Honor.  I think we should put on

18   the record that defense counsel, following the Court's ruling to

19   exclude all witnesses, also excluded Andrew Boji, which is the

20   defendant's father.  Somehow his name, I made a mistake, did not

21   end up on my witness list.  But he has been subpoenaed in the

22   past.  He was under court order to be on call.  So he was aware

23   of this, being a witness in this case.  And defense counsel had

24   been previously made aware that he would be a witness.  But

25   because it was omitted, there was some confusion as to whether

26   or not I was calling him.  So I did want to put that on the

27   record.

28             THE COURT:  All right.  So have you provided a complete

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 150

```
 1    witness list to the People at this time, as required under Penal
 2    Code section -- I'm sorry?
 3              MS. FOSTER:  It was my fault.  It was my witness list
 4    that was missing.
 5              MS. BLUMENTHAL:  It's not our witness, Your Honor.
 6              MS. FOSTER:  It was my fault.
 7              THE COURT:  Have you provided a new witness or updated
 8    witness list pursuant to Penal Code section 1054?
 9              MS. FOSTER:  No.  I'm going to go back to my office and
10    double-check my witness list and make sure there is no other
11    failings, anybody else missing.  Every witness, though, that is
12    being called as a witness, defense has been made aware of
13    through reports or her investigator reports or the original
14    police reports.  And I will update that.
15              THE COURT:  All right.  The Court did provide a witness
16    list from the People, and it was previously filed.  If there is
17    any additions, please provide that to the defense before coming
18    back here at 1:25.
19              MS. FOSTER:  Yes.
20              THE COURT:  And the motion to exclude all witnesses is
21    in full force and effect at this time.
22              MS. BLUMENTHAL:  Your Honor, I came back in the
23    courtroom and asked Mr. -- Mr. -- father to leave the courtroom
24    because of that.  So he was not here once the Court granted the
25    motion in chambers.  I asked him to leave, because I had then,
26    by then been told that he was, while omitted from their witness
27    list, that she was going to be calling him.
28              THE COURT:  Okay.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 151

```
 1              MS. BLUMENTHAL:  So I took care of that at the time.

 2              THE COURT:  All right.  Thank you.

 3              Anything else from the defense?

 4              MS. BLUMENTHAL:  No, Your Honor.

 5              THE COURT:  All right.  Court's in recess.  Thank you.

 6                           (Noon recess.)

 7          (Proceedings were held in the presence of the jury:)

 8              THE COURT:  All right.  Back on the record.  All

 9      parties are present.  All jurors are present.

10              Defense?

11              MS. BLUMENTHAL:  Thank you, Your Honor.

12                        RECROSS-EXAMINATION

13      BY MS. BLUMENTHAL:

14          Q.    Good afternoon, Miss McCauley.

15          A.    Good afternoon.

16          Q.    Did you get a bit of a rest during lunch?

17          A.    Yes.  Thank you.

18          Q.    Before you testified, did you ever review any reports

19      or hear any audio recordings or read any transcripts before you

20      testified?

21          A.    No.

22          Q.    Did you have any discussions about your testimony with

23      anyone?

24          A.    No.

25          Q.    Now, had you ever been shown any of the pictures before

26      today's date?

27          A.    I asked to see them, yes.

28          Q.    You asked to see the pictures?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 152

```
 1        A.   Yes.

 2        Q.   When did you ask to see the pictures?

 3        A.   Two years ago.

 4        Q.   Were you shown pictures at that time?

 5        A.   Yes.

 6        Q.   And were you shown the picture of your son's bed?

 7        A.   I don't recall that picture.

 8        Q.   Okay.  So today in court was the first time that you'd

 9   seen that picture?

10        A.   It could have been, yes.

11        Q.   Did that bed look the same as the last time you had

12   seen it?

13        A.   No.  It was the last time -- it was in the same place

14   as the last time I saw my son there.

15        Q.   Okay.  But not in the condition that was?

16        A.   No.

17        Q.   So that's the first time that you had seen your son's

18   bed with blood over it and all the covers taken off?

19        A.   I believe so.

20        Q.   Okay.  And that was -- that was done here, correct?

21        A.   Yes.

22        Q.   That must be kind of startling?

23        A.   It is.

24        Q.   And must hurt?

25        A.   Yes.

26        Q.   Okay.  And I can understand.  I'm just trying to -- did

27   you -- were you told you were going to be shown any photographs

28   like that?
```

```
 1            MS. FOSTER:  Objection.  Calls for hearsay.  Relevance.
 2            THE COURT:  Sustained on relevance.
 3       Q.   BY MS. BLUMENTHAL:  Were you shocked when you saw the
 4   photograph?
 5       A.   Today?
 6       Q.   Yes.
 7       A.   Yes.
 8       Q.   Okay.  By the way, how tall was your son?
 9       A.   He was six-five and a half.
10       Q.   Six-five.  So he was tall?
11       A.   Yes, he was.
12       Q.   Six-five and a half.
13            Now, do you remember when you were talking to law
14   enforcement and you had told them you had spoken to your son
15   about the I-messages, that you had said, when you talked to your
16   son, he had simply said to you, "Well, it has been taken care
17   of," after he talked to Houston?
18       A.   He told me not to worry, that they weren't friends
19   anymore.
20       Q.   Did you ever tell that to law enforcement, they weren't
21   friends anymore?
22       A.   I don't recall.  I told them afterwards.  I'm sure they
23   asked.
24       Q.   When did you tell them afterwards?
25       A.   I would have told them during -- when they interrogated
26   me.
27       Q.   Now, if it's not -- if it were not on any of the
28   recordings when they were, as you said, interrogating you, would
```

```
 1    you have told them at a different time?
 2        A.   Told them?  What are you --
 3        Q.   Law enforcement.
 4             Well, let me ask you this:  Do you recall that the only
 5    thing you told law enforcement about it was that your son said
 6    to you "It was taken care of"?
 7             MS. FOSTER:  Objection.  Vague as to time.
 8             THE COURT:  Overruled if she understands the question.
 9             THE WITNESS:  I don't remember the exact words I said,
10    I just know that my son and I talked and he said, basically, led
11    me to believe it's taken care of, that, you know, they're no
12    longer friends.
13        Q.   BY MS. BLUMENTHAL:  So you interpreted those words,
14    "It's been taken care of," to mean they were no longer friends?
15        A.   No.  He told me they were no longer friends.
16        Q.   So who's the first person you told that to?
17        A.   I don't recall.
18        Q.   Was it that day?
19             Was it the day that your son passed?
20        A.   I went to the station, but I don't know if that was
21    part of the questioning.  So I don't recall.
22        Q.   How many times were you interviewed thereafter?
23        A.   At the station?
24        Q.   After the station?
25        A.   I think once or twice.  Or do you mean during that
26    time?
27        Q.   Okay.  After that particular day --
28        A.   Okay.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 155

1      Q.    -- on the 10th, okay?  You went to the station,

2  correct?  Did you give a statement before you went to the

3  station?

4      A.    I spoke to the police.

5      Q.    At your school?

6      A.    At my school.

7      Q.    And was that recorded, to your knowledge?

8      A.    I don't know whether it was recorded.

9      Q.    Okay.  You go to the station, correct?

10     A.    Correct.

11     Q.    And you give a longer statement there?

12     A.    Yes.

13     Q.    And was that recorded, to your knowledge?

14     A.    Yes.

15     Q.    Okay.  After you give the longer statement, do you give

16  any more statements?

17     A.    I was interviewed afterwards.

18     Q.    Okay.  You were interviewed afterwards.  And when did

19  that take place?

20           Approximately?

21     A.    Yeah.  It seemed informal.  At my home.

22     Q.    Okay.  And do you know approximately how soon after

23  your son passed you were interviewed, as you said, informally at

24  your home?

25     A.    No, I don't know.

26     Q.    Would it have been within a week?

27     A.    It would have been during funeral arrangements.

28     Q.    Okay.  And you were asked certain questions during

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 156

| | |
|---|---|
| 1 | that? |
| 2 | A.   Yeah.  I don't recall.  It seemed we were just talking. |
| 3 | Q.   I'm sorry? |
| 4 | A.   It was just talking. |
| 5 | Q.   It was just talking. |
| 6 | And what were, without telling me, what was said?  What |
| 7 | were the subject matters upon which you were talking? |
| 8 | A.   Well, I just had questions that they couldn't answer. |
| 9 | Q.   Okay.  Now, you saw the photograph that had a white |
| 10 | cordless phone? |
| 11 | A.   Yes. |
| 12 | Q.   That's your landline phone? |
| 13 | A.   Yes. |
| 14 | Q.   Where is that normally kept? |
| 15 | A.   It's in the kitchen.  It's not working. |
| 16 | Q.   It's in the kitchen.  Was it working that day? |
| 17 | A.   No. |
| 18 | Q.   Okay.  So how long was it not working? |
| 19 | A.   For around three months. |
| 20 | Q.   About three months? |
| 21 | A.   Maybe longer. |
| 22 | Q.   Had you told anybody it wasn't working? |
| 23 | A.   No one used it.  So my son knew and I knew. |
| 24 | Q.   Your son knew and you knew? |
| 25 | A.   Yeah. |
| 26 | Q.   When you say your son knew, you had told him? |
| 27 | A.   Well, he knew not to use it.  He used his phone. |
| 28 | Q.   You say "he knew not to use it."  Did you tell him why |

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 157

```
 1  not to use it?

 2       A.   Yeah.  I'm sure that came up.

 3       Q.   You don't have a recollection?

 4       A.   No.

 5       Q.   You're just assuming that?

 6       A.   Right.

 7       Q.   Okay.

 8            And that was normally kept in the kitchen.  Was it in

 9  plain view in the kitchen?

10       A.   No.  It's tucked away.

11       Q.   It was tucked away.  Where would it be tucked away?

12       A.   Behind the wall by the dining room set.

13       Q.   And at some point in time before the three, you know,

14  like five or six months before, was that phone working?

15       A.   I don't recall.

16       Q.   You don't recall.  So you think about three months it

17  wasn't working.  Before that had Houston ever used that phone

18  that you saw?

19       A.   I don't think so.

20       Q.   Do you know that?

21       A.   No, I don't.  I didn't see him using it.

22       Q.   Okay.  So you don't know if he used it or not?

23       A.   Correct.

24       Q.   At some point in time -- but it was out in the open at

25  some point in time, I take it?

26       A.   Yes.

27       Q.   Now, where did your son normally keep his cell phone

28  when he was in bed at night?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 158

```
 1      A.   He had it on him or under his pillow or maybe under the
 2  mattress.
 3      Q.   Okay.  When it's -- would he charge his phone at night
 4  a lot?
 5      A.   Yes.
 6      Q.   And when he would charge his phone at night, would it
 7  be lying on the floor where we saw it in the photograph?
 8      A.   I wouldn't know.  I get up early.  I was asleep.
 9      Q.   Okay.  You get up early and you were asleep.  Okay.
10      A.   I would be asleep and he'd be charging it.
11      Q.   How did you know he charged it on that wall?
12      A.   Because that's where I always saw the cord.
13      Q.   That's where you saw the cord.
14           Did you ever see the phone charging on that wall?
15      A.   Not specifically.
16      Q.   You don't have a specific recollection?
17      A.   Right.
18      Q.   Thank you.
19           MS. BLUMENTHAL:  No further questions, Your Honor.
20           THE COURT:  People?
21           MS. FOSTER:  Real quick.
22                    FURTHER REDIRECT EXAMINATION
23  BY MS. FOSTER:
24      Q.   I just want to clarify People's 5.  You were asked a
25  question about whether the phone was on the floor.  Is the phone
26  on the floor or on the mattress?
27      A.   It's on the mattress.
28      Q.   So when you say he would either keep it under the
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 159

```
 1   pillow or tucked in the mattress, is this what you're talking
 2   about?
 3       A.   Yes.
 4            MS. FOSTER:  I have nothing further.
 5            THE COURT:  Defense?
 6            MS. BLUMENTHAL:  Nothing further, Your Honor.
 7            THE COURT:  Witness subject to recall?
 8            MS. BLUMENTHAL:  Yes.
 9            THE COURT:  You are ordered subject to recall.  Thank
10   you.
11            THE WITNESS:  Thank you.
12            THE COURT:  People call your next witness.
13            MS. FOSTER:  Thank you, Your Honor.  The People call
14   Gabriella Miller.
15            THE CLERK:  Please remain standing and raise your right
16   hand.
17            Do you solemnly state that the evidence you shall give
18   in this matter shall be the truth, the whole truth, and nothing
19   but the truth, so help you God?
20            THE WITNESS:  I do.
21            THE CLERK:  Please be seated.
22            Please state and spell your first and last name for the
23   record.
24            THE WITNESS:  Gabriella Miller.  G-a-b-r-i-e-l-l-a,
25   M-i-l-l-e-r.
26            THE COURT:  People?
27            MS. FOSTER:  Thank you.
28                      GABRIELLA MILLER,
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 160

```
 1   called as a witness by and on behalf of the Plaintiff, having

 2   been first duly sworn, was examined and testified as follows:

 3                        DIRECT EXAMINATION

 4   BY MS. FOSTER:

 5       Q.   Good afternoon, Miss Miller.

 6       A.   Good afternoon.

 7       Q.   I'm going to ask you some questions about November of

 8   2015, okay?

 9       A.   Okay.

10       Q.   Where did you live in November of 2015?

11       A.   I'm sorry.  Can you repeat that?

12       Q.   Where did you live in November of 2015?

13       A.   In Moreno Valley, California.

14       Q.   And what street did you live on?

15       A.   Soaring Seagull.

16       Q.   And is that a cul-de-sac?

17       A.   Yes.

18       Q.   I'm going to show you what's been marked as People's

19   45?

20            MS. FOSTER:  May I approach?

21            THE COURT:  Yes.

22       Q.   BY MS. FOSTER:  Do you recognize what's being depicted

23   in People's Exhibit 45?

24       A.   Yes.

25       Q.   And does People's 45 show the street that you lived on?

26       A.   Yes.

27       Q.   And do you see the cul-de-sac near your home?

28       A.   Yes.
```

```
 1        Q.    There is a small laser pointer on the desk up there.

 2        A.    Okay.

 3        Q.    Can you point at the screen behind you and show us

 4   where your home is on People's 45?

 5              There is a screen right behind you.

 6        A.    I believe it's that one.

 7        Q.    Are you saying this one where my pen is?

 8        A.    Yeah.

 9        Q.    At the end of the cul-de-sac?

10        A.    Yes.

11        Q.    On November 10th, 2015, at around 8:30 in the morning,

12   were you awakened by someone coming to your door?

13        A.    Yes.

14        Q.    Can you tell us what happened?

15        A.    I was asleep and I heard a lot of pounding, and the

16   doorbell was just ringing.  It was like the door was going to,

17   you know, like come off the hinges.  I was afraid to open it, so

18   I looked through the peephole and there was nobody there.  So I

19   went upstairs and I looked out my brother's window, and there

20   was a guy, and he was just running, you know, like back and

21   forth.  And he was --

22              MS. BLUMENTHAL:  Your Honor, at this time I would

23   object as to narrative and ask the next question.

24              THE COURT:  Sustained.

25        Q.    BY MS. FOSTER:  What happened next, after you saw the

26   guy running back and forth?

27        A.    He was yelling and screaming "Help.  My friend's been

28   shot."
```

1     Q.   And what did you do after that?

2     A.   So I ran to my father's room and I grabbed his cell

3  phone, and then I called the police.

4     Q.   Could you see the guy that was yelling?

5     A.   I didn't see his face, but, obviously, I seen him

6  running.  But, you know, I didn't really, you know, see him or

7  anything.

8     Q.   And what area was he running when you observed him?

9     A.   He was like, like right here.  Just running back and

10  forth.

11     Q.   Okay.  In the middle of the cul-de-sac?

12     A.   Yeah.

13     Q.   And did you end up calling 911?

14     A.   Yes, I did.

15     Q.   And how could you hear him?  You said you were inside,

16  you never opened the door?

17     A.   Yeah.

18     Q.   How were you able to hear him?

19     A.   When I went upstairs, I opened up the window and I

20  was -- I seen him, and then I was hearing what he was saying.

21     Q.   And what exactly did he say?

22     A.   "Help.  My friend's been shot."

23     Q.   And do you remember describing the guy that you were

24  observing?

25     A.   I don't remember.

26     Q.   Did you call 911?

27     A.   Yes, I did.

28     Q.   And did you describe him to the 911 operator?

1       A.   I don't remember.

2       Q.   Would it refresh your recollection to review a copy of

3   your transcript?

4       A.   Yes.

5            MS. FOSTER:  With the Court's permission?

6            THE COURT:  Yes.

7            MS. FOSTER:  May I approach?

8            THE COURT:  Yes.

9       Q.   BY MS. FOSTER:  Can you read this to yourself, and then

10  look up when you're done.

11      A.   (Reading.)

12      Q.   Did that help refresh your memory?

13      A.   Yes, it did.

14      Q.   Did you give a description to the 911 operator?

15           I'm not asking the description, I'm asking, did you

16  give one?

17      A.   Oh, no.

18      Q.   Did you tell the 911 operator the race of the man?

19      A.   Yes.

20      Q.   And what was that?  Do you recall?

21      A.   Yes.  White.

22      Q.   Do you tell the 911 operator about the age of him?

23      A.   Yes.

24      Q.   And do you recall what that was?

25      A.   In his twenties, I think I said.

26           MS. FOSTER:  I have nothing further.

27           THE COURT:  Defense?

28           MS. BLUMENTHAL:  Just briefly, Your Honor.

```
 1                          CROSS-EXAMINATION
 2    BY MS. BLUMENTHAL:
 3        Q.   Good afternoon, Miss Miller.
 4        A.   Good afternoon.
 5        Q.   This kind of shocked you that night, I take it?
 6        A.   Can you repeat that?
 7        Q.   Yes.  This kind of shocked you that night, I take it?
 8        A.   Oh, yes.
 9        Q.   Kind of scared you?
10        A.   Yes.
11        Q.   Okay.  So are you asleep?
12        A.   Yes, I was.
13        Q.   And you hear this knocking and pounding on your door?
14        A.   Yes.
15        Q.   And that would be the door of the residence?
16        A.   No.  It was my door to the house.
17        Q.   The door to the house, okay.
18        A.   Yes.
19        Q.   And were you sleeping downstairs or upstairs?
20        A.   Downstairs.
21        Q.   You were sleeping downstairs.
22             So somebody's pounding on the front door?
23        A.   Yes.
24        Q.   And you could hear them screaming?
25        A.   Yes.
26        Q.   You just couldn't hear what they were saying at that
27    time?
28        A.   Yes.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 165

```
 1      Q.   Is that a fair statement?

 2      A.   Yes.

 3      Q.   And you're not about to open that door, I take it?

 4      A.   No, I wasn't.

 5      Q.   Okay.  So how long did that pounding go on?

 6           I mean, it seemed like forever, I'm sure.

 7      A.   Yeah.  I'll say about -- about a good minute.

 8      Q.   Okay.  And it was -- was it constant pounding?

 9      A.   Yes.  It was pounding and ringing the doorbell.

10      Q.   And ringing the doorbell.

11           And some screaming going on?

12      A.   Yes.

13      Q.   Okay.  So during a portion of this time, you decide to

14   go upstairs where your dad is sleeping and get his cell phone?

15      A.   Yes.

16      Q.   And while you're upstairs, you look through the window?

17      A.   Yes.

18      Q.   And where do you look out to when you're looking out

19   the window of your father's bedroom?

20           What do you see when you looked out in general?

21      A.   Okay.  What do I see?  Well, it was my brother's

22   bedroom, not my father's.

23      Q.   Okay.  Your brother's bedroom, I apologize.

24      A.   I see the street, the cul-de-sac, cars on the street.

25      Q.   Were there cars normally parked there?

26      A.   Yes.

27      Q.   So you see cars parked on the street?

28      A.   Yes.
```

1      Q.   Like normally.

2         Now, this morning when you looked out, do you know

3  about what time it was?

4      A.   It was early.

5      Q.   What is your definition of early?

6      A.   I would probably say about 8 o'clock, 7 or 8 o'clock.

7      Q.   Seven or 8 o'clock, to the best of your recollection?

8      A.   Yeah.

9      Q.   So now you're looking out in the street, and now are

10  you able to hear what this person is screaming?

11      A.   Yes.

12      Q.   When you first looked out on the street, where do you

13  see this person?

14      A.   He is just in the middle of the street.

15      Q.   Middle of the street.

16         And is he yelling?

17      A.   Yes.

18      Q.   And is he screaming?

19      A.   Yes.

20      Q.   And can you now start to hear what he's saying?

21      A.   Yes.

22      Q.   And what do you hear him screaming and yelling?

23      A.   "Help.  My friend's been shot."

24      Q.   Okay.  How many times does he say that?

25      A.   I don't really remember.

26      Q.   More than once?

27      A.   Yeah, more than once.

28      Q.   Okay.  And he says "Help.  My friend's been shot."

```
 1    Does he ask anyone to call the police?

 2            Can you hear him asking that, or call 911.  Call the

 3    police?

 4        A.    Yes.

 5        Q.    Okay.  Do you know how many times he said that?

 6        A.    No.  I don't remember.

 7        Q.    Could you see his face at all?

 8        A.    No.

 9        Q.    Okay.  Could you see his clothing at all?

10        A.    Yes.

11        Q.    Okay.  And what portion of his clothing could you see?

12        A.    His shirt.

13        Q.    Okay.  And could you tell what kind of shirt was he

14    wearing, to the best of your recollection?

15        A.    Okay.  For some reason I'm remembering white, but I

16    guess I said, "black."

17        Q.    Okay.  I'm asking for your memory today's date, though,

18    not what you may have said.

19        A.    Okay.

20        Q.    To the best of your recollection of today's date, you

21    remember him wearing a white shirt?

22        A.    Yes.

23        Q.    Okay.  And, but you never saw his face, correct?

24        A.    Correct.

25        Q.    And how long was he out in the street yelling and

26    screaming "Help.  My friend's been shot.  Call the police"?

27        A.    For the time that I just saw him yell, I would say

28    probably about -- about three to four minutes.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 168

1      Q.   Okay.  Now, were people coming out of the houses and

2   going out into the street?

3      A.   Like the neighbors?

4      Q.   Yes.

5      A.   Well, I couldn't see the sides of, you know, the house.

6      Q.   Okay.

7      A.   All I saw was like the, like literally the front of my

8   house.  And the only person I saw was him.

9      Q.   Okay.  Did you ever see any of the neighbors talking

10  with him at all?

11     A.   No.

12     Q.   Did you ever see any neighbors going into -- do you

13  know what -- could you tell what house he came out of?

14     A.   No.

15     Q.   Okay.  Did you see anyone, any of the neighbors going

16  into any of the houses around there?

17     A.   No.

18     Q.   Did you see him going into any house?

19     A.   No.

20     Q.   So you got on the phone and you called 911?

21     A.   Yes.

22     Q.   And when you started talking to 911, did you continue

23  to look outside anymore?

24     A.   No.

25     Q.   Okay.  After you get off the phone with 911, did you

26  continue to look outside anymore?

27     A.   No.

28          MS. BLUMENTHAL:  No further questions, Your Honor.

```
 1              THE COURT:  Redirect?
 2                      REDIRECT EXAMINATION
 3    BY MS. FOSTER:
 4       Q.   At any point did you actually go outside after the
 5    police arrived?
 6       A.   Yes.
 7       Q.   Did you see the guy that you saw running and yelling,
 8    did you see him again?
 9       A.   No.
10              MS. FOSTER:  Nothing further.
11              THE COURT:  Defense?
12              MS. BLUMENTHAL:  Nothing further, Your Honor.
13              THE COURT:  Witness excused?
14              MS. BLUMENTHAL:  Subject to recall, please.
15              THE COURT:  All right.  Subject to recall.  Thank you,
16    Miss.
17              THE WITNESS:  Thank you.
18              THE COURT:  People, call your next witness.
19              MS. FOSTER:  People call Alan Juarez.
20              THE CLERK:  Please remain standing and raise your right
21    hand.
22              Do you solemnly state that the evidence you shall give
23    in this matter shall be the truth, the whole truth, and nothing
24    but the truth, so help you God?
25              THE WITNESS:  Yes.
26              THE CLERK:  Please be seated.
27              Please state and spell your first and last name for the
28    record.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 170

```
 1              THE WITNESS:  My first name is Fernando Juarez.
 2    F-e-r-n-a-n-d-o, last name is J-u-a-r-e-z.
 3              THE COURT:  People?
 4              MS. FOSTER:  Thank you, Your Honor.
 5                          FERNANDO JUAREZ,
 6    called as a witness by and on behalf of the Plaintiff, having
 7    been first duly sworn, was examined and testified as follows:
 8                          DIRECT EXAMINATION
 9    BY MS. FOSTER:
10        Q.   Good afternoon, Mr. Juarez.
11        A.   Good afternoon.
12        Q.   Do you also go by Alan?
13        A.   Yes.
14        Q.   Is that a middle name?
15        A.   Yeah, middle name.
16        Q.   Where did you live in November of 2015?
17        A.   I lived -- give me one second.  I moved around.  I
18    don't even know the address right off the top of my head.
19        Q.   Did you live off of Soaring Seagull?
20        A.   Yes, correct.
21        Q.   And was that street a cul-de-sac?
22        A.   Yes.
23        Q.   And are you still there?
24        A.   No, I'm not.
25        Q.   And on what part of the cul-de-sac did you live?
26        A.   On the left side on the cul-de-sac.
27        Q.   I'm going to show you what's been marked for
28    identification as People's Exhibit 45.  Do you recognize
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 171

```
 1   People's 45?

 2        A.   Yes, I do.

 3        Q.   Do you see your house in People's 45?

 4        A.   Yes, I do.

 5        Q.   There is a laser pointer on that table somewhere.  You

 6   can take that and point to the screen behind you and let us know

 7   where your house was.

 8        A.   That's my house right there.

 9        Q.   You're saying this house that appears to be a gray top

10   here?

11        A.   Yes.  This one here.

12        Q.   Okay.  Is where my pen pointed the correct location?

13        A.   Yes, correct.

14        Q.   I'm going to circle it and I'm going to put an "A.J."

15             And how long had you lived at that residence in

16   November of 2015?

17        A.   About like six months.

18        Q.   And on November 10th of 2015 did something unusual

19   happen?

20        A.   Yes.

21        Q.   What happened?

22        A.   I heard a loud bang on my door.

23        Q.   And then what happened next?

24        A.   And I was in the shower, and my girl informed me that

25   there was a loud bang on the door, so I got out right away, and

26   I went outside to find -- to find, I don't know his name, but I

27   found him outside worried, lost and confused asking for help.

28        Q.   And now you say you don't know his name.  Do you see
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 172

```
 1   that person in court today?

 2        A.   I believe so.

 3        Q.   Can you direct, for the record, where the person is

 4   seated and what they're wearing?

 5        A.   He's right there.

 6        Q.   And what is he wearing?

 7        A.   A blue suit.

 8             MS. FOSTER:  May the record reflect the witness has

 9   pointed at -- to his right towards defense counsel and

10   identified the defendant?

11             THE COURT:  Yes.

12        Q.   BY MS. FOSTER:  Now, you said when you saw him he

13   looked lost and confused.  Is that what you said?

14        A.   Yes.

15        Q.   Did he tell you that or was that your interpretation of

16   his behavior?

17        A.   His behavior.

18        Q.   And did he speak to you?

19        A.   Yes, he did.

20        Q.   And what did he tell you?

21        A.   He said his friend was hurt, and he said he needed

22   help.

23        Q.   And did he ask you to call 911?

24        A.   No, he didn't.

25        Q.   Was he asking for -- yelling for people to call 911?

26        A.   He was yelling out "Help."

27        Q.   Okay.

28        A.   And I was pretty much the only one out there at that
```

1    time.

2         Q.    Did you call 911?

3         A.    Yes, I did.

4         Q.    And did you provide 911 with information?

5         A.    Yes, I did.

6         Q.    And where were you getting the information that you

7    were provided?

8         A.    As soon as I walked into the house.

9         Q.    Was the defendant also telling you the information that

10   you were providing 911?

11        A.    No.

12        Q.    And you haven't listened to your 911 call; is that

13   correct?

14        A.    Yeah, I haven't.

15        Q.    Do you remember what you said to 911?

16              I'm not asking what you said, but do you remember what

17   you said?

18        A.    For the most part, yes.

19        Q.    Did you tell 911, "No, he shot himself.  I think he's

20   dead right now"?

21        A.    No.

22        Q.    You don't recall saying that?

23        A.    No.

24        Q.    Would it refresh your recollection to review a

25   transcript of your 911 call?

26        A.    Yes.

27              MS. FOSTER:  May I approach, Your Honor?

28              THE COURT:  Yes.

1      Q.   BY MS. FOSTER:  Can you take a moment and read that to
2    yourself, and look up when you're done.
3      A.   (Reading.)
4      Q.   Does that refresh your recollection to the first
5    portion of your 911 call?
6      A.   Yes, it does.
7      Q.   Did you tell 911, "No, he shot himself.  I think he's
8    dead right now"?
9      A.   Yes.
10     Q.   Where did you get that information?
11     A.   I got that information from seeing a body on the
12   ground, seeing a shotgun by his bed, and too many things going
13   on at the same time.
14     Q.   Where did you get the information that he shot himself?
15          MS. BLUMENTHAL:  Objection.  Asked and answered.
16          THE COURT:  Overruled.
17          THE WITNESS:  The defendant.
18     Q.   BY MS. FOSTER:  There was some hesitation.  Is there a
19   reason why?
20     A.   It's hard to think back to one day that happened so
21   quick.
22     Q.   It's been several years?
23     A.   Yeah.
24     Q.   When you saw the defendant, did you call 911 right away
25   or did you do something else?
26     A.   As soon as I seen him, I followed him to where his
27   friend was at that needed help.  And as soon as I saw his
28   friend, that's when I noticed I need to call the police.

```
 1      Q.    Now, why did you follow him?  What encouraged you to do
 2   that?
 3      A.    He looked like he needed help.
 4      Q.    Did he lead you inside or --
 5      A.    Yes.  Correct.
 6      Q.    So do you recall which house in that cul-de-sac you
 7   walked inside of?
 8      A.    Yes, I do.
 9      Q.    Can you direct with the laser pointer which house that
10   is?
11      A.    (Indicating.)
12      Q.    And it's that first house on the left inside the
13   cul-de-sac; is that correct?
14      A.    Yes, that's correct.
15      Q.    When you walked inside the house, how far did you go?
16      A.    I took about four steps right until I saw the entrance
17   of the bedroom.  And I don't remember taking a step into the
18   bedroom.  I was more at the entrance of the door looking over
19   the body.  And as soon as I saw the body, I asked him, the
20   defendant, "Why didn't you call 911?"  And he couldn't speak to
21   me, so I took it upon myself to call 911.
22      Q.    I'm showing you what's been marked for identification
23   as People's Exhibit 55.
24            MS. FOSTER:  Showing defense counsel.
25            May I approach?
26            THE COURT:  Yes.
27      Q.    BY MS. FOSTER:  Do you recognize what's depicted in
28   People's 55?
```

```
 1              Do you recognize?
 2      A.   Yes.
 3      Q.   And what's depicted in People's 55?
 4      A.   What was the question again?
 5      Q.   What's being shown in People's 55, sir?
 6              Sorry.  I have a soft voice.
 7      A.   That's okay.
 8              A body, bed, blood.
 9      Q.   Is this the same room that you saw on November 10th,
10   2015?
11      A.   Yes, it is.
12      Q.   Was the body in a different position when you first
13   walked into that house?
14      A.   It's kind of blurry, but I do recall seeing the body
15   flipped over facedown.
16              I don't remember seeing his face at all.
17      Q.   I assume this all happened pretty quickly; is that
18   correct?
19      A.   Yes.
20      Q.   And the place where you entered, would that be to the
21   top of People's 55?  Can you show us with the laser pointer?
22              Is there a doorway there?
23      A.   That's where the door is at.  Right here.
24      Q.   And how close to the inside of that door did you get?
25      A.   Right at the entrance.  Like right there.
26      Q.   Did you at any point go inside to the room?
27      A.   No.
28      Q.   Did you at any point touch the person laying on the
```

1     ground?

2          A.    No.

3          Q.    Could you tell if he was breathing?

4          A.    Yeah.  He wasn't breathing.

5          Q.    What else did you see inside of that room?

6          A.    I saw a shotgun on the bed with two shell casings, and

7     I saw his body facedown.  It took me about a few seconds to

8     collect my thoughts.  And right after I saw what I saw, I just

9     made a phone call to 911.

10         Q.    Do you remember the gun that you saw?

11         A.    Yes, I do.

12         Q.    Showing what's been marked as People's Exhibit 17.

13               MS. FOSTER:  May I approach, Your Honor?  I showed it

14    to defense counsel.

15               THE COURT:  Yes.

16               I'm sorry.  That's No. 17?

17               MS. FOSTER:  Yes.

18         Q.    BY MS. FOSTER:  Do you recognize People's 17?

19         A.    Yes.

20         Q.    And what is being depicted in People's 17?

21         A.    A shotgun.

22         Q.    And how do you recognize it?

23         A.    There was only one shotgun at the scene.

24         Q.    Is that how it looked the day that you observed it?

25         A.    That's correct.

26               MS. FOSTER:  I'm going to ask at this time for the

27    deputy to retrieve the weapon.

28               THE COURT:  I'm sorry?

```
 1            MS. FOSTER:  I'm going to ask for the deputy to
 2   retrieve the weapon.
 3            THE COURT:  That's fine.
 4            MS. FOSTER:  I believe this is People's 269.
 5            THE CLERK:  269.
 6            THE COURT:  269?
 7            MS. FOSTER:  Yes.  For the record, People's 269 is
 8   being held by the courtroom deputy.
 9       Q.  BY MS. FOSTER:  Mr. Juarez, do you see People's 269?
10       A.  Yes, I do.
11       Q.  And does that appear to be the weapon that you saw on
12   the bed in the bedroom?
13       A.  Correct.
14       Q.  Okay.  Was it open and exposed like this?
15       A.  No.  It was laying on the bed.  It was just laying on
16   the bed with two shells right about like a foot away from it.
17       Q.  When you say "shells," are you familiar with guns?
18       A.  Yes.
19       Q.  Okay.  So did you immediately recognize this to be a
20   shotgun?
21       A.  That's correct.
22       Q.  And --
23            MS. FOSTER:  Thank you, Deputy.
24       Q.  BY MS. FOSTER:  I'm going to show you what's been
25   depicted in People's Exhibit 8.
26            MS. FOSTER:  May I approach?
27            THE COURT:  Yes.
28       Q.  BY MS. FOSTER:  When you say "shells," are you
```

 1    referring to what's depicted in People's Exhibit 8?

 2        A.   That's correct.

 3             MS. FOSTER:  I'm publishing People's Exhibit 8.

 4        Q.   BY MS. FOSTER:  You said you saw two shells.  Were they

 5    similar to the ones depicted in People's 8?  And I'm pointing my

 6    finger at them.

 7        A.   Yes.  There were two red shells.

 8        Q.   And you said they were on top of the bed?

 9        A.   About like one foot away from the shotgun.

10             On the bed.

11        Q.   And did you touch either of those shells?

12        A.   No, I didn't.

13        Q.   Did you touch the shotgun at all?

14        A.   No.

15        Q.   When you were present in the room, where was the

16    defendant?

17        A.   He was holding his friend.

18        Q.   So you see him go to the ground and actually hold him?

19        A.   Right after we both ran in, he was crying, holding his

20    friend.

21        Q.   And did you see him touch the shells?

22        A.   No.

23        Q.   Did you see him touch the shotgun?

24        A.   No.

25        Q.   When you -- after you observed the room and observed

26    the deceased, where did you go next?

27        A.   I was in the living room for about five seconds making

28    a phone call.

```
 1      Q.   Now, did you see blood in the room?

 2      A.   Yes, I did.

 3      Q.   Where did you see blood?

 4      A.   Tiny bits on the ground and on the bed.

 5      Q.   Did you see blood on the walls?

 6      A.   I don't recall.

 7      Q.   Showing you what's been marked for identification as

 8   People's Exhibit 54.

 9           MS. FOSTER:  Showing defense counsel.

10           May I approach?

11           THE COURT:  Yes.

12      Q.   BY MS. FOSTER:  Do you recognize what's depicted in

13   People's 54?

14      A.   Yes.

15      Q.   Is this the blood that you saw near the bed?

16      A.   Yes.

17      Q.   Now, you said, "bits of blood."  The blood that's

18   depicted on the side of the bed and on top of the bed, did you

19   see all of that when you came into the room?

20      A.   I seen a partial of it.  I wasn't paying too much

21   attention to all of the blood.

22      Q.   And how quickly did this all happen?

23      A.   Feels less than a minute.  Less than 60 seconds.

24      Q.   When you saw the defendant, how was he dressed?  Do you

25   recall?

26      A.   A white T-shirt with some blood on it and pants.  Blue

27   jeans.

28      Q.   I'm going to show you what's been marked for
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 181

1    identification as People's Exhibit 248, 252, and 250.

2            MS. FOSTER:  Showing defense counsel.

3            I'm sorry, Your Honor, may I approach?

4            THE COURT:  Yes.

5            I'm sorry.  248 --

6            MS. FOSTER:  250 and 252.

7            THE COURT:  Thank you.

8       Q.   BY MS. FOSTER:  Do you recognize what's depicted in

9    People's 248, 250, and 252?

10      A.   Yes.

11           Yes, I do.

12      Q.   Showing you first People's 248.  What do you see

13   depicted in 248?

14      A.   A blue T-shirt, blue jeans, and blood all over his

15   T-shirt.

16      Q.   Showing you People's 252.  Is this how you saw the

17   defendant?

18      A.   Correct.

19      Q.   Showing you 250.  Do you recall seeing the blood on the

20   back of him as well?

21      A.   I don't recall looking at his back.

22      Q.   Were these the clothes that he had on that day?

23      A.   Correct.

24      Q.   You said, "a white T-shirt."  Did you misremember that?

25      A.   Yes.

26      Q.   Are the clothes depicted in 252 the correct clothing

27   that he had on?

28      A.   Yes.

```
1       Q.   He didn't change?

2       A.   No.

3       Q.   At what point did the defendant tell you that the

4   deceased had shot himself?

5       A.   Almost right outside as we're running into the house.

6   He was mumbling his friend was hurt.  I just heard shots.  So

7   right away I was kind of thinking, you know, when I called 911,

8   maybe he shot himself, maybe he didn't.  I'm not sure.  All I

9   know is there is a body on the ground.

10      Q.   At what point did the defendant tell you that his

11  friend shot himself?

12           MS. BLUMENTHAL:  Objection.  Asked and answered.  Also

13  misstates the witness's testimony.

14           THE COURT:  Overruled.

15           MS. BLUMENTHAL:  And assuming facts not in evidence.

16           THE WITNESS:  Outside and inside.

17           THE COURT:  I'm sorry.  Overruled.

18           I'm sorry to interrupt you.

19           I'm sorry.  Could you ask the question again?  I

20  interrupted the witness.

21      Q.   BY MS. FOSTER:  At what point did the defendant tell

22  you his friend shot himself?

23      A.   Outside and inside the house.

24      Q.   And then did you relay that information to 911?

25      A.   Correct.

26      Q.   Did you hear a gunshot?

27      A.   No.

28      Q.   After you called -- well, let me back up.
```

```
 1            Where did you call 911 from?
 2      A.    In the room outside when I was standing by the door.
 3      Q.    At that time were you still observing what was
 4  happening in the room?
 5      A.    That's correct.
 6      Q.    Was the defendant still inside of the room?
 7      A.    Yes.
 8      Q.    Did you see him pack up that gun at any point?
 9      A.    No, I didn't.
10      Q.    Did you stay at the house until police arrived?
11      A.    No.  I stood until I had given -- until I had given the
12  dispatch the information she needed, and then I walked outside.
13      Q.    And then how long was it after you walked outside the
14  police arrived?
15      A.    Took them about, I'd say, five to ten minutes.
16      Q.    Is that an estimate or did you look at your watch?
17      A.    That's just estimating.
18      Q.    When you went back outside, did the defendant come back
19  out with you?
20      A.    Not right away.
21      Q.    So there was a portion of time that he was inside the
22  room and you were outside?
23      A.    Yes.
24      Q.    Did he ever tell you he was putting the gun away?
25      A.    No.
26      Q.    When you watched him, did you see him move any shells
27  off the bed?
28      A.    No.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 184

```
 1          MS. FOSTER:  I have nothing further.
 2          THE COURT:  Cross-examination?
 3          MS. BLUMENTHAL:  Thank you.
 4                      CROSS-EXAMINATION
 5   BY MS. BLUMENTHAL:
 6       Q.   Good afternoon, Mr. Juarez.
 7       A.   Good afternoon.
 8       Q.   Pretty shocking day for you?
 9       A.   Yeah, it was.
10       Q.   Do you recall what time of the day this happened,
11   approximately?
12       A.   Around 8, 9 a.m.
13       Q.   Like around 8 or 9 a.m.?
14       A.   Correct.
15       Q.   And I'm not asking for exact, I'm looking for
16   approximates.  I know it's been quite a while back.
17            The first thing that you hear is banging on your door?
18       A.   Yes.
19       Q.   And you're in the shower?
20       A.   Yes.
21       Q.   How long does that banging go on?
22       A.   I heard about four or five thumps.  It only lasted
23   about, you know, a couple of seconds.
24       Q.   When you say "four or five thumps," you're talking
25   about the thumps on the door?
26       A.   Correct.
27       Q.   And you said that you were told that, I believe you
28   said your girl informed you that was going on?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 185

1      A.    Yes.

2      Q.    And what did you do when you heard that?

3      A.    When I heard the thumps, I already knew something was

4  going on.  So as she was knocking, telling me, I was already

5  rushing to get out of the shower.

6      Q.    Okay.  Threw some clothes on?

7      A.    Yeah.  Threw something on real quick.

8      Q.    Real quick.

9            And then you go out the front door?

10     A.    Went out the front door.

11     Q.    And where was this individual standing?

12     A.    He was just leaving the neighbor's property after, I

13  believe he was knocking on their front door as well for help.

14     Q.    Okay.  So you saw he was coming from one of the

15  neighbors.  Do you know which side of you?  As you're standing

16  at your front door, would it be --

17     A.    It's on my right side.

18     Q.    It would be on your right side?

19     A.    Yes.

20     Q.    And could you hear him yelling?

21     A.    Yes.

22     Q.    And what did you hear him yell?

23     A.    He yelled out "My friend.  My friend" about four times,

24  and then he yelled out "I need help.  Help.  Help.  He's shot."

25     Q.    "I need help.  Help.  He's shot"?

26     A.    Yes.

27     Q.    Did you see any other neighbors around at that time?

28     A.    No.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 186

1    Q.    Did you ever hear him say call 911 or call the police

2    or call the cops or anything?

3    A.    No.

4    Q.    You go up towards the street towards where he is?

5    A.    Yes.

6    Q.    And do you make eye contact with him?

7    A.    Yes, I do.

8    Q.    What happens then?

9    A.    I asked him "What's wrong?"  To relax.  He said he

10   needs help.  And I said, "What's wrong?"  He said, "Come here.

11   Follow me.  Follow me, please.  My friend needs help."  And I

12   followed him.

13   Q.    So he says "My friend.  My friend."  Come, you know,

14   "Come here.  Follow me."  And he's taking you to the direction

15   of that house?

16   A.    Yes.  Correct.

17   Q.    And is he muttering, crying, screaming?  Could you

18   describe that?

19   A.    Yes.  He's crying.  He's mumbling.  Just can't speak

20   right.

21   Q.    Okay.  And does he take you into the house?

22   A.    He leads me into the house.

23   Q.    And does he lead you to that bedroom?

24   A.    Yes, he does.

25   Q.    Now, what is the first thing that he does?  I mean,

26   that morning, did you know his name?

27   A.    No.

28   Q.    Had you ever seen him around before?

```
 1      A.   No.

 2      Q.   Not that you recall, at least?

 3      A.   Yeah.

 4      Q.   Okay.  Had you ever seen the young man that was lying

 5   on the floor before?

 6      A.   Yes.

 7      Q.   And when would you have seen him?

 8      A.   A few times.

 9      Q.   Because he's a neighbor?

10      A.   Yeah.  Correct.

11      Q.   Did you know his name?

12      A.   No.

13      Q.   Now, when you first saw him, you go in and he's lying

14   on the floor, the deceased, correct?

15      A.   Correct.

16      Q.   What does that young man who was out yelling do?

17      A.   He sits by his friend, starts crying, and he asked me

18   to -- asks me to help him while he's holding his friend on his

19   arms.

20      Q.   Okay.  So he's sitting on the floor next to his friend

21   and he's crying?

22      A.   Correct.

23      Q.   And he's holding his friend.  How is he holding his

24   friend?

25      A.   Pretty much grabbed his body and just like tried to

26   toss him on top of him.

27      Q.   So he's holding him almost like you would a child over

28   your shoulder?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 188

1        A.    Like a child over your shoulder.

2        Q.    And you saw the picture of how the body was lying,

3    okay?  And did he kind of pick him up to put him over his

4    shoulder?

5        A.    Yes.  When we ran in, I was about five steps behind

6    him.

7        Q.    Okay.

8        A.    So when we ran in, he already had his body on his

9    shoulder.

10       Q.    Okay.  So you're not sure.  When you first saw the

11   body, you really saw it with, as you said, the defendant holding

12   him; is that right?

13       A.    Correct.  Yes.

14       Q.    So that would be a fair statement?

15       A.    Correct.

16       Q.    You never really saw the body on the floor itself, you

17   saw it in the defendant's arms first?

18            MS. FOSTER:  Objection.  Compound.

19            THE COURT:  Overruled.

20       Q.    BY MS. BLUMENTHAL:  Would that be fair?

21       A.    I can't recall.

22       Q.    Okay.  And I understand.  But the first -- the first

23   vivid memory you have of it is the defendant, as you called him,

24   holding the body against his chest?

25       A.    I do have two vivid memories.  Of me seeing the body

26   without him holding him, and right after he's holding him.  I

27   can't tell which one came first.

28       Q.    You can't tell which came first?  Okay.  And that's the

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 189

```
 1    shocking one, and I understand that.
 2            Did you ever see the defendant put the body back down?
 3        A.   No.
 4        Q.   While he was holding the body, did you hear him crying?
 5        A.   Yes.
 6        Q.   And how strong were his cries?
 7        A.   As strong as somebody losing a brother.
 8        Q.   It seemed loud and uncontrolled?
 9        A.   Correct.
10        Q.   And how long, when he was holding the body, was he
11    crying?
12        A.   The entire time.
13        Q.   Now, did he talk to you at all while he was holding the
14    body?
15            Or did he just cry?
16        A.   He was just crying.
17        Q.   Okay.  And at that point, around that point in time you
18    go -- you could see he had been injured, I take it?
19        A.   Yes.
20        Q.   There was blood everywhere, correct?
21        A.   Correct.
22        Q.   And you said, "I better call 911"?
23        A.   Yes.  Correct.
24        Q.   And did you then step back?  I mean, I understand you
25    did not go into the bedroom, but did you kind of step back even
26    from the entryway so you could call 911?
27        A.   Yes, I did.
28        Q.   And then did you proceed to walk outside?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 190

```
 1        A.   Yes, I did.

 2        Q.   Now, the last time that you saw the body itself, was

 3   he -- was the body still being held by the defendant?

 4        A.   Yes.

 5        Q.   And was the defendant still sobbing?

 6        A.   Yes.

 7        Q.   Now, at some point in time you're outside and you --

 8   you see him coming outside; is that right?

 9        A.   Yes, I do.

10        Q.   And what's he doing?

11        A.   He's crying.

12        Q.   He's crying?

13        A.   And he's hurt.

14        Q.   I'm sorry, what?

15        A.   He's crying and he's hurt.

16        Q.   He's crying and he's hurt.  Is that a fair statement?

17        A.   He's crying.  He's crying.

18        Q.   He's crying.

19             Is he still crying as hard?

20        A.   Yes.

21        Q.   You're on the phone, and this is while you're on the

22   phone with 911; is that right?

23        A.   Yes.

24        Q.   And while you're on the phone, you're giving

25   information that they're asking; is that correct?

26        A.   Yes.

27        Q.   Were you on the phone with 911 until law enforcement

28   arrives?
```

1    A.   I hung up the phone and about five minutes later they

2    arrived.

3    Q.   Okay.  Now, you had indicated when you were testifying

4    that to the best of your recollection, he had a white shirt on,

5    right?

6    A.   Yes.

7    Q.   And when you see the photograph, he had a blue shirt

8    on.  But it was still a T-shirt, correct?

9    A.   Yes.

10   Q.   And you said he had blue jeans on?

11   A.   Yes.  Correct.

12   Q.   Does this seem like a -- I assume this is the first

13   time you've experienced something like this?

14   A.   Correct.

15   Q.   And was it pretty traumatic for you, I take it?

16   A.   Yes.

17   Q.   Something you're never going to forget, not that you

18   want to remember?

19   A.   Yeah.  I won't forget it.

20   Q.   Certain things are blurred a little bit and other

21   things are not?

22   A.   Yes.

23   Q.   Now, when you first said that you recognized him, you

24   said you think so.  Were you sure at that point in time, or is

25   it he just looks similar?

26        MS. FOSTER:  I'm going to object as vague as to who the

27   "him" is.

28   Q.   BY MS. BLUMENTHAL:  I apologize.  Who the person you've

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 192

```
 1    identified as the defendant.  Do you recall saying that -- were
 2    you sure when you first took a look at him?
 3         A.   Yes.
 4         Q.   Okay.  When you were talking to 911, what did the
 5    defendant do?
 6         A.   He was crying the whole time.
 7         Q.   Crying the whole time.
 8              Now, you get off the phone with 911, and are you
 9    waiting for law enforcement to arrive?
10         A.   Yeah.
11         Q.   And where are you when you're waiting?
12         A.   I'm in the front yard of the house.
13         Q.   When you say "the house," you're talking about the
14    house where the body was?
15         A.   Yes.  Correct.
16         Q.   And is the defendant standing there with you?
17         A.   Yes.
18         Q.   And continuing to cry?
19         A.   Yes.
20         Q.   Is he standing up, sitting down?
21         A.   He's -- he was standing up for about a minute or two,
22    then he sat down and continued to cry more.
23         Q.   So did he almost like collapse?
24         A.   Yes.
25         Q.   Okay.  And did he stay there until law enforcement
26    arrived?
27         A.   Yes.
28         Q.   And what did he do when law enforcement arrived?
```

```
 1        A.   Spoke to them.

 2        Q.   He spoke to them?

 3             Was he crying during that time?

 4        A.   Yes, he was.

 5        Q.   Did you see him go into the house at all with law

 6   enforcement?

 7        A.   I don't recall.

 8        Q.   Did you go into the house at all with law enforcement?

 9        A.   No, I didn't.

10        Q.   Did you tell law enforcement how to find the person

11   inside the house?

12        A.   Correct, I did.

13        Q.   And you gave them explicit directions?

14        A.   Yes.

15        Q.   Did you see where the defendant stayed?  Or did he go?

16        A.   I didn't see.

17             MS. BLUMENTHAL:  No further questions, Your Honor.

18             THE COURT:  Redirect?

19             MS. FOSTER:  Yes, Your Honor.

20                      REDIRECT EXAMINATION

21   BY MS. FOSTER:

22        Q.   You mentioned on cross that the defendant seemed hurt,

23   right?  You said that?

24        A.   Yes.

25        Q.   Do you mean physically hurt?

26        A.   Emotionally.

27        Q.   Okay.  You never saw any physical injury on the

28   defendant; is that right?
```

```
 1        A.   No.

 2        Q.   Let me finish asking the question, because she's typing

 3   what we're both saying, and she can't type us both, okay?

 4             So as far as you saw, you never saw any physical

 5   injury?

 6        A.   No.

 7        Q.   Did he ever tell you he was injured?

 8        A.   No.

 9        Q.   Did you see anyone else in the house?

10        A.   No.

11        Q.   Did anyone else come outside of the house?

12        A.   No.

13        Q.   Do you recall if you saw the body on the floor first

14   and then saw him holding the body?

15        A.   Yes, I believe so.

16        Q.   So the first time you see the body, is that when you

17   described on direct that it was laying on the ground on his

18   stomach?

19        A.   Correct.

20        Q.   When you saw the defendant, did you notice -- I'm

21   putting up 252 -- that his pants were unzipped?

22        A.   No, I didn't.

23        Q.   Do you recall what the victim was wearing?

24             MS. BLUMENTHAL:  Objection.

25             May we have a moment?

26        Q.   BY MS. FOSTER:  And let me correct myself.  Do you

27   recall what the deceased was wearing?

28        A.   He wasn't wearing a T-shirt.  I can't recall.  Pants or
```

```
 1   boxers.  I think he was just in his boxers.
 2       Q.   I'm showing you People's 54 again.  Is that how the
 3   deceased was when you saw him on the ground?
 4       A.   Yes.
 5       Q.   Was he only wearing the boxers, that you observed?
 6       A.   Yes.
 7       Q.   And you said -- did you notice the pants, the
 8   defendant's pants unzipped?
 9       A.   No, I didn't.
10       Q.   Did you notice blood on his face?
11       A.   Yes.
12       Q.   How many times did the defendant tell you that his
13   friend had killed himself?
14            MS. BLUMENTHAL:  Objection.  That misstates the
15   testimony.
16            THE COURT:  I'm sorry.  Overruled.
17       Q.   BY MS. FOSTER:  How many times did he tell you that?
18   Or, I'm sorry, shot himself?
19       A.   He said, "I think he shot himself."  He didn't say he
20   shot himself.
21       Q.   How many times did he tell you "I think he shot
22   himself"?
23       A.   About two or three times.
24       Q.   Two to three times.
25            And you said that was inside and out?
26       A.   Correct.
27       Q.   When he tells you "I think he shot himself," did you --
28   had you asked or did he volunteer that?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 196

1     A.   I asked.  I asked.

2     Q.   Did you ask all three times?

3     A.   I asked "What is wrong?"  Yes.

4     Q.   So describe this for us.  On the outside of the house

5  you asked what?

6     A.   I asked "What's wrong?"  He said, "My friend.  He's

7  hurt.  He shot himself."  I said, "What?  What's wrong?"  He

8  said, "He's hurt.  He shot himself.  Follow me, please.  Help."

9     Q.   And then when did he tell you the third time?

10    A.   When he was holding him and he was crying inside the

11  room.

12    Q.   I'm sorry to interrupt you.

13         And what did he say that time?

14    A.   He said, "Please help.  He's hurt.  He shot himself."

15    Q.   When you observed the defendant, it sounds like you're

16  describing that he seemed in grief; is that right?

17    A.   Yes.

18    Q.   Did that appear to be genuine, from your observation?

19         MS. BLUMENTHAL:  Objection.  Calls for speculation.

20         THE COURT:  Overruled based upon his observation.  Lay

21  opinion.

22         THE WITNESS:  I can't tell.

23    Q.   BY MS. FOSTER:  Did the defendant ever tell you that he

24  shot his friend?

25    A.   No.

26         MS. FOSTER:  Nothing further.

27         THE COURT:  Defense?

28         MS. BLUMENTHAL:  Thank you.

```
 1                      RECROSS-EXAMINATION
 2   BY MS. BLUMENTHAL:
 3       Q.   Earlier you had stated that you had two memories, one
 4   of which was, who we call Mr. Boji, that's his last name, the
 5   defendant.  That Mr. Boji, you could remember him holding the
 6   deceased, and you remember the deceased being on the ground, but
 7   you weren't too sure which was first.  Is that a fair statement?
 8       A.   Yes, it is.
 9       Q.   So at one time when you saw him holding, could it be,
10   or did you ever see Mr. Boji put him down, the body down on the
11   ground?
12       A.   No.  I don't remember that.
13       Q.   Are you specific, have a specific recollection about
14   the positioning of the body when you went into the room?
15       A.   Yes.
16       Q.   And is it your testimony that you never saw the body in
17   an upward position?
18       A.   Yes, I didn't see it upwards.
19       Q.   Okay.  Did you see his face at all?
20       A.   No.
21       Q.   Did you see the back of the head?  Or do you recall?
22       A.   I saw his, the back of his shoulder and his back.
23       Q.   Okay.  And so the back of his shoulder and his back.
24            And when you saw Mr. Boji go over and pick him up, you
25   saw him kind of turn him and put him over his shoulder?
26       A.   Yeah.  Pretty much slide him up the same way he was
27   laid.
28            MS. BLUMENTHAL:  I have no further questions, Your
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 198

1   Honor.

2           THE COURT:  Thank you.

3           Redirect?

4           MS. FOSTER:  No, Your Honor.

5           THE COURT:  Is this witness excused or subject to

6   recall?

7           MS. BLUMENTHAL:  Subject to recall, please.

8           THE COURT:  All right.  Thank you, sir.

9           THE WITNESS:  All right.  Thank you.

10           THE COURT:  Any additional witnesses from the People?

11           MS. FOSTER:  Yes, but not available today.

12           THE COURT:  All right.  Ladies and gentlemen, the

13   People's witnesses are not available today.  We will be in

14   session tomorrow at 9:00 a.m. at least through half the day.  So

15   make plans accordingly.

16           Remember, do not talk about the case or about any of

17   the people or any subjects involved in it with anyone, including

18   your family and friend.  Do not conduct any research or share

19   information.  Keep an open mind.

20           Court is in recess until tomorrow 9:00 a.m.

21           Leave your notebooks here, please.

22       (Proceedings were held out of the presence of the jury:)

23           THE COURT:  All right.  Back on the record out of the

24   presence of the jury.

25           Anything we need to put on the record at this time from

26   the People?

27           MS. FOSTER:  Just that I did provide an updated witness

28   list, and two witnesses were missing.  Deputy Kasprzyk and --

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 199

1    who was one of the reports that was discovered, and then Andrew

2    Boji, the one we already mentioned.

3          THE COURT:  All right.  And in order to make a complete

4    record, the Court is ordering the People to file that additional

5    amendment, exhibit list to the clerk so the clerk can file it

6    and make it part of the record.

7          Anything else from the People?

8          MS. FOSTER:  No, Your Honor.

9          THE COURT:  From the defense?

10         MS. BLUMENTHAL:  Yes, Your Honor.  Just as a general

11   rule, we tend to have all witnesses subject to recall for

12   purposes of potential impeachment down the road, and if they're

13   not subject to recall, sometimes we cannot bring up certain

14   evidence in our case in chief.

15         THE COURT:  Well, that's fine.  I always ask.

16   Sometimes it does happen and excuse an unnecessary witness.

17   But, no, I always ask you every time.  That's my habit.

18         MS. BLUMENTHAL:  I just let the Court know it might

19   happen.

20         THE COURT:  All right.  Anything else?

21         MS. BLUMENTHAL:  No, Your Honor.

22         THE COURT:  Then the Court is -- make sure you gather

23   all the exhibits, and the court's adjourned, then, for the day.

24   Thank you.

25         MR. MOORE:  Thank you, Your Honor.

26                    (Proceedings concluded.)

27

28

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 200

```
 1                 RIVERSIDE, CALIFORNIA; JUNE 29, 2018

 2                 BEFORE THE HONORABLE SAMUEL DIAZ, JR.

 3          THE COURT:  All right.  Back on the record.  All jurors

 4     are present.  All parties are present.

 5               Madam prosecutor, are you ready to begin?

 6          MS. FOSTER:  Yes, Your Honor.

 7          THE COURT:  Call your next witness, please.

 8          MS. FOSTER:  Thank you.  The People call Deputy

 9     Kurylowicz.

10          THE CLERK:  Please remain standing and raise your right

11     hand.

12          Do you solemnly state that the evidence you shall give

13     in this matter shall be the truth, the whole truth, and nothing

14     but the truth, so help you God?

15          THE WITNESS:  I do.

16          THE CLERK:  Please be seated.

17          Please state and spell your first and last name for the

18     record.

19          THE WITNESS:  Adam, A-d-a-m, Kurylowicz,

20     K-u-r-y-l-o-w-i-c-z.

21          THE COURT:  People?

22                         ADAM KURYLOWICZ,

23     called as a witness by and on behalf of the Plaintiff, having

24     been first duly sworn, was examined and testified as follows:

25                         DIRECT EXAMINATION

26     BY MS. FOSTER:

27       Q.  Good morning.

28       A.  Good morning.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 201

1       Q.   What is your current occupation?

2       A.   Deputy sheriff.

3       Q.   And how long have you been a sworn peace officer?

4       A.   Seven years.

5       Q.   And were you a deputy sheriff as well in November of

6    2015?

7       A.   I was.

8       Q.   And what agency were you working for?

9       A.   Riverside County at Moreno Valley.

10      Q.   And were you on duty on November 10th of 2015?

11      A.   I was.

12      Q.   Can you pull that mike just a little?

13           And did you get dispatched to 25964 Soaring Seagull

14   Lane?

15      A.   I did.

16      Q.   And when did that dispatch come through?

17      A.   I don't remember the exact time.  Sometime around 8:30

18   in the morning.

19      Q.   And what was the nature of the dispatch call?

20      A.   It was like a suspicious death.

21      Q.   And so at 8:30 in the morning did a suspicious death

22   dispatch?

23           MR. MOORE:  I'm going to object as to hearsay for that

24   if it's offered for the truth.

25           THE COURT:  Overruled.

26      Q.   BY MS. FOSTER:  And then do you go to Soaring Seagull

27   Lane?

28      A.   I do.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 202

```
 1      Q.    And when you arrive, are you the first one on scene?

 2      A.    No.  There was three other units before me.

 3      Q.    When you arrive, what is your job to do on the scene?

 4      A.    I was the primary deputy.

 5      Q.    Do you go inside?  Is the location a residence?

 6      A.    Yes.

 7      Q.    Do you go inside the residence?

 8      A.    I did go inside, yes.

 9      Q.    And when you went inside the residence, what did you

10  observe?

11      A.    I saw the victim laying on the ground shot.

12      Q.    And let's -- did you ever learn the name of the person

13  on the ground?

14      A.    I did, but I can't recall right now.

15      Q.    And would it refresh your recollection to review your

16  report?

17            I'm going to direct you to --

18            MS. FOSTER:  With the Court's permission?

19            THE COURT:  Yes.

20      Q.    BY MS. FOSTER:  I'm going to direct you to page 5, line

21  34.

22            THE COURT:  All right.  Deputy, once your memory has

23  been refreshed, turn your report over.

24            THE WITNESS:  Yes, Your Honor.

25            THE COURT:  And, ladies and gentlemen of the jury, the

26  police reports are not evidence.  Evidence is the sworn

27  testimony of the witnesses.

28      Q.    BY MS. FOSTER:  Is your recollection refreshed?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 203

```
1        A.   It is.

2        Q.   And what was the name of the deceased person in the

3    room?

4        A.   Nicholas McCauley.

5        Q.   Let's refer to him as Nicholas, okay?

6        A.   Okay.

7        Q.   Now, when you walked into the room, where did you see

8    Nicholas laying?

9        A.   When you walk into the house, there was a bed on the

10   east side, so to the right when you walk in, his body was in

11   there.

12       Q.   And I'm so sorry.  (Coughing.)

13            So you said you walk in and then there is a room to the

14   east, to the right?

15       A.   Correct.

16       Q.   And where was his body laying?

17       A.   It was on the floor.

18       Q.   And which way was Nicholas facing?

19       A.   His head was pointing like east and his feet were

20   pointing west.  So he was on his back.

21       Q.   When you walked into the room, was anyone else in

22   there?

23       A.   No.

24       Q.   And did you disturb that part of the scene at all?

25       A.   I did not.

26       Q.   And then what did you do next?

27       A.   I was the primary deputy.  I waited outside as another

28   deputy stood ground inside the house.
```

1      Q.   And at some point did you come across the other

2   percipient witness?

3      A.   I did.

4      Q.   And who did you come across?

5      A.   It was Houston.

6      Q.   And do you see him in court today?

7      A.   I do.

8      Q.   Can you direct for the record where he's seated and

9   what he's wearing?

10      A.   He's the gentleman over there.  He's wearing a suit.

11      Q.   And it looks like you pointed to the right, and you

12   said, "He's wearing a suit."  There is two gentlemen in a suit.

13      A.   The younger gentleman.

14           MS. FOSTER:  You don't have to take any offense to

15   that, but I think the record should reflect that the witness has

16   identified the defendant.

17           MR. MOORE:  I'll stipulate that I'm older.

18           THE COURT:  I stipulate the one with the hair.

19           THE WITNESS:  Yes, Your Honor.

20           THE COURT:  All right.  Yes.

21      Q.   BY MS. FOSTER:  And where did you first come into

22   contact with the defendant?

23      A.   When I arrived, he was sitting outside on the curb.

24      Q.   And how did he appear when you first saw him?

25      A.   He was covered in blood, like all over his clothing,

26   his shirt and his pants.

27      Q.   I'm going to show you what's been marked for

28   identification as People's Exhibit 248.  Do you recognize

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 205

```
 1   People's 248?
 2       A.   I do.
 3       Q.   And who is that?
 4       A.   That's Houston.
 5       Q.   And is that how you saw him the day on November 10th,
 6   2015?
 7       A.   Yes.
 8       Q.   Is that the clothing he was wearing?
 9       A.   Yeah.
10       Q.   And when you say "he was covered in blood," is that
11   photograph a true and accurate depiction of what you saw?
12       A.   Yeah.
13       Q.   Was there anything particular that you noticed about
14   his physical appearance?
15       A.   Just his clothes being in disarray.
16       Q.   How did his face look?
17       A.   He had blood on it.
18       Q.   Show you what's been marked for identification as
19   People's 261, 260, and 259.
20            MS. FOSTER:  I'm showing defense counsel.
21            May I approach?
22            THE COURT:  Yes.
23       Q.   BY MS. FOSTER:  Do you recognize what's depicted in
24   People's 261?  I'm sorry.  259 and 260?
25       A.   I do.
26       Q.   And are those true and accurate depictions of what you
27   observed on November 10th?
28       A.   Yes, they are.
```

1       Q.    2015?

2             And I'm showing you 261 first.  What are we looking at

3       in Exhibit 261?

4       A.    That's Houston's face covered in blood.

5       Q.    And what are we looking at in 260?

6       A.    That would be his blue shirt covered in blood as well.

7       Q.    And what are we looking at in 259?

8       A.    That's his pants as well covered in blood.

9       Q.    And upon your observation, did you notice the pants

10      being unzipped or whatever?

11      A.    I did.

12      Q.    I'm showing you People's Exhibit 55.  When you describe

13      seeing Nicholas in the bedroom, is this how you saw him?

14      A.    Yes, it was.

15            THE CLERK:  55?

16            MS. FOSTER:  55.

17            THE CLERK:  Thank you.

18      Q.    BY MS. FOSTER:  And at the time that you walked into

19      that house, did you notice any weapons?

20      A.    I saw a shotgun in there.

21      Q.    Where did you see a shotgun?

22      A.    It was in a case.

23      Q.    And do you remember what that case looked like?

24      A.    I believe it was a black soft case.

25      Q.    Was there a shotgun on top of the bed?

26      A.    I believe it was on a speaker.  I'd have to look at my

27      notes.

28      Q.    At any time --

1          MS. FOSTER:  If I may retrieve People's 269?

2     Q.   BY MS. FOSTER:  Did you go into the shotgun case at

3   that time?

4     A.   I did not.

5     Q.   The deputy is going to quickly show you People's 269,

6   and you tell me if you saw that sitting on the bed in that room.

7          Did you see People's 269 sitting on the bed in its

8   current state?

9     A.   To the best of my recollection, I don't remember it

10  being on the bed.

11    Q.   And did you see the gun exposed or did you --

12    A.   I remember seeing the butt of it exposed in the bag.

13    Q.   Thank you.

14         During the time that you were at the scene, did other

15  deputies come and seal off the house?

16    A.   Yes.

17    Q.   And did you end up interviewing the defendant?

18    A.   I spoke to Houston upon arrival.

19    Q.   And how long did you talk to him?

20    A.   Maybe 15, 20 minutes.

21    Q.   And was that interview recorded?

22    A.   Yes, it was.

23    Q.   I'm going to play a second of that interview, and let

24  me know if you hear a true and accurate copy of you interview.

25         THE COURT:  I'm sorry.  What exhibit?

26         MS. FOSTER:  I'm sorry.  I have People's Exhibit 293.

27             (CD being played, not reported.)

28    Q.   BY MS. FOSTER:  Do you hear yourself in your interview?

```
 1        A.    I do.

 2        Q.    And is that the interview you had on November 10th,

 3   2015, with the defendant?

 4        A.    It is.

 5              MS. FOSTER:  Is there a way to hook it into the sound

 6   system?

 7              THE COURT:  I'm sorry.  Miss Foster?

 8              MS. FOSTER:  Yes.

 9              THE COURT:  Do you have the transcripts also?

10              MS. FOSTER:  Yes, Your Honor.

11              THE COURT:  All right.  Ladies and gentlemen, I

12   apologize.  I didn't know this was going to be played early on.

13   I'm going to call IT and make sure that we can all hear, instead

14   of just have it come off of the microphone.  Obviously, it was

15   kind of hard to hear.  I couldn't hear anything.  I'm sorry.

16   You'll all have to leave the courtroom for about ten minutes.  I

17   know we just started, but I'm going to call someone from IT to

18   make sure it's going to be set up correctly.

19              Court's in recess until 9:40.

20              Remember, do not talk about the case.  Keep an open

21   mind.  Do not share any information.

22                          (Recess.)

23              THE COURT:  Back on the record.  All parties are

24   present.  All jurors are present.

25              And is there a stipulation between the parties that the

26   court reporter does not need to transcribe the oral portion of

27   the audio?

28              MR. MOORE:  Yes.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 209

1          MS. FOSTER:  Yes, Your Honor.

2          THE COURT:  All right.  Thank you.

3          You may proceed.

4          MS. FOSTER:  With the Court's permission, at this time

5     I'd like to play People's 293.

6          THE COURT:  All right.  Ladies and gentlemen of the

7     jury, we're going to hand out some transcripts for you of this

8     audio recording.  It is the audio recording that's the evidence,

9     not the transcript.  The transcript is there to assist you and

10    help you.  But if there is any discrepancy, it is the audio, the

11    CD that is evidence.  Do you all understand?

12                   (Jurors responded "Yes.")

13         THE COURT:  All right.  Thank you.

14    Q.   BY MS. FOSTER:  Before I play the tape, I'm going to

15    ask you a couple of questions.

16         During your interview with the -- or your conversation

17    with Mr. Boji, did he tell you what happened inside the house?

18    A.   He kind of tells me things leading up to it.

19    Q.   And did he --

20         THE COURT:  I'm sorry.  Deputy, you got to speak a

21    little louder.

22         THE WITNESS:  I'm sorry.

23    Q.   BY MS. FOSTER:  He says the same thing to me, so we'll

24    work on it together.

25         Did he tell you how Nicholas died?

26    A.   He believes a shotgun blast.

27    Q.   At any time during your conversation, did he tell you

28    about any messages that he had sent Nicholas?

Christine M. DiCaro, CSR                                    201

| | |
|---|---|
| 1 | A. I don't recall. |
| 2 | Q. Did he tell you he had ever threatened Nicholas? |
| 3 | A. I don't recall. |
| 4 | Q. Did you have a chance to review your report? |
| 5 | A. I did. |
| 6 | Q. And would it refresh your recollection to review your |
| 7 | report to determine whether or not he ever told you about |
| 8 | threats? |
| 9 | A. Yeah. I could look. |
| 10 | MS. FOSTER: With the Court's permission? |
| 11 | THE COURT: Yes. |
| 12 | Q. BY MS. FOSTER: Is your recollection refreshed? |
| 13 | A. Yes. |
| 14 | Q. At the scene did the defendant tell you that he |
| 15 | threatened to shoot Nicholas? |
| 16 | A. Not threaten to shoot, no. |
| 17 | Q. Did he tell you he threatened to make any threats to |
| 18 | Nicholas? |
| 19 | A. Nothing about threats. |
| 20 | Q. Okay. Did he tell you that he shot Nicholas? |
| 21 | A. No. |
| 22 | MS. FOSTER: At this time I'd like to play your tape. |
| 23 | (CD being played, not reported.) |
| 24 | MS. FOSTER: I'm going to pause it. I think there is |
| 25 | something wrong with this copy. |
| 26 | Your Honor, I'm going to replace the tape with a |
| 27 | different copy of the same tape. |
| 28 | THE COURT: Is there a stipulation? |

1          MR. MOORE:  Yeah.  Yes, Your Honor.  Sorry.

2          THE COURT:  Thank you.

3               (CD being played, not reported.)

4          MS. FOSTER:  This is not allowing me to fast forward,

5     Your Honor.

6          THE COURT:  Just play it from the beginning.

7               (CD being played, not reported.)

8          By MR. MOORE:  Your Honor, seems like the --

9          THE COURT:  I'm sorry.  Do you want to pause it?

10         I'm sorry?

11         MR. MOORE:  It's the device, not the audio recording.

12    I don't know what the Court's pleasure is, but --

13         MS. FOSTER:  I can try it again from the laptop.

14         We're at four minutes and 31 seconds now.

15         THE COURT:  All right.  Take it out.  Let me take it

16    back in my chambers and play it on my CD-ROM that I have and see

17    if that works better.

18         All right.  All of you stay in here.  Don't leave the

19    courtroom.  If you want to stand up, you may, but don't leave

20    the courtroom.  Court's in recess.

21         Do you want to come with me, Miss Clark?

22         THE CLERK:  Me?

23         THE COURT:  Yep.

24               (Brief pause in proceedings.)

25         THE COURT:  Back on the record.  It works great back

26    there, so I'm going to have to call IT again, and maybe they

27    might have to take my computer and put it out here.  But we're

28    going to have this played today.  So, I'm sorry.  My apologies.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 212

1   We'll take another 15-minute break.  Do not discuss the case.

2   Court's in recess until 10:15.

3       (Proceedings were held out of the presence of the jury:)

4           THE COURT:  All right.  We're in recess until 10:15.

5           MR. MOORE:  Yes, Your Honor.

6                        (Recess.)

7           THE COURT:  All right.  Back on the record.  All

8   parties are present.  All jurors are present.

9           We'll try it again.  Third time is a charm.

10          MS. FOSTER:  Starting at 3.55.

11          THE COURT:  All right.

12              (CD being played, not reported.)

13          MS. FOSTER:  I'm sorry.  I'm trying to locate which

14  page.

15          MR. MOORE:  Six.

16          THE WITNESS:  Six.

17          MS. FOSTER:  Thank you, Mr. Moore.

18          THE COURT:  Page 6.

19              (CD being played, not reported.)

20      Q.   BY MS. FOSTER:  Do you recall that conversation?

21      A.   I do.

22      Q.   And during the time that you're talking to the

23  defendant, was he crying?

24      A.   I don't recall.

25      Q.   Did listening to that, do you recall your conversation?

26      A.   It sounded like it a little bit, but --

27      Q.   And when you were interviewing the defendant before and

28  after the interview, did he mention to you any text messages he

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 213

 1   had sent?

 2        A.   No.

 3        Q.   Based on the story that he's telling you, did you have

 4   the impression that a suicide had been committed?

 5        A.   At the time I wasn't sure.  I was trying to establish

 6   whether it was or not.

 7        Q.   During your interview, did he seem emotional, the

 8   defendant?

 9        A.   He did.

10        Q.   Did he seem convincing?

11             MR. MOORE:  Objection.  Speculation.

12             THE COURT:  Sustained on speculation.

13        Q.   BY MS. FOSTER:  You say you've been an officer for

14   seven years?

15        A.   Yes.

16        Q.   And what assignments have you had?

17        A.   I worked at the Moreno Valley Police Department.  I

18   worked RSAT and then transferred recently to Perris.

19        Q.   And are you saying when you -- at the Moreno Valley

20   Police Department you did patrol?

21        A.   I did patrol, yes.

22        Q.   And are you doing patrol now?

23        A.   Correct.

24        Q.   And how many suspects have you interviewed?

25        A.   Countless.  I don't know.

26        Q.   And how many witnesses have you interviewed?

27        A.   Countless.

28        Q.   Would you say -- can you give us an idea of the number?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 214

```
 1   Is it hundreds?  Less?
 2             MR. MOORE:  Relevance, Your Honor.
 3             THE COURT:  Overruled.
 4             THE WITNESS:  I'd say well over a hundred.
 5        Q.   BY MS. FOSTER:  And as part of your training and
 6   experience, are you taught how to determine -- use tools to
 7   determine if someone is lying to you?
 8             MR. MOORE:  Relevance, Your Honor.
 9             THE COURT:  Sustained on relevance.
10             As to his belief.
11        Q.   BY MS. FOSTER:  Based on your interview with the
12   suspect and in your background, training, and experience, did he
13   seem convincing?
14             MR. MOORE:  Relevance, Your Honor.  Speculation.
15             THE COURT:  As phrased, overruled.
16             MR. MOORE:  And speculation and --
17             THE COURT:  Overruled.
18             THE WITNESS:  He didn't seem too convincing, no.
19        Q.   BY MS. FOSTER:  At the time of your interview, did
20   you -- the information about Ana McCauley being at work, who
21   provided that information?
22        A.   Houston told me that.
23        Q.   During the interview, it appears he told you he got
24   there at around 8:45.  Is that consistent with the time that you
25   received the dispatch call?
26        A.   Yeah.
27        Q.   What time did you receive the dispatch call?
28        A.   I just remember around 8:30.
```

1       Q.   So you get a call at 8:30 that there is already a
2   suspicious death?
3       A.   Correct.
4       Q.   And then what time does the defendant tell you he
5   arrived?  Is that before or after you got that call?
6       A.   I think it was before, I believe.
7       Q.   Did you hear him say on the tape he arrived at 8:45?
8       A.   At some point, yes.
9       Q.   So he's saying he arrived after you got your call?
10      A.   I believe before.  I'd have to look at the notes to
11  refresh my memory on it to be sure.
12      Q.   I'm probably asking this question very poorly.
13           What time did you get the dispatch call?
14      A.   The exact time, I can't remember.
15      Q.   About?
16      A.   I'd say about 8:30ish.
17      Q.   8:30 a.m.?
18      A.   Correct.
19      Q.   So the death has already occurred by 8:30 a.m.?
20      A.   Yes.
21           MR. MOORE:  Hearsay.
22           THE COURT:  I'm sorry?
23           MR. MOORE:  Hearsay.
24           THE COURT:  Sustained on hearsay.
25      Q.   BY MS. FOSTER:  The dispatch saying "suspicious death"
26  has already happened by 8:30 a.m.?
27      A.   Yes.
28      Q.   Would you say you were provided what happened in the

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 216

```
 1   house with some detail?
 2       A.   Not too much detail.
 3       Q.   And what time do you physically arrive at the house?
 4       A.   The actual time, I don't know.  I'd have to refresh my
 5   memory.
 6       Q.   Would it refresh your recollection to review your
 7   report?
 8       A.   It would.
 9            THE COURT:  Go ahead, Deputy.
10       Q.   BY MS. FOSTER:  Can you review lines 18 on page 5,
11   lines 18 through 8?  I'm sorry.  Through 24.
12       A.   So 8:36 the call came out, and I arrived about 8:56.
13       Q.   And you said 8:36 the call came out.  Is that something
14   you documented?
15       A.   Correct.  The dispatch.
16       Q.   And when you say "call," what call are you referring
17   to?
18       A.   The suspicious death.
19       Q.   At a certain point during the tape, it sounds like
20   photographs were being taken of the defendant.  Do you recall
21   that happening?
22       A.   I recall it happened.
23       Q.   And did that occur in front of you?
24       A.   Yeah.
25       Q.   I'm going to show you what's been marked for
26   identification People's Exhibit 251, 53 through 56, and 50.
27            MS. FOSTER:  Showing defense counsel.
28       Q.   BY MS. FOSTER:  Did you observe the defendant as he was
```

1    being photographed?

2        A.    Yes.

3        Q.    And did they photograph his whole body?

4        A.    I believe so.

5              MS. FOSTER:  May I approach?

6              THE COURT:  Yes.

7              THE WITNESS:  Yes.

8              MS. FOSTER:  He gets to decide.

9              THE WITNESS:  Sorry.

10       Q.    BY MS. FOSTER:  People's 250, 251, 253 through 256, do

11   you recognize those?

12       A.    I do.

13       Q.    And are they true and accurate depictions of what you

14   observed?

15       A.    They are.

16       Q.    Showing you first People's 251.  Did you observe --

17       A.    I did.

18       Q.    -- blood on the defendant's arm, similar depicting the

19   middle of the photograph?

20       A.    Yes, I did.

21       Q.    And 253?

22       A.    Yes.

23       Q.    Do you observe blood on his hands?

24       A.    I did.

25       Q.    On the right hand as well?

26       A.    Yes.

27       Q.    And that's 254.

28              255.  Do you look at the top of his hands?

```
 1        A.    I did.

 2        Q.    256.  Do you look at the right hand as well?

 3        A.    I did.

 4        Q.    And 250.  Did you look at the back of his hands?

 5        A.    Yes.

 6        Q.    And do you notice blood on each of those locations on

 7   defendant's body?

 8        A.    I did.

 9        Q.    At any time that you spoke to the defendant, did he

10   ever tell you that he was in the room with Nicholas at the time

11   he was shot?

12        A.    No.

13        Q.    Did he ever tell you that he was holding the gun at the

14   time that Nicholas was shot?

15        A.    No.

16              MS. FOSTER:  I have nothing further.

17              THE COURT:  Cross-examination?

18              MR. MOORE:  Yes, Your Honor.  Thank you.

19                         CROSS-EXAMINATION

20   BY MR. MOORE:

21        Q.    Good morning, Deputy.

22        A.    Good morning, sir.

23        Q.    How are you?

24        A.    I'm good, and you?

25        Q.    Doing well.  Thank you.

26              So you did -- the initial callout comes into your

27   vehicle, and you're assigned at 8:36 a.m., right?

28        A.    Correct.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 219

1        Q.    And you respond.  It takes you about 20 minutes to get
2    to the scene?
3        A.    Correct.
4        Q.    And you documented that you arrived at about 8:56 a.m.,
5    correct?
6        A.    Yes, sir.
7        Q.    And one of the first things that you did was you
8    approached Mr. Boji?
9        A.    Correct.
10       Q.    So other officers are already on scene, right?
11       A.    Yes.
12       Q.    And the scene is being secured, correct?
13       A.    Yes, sir.
14       Q.    You've been told that the reporting party, the person
15   that basically was the genesis of your callout was a person
16   wearing blue jeans, blue shirt, and had blood on him, right?
17       A.    Correct.
18       Q.    So you saw Mr. Boji sitting on the curb next to a
19   police car?
20       A.    He was in front of the house.
21       Q.    In front of the house?  Okay.
22             Was there a police car in the area or no?
23       A.    I believe so.
24       Q.    So he's sitting on the curb next -- well, in front of
25   the house, and he matches the description.  So the first thing
26   you did was you approached him, correct?
27       A.    Correct.
28       Q.    And that's what we heard on the audio recording that

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 220

1    we've been trying to listen to and hopefully listened to?

2         A.   Yes, sir.

3         Q.   Okay.  So that was, basically, the first thing that you

4    did?

5         A.   Yes.

6         Q.   Now, you did hear the part in the tape where you asked

7    him when the shooting had happened, right?

8         A.   Right.

9         Q.   And he said about 25 minutes prior?

10        A.   Correct.

11        Q.   Which put it at about 8:30 a.m.?

12        A.   Right.

13        Q.   Now later he indicated, and Miss Foster was asking

14   questions about this, he indicated that he had arrived at 8:45

15   a.m.; is that correct?

16        A.   Yes, sir.

17        Q.   And you recognize that there is a little discrepancy

18   between saying that it happened at 8:30 and he arrived 15

19   minutes after that, right?

20        A.   Yes.

21        Q.   Did you ever make any attempts to clarify that?

22        A.   I did not.

23        Q.   Did it seem that he was, that Mr. Boji was somewhat

24   flustered during this conversation?

25        A.   Emotionally, yes.

26        Q.   And you described him in your reports as frantic,

27   correct?

28        A.   Correct.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 221

 1      Q.   Now, you ultimately did have a chance to walk through
 2   the house, right?
 3      A.   I did.
 4      Q.   In fact, you walked all around the interior of the home
 5   just as a brief canvas of the home, correct?
 6      A.   Correct.
 7      Q.   You were assigned as the lead deputy on scene at that
 8   point?
 9      A.   Yes, sir.
10           MR. MOORE:  Can I get the screen up?
11      Q.   By MR. MOORE:  I'm going to show you -- I'm going to
12   show you what's been marked as 284 for identification.  Thank
13   you for your patience.
14           But do you recognize what that depicts?
15      A.   Yeah.  That's the house.
16      Q.   Is that consistent with the house that you walked
17   through that day?
18      A.   Yes, sir.
19      Q.   And so you entered the front door, which is down here
20   at the bottom of the screen, correct?
21      A.   Correct.
22      Q.   Bottom just to the left of middle.
23           And you walked up a little bit and turned to your right
24   and looked in and saw the decedent -- the deceased on the floor
25   in the bedroom, correct?
26      A.   That's correct.
27      Q.   Then you actually continued around and you walked
28   through the kitchen area, and then back around to the other door

1    into the bedroom, correct?

2        A.   Correct.

3        Q.   So you walked throughout the entire house?

4        A.   For the most part.

5        Q.   For the most part.

6             Did you clear -- were you involved in clearing this

7    residence?

8        A.   I was not.

9        Q.   Were you involved in the collection of evidence?

10       A.   I was not.

11       Q.   But you did document in your report several items that

12   you observed as you walked through the residence, correct?

13       A.   That's correct.

14       Q.   And when you first entered, Deputy White was inside,

15   right?

16       A.   Correct.

17       Q.   Now, who was the person that took the photographs that

18   we could hear being taken during your audio interview, your

19   audiotaped interview?

20       A.   To my recollection it might have been my training

21   officer at the time.  I was on training.

22       Q.   Who was your training officer?

23       A.   Deputy Granado.

24       Q.   And is he -- you're Adam, correct?

25       A.   Yes, sir.

26       Q.   And he's Joe?

27       A.   Yes, sir.

28       Q.   You introduce yourselves in that audio, so I was just

 1     clarifying the players.

 2            So you think that he was the one who was taking those

 3     photographs?

 4     A.   Yes.

 5     Q.   As you were looking into the room where the body was

 6     located, you noted that -- first of all, you were able to see

 7     the shotgun where it was placed in the case, correct?

 8     A.   Yes, sir.

 9     Q.   Did you -- did you have any trouble seeing it where it

10     was placed?

11     A.   Not where it was placed, no.

12     Q.   And you indicated that your recollection was it was on,

13     I believe, a speaker, potentially?

14     A.   Yeah.  There was a rounder by the speaker.

15     Q.   Okay.  Well, and where was the speaker located on the

16     diagram 284, if you recall?

17     A.   When you enter into the room, to the right it was like

18     a dresser right there just like south of it, and the speaker was

19     right there.

20     Q.   Now, it's bigger on the screen behind you, right?

21            Is there a laser pointer up there next to you?

22     A.   There is.

23     Q.   Could you indicate on 284 where the speaker was

24     located?

25     A.   The speaker was about right there.

26     Q.   So just adjacent to the dresser, just above the dresser

27     as you look at the drawing, correct?

28     A.   On the floor next to it.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 224

1      Q.   Correct.  Right.

2           Now, directing -- well, would looking at your report

3   help refresh your recollection as to where you actually saw the

4   shotgun?

5      A.   It would.

6      Q.   Okay.  Now, if you would do so, with the Court's

7   permission, I'd direct you to page 7 of your narrative, or of

8   your report, line 1 and 2.

9           THE COURT:  Go ahead, Deputy.

10          MR. MOORE:  Thank you.

11          THE COURT:  I'm sorry.  What page again?

12          MR. MOORE:  Seven.

13          THE WITNESS:  On top of the dresser was the shotgun.

14     Q.   BY MR. MOORE:  Does that help refresh your

15  recollection?

16     A.   It does.

17     Q.   So the shotgun at the time that you saw it was inside a

18  soft case?

19     A.   Correct.

20     Q.   The butt of it was exposed?

21     A.   Correct.

22     Q.   And it was sitting in, essentially, in the open and on

23  top of the dresser?

24     A.   Yes, sir.

25     Q.   It wasn't concealed underneath anything?

26     A.   No.

27     Q.   It wasn't concealed behind anything?

28     A.   No.

1      Q.   All right.  And you noticed that -- I believe you
2  indicate that you noticed that there was what appeared to be
3  blood on the butt of the weapon that you could see?
4      A.   Correct.
5      Q.   You didn't take any actions with that weapon, did you?
6      A.   I did not.
7      Q.   You also noticed some shotgun shells, spent and
8  unspent, throughout the room, correct?
9      A.   Correct.
10      Q.   I believe you indicated that there was -- well, first
11  of all, did you actually enter into the room or did you just
12  look in and observe?
13      A.   I just looked in.
14      Q.   Okay.  You were trying to be careful not to step in any
15  potential evidence or disturb anything?
16      A.   I didn't want to disturb the crime scene.
17      Q.   At the time that you saw the body on the floor, had
18  life saving efforts already been made, or was there indications
19  that life -- that first responders had been there?
20      A.   I know the first responders were there, but I don't
21  recall any evidence around or any material.
22      Q.   Okay.  Was there anyone actively working on
23  Mr. McCauley at the time that you were there?
24      A.   No.
25      Q.   You indicated that you saw an unspent shotgun shell in
26  between, I believe you indicated in between his armpit area; is
27  that correct?
28      A.   Yes, sir.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 226

1        Q.    When you say "unspent," what does that mean?

2        A.    Unspent, like it's been fired off.

3        Q.    Unspent?

4        A.    I'm sorry.  It's live still.  It has not been fired.

5        Q.    So when you say "unspent," and just so we're clear,

6   that's your language, correct?  It's an unspent round?

7        A.    Correct.  Yeah.

8        Q.    It hasn't been fired?

9        A.    It has not been fired, no, sir.

10       Q.    And you indicated that was in between his armpit area.

11   Could you describe exactly where you saw it, to the best of your

12   recollection?

13       A.    To the best of my knowledge, it was probably in the

14   middle of like his armpit and his -- his arm was laying to the

15   side, and in the middle of his body and the armpit.

16       Q.    Okay.  And just for the record, you're gesturing with

17   your right arm?

18       A.    Yeah.  I don't exactly remember which one, but --

19       Q.    Okay.  Do you recall which side of the body it was as

20   you were looking at it?

21       A.    Not a hundred percent.

22       Q.    What's your best recollection?

23       A.    I want to say left arm.

24       Q.    As you're looking at it, or the decedent's left arm?

25       A.    His left arm.

26       Q.    Okay.  And then there was a spent shell casing by his

27   right foot; is that correct?

28       A.    Yes, sir.

1    Q.    And you saw that it was actually sitting on top of a
2    sheet?
3    A.    Yes.
4    Q.    And when you say "a spent shell casing," you mean --
5    you indicated that it was one that appeared to have been fired?
6    A.    Correct.
7    Q.    And when a shotgun shell is expended or fired, it kind
8    of opens up.  It unfolds at the front to allow the shot out,
9    correct?
10   A.    Correct.
11   Q.    You're familiar with how that looks?
12   A.    Correct.
13   Q.    Do you recall the colors of these casings?
14   A.    I don't recall a hundred percent, no.
15   Q.    Now, when you were talking with Mr. Boji at the scene,
16   we could hear on the audio that there appeared to be some -- a
17   dog or some dogs; is that correct?
18   A.    Correct.
19   Q.    Do you recall -- did you have any knowledge as to where
20   those dogs came from or who they might have belonged to?
21   A.    I believe they were from the house.
22   Q.    From the decedent's house?
23   A.    Correct.
24   Q.    Do you recall where they -- what ended up happening to
25   them, just out of curiosity?
26   A.    There were two white dogs.  I don't know what happened
27   to them.
28   Q.    They didn't get stuck in someone's car?

```
 1      A.   I don't believe so.  I think he held them the whole

 2   time.

 3      Q.   Now, they weren't present in the photographs that we

 4   saw.  Do you know where they were during those photographs?

 5      A.   No.

 6      Q.   And Miss Foster had you take a look at the photos, or

 7   at least some photos from Mr. -- or from the scene of Mr. Boji,

 8   correct?

 9      A.   Correct.

10      Q.   And those were consistent with what you saw when you

11   were there?

12      A.   Yes, sir.

13      Q.   Did you see -- I'm going to show you Exhibit 856 (sic),

14   which appears to be Mr. Boji's right hand; is that correct?

15      A.   Yes, sir.

16      Q.   Were there any injuries that you observed on Mr. Boji's

17   hand?

18      A.   From the photo it looks like the top of his hand and

19   possibly his fingernail, unless that's dirt.

20           MR. MOORE:  May I approach, Your Honor?

21           THE COURT:  Yes.

22           THE CLERK:  Did you say 856?

23           MR. MOORE:  256.  Probably did say 856.  I'm going to

24   blame your handwriting.

25      Q.   BY MR. MOORE:  I'm going to show you 255 as well.

26           Can you tell if there is any injuries on his hand?

27      A.   It looks like on his right hand there is, either looks

28   like dried blood, or it could be a scrape.  Maybe from his
```

```
 1    fingernail.
 2         Q.   Did you ask him if he had any injuries?
 3         A.   I don't believe so.
 4         Q.   Did you document any injuries?
 5         A.   Did not.
 6         Q.   Now, you didn't have Mr. Boji wash up while you were
 7    working with him, correct?
 8         A.   I did not.
 9         Q.   You left him in the condition whence you found him?
10         A.   I did.
11         Q.   In some of these photographs it's clear that his
12    pockets -- I'll show you 259.  His pockets have been, at least
13    appear to have been pulled out.  Is that how they appeared when
14    you were talking to him when you first walked up to him on the
15    sidewalk?
16         A.   I believe so, yeah.
17         Q.   Did you ask him to turn out his pockets?
18         A.   I did not.
19         Q.   Do you know if anybody else did?  Do you have any
20    personal knowledge as to that?
21         A.   I don't.
22              MR. MOORE:  I have nothing further, Your Honor.
23              THE COURT:  Redirect?
24              MS. FOSTER:  Nothing further.
25              THE COURT:  Is this witness excused or subject to
26    recall?
27              MR. MOORE:  I'd ask to be subject to recall.
28              THE COURT:  All right.  Thank you, Deputy.  Have a good
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 230

```
 1   day.
 2           THE WITNESS:  Thank you, Your Honor.
 3           MR. MOORE:  You can bring those with you.
 4           THE COURT:  People, call your next witness.
 5           MS. FOSTER:  The People call Investigator Corey.
 6           THE CLERK:  Please remain standing and raise your right
 7   hand.
 8           Do you solemnly state that the evidence you shall give
 9   in this matter shall be the truth, the whole truth, and nothing
10   but the truth, so help you God?
11           THE WITNESS:  I do.
12           THE CLERK:  Please be seated.
13           Please state and spell your first and last name for the
14   record.
15           THE WITNESS:  Jason Corey.  J-a-s-o-n, C-o-r-e-y.
16           THE COURT:  People?
17           MS. FOSTER:  Thank you, Your Honor.
18                           JASON COREY,
19   called as a witness by and on behalf of the Plaintiff, having
20   been first duly sworn, was examined and testified as follows:
21                        DIRECT EXAMINATION
22   BY MS. FOSTER:
23      Q.   What is your current occupation?
24      A.   I'm an investigator with the Riverside County Sheriff's
25   Department.
26      Q.   And how long have you been with the Riverside County
27   Sheriff's Department?
28      A.   For 23 years now.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 231

1      Q.    And is that the same amount of time you've been a sworn

2   peace officer?

3      A.    No.  I've been a sworn peace officer for 19 now.

4      Q.    And were you part of an investigation on November 10th,

5   2015, involving a Nicholas McCauley?

6      A.    Yes, I was.

7      Q.    And what was your role in that investigation?

8      A.    I was assigned to supervise the crime scene

9   investigation.

10      Q.    And did you have an occasion to go to 25964 Soaring

11   Seagull?

12      A.    Yes, I did.

13      Q.    Is that in Moreno Valley?

14      A.    Yes, it is.

15      Q.    County of Riverside?

16      A.    Correct.

17      Q.    And when you arrived there, who did you come into

18   contact with?

19      A.    There was a forensic technician that was with me, and

20   there was a deputy, uniformed, two uniformed deputies that were

21   on the perimeter guarding the outside of the crime scene.

22      Q.    And you said your role was to supervise the crime

23   scene.  What does that mean?

24      A.    That means we have forensic technicians that work for

25   the sheriff's department, and that they come out and they do --

26   they do the work.  They do the collection, the photographing of

27   the evidence.  And we supervise and decide what we're going to

28   collect, what we feel is significant within the crime scene, to

```
 1   memorialize that for court later on.

 2      Q.   And as part of your job that day at Soaring Seagull,

 3   did you walk through the crime scene?

 4      A.   Yes, I did.

 5      Q.   And that address that I gave you, is that a residence?

 6      A.   Yes, it is.

 7      Q.   I'm going to show you what's been marked for

 8   identification as People's 284.  Do you recognize what's

 9   depicted in People's 284?

10      A.   Yes, I do.

11      Q.   And is this a schematic of the crime scene that you

12   walked through?

13      A.   Yes, it is.

14      Q.   And is it a true and accurate depiction of how you

15   recall it?

16      A.   Yes.

17      Q.   At the time that you walk through the crime scene, do

18   you have it photographed before any evidence is disturbed?

19      A.   Yes, we do.

20      Q.   And did you have that done on November 10th, 2015?

21      A.   Yes.

22      Q.   When you walked through the crime scene, did you see a

23   decedent?

24      A.   Yes, I did.

25      Q.   And was that Nicholas McCauley?

26      A.   Yes, it was.

27      Q.   When you walked through the crime scene, did you enter

28   into what appears to be that first bedroom by the door?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 233

1    A.   Yes, I did.

2    Q.   And what did you observe when you went into that room?

3    A.   Well, I observed initially the decedent that was on the

4    floor, and I also noticed several other items of evidence,

5    shotgun shells, and there was also blood.

6    Q.   At the time that you walked in, did you see an exposed

7    weapon?

8    A.   No.  I don't believe I could see it from -- initially

9    from that door.  It was further into the bedroom.

10   Q.   And did you see a weapon sitting openly on the bed?

11   A.   I believe it was on the dresser is where we recovered

12   that, but I don't recall seeing a weapon on the bed.

13   Q.   Now, if you could walk us through the crime scene.  I'm

14   going to show you what has been marked for identification as

15   People's No. 52.  Do you recognize People's 52?

16   A.   Yes, I do.

17   Q.   What are we looking at in People's 52?  Do you recall

18   this at the crime scene when you saw it?

19   A.   I do.

20        MR. MOORE:  Your Honor, at this point I'm going to

21   object to the continuation of calling this "the crime scene."

22   It's argumentative.

23        THE COURT:  Overruled.  It is relevant.

24        I'm sorry.  You may proceed.

25        THE WITNESS:  So this is a perspective photograph of

26   the decedent and the bedroom where he was located.  This is on

27   the opposite side of the double doors that lead into the living

28   room.

1     Q.   BY MS. FOSTER:  Would it assist to go back to People's

2   284 which doors are we looking at?

3     A.   Yes.  So down here in the bottom portion of the -- of

4   the crime scene sketch, this is the front door.  And then this

5   door, the front door leads to the living room.  It's on the

6   south side.  And there were double doors here that lead into

7   this bedroom where the decedent was.

8          And then on the opposite side through this, through

9   this hallway there was a hallway here that came around.  And

10   then there was a door here on the, that would have been the east

11   side of the -- of that bedroom.

12          So that photograph that we saw, that is a perspective

13   photograph looking into the room, looking westbound into the

14   room towards the decedent and the double doors that lead into

15   the south living room.

16     Q.   So would it be fair to call the double doors the living

17   room doors?

18     A.   Correct.

19     Q.   And the single door the hallway door?

20     A.   Correct.

21     Q.   So in People's 52 are we looking from -- you're saying

22   we're looking from the hallway door; is that correct?

23     A.   Yes.

24     Q.   Show you what's been marked for identification as

25   People's 53.  Is that also from that hallway door?

26     A.   Yes.

27     Q.   And is that where Nicholas's body was when you walked

28   the scene?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 235

1       A.    Yes.

2       Q.    Show you what's been marked as People's 55.  Is

3  People's 55 a wider vantage point of that view from the hallway

4  door?

5       A.    Yes.

6       Q.    Now, when you -- at some point did you enter into the

7  room?

8       A.    Yes, I did.

9       Q.    And at the point that you enter into the room, is that

10  for the collection of evidence as well as your observation?

11       A.    Yes.

12       Q.    And did you see blood scattered throughout the room?

13       A.    Yes, I did.

14       Q.    Showing you what's been marked for identification as

15  People's 12.  Do you recognize what's depicted in People's 12?

16       A.    Yes.

17       Q.    And what is that?

18       A.    So near the center of the photograph here, this is the

19  door that we just described the hallway door on the east side of

20  the bedroom.  And behind this door depicted here are evidence

21  placards 19 and 20, which are shotgun shells.

22       Q.    And are those shotgun shells that are used or unused?

23       A.    Those are unused.

24       Q.    So they're live?

25       A.    They're live rounds, correct.

26       Q.    And to the left of People's 12 there appears to be a

27  red stain.  What is that?

28       A.    This here in the bottom left-hand corner of the

1    photograph, there appears to be a red stain, which based on my

2    training and experience it was blood.

3        Q.    Showing what's been marked for identification as

4    People's Exhibit 3.  What are we looking at in People's Exhibit

5    3?

6        A.    So in this photograph this is another perspective

7    photograph of the scene in the bedroom, and there is placards

8    out.  The crime scene will be photographed initially without

9    evidence placards set down, and then once overall photographs

10   are completed, then once we start identifying items of evidence,

11   we'll set out yellow placards, and we will -- and those placards

12   will, obviously, be numbered.

13          So here we have a number of evidence items that are set

14   out with placards, identified with placards for additional

15   photographing for more memorialization.

16       Q.    And what was the placard No. 18 memorializing?

17       A.    Placard No. 18 is memorializing another live shotgun

18   shell.

19       Q.    Showing you what's been marked for identification as

20   People's 7.  Do you recognize what's depicted in People's 7?

21       A.    Yes.  This is just a further up-close photograph of

22   that -- of that shotgun shell, of evidence item 18, that was

23   found on the bed.  And then they photograph everything in

24   multiple stages, along with further perspective photographs.

25   Then they'll get another up-close photograph with a ruler there

26   just to show size of that item.

27       Q.    I'm showing you what's been marked for identification

28   as People's 4.  Is that a close-up of the placard 24?  I'm

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 237

```
 1   sorry.  23 to 26?

 2        A.   Yes.

 3        Q.   And what is being documented on placard No. 23?

 4        A.   Placard 23 is here on the right side of the photograph

 5   near the middle of the frame, and it's a white cordless phone

 6   with possible blood on it.

 7        Q.   Showing you what's been identified as People's Exhibit

 8   13.  What's depicted in People's 13?

 9        A.   This is a -- this is what ultimately the final

10   photograph of an up-close perspective photograph of an evidence

11   item looks like here, which would be item No. 24.  So here it's

12   a -- what appears to be a fragmented shotgun pellet, a pellet

13   from a shotgun.

14        Q.   And just for orientation sake, do you see that area on

15   People's 4?

16        A.   Yes, I do.  It's near the midportion of the screen

17   towards the left-hand side of the photograph on top of the bed.

18        Q.   And is there also what appears to be blood in that

19   area?

20        A.   Yes, there is.

21        Q.   Now, those different live rounds, were those collected

22   as well?

23        A.   Yes.

24        Q.   I'm showing you what appears to be, I'm sorry, what is

25   marked as People's Exhibit 6.  Do you recognize what's depicted

26   in People's Exhibit 6?

27        A.   Yes.

28        Q.   And what is that?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 238

1        A.   So this is a perspective photograph of evidence Item

2   No. 17, which is at the top of the picture frame.  Placard 17 is

3   on the floor of the bedroom.  There is an evidence ruler in

4   place next to a live shotgun shell.

5        Q.   Showing you People's Exhibit 9.  Do you recognize

6   what's depicted in People's 9?

7        A.   Yes, I do.

8        Q.   And what is that?

9        A.   So in the center of the photograph there is another

10  live shotgun shell in this perspective photograph marked by

11  evidence placard No. 20.  And it also has a ruler for scale and

12  a directional marker placed in the photograph.

13       Q.   I'm showing you what's been marked as People's Exhibit

14  No. 11.  Do you recognize what's depicted in People's Exhibit

15  11?

16       A.   Yes.  We have evidence item placard No. 22 in the

17  frame, and I believe that's the area where we recovered the

18  shotgun.

19       Q.   And that gray item that appears to be long in the

20  center of 22, do you know what that is?

21       A.   Yes.  I believe it's a soft shotgun case, soft sided

22  case for the shotgun.

23       Q.   And is that where you recovered the shotgun from?

24       A.   Yes.

25            MS. FOSTER:  I'm going to ask the deputy to retrieve

26  Exhibit 269.

27            THE COURT:  Deputy?

28       Q.   BY MS. FOSTER:  Investigator, are you familiar with

1    different types of firearms?

2         A.    Yes.

3         Q.    Have you had training regarding firearms?

4         A.    Yes.

5         Q.    What type of training have you had?

6         A.    Well, through the sheriff's department training with

7    handguns, rifles, and shotguns, as well as my time in the

8    military early on when I was younger.

9         Q.    And have you handled different types of firearms?

10        A.    Yes.

11        Q.    Have you handled shotguns?

12        A.    Yes.

13        Q.    Are you familiar with how a shotgun is discharged?

14        A.    Yes.

15        Q.    Are you familiar with the force of a shotgun?

16        A.    Yes, I am.

17        Q.    Do you recognize the type of weapon handed to you and

18   marked People's 269?

19        A.    Yes.  This is the shotgun that we recovered from the

20   scene.

21        Q.    And how do you know that?

22        A.    Well, I recognize it as a Mossberg 12 gauge shotgun,

23   although, it was boxed up from the crime scene.  But it appears

24   to be, based on my recollection, appears to be the same shotgun.

25        Q.    And was this gun photographed as well?

26        A.    Yes, it was.

27        Q.    At the time that you observed the gun, was there any

28   ammunition inside?

1    A.   I believe there was ammunition on the side saddle.  I

2   do not recall if there was ammunition loaded into the shotgun.

3    Q.   And what do you mean "side saddle"?  What are you

4   describing?

5    A.   There is a plastic piece here on the side of the

6   shotgun, which is called the side saddle, where additional

7   rounds, shotgun shells can be loaded into for ultimate loading

8   into the shotgun.

9    Q.   And this type of shotgun, can that be folded or is it

10   always in this fixed position?

11    A.   It's always in this fixed position.

12    Q.   And about what do you think the length of that shotgun

13   is?

14    A.   Oh, gosh.  Are you talking about the barrel or the

15   overall length?

16    Q.   From the butt to the barrel?

17    A.   I would say about three feet.

18    Q.   And are there different types of shotguns?

19    A.   Yes.

20    Q.   Are there short ones and then long?

21    A.   Yes.

22    Q.   Would this be considered a short barrel shotgun or

23   long?

24        MR. MOORE:  Vague.

25        THE COURT:  Overruled.

26        THE WITNESS:  I would consider it a standard barrel,

27   probably a long barrel shotgun.

28    Q.   BY MS. FOSTER:  And how do you hold one of these

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 241

```
 1    shotguns in order to discharge it?
 2        A.   Well, the stock, the stock would be -- would be placed
 3    into the shoulder area.  I'm left-handed, so for me it would be
 4    my left shoulder.  My hand would go here around the grip.
 5        Q.   And just so for clarification, when you say "stock,"
 6    are you saying the bottom?
 7        A.   Yes, the bottom.  This is the stock of the shotgun
 8    here.  This is the butt of the shotgun.  So the stock and the
 9    butt would go into my shoulder.  My hand would go here around
10    the grip, allowing my finger to slip into the trigger guard.
11        Q.   And then -- so the way to discharge that gun, you'd
12    have to grab it from the trigger gun; is that correct?
13        A.   I don't think I understand.
14        Q.   I think I asked it poorly.
15             The way that you're describing, is that how you go
16    about discharging the firearm?
17        A.   This is how I would, yes.
18        Q.   And have you discharged a shotgun like that before?
19        A.   Yes, I have.
20        Q.   And what is that momentum, or does it have a kick?
21        A.   Yes, it has a kick to it.
22        Q.   Can you describe that for us?
23             MR. MOORE:  Relevance, Your Honor.
24             THE COURT:  Overruled.
25             THE WITNESS:  To me it's a significant kick that will,
26    once the -- once the trigger gets pulled and the round is
27    discharged, there is a pretty significant kick in the shoulder,
28    if you're not prepared for it.  Can leave a bruise.  And over a
```

 1 | matter of, you know, a number of rounds fired, can leave a
 2 | significant bruise on the shoulder.
 3 |       MS. FOSTER:  Thank you, Deputy.
 4 |    Q.   BY MS. FOSTER:  I'm going to show you what's been
 5 | marked for identification as People's Exhibit 19.  Do you
 6 | recognize what's depicted in People's 19?
 7 |    A.   Yes, I do.
 8 |    Q.   And what is that?
 9 |    A.   So this photograph, anytime that we have a -- that we
10 | recover a firearm at a scene, what we'll do is we'll process it
11 | there in place as it is, and what we did here.  So this shotgun
12 | is laid out, and you see it in the center of the photograph it's
13 | marked with evidence placard No. 22.  And we lay out butcher
14 | paper, and then as we begin that, as we begin that process, the
15 | evidence ruler will be placed in for scale.  And then the
16 | technicians will go through and begin to label everything as we
17 | process that.
18 |       So here are the initial, it says "Mossberg 12 gauge"
19 | and then the model.  I believe that says "590."  And then you
20 | could see the shotgun is as we recovered it, as we found it here
21 | with the shoulder strap and the side saddle that I described
22 | previously with the live rounds of ammunition stored in that
23 | side saddle.
24 |    Q.   And the live rounds of ammunition that you described in
25 | this exhibit, were those already in the side saddle or were
26 | those added for the photograph?
27 |    A.   No.  Those were already in the side saddle.  That
28 | photograph is how we recovered -- it is exactly how we recovered

1   the shotgun.

2       Q.    So, and those -- those pieces of ammunition on the side

3   saddle, those appear to be six; is that correct?

4       A.    That's correct.

5       Q.    Are those all live rounds?

6       A.    Yes.

7       Q.    And those are in addition to the live rounds

8   photographed in the room?

9       A.    Yes.

10      Q.    Now, you walked through the entire house; is that

11  correct?

12      A.    Yes.

13      Q.    And did you notice blood in other areas?

14      A.    Yes.

15      Q.    At any point while you were at the scene, did you see

16  the reporting party?

17      A.    No.

18           MR. MOORE:  Vague and speculation.

19           THE COURT:  Sustained on vagueness.

20           Do you want to rephrase your question?

21           MS. FOSTER:  I'll move on, Your Honor.

22      Q.    BY MS. FOSTER:  Showing you what's been marked for

23  identification as People's Exhibit 25.  Is People's Exhibit 25

24  one of the photographs you had taken at the scene?

25      A.    Yes.

26      Q.    And what are we observing in People's 25?

27      A.    In the center of the photograph is the perspective

28  photograph of the hallway here, and what we see here is a blood

1    smear on the wall, which is identified as evidence item No. 30.

2         Q.   And when you say "the hallway," is that that hallway

3    that was on the rear side of the bedroom?

4         A.   Yes.

5         Q.   And so from that door exiting the bedroom, is this the

6    wall you look at?

7         A.   Yes.

8         Q.   Do you see that location in People's Exhibit 284?

9         A.   Yes, I do.  So down here at the bottom right-hand

10   corner towards the bottom right-hand corner of the photograph,

11   that wall is a dividing wall between two bedrooms.  And you can

12   see it's also indicated as evidence item No. 30 on the scene

13   sketch.

14        Q.   I guess I should ask, so you observed blood inside the

15   bedroom; is that right?

16        A.   Yes.

17        Q.   Do you observe blood throughout the rest of the house?

18        A.   Yes.

19        Q.   I'm showing what's been marked for identification as

20   People's Exhibit 26.  Is this a close-up of the blood on the

21   wall in People's 25?

22        A.   Yes.

23        Q.   Showing you what's been marked for identification as

24   People's 50.  Do you recognize what's depicted in People's 50?

25             And if you need me to bring it up, I can.

26        A.   Well, if I -- I believe this is here on the right-hand

27   side of this photograph, this is going to be the front door of

28   the residence.  And then this door here is going to lead into,

1    from the living room on the west side of the residence, into the

2    bedroom where the decedent was located.  And these are double

3    doors that I believe were like accordion doors that folded,

4    folded open.

5         Q.    And did you observe blood in this area as well?

6         A.    Yes, I did.

7         Q.    And, for clarification, the doors with the blood on it,

8    where would that be on People's 284?

9         A.    Well, as I indicated before, this is the front door on

10   the west side of the house.  And then the double doors in the

11   photograph we just saw would be located here in this area

12   towards the bottom mid left side of the photograph.

13        Q.    Do you recognize what's depicted in People's Exhibit

14   27?

15        A.    Yes, I do.

16        Q.    And what is that?

17        A.    This is another perspective photograph of another

18   evidentiary item, item No. 31, which is marked on the wall near

19   the mid center of the photograph just slightly left.  I can see

20   evidence placard No. 31 that's taped to the wall, and there's

21   what appears to be a blood smear on that wall.

22        Q.    I'm showing you People's Exhibit 28.  Is this a

23   close-up of that blood smear on that wall?

24        A.    Yes, it is.

25        Q.    And can you tell us in orientation to People's 284

26   where that wall is located from People's 27 and 28?

27        A.    Yes.  Here on the sketch near -- on the right-hand side

28   near the center is evidence placard 31, it's labeled.  It's on

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 246

1    the wall, the hallway wall just outside of the east bedroom.

2        Q.   Showing what's been marked for identification as

3    People's 32.  Do you recognize what's depicted in People's 32?

4        A.   Yes, I do.

5        Q.   What is that?

6        A.   This is a perspective photograph of the hallway

7    continuing around.  In the background of the left-hand side of

8    the photograph is the kitchen.  And on this hallway wall is

9    evidence placard No. 32, which indicates some more blood smears

10   on that wall.

11       Q.   Do you recognize what's depicted on People's Exhibit

12   30?  Is that a close-up of that same blood smear on People's

13   Exhibit 29?

14       A.   Yes.

15            Yes.

16       Q.   Can you tell us where People's 30 and 29 are?  Can you

17   give us the orientation of that based on People's 284?

18       A.   Yes.  Here on the sketch near the center of the sketch

19   here is item 32, and it's on -- it's in the hallway near that

20   closet, which would lead into the living room and kitchen area.

21       Q.   Did you observe blood inside the kitchen as well?

22       A.   Yes, I did.

23       Q.   Showing you what's been marked for identification as

24   People's Exhibit 33.  Do you recognize what's depicted in

25   People's 33?

26       A.   Yes, I do.

27       Q.   Do you see an evidence marker in People's 33?

28       A.   Yes, I do.

1    Q.   Showing you what's been marked for identification as

2  People's 34.  Is that a close-up of that evidence marker?

3    A.   Yes, it is.

4    Q.   And what is the evidence marker identifying in People's

5  34?

6    A.   Here towards the right-hand side of the photograph is

7  evidence placard No. 34, which is taped to the counter in the

8  kitchen.  And there is -- it identifies additional blood smear

9  on the counter in the kitchen.

10    Q.   Do you recognize what's depicted in People's 31?

11    A.   Yes, I do.

12    Q.   And what is that?

13    A.   This is the same kitchen area.  It's the stove in the

14  kitchen.  And near the upper center of this photograph, it

15  appears to be that there's additional blood smear on the edge of

16  the stove.

17    Q.   In People's 32, a close-up of that stove?

18    A.   Yes, it is.

19    Q.   And does there appear to be blood marks on the knobs of

20  the stove?

21    A.   Yes.

22    Q.   And do you see -- where do you see that?

23    A.   Here in the bottom right-hand corner of this

24  photograph, the knob that would be closest to evidence placard

25  33, on the top of it appears to be a blood smear on the top.

26  And then over on the left side of the photograph there is

27  another knob that appears to also have blood on the knob.

28    Q.   And is this a gas stove?

1    A.    Yes, it is.

2    Q.    Is that the type that ignites a flame?

3    A.    Yes, it does.

4    Q.    Showing you what's been marked for identification as

5    People's 21.  Do you recognize what's depicted in People's 21?

6    A.    Yes, I do.

7    Q.    And what is that?

8    A.    This is a perspective photograph of evidence item No.

9    28, which will indicate blood spatter on this wall.  And these

10   specks here in the center of the photograph are the -- what

11   appear to be the blood spatter.

12   Q.    And what do you mean by "blood splatter"?

13   A.    It's just what we -- how we describe blood that is --

14   that impacts a surface.  And as it impacts, it spreads out as it

15   travels from the donor to a flat surface.  And the further it

16   travels away from, the further it is allowed to spread out and

17   then impacts on the wall.

18   Q.    And is People's 22 a close-up of that blood spatter?

19   A.    Yes, it is.

20   Q.    And in orientation to -- one moment.  I'm looking for

21   284.

22         In orientation to 284, where is that blood spatter seen

23   in People's 21 and 22?

24   A.    So down near the bottom right-hand side of the

25   photograph of the scene here is, the sketch of the scene, is

26   evidence item 28, which is on the wall that separates the

27   hallway from the bathroom just outside of the decedent's

28   bedroom.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 249

1     Q.   Do you recognize what's depicted in People's Exhibit

2     23?

3     A.   Yes.

4     Q.   And what is depicted in People's 23?

5     A.   So here in the center of the photograph, from left to

6     right, there is additional blood spatter along the wall that

7     travels horizontally along the wall, and it's identified with

8     evidence placard 29 taped to the wall.

9     Q.   Showing what's been marked for identification as

10    People's Exhibit 24.  Is this a close-up of that area marked by

11    placard 29?

12    A.   Yes, it is.

13    Q.   And what is that depicting?

14    A.   This is depicting the same blood spatter pattern that's

15    traveled horizontally along the wall.

16    Q.   And can you use People's 284 to give us an orientation

17    of where the blood spatter is in People's 24 and 23?

18    A.   Yes.  Here just outside of the decedent's bedroom door

19    along the wall that separates the laundry room from the hallway

20    is evidence placard 29.  So this length of wall here is the wall

21    where that -- that item was identified.

22    Q.   Now, how many shotgun shells were recovered from inside

23    the bedroom, not including those six on the side saddle?

24    A.   I don't recall a total.  There was a few, but I don't

25    recall a total number.

26    Q.   Would it refresh your recollection to review your

27    report?

28    A.   Yes.

1           THE COURT:  Go ahead.

2           MS. FOSTER:  With the Court's permission?

3           THE COURT:  Go ahead, sir.

4           THE WITNESS:  Thank you, Your Honor.

5       Okay.

6    Q.    BY MS. FOSTER:  And how many shotgun shells were

7    recovered outside of the ones on the side saddle?

8    A.    Six live rounds.

9    Q.    Was there a spent round recovered?

10   A.    Yes.

11   Q.    And how many spent rounds?

12   A.    One.

13   Q.    And the live rounds that were recovered, were they in

14   different locations throughout the room?

15   A.    Yes.

16   Q.    Using Exhibit 284, can you tell us where those live

17   rounds were recovered?

18   A.    There was one live round here on the bed.  I believe

19   evidence item No. 17, which was under the bed.  There were

20   rounds, live rounds collected in this area here, evidence

21   placard 19 and 20.  And then I believe over next to the dresser

22   and by the decedent's leg.  I believe 11 and 12 were also live

23   rounds, if I remember correctly.

24   Q.    And where was the spent round?

25   A.    The spent round, I would have to check my report to

26   confirm that.

27   Q.    Would it refresh your recollection?

28   A.    Yes.

1          MS. FOSTER:  With the Court's permission?

2          THE COURT:  Go ahead.

3          THE WITNESS:  The fired shotgun shell was evidence item

4  No. 13, which was located here right by the decedent.

5      Q.   BY MS. FOSTER:  I'm showing you what's been marked for

6  identification as People's Exhibit 5.  Do you recognize what's

7  depicted in People's 5?

8      A.   Yes.

9      Q.   And what is evidence item No. 21?

10     A.   Evidence item No. 21 here towards the left center of

11 the photograph is a cell phone.

12     Q.   And was that item collected?

13     A.   Yes, it was.

14     Q.   And what was done with that item once it was collected?

15     A.   It was logged into evidence.

16     Q.   And at some point was it given for investigation?

17     A.   I believe so, yes.

18     Q.   I have in my hand what's been marked for identification

19 as People's Exhibit 278.

20         THE COURT:  Let me go talk to the lawyers out in the

21 back while we're waiting for some gloves, regarding scheduling.

22         (Discussion held at sidebar, not reported.)

23         THE COURT:  People, do you want to hand the -- you can

24 hand the gloves to the witness and allow him to open it.  It's

25 up to you.  Why don't we do it that way?

26     Q.   BY MS. FOSTER:  I'm holding in my hand what's been

27 marked for identification as People's 278.  Do you recognize

28 what's depicted in People's 278?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 252

1      A.   Yes, I do.

2      Q.   And is that marked with an evidence tag?

3      A.   It is, yes.

4      Q.   And what is the purpose of an evidence tag?

5      A.   For tracking and to -- and to just confirm that this,

6   that the same item that we collected from the scene is the same

7   one that was booked into evidence.

8      Q.   And then does this evidence tag properly indicate the

9   scene that we've been discussing on November 10th, 2015?

10     A.   Yes.

11     Q.   And is this bag sealed?

12     A.   Yes, it is.

13          MS. FOSTER:  At this time if the record could reflect

14   that we cut open the seal?

15          THE COURT:  And, madam prosecutor, one or two of the

16   jurors are trying to look over your shoulder.  If you can let

17   them see what's going on.

18     Q.   BY MS. FOSTER:  Can you remove the contents of People's

19   278?

20          Can you open up the contents of 278 and display it to

21   the jury?

22          THE COURT:  You can stand up, if you wish.

23          THE WITNESS:  Sure.

24     Q.   BY MS. FOSTER:  And what is depicted in People's 278?

25     A.   This is a soft cover for a shotgun.

26     Q.   And is this the soft cover that you saw the shotgun

27   depicted in People's 269 contained inside of?

28     A.   Yes.

```
 1              THE COURT:  You can just hold on to the exhibits.
 2              THE WITNESS:  Sure.
 3              THE COURT:  Just move them out of the way, and then at
 4    the end, over the lunch hour, we can return them back to the
 5    court.
 6         Q.   BY MS. FOSTER:  Handing you what's been marked for
 7    identification as People's 294.  Is that also a sealed evidence
 8    item?
 9         A.   Yes, it is.
10         Q.   And does it have an evidence tag as well?
11         A.   Yes, it does.
12         Q.   And does it indicate that it was retrieved during the
13    investigation on November 10th, 2015?
14         A.   Yes.
15         Q.   And can you open People's Exhibit 294?
16              And what is contained in People's 294?
17         A.   This is a cellular telephone and a charger.
18         Q.   Okay.  And is that the items that you retrieved from
19    the back of Nicholas's bed?
20         A.   Yes.
21         Q.   Showing you what's been marked for identification as
22    People's 281.  Do you recognize People's 281?
23         A.   Yes, I do.
24         Q.   And how do you recognize it?
25         A.   This is a projectile, say the shot shell, or, I'm
26    sorry, the part of the shotgun pellet that we recovered at the
27    scene.
28         Q.   And can you open People's 281?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 254

```
 1              Is this a very tiny item?
 2        A.    Yes, it is.
 3        Q.    Is there another envelope contained inside?
 4        A.    Yes.
 5        Q.    Can you open that envelope as well?
 6              And have you had a chance to look at the contents of
 7   People's 281?
 8        A.    Yes.  That is that projectile that we recovered at the
 9   scene.
10        Q.    And is what's depicted on this screen a true and
11   accurate depiction of what you observed on the scene?
12        A.    Yes.
13        Q.    I'm showing you both sides of People's 281.
14              Handing you what's been marked for identification as
15   People's 271.  Do you recognize what's depicted in People's 271?
16        A.    Yes, I do.
17        Q.    And what is that?
18        A.    This is a shotgun shell.
19        Q.    And how do you recognize it as something that was
20   recovered from the scene?
21        A.    I recognize the writing.  The evidence barcode will be
22   the same that's in my report as evidence item JC No. 11.
23        Q.    And can you open the contents of People's 271?
24        A.    Yes.
25        Q.    Can you display that to the jury?
26        A.    Yes.  This is a live, double-ought buck shotgun shell.
27        Q.    Showing you what's been marked for identification as
28   People's 273.  Is there an evidence tag on People's 273?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 255

```
 1        A.    Yes, there is.

 2        Q.    And what is contained in People's 273?

 3        A.    This is also a live shotgun shell.  Indicated on here

 4   is evidence item JC 16.

 5        Q.    And can you open and display the contents of People's

 6   273?

 7              And what is contained inside of People's 273?

 8        A.    This is a plastic bag containing a double-ought buck

 9   shotgun shell.  It was a live round.  It looks to have come

10   apart or been taken apart.  It's unknown to me.  And in this --

11   in this bag, you can basically see the internal -- the internal

12   workings of the live round, which will be the pellets, the

13   wadding, and the powder for it.

14        Q.    Handing you what's been marked for identification as

15   People's 275.  Does People's 275 have an evidence tag on it?

16        A.    Yes, it does.

17        Q.    And what is contained in People's 275?

18        A.    This is evidence item JC No. 18, which is a live

19   shotgun shell.

20        Q.    Can you open and display the contents of 275?

21              And what is contained in People's 275?

22        A.    This is another live double-ought buck shotgun shell.

23        Q.    And this is as well recovered from the bedroom?

24        A.    Correct.

25        Q.    Handing you what's been marked as People's Exhibit 274.

26        A.    Yes.

27        Q.    And is that also an item recovered from Nicholas's

28   bedroom?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 256

```
 1        A.    Yes, it is.

 2        Q.    And can you recognize that through an evidence tag?

 3        A.    Yes.  This is identified on the evidence tag as

 4   evidence item JC 17, 17, and it's also a live shotgun shell.

 5        Q.    Can you open and display the contents of People's 274?

 6        A.    It's another live double-ought buck shotgun shell.

 7        Q.    Thank you.

 8              Handing you what's been marked for identification as

 9   People's 276.  Do you recognize 276?

10        A.    Yes, I do.

11        Q.    Is that another item recovered from Nicholas's bedroom?

12        A.    Yes, it is.

13        Q.    And does that one also contain an evidence tag?

14        A.    Yes.  This is identified on the evidence tag as JC item

15   19.

16        Q.    And can you display the contents of People's 276?

17        A.    It's another live double-ought buck shotgun shell.

18        Q.    Handing you what's been marked as People's 272.  Is 272

19   another item that was collected from Nicholas's room?

20        A.    Yes, it is.

21        Q.    And how do you recognize this?

22        A.    This is evidence item JC No. 13, 13.  It is a fired

23   shotgun shell.

24        Q.    Can you open item 272 and display the contents?

25        A.    Yes.

26              It's inside of another bag.

27        Q.    What is contained inside of People's 272?

28        A.    This is a fired shotgun shell.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 257

1      Q.    And how is that different in its appearance from the
2  live rounds that you've shown us?
3      A.    The contents from the shell are empty.  What I showed
4  you before with the plastic bag that contain the wadding and the
5  pellets, this one no longer contains the wadding or the pellets.
6      Q.    Handing you what's been marked for identification as
7  279.  Do you recognize People's 279?
8      A.    Yes, I do.
9      Q.    And how do you recognize that?
10     A.    This is evidence item JC 22-B, as in boy, and they are
11  six 12 guage double-ought buck shotgun shells.
12     Q.    Can you open and display the contents of item 279?
13           And are these the six live rounds that were recovered
14  from the side saddle?
15     A.    Side saddle, yes.
16     Q.    Handing what's been marked for identification as
17  People's 277.  Thank you.
18           Do you recognize what's depicted in People's 277?
19     A.    Yes.  This is evidence item JC 20, which is another
20  live shotgun round.
21     Q.    Can you open item 277 and display the contents to the
22  jury?
23     A.    Another live 12 gauge.
24     Q.    Would this be another round that was collected from
25  Nicholas's room?
26     A.    Yes.
27     Q.    Finally, I'm showing you what's been marked for
28  identification as People's Exhibit 280.  Do you recognize what's

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 258

```
 1   depicted in People's Exhibit 280?
 2       A.   Yes, I do.  This is evidence item JC 23, which is
 3   identified as a cordless house phone.
 4       Q.   And can you open the item 2 -- I'm sorry -- 80 and
 5   display the contents?
 6            Can you turn it to both sides?
 7            Is this the bloody phone found on Nicholas's bed?
 8       A.   Yes, it is.
 9            THE COURT:  All right.  Take a seat, sir.
10            All right.  Ladies and gentlemen, I did discuss with
11   the attorneys regarding scheduling about this afternoon.  They
12   have other things to do.  We started late today.  We're going to
13   start at 9 o'clock on Monday.
14            Remember, keep an open mind.  Do not discuss the case,
15   conduct any research.  Court's in recess until 9:00 a.m. Monday.
16   9:00 a.m. Monday.
17       (Proceedings were held out of the presence of the jury:)
18            THE COURT:  Back on the record out of the presence of
19   the jury.
20            There was an objection from the defense that the
21   photographs of the decedent was cumulative.  The Court at this
22   time will cite *People versus Cruz*, 44 Cal.4th 636.  Crime scene
23   photographs are relevant, especially in this particular case.
24            The Court's finding it's not cumulative at this stage,
25   because the way the body is laid out into the room, is to
26   clarify whether or not this was -- that this particular incident
27   was either an accident, a suicide, or some other thing that
28   occurred inside that room.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 259

1        I think the People are free to continue to show these

2   photographs to clarify these issues before -- in front of the

3   jury.  So the Court is citing *People versus Cruz* at this time.

4        MR. MOORE:  Your Honor?

5        THE COURT:  My understanding is you were making that it

6   was prejudicial or too cumulative, I think, was your objection.

7        MR. MOORE:  I don't think we actually made the

8   objection to that.

9        THE COURT:  I think you made an objection, because my

10  understanding was there is some kind of form of objection of the

11  photograph.

12       MR. MOORE:  No.

13       MS. FOSTER:  No.  I think the objection was using the

14  words "crime scene."

15       MR. MOORE:  Right.

16       THE COURT:  Oh.  I can't hear you guys when I'm up

17  here.

18       MS. BLUMENTHAL:  What happened was, at the very

19  beginning there has been so many pictures of like, I don't know

20  how many pictures were of the autopsy, but we've had discussions

21  between us.  We're not objecting to what's been used so far.

22       THE COURT:  All right.  Okay.  Then never mind.  But

23  *People versus Cruz* is still a good case.

24       MS. BLUMENTHAL:  Okay.

25       THE COURT:  All right.  Okay.  Thank you.

26                   (Proceedings concluded.)

27

28

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 260

```
 1                  RIVERSIDE, CALIFORNIA; JULY 2, 2018

 2               BEFORE THE HONORABLE SAMUEL DIAZ, JR.

 3          THE COURT:  Good morning.

 4               (All jurors responded "Good morning.")

 5          THE COURT:  I hope everyone had a good weekend.  I hear

 6     it's going to be very hot next weekend.

 7               I believe we left off opening the exhibits.  I believe

 8     we finished with that; is that correct, madam prosecutor?

 9          MS. FOSTER:  Yes, it is.

10          THE COURT:  All right.  We're back on the record.  All

11     parties are present, all jurors are present.

12               People?

13               And the witness remains on the witness stand.

14          MS. FOSTER:  Thank you, Your Honor.

15                         JASON COREY,

16     called as a witness by and on behalf of the Plaintiff, having

17     previously been first duly sworn, was examined and testified

18     further as follows:

19                    DIRECT EXAMINATION (Resumed)

20     BY MS. FOSTER:

21       Q.   A couple of extra additional exhibits I wanted to ask

22     you about.

23               Showing you what's been marked for identification as

24     People's Exhibit 10.

25          MS. FOSTER:  Showing defense counsel.

26       Q.   BY MS. FOSTER:  Do you recognize what's been depicted

27     in People's Exhibit 10?

28       A.   Yes, I do.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 261

```
 1      Q.   And is that an earlier -- I'm sorry.  A closer copy of
 2   an earlier exhibit showing the cell phone?
 3      A.   Yes, it is.
 4      Q.   And did you document what type of cell phone that was?
 5      A.   I believe I did.
 6      Q.   Would it refresh your recollection to review your
 7   report?
 8      A.   Yes, it would.
 9           MS. FOSTER:  With the Court's permission?
10           THE COURT:  Yes.
11           THE WITNESS:  No, it does not look like I documented
12   the type and model of the cell phone.
13      Q.   BY MS. FOSTER:  And was that cell phone collected with
14   an evidence tag number?
15      A.   Yes.
16      Q.   Did you document the evidence tag number for the cell
17   phone?
18      A.   Yes, I did.
19      Q.   And what was that?
20      A.   1818695.
21      Q.   And was that the same evidence tag number that you saw
22   when you looked at the cell phone, the physical cell phone last
23   week?
24      A.   Yes.
25      Q.   Showing you what's been marked for identification as
26   People's Exhibit 48.  Do you recognize what's depicted in
27   People's Exhibit 48?
28      A.   Yes.
```

1      Q.   And what is that?

2      A.   This is the hallway within just outside of the bedroom

3  where the decedent was located.

4      Q.   I'm showing what's been marked for identification as

5  People's 284.  Can you tell us where this location on Exhibit 48

6  is on People's 284?

7      A.   Yes.  It's going to be this hallway here towards the

8  bottom right-hand corner of the sketch.  It's going to be this

9  hallway here that runs, essentially, in a horseshoe pattern,

10  comes back around into the kitchen area.

11      Q.   Now, going back to People's 48.  Do you see any items

12  of evidentiary -- that you considered evidentiary value?

13      A.   Yes.

14      Q.   And what were those?

15      A.   Those were the possible blood stains on the walls.

16      Q.   Can you highlight for those using that laser pointer

17  where those were at?

18      A.   Yes.  There's one stain here, another on this wall

19  here, and another here on the left-hand side of the photograph.

20      Q.   I'm showing you what's been marked for identification

21  as People's Exhibit 16.

22          MS. FOSTER:  Showing defense counsel.

23      Q.   BY MS. FOSTER:  Do you recognize what's depicted in

24  People's 16?

25      A.   Yes, I do.

26      Q.   And what is that?

27      A.   Well, it is indicated in the photograph it's evidence

28  item No. 27, and it's on the corner of the bed in the decedent's

 1    bedroom.  I can't remember if item 27 was the actual bed sheet
 2    that we collected.
 3         Q.   Would it refresh your recollection to review your
 4    report?
 5         A.   Yes, please.
 6              THE COURT:  Go ahead.
 7              THE WITNESS:  I'm ready.
 8         Q.   BY MS. FOSTER:  Is your recollection refreshed?
 9         A.   Yes.  Item No. 27 is the entire blue bed sheet that we
10    collected off of the bed.
11         Q.   And did you notice -- well, why was this item
12    collected?
13         A.   Because it had possible blood on it.
14         Q.   And is that -- do you see that depicted in the exhibit?
15         A.   Yes, I do.  From the center of the photograph running
16    to the left of the center of the photograph, this red stain here
17    is what we believed to be blood.
18         Q.   And just for context, item 27, what part of the bed is
19    that showing?  Is it showing the closest to the wall or near the
20    side where the decedent was found?
21         A.   If I remember correctly, I believe that this was the
22    area closest on the floor to where the decedent was found.
23         Q.   Showing you what's been marked for identification as
24    People's Exhibit 40 and 37.
25              MS. FOSTER:  I'm showing defense counsel.
26         Q.   BY MS. FOSTER:  Do you recognize what's depicted in
27    People's 40?
28         A.   Yes, I do.

1    Q.   And what is that?

2    A.   That was a vehicle that was located -- well, it's a

3    Chevy Camaro I know that was parked within the crime scene, I

4    believe, but I don't remember where in front of the residence it

5    was parked.

6    Q.   And you said it's a Chevy Camaro that was parked in

7    front of the residence, but you don't recall specifically where?

8    A.   Exactly where, correct.

9    Q.   I'm showing you People's Exhibit 37.  Do you recognize

10   what's depicted in People's 37?

11   A.   Yes, I do.

12   Q.   And is that that same Chevy Camaro?

13   A.   Yes, it is.

14   Q.   And were you able to obtain a license plate from that

15   Chevy Camaro?

16   A.   Yes, I was.

17   Q.   Were you able to make a determination as to who that

18   car was registered to?

19   A.   Ultimately, yes.

20   Q.   And who was that?

21   A.   It belonged to the defendant in this case.

22   Q.   Now, when you say you don't recall where the car was

23   parked, do you recall which side of the road it was on?

24   A.   Yes.  With the last exhibit, I believe I was able to

25   get my bearings on the location with a further perspective

26   photograph.

27   Q.   I'm going to show you what's been marked for

28   identification as People's 39.  Does that also help you get your

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 265

```
1   bearings as to where the car was parked?

2       A.   Yes.

3       Q.   And where is it parked?

4       A.   It's parked -- our crime scene was located at the

5   residence here in the top left-hand corner, and this would have

6   been the north side of the street, and the vehicle was parked

7   just west of the residence.

8       Q.   I'm showing what's been marked for identification as

9   People's 35.

10           MS. FOSTER:  Showing defense counsel.

11      Q.   BY MS. FOSTER:  Do you recognize what's depicted in

12  People's 35?

13      A.   Yes, I do.

14      Q.   And what is that?

15      A.   This is a perspective photograph from the front yard of

16  our target location.  And in the photograph, obviously, there is

17  crime scene tape with a Moreno Valley patrol car.  And then the

18  Camaro belonging to the defendant is parked near the center of

19  the photograph.

20           THE COURT:  I'm sorry.  What number was that?

21           MS. FOSTER:  I'm sorry.  That's People's 35.

22           THE COURT:  Thank you.

23      Q.   BY MS. FOSTER:  Did you also direct for there to be

24  overhead shots taken of the neighborhood?

25      A.   Such as?

26      Q.   Ariel shots?

27      A.   Yes.

28      Q.   I'm showing what's been marked for identification as
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 266

```
 1    People's 41.  Do you recognize what's depicted in People's 41?

 2        A.   Yes, I do.

 3        Q.   And what is of evidentiary value in People's 41?

 4        A.   Well, this is just a -- this is an aerial photograph,

 5    obviously, of our target location here.  Here is the cul-de-sac.

 6    And then this is the residence where our team was located, along

 7    with -- with the decedent.

 8             MS. FOSTER:  May I have one moment, Your Honor?

 9             THE COURT:  Sure.

10             MS. FOSTER:  I have nothing further.

11             THE COURT:  Cross-examination?

12             MR. MOORE:  Yes, Your Honor.  Thank you.

13                         CROSS-EXAMINATION

14    BY MR. MOORE:

15        Q.   Good morning, Detective.

16        A.   Good morning.

17        Q.   How are you doing?

18        A.   Very well.  How about you?

19        Q.   Good.  Thanks.

20             So ultimately you were in charge of processing the

21    residence, correct?

22        A.   Yes.

23        Q.   Were you -- did you also process the vehicle that was

24    located outside?

25        A.   Yes, we did.

26        Q.   Okay.  Were there any items of evidentiary value seized

27    from the vehicle?

28        A.   I don't believe so.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 267

1    Q.   Okay.  Were you able to identify any locations of

2    suspected blood or other biological samples?

3    A.   From the vehicle?

4    Q.   From the vehicle?

5    A.   No.  I don't recall.

6    Q.   You don't recall or --

7    A.   I don't recall if we did.

8    Q.   Is there something that would help you refresh your

9    recollection?

10   A.   My report.

11   Q.   Sure.

12        BY MR. MOORE:  With the Court's permission?

13        THE COURT:  Yes.

14        THE WITNESS:  I'm ready.

15   Q.   BY MR. MOORE:  Okay.

16   A.   No, we did not.

17   Q.   Okay.  Nothing at all, basically, was seized from the

18   vehicle; is that correct?

19   A.   There were three items.  Well, I'm sorry.  One item.

20   Q.   Dominion and control?

21   A.   Yes, sir.

22   Q.   Meaning, something that identified the owner or user of

23   the vehicle?

24   A.   Yes.

25   Q.   Registration?

26   A.   Yes.

27   Q.   Other than that, nothing was seized from the vehicle?

28   A.   Correct.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 268

1    Q.   So your primary focus, since there was nothing of

2    relevance found in the vehicle, your primary focus was going

3    through the residence, correct?

4    A.   Yes.

5    Q.   Inside the residence you had the room in which the

6    decedent was found, correct?

7    A.   Yes.

8    Q.   The bulk of your -- of your evidence was recovered from

9    that room, correct?

10   A.   Yes.

11   Q.   Did you find any weapons elsewhere in the home?

12   A.   No.

13   Q.   Did you find any ammunition elsewhere in the home?

14   A.   No.

15   Q.   So inside -- inside the bedroom, then, let's talk about

16   what you found.  You did find a shotgun?

17   A.   Yes.

18   Q.   It was inside a soft case?

19   A.   Yes.

20   Q.   Otherwise it was unconcealed in the room; is that

21   correct?

22   A.   Yes.

23   Q.   It was unloaded, meaning there was no ammunition inside

24   the firearm?

25   A.   Yes.

26   Q.   However, on the side saddle or side rack, depending on

27   what you're calling it, there were, I believe, five rounds of

28   shot shells?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 269

1    A.   Six.

2    Q.   Six rounds of shot shells.

3         And then an additional how many rounds of live rounds

4    were found on the floor or elsewhere in the room?

5    A.   If I remember correctly, it was six.

6    Q.   And then one spent casing?

7    A.   Yes, sir.

8    Q.   Were you able to determine how many rounds that

9    particular shotgun held?

10   A.   I don't believe I determined that at that point, no.

11   Q.   So, obviously, it appeared to you that the firearm was

12   operable.  It was able to fire?

13   A.   Yes.

14   Q.   Just based on the evidence you had in front of you.

15        Did you do any additional testing or examination of the

16   gun other than to seize it and clear it?

17   A.   No.

18   Q.   And then you booked it into evidence for further

19   processing?

20   A.   Yes, sir.

21   Q.   Now, let's talk about where the items were found in the

22   room.

23        Okay.  I'm going to show you Exhibit 284 for

24   identification.  I'm going to zoom in a little bit on the

25   bedroom that we've been talking about.

26        Now, the rounds that you found inside, do you recall

27   the evidence item numbers that were attributed to them or

28   described to them, given to them by you?

1      A.   I believe they were items 11 and 12, 19 and 20, 17,

2   item 17, which I don't see on here.  And there was one more.  I

3   don't recall if item 10 was a -- a shotgun shell or not.

4      Q.   Okay.  So let's go ahead.  You have your report up

5   there, right?

6      A.   Yes, I do.

7      Q.   And in your report you document what each of the items

8   are, correct?

9      A.   Yes.

10      Q.   Because I want to clear up something that I believe you

11   just misrecollected a couple of times so far.

12          What is item 12, according to your report, if that

13   helps you refresh your recollection?

14      A.   Item 12 is a tennis shoe.

15      Q.   So 12 is not a shot shell?

16      A.   Correct.

17      Q.   There was a shot shell that was found and given item

18   No. 11, correct?

19      A.   Yes, sir.

20      Q.   And that was a live round?

21      A.   Yes, sir.

22      Q.   Was that found on top of the shoe?

23      A.   I believe it was.

24      Q.   Okay.  And if you refer to the narrative of your

25   report, that might help you refresh your recollection.  If you

26   need a line, I can give it to you.

27      A.   Yes, please.

28      Q.   Line 19 on page 11.

1          Is that correct?  Did I misdirect you?

2     A.   No.  I found it.

3     Q.   Okay.

4     A.   Yes, sir, that's correct.

5     Q.   Okay.  So the live round was found on top of the shoe,

6  right?

7     A.   Yes.

8     Q.   And then the other live rounds were item 16, which is

9  depicted where on this?

10     A.   I do not see item 16 here on this.

11     Q.   Okay.  So we'll come back to item 16.

12          Item 17 is also a live shot shell, correct?

13     A.   Yes.

14     Q.   Also not depicted on this, correct?

15     A.   Correct.

16     Q.   Item 18 is a live shot shell?

17     A.   Yes.

18     Q.   And that's the one that was found on top of the box

19  spring right next to the mattress?

20     A.   Yes.

21     Q.   19 is a shot shell, and 20 as well, correct?

22     A.   Yes.

23     Q.   And those were found kind of back by, looks like a

24  music stand near the doorway into the room, correct?

25     A.   Yes.

26     Q.   So we have 11, 16, 17, 18, 19, and 20, the six live

27  rounds that were recovered, correct?

28     A.   Yes.

1     Q.    And we'll talk about where 16 and 17 were in just a

2     moment.

3           And then item No. 13 on this diagram, that's the fired

4     shot shell; is that correct?

5     A.    That's correct, yes.

6     Q.    That was found in between the decedent's right arm and

7     his body, correct?

8     A.    Correct.

9     Q.    Was it underneath him, was it on top, or was it just

10    resting in between, if you recall?

11    A.    I believe it was resting in between.

12    Q.    Now, also on the bed you found the telephone, correct?

13    A.    Yes.

14    Q.    And that was -- well, you found a couple of phones, so

15    I'll be exact.  You found the cell phone that was between the

16    mattress and the wall, resting on top of the box spring, right?

17    A.    Yes.

18    Q.    And then on the bed itself, you found, I believe what

19    is item 23, and I'll show you Exhibit 55.  So on the bed you

20    found that phone, correct?

21    A.    Yes, sir.  This phone here.

22    Q.    And that's the home phone?

23    A.    That is the home phone.

24    Q.    Did you ever make any attempt to determine if the phone

25    line was operational when you were there?

26    A.    I did not, no.

27    Q.    Did you ever locate where the base station for that

28    phone was?

1        A.    I believe it was in the kitchen.

2        Q.    So that is a cordless telephone?

3        A.    Yes.

4        Q.    Did you document where the base station was found?

5        A.    I don't recall if I did or not.

6        Q.    Do you recall taking any photographs of it?

7        A.    It should be in overall photographs, yes.

8        Q.    But do you recall specifically any photographs which

9   specifically depict the base station?

10       A.    No, I do not.

11       Q.    Going back to Exhibit 284 for identification.  Can

12  you -- can you identify where exactly the base station was, to

13  the best of your recollection?

14       A.    To the best of my recollection, it was here in this

15  area where item 34 was -- evidence item 34 was recovered.

16       Q.    Okay.  And so let's now talk about some of the other

17  evidence that you located.  I'm going to switch over to some

18  defense exhibits.

19            MR. MOORE:  I have several exhibits to be marked.

20  What's next in order?

21            THE CLERK:  Next in order is going to be "J."

22            THE COURT:  "J"?

23            THE CLERK:  Yes.

24       Q.    BY MR. MOORE:  Okay.  So I'm going to start with what

25  is being identified as Exhibit J for identification.  This a

26  photograph that was taken at your direction in the bedroom,

27  correct?

28       A.    Yes.

1      Q.   Let me see if I can tune it up a little bit.

2           So, again, I mean, we've seen it before, but we got the

3    bed here.  23 is the home phone, correct?

4      A.   Yes.

5      Q.   24 is the shot, what appeared to be a fragment or a

6    shot pellet?

7      A.   Correct.

8      Q.   And that was found on the bed?

9      A.   Yes.

10     Q.   Did you find any other impact marks or apparent impact

11   marks from, say, a bullet or a pellet, something related to a

12   firearm anywhere else in the room aside from the decedent?

13     A.   No.

14     Q.   I'm going to show you what's been marked as Exhibit K.

15   And then this is the music stand or the guitar stand where the

16   two shot shells were found by the door, correct?

17     A.   Yes.

18     Q.   So now let's go down the hallway.  Exhibit L for

19   identification.  This is a shot right outside the -- right

20   outside the bedroom door, showing you exhibit item, I'm sorry,

21   evidence item 28, correct?

22     A.   Yes.

23     Q.   And then just down the hallway, or across the hallway

24   we have item 29, which is more blood on the wall, correct?

25     A.   Yes.

26     Q.   And that's "M" for identification.

27          And then "N" for identification, we have evidence item

28   30 as we progress down the hall kind of towards the kitchen,

1    right?

2         A.    Yes.

3         Q.    "O" is going to be exhibit, I'm sorry, evidence item

4    31, which is another blood stain on the wall.

5              Now we're getting closer to the kitchen, correct?

6         A.    Yes.

7         Q.    "P" for identification is evidence item 32.  And now --

8    and which is another blood stain on the wall, right?

9         A.    Yes.

10        Q.    And now we can actually see the kitchen down the

11   hallway.  Is that fair to say?

12        A.    Yes.

13        Q.    Okay.  And that's on the left-hand side of the

14   photograph.

15             We get to "Q" for identification, which is in the

16   kitchen; is that right?

17        A.    Yes.

18        Q.    And what we see here is the stove?

19        A.    Correct.

20        Q.    And on the stove, although it's not yet placarded by

21   your helpers, we have blood stains on the front of the stove,

22   correct?

23        A.    Yes.

24        Q.    And those ultimately get evidence item 33; is that

25   correct?

26        A.    Yes.

27        Q.    Okay.  And then, finally, Exhibit R for identification.

28   This is the counter in the kitchen, correct?

1      A.   Yes.

2      Q.   And we got evidence item 34, which is another blood

3   smear?

4      A.   Yes.

5      Q.   Is that right?

6           Okay.  So now is the phone base station here in this

7   photograph, or is it elsewhere in the kitchen?  Does that help

8   refresh your recollection?

9      A.   Well, I don't see the base station there, but I thought

10   it was somewhere in that kitchen area or maybe on the other side

11   of the refrigerator.  I don't recall the exact spot where that

12   phone base was.

13      Q.   Okay.  So going back to evidence, I'm sorry, to Exhibit

14   284 for identification.  We have at least one interpretation of

15   this evidence is basically a trail of blood that's being left by

16   one or, I guess, more people moving down the hallway from the

17   bedroom to the kitchen; is that right?

18      A.   Yes.

19      Q.   In fact, you can almost visualize the progress of the

20   person as they're going down the hallway kind of bouncing off

21   the walls or grabbing onto the wall, correct?

22      A.   Yes.

23           MS. FOSTER:  Objection.  Calls for speculation.

24           THE COURT:  Sustained on speculation.

25           MS. FOSTER:  Move to strike the answer.

26           THE COURT:  If there was an answer, the answer will be

27   stricken.

28      Q.   BY MR. MOORE:  The marks that you see on the wall,

1    specifically at 30, 31, 32, are those consistent with someone
2    placing their hand or a bloody part of their body on the wall as
3    they progressed down the hallway?
4         A.    Based on my experience, yes.
5         Q.    33 and 34, again, you have something bloody, whether
6    it's a body part or something clothing related brushing up
7    against a hard surface in the kitchen, correct?
8         A.    Yes.
9         Q.    Smeared kind of blood, right?
10        A.    Yes.
11        Q.    And then somewhere -- somewhere in the kitchen, based
12   on your recollection, you have the phone cradle, correct?
13        A.    Yes.
14        Q.    So then as we come back down into the bedroom, did you
15   find any smears or transfers of blood, say, on the opposing
16   walls?  Well, I don't know how to phrase this, so I'm just going
17   to withdraw the question.
18             You also found some blood items, some items of evidence
19   more towards the front door of the home, correct?
20        A.    Yes.
21        Q.    Okay.  And that's obscured here, but I'll move up the
22   exhibit a little bit.
23             So down towards the bottom of the photograph now in
24   what's been labeled as the south living room, there is several
25   items.  I believe you have 6, 7, 8, 9, and 5, and 3, and 4.  And
26   I don't know why I read them in that order, but I did.  So if
27   you could just kind of reverse them, more or less.  But we have
28   3 through 9, fair to say, in the living room?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 278

1       A.   Yes.

2       Q.   Okay.  And each of those evidence items is another

3  blood smear or stain either on the floor or on the walls,

4  correct?

5       A.   I believe evidence item No. 9 was a rubber band.

6       Q.   Aah.  Right.  Okay.  So were you ever able to determine

7  where that rubber band came from?

8       A.   I was not, no.

9       Q.   So let's talk a little bit about something we've seen

10 photos of this.  What we have -- I'm going to show you Exhibit H

11 for identification.  Do you recognize what this photo is?

12      A.   Yes, I do.

13      Q.   Okay.  Now, this -- was this one taken at your

14 direction?  Do you know?

15      A.   I don't know if this was one of my photographs or one

16 of the forensic technician's photographs, but all of them would

17 have been taken at my direction.

18      Q.   Okay.  And in the back you can see there's, someone

19 appears to be standing, possibly some sort of EMT, a first

20 responder.  Is that fair to stay?  Or can you tell?

21      A.   I can't tell who that is in the background.  It's

22 somebody taking notes, and then I'm not sure who else that is.

23      Q.   Okay.  But, anyway, this is looking through the front

24 door of the residence towards the bedroom; is that correct?

25      A.   Correct.

26      Q.   And then on the right-hand side you have the folding,

27 or there's kind of pocket doors or folding doors leading into

28 the bedroom where the decedent was, right?

```
 1        A.    Yes.

 2        Q.    Now showing you Exhibit G for identification.  Is this

 3   a closer view of that folding door into the decedent's room?

 4        A.    Yes, it is.

 5        Q.    Okay.  And I'll zoom in just a little bit.

 6              You can see several what look to be handprints or at

 7   least blood leavings on the door itself, correct?

 8        A.    Yes.

 9        Q.    Now, did you ever close that door?

10              To the best of your recollection?

11        A.    I don't believe that we did.  Not that I can remember.

12        Q.    So when you processed the door, you took photographs of

13   this, of the exposed surfaces of the door, right?

14        A.    Yes.

15        Q.    If not this one, similar to this one depicting the

16   blood on the door?

17              Right?

18        A.    Yes.

19        Q.    You never closed the door to determine what was on that

20   inside that's folded up and hidden, right?

21        A.    Not that I recall, no.

22        Q.    And to your knowledge were any photographs ever taken

23   of that concealed portion of the door by law enforcement, by

24   Riverside Sheriff's Department?

25        A.    Not that I remember, no.

26        Q.    Okay.

27              So we don't know if there's anything of interest that

28   might be concealed within the door, we just don't know; is that
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 280

```
 1   correct?

 2       A.   Correct.

 3       Q.   So looking down just a bit in the same location at

 4   Exhibit F for identification.  I'm going to turn this.

 5            You recognize what that depicts?

 6       A.   Yes.

 7       Q.   Okay.  And this is looking into the decedent's bedroom.

 8   In fact, you can see his foot in the top right corner; is that

 9   correct?

10       A.   Yes.

11       Q.   And then we have what appears to be some sort of blood

12   transfer, possibly a footprint down here at the bottom of the

13   photograph; is that right?

14       A.   Yes.

15       Q.   And then, I don't know if you're going to be able to

16   identify where this is.

17            MR. MOORE:  May I approach, Your Honor?

18            THE COURT:  Yes.

19       Q.   BY MR. MOORE:  I'm going to show you Exhibit E for

20   identification.

21            THE COURT:  I'm sorry.  Exhibit what?

22            MR. MOORE:  "E."  Sorry.  I was trying to show the

23   People, but she was running away.

24       Q.   BY MR. MOORE:  Do you know where that might be?

25            And possibly I'll orient you, or I'll approach with

26   Exhibit H for identification, if I may?

27            THE COURT:  Yes.

28            You said, "H"?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 281

```
1              MR. MOORE:  "H."

2              THE WITNESS:  I don't know if these are the same two

3    items.

4         Q.   BY MR. MOORE:  Okay.

5         A.   This might have been at a different point during the

6    processing of the scene when we were removing the decedent.

7         Q.   Sure.

8         A.   From the scene.

9         Q.   Now, you did find -- I'll back up so I'm not just

10   looming over you.

11             You did find some footprints leading, what appeared to

12   be leading from the bedroom to the front door, right?

13        A.   Yes.

14        Q.   I'm going to show you Exhibit E now.

15             I just showed you this up at the stand, right?

16        A.   Yes.

17        Q.   Now, can you tell me exactly where in the house this

18   is?

19             Just by looking at it?

20        A.   Not by looking at it.  Not 100 percent, no.

21        Q.   Okay.  Are those consistent with some of the shoe

22   prints that you saw during your examination of the home?

23        A.   Yes.

24             MS. FOSTER:  Objection.  Assumes facts not in evidence.

25             THE COURT:  Overruled.

26        Q.   BY MR. MOORE:  In fact, when you go back to Exhibit 284

27   for identification, several of these items that are in --

28   documented in the south living room are in fact shoe prints or
```

```
 1   apparent shoe prints left on the floor, correct?
 2        A.   I believe three of those items are, yes.
 3        Q.   Which three of those items are apparent shoe prints
 4   that you had documented?
 5        A.   What we will do is items that we're going to photograph
 6   will get photographed and not collected.  That physical item
 7   will be identified as a letter placard.  So "A" and "B" would
 8   have been shoe prints, and then "C" would have been as well.
 9   And then what we did was if we're going to then collect like a
10   swab and control sample from that area, it would also be given a
11   number placard.
12        Q.   Okay.  And how about "D" up at the top?
13        A.   Same thing for "D," yes.
14        Q.   So "D," just so we're clear, that's consistent with the
15   shoe print or apparent shoe print that's found in Exhibit F for
16   identification, correct?
17        A.   Yes.
18        Q.   It's right in the doorway?
19        A.   Yes.
20        Q.   And then, finally, I'm going to show you what's been
21   marked as Exhibit I for identification.  And are these what were
22   later marked as evidence items 3 and 4 for potential blood
23   evidence left on the wall by the front door of the residence?
24        A.   Yes.
25        Q.   Okay.  And just based on your observations, the shoe
26   prints or apparent shoe prints appeared to be leading from the
27   bedroom door, that folding pocket door to the front door of the
28   residence, correct?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 283

```
 1        A.   Yes.
 2        Q.   And, in fact, you found one or a few apparent bloody
 3   shoe prints leading away from the residence on the walk outside,
 4   correct?
 5        A.   Yes.
 6        Q.   Now, did you ever make any attempt to compare those
 7   shoe prints to anything else that was seized in this case?
 8        A.   I did not, no.
 9        Q.   Did you ever make any attempt to identify the source of
10   the smears or apparent handprints that were left on the walls
11   throughout the house?
12        A.   No.
13        Q.   No fingerprinting was done?
14        A.   No.
15        Q.   No attempt to measure or compare sizes of hands or
16   other appendages?
17             Does that make sense?
18        A.   I don't think I understand.
19        Q.   You didn't compare someone's hand to maybe a bloody
20   handprint that was found on the wall?
21        A.   No.
22        Q.   Or the door?
23        A.   No.
24        Q.   Okay.  Did you find, throughout your search of the
25   home, did you take a look in the sinks or the toilets for any
26   signs of blood having been washed off or discarded?
27        A.   No.
28        Q.   You didn't look?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 284

```
 1        A.    I don't believe we saw any.  If we would, when we did

 2   our overall walk-through of the house, I did not note any of

 3   that in the sinks or in the toilets.

 4        Q.    Okay.  So you at least looked in the sinks, correct?

 5        A.    Yes.  We looked throughout the entire house.

 6        Q.    And there is a kitchen sink, and it's depicted in

 7   several of the photographs that we've seen so far, correct?

 8        A.    Yes.

 9        Q.    I'm going to show you Exhibit R for identification

10   again.  There is a smear at 34 next to the sink, right?

11        A.    Yes.

12        Q.    But you didn't locate any evidence of blood in the

13   sink?

14        A.    I don't believe in the sink, no.

15        Q.    Did you -- and nowhere else in the house did you find

16   any evidence of, say, washing up or showering while bloody; is

17   that correct?

18        A.    Correct.

19        Q.    Did you find any items of discarded bloody clothing

20   scattered in the house or anywhere concealed in the house?

21        A.    No.

22        Q.    In the trash cans?

23        A.    No.

24        Q.    Did you look in the trash cans?

25        A.    I believe we did, yes.  I typically do in scenes.  I

26   look in the trash cans.

27        Q.    That would be important to know if maybe someone was

28   trying to throw something away and hide it, right?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 285

```
1        A.    Yes.

2        Q.    So that would be standard procedure for you to look?

3        A.    Yes.

4        Q.    And there's nothing documented, at least; is that fair

5   to say?

6        A.    Yes.

7        Q.    And you don't have any recollection of finding anything

8   in the trash cans?

9        A.    No.

10             MR. MOORE:  I have nothing further, Your Honor.

11             THE COURT:  All right.  Redirect?

12             MS. FOSTER:  Yes, sir.

13                        REDIRECT EXAMINATION

14  BY MS. FOSTER:

15       Q.    Just briefly.

16             You were shown some photographs of bloody shoe prints.

17  Do you recall that?

18       A.    Yes.

19       Q.    And you documented where those shoe prints were located

20  using letters; is that correct?

21             On Exhibit 284?

22       A.    Yes.

23       Q.    Did you document or did anyone that you were overseeing

24  during the investigation document bloody shoe prints that were

25  consistent with the trail of blood that went through the

26  hallway?

27       A.    I believe I noted something in my report about prints

28  that were located on the floor that were not the same as the
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 286

```
 1   shoe prints.

 2       Q.   Would it refresh your recollection to remember what you

 3   documented?

 4       A.   Yes.

 5            MS. FOSTER:  With the Court's permission?

 6            THE COURT:  Yes.

 7            THE WITNESS:  Okay.

 8       Q.   BY MS. FOSTER:  Is your recollection refreshed?

 9       A.   Yes.

10       Q.   What did you document as it refers to prints on the

11   floor in that hallway following that trail?

12            MR. MOORE:  I'm going to object to relevance as phrased

13   as to what's documented.

14            THE COURT:  Overruled.

15            THE WITNESS:  Well, I had a criminalist from -- I'm

16   sorry -- DOJ come out to the crime scene, and he photographed

17   and noted there was what appeared --

18            MR. MOORE:  Objection.  Hearsay.

19            THE COURT:  Do you want to rephrase the question

20   whether or not this officer was present?

21            MS. FOSTER:  Yes.

22       Q.   BY MS. FOSTER:  When the criminalist came from DOJ, did

23   you follow him as he took his photographs?

24       A.   Yes, I did.

25       Q.   Okay.  What did you observe in regards to any prints

26   that you noted along the hallway?

27       A.   I observed what appeared to be a faint footprint, but

28   we couldn't confirm that, so I had that criminalist observe that
```

1     and photograph that for documentation.

2         Q.   And during the time that you took that trail, did you

3     notice any shoe prints consistent with ones you saw in "A"

4     through "D"?

5         A.   No.

6         Q.   Beyond that area leading into the hallway where we saw

7     evidence item 32, did you see any shoe prints leading in that

8     area?

9         A.   No.

10        Q.   In the kitchen area did you observe any shoe prints?

11        A.   No.

12             MS. FOSTER:  May I have one moment, Your Honor?

13             THE COURT:  Yes.

14        Q.   BY MS. FOSTER:  And when you saw the decedent's body,

15    did he have any shoes on or footwear?

16        A.   No.

17        Q.   Do you also recall -- do you recall any other floor

18    stains being observed when you do your walk-through with DOJ?

19        A.   I don't understand "floor stains."

20        Q.   Consistent with what you just described as a possible

21    bloody footprint?

22        A.   Not that I recall, no.

23             MS. FOSTER:  Your Honor, I have in my hand three

24    photographs, which I'd like to mark People's next in order.  And

25    I'll mark on the back of them.

26             THE CLERK:  I'm not sure what that is, because I have a

27    stack.

28             THE COURT:  All right.  Why don't you come to the clerk

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 288

```
 1   and show.

 2           MS. FOSTER:  I'm writing 319 through 321 in the bottom

 3   left-hand corner.

 4           May I approach?

 5           THE COURT:  Yes.

 6           I'm sorry.  Beginning at 319?

 7           MS. FOSTER:  Yes, Your Honor.

 8       Q.   BY MS. FOSTER:  I want you to take a look at People's

 9   319 through 321.  Do you recognize 319 through 321?

10       A.   Yes.

11       Q.   Are those the photographs that were taken of that

12   bloody stained area you're referring to when you were following

13   DOJ?

14       A.   Yes.

15       Q.   And are they true and accurate depictions of your

16   observations?

17       A.   Yes.

18       Q.   Handing you first People's Exhibit 321.  Do you

19   recognize what's depicted in People's 321?

20           What area of the house is this, let me ask you that?

21       A.   This is in the family room area on the north side of

22   the residence.

23       Q.   And in People's 321 do you see that area what you were

24   describing as a possible bloody footprint?

25       A.   Yes, I do.

26       Q.   And where is that, using the laser pointer?

27       A.   Near the bottom center of the photograph there is a

28   placard and an evidence ruler placed down by the criminalist
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 289

1    from Department of Justice.

2         Q.   Showing you what's been marked for identification as

3    People's 320.  Do you recognize what's depicted in People's 320?

4         A.   Yes, I do.

5         Q.   And at the top left corner of People's 320, what are we

6    looking at there?

7         A.   In the top left corner this is another perspective

8    photograph of that same print with evidence item placard 1 for

9    DOJ and the ruler for scale.

10        Q.   And what are we looking at in the bottom photograph on

11   320?

12        A.   The bottom photograph here is just a closer up close-up

13   photograph of that item.

14        Q.   And by "item" you mean that possible bloody footprint?

15        A.   Of the print, yes.

16        Q.   Showing you what's been marked for identification as

17   People's Exhibit 319.  Do you recognize what's depicted in

18   People's Exhibit 319?

19        A.   Yes.

20        Q.   And what is that?

21        A.   This is another photograph of that same print, also

22   along with the Department of Justice ruler for scale placed

23   down.

24        Q.   Was that the only area in what you saw what you thought

25   could be a possible bloody footprint?

26        A.   I believe so, yes.

27        Q.   Were there other areas in which there were blood on the

28   floor?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 290

```
 1        A.   I don't recall.

 2        Q.   Did you walk around with DOJ the entire time that they

 3   do their photographing?

 4        A.   Yes.

 5        Q.   Did you also have a chance to review their report?

 6        A.   No.

 7        Q.   As you walked around with DOJ while they did their

 8   photographing, did you notice whether they were marking the

 9   different areas either with placards or rulers?

10        A.   Yes.

11        Q.   And were they doing that?

12        A.   Yes.

13        Q.   I have in my hand what's marked for identification as

14   People's 322, marking in the bottom left corner.

15             MS. FOSTER:  I'm showing defense counsel.

16             May I approach, Your Honor?

17             THE COURT:  Yes.

18        Q.   BY MS. FOSTER:  Do you recognize People's 322?

19        A.   Yes.

20        Q.   And is it an item that was recorded during your

21   observation of DOJ?

22        A.   Yes.

23        Q.   And is it a true and accurate depiction of what you

24   recall seeing?

25        A.   Yes.

26        Q.   Showing you 322.  Do you recall what you were observing

27   in item 322?

28        A.   Yes.  Up here in the top right-hand corner is just
```

1    another faint blood print on the floor.  And the criminalist

2    from Department of Justice placed a placard along with the ruler

3    for scale.

4         Q.    And what is at the bottom photograph of 322?

5         A.    The bottom photograph is just a close-up photograph of

6    what the criminalist took in item No. 3.

7              MS. FOSTER:  I have nothing further.

8              THE COURT:  Defense?

9              MR. MOORE:  Sure.

10                        RECROSS-EXAMINATION

11   BY MR. MOORE:

12        Q.    Just so I'm clear, where are the observations depicted

13   in 322 located in the house?  Do you recall?

14        A.    Yes.  This is going to be towards the -- in the upper

15   right-hand photograph up on the screen, this is going to be the

16   northern part of the -- this is in the, it's basically in the

17   area between the living room, the kitchen, and the hallway, this

18   horseshoe-shaped hallway on the north side of the residence.

19        Q.    Okay.  So I'll show you 284 for identification.  You're

20   talking about a transition between, say, this area on the left

21   of the closet and this area on the right of the closet as we

22   look at it?

23        A.    Yes.  It's going to be located right in here, in the

24   entry area to that hallway.

25        Q.    Okay.  So going back to the initial exhibit, which is

26   322.  Now, there is a placard depicted in the top kind of

27   perspective shot, right?  That's placard 3?

28        A.    Yes.

1    Q.   That looks like a Riverside Sheriff's placard; is that

2    correct?

3    A.   It's similar to one, yes.

4    Q.   But it's not -- so if you have evidence item 3 that

5    you've collected, that has nothing to do with this, what's

6    depicted in this exhibit; is that correct?

7    A.   Correct.

8    Q.   This was somebody else's observation; is that fair to

9    say?

10   A.   Part of it, it was part of the criminalist's

11   investigation for the blood stain patterns that we had at the

12   house, yes.

13   Q.   Okay.  Now, did you do any testing on this particular

14   print?

15   A.   I did not, no.

16   Q.   And did you do any testing on the apparent bloody print

17   that was left behind in Exhibit 320 for identification?

18   A.   I did not, no.

19   Q.   In fact, you didn't even document the presence of the

20   first print or apparent print, which is depicted in evidence

21   item, or, I'm sorry, Exhibit 322; is that correct?

22   A.   Yes, I documented it.

23   Q.   Where is that documented?

24   A.   In my report on page 10, line 15 where it indicates

25   kitchen and family room evidence that was collected.  Blood

26   stains on the floor of the family room are located by Forensic

27   Technician Devore.  The blood stain was believed to be bloody

28   feetprints.  The prints were faint and only a right and slight

 1   ridge detail could be seen.  The prints were photographed.

 2           MR. MOORE:  I'm going to object as lacking foundation

 3   and nonresponsive and move to strike.

 4           THE COURT:  Overruled.

 5           MR. MOORE:  For the contents of that statement, Your

 6   Honor.

 7           THE COURT:  Overruled.

 8           MR. MOORE:  All right.

 9   Q.    BY MR. MOORE:  So -- well, that was with regard, you're

10   talking on page 10, line 24?

11   A.    Yes.

12   Q.    Is that correct?

13   A.    24 through 27.

14   Q.    Okay.  You indicated that there were blood stains on

15   the floor in the family room near a lounge chair, right?

16           That's what you said in your report?

17   A.    Yes.

18   Q.    Is there a lounge chair that was visible or anywhere

19   near the exhibit in -- well, the item in Exhibit 322?

20   A.    Just outside of that photograph.

21   Q.    Showing you Exhibit 320.  In the perspective shot is

22   that the lounge chair that you're referring to?

23   A.    In that general area, yes.

24   Q.    Okay.  Now, that's a different smear on the floor,

25   correct?

26   A.    Yes.

27   Q.    Did you -- well, and you said that -- you indicated

28   that at least some people were able to see faint ridge detail?

1      A.   Yes.

2      Q.   Indicating it could be a handprint or a footprint?

3           Is that correct?

4      A.   Once I observed it, I didn't believe it to be a

5 handprint, no.

6      Q.   Okay.  Ridge detail is consistent with either a

7 handprint or a footprint; is that correct?

8      A.   A bare footprint, yes.

9      Q.   Well, did you ever make any attempt to identify the

10 source of that print or the apparent print?

11      A.   I did not, no.

12      Q.   Throughout the entirety of the hallway, from the door

13 to the bedroom all the way up to, say, this closet area, did you

14 observe any blood staining at all on the floor?

15      A.   Not that I recall.

16      Q.   Is that something that you would have documented in

17 your report?

18      A.   It would have either been documented by me or the

19 criminalist that came out from DOJ in his investigation for

20 those blood stain patterns.

21      Q.   Did you notice any obvious droplets of blood?

22      A.   Not that I recall, no.

23      Q.   And we're talking about this hallway area.

24           Did you notice any pools of blood on the floor in the

25 hallway area?

26      A.   No.

27      Q.   Excuse me.

28           Did you notice any possible or apparent footprints on

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 295

```
 1   the floor in the hallway area?

 2        A.   Not that I recall, no.

 3        Q.   Did you locate anything else with apparent ridge detail

 4   on the floors in the residence, aside from the two items that

 5   you've seen documented so far?

 6        A.   Not that I recall, no.

 7             MR. MOORE:  I have nothing further, Your Honor.

 8             THE COURT:  People?

 9             MS. FOSTER:  One moment, Your Honor.

10             THE COURT:  Sure.

11                     FURTHER REDIRECT EXAMINATION

12   BY MS. FOSTER:

13        Q.   Just ask you a quick question.

14             You testified that when you observed the item depicted

15   in People's 319 that you observed ridge prints; is that correct?

16             That's what you testified?

17        A.   Yes.

18        Q.   And do you recall testifying that you do not observe it

19   to be a handprint?

20        A.   Yes.

21             MR. MOORE:  Objection.  Speculation.

22             THE COURT:  I'm sorry.

23             MR. MOORE:  Foundation.

24             THE COURT:  You want to rephrase the question?  Lack of

25   foundation.

26        Q.   BY MS. FOSTER:  When you were cross-examined, you were

27   asked whether or not it could be a handprint or a footprint?

28             MR. MOORE:  Objection.  Relevance.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 296

1          THE COURT:  Overruled.

2     Q.   BY MS. FOSTER:  Do you recall that?

3     A.   Yes.

4     Q.   And do you recall responding that you could not have

5  observed it to be -- when you observed it, could not have been a

6  handprint?

7          MR. MOORE:  Objection.  Relevance.  Foundation.

8          THE COURT:  Overruled.

9     Q.   BY MS. FOSTER:  And can you give us your specific

10  background and training and experience as it comes to observing

11  crime scenes of particularly in homicides or violent crimes?

12     A.   Yes.  I have training in -- I'm not an expert in blood

13  stain pattern analysis, that's why I call the criminalist out

14  from DOJ, however, I've been involved in over 120 homicide and

15  officer-involved-shooting investigations.  During those

16  investigations, there has been in all of them, obviously, blood

17  stain patterns that were there.  So based on those crime scenes,

18  I've been able to observe and draw conclusions from those scenes

19  and gain experience from those.

20     Q.   And based on your experience, why did you believe this

21  to be a footprint?

22          MR. MOORE:  Objection.  Foundation.

23          THE COURT:  Overruled.

24          THE WITNESS:  In the overall looking at it from, not

25  from this close-up photograph, but in looking at it when

26  Forensic Technician Devore first located it, we could see a

27  slight pattern, not a full pattern of a foot but of, I believe

28  it was a heel and part of the center of the foot.

```
1            MS. FOSTER:  I have nothing further.
2            THE COURT:  Defense?
3                    FURTHER RECROSS-EXAMINATION
4   BY MR. MOORE:
5       Q.   So in your report you stated that the prints, and we're
6   talking about this print here, I believe, the one near the
7   observation No. 1 near the lounge, the prints were faint and
8   only slight ridge detail could be seen, correct?
9       A.   Yes.
10      Q.   Did you do anything at all to attempt to develop or
11  otherwise visualize that print?
12      A.   Yes.
13      Q.   What did you do?
14      A.   I called the criminalist from the Department of Justice
15  to come out and conduct a thorough investigation, because he's
16  an expert, and he can do the necessary photographs and take
17  those back for later expert conclusions.
18      Q.   Okay.  So you felt that it was beyond your expertise to
19  form an adequate conclusion.  You called in the Department of
20  Justice?
21      A.   Yes.
22      Q.   Are you familiar with chemicals or other techniques
23  that you can use to enhance the appearance of blood at a crime
24  scene?
25      A.   Yes.
26      Q.   There's chemicals that you can spray that will show you
27  where blood is that might not be visible to the naked eye,
28  right?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 298

```
 1        A.    Yes.
 2        Q.    And then they have things that are called alternative
 3   light sources that can help highlight blood or other biological
 4   samples, correct?
 5        A.    Yes.
 6        Q.    Did you do any of that to help you further identify
 7   what these possible prints or smears were?
 8        A.    No.
 9        Q.    Do you know, did anybody else do such a thing?
10        A.    No.
11        Q.    Were you ever able to do a comparison between any of
12   these, well, either of these two observation smears, 1 or 3, as
13   depicted in these exhibits to any possible source or donor of
14   that blood?
15        A.    No.
16        Q.    In fact, did you ever confirm that it was blood?
17        A.    I did not, no.
18              MR. MOORE:  Nothing further.
19              THE COURT:  People?
20              MS. FOSTER:  Nothing further.
21              THE COURT:  All right.  Thank you, sir.
22              THE WITNESS:  Thank you, Your Honor.
23              THE COURT:  Subject to recall.
24              All right.  People, call your next witness.
25              MS. FOSTER:  Thank you.  The People call Deputy
26   Grotefend.
27              THE COURT:  I'm sorry.  Deputy who?
28              MS. FOSTER:  Grotefend.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 299

```
1              THE COURT:  Okay.  Thank you.
2              THE CLERK:  Please remain standing and raise your right
3    hand.
4              Do you solemnly state that the evidence you shall give
5    in this matter shall be the truth, the whole truth, and nothing
6    but the truth, so help you God?
7              THE WITNESS:  I do.
8              THE CLERK:  Please be seated.
9              Please state and spell your first and last name for the
10   record.
11             THE WITNESS:  Paul Grotefend.  P-a-u-l,
12   G-r-o-t-e-f-e-n-d.
13             THE COURT:  People?
14             MS. FOSTER:  Thank you, Your Honor.
15                        PAUL GROTEFEND,
16   called as a witness by and on behalf of the Plaintiff, having
17   been first duly sworn, was examined and testified as follows:
18                        DIRECT EXAMINATION
19   BY MS. FOSTER:
20       Q.   What is your occupation and assignment?
21       A.   I am an investigator for the Riverside County Sheriff's
22   Department, and I am currently assigned to the Computer and
23   Technology Crime High-Tech Response Team.  CATCH for short.
24       Q.   And how long have you been with the CATCH Team?
25       A.   I've been with the CATCH Team for a little over four
26   years.  About four years now.
27       Q.   What does the CATCH Team do?
28       A.   Our role is to assist investigators countywide in
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 300

1    examination of digital devices, computers, cellular phones,

2    closed circuit television, digital video recorders, and then

3    also assisting in investigations such as network intrusion and

4    computer crime investigations.

5         Q.    And is there a certain specialized training that comes

6    with being part of the CATCH Team?

7         A.    Yes.

8         Q.    And what type of training and experience do you have as

9    it relates to cell phone tech investigations?

10        A.    I have been trained by Cellebrite.  It's a private

11   company that -- that has designed and markets software and

12   hardware solutions for extraction of cellular devices.  I'm a

13   Cellebrite certified logical examiner and physical analyst.

14   Those are two certifications that I got upon completion of that

15   training.  And I've had since then updated training as an

16   ongoing for that from the company.

17         I've also had training from the California Department

18   of Justice in cell phone examinations and extractions.  I've had

19   training from private companies, such as, H-11 Digital Forensics

20   and Telo Technology in advanced cell phone extractions,

21   including chip-off extractions and insistent programming

22   extractions.

23         I've also had training in the operating systems of

24   cellular phones, including database, forensics.

25        Q.    Okay.  And when you say the term "extractions, "what

26   are you speaking -- specifically what do you take from the

27   phone?

28        A.    When I'm discussing extractions, I'm talking about

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 301

```
1    pulling data from the phone, or making a copy of data from the
2    phone.
3         Q.   And what kind of data are you able to pull from a
4    phone?
5         A.   It is very phone specific on what data the phone allows
6    us to pull.  It's a communication with a forensic tool or a
7    software program communicating with a phone in trying to attempt
8    to pull some of that data.
9         Q.   So when you say "it's phone specific," does it matter
10   who the phone is connected to or what type of phone it is?
11        A.   It's typically a combination, whether it's supported
12   for our basic or advanced techniques.  It's a combination of the
13   make and model of the phone, the type of operating system that
14   it's running.  And in some cases the version of operating system
15   dictates what data we're able to pull from the phone for
16   examination.
17        Q.   And are you familiar with a case -- I'm sorry.
18             Now, as far as your participation in investigations, at
19   what part are you brought into the investigation?
20        A.   For most investigations we're brought in after the fact
21   or when investigators are either on scene.  We can help examine
22   devices on scene in some cases.  In other cases devices are
23   brought to us at our lab by an investigator in helping them
24   extract data.
25        Q.   And so did you participate in the investigation of
26   Houston Boji?
27        A.   I assisted Investigator Dean in -- on the Boji case,
28   yes.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 302

1     Q.    And that was given to you via case number; is that
2     correct?
3     A.    Yes, it was.
4     Q.    And was that MV15-3140129?
5           Would it refresh your recollection?
6     A.    Yes.  Sorry.  I'd have to refer to my report for the
7     exact case number.
8           THE COURT:  Go ahead.
9     Q.    BY MS. FOSTER:  Was it was ending in 0129?
10    A.    Yes, it was.
11    Q.    And what type of -- well, let me go back.
12          How many cell phones -- were you given cell phones in
13    this case?
14    A.    Yes, I was.
15    Q.    And how many cell phones were you given?
16    A.    I examined three cellular devices.
17    Q.    Can you describe for us what type of phones you
18    examined?
19    A.    I examined a Nokia cellular device, I examined a ZTE
20    cellular device, and I also examined an Apple iPhone, cellular
21    phone.
22    Q.    Showing you what's been marked for identification as
23    People's Exhibit 10.
24          MS. FOSTER:  And now showing defense counsel.
25          May I approach?
26          THE COURT:  Yes.
27    Q.    BY MS. FOSTER:  Do you recognize what's depicted in
28    People's Exhibit 10?

```
1        A.    Yes, I do.

2        Q.    And what is it?

3        A.    This is a ZTE cellular device that was submitted to our

4   lab for examination.

5        Q.    And is People's 10 a true and accurate depiction of the

6   one you received?

7        A.    Yes.

8        Q.    I'm going to show you what's been marked for

9   identification as People's 294.

10            MS. FOSTER:  Showing defense counsel.

11            May I approach?

12            THE COURT:  Yes.

13       Q.    BY MS. FOSTER:  Do you recognize the exterior of

14   People's 294?

15       A.    Yes.

16       Q.    And does that include an evidence tag?

17       A.    Yes, is does.

18       Q.    And is that evidence tag consistent with the tag you

19   received when you got that ZTE cell phone?

20       A.    Yes.

21       Q.    And is that, in fact, the packaging you received for

22   the ZTE cell phone?

23       A.    Yes, it was.

24       Q.    And can you look in the contents of People's 294?

25            Can you show the contents to the jury?

26            Do you recognize the contents of People's 294?

27       A.    Yes, I do.

28       Q.    And what is that?
```

1       A.   This is the ZTE cell phone that I examined.

2       Q.   Now, you described for us earlier several different

3   processes, depending on the phone.  Do you recall the process

4   specifically used to retrieve information from that phone?

5       A.   Yes, I do.

6       Q.   And what was that?

7       A.   The device contained a SIM card, which is a subscriber

8   identity module.

9       Q.   And just for clarification, is that little white card

10  that gets stuck inside the back of phones?

11      A.   There are many different colors.  This one, I believe,

12  was AT&T, and so it was not white.  But -- well, I would have to

13  refer to my report for the color.  I took a photo of it for my

14  report.  May I refresh my recollection?

15           THE COURT:  Yes.

16           THE WITNESS:  Okay.  There we go.  It was white and

17  orange with an AT&T logo in this case.

18           I removed that from the phone first and used a

19  Cellebrite's touch device to extract data from that SIM card.

20      Q.   BY MS. FOSTER:  And what is a Cellebrite touch device?

21  What does that mean?

22      A.   So, like I said before, Cellebrite is a company that

23  designs both hardware to communicate with cellular devices and

24  subscriber identity modules, SIM cards.  And they also design

25  software.  In this case the Cellebrite touch device is a

26  standalone device that runs a Microsoft Windows operating

27  system, kind of embedded in it with the touch screen.  And it

28  has connections for the source, as well as a SIM card, and then

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 305

 1    provides for a destination that would plug in any 8.2 USB drive

 2    and generate the reports to that.

 3          The device runs Cellebrite proprietary software,

 4    Windows software, and is able to communicate with either the

 5    phones or the SIM card by us manipulating some options on the

 6    screen and telling it what we would like to extract.

 7    Q.   So, and just so we're clear, you took the SIM card and

 8    inserted it into the Cellebrite device to pull the data?

 9    A.   Yes, I did.

10    Q.   Okay.  So, and were you able to retrieve any text

11    messages off of the ZTE phone?

12    A.   Off of the phone or the SIM card?

13    Q.   Off of the SIM card first?

14    A.   The SIM card did not contain any text messages.

15    Q.   Okay.  So since you couldn't find text messages on the

16    SIM card, did you use another step or another option to try and

17    retrieve that information?

18    A.   Yes.

19    Q.   And what was that?

20    A.   Our first inclination is always to use the Cellebrite

21    device to communicate with the phone and extract data.  To do

22    that the Cellebrite software has to be able to have a profile to

23    communicate with, with this device.  In this case there was no

24    profile and it was unable to communicate with the device because

25    of this operating system wasn't supported.  So I, the next

26    method was to grab a camera and scroll through and take photos

27    of the contents located on the device.

28    Q.   Were you able to power up the cell phone?

1      A.    Yes, I was.

2      Q.    And then once you powered up the cell phone, what did

3  you do next?

4      A.    Well, the device was initially powered on inside of a

5  faraday box, f-a-r-a-d-a-y.  And this is a specialized container

6  that blocks radio signals, including cell phone, the cellular

7  signals, wireless networking, bluetooth.  It blocks them but

8  allows us to access the device and place it in airplane mode.

9      Q.    And after you placed the phone in airplane mode and

10 were able to block the access to it, what did you do next?

11     A.    Once the radios were turned off, I was able to pull it

12 out of the box and set it in a holder that allowed me to take

13 still photographs of the screen.

14     Q.    So when you're saying you took still photographs,

15 you're saying you actually looked at the phone and looked page

16 by page and photographed it, correct?

17     A.    Yes.  Screen by screen through the content I located.

18     Q.    And specifically as it relates to text messages, did

19 you observe text messages on the screen?

20     A.    Yes, I did.

21     Q.    Can you estimate for us about how many text messages?

22           Hundreds?

23     A.    A couple hundred.  I couldn't tell you exact number.

24     Q.    Did you specifically look at text messages that were

25 near the date of the crime or, I mean, let me say near the date

26 of -- near the date that Nicholas died, November -- I'm sorry --

27 10th, 2015?

28     A.    Yes, I did.

1    Q.    And did you photograph those text messages as well?

2    A.    Yes, I did.

3    Q.    Now, when you were looking for text messages in the ZTE

4    phone, were you directed as to specific content to search for?

5    A.    Yes.

6    Q.    And were you given names of who to look for?

7    A.    I was given a name, yes.

8    Q.    And what name were you given?

9    A.    Investigator Dean provided the name of Houston Boji and

10   requested any communication potentially up to the date of the

11   incident.

12   Q.    Did you take photographs of text messages taken prior

13   to the date of the incident?

14   A.    Yes.  I took pictures of every text message on the

15   device.

16   Q.    I'm going to start with photographs, what appear to be

17   photographs from November 6th, 2015.

18         MS. FOSTER:  And I'm showing defense counsel.

19         May I approach?

20         THE COURT:  Yes.

21   Q.    BY MS. FOSTER:  I'm asking you to look at what's been

22   marked for identification as People's 295 through 301.  Do you

23   recognize what's depicted in People's 295 through 301?

24   A.    Yes.  These are images of messages.  I took these

25   images, these pictures.

26   Q.    And are they true and accurate depictions of your

27   observations when you were photographing this phone?

28   A.    Yes.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 308

1      Q.    When you went through the phone, did you also note a
2   contacts list?

3      A.    Yes, I did.

4      Q.    And did you see a contact for a Houston Boji?

5      A.    I believe there was a contact for Houston.

6      Q.    And then when you looked through the text messages that
7   you observed in 295 through 301, were they also identifying the
8   texter?

9            The person sending the text?

10     A.    The screen of the text messages, as when I photographed
11   it, showed either from or to, and it had a name and then it had
12   a phone number.

13     Q.    Showing you what's been marked for identification as
14   People's 295.  Do you recognize what's depicted in People's 295?

15     A.    Yes.  This is a picture of the screen that I took from
16   the phone.

17     Q.    Now, you said that each of the calls -- well, let me
18   back up.  Do the calls document date and time?

19     A.    The text messages, yes.

20     Q.    And there should be a laser pointer up there.

21           Can you direct us to the area in which the date and
22   time are documented on People's 295?

23     A.    The time 0535 p.m., Friday, November 6th, this is the
24   time and date associated with this message.  The time up here is
25   the device time as it stood when I was photographing it.

26     Q.    And did you make an observation as to whether the
27   device time, as it stood when you were photographing it,
28   appeared to be accurate?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 309

1      A.    The time was correct on the device when I powered it
2   up, as compared to my cellular time.
3      Q.    And on People's 295 does it document who the text
4   message is from?
5      A.    This shows from a Houston, and then it has a phone
6   number.
7      Q.    And then where in People's 295 is the content of the
8   text message?
9      A.    Just below the "From" line is the content area.
10     Q.    And it says "Save it for tonight"; is that correct?
11     A.    That's correct.
12     Q.    Showing you what's been marked for identification as
13  People's 296.  Do you recognize what's depicted in People's 296?
14     A.    Yes.
15     Q.    And does that also document the date and time as 5:35
16  p.m., November 6th?
17     A.    Correct.  5:35 p.m., Friday, November 6th.
18     Q.    And does it also document Houston and a phone number?
19     A.    Correct.  This one says "To" and then "Houston" and a
20  phone number.
21     Q.    And when you noticed the ones that say "To" and "From,"
22  what does that indicate based on your training and experience?
23     A.    Based on my training and experience, this is -- a "To"
24  is a sent message and a "From" is a received message.
25     Q.    And the sent message in 296, is that the section that
26  says "Shiet, Bro.  I'm going to bed early"?
27     A.    Yes.
28     Q.    Showing you what's been marked for identification as

1    People's 297.  Do you recognize what's depicted in People's 297?

2        A.   Yes.

3        Q.   And is that a call from 5:38 p.m. on November 6th?  I'm

4    sorry.  Text at 5:38 p.m. on November 6th?

5        A.   Yes.

6        Q.   And do you see who's in the "From" line on that text?

7        A.   Yes.

8        Q.   So it was received from who?

9        A.   It says "Houston" with a phone number there.

10       Q.   And is the content of that text "Friday night and we

11   will party, Bro, IDC"?

12       A.   Correct.

13       Q.   Do you know what "IDC" is?

14       A.   Not -- I don't use it.  I don't know.

15       Q.   Showing you what's been marked for identification as

16   People's 298.  And is that another text from the ZTE on November

17   6th around 5:55 p.m.?

18       A.   Yes.  This is a text message that I photographed as

19   well.

20       Q.   And is this one, one that was sent out?

21       A.   It's showing to Houston, correct.

22       Q.   And the content of that is "That sounds fun"; is that

23   correct?

24       A.   Correct.

25       Q.   I'm showing you what's been marked for identification

26   as People's 288.  Do you recognize what's depicted in People's

27   288?

28       A.   Yes.  It's a picture I took of the text message.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 311

1     Q.   And is that one showing a date and time of 6:30 p.m. on
2  Friday, November 6th?

3     A.   Yes.

4     Q.   And does it show as who it's from?

5     A.   It's showing from Houston.

6     Q.   With the phone number?

7     A.   With the phone number.

8     Q.   And is the content of that text "Bro, you gave me a
9  cole sore.  My upper mouth region hurts"?

10    A.   Yes.

11    Q.   Showing you what's been marked for identification as
12 People's 299.  Do you recognize what's depicted in People's 299?

13    A.   Yes.  Another image I took of the phone.

14    Q.   And is that a text message with a date and time of 7:07
15 p.m. on Friday, November 6th?

16    A.   Correct.

17    Q.   And is that a text from and marked "Houston"?

18    A.   Correct.

19    Q.   And is the content of that context "Bro"?

20    A.   Correct.

21    Q.   And just so we're clear, each time we're looking at
22 these texts, are you scrolling through going through separate?

23    A.   Yes.  I'd take a photo of the message, hit "next," take
24 a photo, hit "next," take a photo as I went through.

25    Q.   And showing you what's been marked for identification
26 as People's 300.  Do you recognize what's depicted in People's
27 300?

28    A.   Yes.  Another image I took.

```
 1        Q.   And is that taken -- I'm sorry.  Is that a text message

 2   marked 7:32 p.m. on Friday, November 6th?

 3        A.   Correct.

 4        Q.   And is that from Houston with a phone number?

 5        A.   Correct.

 6        Q.   And is the content of that text "Dude"?

 7        A.   Yes, it is.

 8        Q.   Showing you what's been marked for identification as

 9   People's 301.  Do you recognize what's depicted in People's 301?

10        A.   Yes.  Another image I took.

11        Q.   And is the time and date of that text message 8:40 p.m.

12   on November 6th?

13        A.   Yes.

14        Q.   And is that from Houston?

15        A.   Yes.

16        Q.   With a phone number?

17        A.   Yes, you're correct.

18        Q.   And is the content again "Dude"?

19        A.   Yes.

20        Q.   In going through the texts, were you selective in

21   skipping over any text messages?

22        A.   No.

23        Q.   Did you photograph them as they came up on the phone in

24   order?

25        A.   Yes.

26        Q.   Showing you what's been marked for identification as

27   People's 289.  Do you recognize what's depicted in People's 289?

28        A.   Yes.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 313

1    Q.   And is that a text message sent at 7:07 p.m. on Friday,
2  November 6th?

3    A.   Yes.

4    Q.   And is that text message also from Houston and a phone
5  number?

6    A.   Yes.

7    Q.   And is the content of that text message "Ima shoot you,
8  I swear"?

9    A.   Yes.

10    Q.   Showing you what's been marked for identification as
11  People's 290.  Do you recognize what's been depicted -- I'm
12  sorry -- what's depicted in People's 290?

13    A.   Yes.

14    Q.   And is that a text message sent at 9:54 p.m. on Friday,
15  November 6th?

16    A.   Yes.

17    Q.   And is that from Houston?

18    A.   Yes.

19    Q.   And is the content of that message "Okay.  You shut
20  your phone off -- shut your phone of.  Idc, but I'm serious.  I
21  will shoot you when I see you, mother fucker"?

22    A.   Yes.

23    Q.   Were you able to observe additional text messages sent
24  on -- or that indicated they were sent on November 7th?

25    A.   I believe so, yes.

26    Q.   I'm going to hand you what's been marked for
27  identification as People's 302 through 308.

28        MS. FOSTER:  Showing defense counsel.

```
 1          May I approach?

 2          THE COURT:  Yes.

 3     Q.   BY MS. FOSTER:  Showing you what appears to be a set

 4   from November 7th.  Do you recognize what's depicted in People's

 5   302 through 308?

 6     A.   Yes, I do.  Those are images that I took of the

 7   messages stored on the phone.

 8     Q.   Showing you what's been marked for identification as

 9   People's 302.  Do you recognize what's depicted in People's 302?

10     A.   Yes.

11     Q.   And did that appear to be a text message sent at 3:02

12   p.m. on Saturday, November 7th?

13     A.   Yes.

14     Q.   And is it to Houston with a phone number?

15     A.   Yes.

16     Q.   And is the content of that message "Bro"?

17     A.   Yes.

18     Q.   Showing you what's been marked for identification as

19   People's 303.  Do you recognize what's depicted in People's 303?

20     A.   Yes.

21     Q.   And does that appear to be a text message sent at 3:22

22   p.m. on Saturday, November 7th?

23     A.   Yes.

24     Q.   And is that from Houston?

25     A.   Yes.

26     Q.   And is that one with the content of "Bro"?

27     A.   Yes.

28     Q.   Showing you what's been marked for identification as
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 315

1    People's 304.  Do you recognize what's depicted in People's 304?

2        A.    Yes.

3        Q.    And was that taken at 3:25 p.m.?

4              That's Saturday, November 7th?

5              The document?

6        A.    That is -- that is the time of the text message, yes.

7        Q.    And that one indicated it's also from Houston?

8        A.    It's showing from Houston, yes.

9        Q.    And does that one say "Dude"?

10       A.    Yes.

11       Q.    Showing you what's been marked for identification as

12   People's 305.  Do you recognize what's depicted in People's 305?

13       A.    Yes.

14       Q.    And is that another text message that you obtained off

15   of that ZTE phone?

16       A.    Yes.

17       Q.    And is this text message documented as being at 3:50

18   p.m., Saturday, November 7th?

19       A.    Yes.

20       Q.    Is that one another text message that says from

21   Houston?

22       A.    Yes.

23       Q.    With the content of "one sec"; is that correct?

24       A.    Correct.

25       Q.    Showing you what's been marked for identification as

26   People's 306.  Do you recognize what's depicted in People's 306?

27       A.    Yes.

28       Q.    And is that another text message on that ZTE?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 316

1        A.   Yes, it is.

2        Q.   And is this one documented as being sent at 8:22 p.m.

3   on Saturday, November 7th?

4        A.   Yes, it is.

5        Q.   And is it also from Houston and a phone number?

6        A.   Yes.

7        Q.   And does the content of that one say "Tonight"?

8        A.   Yes.

9        Q.   Showing you what's marked for identification as

10  People's 307.  Do you recognize what's depicted in People's 307?

11       A.   An image I took of a message on the ZTE.

12       Q.   And is this text message documented as being sent at

13  8:32 p.m. on Saturday, November 7th?

14       A.   Yes.

15       Q.   And does this one also show being from Houston and a

16  phone number?

17       A.   From Houston, yes.

18       Q.   And does that one have two symbols?

19       A.   It appears so, yes.

20       Q.   Do you recognize those symbols?

21       A.   It's an open parenthesis and a semicolon twice.

22       Q.   Showing you what's been marked for identification as

23  People's 308.  Do you recognize what's depicted in People's 308?

24       A.   Yes.

25       Q.   And is that another text message sent at 10:51 p.m. on

26  Saturday, November 7th?

27       A.   It was received -- since it's a "From" message, it's

28  received at 10:51 p.m., Saturday, November 7th, yes.  That's the

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 317

```
 1  date that the phone recorded.

 2      Q.   Okay.  And this one also documenting from Houston and

 3  then showing a phone number?

 4      A.   Yes.

 5      Q.   And then does this one say "You are KO" as the content?

 6      A.   Yes.

 7      Q.   I'm showing you what's been marked for identification

 8  as People's 309.

 9           MS. FOSTER:  May I have one moment, Your Honor?

10           THE COURT:  Yes.

11           You know what, let's take our morning break.

12           Ladies and gentlemen of the jury, do not discuss the

13  case, do not conduct any research.  Keep an open mind.

14           Let's come back here at 11:05.  11:05.  Court's in

15  recess.

16                       (Recess.)

17           THE COURT:  Back on the record.  All parties are

18  present.  All jurors are present.

19           Madam prosecutor?

20           THE CLERK:  Your Honor, if you could wait just a

21  moment.  The deputy needs to give a juror another notebook.

22           THE COURT:  All right.

23                    (Brief pause.)

24           THE COURT:  People?

25           MS. FOSTER:  Thank you, Your Honor.

26      Q.   BY MS. FOSTER:  Showing you what's been marked for

27  identification as People's 309.

28           MS. FOSTER:  Showing defense counsel.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 318

```
1       Q.   BY MS. FOSTER:  Do you recognize what's depicted in
2   People's 309?
3       A.   Yes, I do.
4       Q.   And is that another text message that you photographed
5   from the ZTE phone?
6       A.   Yes, it is.
7       Q.   And is this one from 12:07 p.m. on Sunday, November
8   8th?
9       A.   Yes.
10      Q.   And is this one that was received from Houston Boji?
11           I'm sorry.  From Houston and a phone number?
12      A.   Yes, it was.
13      Q.   And is the content of that text message "What is up in
14  the hood, you fagot"?
15      A.   Yes.
16      Q.   Showing you what's been marked for identification as
17  People's 310.  And is this another text message that you
18  photographed?
19      A.   Yes.
20      Q.   Was this one received on -- at 2:08 p.m. on Sunday,
21  November 8th?
22      A.   Yes.
23      Q.   And it's also documented from Houston with a phone
24  number?
25      A.   Yes.
26      Q.   And is the content of this one "Bro, I'm board"?
27      A.   Yes.
28      Q.   Showing you what's been marked for identification as
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 319

1    People's 311.  Is this one, is People's 311 another one of the
2    ZTE text messages you photographed?
3         A.    Yes.
4         Q.    And is this one documented as being sent on -- at 3:21
5    p.m. on Sunday, November 8th?
6         A.    Correct.
7         Q.    And does it say to Houston and a phone number?
8         A.    Correct.
9         Q.    And it says "Bro"?
10        A.    That's correct.
11        Q.    Showing you People's 312.  Do you recognize what's
12   depicted as People's 312?
13        A.    Yes.
14        Q.    And is this another one of the text messages on the ZTE
15   phone, which you photographed?
16        A.    Yes.
17        Q.    And is this one -- I'm sorry.  Let me move -- 9:27 p.m.
18   on Sunday, November 8th; is that correct?
19        A.    Received -- the phone documented it was received from
20   that contact at that date and time, yes.
21        Q.    And that contact is Houston, again, with the phone
22   number?
23        A.    From Houston and a phone number, correct.
24        Q.    And the content of that text message says "Bro"; is
25   that correct?
26        A.    Correct.
27        Q.    Showing you what's been marked for identification as
28   People's 291.  Do you recognize what's depicted in People's 291?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 320

```
1        A.   Yes.

2        Q.   And is this another text message from the same ZTE

3   phone that you photographed?

4        A.   Yes.

5        Q.   And is this one documented as being received at 9:32

6   p.m. on Sunday, November 8th?

7        A.   That's correct.

8        Q.   And is the contact displayed as from Houston?

9        A.   Correct.

10       Q.   And does this one, content say "I make you my bitch"?

11       A.   Yes.

12       Q.   Showing you what's been marked for identification as

13  People's 313.  Do you recognize what's depicted in People's 313?

14       A.   Yes.

15       Q.   And is this another photograph taken from that ZTE

16  phone?

17       A.   Photograph of the phone, yes.

18       Q.   And is this documented as a text message being sent

19  on -- at 9:36 p.m. on Sunday, November 8th?

20       A.   Yes.

21       Q.   And does this one document the contact that it was sent

22  to as Houston and a phone number?

23       A.   Yes.

24       Q.   And does this reply simply "Bro"?

25       A.   The message content says "Bro," yes.

26       Q.   Showing you what's been marked for identification as

27  People's 314.  Do you recognize what's depicted in People's 314?

28       A.   Yes.
```

1        Q.   And is this another text message sent from --
2   photographed from that ZTE phone?

3        A.   Yes, it is.

4        Q.   And is this one documented as being received on 9:37
5   p.m. on Sunday, November 8th?

6        A.   Yes.

7        Q.   And this content -- contact that sent it is Houston?

8        A.   It was received from Houston and the phone number,
9   correct.

10       Q.   And does this content of this call say "I will slowly
11  take over your sole"?

12       A.   Yes.

13       Q.   Showing you what's been marked for identification as
14  People's 315.  Do you recognize what's depicted in People's 315?

15       A.   Yes.

16       Q.   And is this another text message that you photographed
17  from that ZTE phone?

18       A.   Yes.

19       Q.   And is this photograph documenting a text message that
20  was received at 9:54 p.m. on Sunday, November 8th?

21       A.   Correct.

22       Q.   And is the contact showing as from Houston and a phone
23  number?

24       A.   That's correct.

25       Q.   And is the content of that text message "I am the sole
26  eater, but be out Jacks at 11:00"?

27       A.   Correct.

28       Q.   Showing you what's been marked for identification as

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 322

1    People's 316.  Do you recognize what's depicted in People's 316?

2       A.   You have to unfreeze it.

3            There you go.

4            Yes.  That's a picture I took of a text message found

5    on the ZTE.

6       Q.   And was this text message documented as having been

7    sent from the phone at 9:57 p.m. on Sunday, November 8th?

8       A.   That's correct.

9       Q.   And it went to Houston and a phone number; is that

10   correct?

11      A.   That's correct.

12      Q.   And the content is "Man.. I'm going to bed"?

13      A.   Correct.

14      Q.   Showing what's been marked for identification as

15   People's 318.  Do you recognize what's depicted in People's 318?

16      A.   Yes.  A picture I took of the phone.

17      Q.   And does this text message document it as being

18   received at 10:23 p.m. on Sunday, November 8th?

19      A.   Correct.

20      Q.   And it's from Houston and a phone number?

21      A.   Correct.

22      Q.   And the content says "Tonight"?

23      A.   Correct.

24      Q.   And I'm looking over here to the right of the

25   photograph where it says "284/296."  What is that?

26      A.   This is the 284th message in a thread to and from,

27   including this person, of 296 messages.  So there is 296

28   messages in this thread.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 323

1        Q.   I'm showing you what's been marked for identification

2   as People's 317.  Do you recognize People's 317?

3        A.   Yes.  I took that photo of the phone.

4        Q.   So the last one was 284 out of 296; is that correct?

5             The last photograph?

6        A.   Correct.

7        Q.   And what number out of 296 is People's 317?

8        A.   283.

9        Q.   It was a different message; is that correct?

10            That you photographed a separate time?

11       A.   Correct.

12       Q.   Now, is this one also documented at being at 10:23 p.m.

13   on Sunday, November 8th?

14       A.   That's correct.  That's the time it shows.

15       Q.   And does it also show a contact of Houston with a phone

16   number?

17       A.   From Houston and the phone number, yes.

18       Q.   And the content also is "Tonight"?

19       A.   The content is "Tonight," yes.

20       Q.   Show you what's been marked as People's -- actually,

21   I'm going to mark it now in the left corner as People's 323,

22   324, 325, and 326.

23            MS. FOSTER:  Showing defense counsel.

24            May I approach?

25            THE COURT:  Yes.

26       Q.   BY MS. FOSTER:  Take a look at People's 323 through

27   326.

28            Do you recognize them?

1      A.   Yes, I do.

2      Q.   And are these text messages sent and received on

3  November 9th, 2015?

4      A.   Yes.

5      Q.   And were you aware of the date that Nicholas McCauley

6  died?

7      A.   I believe it was the 10th, but I didn't have all of

8  that information.  I was given a date range to look for, for

9  messages on this device.

10     Q.   Showing you what's been marked for identification as

11 People's 323.  Do you recognize what's depicted in People's 323?

12     A.   It's a picture that I took of the phone, again, the

13 messaging threads.

14     Q.   And is this photograph in 323 documented as being

15 received at 11:04 a.m. on Monday, November 9th?

16     A.   That's correct.

17     Q.   And says "From Houston" again, correct?

18     A.   Correct.

19     Q.   And says "Almost there"?

20     A.   Correct.

21     Q.   Showing you what's been marked for identification as

22 People's 324.  Is 324 another photograph of that ZTE phone text

23 message?

24     A.   Correct.

25     Q.   And is this one documented as being sent at 9:07 p.m.

26 on Monday, November 9th?

27     A.   Sent from the phone, yes.

28     Q.   And it's to Houston with a phone number; is that

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 325

```
 1   correct?

 2       A.   That's correct.

 3       Q.   And it says, the content is "Bro"?

 4       A.   Correct.

 5       Q.   Showing what's been marked for identification as

 6   People's 325.  Do you recognize what's depicted in People's 325?

 7       A.   Yes, I do.  Another image I took of the screen of the

 8   ZTE.

 9       Q.   And is this text message documented as being sent --

10   I'm sorry.  Or received to the phone on November 9th at 10:21

11   p.m.?

12       A.   That's correct.

13       Q.   And it says a content of "To"; is that correct?

14       A.   It was received -- sorry.

15       Q.   Received to the phone 10:21 p.m. on Monday, November

16   9th?

17       A.   Correct.

18       Q.   And the content is the word "To"?

19       A.   Correct.

20       Q.   And also from Houston?

21       A.   Correct.

22       Q.   I'm showing you People's 322.  This one is another text

23   message sent at 10:21 p.m. on Monday, November 9th; is that

24   correct?

25       A.   That's correct.

26       Q.   And it's from?

27       A.   Sorry.  Received, yes.

28       Q.   From Houston?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 326

1      A.   Yes.

2      Q.   And it says "Night"; is that correct?

3      A.   Correct.

4      Q.   Now, you said that this is a text message thread.  What

5  do you mean by that?

6      A.   This phone had a proprietary operating system, so it

7  wasn't like an Apple iOS or any android operating system.  It

8  was very basic.  But the text messages, the to and from text

9  messages were grouped together under the contact that they were

10  from.  So that's the concept of message threading is that it

11  takes, the phone software takes the tos and froms and puts them

12  in order so you can scroll through those messages to and from a

13  certain person.

14      Q.   So did you go to a contact that said, "Houston" and

15  look at all the text messages back and forth?

16      A.   I went to the messaging section and found the messages

17  stored for Houston and took photos as I went through those

18  messages.

19      Q.   And you said there was a total of how many photos, text

20  messages that you photographed?

21      A.   Overall hundreds, but there was 296 in that group

22  between the sender on this phone and the contact Houston.

23      Q.   And showing you again People's 326.  Was this the last

24  text message in that thread for the contact Houston?

25      A.   Correct.

26      Q.   And how do you know that?

27      A.   It was 296 of 296, and when I would hit "next," it took

28  me back to the first in that thread.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 327

1     Q.   So following this People's 326, did you observe any

2   text messages in that same thread for November 10th?

3     A.   No, I did not.

4     Q.   You said you also were in receipt of an iPhone; is that

5   correct?

6     A.   An Apple iPhone, yes.

7     Q.   Did you also do an investigation on the Apple iPhone?

8     A.   I did an extraction on that phone, yes.

9     Q.   And what type of information were you able to extract

10  from the iPhone?

11    A.   The iPhone was not done in the same manner as the -- as

12  the ZTE.  The iPhone was supported by the physical analyzer,

13  which is Cellebrite's software tool.  And I was able to do a

14  backup of the device, an iTunes backup.  It was then able to

15  parse that information.  The software was able to parse it and

16  get general phone information, contacts, call logs, messages,

17  images, videos, and generate it into a digital report.

18    Q.   So were you able to -- you're saying you were able to

19  take videos off of the iPhone?

20    A.   Yes.  The physical analyzer software is able to extract

21  the iTunes backup, which contained all of those items, and then

22  parse them out into a digital report.

23    Q.   Including video?

24    A.   Including video.

25    Q.   Were you able to extract text messages as well from the

26  iPhone?

27    A.   Yes.

28    Q.   Do you recall the phone number for the iPhone?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 328

```
 1      A.   I'd have to refer to my report real quick to refresh my
 2   memory.
 3           THE COURT:  Go ahead.
 4      Q.   BY MS. FOSTER:  And what is the phone number, if you
 5   recall?
 6      A.   (951) 249-4822.
 7      Q.   And is that the same number -- did that number match
 8   the number you saw in the text messages on the ZTE?
 9      A.   Yes, it did.
10      Q.   And how many iPhones did you receive and do an
11   extraction on in this case?
12      A.   Just one.
13      Q.   And was that marked by an item number?
14      A.   Yes, it was.
15      Q.   And do you recall what that is?
16      A.   I'd have to get the barcode number out of my report.
17           THE COURT:  Go ahead.
18           THE WITNESS:  It was 1818647.
19           Riverside Sheriff's barcode.
20           MS. FOSTER:  I have nothing further.
21           THE COURT:  Cross-examination?
22           MR. MOORE:  Yes.
23           THE COURT:  Do you need a moment?
24           MR. MOORE:  I'm having some exhibits marked.  It will
25   be just a moment, I believe.
26           I'll start slowly.
27                          CROSS-EXAMINATION
28   BY MR. MOORE:
```

1    Q.    Okay.  So you examined several cell phones in this

2  particular case, right?

3    A.    Three.

4    Q.    Three.  Three total.

5          There was, I believe it was a ZTE, and that was the one

6  that you took individual screenshots of the 296 messages that

7  went between the possessor of the phone and the contact list?

8    A.    Correct.

9    Q.    Okay.  So, and you took a shot of each one of those

10  text messages or messages back and forth between the phones,

11  right?

12    A.    Correct.

13    Q.    And then you also examined an iPhone that you talked

14  about with Miss Foster just now, correct?

15    A.    Correct.

16    Q.    Now, with the iPhone, you were able to do a full

17  extraction?

18    A.    Partially.

19    Q.    Okay.

20    A.    So, like I described before with Miss Foster, the

21  Cellibrite physical analyzer is able to do it using an iTunes

22  backup to do a backup.  It's called an advanced logical

23  extraction, because it pulls databases, it pulls content from

24  the phone.  But it's not a full extraction in that it's not

25  getting some system areas and system settings as you would with

26  like a bit-for-bit copy of a physical extraction that can be

27  parsed.  So it's as good as we get with iPhones.  And that was

28  an iPhone 6.  It's as good as we get with those.  But it's not a

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 330

```
 1   bit-for-bit copy of the entire memory space on the phone.
 2       Q.   Okay, understood.
 3            Ultimately, though, you were able to generate a report,
 4   I mean, reports are kind of cool.  They, at least one form is
 5   it's an actual GHF file where it's hyperlinked, and so you can
 6   just click on, say, an image that was found in the known, and it
 7   will take you to the image, right?
 8       A.   That's correct.  It opens in a common web browser.
 9       Q.   But you also have one where it's printed out in a hard
10   copy or a digital hard copy in a PDF format, correct?
11       A.   Correct.
12       Q.   Now, the PDF report ran to 2800 pages even; is that
13   right?
14       A.   I'd have to review.  I generated the report and
15   verified that it did pull contacts, it did pull call logs, it
16   did pull text messages, and then copied that to a disk for the
17   case agent to review.
18       Q.   Did you review the report?
19       A.   I didn't go through every message and whatnot.
20       Q.   You didn't?
21       A.   No.
22       Q.   Okay.  So you just pulled the data off the phone?
23       A.   Correct.
24       Q.   You organized it, you put it in a report for somebody
25   else to review, right?
26       A.   That's correct.
27       Q.   But do you have a copy of that report available to you?
28       A.   I don't right here.
```

 1      Q.   Okay.  Would if I'm going to be referring to the
 2   report, would having access to it possibly be helpful to you?
 3      A.   Yes, it would.
 4      Q.   Okay.
 5           MR. MOORE:  May I approach, Your Honor?
 6           THE COURT:  Do you have an extra copy or do we need to
 7   make one?
 8           MR. MOORE:  Well, it's 2800 pages, Your Honor.  I have
 9   it in a digital format.
10           THE COURT:  All right.  I guess you can go back and
11   forth.
12           MR. MOORE:  I have some hard copies of the specific
13   things I'm going to be reviewing with him, but I'm sorry.
14      Q.   BY MR. MOORE:  And you didn't bring a computing device
15   or anything that you can use to confer?
16      A.   I don't have that with me.
17      Q.   Okay.  One second.
18      A.   I'm going to keep the water away from the electronics.
19      Q.   Thank you.  I appreciate it.
20      A.   I'm a nerd too.
21      Q.   I'm going to open up the PDF.
22           You know how to use this here?
23      A.   I've used a Mac or two, so --
24           In PDF form, 2800 pages.
25      Q.   Okay.  So there you go.
26           And ultimately this won't be an exhibit, but what
27   you're looking at for reference is a copy of your PDF version of
28   the report, correct?

```
 1        A.    Yes.

 2        Q.    You recognize that?

 3        A.    Yes.  The summary page is the one I generated.

 4        Q.    Okay.  And just scanning through it, let me know if

 5   something seems a little off.  But what you're looking at now,

 6   is that consistent with the report that you generated?

 7        A.    Yes.

 8        Q.    Okay.

 9        A.    I don't know if this is the exact -- again, PDFs have

10   been manipulated down the road, but that's a story for another

11   day.

12        Q.    Exactly.

13              Well, let's assume for the moment that it's accurate.

14   If you see something that appears to be inaccurate, please let

15   me know.

16        A.    Okay.

17        Q.    Okay?

18              And then you have page numbers on throughout the PDF,

19   or at least numbers have been generated for each page, correct?

20        A.    Correct.

21        Q.    Okay.  So you were able to do several -- well, you were

22   able to isolate several different streams of information from

23   the iPhone.  That may not be the proper terminology, but do you

24   understand what I'm kind of getting at?

25        A.    Several types of artifacts?

26        Q.    Sure.

27        A.    Yes.

28        Q.    You got photos, video, SNS or text messages, right?
```

```
 1        A.    Correct.

 2        Q.    MMS, which is when you send a photograph over, or video

 3   over?

 4        A.    It's multimedia message.

 5        Q.    Correct.  But you also have at least some I-messages,

 6   right?

 7        A.    Yes.  Those come through as chats.

 8        Q.    And that's a proprietary platform used by the iPhone

 9   with other iPhones or Mac or Apple operating systems; is that

10   right?

11        A.    Yes.  You're talking about -- yes.  I-message is

12   proprietary to Apple devices.

13        Q.    Okay.  So if you're chatting with somebody with another

14   Apple device, at least one way to communicate with them is

15   through I-messages?

16        A.    If both devices are configured as such, yes.

17        Q.    Okay.

18              Now, in this case the communications between the ZTE

19   and the iPhone, they wouldn't have been I-messages, right?

20        A.    Correct.

21        Q.    Just a different operating system?

22        A.    That's correct.

23        Q.    You were able to isolate the call logs from the iPhone,

24   correct?

25        A.    The physical analyzer, yes, located call logs.

26        Q.    Okay.  And those were found, directing your attention

27   to page 17 through 37 in your report?

28        A.    Yes.  Page -- yeah.  Through page 37, yes.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 334

1      Q.   So you have about 20 pages of calls that were logged

2   showing incoming, outgoing, and missed calls, correct?

3      A.   Correct.

4      Q.   And then what's the date range on those calls that you

5   were able to isolate from the phone?

6      A.   Looks like 5-10 of 2015 to 11-10 of 2015.

7      Q.   So, basically, May through November?

8      A.   Yes.

9      Q.   Okay.  And if we assume that the phone was no longer

10   used after 11-10, that would be consistent with what you found?

11      A.   Yes.  So Apple stores these in the database.

12      Q.   Um-hum.

13      A.   And so if there was any content afterwards, you would

14   see -- and it was deleted, you would see a deleted flag in

15   there, but the content would remain via pre parsed.

16      Q.   In fact, there were some items that had been deleted

17   for whatever reason.  You don't know the reasons why something

18   might be deleted, right?

19      A.   That's correct.

20      Q.   But at least your examination was able to isolate at

21   least some deleted items and bring them up for examination,

22   maybe not in the call log?

23          You were able to find some deleted items elsewhere in

24   the phone, right?

25      A.   Yes.  The physical analyzer was able to locate items

26   marked as deleted.

27      Q.   Okay.  So there may be something that was marked as

28   deleted and then actually removed from the phone by the

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 335

1   operating system?  Things can be deleted permanently from the

2   iPhone, right?

3        A.   Yes.

4        Q.   You sound like you desperately want to say more, and

5   feel free.

6        A.   Yes and no.  So when a user marks an item for deletion

7   on an iOS operating system, it changes a flag in that database

8   where that information is stored, and it just doesn't show the

9   user.  It's marked as deleted.  At some point if the database is

10  closed properly and the developer has set that to do what is

11  called a vacuum of the database, it will clean up those items

12  marked as deletion.  Unfortunately, that access to the

13  developer's mind for any specific application, whether it be

14  Apple's or a third party, you couldn't tell when that cleaning

15  would happen.

16       Q.   Okay.

17       A.   But it's not something typically a user triggers, it's

18  done by an operating system or an application in the background.

19       Q.   Fair enough.

20            And there are things that you can do to the phone, like

21  a reset or even reinstalling an operating system, like

22  permanently delete something from the database.  Is that fair to

23  say, or no?

24       A.   If you were to do a phone reset, it would wipe the data

25  per se.  It would wipe the data.  But you would see a fresh

26  installation with blank databases, correct.

27       Q.   And you didn't see anything like that in this case?

28       A.   No.  It appeared that the phone had content and was

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 336

 1   operating as normal.

 2       Q.   Okay.  And you can feel free to play with the mouse pad

 3   every now and then just so it doesn't go to sleep in log.

 4       A.   Okay.

 5       Q.   I'm going to approach and show you what's been marked

 6   as Exhibit S for identification.  And can you just tell me if

 7   that appears to be an accurate printout of pages 17 through 37

 8   of your report with regard to the call logs?

 9       A.   Nice thing is, is that Cellebrite line numbers them for

10   us.

11            Sorry.  Going as quickly as I can.

12       Q.   That's quite all right.

13       A.   Yes, that appears to be an accurate representation of

14   the analyzer report for the call logs.

15       Q.   Okay.  And I added some Post-its, and there's some

16   highlights in here.  Those aren't part of the report, the

17   official report; is that correct?

18       A.   No.  Those have been added.

19       Q.   But other than that, it appears to be an accurate

20   printout?

21       A.   Correct.

22       Q.   I'm going to show you what's been marked as Exhibits T

23   and V for identification.  Exhibit T purports to be the activity

24   analytics, or at least a portion of them, for the phone, and

25   that's found at page 2788.  Does that appear to be an accurate

26   representation of your report?

27       A.   Yes.

28            2788.

1          Yes.

2      Q.   And then "V" is the analytics phone, phone's section,

3   which is found at 2795?

4      A.   Yes.  That appears to be an accurate representation of

5   page 2795.

6      Q.   Okay.  So let's talk about these just real quick.  The

7   activity analytics section of your report, so that's 2788 for

8   your reference, can you explain to us what your analyzer, what

9   your process is isolating at that point in the report?

10     A.   This is -- this is Cellebrite's kind of culmination of

11  data in the phone from all kinds of different sources trying to

12  say where, you know, the most used contact numbers or the most

13  used, you know, text messages.  It aggregates this information

14  together.  It's mainly appointed for an investigator that's

15  trying to -- it's included in all the software reports, but it's

16  mainly for the investigator to try to determine if someone's

17  constantly contacting a single number, which numbers, to try to

18  narrow their focus down.  Not so much on a per artifact basis

19  but just as an aggregation and -- does that make sense?

20     Q.   Yes.  Thank you.

21          MR. MOORE:  And so, if I may, Your Honor, I'd like to

22  put Exhibit T up on the screen.

23     Q.   BY MR. MOORE:  So now you can direct your attention to

24  the screen next to you.

25          What we see here is just -- so we have the Exhibit T.

26  It's the activity analytics.  So, and it says here "310."  So

27  there's 310 total entries in this particular segment of the

28  report, correct?

1    A.    Correct.

2    Q.    And Exhibit T just represents 1 through 31 down here at

3  the bottom on this one page, right?

4    A.    Correct.

5    Q.    Okay.  So this part of the report will actually go on

6  for several more pages, right?

7    A.    Yes.

8    Q.    But the contents of at least this page is accurate for

9  the information that it reports here.  The omission of the

10  remaining pages of this section of the report, it doesn't omit

11  anything relevant, say, to line 3 where it's the names "Big Man

12  'N'."  Am I saying that right?

13        So by omitting those next ten pages, or whatever it is,

14  we're not losing context for the entries on this particular

15  page; is that right?

16    A.    That's correct.  It's just aggregated to artifacts in

17  general, whether it be calls or texts, whatever it is.  It's

18  showing that, like you point out line 3, that there's 280 phone

19  events.  That's all it's saying.

20    Q.    Okay.  And so this is activity analytics.  What does

21  that report in your report?

22    A.    Again, I don't use this in a daily basis for my

23  investigations.  This is something that Cellebrite includes at

24  the tail end of their reports after all the artifact is located

25  for an investigator, if they need it, to be able to go in and

26  look for most contact numbers, most used numbers, those kind of

27  things.  Does that answer your question?

28    Q.    Not really.  I mean, we have numbers here.  We show

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 339

```
 1    that the top number on line 1 is actually the number of the
 2    phone itself, correct?
 3        A.   Correct.
 4        Q.   And then the next line down, do you know what that
 5    number is or purports to be?
 6             MS. FOSTER:  I'm going to object as lacks foundation.
 7             THE COURT:  Overruled if he can testify.
 8             THE WITNESS:  I don't know what that number is.
 9        Q.   BY MR. MOORE:  Okay.  If I can direct you to line 9.
10    Does that appear to be consistent with the data contained in
11    line 2 as well?
12        A.   It appears to be the same phone number, yes.
13        Q.   Okay.  Do you know why that would be broken out into
14    two, two or three, actually, three different line items?
15             MS. FOSTER:  Objection.  Lacks foundation.
16             THE COURT:  Overruled if he knows.
17             THE WITNESS:  I don't know for certain.  My educated
18    guess --
19             MS. FOSTER:  Objection.  Lacks foundation and calls
20    for speculation.
21             THE COURT:  Sustained on speculation.
22        Q.   BY MR. MOORE:  Is that something you might be able to
23    look up over the next hour and a half?
24        A.   I don't know if I could get you an answer for that.
25        Q.   Okay.
26        A.   It's a feature, again, that Cellebrite --
27             MS. FOSTER:  I'm going to object as lacks foundation.
28             THE COURT:  No.  Let him finish the answer.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 340

1           I'm sorry.  Go ahead.

2           THE WITNESS:  It's a feature that Cellebrite builds in

3   for case agent review, not so much as a specificity to, because

4   it doesn't tell us which artifact.  It says "phone events."  And

5   it's very -- it's a general -- it's not pulled from, telling you

6   it's pulling from certain areas like the beginning of the report

7   shows.

8      Q.   BY MR. MOORE:  Okay.  So this -- this doesn't

9   necessarily let you determine if there was, say, 18,000

10  I-messages back and forth with a specific number or user, but

11  what you could deduce from at least line 2 is that there was

12  some sort of activity involving the phone number of (951)

13  790-6655, I'm sorry, 665, that involved 18,468 total events,

14  right?

15     A.   If you move it over slightly --

16     Q.   Sure.

17     A.   -- to get the last column, it shows "Other Events."

18     Q.   Right.

19     A.   And it's classifying those as "Other Events."  What

20  those are, it doesn't tell us.

21     Q.   Okay.  And do you know where the name on each line

22  comes from, if there is one, like line 3 and 4, "Big Man 'N'"?

23     A.   I couldn't tell you specifically.

24     Q.   Is that --

25     A.   From this section.

26     Q.   Is that consistent with being pulled from potentially

27  the contacts section of the phone?

28     A.   It could be.  But this does not tell us at this

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 341

 1   location.  In other areas of the Cellebrite report, it has an

 2   asterisk next to that name and tells you that it pulls it from

 3   the contacts, whereas here it doesn't.  So I wouldn't be able to

 4   say confidently that that was pulled from the contacts.

 5       Q.   Okay.  Do you recognize the phone number in both lines

 6   3 and 4, which appear to be, based on the number of total

 7   events, probably duplicative.  Is that consistent with the known

 8   number of the ZTE phone that you also analyzed in this case?

 9       A.   Can I refer to my report real quick to confirm that I

10   have the right number?

11       Q.   Sure.

12            THE COURT:  Yes.

13            THE WITNESS:  Yes, that is correct.  That is a phone

14   number that I obtained from the ZTE in my examination.

15       Q.   BY MR. MOORE:  Okay.  And then elsewhere in this report

16   you also found some chats between the user and McCauley 49 and

17   the owner of this phone, Mr. Boji; is that correct?

18            Referring to line 5.

19       A.   Well, line 5 doesn't show me chats.

20       Q.   Okay.  I'm asking you, did you find chats between the

21   user and McCauley 49 and Mr. Boji in this phone?

22            Or do you remember?

23       A.   I don't remember.  I would have to review the physical

24   analyzer report.

25       Q.   Okay.  Did you review this report before you came in to

26   testify?

27       A.   No, not this report.  This was extracted and provided

28   to the case agent.

1      Q.   Okay.  Well, did Miss Foster inform you that you were

2  going to be testifying regarding the analysis of this phone for

3  this case?

4      A.   No.  Her primary leading of questioning was on the ZTE,

5  because I photographed those messages, and I went through every

6  one of those messages.

7      Q.   Okay.

8      A.   Whereas this was an extraction, a brief review of what

9  content, and then provided to the case agent for his review.  I

10  wasn't asked to go line by line through the iPhone extraction.

11     Q.   Okay.

12          But, again, were you aware that you were going to be

13  testifying regarding your examination of this phone today?

14     A.   The procedural extraction, yes.

15     Q.   Just not the contents?

16     A.   Correct.

17     Q.   Were you specifically told that you weren't going to be

18  talking about the contents of this phone?

19     A.   No.  I was asked questions about my procedural

20  extraction of it.  And I can testify to sections of the report,

21  if asked, but --

22     Q.   Well, but I'm asking you about this section of the

23  report, right?

24     A.   Correct.

25     Q.   Okay.  So let's talk about Exhibit V for

26  identification.  This is the one entitled "Analytics Phones,"

27  right?

28     A.   Correct.

 1      Q.   Okay.  Are you familiar with this section of the report

 2  that you generated?

 3      A.   Yes.

 4      Q.   And this is page 2795, for your reference.

 5           MR. MOORE:  Your Honor, do you want to break now?

 6           THE COURT:  Yes, we'll break now.

 7           All right.  Ladies and gentlemen, keep an open mind.

 8  Do not conduct any research or share information.  Do not

 9  discuss the case amongst each other.

10           Court's in recess until 1:30.  1:30.

11      (Proceedings were held out of the presence of the jury:)

12           THE COURT:  All right.  Back on the record out of the

13  presence of the jury.

14           You said you don't have your complete -- I'm sorry.

15  Your analytical report, you said consists of how many pages?

16           THE WITNESS:  2,800 pages.

17           THE COURT:  Do you have that back at the office?

18           Because I'm assuming he's going to go over it with you

19  at length in the next -- in another hour and half.

20           THE WITNESS:  Day or two.

21           MS. FOSTER:  Can the witness and Mr. Moore talk about

22  which specific?  I don't know -- I don't even think we can print

23  2800 pages for him.

24           THE COURT:  Right now the investigator doesn't even

25  have his laptop.  He's reviewing the defense attorney's laptop

26  that contains the information.  I just want to make sure he

27  can -- do you have access to it?

28           THE WITNESS:  I have a laptop that's in the back room.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 344

```
 1   I would just have to power it up.  And if you can tell me what
 2   sections we're looking at, I can refresh so that I can better
 3   testify to what you're asking for.
 4            MR. MOORE:  Sure.  The main thing I'm going to be
 5   looking at is the call logs.
 6            THE COURT:  Well, I mean, we don't have to have this on
 7   the record.
 8            MR. MOORE:  Yes.
 9            THE COURT:  Also, a whole bunch of other exhibits
10   were -- the clerk, I lost track.  I don't even know where we
11   started off.  So if you plan to use those exhibits, it would be
12   kind of, maybe kind of nice to show it to the investigator also
13   so he has a clue.
14            MR. MOORE:  Sure.
15            THE COURT:  All of this is supposed to have been done
16   before trial, not in the middle of trial.  I think, my
17   understanding, they have -- well, I lost count.  Over a hundred
18   exhibits that's been --
19            THE CLERK:  Over 300.
20            THE COURT:  300 exhibits as of today.  And I think we
21   began with like, well, I don't know, less than that.  Way less
22   than that.
23            MR. MOORE:  260.
24            THE COURT:  All right?
25            All right.  Court's in recess till 1:30.
26            If you want to, if you have a chance, okay?
27                         (Noon recess.)
28       (Proceedings were held in the presence of the jury:)
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 345

```
 1              THE COURT:  All right.  Back on the record.  All
 2    parties are present.  All jurors are present.
 3              Defense may continue.
 4              MR. MOORE:  Thank you, Your Honor.
 5       Q.    BY MR. MOORE:  Detective Grotefend, is it true that we
 6    had a chance to get our heads together a little bit over the
 7    break and, hopefully, streamline a little bit of the testimony?
 8       A.    A little bit.
 9       Q.    A little bit.
10              Okay.  We'll do our best.
11       A.    I'll try.
12       Q.    Can you commit to that?
13       A.    I'll try.
14       Q.    Excellent.  And I will too.
15              Okay.  So going back a little bit of a chat about
16    Exhibit T, which is that activity analytics report, correct?
17       A.    Correct.
18       Q.    Okay.  And would you agree with me that it's basically
19    a summary of data that's contained elsewhere within the report
20    and presented in a format that an investigator might use to help
21    identify frequent contacts or frequent activity by the user of
22    the phone?
23       A.    Correct.
24       Q.    So on this phone, obviously, or maybe not obviously,
25    but the most frequent contact number is going to be the
26    phone's -- the device's own number, because it's involved in a
27    lot of the back and forth no matter who it's communicating with,
28    correct?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 346

1      A.    In this case that's correct.

2      Q.    So if there is a text message sent out to the target

3   number, that's going to be reflected both in the sending

4   device's activity analytics and also under the line for the

5   device as receiving the text, correct?

6      A.    Correct.  The end of multiple artifacts from one pool

7   here from one incident potentially.

8      Q.    Okay.  So according at least to this activity analysis,

9   we see that the most frequent contacts that are at least tracked

10  by this particular part of the software, the Cellebrite

11  software, are the number itself, but also then we have a number

12  that seems to be associated with someone that's identified as

13  Nicole; is that correct?

14     A.    You're referring to lines 9 and 10?

15     Q.    Line No. 2, it matches up with the date that's in line

16  9 and 10, correct?  We talked about that earlier?

17     A.    Correct.

18     Q.    Okay.  And so we're seeing a huge amount of activity

19  with Nicole, or what appears -- what has been listed as Nicole

20  in the phone, right?

21     A.    That's correct.  What this is showing is Nicole's

22  number.

23     Q.    Okay.  Now, and then we have "Big Man 'N'," which we

24  now know is identified or associated with the ZTE phone that you

25  analyzed, correct?

26     A.    Correct.

27     Q.    Okay.  And then we see other activity from what appears

28  to be a live account, presumably, I believe that's a Microsoft

```
 1    type of account?

 2        A.   It could be.

 3        Q.   Okay.  But, and McCauley 49.

 4             So this is just, it's showing activity with this phone

 5    and who he's reaching out to or who he's communicating with?

 6        A.   Correct.

 7        Q.   Okay.  And by "he," I mean, presumably the user of the

 8    phone is the owner of the phone, Houston Boji?

 9        A.   Yes, the user of the phone.

10        Q.   Right.

11             And so with Exhibit V, we have the phone's analytics,

12    and that's up here at the top, right?

13        A.   Correct.

14        Q.   And, again, we have information that's broken out for

15    activity regarding each person that the user of the phone is

16    contacting, yes?

17        A.   That's correct.

18        Q.   And this is specifically looking at phone related

19    activity, either calls or actual text messages or MMS messages,

20    right?

21        A.   That is correct.

22        Q.   This is page 2795 of the PDF of the report.

23             MS. FOSTER:  Thank you.

24        Q.   BY MR. MOORE:  So, and again, so line 1 here, the

25    contact, this information is drawn straight out of the phone's

26    contact list, right?

27        A.   Correct.  We see that where it says contact here "Big

28    Man 'N'," the physical line here is parsed, the contact, and
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 348

1    says "any contacts true."  So that's where it's pulling that

2    contact name from.

3         Q.   Okay.  And so -- and we can see that at least for the

4    date that it was still contained on this phone for Big Man "N,"

5    which is, again, that's the number that's associated with the

6    other phone that you analyzed, correct?

7         A.   Correct.  The ZTE.

8         Q.   We see that there's 154 outgoing calls and a total of

9    99 incoming calls from that number over the life of the phone,

10   including 50 missed, correct?

11        A.   That's a 49.  Incoming 49, outgoing 154, and missed is

12   50.

13        Q.   Right.  You add the 50 to the 49, you get 99?

14        A.   Okay.

15        Q.   He doesn't miss a call that he's making.  A missed call

16   would be an incoming call that's not answered, right?

17        A.   That's correct.

18        Q.   So 99 incoming calls, and then a series of some odd

19   texts, both sent and received, and no MMS, right?

20        A.   That's what this is showing, yes.

21        Q.   And, again, this is the No. 1 line on the phone, so

22   this is the most frequent phone contact that he had, if it's

23   being yanked by the number of -- by the amount of activity; is

24   that right?

25        A.   Yes, I believe.  And this is, again, this goes back to

26   the analyzer who -- for the case agent who is being contacted

27   the most and orders them in number of contacts.

28        Q.   Okay.

1      A.   In this case it appears that it's going for calls.

2      Q.   Right.

3           Calls or other phone-related activity?

4      A.   Okay.

5      Q.   Fair enough?

6      A.   Fair enough.

7      Q.   So, and just we were asked what page number that was.

8  In terms of your report, the 2800-page report and all the

9  associated files, whether they were recovered text files or

10 movie files, the files that you recovered from the phone, those

11 are true and accurate copies of the contents of the phone at the

12 time that you analyzed them; is that right?

13     A.   Correct.

14     Q.   So if it's in your report, that is data that was

15 present on the phone, whether you analyzed it?

16     A.   Correct.

17     Q.   Or at least it's presented as maybe an interpretation

18 done by Cellebrite?

19     A.    It is Cellebrite's interpretation in some of it,

20 because the contacts and call logs that we see may have

21 different database header names.  Cellebrite has streamlined

22 that for ease of use.

23     Q.   So kind of they do a little bit of a user interface,

24 cleanup?

25     A.   Correct.

26     Q.   Presentation of data?

27     A.   Correct.  But the actual images and videos and whatnot

28 are extracted and put on disks for the case agent's review.

1    Q.   Okay.  And you were able to recover a number of videos.

2    We've heard that.  And the total number was about 77; is that

3    correct?

4    A.   I'd have to review real quick, but it's over 70, yes.

5    Q.   Sure.  Referring you to pages 2770 and 22 -- 2784.

6    That was terrible.  Let me back up and restate that for clarity

7    of the record.  Page numbers 2770 through 2784.

8         MR. MOORE:  And I'll just approached with Exhibit U, if

9    that's okay, Your Honor?

10         THE COURT:  Yes.

11         THE WITNESS:  And that's an excerpt from in reviewing

12    in the --

13    Q.   BY MR. MOORE:  Were there any others?  Did I leave some

14    off?  Were there 77 total?

15    A.   There were 94 total.

16    Q.   94 total.  Okay.

17         I'll have to prepare an addendum, but, and I apologize

18    for that.  Thank you for double-checking.

19         But, regardless, there were at least -- there were more

20    than 77 recovered, correct?

21    A.   Correct.

22    Q.   And those were all -- none of those were generated by

23    Cellebrite.  Those were all on the phone itself?

24    A.   Correct.

25    Q.   I'm going to show you from your report page 2784.  And

26    just so we're clear, what's the final page of that, the videos

27    list in your report?

28    A.   2788.

1      Q.   Okay.  I'm going to show you page 2784 from Exhibit U
2  for identification.  Now, do you recognize what's depicted in --
3  on this page of the exhibit?
4      A.   Yes.  This is Cellebrite's report for the videos
5  recovered.
6      Q.   Okay.  So, and on here we can see at least portions of
7  the data that's recovered with regard to three different videos,
8  and we see video 74 and 75 here, and then presumably video 73 on
9  top, but it's stapled, so I'll just leave it.  Is that right?
10     A.   That is correct.
11     Q.   So for those three videos, the 74, 75, those numbers,
12 those are Cellebrite generated, right?
13     A.   Correct.
14     Q.   The rest of this data is all from the Apple operating
15 system; is that correct?
16     A.   Correct.
17     Q.   At least as presented?
18     A.   Yes.  In this case, yes, all of that data is from an
19 Apple operating system.
20     Q.   So the top one, the file would be named IMG 1455.MOV,
21 correct?
22     A.   Correct.
23     Q.   And that's in movie format?
24     A.   That is in movie format.
25     Q.   So that tells you that this is a video, right?
26     A.   Yes.
27     Q.   At least a video file?
28     A.   Yes.  It's a video file.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 352

1     Q.    And then right below that it tells you where it was

2  found on the device?

3     A.    That's correct.

4     Q.    And this is consistent with the photos, or where photos

5  are stored within the operating system?

6     A.    Correct.  The media DCIM 101 Apple folder structure is

7  the user's gallery.

8     Q.    Okay.  So that's the gallery that's native to the

9  phone?

10    A.    Correct.

11    Q.    Then over in the right-hand column, this gives you a

12 little more data about the file itself, correct?

13    A.    That's correct.

14    Q.    And then -- so tell us what this created modified and

15 access date information is on the right-hand side.

16    A.    This is the date that the operating system began

17 tracking that item.

18    Q.    Okay.

19    A.    So that's your created.  Typically created modified

20 access are all the same at the file creation.  The access date

21 can be updated in a variety of ways, most commonly when a user

22 views it on the device.  But there -- if an application requests

23 it for somethings in the course -- in the back end, it can also

24 update that date.  So that's not a hard-and-fast access date by

25 user.

26    Q.    Okay.

27          So -- okay.  Fair enough.

28          But, regardless, this stuff up top, on the top part of

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 353

 1   this column, the right-hand column on this page, that has to do
 2   with how the operating system views this file?
 3       A.   Yes.
 4       Q.   Right?
 5       A.   That was the date and time that that -- that this
 6   device was set to, this Apple iPhone was set to, the internal
 7   clock, when that file was created on that device.
 8       Q.   Okay.
 9       A.   When it was first started tracking.
10       Q.   Okay.  And so if it was an older video that had been
11   emailed or texted or otherwise downloaded to the phone, that
12   could be the date that it was received by the phone, not
13   necessarily the date that the file was created, actually created
14   in the --
15       A.   Correct.  You are correct.  It was -- this created date
16   is the date that it lands on the device.
17       Q.   Okay.
18           And if the -- if that file was created with the device
19   or on the device, that's going to match up with the creation
20   date of the file, and it's also going to be the creation date in
21   the operating system, right?
22       A.   Most likely.
23       Q.   Okay.  And then the date is just in standard American
24   format, month, date, year?
25       A.   Correct.
26       Q.   Next to it we have a time that goes down to the
27   seconds, and on this one the top entry up there it's 4:29:29
28   a.m.; is that correct?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 354

1      A.   That's correct.

2      Q.   And then next to it in parenthesis it indicates UTC

3   minus eight.  What does that mean?

4      A.   That is the time offset for Pacific Time.  So the phone

5   records everything natively in UTC, which is Coordinated

6   Universal Time or Greenwich Mean Time, which is set out of

7   England.  And then all times of the world are set off of that

8   either minus or plus.  In this case with our investigators,

9   they've requested that they look at things in Pacific Time, and

10  so Cellebrite adjusts that to Pacific Time.

11     Q.   Okay.

12     A.   And then notates that it's been, that that time has

13  been adjusted from what the phone stores as UTC minus eight.

14     Q.   I see.

15          So that 4:29:29 a.m. would indicate that that's local

16  to this investigation, local time here?

17     A.   Local California, yes.

18     Q.   And we're UTC minus seven and daylight saving minus

19  eight, and nondaylight saving, is that true?

20     A.   It can go back and forth between minus and daylight

21  saving time, and Cellebrite will make that adjustment based off

22  of the dates located.

23     Q.   Okay.  Now, there's an entry here that says "Metadata"

24  in this column, right?

25     A.   Correct.

26     Q.   And then down below there is more information that

27  we'll get to, but can you explain what metadata is on files?

28     A.   Yes.  Metadata with any file is data about a file.

1    It's data that is embedded inside of the file and, therefore,

2    can remain when moved around from different devices or different

3    operating systems.

4        Q.   Okay.  So that's -- it's -- where the top stuff has to

5    do with when this file was introduced to the operating system,

6    the bottom stuff is actually, in theory at least, embedded

7    within the file itself, and so that's going to stay the same as

8    it moves from device to device?

9            Usually?

10       A.   Usually it does.

11       Q.   Okay.  Is there anything here that would indicate to

12   you that this has been -- that this is departing from the usual?

13       A.   No.  It appears that the beginning of this movie was

14   stamped with information from the camera.

15       Q.   Okay.  And in this case the camera, at least according

16   to the metadata, was an Apple iPhone 6, which is the same as the

17   device that you were actually analyzing, correct?

18       A.   That is correct.

19       Q.   It was running iOS 9.1, right?

20       A.   That is correct.

21       Q.   And is that consistent with the operating system on the

22   device analogs?

23       A.   I can check real quick.  It's in the general settings.

24       Q.   We'll get to that.  We'll come back to that.  Remind

25   me.

26           And then down here the record time, that's the time

27   that the file was actually -- the video was actually created,

28   according to the metadata?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 356

1        A.   Kind of.

2        Q.   Okay.

3        A.   The record time here is the time that the device was

4    set to be captured in.

5        Q.   So if the device was set erroneously, that could be a

6    misleading entry; is that correct?

7        A.   It could be.

8        Q.   Now, was the date and time set correctly on the phone

9    that you examined?

10       A.   I believe so.

11            I don't recall, and I didn't put it in my notes, but it

12   was network connected at the time of receipt.

13       Q.   And phones typically when they're connected to the

14   network are correcting for the time according to what the

15   telephone network is telling them?

16       A.   That's correct.  Cell phones by default pull from

17   network time.

18       Q.   Which is why we always look at our phone instead of our

19   watches now?

20       A.   Correct.

21       Q.   So -- okay.  So now we, at least what we can presume

22   from this information, assuming it has been manipulated, hasn't

23   been entered erroneously, the data that was pulled from the file

24   would indicate that this video, and this is a little thumbnail.

25   It doesn't show up well, but it's a thumbnail from that video,

26   correct?

27       A.   That is correct.

28       Q.   And that's in the far right column, or almost far

1    right?

2        A.    Almost far right.

3        Q.    So the video that's represented by this thumbnail was

4    put on the phone on November 7th, 2015, at 4:29 a.m.  It was

5    created on that same date at that same time.  And then it also

6    has a latitude and longitude as well.  Is that data that's

7    encoded on the -- on the video as well when an Apple iPhone 6

8    takes a video?

9        A.    It can be set up that way.

10       Q.    Did you check to see if this phone was set up that way?

11       A.    I did not.

12       Q.    And the latitude/longitude elevation, assuming that the

13   phone is set up to encode that on video, and the phone was

14   operating properly, hasn't been manipulated or something, have

15   you found that to be an accurate entry as well in the past?

16       A.    Most of the time it is, yes, unless it's, like you

17   said, being manipulated intentionally.

18       Q.    Sure.  Unless there is some sort of we'll call it

19   nefarious activity trying to interfere with the validity of the

20   actual video, right?

21       A.    Correct.

22       Q.    So from this, what it purports to have is the date it

23   was recorded, the time it was recorded, and actually the

24   physical location down to four decimal points in terms of

25   latitude and longitude, three decimal points in terms of

26   elevation, right?

27       A.    I am not familiar with elevation on the readouts, but

28   the GPS I have used in the past.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 358

1      Q.    Okay.  Well, I'm just talking about the data that's

2   represented?

3      A.    Yes.  That's what it shows.

4      Q.    Now, did you do anything at all to check out what the

5   latitude and longitude comes back to on these particular videos,

6   these videos, 73, 74, 75?

7      A.    I did not at the time.  I have since.

8      Q.    Have you?  How did you do that?

9      A.    As requested, I used that latitude and longitude as

10  it's in the report, and I copied and pasted that into Google

11  Maps, and it gave me a location information.

12     Q.    What was the location of the data?

13     A.    It gave me a park in Moreno Valley.

14     Q.    Okay.  Do you have that location with you?

15     A.    Not off the top of my head.

16     Q.    Do you know the name of the park?

17     A.    I believe it was Bethune Park.

18     Q.    And that was according to, at least, Google; is that

19  correct?

20     A.    Yes.

21     Q.    There are other services that can -- that can provide

22  that information as well?

23     A.    Yes.

24     Q.    And you watched the videos?

25     A.    Yes, I did.  Not all of them, just the ones you're

26  referencing.

27     Q.    Fair enough.

28           Which videos -- do you see the videos depicted on this

1    page, the final page of Exhibit U?  Well, which you actually

2    viewed, and what did you view?

3         A.   Image 1455, image 1456, image 1457, and image 1458 at

4    the bottom there.  I viewed those at lunch.

5         Q.   Okay.  And I'm just going to approach you.

6              MR. MOORE:  With the Court's permission?

7              THE COURT:  Yes.

8         Q.   BY MR. MOORE:  With Exhibit X.  And we have a little

9    chain of custody thing, but are you comfortable saying that that

10   appears to be the disk that you viewed of those four videos?

11        A.   Yes.

12        Q.   So Exhibit X contained accurate copies of the four

13   videos that you just referenced, which had been pulled from the

14   iPhone during your examination?

15        A.   Correct.

16        Q.   Now, did you view those at all during the course of

17   your initial investigation when you were analyzing the phone?

18        A.   No, I did not.

19        Q.   Did you call them out in any way in your report at all?

20   Did you direct anybody else to those for further investigation,

21   aside from their inclusion in your report as videos that had

22   been recovered?

23        A.   No.

24             MR. MOORE:  May I have just a moment, Your Honor?

25             THE COURT:  Yes.

26        Q.   BY MR. MOORE:  Okay.  I think I'm done with the iPhone.

27   So I'm just telling you that so you can kind of let go of the

28   phone, let go of that phone.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 360

```
 1            Now -- I lied.  So come back to the iPhone real quick.
 2            Exhibit S for identification, we already talked about
 3    that.  That is the phone logs, right?
 4       A.   Correct.
 5       Q.   Okay.  And just so I have all this down, I think I
 6    already asked you, but Exhibit S that we went over earlier, that
 7    is an accurate representation of those pages from your report,
 8    right?
 9       A.   Yes.  I was viewing that on your laptop at the time, I
10    believe.
11       Q.   Okay.  And did you want to verify it with your laptop
12    or are you okay?
13       A.   What pages were we?
14       Q.   Sure.  It was 17 through 37.
15       A.   Yes, that's correct.
16       Q.   Okay.
17            MR. MOORE:  Your Honor, I asked earlier, but permission
18    to breach the well?
19            THE COURT:  Yes.
20            MR. MOORE:  So I'll do that in just a moment.
21       Q.   BY MR. MOORE:  Now, Miss Foster went over 40ish, just a
22    couple of dozen text messages between what would appear to be
23    Mr. Boji and the decedent in this case, Nicholas McCauley,
24    earlier in the case, correct?
25       A.   Correct.
26       Q.   That was this morning.
27            And you referenced that you had actually recovered
28    approximately 296 text messages between them in a long extended
```

1    string or conversation that actually spanned several months,

2    right?

3         A.   Correct.

4         Q.   And you did your best to take photographs of most of

5    those during the course of your investigation?

6         A.   Correct.

7         Q.   And just so we're clear, I'm not going to belabor the

8    point, but it's going to become apparent, I think, that you

9    didn't quite get all of the text messages; is that correct?

10        A.   Upon review today, that's correct.

11        Q.   So I had you go through the stack of the photographs

12   that you had taken, and you compared them to the photographs

13   that you actually have on your laptop; is that correct?

14        A.   That is correct, on the disk that I provided the case

15   agent.

16        Q.   And in the course of that review, you learned that

17   there had been a few that had been skipped over, I'm assuming,

18   inadvertently, correct?

19        A.   Yes.  That was in error.  That's the human element.

20   That's why we like the extractions on Cellebrite.

21        Q.   Sure.  Not a problem.

22             How many did you actually skip over, according to your

23   review today?  I believe you took some notes.

24        A.   If I can refer to my notes real quick?

25             THE COURT:  Yes.

26        Q.   BY MR. MOORE:  And I don't need the number, the

27   specific number right now.

28        A.   13.

1    Q.   So out of 296, you missed, at least it appears that you
2    missed about 13 text messages, correct?
3    A.   In that conversation, yes.
4    Q.   Do you know, is it your recollection or your belief
5    that you actually reviewed those and they were just
6    inadvertently skipped by the camera, or is it possible that you
7    have never actually seen them?
8    A.   It's been three years.  I was down scrolling, hitting
9    the button, taking the picture shutter, hit the next shutter.
10   And in scrolling through them, it appeared I had them all.  I
11   missed them.  So I may have seen them or not.  I could not tell
12   you what the content was of them, because I haven't looked at
13   that device in three years.
14   Q.   Okay.  The one thing that you can tell us is that you
15   would not have left something out intentionally?
16   A.   Oh, no, not at all.
17   Q.   So I've had marked as Exhibit W the entirety of the
18   text conversation that you reviewed.
19   A.   It's not the entirety because there's 13 missing.
20   Q.   The entirety of the text conversation that you were
21   able to preserve using the equipment that you had at the time?
22   A.   That's correct.
23   Q.   Okay.  And you went through these and you compared
24   these, maybe not individually, but you reviewed these earlier,
25   and they appeared to be consistent with the photographs that you
26   took of the conversation between Mr. McCauley and Mr. Boji, or
27   at least their devices, correct?
28   A.   Yes.  I reviewed the pictures that are printed or the

1    pictures that I took.

2        Q.    Okay.

3            MR. MOORE:  And, Your Honor, I'd like at this point to

4    go through the messages.  I'll do it as expeditiously as I

5    possibly can.

6            THE COURT:  That's fine.

7            MS. FOSTER:  I'm going to object, Your Honor, as

8    relevance and vagueness as to the date.  May we be heard at

9    sidebar very quickly?

10           THE COURT:  Yes.  I'll have the court reporter and the

11   two attorneys in the hallway.

12           THE CLERK:  Do you want to see the exhibit?

13           THE COURT:  Yeah.

14           MR. MOORE:  I'll bring it.

15           THE CLERK:  What exhibit number is that?

16           THE COURT:  "W."

17      (Proceedings were held out of the presence of the jury:)

18           THE COURT:  Back on the record out of the presence of

19   the jury.

20           There was an objection of relevance and Exhibit W, I

21   believe.

22           MR. MOORE:  Yes.

23           THE COURT:  Consists of?

24           MR. MOORE:  Approximately 283 pages.  They are each a

25   photograph of an individual screen as he pages through the

26   various texts that are sent.  Most of them are, essentially, one

27   to five words.  There are a few that are longer.

28           THE COURT:  And is this for, being efficient, what date

```
 1  frames are we looking at?  From what?
 2         MR. MOORE:  Wednesday, June 24th is No. 1, and the
 3  November 9th is last.
 4         THE COURT:  All right.  Are these text messages between
 5  the defendant and the victim?
 6         MR. MOORE:  Yes.
 7         THE COURT:  All right.
 8         Counsel?
 9         MS. FOSTER:  And our crime occurs in November of 2015,
10  so my objection is as to relevance of the text messages from
11  June, July, August, unless there is something specific, but I've
12  been through these text messages.  A lot of them are photos of
13  a photo and other things that are unclear as to what they are in
14  the text message, and -- and not -- I don't see the relevance in
15  those particular messages.  They're, like he said, in the span
16  of a few months, there is almost 300.
17         THE COURT:  Madam prosecutor brought up a good point.
18  She's saying that there is no probative value in a lot of these
19  text messages.  Are you tending to go over each and every one
20  with the witness?
21         MR. MOORE:  I do in a very brief sense.  I don't want
22  to go line by line, as she did with hers.  I think I can do them
23  much more expeditiously.
24         THE COURT:  And what's the probative value?  I have to
25  review these myself, if I need to.  But it seems to me that
26  June, July, August, September, October, I don't find any
27  probative value.  At this stage, once again, I don't know what
28  the defense is, so at this stage in the People's case, the Court
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 365

1    cannot connect the dots to find probative value for June, July,

2    August, September, October.  My understanding the crime occurred

3    November.  So maybe sometime in October.

4          MR. MOORE:  I understand the Court's concern, and,

5    actually, the vast bulk of these occur in June and then a long

6    gap until October where they're, apparently, communicating in

7    some sort of alternate means, which isn't captured here.  But

8    what the relevance of it is, she has introduced these statements

9    somewhat out of context in terms of, "I'm going to shoot you,"

10   which I think are clearly probative in the sense that he then

11   got shot, apparently, by Mr. Boji.  So that I understand the

12   relevance there.

13         THE COURT:  Do you have any other -- any statements in

14   there in regards "I'm going to shoot you" in a playful way?

15         MR. MOORE:  Yes.

16         THE COURT:  You can use that one.

17         MR. MOORE:  Well, but what --

18         THE COURT:  What month is that, for the record?

19         MR. MOORE:  June.  June 26th.

20         THE COURT:  Can I see it just so I can make a good

21   record?

22         MR. MOORE:  Oh, yeah.

23         THE COURT:  This is for the first time the Court's

24   viewing these exhibits too.

25         MR. MOORE:  I'll pull out these pages, and they are 51

26   through 61 in the text string.

27         THE COURT:  That's Exhibit W?

28         MR. MOORE:  "W."

1          THE COURT:  All right.

2          All right.  I think these are relevant.

3          Have you taken a look at these?

4          MS. FOSTER:  I have seen -- a chunk of that may be

5     relevant, but I think all the rest of them, I don't.  Between

6     that set in June until November, I just don't think every single

7     one of these text messages has any relevant or probative value

8     to it.

9          THE COURT:  I agree that unless there is other ones

10    like this, and let me make my record.  The one I'm looking at is

11    from 1:56 p.m., Friday, June 26th.  If you want to show that,

12    that's fine.  Friday, June 26th, 2:08, that's fine.  Friday,

13    June 26th, 2:09, that's fine.  That's about the hookah lounge.

14    And then 2:12, same date.  2:35, same date.  2:57, same date.

15    "I will destroy you."  Obviously, they're talking about

16    something else.  But, I mean, hold on.  Let me make my record so

17    you could show these.

18          3:03, that's fine.  "I will kill you."  3:04, "I will

19    chop up Lola's head."  That's fine.  Obviously, there is another

20    meaning here.  There is another one I'm not going to read into

21    the record.  3:11, that's fine.  3:33, that's fine.  And 3:36, I

22    think that's probative at this time.

23          MR. MOORE:  I agree, however --

24          THE COURT:  But there's other ones like that.

25          MR. MOORE:  By isolating them, what we're doing is

26    robbing them of their context and, you know, that's the whole

27    point.

28          THE COURT:  I could get the context from that about the

1    hookah lounge.

2          MR. MOORE:  I get it, yes, but these, this conversation

3    is just it's within this continuing conversation.  It starts at

4    11:56 p.m. on June 24th, which is page 1 of the exhibit, and the

5    pages that you read were 1:56 p.m. on June 26th.  It's all just

6    this continuous messaging back and forth, and it's important, I

7    think, for the jury to see that this is how these guys were

8    communicating at the time.

9          This is -- and by robbing them of the context and

10   stripping them down to just these ten or 12 texts, it gives them

11   kind of this artificial power and artificial probity that makes

12   it much more, actually, I think prejudicial against my client,

13   because we don't see the entirety of the conversation.

14         THE COURT:  All right.  What I'm going to do is if

15   there is something else other than that, I agree, it's just too

16   much.  If there is other things like, you know, semantics, like

17   maybe your defense is that killing text message may be in gest

18   or jokingly, you're fine with that, you can show that.  I don't

19   think if there is anything else, like I said, I haven't had the

20   luxury of time to review all 283 pages.  This was just presented

21   to me in the last seven minutes.

22         MR. MOORE:  That's true.

23         THE COURT:  So I could take a look at it one by one,

24   but since both of you have looked at it previously, and this

25   case is over two years old, if there is something else more, but

26   at this time I do think it's cumulative, and I don't think it's

27   probative.  I just picked out -- you just picked out a couple of

28   ones that I think is probative.  If you have anything else to

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 368

1     show me that you think is probative, I'll review it, but just

2     miscellaneous texts from June all the way to, let's say, well,

3     actually, what's the first page of your exhibit?

4              MR. MOORE:  June 24th.

5              THE COURT:  Yeah.  All the way through November, I

6     don't think is probative.  If there is something in there in

7     gest or, you know, hurting you in gest or --

8              MR. MOORE:  Well, I mean, but that's what I pointed out

9     the problem is.  Without the remainder of the conversation, you

10    can't even tell it's in gest.  Now, he doesn't kill him in June,

11    and they go on to have this long --

12             THE COURT:  If you want me to take a look at some of

13    the other exhibits, I mean, it's just -- 283 is just too much.

14    283 pages, it's too much.  A lot of it might be miscellaneous.

15    It might be probative, I don't know.  I have to take a look at

16    it.

17             MS. BLUMENTHAL:  Just to add on the record, Your Honor,

18    if I may, one of the concerns we have is putting everything into

19    perspective.  This is their relationship.  And I think comments

20    can be made about their relationship describing it in ways that

21    are not accurate.  And the way you can take a look at their

22    relationship and the joking and the hookah lounges and what they

23    go off and do at nights and stuff like that is set forth in

24    here.

25             THE COURT:  But this witness can't testify to the

26    relationship.

27             MS. BLUMENTHAL:  But these text imagine messages speak

28    to it.  That's what I'm saying.  The text messages explain their

```
 1   relationship fully.
 2            THE COURT:  Not through this witness, no.  That's where
 3   I have a problem with it.
 4            MR. MOORE:  In that case, I'm just not going to seek to
 5   introduce them at this point in time, although, I do believe
 6   that they have been sufficiently authenticated, so.
 7            THE COURT:  If you want to lay the foundation with this
 8   witness to do so, that's fine.  That way you don't have to
 9   recall him.
10            MR. MOORE:  But they got to do it the same contents,
11   and all we're doing is putting those statements into perspective
12   on their relationship.
13            THE COURT:  I understand.  I've already made my ruling
14   at this stage of the proceedings what is probative.
15            All right.  At this stage we're at the People's case,
16   okay?  We're not at the defense case.
17            MR. MOORE:  All right.
18            THE COURT:  And this witness is testifying as an expert
19   as an investigator, not as an individual about relationships or
20   whether or not they were good friends or not.  This is not the
21   proper witness to lay -- to introduce these exhibits.
22            MR. MOORE:  Okay.
23            THE COURT:  All right.
24            But my ruling still stands.  There is some probative
25   value of what you just showed me, if you want to show that to
26   this witness of other statements, but bringing in all 283 to
27   establish some type of relationship is not -- this is not the
28   proper witness to do so.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 370

1          MR. MOORE:  Okay.  We'll do it.

2          MS. FOSTER:  And, Your Honor, Mr. Moore brought up the

3     issue of authentication.  I agree with him.  I think he's

4     authenticated all of the text messages at this point.

5          THE COURT:  Yes, I agree with this investigator, yes.

6          THE CLERK:  Your Honor, I have a concern about that

7     exhibit.  It's 280-some pages, and they're all loose, and I

8     don't have a binder clip big enough to go around it.  So I did

9     place a rubber band.  But I'm still concerned about them getting

10    lost in between.  Should they be in a book, a binder, or what?

11         MR. MOORE:  I can bring a binder in, yeah.  I think

12    these are three-hole punchable, and we can three-hole punch

13    them.

14         THE COURT:  And we'll just call it "W", right?

15         Right?

16         THE CLERK:  Yes.

17         THE COURT:  All right.

18         THE CLERK:  Thank you.

19    (Proceedings were held in the presence of the jury:)

20         THE COURT:  All right.  Back on the record.  All

21    parties are present.

22         The Court made its ruling.

23         MR. MOORE:  Sure.  And, Your Honor, I have nothing

24    further at this time.

25         THE COURT:  All right.  People?

26         MS. FOSTER:  Yes, Your Honor.

27                         REDIRECT EXAMINATION

28    BY MS. FOSTER:

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 371

```
1        Q.   I'm going to follow up on Defense Exhibit S.

2             MS. FOSTER:  May I approach?

3             THE COURT:  Yes.

4             I'm sorry.  What exhibit is this?

5             MS. FOSTER:  "S."  Defense Exhibit S.

6        Q.   BY MS. FOSTER:  Have you had an opportunity to review

7   Defense Exhibit S?

8        A.   Yes, I have.

9        Q.   And what is contained on the second page of defense

10  Exhibit S, which is marked page 18?

11       A.   Call logs from the iPhone.

12       Q.   And those call logs, do they indicate calls that were

13  incoming or outgoing on November 10th, 2015?

14       A.   I was going to say, are you able to show it so I can

15  reference?

16       Q.   Can you see calls, incoming or outgoing, on November

17  10th, 2015?

18       A.   At least from here it shows missed.

19       Q.   And is that blurry?

20       A.   A little bit.

21            There we go.  That clarifies.

22       Q.   Now, is the call logs, is that data retrieved in a

23  chronological manner, or presented in a chronological manner?

24       A.   In this case it is, yes, it's chronological.

25       Q.   So Cellebrite can order the calls by when they came in,

26  the date and time?

27       A.   Date and time, yes.

28       Q.   So it appears that in the top of People's 8, I'm sorry.
```

1    Defense Exhibit S, around No. 24 -- I'm sorry.  Looking at 25,

2    there is an outgoing call; is that correct?

3         A.    Line 25 is an outgoing call.

4         Q.    And that indicates the date as generated by Cellebrite

5    as November 9th, 2015; is that correct?

6         A.    That was the date that Cellebrite recovered from the

7    call log on the iPhone.

8         Q.    And what do you mean by that?

9               In layman's terms?

10        A.    Well, you said that this is the date generated by

11   Cellebrite.  It's actually a date that's generated by the phone.

12   When the call was outgoing, it recorded it.  Cellebrite is

13   displaying it for us here.

14        Q.    Okay.  So this is the date when the phone recorded that

15   outgoing call?

16        A.    Correct.

17        Q.    Making sure I say it right.

18              And then we go into from November 9th, and this also

19   indicates a time, right?  9:08 and 34 seconds p.m.; is that

20   correct?

21        A.    Correct.  Pacific Time.

22        Q.    And then you go into November 10th; is that correct?

23        A.    That's correct.

24        Q.    And the point at November 10th starts on -- at 10:00

25   a.m.; is that correct?

26              10:19 and 45 seconds?

27        A.    That's correct.

28        Q.    With a missed call; is that correct?

1    A.   Correct.

2    Q.   So based on the data from Cellebrite, there is no

3    outgoing or income call around 8 o'clock in the morning on

4    November 10th?

5    A.   Based on what Cellebrite pulled, that's correct.

6         MS. FOSTER:  I have nothing further.

7         THE COURT:  Mr. Moore?

8         MR. MOORE:  No.

9         THE COURT:  I'm sorry?

10        MR. MOORE:  No redirect, or recross.  Thank you.

11        THE COURT:  Thank you.

12        Thank you, sir.

13        THE CLERK:  Subject to recall, Your Honor?

14        THE COURT:  Yes, subject to recall.

15        THE WITNESS:  Miss Foster, do you need this?

16        THE COURT:  Yes.  Return all that back, please.

17        People, call your next witness.

18        MS. FOSTER:  Thank you, Your Honor.  The People call

19   Deputy White.

20        THE COURT:  I'm sorry.  Deputy White?

21        MS. FOSTER:  Yes.

22        THE COURT:  All right.  Thank you.

23        I'm sorry.  You got to speak a little louder.  You

24   know, I attended too many concerts in my teenage years.

25        THE CLERK:  Please remain standing and raise your right

26   hand.

27        Do you solemnly state that the evidence you shall give

28   in this matter shall be the truth, the whole truth, and nothing

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 374

```
 1    but the truth, so help you God?

 2            THE WITNESS:  Yes, ma'am.

 3            THE CLERK:  Please be seated.

 4            Please state and spell your first and last name for the

 5    record.

 6            THE WITNESS:  My name is Ron White.  R-o-n, W-h-i-t-e.

 7            THE COURT:  People?

 8            MS. FOSTER:  Thank you, Your Honor.

 9                            RON WHITE,

10    called as a witness by and on behalf of the Plaintiff, having

11    been first duly sworn, was examined and testified as follows:

12                        DIRECT EXAMINATION

13    BY MS. FOSTER:

14        Q.   What is your current occupation and assignment?

15        A.   I'm a deputy sheriff with the Riverside County

16    Sheriff's Department.

17        Q.   And how long have you been a sworn peace officer?

18        A.   For 15 years, ma'am.

19        Q.   Were you on duty on November 10th, 2015, around 8:37

20    a.m.?

21        A.   Yes, ma'am.

22        Q.   And what was your assignment that day?

23        A.   Patrol.  I was a patrol deputy in Moreno Valley.

24        Q.   And you said, "In Moreno Valley"?

25        A.   Yes, ma'am.

26        Q.   And were you dispatched to 25964 Soaring Seagull?

27        A.   Yes, ma'am.  It sounds -- the address sounds right, but

28    that's the street, yes.
```

1    Q.    Do you not recall the address?

2    A.    Can I look?  I just want to make sure it's the exact

3    address.

4    Q.    Would it refresh your recollection to review your

5    report?

6    A.    Yes, ma'am.

7          MS. FOSTER:  With the Court's permission?

8          THE COURT:  Go ahead, Deputy.  And then turn your

9    report over.

10         THE WITNESS:  Yes, ma'am, that's the address.

11   Q.    BY MS. FOSTER:  Okay.  And were you the first officer

12   on scene?

13   A.    Yes, ma'am.

14   Q.    And when you arrived on scene, what did you first

15   observe?

16   A.    When I got to the street, there were -- there was some

17   people.  There were people outside from the residence.

18   Q.    And did you come in contact with the reporting party?

19         MR. MOORE:  Speculation.

20         THE COURT:  Overruled.

21         THE WITNESS:  I'm not sure if it was the reporting

22   party.  It was one of the first, the closest people to me when I

23   got to the -- when I got there.

24   Q.    BY MS. FOSTER:  Did you come in contact with a Houston

25   Boji?

26   A.    Yes.

27   Q.    And do you see that person in the courtroom today?

28   A.    Yes.  Yes, ma'am.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 376

 1      Q.   Can you identify for the record where the person is

 2  seated and what they're wearing?

 3      A.   It's the gentleman with the black suit, white shirt,

 4  and gray tie, it looks like.

 5           MS. FOSTER:  May the record reflect the witness has

 6  identified the defendant?

 7           THE COURT:  Yes.

 8      Q.   BY MS. FOSTER:  And was the defendant the first person

 9  you came into contact with when you started contacting people at

10  the scene?

11      A.   No, ma'am.

12      Q.   Okay.  And what led you to him?

13      A.   When he -- he came running out of the residence on

14  Soaring Seagull.

15      Q.   And did you see him actually exit the residence and

16  come towards you?

17      A.   Yes.

18      Q.   Did you contact him and speak to him?

19      A.   Yes.

20      Q.   What, if anything, did you ask him?

21      A.   I asked him if he was -- if he was injured.

22      Q.   And how did he respond?

23      A.   That he wasn't.  He wasn't hurt.

24      Q.   When you contacted the defendant, did you observe his

25  appearance?

26      A.   Yes, ma'am.

27      Q.   Did you notice anything unusual present on him?

28      A.   Yes, ma'am.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 377

```
 1        Q.   And what was your observation of him?

 2        A.   That he had -- that he had blood -- that he had blood

 3   on his face and clothes.

 4        Q.   Did he have anything else?

 5             Besides blood?

 6        A.   Well, it looked like maybe like -- it looked like maybe

 7   flesh or something like that on him, possibly.

 8        Q.   And where did you notice flesh on him?

 9        A.   On his face and clothing.

10        Q.   Did you have him -- did you ask him whether or not he

11   had any weapons on him?

12        A.   Yes, ma'am.

13        Q.   And what was his response?

14        A.   That he didn't have any weapons on his person.

15        Q.   Did you have him show you his hands?

16        A.   Yes, ma'am.

17        Q.   Did you have him turn out his pockets?

18        A.   Yes, ma'am.

19        Q.   Did you notice anything unusual about his clothing?

20        A.   As far as besides the fact that it was -- that he had

21   blood all over his clothes?

22        Q.   Yes, besides that?

23             I'm going to show you what's been marked for

24   identification as People's 259.

25             MS. FOSTER:  May I approach?

26             THE COURT:  Yes.

27             MS. FOSTER:  Showed defense counsel.

28        Q.   BY MS. FOSTER:  Do you recognize what's depicted in
```

1    People's 259?

2         A.    Yes.  His zipper is down.

3         Q.    Did you notice that when you arrived at the scene?

4         A.    Yes.

5         Q.    Did that draw your attention?

6         A.    It was -- I can't say that it particularly drew my

7    attention, but it didn't seem usual, so it was just one of those

8    things just to kind of like, okay, let me take note of that.

9         Q.    Did you eventually go inside of the house?

10        A.    Yes, ma'am.

11        Q.    And when you went inside, were you alone or were you

12   escorted by someone?

13        A.    I was escorted.

14        Q.    And by who?

15        A.    By Mr. Boji.

16        Q.    And so was it just the two of you that went back into

17   the house?

18        A.    Yes.

19        Q.    What happened when you entered back into the house?

20        A.    When we went to the house, he -- he approached the

21   decedent.

22        Q.    And then what did he do next?

23        A.    It looked like he tried to go give him like CPR.

24        Q.    Did he put his mouth to Nicholas's mouth?

25        A.    That part I don't remember.  I don't remember if he put

26   his mouth on his mouth, but it looked like he was going -- he

27   was going in to do CPR.

28        Q.    Like chest compressions?

```
 1        A.   Yes.
 2        Q.   And at some point did you see the decedent inside the
 3   room?
 4        A.   Yes.
 5        Q.   And did you at some point identify that person?
 6        A.   Yes, ma'am.
 7        Q.   And who was that identified as?
 8        A.   Nicholas McCauley.
 9        Q.   I'm going to show you what's been marked for
10   identification as People's 327, 328, 329, and 330.
11             MS. FOSTER:  Showing defense counsel.
12             May I approach?
13             THE COURT:  Yes.
14        Q.   BY MS. FOSTER:  Showing you People's 327 through 330.
15   Do you recognize 327 through 330?
16        A.   The first three, ma'am, yes, not the last one.
17        Q.   So putting aside 330.
18             And are 327 through 329 true and accurate depictions of
19   what you observed in Nicholas McCauley's room?
20        A.   Yes, ma'am.
21             Is it okay to make a statement, though?  It would be
22   true.
23             THE COURT:  I'm sorry.  There is no question pending.
24             Do you want to ask your question?
25             MS. FOSTER:  Yes.
26        Q.   BY MS. FOSTER:  Is this how you observed Nicholas
27   McCauley's body when you entered into that room?
28        A.   Yes, ma'am, without the evidence tags.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 380

1    Q.   Is that the same position that you noticed his body in?

2    A.   Yes.

3    Q.   Is it the same physical appearance that you noticed his

4    body in?

5    A.   Yes, ma'am.

6    Q.   Did you notice blood on different parts of Nicholas's

7    body?

8    A.   Yes, ma'am.

9    Q.   Were you able to observe his -- where the blood was on

10   his body?

11   A.   Yes.

12   Q.   And do you, from your observation on that date, did you

13   notice blood on his feet?

14   A.   Yes.

15   Q.   Can you take the -- do you see that depicted in

16   People's 327?

17   A.   Yes, ma'am.

18   Q.   Can you use the laser pointer that's up there to

19   indicate for us where you noticed that blood?

20        And it appears that you're pointing to the palm of his

21   feet and the heel of his feet; is that correct?

22   A.   Yes.

23   Q.   Showing you what's been marked for identification as

24   People's 329.  You said you also recognized People's 329?

25   A.   Yes, ma'am.

26   Q.   And is this another angle of where you observed

27   Nicholas McCauley's body?

28   A.   Yes, ma'am.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 381

 1     Q.   I'm showing you what's been marked for identification

 2   as People's 328.  Without the evidence tags, is that how you

 3   observed Nicholas McCauley's feet?

 4     A.   Yes, ma'am.

 5     Q.   After you observed the defendant attempting to do chest

 6   compressions to Mr. McCauley, what happened next?

 7     A.   I told him -- I told him to get up.  I told him not to

 8   touch the -- not to touch the scene.

 9     Q.   And then where did you go next?

10     A.   Outside of the room.

11     Q.   Okay.  Did you take the defendant outside of the room?

12     A.   Yes.

13     Q.   Did you have him exit the house?

14     A.   Yes.

15     Q.   After he exits the home, do you continue making your

16   observations?

17     A.   Yes.

18     Q.   What else did you notice on the decedent's body?

19     A.   Just his -- just his, looked like his underwear.

20     Q.   As far as clothing?

21     A.   Yes.

22     Q.   Did you notice any possible injury wound?

23     A.   Yes, ma'am.

24     Q.   And where did you notice the injury wound?

25     A.   It looked like under his right -- his right arm.

26     Q.   Displaying again People's 329.  And where is the injury

27   wound that you observed?

28     A.   (Indicating.)

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 382

1    Q.   So you're pointing to the right arm that's at the top
2    center of People's 329; is that correct?
3    A.   Yes, ma'am.
4    Q.   Now, did you have an inclination as to what type of
5    injury wound that you were observing?
6    A.   No.  Not at that time, ma'am.
7    Q.   Did you make an observation as to whether or not
8    Nicholas was already dead at the time that you entered the room?
9    A.   Yes.
10   Q.   And what was the basis of that?
11   A.   Well, there was no -- there was no rise and fall of his
12   chest.  He had bloody matter coming out of his nose and mouth.
13   And there was no indication that he was breathing, because, you
14   know, it would foam and bubble maybe if he was still breathing
15   while it was coming out, but that wasn't happening.
16   Q.   Did you notice whether or not there were any bullets or
17   casings or any indication of a weapon present at the scene at
18   that time?
19   A.   Yes, ma'am.
20   Q.   Okay.  And what did you observe?
21   A.   There was a -- there were shotgun shells in the room
22   near the -- near the decedent's body.
23   Q.   And can you see where those are located based on
24   People's 329?
25   A.   Yes, ma'am.
26   Q.   Can you indicate with the laser pointer where you
27   observed those?
28   A.   (Indicating.)

1    Q.   You're pointing to the top towards the right corner on

2    top of what appears to be the bed; is that correct?

3    A.   Yes, ma'am.

4    Q.   Where else?

5    A.   (Indicating.)

6    Q.   The bottom right side of the picture towards the left

7    leg; is that correct?

8    A.   Yes, ma'am.

9    Q.   Anywhere else?

10   A.   Those are the only ones I can see in this photograph.

11   Q.   Did you indicate -- did you observe another shotgun

12   casing?

13   A.   Yes, ma'am.  I think there was one in the bed at the

14   time also.

15   Q.   Now, do you recall seeing a shotgun casing under his

16   right arm?

17   A.   Yes.  Yes, I do.  I don't remember where it was,

18   though, at the time.

19   Q.   Would it refresh your recollection to review your

20   report?

21   A.   Yes, ma'am.

22        MS. FOSTER:  With the Court's permission?

23        THE COURT:  Yes.

24   Q.   BY MS. FOSTER:  Page 3, line 3.

25   A.   Yes, ma'am.

26   Q.   And where was that other casing?

27   A.   If memory serves, I think it was -- I think it was on

28   the other side of his arm over there.

```
 1        Q.    Now, this time of your arrival, 8:37 a.m., where did
 2   you get that time from?  Where did you record that information
 3   from?
 4        A.    From our -- from my -- from my -- my mobile computer.
 5        Q.    Okay.  And how does that function?  How was that able
 6   to give you time?
 7        A.    Well, when we -- when we arrive, it shows us time
 8   frames, like the time we get dispatched, the time we arrive,
 9   which is we pretty much press a button when we get there.  It
10   says, basically, 97, which means arrival.  And I got it from
11   that time.
12        Q.    So did you press a button to sort of record a time of
13   your arrival?
14        A.    Yes.
15        Q.    And was that time 8:37 a.m.?
16        A.    Yes.
17        Q.    And at the time that you observed Mr. McCauley, was he
18   continuously bleeding?
19        A.    Yes.  There was -- yeah, there was blood throughout.
20        Q.    Was that --
21              MR. MOORE:  Nonresponsive, Your Honor.
22              THE COURT:  Overruled.
23        Q.    BY MS. FOSTER:  Was that blood pooling in any certain
24   area?
25        A.    Yes.
26        Q.    And where was that?
27        A.    Underneath where his right arm -- where his right arm
28   is deformed right there.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 385

1          MS. FOSTER:  I have nothing further.

2          THE COURT:  Cross-examination?

3                    CROSS-EXAMINATION

4    BY MR. MOORE:

5      Q.   Okay.  Well, were you able to see if he was actively

6    bleeding at the time that you were there?

7      A.   Can you describe "actively bleeding," because he was

8    bleeding.

9      Q.   Was there blood pumping from any of the wounds?

10     A.   I couldn't tell that.

11     Q.   Was the pool of blood growing noticeably larger as when

12   you were there?

13     A.   No, sir.  I can't say that it was.

14     Q.   So referring you to Exhibit 329, you're saying that

15   this is an accurate depiction of the blood that was on

16   Mr. McCauley's feet when you arrived; is that correct?

17     A.   Yes.

18     Q.   Showing you the -- his left foot and then his right

19   foot?

20     A.   Yes, sir.

21     Q.   Okay.  Now, were you ever able to see all of

22   Mr. McCauley's right foot when you were there?

23     A.   Yes.

24     Q.   How long were you there?

25     A.   Maybe a couple of hours.

26     Q.   When was it -- is it not true that there was a blanket

27   that was covering at least part of his foot when you arrived?

28     A.   I'm sorry.  One more time, sir?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 386

1      Q.    Is it not true that there was a blanket covering at

2    least part of his foot when you arrived?

3      A.    No, there was no blanket.

4      Q.    I'm going to show you Exhibit 328 for identification.

5    Does that look like his right foot?

6      A.    Yes.

7      Q.    Does that look like a blanket?

8      A.    Yes, it does.  It looks like one of the sheets.

9      Q.    Did you put that there?

10     A.    No, sir.

11     Q.    Did you take it away?

12     A.    No, sir.

13     Q.    Do those look like the evidence placards that were

14   distributed, or does that look like evidence placards that are

15   put out by Riverside Sheriff's Department?

16     A.    Yes, sir.

17     Q.    Were you there when the placards were put in place?

18     A.    No, sir.

19     Q.    Okay.  So do you remember the sheet being there, or no?

20     A.    No, sir.

21     Q.    After you arrived, did you take steps to make sure that

22   law enforcement was the only personnel that had access to that

23   room, or people under their direct supervision, like EMS or

24   forensics?

25     A.    After I arrived, yes, sir.  After I secured the scene,

26   yes.

27     Q.    Okay.

28           When you arrived -- let's talk about when you arrived.

1    You're saying that you arrived at 8:27; is that correct?

2          MS. FOSTER:  Objection.  Misstates.

3          MR. MOORE:  I'm sorry.  That was my mistake.  I'm not

4    looking at the paper.

5    Q.   BY MR. MOORE:  8:37?

6    A.   Yes, sir.

7    Q.   Okay.  Now, did you document that in your report that

8    that was your time of arrival?

9    A.   Yes, sir.

10   Q.   Okay.  Is it typical for you to write in your report

11   that you were assigned to a case, to indicate that that was the

12   time of your arrival?

13   A.   I might not be understanding exactly what you're

14   asking.

15   Q.   Sure.  That was probably a poorly asked question.

16         Do you have a copy of your report?

17   A.   Yes, sir.

18   Q.   Where in your report does it indicate that you arrived

19   at 8:37 a.m.?

20   A.   On the -- on the first line of the "Details" on page --

21   on line 17 on page 2.

22   Q.   Okay.  And so it says on November 10th, 2015, about

23   8:37 hours, about 0837 hours, meaning 8:37 a.m., right?  I was

24   assigned to patrol in the city of Moreno Valley.  I was

25   dispatched to an attempted suicide at 25964 Soaring Seagull,

26   right?

27   A.   Yes, sir.

28   Q.   You then wrote that you responded to the location.  How

1    far away were you when you were assigned to that call?

2         A.   Oh, I don't remember that, sir.

3         Q.   How long did it take you to respond to that call?

4         A.   Probably a couple of minutes.  I wasn't very far from

5    it.  About two minutes, maybe.

6         Q.   Okay.  That's your best guess right now?

7         A.   Best guess right now, sir, yes.

8         Q.   You didn't write any sort of indication in your report

9    as to how long it took, did you?

10        A.   No, sir.

11        Q.   Now, there are parts of the incident report that allow

12   you to write in a date and time that you were assigned, and the

13   date and time that you started your investigation, right?

14        A.   Yes, sir.

15        Q.   You left those parts of your report blank?

16        A.   Yes, sir.

17        Q.   Would that have assisted you in determining exactly

18   when you arrived on location?

19        A.   Yes, sir.

20        Q.   As you sit here now, is it fair to say, or did that

21   help refresh your recollection that you were actually assigned

22   to the case, the call-out at 8:37, or do you still believe that

23   you responded, you arrived at 8:37?

24        A.   Still believe I responded, that I arrived at the

25   location at 8:37.

26        Q.   Okay.  Would you agree that your report then is

27   slightly inaccurate as to the time frame?

28        A.   Yes.  That's why I put "about" instead of directly at

 1    the time.

 2        Q.   Okay.  What does the "about" mean?

 3        A.   About because it's, I guess it would be virtually

 4    impossible to determine direct time unless I had access to

 5    Greenwich Mean Time or something like that.  So it's give or

 6    take.

 7        Q.   You told Miss Foster that there was a button that you

 8    pushed to indicate when you arrived?

 9        A.   Yeah.  Well, right, yes, sir.

10        Q.   Okay.  That would be exact, right?

11        A.   According to our time frame, yes.

12        Q.   Okay.  So where is that recorded?

13        A.   In the report, sir.

14        Q.   I feel like we're going around in circles.

15             So the time that you were assigned, according to your

16    report, the time that you were assigned is actually the time

17    that you arrived?

18        A.   Yes, sir.

19        Q.   Fair enough.

20        A.   To my recollection, sir, yes.

21        Q.   To your recollection?

22        A.   Yes.

23        Q.   It was three years ago?

24        A.   Yes.

25        Q.   Is that how you typically write your reports?

26        A.   Depends on my -- on where I -- my part in the report.

27        Q.   Your part in this report was finding a dead body?

28        A.   Yes, sir.

1     Q.   So how does that play into how you document what you
2   did?
3     A.   Well, I didn't know he was dead when I got there.
4     Q.   Did you know he was dead when you wrote your report?
5     A.   Yes, I did, sir.
6     Q.   So you knew your role at that point?
7     A.   Yes, sir.
8     Q.   You knew that it might be important at some point to be
9   relatively precise and exact in your wording and your conduct?
10     A.   Absolutely.
11     Q.   Okay.  So you arrived at whatever time you arrived,
12   8:37 or some time thereafter.  You don't see Mr. Boji
13   immediately; is that correct?
14     A.   No, sir.
15     Q.   That's correct?
16     A.   Well, that is correct, yes, sir.
17     Q.   You see there is a neighbor or someone who turns out to
18   be a neighbor in the area, and you initiate talking to him,
19   right?
20     A.   Yes, sir.
21     Q.   At that point Mr. Boji gets your attention as he exits
22   the home, what turns out to be the home of interest?
23     A.   Yes, sir.
24     Q.   And he calls you over.  He asks for help, right?
25     A.   Yes, sir.
26     Q.   And you could see he's visibly distressed?
27     A.   Yes, sir.
28     Q.   The way you answered that, that was -- it was patently

```
 1   obvious this is a kid that's in distress?
 2        A.   Absolutely.
 3        Q.   He had blood on his face?
 4        A.   Yes, sir.
 5        Q.   Blood on his clothes?
 6        A.   Yes, sir.
 7        Q.   Did he have blood on his hands as well?
 8        A.   Yeah.  I believe so, yes, sir.
 9        Q.   You noticed that his zipper was down, right?
10        A.   Yes, sir.
11        Q.   His penis wasn't exposed or anything?
12        A.   Not that I saw, sir.
13        Q.   Throughout the entire investigation, it's not like he
14   was flashing his private parts at you?
15        A.   I never made that indication, if that's what we're
16   getting at.
17        Q.   In fact, you didn't even note in your report that his
18   zipper was down, did you?
19        A.   No, sir.
20        Q.   You did document what you did see through photographs?
21        A.   Yes, sir.
22        Q.   You yourself took some photographs?
23        A.   Yes, sir.
24        Q.   Did you have a chance to review those photographs
25   before you came in today?
26        A.   No, sir.
27        Q.   Did you make any attempt to do so?
28        A.   No, sir.
```

 1     Q.   Aside from -- well, okay.  So Mr. Boji gets your
 2   attention.  First you made sure that he's safe, at least with
 3   regard to officer safety, right?
 4     A.   Yes, sir.
 5     Q.   Do you find that he has no weapons on him?  He seems to
 6   be compliant with your orders, right?
 7     A.   Yes, sir.
 8     Q.   And you have him lead you into the house?
 9     A.   Yes, sir.
10          Well, I can't say I had him lead me into the house.  He
11   went into the house.
12     Q.   Okay.  You didn't stop him?
13     A.   No, sir.
14     Q.   You followed him?
15     A.   Yes, I did.
16     Q.   Did you have your gun out?
17     A.   No, sir.
18     Q.   So the first thing you see as you come into the house
19   is -- by the time you get there, is Mr. Boji already out of view
20   in the bedroom?
21     A.   No, sir.  I never said he was out of view.
22     Q.   No.  That was a question.  I wasn't implying that you
23   had said that.
24     A.   Okay.
25     Q.   So was he ever out of your view?
26     A.   No, sir.
27     Q.   So you follow him in, and he immediately, as you enter
28   the bedroom, he gets down on the floor next to Mr. McCauley?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 393

```
 1        A.   Yes, sir.

 2        Q.   And you said that he began to give chest compressions

 3   again?

 4        A.   Yes, sir.

 5        Q.   Or he began to give chest compressions?

 6        A.   Yes, sir.  It looked like he was moving into perform

 7   CPR.

 8        Q.   Okay.  And you didn't see any sort of mouth-to-mouth

 9   contact?

10        A.   Not while I was there, no, sir.

11        Q.   This was just hands on the chest?

12        A.   Yes, sir.

13        Q.   Did he make contact?

14        A.   That I don't remember.

15             But I know that he was moving in to touch him and

16   that's when I told him to stop.

17        Q.   Okay.

18        A.   So as far as him making contact, I don't recall that

19   part.

20        Q.   Okay.  At that point you had him -- so he had stepped

21   over -- let's assume -- you don't remember the blanket, but

22   let's assume that the blanket is there covering Mr. McCauley's

23   legs.  I'm going to show you that photo consistent with what you

24   recall, 329.  Mr. Boji comes up on the left side of the

25   photograph but the right side of the decedent's body; is that

26   correct?

27        A.   Yes.

28             Yes, sir.
```

1    Q.    And he kneels down next to him?

2    A.    Yeah.  He starts to kneel at about this point here.

3    Q.    Indicating, more or less, where -- I think that's a

4    microphone underneath Mr. McCauley's wrist?

5    A.    Yes, sir.

6    Q.    Right in that area?

7    A.    Yes.

8    Q.    And you indicated at that point that he was moving as

9    if he was going to be giving chest compressions again?

10   A.    Yes, sir.

11   Q.    Okay.  And you --

12   A.    I can't say "again," because I don't know if he had

13   done it in the first place.

14   Q.    I said, "again."  I didn't mean to, and I apologize.  I

15   caught myself the first time, so.

16         Right.  This is the only time that you actually seen

17   Mr. Boji near the body or near the person?

18   A.    Yes, sir.

19   Q.    Okay.  You can't remember if he actually made contact

20   at the time that you saw him?

21   A.    No.  I don't remember that, sir.

22   Q.    You ordered him to step away?

23   A.    Yes.

24   Q.    And what did you do then?

25   A.    I called for medical and escorted him out of the house.

26   Q.    Okay.

27         Now, did you attend to Mr. McCauley while Mr. Boji was

28   still in the house, or did you just escort him in the house and

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 395

1    drop Mr. Boji off with somebody else?

2        A.   No.  I escorted him out of the house, and by that time

3    medical was, you could hear that they were in route.  So by the

4    time I started to go back into the house, medical was arriving.

5    So all I had to do was guide them in.

6        Q.   Okay.  And you were the first officer on scene?

7        A.   Yes, sir.

8        Q.   So medical response, first responders were not far

9    behind you?

10       A.   Right.

11       Q.   And you said you could hear.  I'm assuming you had your

12   earpiece in?

13       A.   Yes.

14       Q.   Okay.  Were there other officers already on scene when

15   you escorted Mr. Boji out?

16       A.   Yes, sir.

17       Q.   And so you -- did you just kind of deliver him to them?

18       A.   You could -- yes.  I wouldn't say "deliver him," but,

19   yeah, kind of.  I wouldn't say "handed him off," but I asked

20   them to watch -- to monitor him --

21       Q.   Okay.

22       A.   -- while I escorted the medical staff inside.

23            MR. MOORE:  I have nothing further.

24            Well --

25       Q.   BY MR. MOORE:  You saw -- Miss Foster asked you about

26   some of the items that you observed, and you indicated that you

27   saw at least a couple live, what appeared to be live shotgun

28   shells in the room?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 396

1      A.   Yes.

2      Q.   One was under the bed, just under the corner of the bed

3  next to his left leg?

4      A.   Yes.

5      Q.   And one was on the box spring where the mattress was a

6  little bit --

7      A.   Askew.

8      Q.   Askew, good word.

9           And then there was what you referred to as a shotgun

10  shell casing.  I'm assuming that means an expended shell?

11     A.   Yes, sir.

12     Q.   In his right armpit area?

13     A.   Yes, sir.

14     Q.   Is that fair?

15     A.   Yes, sir.

16          MR. MOORE:  Okay.  Nothing further.

17          THE COURT:  People?

18          MS. FOSTER:  Just very quickly.

19                        REDIRECT EXAMINATION

20  BY MS. FOSTER:

21     Q.   You talked about you did not know your role in the

22  investigation.  What do you mean by that?

23     A.   Well, when it was deemed that, that where the suspicion

24  of possible murder, it became -- I took a -- my report is

25  supplemental to the initial report, which is -- which would

26  explain maybe the lack that he was initially getting at as far

27  as the time frames go.

28     Q.   Okay.  So were you the primary investigator?

```
 1        A.   No.

 2        Q.   Were you the lead investigator?

 3        A.   No.  No, ma'am.

 4        Q.   Are those different roles, and depending on those roles

 5   is how you fill out paperwork differently?

 6        A.   Yes, ma'am.

 7        Q.   Now, the portion of your report that was left blank, is

 8   that left blank because of your role in the investigation?

 9        A.   Yes, ma'am.

10        Q.   However, in the "Detail" section of your investigation,

11   do you indicate the time of your arrival?

12        A.   Yes, ma'am.

13        Q.   And you said that that could be -- it's not exact.  Do

14   you mean to the second or do you mean it's not exact like the

15   minutes could be off?

16        A.   The minutes.

17        Q.   Okay.  How far either way?  Is it substantial?

18        A.   No, ma'am.

19             MS. FOSTER:  Nothing further.

20             THE COURT:  Defense?

21             MR. MOORE:  May I have just a moment, Your Honor?

22             THE COURT:  Sure.

23             MR. MOORE:  It's a minor point, but I would like to ask

24   just a few other questions.

25             May I approach, Your Honor?

26             THE COURT:  Yes.

27                         RECROSS-EXAMINATION

28   BY MR. MOORE:
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 398

 1     Q.   Deputy, are you familiar with how dispatch logs are
 2   reported?
 3     A.   Yes.
 4     Q.   Okay.  Have you had a chance to review the dispatch log
 5   in this particular case?
 6     A.   No, sir.  Not since --
 7     Q.   Sure.
 8     A.   -- the incident.
 9     Q.   I'm just going to show you a couple of pages.  And I
10   ran them by the DA.  This is baits 112, right?
11     A.   Yes, sir.
12     Q.   And, then, so the dispatch log keeps a record of the
13   calls that you guys get and the various radio traffic that you
14   do?
15     A.   Yes, sir.
16     Q.   And you're identified by a specific identifier when
17   you're on shift; is that correct?
18     A.   Yes, sir.
19     Q.   And your identifier that day was 2MV --
20     A.   44.
21     Q.   2 Mo Val 44?
22     A.   Yes, sir.
23     Q.   So you had a chance to look at the dispatch log; is
24   that right?
25     A.   Yes.  Just right now, yes, sir.
26     Q.   Did that help refresh your recollection to the time of
27   your arrival?
28     A.   Yes, sir.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 399

```
1      Q.   8:39 arrival?

2      A.   Yes, sir.

3      Q.   So you were off by two minutes?

4      A.   Yes, sir.

5      Q.   I don't think anyone is going to make a big deal about

6   that, but that's actually consistent with what you said, it was

7   a short response time, right?

8      A.   Yes, sir.

9           MR. MOORE:  Okay.  Nothing further.

10          THE COURT:  People?

11          MS. FOSTER:  Just real quickly.

12                    FURTHER REDIRECT EXAMINATION

13   BY MS. FOSTER:

14      Q.   What time were you dispatched when you looked at the

15   log?

16      A.   8:36.

17          MS. FOSTER:  Nothing further.

18          THE COURT:  Defense?

19          MR. MOORE:  No.  I'm good.

20          THE COURT:  All right.  Thank you, sir.

21          THE WITNESS:  Thank you.

22          THE COURT:  If you just want to holdup, we're going to

23   take an afternoon break.

24          Ladies and gentlemen, we'll take a 15-minute break.  Be

25   back here at 3:25.

26          Keep an open mind.  Do not discuss the case amongst

27   each other.  Do not share information.  Do not conduct any

28   research.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 400

```
 1                  Court's in recess until 3:25.
 2             THE CLERK:  Your Honor, is Mr. White subject to recall?
 3             THE COURT:  Yes.
 4                         (Recess.)
 5             THE COURT:  Back on the record out of the presence of
 6   the jury.
 7             Madam prosecutor?
 8             MS. FOSTER:  Yes, Your Honor.  I have two witnesses I'd
 9   like to be ordered back for tomorrow.
10             THE COURT:  And spell the name of the witness, please.
11             INVESTIGATOR BAEZA:  Investigator Edwin Baeza.
12   E-d-w-i-n, B-a-e-z-a.
13             THE COURT:  What time?
14             MS. FOSTER:  What time are we resuming tomorrow?  I
15   know we have the --
16             THE COURT:  8:45 in the morning, but that's for the
17   expert.  Shouldn't take more than 15, 20 minutes.
18             MS. FOSTER:  So are we going to call witnesses at 9
19   o'clock?
20             THE COURT:  Yes.  That's the goal.
21             MS. FOSTER:  Then I would say 9 o'clock.
22             THE COURT:  Sir, you're ordered to appear in this
23   department at 9 o'clock in the morning, Tuesday, July 3rd.  Do
24   you understand the Court's order?
25             INVESTIGATOR BAEZA:  Yes, Your Honor.
26             THE COURT:  Thank you.  Have a good day.
27             INVESTIGATOR BAEZA:  Thank you.
28             DEPUTY BELLAVIA:  Deputy Krysti Bellavia.  That's
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 401

1    K-r-y-s-t-i, "B," as in boy, e-l-l-a, "v," as in Victor, i-a.

2              THE COURT:  What time?

3              MS. FOSTER:  9:30.

4              THE COURT:  You're ordered to appear July 3rd, 9:30

5    a.m. in this department.  Do you understand the Court's order?

6              DEPUTY BELLAVIA:  Yes, sir.

7              THE COURT:  Have a good afternoon.

8              DEPUTY BELLAVIA:  Thank you.

9              THE COURT:  All right.  Let's bring the jury in.

10          (Proceedings were held in the presence of the jury:)

11             THE COURT:  All right.  Back on the record.  All

12    parties are present.  All jurors are present.

13             Madam prosecutor, call your next witness.

14             MS. FOSTER:  Thank you, Your Honor.  The People call

15    Dr. Hunt.

16             THE CLERK:  Please remain standing and raise your right

17    hand.

18             Do you solemnly state that the evidence you shall give

19    in this matter shall be the truth, the whole truth, and nothing

20    but the truth, so help you God?

21             THE WITNESS:  I do.

22             THE CLERK:  Please be seated.

23             Please state and spell your first and last name for the

24    record.

25             THE WITNESS:  Allison, A-l-l-i-s-o-n, Hunt, H-u-n-t.

26             THE COURT:  People?

27             MS. FOSTER:  Thank you, Your Honor.

28                          ALLISON HUNT,

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 402

 1    called as a witness by and on behalf of the Plaintiff, having

 2    been first duly sworn, was examined and testified as follows:

 3                          DIRECT EXAMINATION

 4    BY MS. FOSTER:

 5        Q.   Good afternoon, Dr. Hunt.

 6        A.   Good afternoon.

 7        Q.   What is your current occupation?

 8        A.   I'm a forensic pathologist for the Riverside County

 9    Sheriff Coroner's Department.

10        Q.   And how long have you been a forensic pathologist?

11        A.   Nine years.

12        Q.   And what was your career prior to that?

13        A.   Lifelong student.

14        Q.   Which leads me to my next question.  What is your

15    educational background?

16        A.   Four years of college, University of Louisville.  I

17    have a master's degree in forensic science from Marshall

18    University, which is in West Virginia.  After that, four years

19    of medical school, which is the same for any doctor.  It's your

20    initial four years of training.  After that, you choose what's

21    called a residency.  I chose pathology.  I did four years of

22    pathology residency in south Alabama.  After that, I

23    subspecialized in forensic pathology, with an additional year of

24    training just in forensics.  And I did that at Miami-Dade

25    County.

26        Q.   In addition to all that extensive education, do you

27    have a background and training and experience specifically in

28    conducting autopsy -- autopsies -- it's going to look bad on the

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 403

1    transcript -- in rendering cause of death?

2        A.   Yes.

3        Q.   And what is that background, training, and experience?

4        A.   Well, besides that, I was also steering in college

5    autopsy technician, so I got a little start early.

6        Q.   And how many autopsies have you conducted?

7        A.   Approximately 2000.

8        Q.   And how many autopsies have you had to render a cause

9    of death?

10       A.   All of them.

11       Q.   Can you describe for us what an autopsy is?

12       A.   Yes.  So, first of all, an autopsy is needed or

13   warranted when there is a death that is unnatural or suspicious

14   in nature.  So not everyone gets an autopsy.  We have what's

15   called deputy coroners.  They go out to the scene where the

16   death occurred.  They'll get the information from police, from

17   family regarding circumstances surrounding the death.  So we'll

18   know a little bit of that before we start the autopsy.

19          The body is brought in, it's placed in a refrigeration

20   unit.  Prior to the autopsy, height, weight, things of that

21   nature are taken.  X-rays, if indicated.  And the autopsy itself

22   consists of what's call an external examination where we look at

23   the outside of the body.  We note, you know, height, weight,

24   scars, tattoos, medical intervention.

25          And then we do what's called the internal examination.

26   We actually make a Y incision, open the body, expose the organs,

27   take them out.  We're looking for any sign of trauma, any sign

28   of disease, or any genetic conditions that we might -- could

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 404

```
 1   tell family about.
 2           Part of the autopsy is taking specimens for toxicology
 3   or specimens of tissue to look at under the microscope.  So we
 4   usually do toxicology on most decedents.  We can look at tissue
 5   under the slide, and then we render a report from our findings.
 6      Q.   Now, on November 12th, 2015, did you do an autopsy on
 7   Nicholas McCauley?
 8      A.   Yes, I did.
 9      Q.   And where was that performed?
10      A.   In Perris.
11           Perris, California.
12      Q.   And during that autopsy, did you perform the same
13   procedure that you just described?
14      A.   Yes, I did.
15      Q.   Was the same information collected?
16      A.   Yes.
17      Q.   Did you collect height and weight for Nicholas
18   McCauley?
19      A.   Yes, I did.
20      Q.   And what was that?
21      A.   Six-seven and 249 pounds.
22      Q.   Did you also take notes so that you could generate a
23   report for -- regarding Nicholas's autopsy?
24      A.   Yes, I did.
25      Q.   Did you also take photographs or have photographs taken
26   as the autopsy was being conducted?
27      A.   Yes.
28      Q.   Is that something you take yourself or someone takes
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 405

 1   that works with you during the autopsy?

 2        A.   We have a forensic technician at the office that's

 3   there specifically for photographs.  Someone else took them.

 4        Q.   Now, as described before, did you start your autopsy by

 5   examining the outside of Nicholas's body?

 6        A.   Yes.

 7        Q.   And in examining the outside of his body, did you make

 8   a determination of whether or not you saw a wound?

 9        A.   Yes.

10        Q.   And where did you first locate a wound on Nicholas's

11   body?

12        A.   First defect I saw was on the right arm near the right

13   elbow.

14        Q.   I'm going to show you what's been marked for

15   identification People's Exhibit 145.

16             MS. FOSTER:  Showing defense counsel.

17             May I approach, Your Honor?

18             THE COURT:  Yes.

19        Q.   BY MS. FOSTER:  Do you recognize what's depicted in

20   People's 145?  And there is a sticky covering the genital area.

21   Do you observe that as well?

22        A.   I do.

23        Q.   Okay.  That's not something you placed there, it's

24   something we placed there, correct?

25        A.   Correct.

26        Q.   Do you recognize 145?

27        A.   Yes.

28        Q.   Do you recognize People's 63?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 406

```
 1      A.   Yes.

 2      Q.   And are those true and accurate depictions of your

 3  observations?

 4      A.   Yes.

 5      Q.   On Nicholas McCauley?

 6      A.   Yes.

 7      Q.   Showing you first People's 145.  Do you see that wound

 8  area that you described in People's 145?

 9      A.   It's not readily apparent on this photograph.

10      Q.   Okay.  Can you direct for us on 145 what area that's

11  in?

12      A.   It's going to be on the right forearm near the elbow

13  when you rotate the arm just a bit.

14      Q.   I'm going to show you what's been marked for

15  identification as People's 62.

16           THE COURT:  I'm sorry.  What number?

17           MS. FOSTER:  People's 62.

18           May I approach?

19           THE COURT:  Yes.

20      Q.   BY MS. FOSTER:  Does People's 62 more accurately show

21  that area for you?

22      A.   Yes, it does.

23      Q.   Do you recognize what's depicted in People's 62?

24      A.   Yes, I do.

25      Q.   And what is that?

26      A.   So this is the right arm, and right here we have a

27  shotgun entrance wound.

28      Q.   And how can you tell that's a shotgun entrance wound?
```

1       A.    It's a gaping defect.  It's round.  I'll just go ahead
2   and get into it.  The characteristics that I'm really looking
3   for in this one, right here you notice it's kind of scalloped,
4   so those edges are scalloped with a little bit of what's called
5   an abrasion collar right here.  The wound is large.  So we look
6   for those characteristics when we're evaluating shotgun wounds.
7       Q.    Let me show you what's been marked as People's 63.  Do
8   you recognize what's depicted in People's 63?
9       A.    Yes.  So this is a close-up of the entrance wound
10  again.  Prominent scalloping of the edges and destruction of the
11  underlying tissue.
12      Q.    Did you notice any other defects or wounds on the
13  exterior of Nicholas's body?
14      A.    Yes.
15      Q.    And where were those?
16      A.    So continuing on the path with the shotgun wound,
17  shotgun shells contain pellets usually.  This one did.  So we
18  also take X-rays, so I could see led fragments in the body, so I
19  knew I had to be looking for that as well.
20          The defects on the arm, he had six on the inside of the
21  right upper arm, and then corresponding in the right lateral
22  chest wall, he had five defects.  So six of the pellets actually
23  came out and exited, and five of them went back into the chest.
24  One dropped off.  And then I recovered two from the right arm.
25      Q.    Now, when you're describing them, let me show you
26  what's been marked for identification as People's Exhibit 79,
27  75, and 73.
28          MS. FOSTER:  Showing defense counsel.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 408

1          May I approach?

2          THE COURT:  Yes.

3     Q.   BY MS. FOSTER:  People's 79, 75, and 73 show you the

4     area which you're describing?

5     A.   Yes.

6          Yes.

7     Q.   I'm going to show you People's 79 first.  Can you show

8     us, using the laser pointer, on People's 79 the area which

9     you're describing as the wound to the chest?

10    A.   So they're going to exit the inner aspect of the right

11    upper arm and reenter the chest through the right lateral chest

12    wall.  "Lateral" just means on the side.  So this is the right

13    lateral chest wall.

14    Q.   Showing you People's 75.  Do you see that area again?

15    A.   Yes, I do.

16    Q.   Is this a cleaned-up version as the autopsy progressed?

17    A.   Yes, it is.

18    Q.   And you described the wound that you saw on the inner

19    arm, of the inner portion of the right arm.  Can you tell us

20    where you see those pellets being moved in the inner portion of

21    the right arm?

22    A.   So the pellets, well, the shotgun pellets entered, so

23    you can see one, two, three is kind of hidden, four, five, six.

24    So six actually break out of the right inner aspect of the arm.

25    And you can see the -- I left the cotton on that one.  There is

26    no sixth defect on the right aspect of the chest wall, so that

27    pellet actually did not enter, but five of them came across and

28    actually went into the body.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 409

```
 1        Q.   So just to give us a little bit of perspective in what
 2   we're observing, you start off by telling us that there is an
 3   exterior wound to the outside, and that's that round gaping
 4   wound; is that correct?
 5        A.   Yes.
 6        Q.   And is that customary in a shotgun?
 7        A.   Yes.
 8        Q.   So what then, based on your training and experience in
 9   dealing with shotgun wounds, was the process that is taking
10   place that allows you to start looking for this sort of pellet
11   spray in the inner arm to the chest?
12        A.   Okay.  So I mentioned previously we did X-rays.  This
13   pattern on the arm with the scalloping, just through training
14   and experience, textbooks, any forensic textbook you read or
15   ballistic book, which is bullets, scalloping on the edges,
16   that's pretty much a distance of about three feet.
17             MS. BLUMENTHAL:  Objection, Your Honor.  I object as to
18   lack of foundation.
19             THE COURT:  You want to lay a further foundation?
20             MS. FOSTER:  Yes.
21        Q.   BY MS. FOSTER:  And let me go back to this question:
22   Do you have experience with specifically shotgun wounds?
23        A.   Yes.
24        Q.   Okay.  And how many, about, shotgun wounds would you
25   say you've rendered an opinion on?
26             MS. BLUMENTHAL:  Objection.  Relevance as to that
27   particular question.
28             THE COURT:  Overruled.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 410

1          THE WITNESS:  I'd say I get about five or six a year,
2     times nine, so at least, 40, 45.
3          Q.   BY MS. FOSTER:  And what sort of training and
4     information do you have to learn in order to render an opinion
5     and become familiar with shotgun wounds?
6          A.   Once again, it's part of your fellowship.  I trained in
7     Miami.  Firearm injuries are very common.  So we have training
8     looking at gunshot wounds from, you know, handguns, it includes
9     shotguns, it includes rifles, it includes high-powered rifles.
10    I know the basics and what the injuries can look like on a body
11    due to those weapons.
12         Q.   And do you also receive training and have kept yourself
13    up on materials that describe how the shotgun functions so that
14    you can understand how the wound would result?
15         A.   Yes.
16         Q.   And based on your training and experience with
17    shotguns, have you ever had to reach a conclusion as to things
18    like distance based on the type of wound that's received?
19         A.   Yes.
20         Q.   And what things about a wound indicate the distance
21    that the shotgun was fired from?
22         A.   In general, as a forensic pathologist, we're often
23    asked if it's contact, meaning it's pressed against the skin.
24    If it's far away or indeterminate, sometimes we can't tell.  Or
25    if it's a close range of fire.  We don't get into exact
26    specifics.  That's more of a firearms expert that would come in
27    and testify to exact distances or close distances.  But there
28    are certain characteristics you look for.

1          So right off on an entrance wound you're looking for

2    what's called a muzzle stamp or a muzzle abrasion where the gun

3    is against the skin tightly and makes a big red abrasion on the

4    skin, because the gases are super heated, and it will cause a

5    ring around the entrance wound.

6          You also see what's called soot deposition.  So you see

7    the black carbonation debris that comes off the end of the

8    barrel.  You'll see that in the wound bed.

9          Usually splitting of the skin, because there is like

10   super heated gases, and you get a blow-back effect.  It depends

11   on the surface that the gun is placed.

12         This has no characteristics of a contact wound.  I

13   briefly mentioned the scalloping.

14   Q.   And when you were mentioning that, if I may, I'm

15   showing you People's Exhibit 63.  When you were talking about

16   the soot and the scalloping, is this the area that you'd be

17   observing to make that determination?

18   A.   Yes.

19   Q.   And so what would you be looking for specifically in

20   People's 63 that would indicate for you how close the weapon is?

21   A.   So, again, there is not a muzzle impression, there is

22   no soot in the wound bed, so you know it's not contact.  Then

23   you start looking at characteristics of the wound.  Anywhere

24   from about two feet in -- guns are different.  Just a typical,

25   normal shotgun, two feet in usually you get a really round

26   defect, very distinguished look.  It is smaller.

27   Q.   Let me just pause you right there.

28         When you said that because there is no soot, and are

```
 1   you referring to like a black --

 2       A.   Yes.

 3       Q.   Blackening of the skin?

 4       A.   Yes.

 5       Q.   Because there is no soot, you know it's not a contact

 6   wound.  What do you mean by that?

 7       A.   The barrel of the gun was not against the skin.

 8       Q.   So it's not touching?

 9       A.   Exactly.

10       Q.   Okay.  And now you're moving onto -- we're passed that

11   and now you're moving on to how close the barrel is; is that

12   correct?

13       A.   Potentially.  Just for signs that we look for.

14       Q.   Okay.  And what are the signs, the next step of signs

15   you look for, for I think you said two feet?

16       A.   Right.  So if it's not contact, basically you know it

17   was the barrel of the gun, or you want to know was the barrel of

18   the gun close, you know, six inches, a foot, two feet.  With

19   that you usually can have stippling, which is unburned gun

20   particle coming out the end of the barrel.

21            Now, these are shotgun shells, so they're a little bit

22   different.  Stippling can still travel out the end.  They have

23   what's called a filler, so filler will come out.  It's a part of

24   the ammunition that's in the cup.  You actually have a cup that

25   holds the pellets that holds the filler, holds the primer, and

26   then it all comes out together.

27       Q.   And is the filler the white powdery --

28       A.   Yes.
```

1     Q.   -- substance?

2     A.   So you're looking for all these.

3          Again, scalloping, like I said, in textbooks it's a

4     typical question, approximately three feet when you see

5     scalloping.  Once the scalloping disappears and the pellets

6     actually break out of the cup and start to spread out, so like

7     you saw before, they cause round defects, the pellets.

8          So if they're coming out of the shotgun and they've had

9     time to dissipate or come apart, and they enter, say they would

10    have entered the skin over here, that's even further evidence

11    that the barrel of the gun is further away from the target.  And

12    then --

13    Q.   So at what distance typically would you see where the

14    pellets have already come out and it would be --

15    A.   It's tough to say.

16         MR. MOORE:  Objection to foundation.  Speculation, Your

17    Honor.

18         THE COURT:  I'm sorry.  Can you read the question back,

19    madam court reporter?

20              (Record read as requested.)

21         THE COURT:  Overruled.

22         THE WITNESS:  So, again, there is the scalloping, and

23    then anything after four to five feet you can start to get the

24    spread pattern.  That's where it comes in where you actually

25    want a firearm examiner to fire the exact weapon in question, or

26    a model very similar, and the ammunition used.  Because it can

27    vary a little bit.

28         But in general what I'm looking for is, in general,

```
 1    this is not contact and it's not super far away, and I can tell
 2    you it's approximately three feet.
 3        Q.    BY MS. FOSTER:  Now, in the process of examining the
 4    body, do you create a diagram?
 5        A.    Yes.
 6        Q.    And in that diagram do you go through and mark the
 7    wounds and entrance wounds?
 8        A.    Yes.
 9        Q.    And as you're examining the body, do you continue to
10    follow the trajectory or the pattern, or the path, I'm sorry,
11    that the bullets are taking into the internal part of the body?
12        A.    Yes.
13        Q.    And based on your observations of Nicholas McCauley,
14    what path did the bullets that went inside of his body take?
15        A.    So in this case on the right arm near the elbow, you
16    have the entrance wound.  You have pellets coming out of the
17    medial or the inner aspect of the right arm and entering the
18    right aspect of the chest.  And they continue in that direction
19    and slightly upward.  So front to back, right to left, and
20    upward.
21        Q.    We we're talking about the external part of the body in
22    correlation to the internal part.  Did you notice any other
23    wound on Nicholas McCauley on the external part of his body?
24        A.    He had a couple of abrasions just up above the entrance
25    wounds a little bit, but the humerus was shattered, so that
26    could be due to injury.
27              And he had a couple of small abrasions on the lips.
28        Q.    When you say "abrasions to the upper part of his arm,"
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 415

1    showing you People's 145.  Are you talking about the swollen

2    portion?

3        A.   That's not a good picture.

4        Q.   I show you People's 62.  Is that one helpful?

5        A.   Okay.  Yes.  So right here you have a little scraped

6    off piece of skin.  Scrape, probably a small bruise even.  But

7    right here you have destruction, basically the right arm.  So

8    his right humerus, or the long bone in his right arm is

9    shattered.

10       Q.   And did you notice any other wounds on Nicholas's

11   exterior part of his body?

12       A.   He had the small just red abrasions on his lips.

13       Q.   And what are defensive wounds?

14       A.   So defensive wounds, typically bruising, abrasions.  So

15   scrapes or bruises on the back of the hands, on the forearms,

16   front of the legs, like if you're picking up your leg to defend

17   yourself.  Even on the back of your hands, if you're like this.

18   In stabbings sometimes we see cuts across the palm or the inside

19   of the fingers.  So we look for defensive wounds, basically, on

20   the hands and forearms and fronts of the legs.

21       Q.   And did you notice any defensive wounds on Nicholas

22   McCauley?

23       A.   I did not.

24       Q.   Did you examine his hands?

25       A.   Yes.

26       Q.   Did you examine them front and back?

27       A.   Yes.

28       Q.   I'm holding in my hand what's been marked for

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 416

```
 1   identification as People's 137, 138, 139, 140, and 141.

 2            MS. FOSTER:  Your Honor, may we meet at sidebar?

 3            THE COURT:  Yes.

 4            With the court reporter?

 5            MS. FOSTER:  No.

 6            THE COURT:  All right.

 7            Just go around.

 8             (Discussion held at sidebar, not reported.)

 9            THE COURT:  Back on the record.

10            Ladies and gentlemen, we're going to have to excuse the

11   jury for the rest of the day.

12            Do not discuss the case.  Keep an open mind.

13            I'm going to have you come back at 9:15.  I have a

14   hearing that I have to conduct at 8:30 in the morning.  9:15

15   tomorrow.  All jurors are ordered to appear 9:15 in the morning.

16   Thank you.

17        (Proceedings were held out of the presence of the jury:)

18            THE COURT:  All right.  You need to stay for a moment.

19            Out of the presence of the jury.  Mr. Moore is present,

20   the defendant is present.

21            Doctor, you're ordered to appear tomorrow at 9:15.  Do

22   you understand the Court's order?

23            THE WITNESS:  Yes, Your Honor.

24            THE COURT:  All right.  Court's adjourned for the day.

25                      (Proceedings concluded.)

26

27

28
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 417

```
 1                  RIVERSIDE, CALIFORNIA; JULY 5, 2018

 2                BEFORE THE HONORABLE SAMUEL DIAZ, JR.

 3           THE COURT:  We're back on the record.  All parties are

 4    present.  The witness -- all jurors are present.  The witness is

 5    on the witness stand.

 6                            ALLISON HUNT,

 7    called as a witness by and on behalf of the Plaintiff, having

 8    previously been first duly sworn, was examined and testified

 9    further as follows:

10                      DIRECT EXAMINATION (Resumed)

11    BY MS. FOSTER:

12       Q.   I think, if memory serves me right, we left off talking

13    about defensive wounds.  Do you recall that?

14       A.   Yes.

15       Q.   And when you are conducting an autopsy, do you search

16    for defensive wounds on the decedent?

17       A.   Yes.

18       Q.   And do you search for defensive wounds on Nicholas

19    McCauley?

20       A.   Yes.

21       Q.   And did you find anything -- well, describe for us what

22    a defensive wound is?

23       A.   So for defensive wound, we're looking for bruising or

24    abrasions or scrapes, usually on the back of the hands, on the

25    forearms, you know, close contact with someone indicating that

26    they've been hit or struck.

27           In sharp force injuries, you tend to turn your hands

28    out and get cuts on your palms.  You can also have bruising or
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 418

1   scrapes on the front part of your lower legs, if you're bringing

2   your legs up.

3          In gunshot wound cases sometimes like it's just a

4   reaction to put your hand up.  Sometimes if the firearm is

5   close, we can see what's called stippling or little punctate

6   abrasions from the unburned gunpowder that comes out the end of

7   the barrel.  You would have to be in very close proximity to the

8   gun for this to happen though.

9      Q.   And did you observe any stippling to hands on Nicholas

10  McCauley?

11     A.   I did not.

12     Q.   Okay.  And tell us again what that would have indicated

13  on Nicholas McCauley, given the type of weapon you were aware

14  was used?

15     A.    In this case the weapon was a shotgun.  Stippling can

16  travel a bit further out of a shotgun than it can out of a

17  handgun.  But those are punctate red abrasions.  We look for

18  them around the entrance wound usually.  Typically a shotgun

19  approximately up to two feet, you can get stippling from the

20  unburned gunpowder coming out of the shell.

21     Q.   And so when you talk about the different types of

22  defensive wounds, did you see anything -- I think we're taking a

23  look at Nicholas's hands.

24          Sorry.  One moment.

25          We're going to search for those hand photos, but I'll

26  move on.

27     A.   Okay.

28     Q.   When you were looking at Nicholas McCauley's hands, did

1    you see anything on the top of his hands to indicate that he
2    tried to defend himself?
3        A.   No, I did not.
4        Q.   Did you see anything on the palms of his hands that
5    indicated he tried to defend himself?
6        A.   No, I did not.
7        Q.   Did you do an examination of Nicholas's feet?
8        A.   Yes.
9        Q.   And what, if anything, did you notice on his feet?
10       A.   I think he had just a little bit of blood, maybe, on
11   the heel of the foot.
12       Q.   Sorry.  I had these pulled last week and then I mixed
13   them back up.
14            MS. FOSTER:  Can I have one moment, Your Honor?
15            THE COURT:  Sure.
16       Q.   BY MS. FOSTER:  Show you what's been marked for
17   identification as People's Exhibit 154.
18            MS. FOSTER:  And I'm showing defense counsel.
19       Q.   BY MS. FOSTER:  Do you recognize what's depicted in
20   People's Exhibit 154?
21       A.   Yes, I do.
22       Q.   And is that from the autopsy that you conducted on
23   Nicholas McCauley?
24       A.   Yes, it is.
25       Q.   And when you were describing blood on his feet, do you
26   see the areas -- let me clarify.  Is this before or after his
27   body was cleaned up for the autopsy?
28       A.   It's hard to say.  In this photograph it looks like it

```
 1    probably has not been cleaned.
 2        Q.   And where did you see an indication of blood in
 3    People's 154?
 4        A.   Think a little bit back here on the heel area and also
 5    on the toe.  Small toe.
 6        Q.   I'm going to show you what's been marked for
 7    identification as People's 155.  Do you recognize what's
 8    depicted in People's 155?
 9        A.   Yes.  This is the left foot, bottom of the left foot,
10    and, again, we have blood at the heel area.
11        Q.   Let me -- I'm going to show you what's been marked for
12    identification as People's Exhibit 143.  Do you recognize what's
13    depicted in People's 143?
14        A.   Yes.
15        Q.   And what is that?
16        A.   So that is the decedent's right hand.
17        Q.   And from that photograph, 143, can you tell -- tell us
18    where there would have been any indication of any defensive
19    wounds, where you would have looked?
20        A.   From this angle sometimes you can see them on the base
21    of the thumb and the knuckles.  It's usually the back of the
22    hands, though.
23        Q.   Based on your observation of the wound to Nicholas
24    McCauley to the external part of his right arm, could you tell
25    which way he may have been holding his arm, or must have been
26    holding his arm at the time that he was shot?
27             MR. MOORE:  Objection.  Speculation.  Foundation.
28             THE COURT:  Overruled.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 421

1          THE WITNESS:  He almost had to be holding his arm with

2    his hand going across his body or even hanging down.

3          Q.    BY MS. FOSTER:  I see you demonstrating.  Do you mind

4    standing up so we can see more clearly?

5          A.    Sure.

6          So either across the body like this or hanging down.

7    It basically entered about the right elbow.  The right humerus

8    was fractured.  And, again, we had six pellets exiting this

9    inner aspect and then coming back into the chest wall.  There

10   was an abrasion kind of right in the armpit, and then the

11   pellets had a real tight pattern going back in.  Some had an

12   abrasion collar.  It's more consistent with the arm being close

13   to the chest wall than just hanging out.

14         Q.    And you said that it either had to be, was that

15   straight down, or let me describe what you did for the record.

16   It seems like you held your arm, your right arm to your side; is

17   that correct?

18         A.    I did.

19         Q.    And then you either had your -- the lower part of your

20   right arm down or facing forward; is that correct?

21         A.    Yes.

22         Q.    And based on your observation of the wound, could the

23   arm have been up facing towards the sky?

24         A.    No.

25         Q.    Could the arm have been out, stretched outwards?

26         A.    No.

27         Q.    You described the pattern of the wound in between the

28   inner arm and the chest, right?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 422

1      A.    Yes.

2      Q.    I'm going to show you what's been marked for

3   identification as People's 147.

4            MS. FOSTER:   Showing defense counsel.

5      Q.    BY MS. FOSTER:   Do you recognize what's depicted in

6   People's 147?

7      A.    Yes.

8      Q.    And when you're describing that pattern, can you tell

9   us what observations you make based on People's 147?

10     A.    So what I'm saying that the upper arm has to be in

11  close proximity to the chest, is right here around the top one

12  kind of even with the nipple, there is a red/purple contusion or

13  bruise around it.  Again, you have this red abrasion contusion

14  around that.  And usually that's due to the skin being in

15  contact with skin.

16           So it's right here.  And you have a lot of pressure

17  moving through, so it creates an abrasion or a contusion.

18  Sometimes you see this type of effect if someone has on

19  clothing, however, the decedent did not have on his shirt.

20     Q.    So there is more that indicates that his arm was in

21  close proximity than just the trajectory of the bullet?

22     A.    Yes.

23     Q.    And when I say "in close proximity," I mean down?

24     A.    Yes.

25     Q.    Showing you what's been marked for identification as

26  People's 148.

27           MS. FOSTER:   And I'm showing defense counsel.

28     Q.    BY MS. FOSTER:   And is People's 148 that same area but

 1    a close-up?

 2         A.   Yes, it is.

 3         Q.   And what's the best way to face it so you can --

 4         A.   Like that.

 5         Q.   That.

 6              Tell us what we're observing in People's 148,

 7    particularly why the pattern of the different bullet entry

 8    wounds appear different?

 9         A.   Okay.  So you have the exits on this aspect, the

10    reentry on -- when I say "this aspect," it's the left aspect of

11    the photograph, which is the inner part of the right arm of the

12    decedent.  So this is the armpit.  Then you're moving on to the

13    right aspect of the chest wall of the decedent.  And so

14    basically they come across and enter the right chest cavity.

15         Q.   Is there a process or procedure you use to kind of

16    follow the pattern of the bullets rather than just looking at it

17    through the naked eye?

18         A.   We can do what's called rod them.  If they're large

19    enough, you can use an actual rod.  Sometimes we use Q-tips

20    or --

21         Q.   I'm going to show you what's been marked for

22    identification as --

23         A.   Swab tips.  I'm sorry.

24         Q.   I apologize.

25              I'm going to show you what's been marked for

26    identification as People's 159.

27              MS. FOSTER:  And showing defense counsel.

28         Q.   BY MS. FOSTER:  Do you recognize what's been depicted

1   in People's 159?

2       A.   Yes, I do.

3       Q.   Is that the process that you just described as rodding

4   the entrance and exit wounds?

5       A.   Yes.

6       Q.   Okay.  And what does this process indicate for you?

7       A.   The trajectory of the pellets.

8       Q.   Now, after you've kind of followed this external

9   pattern, do you follow the wound to see where the pellets landed

10  internally?

11      A.   Yes.

12      Q.   And where did the pellets land for Nicholas McCauley?

13      A.   So the pellets, I recovered five out of the body.  One

14  was in the back of the neck kind of on the right aspect.

15          May I refer to my report, Your Honor?

16          THE COURT:  Yes.  Do you have that with you?

17          THE WITNESS:  I do.

18          THE COURT:  You may.

19          THE WITNESS:  So the back of the neck on the right

20  aspect near the vertebral column at the level of the fifth,

21  seventh, and ninth thoracic vertebrae, which are the ones in

22  your spinal column in the midportion.  So, and then one was

23  behind the scapula.  And -- and that's all.

24      Q.   BY MS. FOSTER:  So you described where the pellets are,

25  you also described a plastic wadding.  Where did you locate the

26  wadding?

27      A.   That was in the right arm.

28      Q.   And did you do an incision into the right arm to find

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 425

1    that wadding?

2        A.   Yes.

3        Q.   I'm going to show you what's been marked for

4    identification as People's Exhibit 102.

5            MS. FOSTER:  Showing defense counsel.

6        Q.   BY MS. FOSTER:  Is this the incision you did into the

7    right arm to locate the wadding?

8        A.   Yes, it is.

9        Q.   And can you use the laser pointer in front of you to

10   tell us where that wadding is?

11       A.   Basically in the middle of the photograph is the

12   wadding.

13       Q.   I'm going to show you what's been marked for

14   identification as People's 104.

15           MS. FOSTER:  Showing defense counsel.

16       Q.   BY MS. FOSTER:  Do you see that wadding?  Is that a

17   close-up of that wadding?

18       A.   Yes.

19       Q.   And is that how it was when you looked inside that

20   incision in the right arm?

21       A.   Yes.

22       Q.   And is that something that you removed from the right

23   arm?

24       A.   Yes.

25       Q.   I'm going to show you what's been marked for

26   identification as People's Exhibit 107.

27           MS. FOSTER:  Showing defense counsel.

28       Q.   BY MS. FOSTER:  Do you recognize what's depicted in

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 426

```
1    People's 107?
2        A.   Yes.
3        Q.   And what is that?
4        A.   So it's -- this was the plastic wadding or cup.  You
5    actually have a cup-like cylinder.  It extended out in a
6    cylindrical fashion, sorry.  And the little white dots are
7    polyethylene.  It's just a substance which you put between the
8    pellets that kind of holds them in together and makes the flight
9    of the pellets stay tighter and more compact.  So that's the
10   residual things you're seeing.  And this is -- probably a better
11   term would be the cup.
12       Q.   So this is the cup that holds all the bullets?
13       A.   Yeah.
14       Q.   And the powder?
15       A.   And sometimes they use just a plastic cylinder, which
16   can be called a wad.  You can also have a cardboard piece, which
17   could be called wadding.  A lot of people use terms
18   interchangeably.  It's fine.
19       Q.   Okay.  So this plastic cup, this is a cup that holds
20   the bullets; is that right?
21       A.   Yes.
22       Q.   So when observing that plastic cup being inside the
23   arm, what does that tell you?
24       A.   Again, this gives you some idea of range of fire.  The
25   plastic cup, obviously, it's plastic, it's propelled out of the
26   end of the shotgun.  It can only travel so far.  Air resistance,
27   it's going to drop off.  They usually drop off.  Again, you need
28   to fire the exact firearm with the exact ammunition to get, you
```

1    know, more accurate numbers, but, in general, wadding and cups

2    are going to start to fall off by eight to ten feet.  If they're

3    inside the wound like this, they travel into the wound, you're

4    talking probably no more than five feet away, five or six feet.

5         Q.   And because this wadding is seen inside of Nicholas, is

6    that why all of the bullets that are -- the pellets that are

7    inside of the wadding are able to travel into his body?

8         A.   Yes.

9         Q.   Were you also able to retrieve pellets from inside

10   organs in Nicholas's body?

11        A.   Inside the organs themselves?  They pass through the

12   organs.

13        Q.   Okay.  So there were no bullets inside -- pellets

14   inside of the organs, but they would pass through the organs?

15        A.   Correct.

16        Q.   And did you retrieve pellets from inside of Nicholas's

17   body?

18        A.   Yes.

19        Q.   And did you collect those pellets?

20        A.   I did.

21        Q.   Let's start with the ones that traveled through the

22   chest area.  Can you tell us again how many traveled in the

23   chest area?

24        A.   I'm not sure of the exact number.  Probably four of

25   them.  Maybe all five.

26        Q.   And what organs did they travel through?

27        A.   So you have defects to the right lateral chest wall,

28   fracturing some ribs; multiple defects in the right lung;

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 428

1    defects in the heart, specifically the top chambers of the

2    heart, which are called the atria.  It went through both of the

3    top chambers of the heart.  It hit the aorta, I think, in two

4    places.  I would have to refer to everything.

5        Q.   And tell us what the aorta is?

6        A.   So the aorta is the big blood vessel that comes out of

7    the heart.  It's about the size of a garden hose, and it pumps

8    blood to all your main organs in the mid-part of your body.

9    It's a very large vessel.

10       Q.   I'm going to show you what's been marked for

11   identification as People's Exhibit 96.

12            Do you recognize what's depicted in People's 96?

13       A.   Yes.

14       Q.   And what is that?

15       A.   So this is the lung.  And so the lung is normally

16   fluffy and pink.  So this is the actual lung tissue where you

17   can see the hole's surrounded by the purple discoloration.

18   That's basically a bruise of the lung.  A hole with a bruise.

19   These are all defects secondary to the pellets traveling through

20   the lung.

21       Q.   So, and just so we're clear and we understand, are you

22   saying that the different black wounds, that's the defect

23   showing that the bullets traveled in that pattern through the

24   lung?

25       A.   Yes.

26            THE COURT:  I'm sorry.  What exhibit was that?

27            MS. FOSTER:  That was Exhibit 96.

28            THE COURT:  Thank you.

1      Q.   BY MS. FOSTER:  I'm going to show you what's been
2   marked for identification as People's Exhibit 128.
3           MS. FOSTER:  Showing defense counsel.
4      Q.   BY MS. FOSTER:  Do you recognize what's depicted in
5   People's 128?
6      A.   Yes.
7      Q.   And what is that?
8      A.   So this is a pellet, one of the pellets from the wound.
9      Q.   And is that the form in which the pellets are when you
10  retrieved them from inside of Nicholas's body?
11     A.   Yes.
12     Q.   So they're still whole and round in some of them?
13     A.   This one is.  It depends on what it hits.  If it hits
14  bone, it can flatten out.
15     Q.   And do you recall how many of them were still in this
16  form?
17     A.   I don't.
18     Q.   Would it refresh your recollection to review your
19  report?  Is it something that's indicated?
20     A.   I don't really indicate if they're flattened out or
21  spherical.
22     Q.   I'm going to show you what's been marked for
23  identification as People's Exhibit 90.  Do you recognize what's
24  depicted in People's 90?
25     A.   Yes, I do.
26     Q.   And what is that?
27     A.   So the previous lung was actually the right lung.  So
28  most of the injuries, of course, they're entering the right

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 430

1    chest cavity, so more injury.  This is the left lung.  And you

2    have a defect.  This is the upper level of the left lung right

3    in the middle of it.

4        Q.   And you said you have a defect.  What are we observing

5    in that defect?  What does that indicate?

6        A.   This is where the pellet traveled.  The hole with a

7    bruise around it.

8        Q.   And when you made your observations of Nicholas's

9    heart, did it have a similar type of injury to it?

10       A.   Yes.

11       Q.   Now, I want to ask you this question.

12       A.   Okay.

13       Q.   What ultimately causes Nicholas to die?

14       A.   Ultimately it's -- it's probably a combination of two

15   things.  A bullet traveled right through his heart, so chances

16   of that getting fixed, not great.  That in itself can cause an

17   arrhythmia and cause the heart to either quiver, not beat

18   properly, and ultimately stop.

19          Also, he had significant blood loss.  That's probably

20   the main factor.  Getting shot in the heart.  So getting hit in

21   the heart and all the fragments or pellets traveling through the

22   chest, you hit both lungs, so your respiratory reserve is going

23   to be decreased.

24          It hit the aorta in two places, so you're losing a lot

25   of blood.  I think he had -- he had over one liter, I'd have to

26   look at the report to see exactly, but approximately 1/4200

27   milliliters in the right chest cavity and then approximately one

28   liter in the left chest cavity.  So when the aorta is hit, blood

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 431

1    is just pouring into each chest cavity.  So it's blood loss,

2    plus you're not going to survive a gunshot wound to the heart.

3        Q.   And so based on the amount of blood that you saw in the

4    chest cavity, based on your experience and your educational

5    background, can you tell us about how long that takes to fill up

6    that amount of blood, you said one liter on one side and

7    approximately one-and-a-half liters on the other side?

8        A.   That could be difficult.  It's going to be fast.

9    Possibly 30 seconds, maybe a few minutes.  It depends on the

10   condition of the person, if they have any clotting deficiencies,

11   if they're on aspirin.  This is a young, healthy 18 year old.  I

12   wouldn't expect him to have any disease.

13          But with that rapid of blood loss, you're going to lose

14   consciousness quickly.  The main thing when we talk about this

15   is there's no injury to the brain stem or the spinal cord.  So

16   brain stem is immediate death.  Death is not immediate, however,

17   when you're losing blood at a rapid rate, you're going to go

18   unconscious first, probably 20 to 30 seconds, maybe sooner,

19   again, it depends on the health of the decedent and the person

20   involved.

21          And then you also have the aspect of the heart.  It's

22   probably still beating, quivering a little bit, because once the

23   heart stops pumping, the blood is going to stop flowing.  So it

24   may not be effectively pumping.  It may just kind of be

25   contracting, but you still have enough reserve for the heart to

26   pump a little while to get blood to flow to the chest cavity.

27       Q.   So I know you were speaking in general terms.

28   Specifically based on Nicholas McCauley, and you said he's about

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 432

1    how tall?

2        A.    I think I had six-seven measured at autopsy.

3        Q.    Are you sure?  Would it refresh your recollection to

4    review your report?

5            THE COURT:  Go ahead.

6            THE WITNESS:  Yes.

7            Six foot seven.

8        Q.    BY MS. FOSTER:  Okay.  And based on your review of

9    Nicholas McCauley, did he appear to be a healthy male?

10       A.    Yes.

11       Q.    So specifically in the case of Nicholas McCauley, about

12   how long would he have lived after receiving this gunshot wound?

13       A.    Minutes.

14       Q.    Is there anything physically indicated that would

15   prevent him from being able to walk around?

16       A.    No.

17       Q.    Is there anything physically indicated that would

18   prevent him from being able to speak?

19       A.    No.

20           MS. BLUMENTHAL:  Your Honor, I would object as to

21   ambiguous as to what point in time.

22           THE COURT:  Do you want to rephrase the question?

23       Q.    BY MS. FOSTER:  During those couple of minutes that he

24   could have still been alive, was there anything physically that

25   would have prevented him from walking around?

26       A.    Specifically to walking around, not a couple of

27   minutes.  He's going to have enough oxygen reserve, the blood

28   that's travel through him, probably to stumble around probably

1    15, 20, maybe 30 seconds.  Again, we're talking generalities

2    here.  It's just people do have enough reserve after they've

3    been shot, stabbed to move around a little while if their brain

4    stem or spinal cord has not been hit.

5           However, minutes, I would say no.  He's going to go

6    unconscious, and then the blood loss will continue.  The heart

7    will slowly go into either V-fib or V-tach and then he'll die.

8    That's why I say "minutes."  It takes a while for the actual

9    complete death to occur, but he's probably going to be

10   unconscious within 30 seconds.

11       Q.   BY MS. FOSTER:  And then based on your observation of

12   the pattern that the, or the direction that the gunshot wound

13   took through Nicholas's body, can you tell what position he was

14   in, if he was up or down, laying up or standing up?

15       A.   I cannot.

16       Q.   Is there anything, based on your observation, that

17   indicates that he was not laying down?

18           Is that a bad question?

19           Do you want me to resk that?

20       A.   Yeah.  Can you rephrase that?

21       Q.   Considering the pattern that his body took and the fact

22   that his arm was down, could he have been laying down?

23       A.   Yes.

24       Q.   At the time he was shot?

25       A.   Yes.

26       Q.   Based on the pattern of the wound, could he have been

27   standing up at the time he was shot?

28       A.   Yes.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 434

1       Q.   And you hesitate.  Why is that?

2       A.   Okay.  So the path of the pellets, they're going from

3  right to left, front to back, and upward.  So Nicholas was a

4  tall guy, we've already established that.  So if he's standing

5  straight up, the barrel has to be below the point of entry for

6  the wadding cup to end up right here and the pellets to continue

7  in a right-to-left, upward fashion.  So I guess if the barrel of

8  the gun is lower than his right arm, it's possible.

9       Q.   Can you stand up again when you show that bottom part

10 of your arm?

11      A.   Sure.

12      Q.   What you're indicating for us?

13           So that I can indicate for the record?

14           When you're -- and you're saying -- well, can you

15 describe that again, showing it?

16      A.   So -- so basically it's coming in at about the right

17 elbow, cup wadding filler in here, defects on the inner arm,

18 defects on the chest wall, pellets.

19           MS. FOSTER:  And just so the record is clear, the

20 witness is standing in the witness stand, she has her right arm

21 up towards the side of her body with the front of it in front of

22 her, and she's pointing with her left arm at the elbow, up

23 through the top of the arm and then across the chest.

24           THE WITNESS:  Yes.

25           So once the pellets get in the right arm, it's hitting

26 this right humerus.  This is bone.  So they're going to deflect

27 in different ways.  But you know that it's coming front to back,

28 right to left, and upward.  So I found pellets in the right back

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 435

1    of the neck, along the spine in the thoracic area, and then one

2    behind the scapula, which is your shoulder blade.

3          So I guess if he's a tall guy, so if somebody is

4    shorter and they have a gun on their hip and pull the trigger,

5    you could still get that trajectory.

6       Q.   BY MS. FOSTER:  So --

7       A.   If he's standing.

8       Q.   And that's with a shotgun, which is about three feet in

9    length?

10      A.   Yes.

11      Q.   And what you describe is a person would have to have

12   their gun lower than them to shoot it in that pattern, if he's

13   standing?

14      A.   Yes.

15          MS. BLUMENTHAL:  Objection.  That misstates her

16   testimony.

17          THE COURT:  Overruled.

18          MS. BLUMENTHAL:  It's more than that.

19          THE COURT:  Overruled.

20          THE WITNESS:  The gun has to be --

21          MS. BLUMENTHAL:  Objection.  No question pending.

22          THE COURT:  Sustained.

23      Q.   BY MS. FOSTER:  To my last question, you seem to have

24   some hesitation.  Why is that?

25      A.   Basically the gun has to be lower than the point of

26   entry to get the trajectory, however you want to put it.

27      Q.   And, now, you didn't describe it that way for if

28   Nicholas was laying down.  What's different about the position

```
 1   if he's laying down?
 2       A.   If he's laying down, it still has to come in at the
 3   right angle to be going right to left, front to back, and up.
 4       Q.   And when you describe him standing up, you're saying
 5   the gun has to be lower in order to get that trajectory.  Is
 6   that different with him laying down?
 7       A.   Depends on how the arm is.  The gun technically could
 8   be higher.
 9       Q.   So with him laying down, would you say it's not clear
10   as to which way the gun would have to face, there's more
11   options?
12           As far as your expertise can go?
13       A.   There is more of an angle that's possible when he's
14   laying down, yes.
15       Q.   So given what you know about Nicholas's size and your
16   experience and training in shotgun wounds, is it possible that
17   Nicholas could have shot himself with the shotgun?
18           MS. BLUMENTHAL:  Your Honor, at this time I would
19   object as to outside this witness's expertise.  She's not a
20   forensic.
21           THE COURT:  Do you want to lay further foundation?
22           Sustained on foundation at this time.
23       Q.   BY MS. FOSTER:  Now, you talked a lot about trajectory?
24       A.   Yes.
25       Q.   And is that consistent with your background, training,
26   and experience?
27       A.   Yes.
28       Q.   And do you have significant training and experience
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 437

1  that would indicate whether or not in this specific case
2  Nicholas could have shot himself?
3       MS. BLUMENTHAL:  Same objection, Your Honor.  Lack of
4  foundation.  No specifics.
5       THE COURT:  She's trying to lay a foundation, so it's
6  overruled.  Further foundation is needed.
7       Q.   BY MS. FOSTER:  Do you have that training and
8  experience that would have indicated -- allowed you to form an
9  opinion as to whether or not Nicholas shot himself?
10      A.   Yes.
11      Q.   Okay.  Describe for us what that training and
12 experience is that will allow you to form that opinion?
13      A.   So just the basics in forensic pathology what we're
14 trained to do is determine cause and manner of death.  One
15 manner -- there is only five manners.  Natural, accident,
16 suicide, homicide, undetermined.  So a group that we often sign
17 the death certificate with is suicide.  So part of my job is
18 being able to determine homicide versus suicide.
19      Q.   And in your determinations that you form to determine
20 suicide -- well, let me back up.  Have you conducted autopsies
21 in which you made a determination of suicide?
22      A.   Yes.
23      Q.   And have you conducted autopsies in which you made a
24 determination of suicide that were the result of a firearm?
25      A.   Yes.
26      Q.   And about how many autopsies, if you can estimate, have
27 you done that where you've made a determination of suicide?
28      A.   At least probably 200, 250.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 438

```
 1      Q.   And you said it's -- your job is not just to consider
 2   the cause of death but also the manner?
 3      A.   Yes.
 4      Q.   And does that also include the manner in which the
 5   suicide occurred?
 6           Meaning how they inflicted their self-inflicted wound?
 7      A.   Yes.
 8      Q.   So based on your training and experience, did you make
 9   a determination of whether or not Nicholas McCauley's death was
10   a result of homicide or suicide?
11           MS. BLUMENTHAL:  Objection as to calls for a conclusion
12   and invades the province of the jury.
13           THE COURT:  Overruled.
14           THE WITNESS:  Yes.
15      Q.   BY MS. FOSTER:  And what was your conclusion?
16      A.   For manner of death?
17      Q.   Yes.
18      A.   Homicide.
19      Q.   And how were you able to eliminate suicide?
20      A.   So for suicide, first of all, for this wound I already
21   talked, there is no soot in the wound; there is no searing in
22   the edges, which is due to the flame that comes out the end of
23   the barrel; there is no muzzle impression, which would be an
24   abrasion with roughly the impression of the barrel on the skin.
25           In this case it's a shotgun.  There's -- with the right
26   arm, it's, essentially, impossible to hold it.  I don't even
27   know how you would hold it and get it to enter here and come up.
28           Another aspect is we have --
```

```
 1      Q.   And when you say "enter here," just so the record is

 2   clear --

 3      A.   Sorry.  Near the right elbow.

 4           So right hand is out of the question.

 5           Left hand, the barrel has to be at least three feet

 6   from the body.  He has scalloped edges of the wound, it's large,

 7   it's irregular.  Again, there is no evidence of contact, there

 8   is not even evidence of close-range firing, which would be the

 9   stippling.  But we do have evidence that it was close, because

10   we still have the wadding in the arm.  So roughly three to six

11   feet.  Again, you need a firearms expert if you want to narrow

12   that down further.  These are rough estimates.

13           But these are the things we look for.  So there's --

14   there is no way he could have pulled the trigger himself.

15           MS. FOSTER:  I have nothing further.

16           THE COURT:  Cross-examination?

17           MS. BLUMENTHAL:  Thank you, Your Honor.

18                         CROSS-EXAMINATION

19   BY MS. BLUMENTHAL:

20      Q.   Good morning, Dr. Hunt.

21      A.   Good morning.

22      Q.   You don't claim to be a forensic or ballistic expert, I

23   take it?

24      A.   No.

25      Q.   Okay.  There are those out there who specifically

26   that's what they do?

27      A.   Yes, ma'am.

28      Q.   It's your opinion is between like three and six feet
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 440

```
 1   the gun would have to be away?

 2       A.   Approximately.

 3       Q.   So eight to ten feet?

 4            Is that a possibility?

 5       A.   On the outer edge of possible.  The wadding is probably

 6   really going to fall off about ten feet.

 7       Q.   Okay.  Now, doesn't it depend on what size ammunition

 8   is being used?

 9       A.   Yes.

10       Q.   Do you know what size ammo this was?

11       A.   I do not.

12       Q.   So part of what happens is when we're talking about the

13   pellet, the projectile and so on, is it depends on what type of

14   ammunition has been used, doesn't it?

15       A.   Yes.

16       Q.   And in this case you know it's a shotgun?

17       A.   Yes.

18       Q.   You don't know what caliber; is that correct?

19       A.   I do not.

20       Q.   You don't know what size shotshell was used?

21       A.   I do not.

22       Q.   You know the various types of shotshells?

23       A.   You know, vaguely.  Yeah.

24            12 gauge, 20 gauge, 16 gauge.

25       Q.   I'm talking shotshells, the ammunition, not the gauge

26   of the shotgun, I'm talking the size of the shells?

27       A.   Two-and-a-half inches is usually normal.

28       Q.   Okay.  Do you know how they -- how they -- what they
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 441

```
 1    call the shotshells?
 2            I mean, there is different type of shotgun shells that
 3    can be used, isn't there?
 4        A.   Yes.
 5        Q.   And are you familiar with the types of shotgun shells
 6    that can be used?
 7        A.   Not right off.
 8        Q.   Okay.  Doesn't that have an impact on the number of
 9    pellets that's in the shotgun shell?
10        A.   It does.
11        Q.   Doesn't that have an impact as to how far some of those
12    shotgun pellets travel?
13        A.   It will.
14        Q.   And doesn't it have an impact on the type of stippling
15    that there could be?
16        A.   Yes.
17        Q.   So all of those are also variables, correct?
18        A.   Yes.
19        Q.   And you don't have any knowledge of the type of shotgun
20    shell that was used in this case; is that correct?
21        A.   I don't recall if I was told what ammunition was
22    suspected.  I don't know.
23        Q.   Okay.  But that is also a variable that you would take
24    into consideration with the proximity of where the end of the
25    barrel of the gun would be when it's discharged?
26        A.   Yes.
27        Q.   And so you're not -- you're not trying to be a
28    ballistics expert, I take it?
```

 1    A.   No.

 2    Q.   You're just kind of -- you're saying in your opinion,

 3   generally speaking, because depending on what type of shotgun

 4   shell and so on, this would be your general opinion dealing with

 5   the ballistics area?

 6    A.   Yes, ma'am.

 7    Q.   Okay.

 8         Now, let me ask you a couple of questions.

 9         With this type of injury, and you say that the decedent

10   here was -- appeared to be in pretty good physical condition; is

11   that correct?

12    A.   Yes.

13    Q.   That he could have been unconscious between 15 to 30

14   seconds.  Is that a fair statement?

15    A.   Yes.

16    Q.   That you're pretty sure about now?

17    A.   Yes.

18    Q.   Okay.

19         Now, when a person gets hit with a shotgun blast at

20   close distance, and you seem to have some familiarity with guns

21   in general.  Is that a fair statement?

22    A.   Yes, ma'am.

23    Q.   You grew up with guns?

24    A.   I did.

25    Q.   And that's what I'm trying to get at.

26    A.   Okay.

27    Q.   So when you get hit by a shotgun blast, that's pretty

28   traumatic to the body by itself?

```
 1        A.   Yes.

 2        Q.   I mean, it's startling when you get hit with a shotgun

 3   blast, it kind of pushes you back?

 4             MS. FOSTER:  I'm going to object as to outside

 5   foundation as to this expert.

 6             THE COURT:  Overruled.

 7             THE WITNESS:  It's not like TV.  It's not going to blow

 8   you back.

 9        Q.   BY MS. BLUMENTHAL:  Correct.

10        A.   I mean, it may stun you.

11        Q.   In other words, you're not going -- if you get --

12        A.   But physically you're not --

13        Q.   Go ahead.

14        A.   Sorry.  Physically you're not going to fly backwards

15   like the movies.

16        Q.   Right.  I'm not suggesting that.

17        A.   Okay.

18        Q.   But if you get hit with a shotgun blast, you're not

19   going to keep going forward either?

20        A.   I mean, if your momentum is carrying you that way and

21   you still can breathe, I mean, I can't say.

22        Q.   Okay.  In this particular case it's your belief that

23   the decedent was probably unconscious within 15 to 30 seconds?

24        A.   Yes.

25        Q.   Is that a fair statement?

26        A.   Yes.

27        Q.   And that in that 15 to 30 seconds, is it your belief

28   that he was probably not communicating?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 444

1        A.    I don't know.

2        Q.    What happens to -- when a person goes unconscious

3   within 15 to 30 seconds, what causes them to go unconscious that

4   quickly?

5        A.    Well, in this case would be the loss of blood, and his

6   heart is not functioning properly.  What's allowing him to

7   initially carry on is probably just the reserve amount of oxygen

8   that's in his blood that's supplying his brain.

9        Q.    Now, there was also a defect to the carotid artery as

10   well, correct?

11        A.    I would have to look in my report.

12        Q.    Would you do that, please?

13        A.    Sure.

14              I don't see where I listed the carotid.

15        Q.    Okay.  When you first start an autopsy, one of the

16   first things that you do is you take a look at external

17   injuries, correct?

18        A.    Yes, ma'am.

19        Q.    And this is before.  When you first take a look at the

20   body itself, it's normally at that time been taken out of the

21   body bag that's it's been put in, correct?

22        A.    Yes.

23        Q.    And how long had the decedent in this case been

24   deceased at the time you did the autopsy?

25        A.    I would have to refer to it.

26              THE COURT:  Okay.  Go ahead.

27              THE WITNESS:  Okay.

28              So time of death, or date of death I have as November

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 445

1    the 10th.  I did my autopsy on November the 12th.

2        Q.   BY MS. BLUMENTHAL:  Okay.  So a day, day and a half,

3    two days had gone by?

4        A.   Yes, ma'am.

5        Q.   What happens to the body in that time period?

6        A.   It's refrigerated, so decomposition is minimal, but

7    technically it's starting to decompose.

8        Q.   And what happens to the rigidity of the body?

9        A.   When it's refrigerated, it usually holds pretty good.

10   It's going to appear that rigor may still be there.

11       Q.   Was rigor there when you did the autopsy?

12       A.   May I refer?

13            THE COURT:  Yes.

14            THE WITNESS:  Yes.  It appeared to be.

15       Q.   BY MS. BLUMENTHAL:  In fact, the rigor mortis was fully

16   developed?

17       A.   Yes.

18       Q.   Is that correct?

19       A.   Yes.

20       Q.   At least per your report that you put in there,

21   correct?

22       A.   Yes.

23       Q.   Now, when you first examine the body, you take a look

24   at the outside of the body and you found the measurements and

25   the weight?

26       A.   Yes.

27       Q.   And that is before you clean the body; is that correct?

28       A.   Yes.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 446

1      Q.   Okay.  And you take a look, and the decedent in this
2  case had facial hair?

3      A.   Yes.

4      Q.   In fact, you had written had full facial -- had full
5  beard and mustache?

6      A.   Yes.

7      Q.   And when you examined the face, did you notice any
8  injuries on the face?

9      A.   Had punctate abrasions or scrapes on the lips.

10     Q.   And would you describe what that is?

11     A.   The removal of the first layer of skin.

12     Q.   And did that appear to be from the blood that had come
13 from his mouth?

14     A.   I can't say.

15     Q.   That's something that happens when a person is deceased
16 and the blood comes from their mouth, that frequently will cause
17 a deterioration of the lips and the mouth; isn't that correct?

18     A.   It can.

19     Q.   And you didn't make a determination as to the cause of
20 that in this case; is that correct?

21     A.   That is correct.

22     Q.   Now, I'm going to show you what we had marked as
23 Exhibit Y.  And I think I'll put it this way.

24          Take a look at Exhibit Y.

25     A.   Yes.

26     Q.   Has this body been cleaned up with the blood at all
27 yet?

28     A.   No, ma'am.

1     Q.   As you took a look at the body, did you notice any --

2   well, as we take a look at the body, we see what appears to be,

3   at least I would suspect, not being an expert or anything like

4   that, that this could well be blood around the nose and mouth

5   area?

6     A.   Yes.

7     Q.   And is that?

8     A.   Yes.

9     Q.   Now, that's something that gets cleaned up afterwards,

10  correct?

11    A.   Yes.

12    Q.   Now, when that blood has, I guess for lack of a better

13  word, dried on an individual's face, a deceased face, that still

14  causes some damage to the skin?

15    A.   The blood itself typically doesn't.  More of it is

16  caused from the acidic nature of gastric contents that would

17  possibly come up.

18    Q.   And explain that a minute, if you could?

19    A.   So a lot of times usually purge is what comes out of

20  the mouth.  So you can have a little bit of gastric contents and

21  acid come up.  And sometimes it can cause drying or

22  abrasion-like lesions on the face or lip.

23    Q.   Okay.  And that was what I partly what I was asking

24  you.

25          Now, when you take this, when you clean up the body

26  after you observe the blood on it, you would be removing all the

27  dried blood around the nose and mouth, then, I take it?

28    A.   Yes.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 448

1      Q.   Okay.  Now, as you looked at the body, did this appear

2   to be -- did this photograph appear to be the same or similar

3   condition when you first looked at the body outside of the body

4   bag?

5      A.   Yes.

6      Q.   Now, could you describe the blood that would be on the

7   body here?

8      A.   So this is thick and dry.  I would say "scattered

9   blood."  Because it appears to be dry, I can't say for sure.

10      Q.   Now, there appears to be some blood, or, and I don't

11   mean that it was formed there, but maybe rubbed there or

12   something, but appears to be some blood or blood remnants around

13   the belly area?

14      A.   Yes.

15      Q.   And, obviously, as we're looking at the body here, the

16   right arm appears to be, as you described it, shattered.  It

17   appears to be very, very large on the upper arm area?

18      A.   Yes.

19      Q.   And could you explain why it's so large?

20      A.   Because the right arm is broken in many pieces.

21      Q.   Now, does that inflame immediately to that side, or

22   does that take a little while?

23      A.   No.  That -- it won't continue in the inflammation

24   process after death.  So it does it pretty much immediately.

25      Q.   Okay.  That would happen almost immediately?

26      A.   Yes.

27      Q.   And there is blood on that right arm?

28      A.   Yes.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 449

1    Q.   And that would come from the wounds, what appears to be

2    the wounds from the pellet entry?

3    A.   Possibly, yes.

4    Q.   Is that what you were able to determine?

5    A.   I don't know if I necessarily made a determination for

6    that blood.

7    Q.   Okay.

8    A.   It would be consistent with that, yes.

9    Q.   That's what I'm asking you.  It would be consistent,

10   the blood that's seen on that arm would be consistent with the

11   entry wound?

12   A.   Yes.

13   Q.   Now, as you examine the left arm, did you notice any

14   injuries at all on the left arm?

15   A.   No.

16   Q.   Did you, outside of the upper -- I'm sorry.  The upper

17   portion of the right arm that was fractured, did you see any

18   other injuries on the right arm?

19   A.   I think there was just a bruise, but that's related to

20   the fracture.

21   Q.   Okay.  The bruise that -- you found a bruise on the

22   right arm, the upper portion of the right arm?

23   A.   Yes.

24   Q.   That you believe is related to the fracture?

25   A.   Yes.

26   Q.   That appeared to be to you?

27   A.   Yes.

28   Q.   Now, as you examined the rest of the body of the

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 450

```
 1    decedent, did you notice on the front side, did you notice any
 2    other injuries at all?
 3         A.   No, ma'am.
 4         Q.   And from the waist down to the feet, did you notice any
 5    injuries at all on his body on the legs?
 6         A.   No.
 7         Q.   And any other portion of the body on the front side?
 8         A.   No.
 9         Q.   I'm going to show you what's been marked as "X" for
10    identification.  And this appears to be the backside -- I'll put
11    it up this way -- of the body of the decedent, correct?
12         A.   Yes.
13         Q.   Now, there appears to be some discoloration on the left
14    side of his body of the back?
15         A.   Yes.
16         Q.   And why is that?
17         A.   That's called lividity.  It's the settling of the
18    blood.
19         Q.   So when a person lays on a certain spot after they're
20    deceased, and the body lays there, it causes certain change of
21    colors?
22         A.   Yes.
23         Q.   And does that -- is that what happened here?
24         A.   Yes.
25         Q.   Now, there also appears to be on the right side of the
26    body some blood on his back just below the waist area?
27         A.   Yes.
28         Q.   And where would that blood appear to you to have come
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 451

1   from?

2       A.   The right arm area.

3       Q.   That appears to be blood that came from the wound

4   itself?

5       A.   Yes.

6            MS. BLUMENTHAL:  I'm sorry.  I had the wrong exhibit on

7   there.

8            Exhibit Z.

9            I looked at the "X" you had below there.  I apologize.

10           THE COURT:  I'm sorry.  "Z"?

11           MS. BLUMENTHAL:  "Z."  I looked at the "X," the little

12  box below.

13      Q.   BY MS. BLUMENTHAL:  Now, as you looked at the backside,

14  did you notice any injuries at all?  Outside of the blood that

15  we see, were there any injuries at all on the backside?

16      A.   No.

17      Q.   And how about the back of his neck?

18      A.   I don't think so.

19      Q.   Okay.  You didn't note any, at least in your report; is

20  that correct?

21      A.   I did not.

22      Q.   And if you would -- as you're doing an autopsy, if you

23  notice that there is an injury that does not appear to be

24  related to the wound itself, you would -- you would have written

25  that down; is that correct?

26      A.   Yes.

27      Q.   And why do you do that?

28      A.   Just we document everything we see.

1     Q.   Sure.

2          So you did not notice anything, then, to his backside;

3     is that correct?

4     A.   I did not.

5     Q.   Now, I'm going to show you what's been marked as "AA"

6     for identification.  And I'm going to ask if you are familiar

7     with the contents of that photograph?

8     A.   It appears to be an autopsy photograph, yes.

9     Q.   And that's of the decedent in this case, correct?

10    A.   Yes.

11    Q.   Now, again, it has various colors, looks like darker

12    red and white on the backside.  Could you explain what that is?

13    A.   Again, this is rigor mortis.  So areas of pressure are

14    going to be pale, and then the pinkish purple areas are where

15    the blood has settled.

16    Q.   That has nothing to do with any injuries, though?

17    A.   No, ma'am.

18    Q.   So when a body is in a position after the body is

19    deceased, then blood accumulates in certain areas?

20    A.   Yes.

21    Q.   And that's what this is reflecting; is that correct?

22    A.   Yes, it is.

23    Q.   Now, as you did the external examination, it's your

24    testimony that you noticed no injuries on the body, then, not

25    related to the -- to the bullet shot injury?

26    A.   Yes.

27    Q.   By the way, when you were describing the projectiles

28    and you were describing where they were found inside the body,

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 453

1    you said you found one that was near the back or the base of the

2    skull; is that correct?

3        A.   It was on the, I just have posterior aspect of the

4    neck.

5        Q.   Okay.  And you use that, the location of that pellet to

6    determine the position of the weapon; is that correct?  That was

7    one of your variables?

8        A.   The pellets in the body less so than the wadding in the

9    arm.

10       Q.   Okay.  I think what I'm asking you is:  Once that

11   shotgun shell, or the pellets hit the arm and it burst the way

12   it did, it shatters the way it did, doesn't that affect the

13   direction that the pellets go inside the body?

14       A.   Yes, it will.

15       Q.   Okay.  So you can't always say the position of the gun,

16   based upon a pellet that could be found at the base of the

17   skull, because it can also be deflected by the bone in the arm

18   that it hit?

19       A.   Yes.

20       Q.   I'm going to show you "FF" for identification.  And I'm

21   going to ask -- this is the -- I always have to look at my

22   hands.  The other left.  This is the left hand of the decedent,

23   correct?

24       A.   Yes.

25       Q.   Now, the nails appear to be a little bit darker here?

26       A.   Yes.

27       Q.   And why is that?

28       A.   Basically the nail beds get what's called cyanotic.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 454

 1  Purple.  So low oxygen.

 2      Q.   Okay.  It would not have been like that before he was

 3  deceased; is that correct?

 4      A.   That is correct.

 5      Q.   Okay.  This is because of the lack of oxygen for the

 6  nail bed area?

 7      A.   Yes.

 8      Q.   Now, I take it, you examined his hands?

 9      A.   Yes.

10      Q.   Is that right?

11          And when you examined his hands, is that basically the

12  condition you found the hands in?

13      A.   Yes.

14      Q.   Now, when you examined the hands, you did not find, and

15  I take it on his left hand, you did not find any wounds

16  whatsoever?

17      A.   Correct.

18      Q.   Defense or offense?

19      A.   Correct.

20      Q.   Okay.  There was just no injuries at all?

21      A.   Right.

22      Q.   Now, I'm going to show you "CC" for identification.

23  And this appears to be the outside of -- well, let me go back to

24  the other one first, I apologize.

25          "FF" for identification.  Was this taken after the body

26  was cleansed, or can you tell?

27      A.   It appears to be.  Those hands are very clean.

28      Q.   Okay.  Number "CC" for identification, that appears to

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 455

1    be the outside, the upper -- the top portion of the left hand

2    prior to the cleaning; is that correct?

3        A.   Yes, ma'am.

4        Q.   Did you notice any injuries at all to that left hand?

5        A.   No.

6        Q.   I'm going to show you the side portion, "DD" for

7    identification.  And that appears to be the side of the

8    decedent's left hand?

9        A.   Yes.

10       Q.   And did you notice any injuries there at all?

11       A.   No.

12       Q.   What type of injuries do you look for?  When you were

13   saying you look for injuries, it kind of gives you a better idea

14   of what the body was doing before the shooting?

15       A.   Yes.

16       Q.   Before during, correct?

17       A.   Correct.

18       Q.   And one of the things you look for, as you described

19   it, was defensive wounds?

20       A.   Yes.

21       Q.   You also look for offensive wounds?

22       A.   Sure.

23       Q.   You didn't find any wounds.  Is that a fair statement?

24       A.   Yes.

25       Q.   I mean, outside of the gunshot wound?

26       A.   Correct.

27       Q.   I'm going to show you "EE" for identification, which

28   also appears to be the palm portion of the decedent's hand,

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 456

```
 1   correct?
 2       A.   Yes.
 3       Q.   And that appears to be before it's been cleaned?
 4       A.   Yes, ma'am.
 5       Q.   And as you're looking at that, and you looked at it at
 6   the time, were there any wounds whatsoever?
 7       A.   No, ma'am.
 8       Q.   Does anything happen to the finger -- now, we see also
 9   a difference in color of the fingernails on this hand.  Is this
10   also due to the lack of oxygen going there?
11       A.   Yes.
12       Q.   Now, as the body is being refrigerated, no oxygen
13   going, do those nails get darker and darker as the days go by?
14       A.   They do.
15       Q.   I'm going to show you "BB" for identification, which
16   appears to be the clean -- cleaned up left hand, correct?
17       A.   Yes.
18       Q.   And I take it that pretty much gives you an idea that
19   there is no injury whatsoever to the left hand?
20       A.   Yes, ma'am.
21       Q.   I'm going to show you "GG" for identification.  And
22   that is the bottom of the right foot?
23       A.   Yes.
24       Q.   I always have to look at mine to see which is right or
25   left.
26            There seems to be a little bit of blood on that.  Could
27   you describe that?
28       A.   It appears to be a small amount of dry blood.
```

1      Q.   As we take a look at it, there appears to be some on
2   the little toe?
3      A.   Yes.
4      Q.   Were there any injuries to the feet?
5      A.   None.  Not that I noted, no.
6      Q.   Now, if you would have seen an injury, a direct wound,
7   you would have noted that?
8      A.   Yes, ma'am.
9      Q.   Whether they stepped on something or whatever, you
10  would have still noted it in some way?
11     A.   Yes.
12     Q.   So this appears to be simply some blood that was either
13  on the floor or on the person, you don't know, but just redness
14  of blood?
15     A.   Yes.
16     Q.   And you see as to the ball of the foot, about halfway
17  through, there appears to be a little bit of blood there; is
18  that right?
19     A.   Yes.
20     Q.   And there appears to be a little bit to the upper
21  portion of the heel of the right foot?
22     A.   Yes.
23     Q.   And were there any -- did you see any injuries at all
24  on either the top or the bottom of the right foot?
25     A.   No, ma'am.
26     Q.   I'm going to show you the left foot that's been marked
27  as "HH" for identification.  And does that appear to be the left
28  foot as you first saw it?

1      A.   Yes.

2      Q.   Now, there appears to be a little bit of blood back

3  here on the backside; is that correct?

4      A.   Yes.

5      Q.   Now, frequently when a body is lying down, and assume

6  the body is lying on its back, can blood coagulate or gather at

7  the area of -- at the back of the heels if the body is laying on

8  its back?

9      A.   Yes.

10      Q.   And sometimes will that form a bubble?

11      A.   It's possible.

12      Q.   Okay.  Do you see blood on the heel of this photograph

13  here?  Can you tell if -- how -- when you took a look at that

14  foot, could you tell the origin of that blood?  Did it appear

15  just to be on top?  Did it appear to have coagulated in that

16  area?

17      A.   Can you rephrase, I'm sorry?  Okay.  The origin?

18      Q.   Yes.  Thank you.

19      A.   I can't tell.

20      Q.   Okay.

21      A.   And, sorry, the second part?

22      Q.   Well, you don't have, as you're sitting here today, you

23  don't have any idea as to the origin of that blood?

24      A.   Right.

25      Q.   Was there an injury there?

26      A.   No.

27      Q.   Okay.  Now, I'm going to show you -- I'm going to show

28  you the right hand.  "RR" for identification.  Now, obviously,

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 459

```
 1    the upper portion of that right hand, the upper portion of the
 2    arm is the arm that is shattered?
 3        A.   Yes.
 4        Q.   In essence?
 5             Now, you took a look at the right hand itself.  Were
 6    there any injuries on the right hand?
 7        A.   No.
 8        Q.   And I'm going to show you "QQ" for identification,
 9    which appears to be the topside of the right hand.  When you
10    examined that, were there any injuries, defensive or otherwise,
11    on the right hand?
12        A.   No.
13        Q.   Now, when you -- you have been given special training
14    in defensive kinds of injuries?
15        A.   Yes.
16        Q.   And the injuries that you're talking about were
17    defensive, are those the kind -- are those the kind of injuries
18    where a person is engaged in some sort of altercation or they're
19    trying to protect themselves?
20        A.   Yes.
21        Q.   Being called a defensive wound?
22        A.   Yes, ma'am.
23        Q.   And sometimes you'll see wounds that will be offensive,
24    meaning that they were trying to slug someone else?
25        A.   Yes.
26        Q.   For lack of a better word?
27        A.   Sure.
28        Q.   It is my understanding your testimony that you didn't
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 460

1    find any injuries whatsoever outside of the gunshot wound that

2    we're talking about on his whole body?

3        A.    Correct.

4        Q.    How many pellets did you find in the body?

5        A.    Seven.

6        Q.    Were there any that were deformed?

7        A.    I don't recall.

8        Q.    Okay.  You would also have to know the type of, you

9    know, whether it's buckshot, double-ought, slugs?

10       A.    It is not a slug, but --

11       Q.    Okay.  That's because you found pellets, correct?

12       A.    Correct.

13       Q.    So you know it's not a slug, but outside of that, you

14   would not know the caliber of the ammunition?

15       A.    Not specifically, correct.

16             It's consistent with double-ought.

17       Q.    Bird shot?

18       A.    No.

19       Q.    Okay.  Now, you were asked questions about the

20   positioning of the other gun?

21       A.    Yes.

22       Q.    Sometimes the direction of it depends on the size of

23   the gun; is that correct?

24       A.    Yes.

25       Q.    It can depend on whether it's short barreled or long

26   barreled?

27       A.    Yes.

28       Q.    And sometimes it depends on whether the person who is

1    holding the gun has it in an upward position or is just holding

2    it downward; is that correct?

3        A.   Yes.

4        Q.   I mean by holding it downward, the barrel might be

5    pointed up, but they're holding it down?

6        A.   Yes.

7        Q.   Okay.  Now, at six-seven, that's a pretty tall person?

8        A.   Yes.

9        Q.   And if another person is shorter and is holding a

10   weapon, and assume they're just holding it in a regular form,

11   not up at their shoulder, not like they're getting ready to

12   shoot it or something, but holding it, is it possible for it to

13   go front to back, and when you said, "front to back," you're

14   talking from the side over, correct?

15       A.   Yes.

16       Q.   You're not -- when you say "front to back," you're not

17   talking from the direct front of the person's body?

18       A.   No, ma'am.

19       Q.   Would that be a correct statement?

20       A.   Yes.

21       Q.   So when you say "front to back," you're talking about

22   the front of the arm?

23       A.   Yes.  I mean, you have injuries to, you know, more

24   anterior places in the body, and the pellets are mostly around

25   the back.

26       Q.   Okay.

27       A.   So that trajectory is front to back.  It doesn't mean

28   straight on, it could be --

```
 1      Q.   Sideways?

 2      A.   Any angle, yes.

 3      Q.   Okay.

 4      A.   But front to back, generally.

 5      Q.   Okay.  So you're not saying the person is standing

 6  directly in front of them?

 7      A.   Correct.

 8      Q.   If the decedent's body is to the side, and pellets, if

 9  they hit that arm bone, get deflected; is that correct?

10      A.   Yes.

11      Q.   So you can't really tell by that.  You might be able to

12  tell a little by the wadding, but even the wadding gets

13  deflected, doesn't it?

14      A.   Somewhat.

15      Q.   So you can't really tell the positioning in the same

16  way once it hits bone, because the pellets spread?

17      A.   Correct.

18      Q.   And they can all go the same direction or they can all

19  go in different directions?

20      A.   True.

21      Q.   There is no set format; is that correct?

22      A.   Correct.  Correct.

23      Q.   So the person could be on the side, there could be

24  movement going on; isn't that correct?

25      A.   Yes.

26      Q.   Now, if you were -- once a body gets hit with that kind

27  of force where we had that kind of wound, how quickly does the

28  bleeding start?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 463

1    A.    Immediately.

2    Q.    And how much gushing is there of the blood?

3    A.    A lot.

4    Q.    A lot?

5    A.    Yes.

6    Q.    In other words, we're not talking about a trickle

7  effect that builds up?

8    A.    No.

9    Q.    We're talked pretty steadily?

10    A.    Yes.

11    Q.    Especially because of the massiveness of the wound and

12  because of the veins and arteries that were hit?

13    A.    Yes.

14    Q.    Which is why a person goes into unconsciousness within

15  15 to 20 seconds -- within 15 to 30 seconds?

16    A.    Yes.

17    Q.    Now, when a person goes into unconsciousness, what

18  happens to them?

19    A.    Basically they're not conscious, so they may still be

20  breathing, but they're not moving.  Higher functions do not

21  work.

22    Q.    Okay.  Are they able -- if they go into

23  unconsciousness, are they able to walk?

24    A.    No.

25    Q.    Are they able to move around?

26    A.    I mean technically if they had a seizure, they could

27  move, but voluntarily they cannot move.

28    Q.    That's what I'm talking about, voluntarily?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 464

1    A.   No.

2    Q.   Now, when a person gets, they go into unconsciousness,

3    if they're in a standing position, do they normally just

4    collapse?

5    A.   Yes.

6    Q.   And so if a person has been standing when they were

7    shot like this, go into unconsciousness within 15 to 30 seconds,

8    it would be your medical belief that that body would just kind

9    of collapse on the floor, if they had been standing up?

10   A.   Yes.

11   Q.   Now, when you were talking about the placement of the

12   arm to have the kind of scattering effect on the outside of the

13   arm where the pellets going inside the body, you had two kind of

14   different positions.  One was that the arm would be kind of

15   down, just kind of hanging down at the body?

16   A.   Yes.

17   Q.   The arm's not necessarily doing anything; is that

18   correct?

19   A.   Correct.

20   Q.   And the other would be if that same arm, the right arm

21   were simply -- the forearm were simply up?

22   A.   Yes.

23   Q.   But the -- what do you call this portion of your arm?

24   A.   We just call that the arm, and this is the forearm.

25   Q.   Okay.  The forearm and the arm.

26        Let's assume that that upper portion were just simply

27   down and the forearm were up.  Would that be consistent with the

28   wound that you saw?

```
 1        A.   Yes.
 2        Q.   Okay.  And if the forearm were down and the upper arm
 3   is still in that same position, that would also be consistent
 4   with the injury that you saw?
 5        A.   Yes, ma'am.
 6        Q.   All you're saying is that the arms are not way up in
 7   the air or way out away from the body?
 8        A.   Yes.
 9        Q.   Would that be a fair statement?
10        A.   That's fair.
11        Q.   Or at least the right arm?
12        A.   Yes, ma'am.
13        Q.   Do you know when a -- when pellets hit, just assume for
14   this hypothetical that it's a double-ought.
15        A.   Okay.
16        Q.   Pellet.  Double-ought.
17             Do you know how much deflecting they do when they hit
18   an arm or they hit a major bone?
19        A.   No.
20        Q.   You haven't done any study of that, I take it?
21        A.   No.
22        Q.   Would there be a consistency, or that just depends on
23   it could go anywhere?
24        A.   I don't know.
25             MS. BLUMENTHAL:  I have no further questions, Your
26   Honor.
27             THE COURT:  Redirect?
28             MS. FOSTER:  Yes.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 466

```
 1                      REDIRECT EXAMINATION
 2    BY MS. FOSTER:
 3        Q.   I just want to clarify a few things from
 4    cross-examination, okay?
 5        A.   Okay.
 6        Q.   You talked about the different types of shells and
 7    ammunition.  Do you recall having that conversation?
 8        A.   Yes.
 9        Q.   And do you have all those different types for shotguns
10    specifically memorized?
11        A.   No.
12        Q.   Do you have secondary resources that you use during the
13    time that you're drawing your conclusions to reeducate yourself
14    on those specifics?
15        A.   Yes.
16             MS. BLUMENTHAL:  I'm going to object.  That calls for
17    hearsay.
18             THE COURT:  Overruled.
19             THE WITNESS:  Yes.
20        Q.   BY MS. FOSTER:  And did you use those sources to form
21    your opinions in this case?
22        A.   Yes.
23        Q.   Now, we looked at some photographs of Nicholas's body
24    at the time of the autopsy.  Can you tell, based on his wound,
25    how much he would have been bleeding externally?  I know you
26    talked about how many liters filled up in his chest cavity, but
27    how much he would have been bleeding externally based on the
28    wound that you saw?
```

1        A.    No.

2        Q.    And is that because it varies depending on what he's

3   doing?

4        A.    It would vary.  I mean, I wouldn't necessarily base it

5   on the wound.  You still have a large defect of the right arm

6   with a lot of fractures, so I would say a significant amount.

7   The best thing we do is look at seeing photographs.

8        Q.    Now, when you talk about the direction of the gun, what

9   types of things are you using to base your opinion?

10       A.    For the path?

11       Q.    The path?

12       A.    So we put the body in what's called anatomic position.

13  So standing straight up, palms out, looking forward, hands down

14  at your side.  So came in at the right elbow.  I have a wad

15  here, I have a fracture of the upper arm, and then I have

16  pellets coming across.  So just in general, it's front to back,

17  right to left, and upward.

18       Q.    And did you -- when you conduct autopsies, are there

19  times where you noted that a bullet either hits bone and goes,

20  starts to travel in a different direction?

21       A.    Yes.

22       Q.    Do you see that in Nicholas's body?

23       A.    It's -- again, it's hard to tell with pellets.  They

24  can spray.  I think the trajectory from the arm to the chest

25  wall is pretty, you know, much what I said, upward and front to

26  back and right to left.

27       Q.    So you didn't see anything that made you think they

28  were detoured in different directions?  Nothing that stood out?

1     A.    No.

2     Q.    When you talk about offensive and defensive wounds, did

3  you see anything on Nicholas's body that indicated a fistfight

4  or physical fight?

5     A.    No, I did not.

6     Q.    You specifically said the type of ammunition was not

7  bird shot.  What's the difference in bird shot?

8     A.    Bird shot's tiny.  It's like a millimeter, two

9  millimeters, you know, probably hundreds, maybe thousands of

10  little pellets packed into the shell.  And they scatter a lot.

11     Q.    Do you -- have you seen wounds that were inflicted by

12  bird shot?

13     A.    Yes.

14     Q.    And what is the difference?  Is there any noticeable

15  difference in those types of wounds versus what Nicholas had?

16     A.    Those wounds, the outside is going to be about the

17  same.  Unless you're far away and the shot actually starts to

18  spread before it gets to the body, you're going to have a lot

19  impact from just the bird shot.  Once it gets into the body,

20  those -- for these we do X-rays, and so I saw seven pellets, so

21  I recovered seven pellets.  They're large fragments of led.  We

22  recovered them all.  Bird shot we just get what's called a

23  representative sample.  So we'll take a few.  It does, you know,

24  it kind of shreds things more than makes the one exact wound

25  that you can follow.

26     Q.    Now, you were also asked a question about whether or

27  not your opinion could change depending on whether it's a

28  short-barreled or a long-barreled shotgun.  Do you recall those

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 469

```
 1   questions?
 2       A.   Yes.
 3       Q.   If the gun is a long-barreled shotgun, does your
 4   opinion change any?
 5       A.   In this case, no.
 6       Q.   And as far as being a self-inflicted wound, does the
 7   fact that it's a long-barreled, if it is a long-barreled
 8   shotgun, does that affect your opinion?
 9       A.   It makes it even more not likely.
10       Q.   That it was self-inflicted?
11       A.   That it was not self-inflicted.
12       Q.   When you say "15 to 30 seconds," is that an estimate or
13   is that exact?
14       A.   Estimate.
15       Q.   Could it be more or less?
16       A.   Yes.
17       Q.   And what variables affect that?
18       A.   State of the person, or, you know, the health, state of
19   the person.  Just physiologically if it happens to hit the
20   conduction system of the heart or not, how much oxygen reserve
21   they have.  It's just lots of physiologic factors that vary from
22   person to person.
23       Q.   With those variations in mind, what is the outside,
24   meaning the longest?
25       A.   Minutes.  Highly unlikely.
26       Q.   And where does one minute fall in that scale?
27       A.   For death or unconsciousness?
28       Q.   Unconsciousness?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 470

 1    A.   It's hard to say.  Not likely.  But "not likely" could

 2    be conscious at one minute.

 3    Q.   Now, I think one of the last questions you were asked

 4    was about what the right arm movement consisted of.  So you were

 5    asked if it -- what you're saying is whether it means that the

 6    arm was not up, and you said, "No"?

 7    A.   Correct.

 8    Q.   And it's not out?

 9    A.   No.

10    Q.   But based on your conclusions, did you also come to the

11    conclusion that the right arm is not holding the gun that fired

12    it?

13    A.   Yes.

14    Q.   Based on the -- let me get the photograph.  I'm going

15    to show you what's been marked for identification as People's

16    156.  Based on the photograph in People's 156, using what you

17    see in this photograph alone, can you make a determination that

18    the gun was not touching, physically touching Nicholas at the

19    time it was discharged?

20    A.   Yes.

21    Q.   And that's outside of what happens with the pellets

22    inside of his body?

23    A.   Yes.

24    Q.   And what is your opinion based on 156 alone?

25    A.   Based on 156 alone, so when you look at the outside,

26    the appearance of the shotgun wound, first of all, I'm looking

27    around the skin.  Is there soot, which would be heavy, black,

28    thick residue?  No soot.  That's usually right out the end of

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 471

1    the barrel.  The barrel has to be very close.  Is there soot in

2    the wound bed?  Black particles pushed into the wound bed?  No.

3           So then you look around the outside.  Could this be

4    consistent with the barrel of the gun touching the skin causing

5    an abrasion?  Well, that's a pretty large wound, and the barrel

6    is not that big, plus that might have a little bit of an

7    abrasion appearance.  This is just skin rubbed off.  Then you

8    start to notice the scalloping.  So I know it's not contact.

9           Then you want to look on the skin.  It's called

10   stippling.  It's a lot less in a shotgun wound than in handguns,

11   because it has further to travel down the barrel, but you still

12   can get unburnt gunpowder particles coming out the end of the

13   barrel, and they stick in the skin.  They cause a little

14   abrasion.  We call them punctate red abrasions.  Super small.

15   None of those are around the skin.  Again, stippling, handguns

16   it's usually like a foot, a foot and a half.  Shotguns it can go

17   further, two, two-and-a-half feet.  Again, it depends on the

18   gun.  It depends on the ammunition.

19           I'm looking for relative things that I can say, you

20   know, with pretty good certainty concerning this wound.  It was

21   not held against the skin, it was not close enough to get soot,

22   and it was not close enough to cause stippling.

23      Q.   And is that regardless of the gun or the caliber?

24      A.   Yes.

25           MS. FOSTER:  I have nothing further.

26           THE COURT:  Counsel?

27                         RECROSS-EXAMINATION

28   BY MS. BLUMENTHAL:

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 472

1      Q.   You were asked questions on how long a person would be

2   maintaining their consciousness.  Your best medical opinion

3   would be 15 to 30 seconds.  Is that a fair statement?

4      A.   Yes.

5      Q.   Okay.  Now, part of that reason is because the moment

6   that that wound was created in the arm, the right arm would be

7   totally disabled?

8      A.   Yes, ma'am.

9      Q.   Immediately?

10      A.   Yes.

11      Q.   If you have an arm that gets totally disabled, does

12   that throw your balance off?

13      A.   It can.

14      Q.   Okay.  Now, in this particular case you had the total

15   disruption of the entire circulatory system; is that right?

16      A.   Yes.

17      Q.   What happens when your entire circulatory system gets

18   disrupted?

19      A.   You go into hemorrhagic shock.

20      Q.   Explain what that is, please?

21      A.   So you're losing blood at a very rapid rate.  Your

22   blood pressure is going to fall.  Once again, it's going to lead

23   to unconsciousness pretty quickly.

24      Q.   And what you're saying is pretty quickly with that.

25   And here we have a lacerated aorta, correct?

26      A.   Yes.

27      Q.   We have a lacerated pulmonary vein?

28      A.   Yes.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 473

1    Q.    You had an inferior vena cava that's been lacerated?

2    A.    Yes.

3    Q.    You had the heart that's been lacerated, so to speak?

4    A.    Yes.

5    Q.    And those items would cause a complete disruption of

6    the entire circulatory system?

7    A.    Yes.

8    Q.    Which means the person goes down?

9    A.    Yes.

10   Q.    Or at least they lose consciousness?

11   A.    They can probably, again, 15, 30 seconds.  Closer to

12   the end.

13   Q.    It happens very quickly?

14   A.    It happens very quickly, yes.

15   Q.    Now, when we were talking about some of the other types

16   of bleeding, if a person, let's assume that they had received a

17   type of wound that they had CPR performed on them.  When I say

18   "CPR," I mean chest CPR?

19   A.    Okay.

20   Q.    How does that affect them?

21   A.    It won't.

22   Q.    Okay.  Does it help with the blood going out of the

23   body at all?

24   A.    It will forcefully push it out of the body more.  You

25   may keep the heart beating possibly longer to force it out, but

26   it's really going to have no affect.

27   Q.    Does that cause any of the body's excretions or fluids

28   to come out through the mouth at all?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 474

1          Like the foam that you sometimes see after?

2     A.   The foam, yes.

3     Q.   Okay.

4     A.   Blood, no.

5     Q.   Okay.  But the foam could come out with hands only CPR,

6  I take it?

7     A.   Yes.

8          MS. BLUMENTHAL:  I have no further questions, Your

9  Honor.

10         THE COURT:  People?

11         MS. FOSTER:  Nothing further.

12         THE COURT:  All right.  Thank you, Doctor.

13         THE WITNESS:  Thank you.

14         THE COURT:  Do you have any witnesses lined up at this

15  time?

16         MS. FOSTER:  Yes, Your Honor.

17         THE COURT:  How many witnesses today?

18         MS. FOSTER:  I have three additional.

19         Four.  Possibly four.

20         THE COURT:  All right.  Ladies and gentlemen, let's

21  take -- I'm sorry?

22         MS. FOSTER:  Possibly four.

23         THE COURT:  You want to take an early lunch or do you

24  want to start?  We need to take a break for the court reporter.

25         MS. FOSTER:  Early lunch, please.

26         THE COURT:  All right.  Ladies and gentlemen, my court

27  reporter needs a break, and doesn't make any sense to take a

28  ten-minute break and then come back and just start with five or

1   ten minutes, so let's be back here at 1:25.

2           Keep an open mind.  Do not discuss the case.

3           All jurors are ordered to -- out in the lobby at 1:25.

4   Thank you.

5       (Proceedings were held out of the presence of the jury:)

6           THE COURT:  Back on the record out of the presence of

7   the jury.

8           We were supposed -- we had scheduled a 402 hearing, I

9   believe, with one of your experts.  When would you like to do

10  that?  Today?  This afternoon?  Tomorrow?

11          MS. FOSTER:  Given everything that happened yesterday

12  or two days ago, he was here that day, and we didn't order him

13  back, and he traveled back to San Francisco in his car.  And he

14  is saying he will not come back until Monday.

15          THE COURT:  Okay.

16          MS. FOSTER:  So we're trying to get him to come back

17  tomorrow, but we have not had any success with that.  He doesn't

18  want to come back until Monday.

19          THE COURT:  All right.

20          MS. FOSTER:  And the concern I have is that I think my

21  witnesses will be done early tomorrow.

22          THE COURT:  Okay.  That's fine.

23          MS. FOSTER:  We're trying to see, but --

24          THE COURT:  Okay.  Thank you.

25          MS. FOSTER:  So that puts off that 402.

26          THE COURT:  All right.  That's fine.

27          All right.  Then anything else from the defense?

28          MS. BLUMENTHAL:  No, Your Honor.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 476

```
 1              MR. MOORE:  No.

 2              THE COURT:  Then court's in recess until 1:30.  Thank

 3     you.

 4                         (Noon recess.)

 5         (Proceedings were held in the presence of the jury:)

 6              THE COURT:  Back on the record.  All parties are

 7     present.  All jurors are present.

 8              People, call your next witness.

 9              MS. FOSTER:  Thank you, Your Honor.  The People call

10     Samuel Murillo.

11              THE COURT:  I'm sorry.  What was the last name again?

12              MS. FOSTER:  M-u-r-r-i-l-l-o.

13              THE COURT:  Thank you.

14              MS. FOSTER:  Might be one "R," I'm sorry.

15              MS. BLUMENTHAL:  It's one "R," Your Honor.

16              THE CLERK:  Do you solemnly state that the evidence you

17     shall give in this matter shall be the truth, the whole truth,

18     and nothing but the truth, so help you God?

19              THE WITNESS:  I do.

20              THE CLERK:  Please be seated.

21              Please state and spell your first and last name for the

22     record.

23              THE WITNESS:  Samuel, S-a-m-u-e-l.  Murillo,

24     M-u-r-i-l-l-o.

25              THE COURT:  People?

26                         SAMUEL MURILLO,

27     called as a witness by and on behalf of the Plaintiff, having

28     been first duly sworn, was examined and testified as follows:
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 477

```
 1                    DIRECT EXAMINATION
 2   BY MS. FOSTER:
 3       Q.   Good afternoon, Mr. Murillo.  Am I saying that
 4   correctly?
 5       A.   Yeah.
 6       Q.   Now, Mr. Murillo, do you know a Houston Boji?
 7       A.   Yes.
 8       Q.   And do you see him in the courtroom today?
 9       A.   Yes.
10       Q.   And can you tell us, for the record, where he's seated
11   and what he's wearing?
12       A.   On my right.  He's wearing a blue suit with a white
13   shirt, green tie.
14            MS. FOSTER:  May the record reflect the witness has
15   identified the defendant?
16            THE COURT:  Yes.
17       Q.   BY MS. FOSTER:  And, Mr. Murillo, did you serve time in
18   the Riverside County jail?
19       A.   I did.
20       Q.   And do you have your own case related to why you were
21   at the Riverside County jail?
22       A.   Yes.
23       Q.   And during the time that you were at the Riverside
24   County jail, did you meet Mr. Boji?
25       A.   Yes.
26       Q.   And can you describe for us the facilities that you
27   were living in at the time?
28       A.   It was a general population.  It was an open facility.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 478

```
 1    There is no -- there is no cells.  It's -- it's open.
 2        Q.    Okay.  So when you say "no cells," there is not like a
 3    two-man or a three-man room, but actually a large room with
 4    several bunk beds?
 5        A.    Yes.
 6        Q.    And during the time that you got to know the defendant,
 7    how long ago was that?
 8        A.    Around three years.
 9        Q.    And can you describe for us how far your bunk was from
10    the defendant's bunk?
11        A.    Just one.
12        Q.    Meaning one set of bunks, or was he one bunk up or --
13        A.    He was on -- it was a set of bunks, and he was on the
14    top bunk to my left.
15        Q.    Okay.  So you're in one set of bunks; is that correct?
16        A.    Um-hum.  Yes.
17        Q.    And is it a two-man or three-man?
18        A.    Two-man.
19        Q.    Okay.  Meaning there is one bunk on the bottom and one
20    on the top?
21        A.    Yes.
22        Q.    And you said to your left was the defendant's bunk?
23        A.    Yes.
24        Q.    And was your bunk on the bottom or the top?
25        A.    My bunk was at the bottom.
26        Q.    And was his bunk on the bottom or the top?
27        A.    The top.
28        Q.    And when you say he's to your left, was he -- how many
```

```
 1   bunks over was he?
 2       A.   Just one.
 3       Q.   Given the space they we're in this room, about how far
 4   away from you would you say the defendant's bunk was from your
 5   bunk?  And if you can tell me if it's closer than the court
 6   reporter or further than the court reporter?  Closer to where I
 7   am or further?
 8       A.   It's closer to my left, as I'm sitting here, but it
 9   would have been closer than the reporter.
10       Q.   So a little bit less than two feet; is that accurate?
11       A.   Yes.
12       Q.   And about how long, meaning how much time, would you
13   say that you and the defendant were in that proximity of each
14   other?  How many days or weeks or months?
15       A.   Roughly about a month and a half.
16       Q.   During that time period, did you and the defendant end
17   up ever having conversation with each other?
18       A.   Yes.
19       Q.   And about how many times would you say you had a
20   conversation with the defendant?
21       A.   Around ten times.
22       Q.   During those ten conversations, did you ever talk to
23   him about his case?
24       A.   Yes.
25       Q.   Did he tell you what he was being charged with?
26       A.   Yes.
27       Q.   And what did he say he was being charged with?
28       A.   187.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 480

1    Q.    And what did you take that to mean?

2    A.    Murder.

3    Q.    Did he tell you who the decedent, or who the deceased

4    person was?

5    A.    He didn't tell me his name, but he told me that it was

6    his friend.

7    Q.    He told you it was his friend?

8    A.    Yes.

9    Q.    Did he describe whether they were close friends or

10   acquaintances?

11   A.    At first he told me he was an acquaintance, then he

12   told me it was his close friend.

13   Q.    Did he use the word "best friend" or "close friend"?

14   A.    Just friend.

15   Q.    During those ten conversations, were they all, or most

16   of them, were they had while you were in your bunks?

17   A.    I'm sorry?

18   Q.    Were they had while you were in or near your bunks?

19   A.    Some of them were near, and the other ones were just

20   while we were in the dayroom.

21   Q.    During those conversations that you had with the

22   defendant, did he tell you how his friend was killed, or died?

23   How his friend died?

24   A.    Yes.

25   Q.    And did he tell you -- how many versions did he tell

26   you of how his friend died?

27         Did he tell you -- about how many did he tell you

28   directly?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 481

1    A.    Two.

2    Q.    How did he say his friend died in the first version

3  that he gave you?

4    A.    The first version, he stated to me that him and his

5  friend were going to go shooting.  So he grabbed the shotgun

6  from his dad, without permission, and he put it in his trunk.

7  He headed towards his friend's residence in Moreno Valley.  And

8  he got there and he took out the shotgun.  And him and his

9  friend, he was showing it to his friend.  His -- he stated to me

10  that his friend popped a shell into the chamber and was playing

11  around with it, and that he handed the shotgun back to Boji, but

12  the shotgun pointing towards him, towards his friend.  So Boji

13  went out to go get it and he touched the trigger.

14    Q.    So he's saying he touched the trigger when he went to

15  get the gun?

16    A.    Yes.

17    Q.    And is that all he said about that version of the

18  story?

19    A.    Yes.

20    Q.    And then at some point did he tell you another version

21  of what happened of how his friend got shot?

22    A.    Yes.

23    Q.    And what did he say in the second version?

24    A.    He said that he had texted his friend that he had

25  gotten an STD, and his friend told him that, you know, that he,

26  what, was he gay?  And called him -- am I allowed to say the bad

27  words or --

28    Q.    Well, if that's what he told you.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 482

```
 1        A.    Yeah.

 2        Q.    Did he tell you a bad word?

 3        A.    Yeah.  He said that he called him a fagot, and that

 4   that was the only -- the only way he could have probably gotten

 5   it.

 6        Q.    He's saying that's what his friend said to him?

 7        A.    Yes.

 8        Q.    And then what happened next?  What did he tell you

 9   next?

10        A.    He told me that he texted his friend back saying that

11   he was going to shoot him.

12        Q.    And then what else did he say?

13              During that conversation?

14        A.    He also stated to me that he was worried about the text

15   messages that he had sent, because in those text messages he had

16   texted his friend that he was going to shoot him, so he was

17   worried about the cops finding out those text messages.

18        Q.    Okay.  And was that basically the end of what he told

19   you during that conversation?

20        A.    He also told me that he was worried about those text

21   messages, and he asked me what the cops were going to do if they

22   found those text messages.

23        Q.    Okay.  And without getting into your response --

24        A.    Okay.

25        Q.    -- was that the end of what he told you?

26        A.    Yes.

27        Q.    Now, after you had your series of conversations with

28   the defendant, at some point do you get out of jail?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 483

```
 1      A.   Yes.

 2      Q.   And after you get out of jail, is that when you notify

 3   the police about the information you just testified to?

 4      A.   Yes.

 5      Q.   And how long after you got out of jail did you notify

 6   the police?

 7      A.   Not exactly sure.  But if I have to say, it was around

 8   the first month that I got out.

 9      Q.   And would that be in February of 2016 that you notified

10   the police?

11      A.   Yes.

12      Q.   Does that sound correct?

13      A.   Yes.

14      Q.   And at the point that you notified the police, did the

15   police make any deal with you for your information?

16      A.   No.  I didn't accept anything.  I didn't want anything.

17      Q.   Had you already pled guilty to your crime?

18      A.   Yes.

19      Q.   So you didn't get anything in exchange for providing

20   this information?

21      A.   No.

22           MS. FOSTER:  I have nothing further.

23           THE COURT:  Cross-examination?

24           MS. BLUMENTHAL:  Yes.  Thank you.

25                          CROSS-EXAMINATION

26   BY MS. BLUMENTHAL:

27      Q.   Good morning, Mr. Murillo.

28      A.   Good morning.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 484

1     Q.    What did you plead guilty to?

2     A.    Terrorist threats.

3     Q.    Terrorist threats, correct?

4     A.    Yes.

5     Q.    Violation of Penal Code section 422?

6     A.    If that's terrorists threats, yeah.

7     Q.    Now, you were already in custody when you met Mr. --

8  when Mr. Boji came into custody; is that correct?

9     A.    Yes.

10    Q.    And how long had you been in custody when Mr. Boji came

11 there?

12    A.    I was going on six months.

13    Q.    You had already been there six months?

14    A.    I was going on six months.

15    Q.    Going on six months.

16          You went in in August of 2015, correct?

17    A.    I don't remember, honestly.

18    Q.    You got out approximately when?

19    A.    It was Christmas day.  December 25th.

20    Q.    So you got out Christmas day of 2015?

21    A.    Yes.

22    Q.    And Mr. Boji came in in mid-November of 2015?

23    A.    Yes.

24    Q.    Does that sound about right?

25    A.    That sounds about right.

26    Q.    So he had been there, you were with him maybe a month

27 and a half?

28    A.    Around there.

1      Q.   Did he ever tell you that he shot his friend on

2  purpose?

3      A.   No.

4      Q.   He specifically said he did not; isn't that correct?

5      A.   He didn't specifically say he did not.

6      Q.   He never told you he shot his friend on purpose; isn't

7  that correct?

8      A.   Yes.

9      Q.   Now, how many people are housed in the area which you

10  were being housed?

11      A.   I wouldn't be able to tell you, honestly.

12      Q.   Are we talking five?  Are we talking 25?

13      A.   More than 25.

14      Q.   More than 25?

15      A.   Yes.

16      Q.   And this is an open area, correct?

17      A.   Yes.

18      Q.   And what do you call those open areas?

19      A.   General population.

20      Q.   Can you give an estimate of how many people -- it's all

21  men, correct?

22      A.   Yes.

23      Q.   Can you give an estimation of how many men were being

24  housed in that area?

25      A.   I can't.  More than 25.

26      Q.   More than 25.  More than 50?

27      A.   Less than 50.

28      Q.   Okay.

```
 1      A.   But more than 25.

 2      Q.   More than 25.

 3           So somewhere maybe between 25 and 35 or 40, does that

 4   sound about right?

 5      A.   That sounds about right.

 6      Q.   And this open population area, you were in the general

 7   population of that particular area how many hours a day?

 8      A.   24 hours a day.

 9      Q.   And there were times that you were allowed to go to the

10   dayroom?

11      A.   Yes.

12      Q.   And where is the dayroom located?

13      A.   A couple feet away.

14      Q.   Is it in a separate area?

15      A.   No.

16      Q.   I'm sorry?

17      A.   No.  It's in the same building.

18      Q.   The same building, but away from where your bunks are?

19      A.   Yes.

20      Q.   Okay.  And, in fact, you leave your bunk area to go

21   into the dayroom?

22      A.   Yes.

23      Q.   And how many hours a day were you allowed in the

24   dayroom?

25      A.   It would depend.  It would depend.

26      Q.   It would depend on what?

27      A.   On our behavior.

28      Q.   Okay.  Now, you testified that you had -- you're
```

 1   estimating when you say about ten conversations with Mr. Boji;
 2   is that correct?
 3        A.   Yes.
 4        Q.   You didn't keep track of them, I take it?  Would that
 5   be a fair statement?
 6        A.   Around ten sounds about right.  I feel comfortable with
 7   that.
 8        Q.   You feel comfortable with about ten.  It could have
 9   been nine, it could have been 11?
10        A.   No.  It was around ten.
11        Q.   Did you keep specific track of the conversations you
12   had with Mr. Boji?
13        A.   Not specific track, but I remember.
14        Q.   Give us the date of the first conversation you had with
15   Mr. Boji?
16        A.   I don't remember the exact dates, but I do remember the
17   amount of conversations I had with him.
18        Q.   Okay.  Were all of these conversations about his
19   charges?
20        A.   Yes.
21        Q.   So every conversation you ever had with Mr. Boji is
22   about his charges; is that correct?
23        A.   Yes.
24        Q.   So you didn't talk to him about anything else?
25        A.   Within those conversations, we talked about something
26   else, but normally they were about his charges.
27        Q.   And who brought up the charges?
28        A.   He would.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 488

1    Q.    He would.

2          Your testimony is he would bring them up?

3    A.    Yes.

4    Q.    And you would ask him questions about it?

5    A.    Sure.  He's opening up to me.

6    Q.    He was opening up to you, so you decided to ask him

7  questions; is that your testimony?

8    A.    Well, he started talking to me about his case, so.

9    Q.    And you started asking him questions; is that correct?

10   A.    From what he was telling me, yes.

11   Q.    That's yes or no?

12   A.    Yes.

13   Q.    You started asking him questions; is that correct?

14   A.    Um-hum.  Yes.

15   Q.    Now, you said that there were two versions that he gave

16  to you?

17   A.    Yes.

18   Q.    Is that your testimony?

19   A.    Yes.

20   Q.    In neither of those versions did he tell you that he

21  intended to shoot his friend; is that correct?

22         That's what you just said a few minutes ago?

23   A.    Yes.

24   Q.    Is that correct?

25   A.    Yes.

26   Q.    Now, you said initially that when he first started

27  talking to you, he told you he did not know his friend's name,

28  or you don't remember the name?

```
 1      A.   No, he never stated to me his friend's name.

 2      Q.   Did he tell you that he -- so he never stated the

 3  friend's name.  Did he tell you he didn't know the friend's

 4  name?

 5      A.   No.

 6      Q.   Okay.  So when you made a statement on direct that he

 7  didn't know that person's name, was that a misstatement?

 8           MS. FOSTER:  Objection.  Misstates the testimony.

 9           THE COURT:  Overruled.

10      Q.   BY MS. BLUMENTHAL:  Was that a misstatement on your

11  part?

12      A.   I'm sorry?

13      Q.   When you were on direct examination, you were asked

14  questions.  You made the statement that, basically, Mr. Boji

15  said he didn't know the deceased's name.  Do you remember saying

16  that?

17      A.   No.

18      Q.   Did he ever tell you that he did not know the

19  decedent's name?

20      A.   He never told me the deceased victim's name.

21      Q.   That's not my question.  My question is:  Did he ever

22  tell you that he did not know the name of the deceased?

23      A.   No.

24      Q.   Is it your testimony, then, he simply never used the

25  name of the deceased person?

26      A.   Yes.

27      Q.   Now, you said some of these conversations were near

28  your bunk beds; is that correct?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 490

```
 1        A.    Yes.

 2        Q.    And how many of the conversations were near the bunk

 3   beds?

 4        A.    Mostly all of them.

 5        Q.    Mostly all of them?

 6        A.    All of them.

 7        Q.    All of them were.

 8              You said some, however, were in the dayroom.  How many

 9   conversations were in the dayroom?

10        A.    Well, about the case, there were ten.  Obviously, we

11   had other conversations that didn't have to do with the case.

12   We would talk.

13        Q.    Well, let me go back and repeat some of my questions to

14   you, sir.

15              How many conversations did you have with Mr. Murillo

16   about -- I'm sorry.  With Mr. Boji about anything?

17        A.    Can you say that again?

18        Q.    How many conversations did you have with Mr. Boji about

19   any topic at all?

20        A.    Around six or seven.

21        Q.    Around six or seven?

22        A.    Yes.

23        Q.    About any topic at all?

24        A.    Um-hum.

25        Q.    So that's the total of the conversations you ever had

26   with Mr. Boji was six or seven?

27        A.    No.

28        Q.    Let me ask my -- let me ask my question again.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 491

```
 1            How many total conversations did you have with Mr. Boji
 2    about any topic?
 3            Do you understand my question?
 4    A.    Yeah, I understand your question.
 5            The total, including about the case, were --
 6    Q.    How many conversations did you have with Mr. Boji about
 7    any topic?
 8    A.    Seventeen.
 9    Q.    Seventeen?
10    A.    Yes.
11    Q.    And you're sure of that number?
12    A.    Pretty sure.
13    Q.    Pretty sure.  What does that mean?
14    A.    I'm sure.
15    Q.    You're sure?
16    A.    I'm sure.
17    Q.    You're sure it was exactly 17?
18    A.    Yes.
19    Q.    Now, earlier you had said that you had conversations --
20    well, where did these conversations take place?
21    A.    Ten of those conversations were taken place near our
22    bunks, seven of those other conversations were taken place in
23    the open dayroom.
24    Q.    So you have a specific recollection that ten of the
25    conversations took place near the bunks, correct?
26    A.    Yeah.
27    Q.    And seven of the conversations you have a specific
28    recollection took place in the dayroom; is that correct?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 492

 1     A.   Yes.  I feel comfortable with that number.

 2     Q.   Well, I'm asking you what your testimony is?

 3     A.   Yes.

 4          MS. FOSTER:  Objection.  Argumentative.

 5          THE COURT:  Sustained on it being argumentative.

 6     Q.   BY MS. BLUMENTHAL:  Is it your testimony that the ten

 7  conversations that took place by the bunk were solely about his

 8  case?

 9     A.   Yes.

10     Q.   And that the seven conversations that took place in the

11  dayroom were about other subjects?

12     A.   Yes.

13     Q.   Besides this case; is that correct?

14     A.   Yes.

15     Q.   Now, you said the first version that he gave to you was

16  that he and his friend were going to go shooting; is that

17  correct?

18     A.   Yes.

19     Q.   Did he tell you where they were going shooting?

20     A.   No.

21     Q.   Did he tell you -- and you stated that he took a

22  shotgun from his father or father's room; is that correct?

23     A.   Yes.

24     Q.   And that his father did not give him permission to do

25  so.  Is that your testimony?

26     A.   Yes.

27     Q.   And that when he went over there, he told you about

28  them each handling the shotgun; is that correct?

```
 1        A.   Yes.
 2        Q.   And that there was an accidental discharge of the
 3   shotgun; is that correct?
 4             MS. FOSTER:  Objection.  Misstates the testimony.
 5             THE COURT:  Sustained.
 6        Q.   BY MS. BLUMENTHAL:  Did he tell you how the gun went
 7   off?
 8        A.   Yes.
 9        Q.   And did he tell you that he intentionally pulled the
10   trigger?
11        A.   No.
12        Q.   Did he tell you that it accidentally went off?
13        A.   No.
14        Q.   Did he tell you that it wasn't meant to go off?
15        A.   No.
16        Q.   Did he -- you said that later he gave you a second
17   version?
18        A.   Yes.
19        Q.   Did he tell you the second version that he was still
20   going to be going shooting with his friend?
21        A.   No.
22        Q.   Did he tell you these additional items by saying that
23   there was more to it, but there were these additional facts that
24   had him concerned?
25        A.   Which additional facts?
26        Q.   That he had sent his friend a text message that said he
27   was going to shoot him?
28        A.   Yes.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 494

1    Q.   Now, when you got out of custody in approximately, you

2    said Christmas day; is that correct?

3    A.   Yes.

4    Q.   How soon thereafter did you contact law enforcement or

5    anyone about the statements that Mr. Boji made?

6    A.   Roughly about a month.

7    Q.   About a month.

8         And who did you first contact?

9    A.   I don't recall the name off the top of my head.

10   Q.   Well, how did you get a hold of anybody?  How did you

11   know who to contact?

12   A.   I contact a -- I think I called 911.  I contacted a --

13   I looked it online.  I'm not -- this happened three years ago.

14   I can't really remember.  But I looked up the number online.

15   Q.   You looked up the number for what online?

16   A.   For an investigator.

17   Q.   For an investigator online.

18        How did you find -- how did you know who the

19   investigator was to look up online?

20   A.   I didn't.

21   Q.   How did you find the investigator's name?

22   A.   I told him I had information about a case.

23   Q.   So you called 911; is that correct?

24   A.   I don't recall if I called 911, but I do recall trying

25   to find a number online for an investigator.

26   Q.   Okay.  So you went online; is that correct?

27   A.   Yes.

28   Q.   Now, let me ask you some questions about it.  You had

1   said a few minutes ago that you called 911, but now you're

2   saying that you don't think that you called 911; is that

3   correct?

4        A.   Yes.

5        Q.   Okay.  Do you go online to look for an investigator's

6   phone number?

7        A.   I'm sorry?

8        Q.   Did you say that you went online to look for an

9   investigator's phone number?

10       A.   Yes.

11       Q.   And what did you put in to look for the investigator's

12   phone number?

13       A.   I just typed in.  I don't recall what I typed in, but I

14   just typed in for a -- for an investigator.

15       Q.   Okay.  You had to have more information than that,

16   didn't you?

17       A.   Well, I did but I don't recall right now.

18       Q.   What other information did you have?

19       A.   Well, just my phone.  And I looked.

20       Q.   Just your phone?

21       A.   Yes.  And I looked up something there and I just got

22   the phone number.

23       Q.   What did you look up?

24       A.   Private investigators.

25       Q.   You looked up private investigators?

26       A.   Yes.

27       Q.   And in looking up private -- is it your testimony by

28   looking up private investigators that you got the phone number

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 496

```
 1   for the investigator on this case?
 2        A.   Why I looked private investigators and that led me
 3   to -- to other phone numbers.
 4        Q.   Okay.
 5        A.   And I just picked it and called.
 6        Q.   Okay.  So you go online and you kind of, for lack of a
 7   better word, you Google private investigators?
 8        A.   Yes.
 9        Q.   And it comes up with a bunch of names and phone
10   numbers?
11        A.   Yes.
12        Q.   And what do you do from there?
13        A.   Well, I look up -- I see Riverside -- Riverside
14   sheriff's office, or I don't recall really what it says, but I
15   clicked on there and I called.
16        Q.   Okay.  Isn't it true you went online and you ran
17   Houston's name?
18        A.   I'm sorry?
19        Q.   You went online and you ran Houston Boji's name, didn't
20   you?
21        A.   Yes.
22        Q.   And that's how you started it, isn't it?
23        A.   Well, that's --
24        Q.   Isn't it?
25        A.   That's how I started looking up --
26        Q.   That can be answered yes or no.
27             MS. FOSTER:  I'm going to object, Your Honor, as not
28   allowing the witness to answer.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 497

```
 1            MS. BLUMENTHAL:  I'm going to object as being
 2   nonresponsive.
 3            THE COURT:  Hold on.  Ask the question again and give
 4   the witness an opportunity to fully answer the question.
 5       Q.   BY MS. BLUMENTHAL:  Did -- was the first thing you did
 6   was go online and run Houston Boji's name?
 7       A.   To look furthermore into the case, yes.
 8       Q.   So, yes.
 9            You pulled up his name; isn't that correct?
10       A.   Yes.
11       Q.   And you started reading about the purported facts of
12   this case; isn't that correct?
13       A.   There wasn't really much there.
14       Q.   You started looking for what you felt were facts of
15   this case or what was being alleged; isn't that correct?
16       A.   There wasn't really much there.
17       Q.   Isn't that correct, that that's what you went looking
18   for?
19            MS. FOSTER:  Objection.  Asked and answered.
20            THE WITNESS:  I wasn't looking for that, no.
21            THE COURT:  I'm sorry.  Overruled.
22            What was your answer, sir?
23            THE WITNESS:  What was the question?
24       Q.   BY MS. BLUMENTHAL:  Did you start looking for the facts
25   of Houston Boji's case?
26       A.   No.
27            MS. BLUMENTHAL:  Could the record reflect he took
28   approximately ten seconds to respond to that question?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 498

 1             THE COURT:  Ask your next question.

 2        Q.    BY MS. BLUMENTHAL:  Did you read anything about --

 3   strike that.

 4             Did you find Houston Boji's name online?

 5        A.    Yes.

 6        Q.    Did you find what he had been charged with online?

 7        A.    Of course.

 8        Q.    Did you find what the press releases were about his

 9   case online?

10        A.    Yes.

11        Q.    You read about some of the alleged facts online, didn't

12   you?

13        A.    But I don't really recall.  There wasn't really any

14   information there.

15        Q.    You found the investigator's name online, investigator

16   for the sheriff's department in this case online, didn't you?

17        A.    Yes.

18        Q.    That was included in some of the information that you

19   found; isn't that correct?

20        A.    I don't recall that, no.

21        Q.    Well, how did you get the investigator's name then?

22             MS. FOSTER:  Objection.  Asked and answered.

23             THE COURT:  Overruled.

24             THE WITNESS:  Because I Googled it.

25        Q.    BY MS. BLUMENTHAL:  What did you Google to find the

26   investigator's name?

27             MS. FOSTER:  Objection.  Asked and answered.

28             THE COURT:  Overruled.

```
 1            THE WITNESS:  Riverside County Sheriff's Department.
 2       Q.   BY MS. BLUMENTHAL:  You're familiar with Riverside
 3   County Sheriff's Department, correct?
 4       A.   Yes.
 5       Q.   You know they had many investigators?
 6       A.   Yes.
 7       Q.   Did you find online -- did you Google specifically
 8   Riverside County Sheriff's Department investigators?
 9       A.   No.  I Googled Riverside County Sheriff's Department.
10       Q.   Okay.  Isn't it true that when you Googled, or ran
11   Houston Boji's name, you came up with what he was accused of and
12   that's where you found the investigator's name?
13       A.   I didn't thoroughly read through what he was being
14   accused of.
15       Q.   So it's your -- is it your testimony that you just
16   searched Riverside County Sheriff's Department and looked up
17   investigators?
18       A.   Yes.
19       Q.   And whose name did you come up with?
20       A.   I don't recall the name.  But I did get a phone number.
21   I called the --
22       Q.   Where did you get the phone number?
23       A.   I'm sorry?
24       Q.   Where did you get a phone number?
25       A.   I don't recall, but I got a phone number and --
26       Q.   Well, just a minute.  There's no question pending on
27   that.
28            Do you recall where you got a phone number?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 500

1    A.   Yes.

2    Q.   Where?

3    A.   Online.

4    Q.   Now, was this phone number in Murrieta?  Was it in

5  Indio?  Was it in Blythe?  The sheriff's department goes

6  countywide.

7    A.   I don't recall.

8    Q.   You don't recall?

9    A.   No.

10    Q.   So it's your testimony you just look up Riverside

11  County Sheriff's Department, look for investigators?

12    A.   Yes.

13    Q.   And you get a phone number that way?

14    A.   Yes.

15    Q.   You call the phone number?

16    A.   Yes.

17    Q.   And what do you say?  Well, first off, who answered the

18  phone?

19         MS. FOSTER:  I'm going to object as hearsay.  Oh, not

20  this question.  Withdrawn.

21    Q.   BY MS. BLUMENTHAL:  Who answered the phone?

22    A.   A receptionist.  I'm not quite sure, but --

23    Q.   Do you recall where the receptionist was located?

24    A.   No, I don't.

25    Q.   Was it an investigator that answered the phone?

26    A.   No.

27    Q.   Okay.

28    A.   She referred me to an investigator that was handling

```
 1    the case.

 2        Q.    She referred you to an investigator who was handling

 3    the case; is that your testimony?

 4        A.    Yes.

 5        Q.    And did you call the investigator?

 6        A.    Yes.  I gave him my information.

 7        Q.    And when did that happen?

 8        A.    Around that month.  Around the month I got out.  A

 9    month after.

10        Q.    Okay.  So that would be approximately -- you say you

11    got out on Christmas day?

12        A.    Um-hum.  Yes.

13        Q.    So how soon after that did you make this phone call?

14        A.    About a month after.

15        Q.    You waited a month to do it?

16        A.    Well, obviously, I was going through my own personal

17    problems.

18        Q.    But you were anxious to call; is that correct?

19        A.    I wasn't anxious.

20        Q.    You wanted to be sure that you called?

21        A.    I wanted to help.

22        Q.    You wanted to help?

23        A.    Yes.

24        Q.    When you were researching this or running Mr. Boji's

25    name online, did you get the name of the deceased?

26        A.    Yes.

27        Q.    So you found that information online; is that correct?

28        A.    Yes.  It's all over.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 502

```
 1      Q.   That was all over.
 2           And the way -- the manner in which he -- it described
 3   how he died was all over too, wasn't it?
 4      A.   I didn't see that.
 5      Q.   You didn't see that, but you saw his name?
 6      A.   Yes.
 7      Q.   And you saw his name in connection with Houston Boji's
 8   name online; is that correct?
 9      A.   Yes.
10           MS. BLUMENTHAL:  I have no further questions, Your
11   Honor.
12           THE COURT:  Redirect?
13           MS. FOSTER:  Real quickly.
14                     REDIRECT EXAMINATION
15   BY MS. FOSTER:
16      Q.   You said on cross that you did not read the facts of
17   the case; is that correct?
18      A.   I did read them, but I didn't read them thoroughly.
19      Q.   What, when you were looking up the case, what did you
20   go looking for?
21      A.   Just to go more into detail about the case.
22      Q.   What did you -- did you come across any blogs or
23   conversations regarding the case?
24      A.   Yes.
25      Q.   And is it -- did one of those conversations inspire you
26   to call?
27           MS. BLUMENTHAL:  Objection.  Leading.
28           THE COURT:  Overruled.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 503

```
 1              THE WITNESS:  Yes.
 2      Q.   BY MS. FOSTER:  And without telling the content of that
 3   conversation, who was speaking?
 4              MS. BLUMENTHAL:  Objection.  Calls for hearsay.  Also
 5   lack of foundation as to whether or not that blog is really that
 6   person.
 7              THE COURT:  Sustained on hearsay.
 8              MS. FOSTER:  For subsequent conduct, not for the truth.
 9   And I'm not asking the content either.
10              THE COURT:  Sustained on hearsay.
11      Q.   BY MS. FOSTER:  Well, what led you to call?
12           Let me back up.  When you came out of jail, did you
13   intend to call the police about the defendant's case?
14      A.   I did.
15      Q.   And what prompted you to finally call the police?
16              MS. BLUMENTHAL:  Your Honor, I'm going to object at
17   this time as it's going to be calling for hearsay.
18              THE COURT:  Overruled the way the question is phrased.
19              THE WITNESS:  Can you repeat the question, please?
20      Q.   BY MS. FOSTER:  What made you call?
21      A.   The mother.
22      Q.   Now, the facts that you read regarding the case, did
23   you relay those to the police, or the information from your
24   conversations?
25      A.   I'm sorry?
26      Q.   Let me be more clear.
27           When you spoke to the police, did you only tell them
28   about your conversations, or did you tell them about things you
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 504

```
 1    read on the Internet?

 2         A.    No.  I told them about my conversations.

 3              MS. FOSTER:  Nothing further.

 4              THE COURT:  Defense?

 5                        RECROSS-EXAMINATION

 6    BY MS. BLUMENTHAL:

 7         Q.    You stated that when you got out, the reason that you

 8    wanted to call was why?  Because of his -- of the deceased's

 9    mother, did you say?

10         A.    Yes.

11         Q.    Okay.  Do you recall calling law enforcement on

12    December 30th of 2015, five days after you got out?

13         A.    I don't recall.

14         Q.    Is that possible?

15         A.    It could be.

16         Q.    Okay.  So you called them within five days after you

17    get out of custody, correct?

18         A.    That's within the month and a half, yes.

19         Q.    It's -- five days is usually within a month and a half.

20    So it was only five days when you called?

21         A.    Yes.

22              MS. FOSTER:  Objection.  Argumentative.

23              THE COURT:  It is argumentative as phrased.

24              MS. BLUMENTHAL:  I will rephrase.

25         Q.    BY MS. BLUMENTHAL:  Do you recall giving them a phoney

26    name?

27         A.    I don't recall that.

28         Q.    Do you recall giving them the name of Eddie?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 505

```
 1        A.   I don't recall.

 2        Q.   And not your real name?

 3        A.   I don't recall.

 4        Q.   You don't recall?

 5        A.   No.

 6        Q.   Go back and try to reflect on the first conversation

 7   you had.  Do you recall giving them a false name?

 8        A.   I don't recall.

 9        Q.   If there is a report on that, on the date you called,

10   time you called, and the name you left, would that report be

11   accurate if it said you gave the name Eddie?

12        A.   It could be on the report, I just personally don't

13   recall.

14        Q.   You could have done it, though?  You could have given a

15   false name?

16        A.   If it's on the report, yes.

17             MS. BLUMENTHAL:  No further questions, Your Honor.

18             THE COURT:  People?

19             MS. FOSTER:  Nothing further.

20             THE COURT:  Thank you, sir.

21             You're free to go.

22             People, call your next witness.

23             MS. FOSTER:  Thank you.  The People call Deputy Baeza.

24   Investigator, I'm sorry, Baeza.

25             THE CLERK:  Do you solemnly state that the evidence you

26   shall give in this matter shall be the truth, the whole truth,

27   and nothing but the truth, so help you God?

28             THE WITNESS:  I do.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 506

```
 1              THE CLERK:  Thank you.  Please be seated.

 2              Please state and spell your first and last name for the

 3    record.

 4              THE WITNESS:  My name is Edwin Baeza.  E-d-w-i-n,

 5    B-a-e-z-a.

 6              THE COURT:  People?

 7                        EDWIN BAEZA,

 8    called as a witness by and on behalf of the Plaintiff, having

 9    been first duly sworn, was examined and testified as follows:

10                        DIRECT EXAMINATION

11    BY MS. FOSTER:

12         Q.   What is your current occupation and assignment?

13         A.   I am a master investigator employed by the Riverside

14    County Sheriff's Department.  I'm assigned to the Moreno Valley

15    station Special Enforcement Team.

16         Q.   And what was your assignment in November of 2015?

17         A.   I was a master investigator assigned to Moreno Valley,

18    assigned to the Investigations Bureau.

19         Q.   And were you on duty on November 10th, 2015?

20         A.   Yes.

21         Q.   And did you play a role in the investigation of the

22    death of Nicholas McCualey?

23         A.   Yes.

24         Q.   And what was your role in that investigation?

25         A.   I was tasked with serving a search warrant, a residence

26    in Canyon Lake.

27         Q.   And did you go to that residence and serve a search

28    warrant?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 507

```
 1        A.   Yes, I did.

 2        Q.   And was that residence located at 22190 Tumbleweed

 3   Drive in Canyon Lake?

 4        A.   Yes.

 5        Q.   And what was the purpose of you serving that search

 6   warrant at that residence?  What were you looking for?

 7        A.   For items enumerated in the actual search warrant that

 8   would lead to the -- for evidence towards the crime that was

 9   committed.

10        Q.   And who -- did you find out during your investigation

11   who resides at that residence?

12        A.   Yes.

13        Q.   And who resided at that residence, 22190 Tumbleweed?

14        A.   It was the Boji family.  B-o-j-i.  With dad Andrew,

15   mother Fadia, and Mr. Boji there sitting to the left of, or in

16   the middle of his counsel.

17             MS. FOSTER:  Can the record reflect the witness

18   identified the defendant?

19             THE COURT:  Yes.

20        Q.   BY MS. FOSTER:  And you said, "Fadia."  Is that

21   F-a-d-j-a?

22             I'm sorry.  F-a-d-i-a?

23        A.   I believe that's how it's called -- spelled.

24        Q.   And did you find out what their relationship was to the

25   defendant?

26        A.   Yes.

27        Q.   And who are they?

28        A.   They were his parents, mother and father respectively.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 508

 1       Q.   And I'm going to show you what's been marked for
 2   identification as People's 203?
 3            MS. FOSTER:  Showing defense counsel.
 4       Q.   BY MS. FOSTER:  Do you recognize what's depicted in
 5   People's 203?
 6       A.   Yes.
 7       Q.   And is that that residence on Tumbleweed that you
 8   searched?
 9       A.   Yes.  That is a photograph of that residence.
10       Q.   And is that a true and accurate depiction of the house
11   as you saw it the night that you went?
12       A.   Yes, it is.
13       Q.   During your search of the residence, did you search the
14   entire residence?
15       A.   I was assisted by several investigators.  I was,
16   essentially, the team leader.  And while I did participate in
17   the search, the entire residence was searched.
18       Q.   So you oversaw a team of officers that searched the
19   whole residence?
20       A.   Yes.
21       Q.   And during your search of the residence, did you find
22   any firearms?
23       A.   Yes.
24       Q.   Did you find ammunition?
25       A.   Yes.
26       Q.   Where did you find firearms in the residence?
27       A.   Well, there were several firearms.  There was over 30
28   firearms inside the residence.  There was some in a converted

 1   workshop in the residence.  There was a couple in the bedrooms,

 2   but there was two in what was identified to us as the

 3   defendant's bedroom by his parents.

 4        Q.   And what type were the two found in the defendant's

 5   bedroom?

 6        A.   One was a shotgun, the other one was an AR-15.

 7        Q.   I'm going to show you what's been marked for

 8   identification as People's 215.

 9             Do you recognize what's depicted in People's 215?

10        A.   Yes.

11        Q.   And what is that?

12        A.   That is a photograph of the firearms that were located

13   in one of the bedrooms, which were displayed on the bed on

14   purpose to show the amount of firearms located.

15        Q.   So officers lined it up like this.  This is not how it

16   was found?

17        A.   That is correct.

18        Q.   And where were these firearms located?

19        A.   I don't know where every single firearm was located,

20   but those were located within that bedroom and the surrounding

21   bedrooms' closets.

22        Q.   I'm going to show you what's been marked for

23   identification as People's 207.  Do you recognize what's

24   depicted in People's 207?

25        A.   Yes.

26        Q.   And what is that?

27        A.   That is the shotgun, Beretta brand shotgun recovered

28   from Mr. -- the defendant's bedroom.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 510

1      Q.   I'm going to show you what's been marked for
2  identification as People's 206.  Do you recognize what's
3  depicted in People's 206?
4      A.   Yes.
5      Q.   And what is that?
6      A.   That is an Olympic Arms brand AR-15 rifle recovered
7  from the defendant's bedroom as well.
8      Q.   I'm noticing that there appears to be three sheriff's
9  department placards marked 1, 2, and 3.  Do you see that in the
10 photograph?
11     A.   Yes.
12     Q.   And what are the different placards indicating?
13     A.   These placards are the placards that are put down at my
14 direction by the forensic technicians.  And those are to
15 identify three separate items of evidence.  Item 1 being a white
16 cell phone, item 2 we spoke about the Beretta brand shotgun, and
17 item 3 being the Olympic Arms AR-15.
18     Q.   Showing you what's been marked for identification as
19 People's 226.  Do you recognize what's depicted in People's 226?
20     A.   Yes.
21     Q.   And what is that?
22     A.   That is a white iPhone logged into evidence as item 1.
23 That was collected at my direction.  You can tell because my
24 name was at the bottom.
25     Q.   And where was that iPhone located?
26     A.   If I recall correctly, that was in between the
27 mattress, between the mattresses of that bed in the bedroom.
28     Q.   In the defendant's bedroom?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 511

```
 1        A.   Yes.

 2        Q.   I'm going to show you what's been marked for

 3   identification as People's 228.

 4             MS. FOSTER:  Showing defense counsel.

 5        Q.   BY MS. FOSTER:  Do you recognize what's depicted in

 6   People's 228?

 7        A.   Yes.

 8        Q.   And what is that?

 9        A.   That is a box or a case containing several boxes of

10   open -- and that opened shotgun ammunition.

11        Q.   And there appears to be an evidence placard in that as

12   well; is that correct?

13        A.   Yes.

14        Q.   And about how many boxes of shotgun ammunition were

15   found in that box at the defendant's home?

16        A.   I don't recall.  Several.  Multiple.

17        Q.   Showing you what's been marked for identification as

18   People's 229.  Do you recognize what's depicted in People's 229?

19        A.   Yes.

20        Q.   And what is that?

21        A.   Those, again, are -- that's a case of shotgun shells in

22   the different boxes.

23        Q.   And is that specifically buckshot?

24        A.   It's listed as buckshot.  I did not verify whether

25   there was buckshot inside the boxes.

26        Q.   Show you what's been marked for identification as

27   People's 230.  Do you recognize what's depicted in People's 230?

28        A.   Yes.
```

1      Q.    And what is that?

2      A.    That, again, is one of the bedrooms in the defendant's

3   residence where firearms were located near the makeshift

4   workshop that I stated.  And my fellow assisting officers laid

5   out the firearms in that -- in that way so they could be

6   photographed.

7      Q.    So these are separate from the ones that were in the

8   bedroom?

9      A.    Yes.

10      Q.    During the time of your search, did you locate

11   different types of shotgun ammunition?

12          Meaning buckshot versus bird shot, et cetera?

13      A.    Yes.

14      Q.    What types of ammunition did you locate?

15      A.    It was both bird shot, buckshot, and different caliber.

16   10 gauge versus 12 gauge.

17          MS. FOSTER:  May I have one moment, Your Honor?

18          THE COURT:  Yes.

19          MS. FOSTER:  I have nothing further.

20          THE COURT:  Cross-examination?

21          MR. MOORE:  Yes, Your Honor.  Thank you.

22                     CROSS-EXAMINATION

23   BY MR. MOORE:

24      Q.    Good afternoon, Investigator.

25      A.    Good afternoon.

26      Q.    How are you doing today?

27      A.    I'm doing okay.

28      Q.    Good.

```
 1          Okay.  So you went out to this house this same day
 2   as -- well, you were called out on November 15th; is that
 3   correct?
 4          I'm sorry.  November 10th; is that correct?
 5   A.    Yes.
 6   Q.    Okay.  So you went out to this house in Canyon Lake,
 7   right?
 8   A.    Yes.
 9   Q.    And you and your team searched it?
10   A.    Correct.
11   Q.    You found what was quite clearly a large number of
12   weapons, correct?
13   A.    Yes.
14   Q.    So you had your team identify and isolate all the
15   weapons that were in the house, right?
16   A.    Yes.
17   Q.    You put them out for photographs and for processing?
18   A.    Yes.
19   Q.    How many of those weapons did you actually seize?
20   A.    Two.
21   Q.    And those were the weapons that were found in the
22   bedroom that belonged to Houston Boji; is that correct?
23   A.    Yes.
24   Q.    So the AR-15 and the shotgun?
25   A.    Correct.
26   Q.    All of the other weapons were -- the serial numbers
27   were run through your databases, right?
28   A.    Yes.
```

```
 1        Q.    None of them were stolen?

 2        A.    Correct.

 3        Q.    None of them were identified as being used in any

 4   crimes?

 5        A.    Correct.

 6        Q.    In fact, all of them were returned to the owner, Andrew

 7   Boji, were they not?

 8        A.    They were never seized, so they weren't returned.  They

 9   just weren't collected.

10        Q.    So they were released back.  I mean, you guys took

11   possession of them for at least a period of time?

12        A.    Okay.  Take inventory of them and run them, yes.

13        Q.    And then you gave them back?

14        A.    Yes.

15        Q.    And as for the ammunition, the only ammunition that you

16   actually took were the two boxes or cases of shotgun ammunition

17   that you found, correct?

18        A.    That is correct.

19        Q.    There was ammunition for some or all of the other

20   firearms, as far as you know, wasn't there?

21        A.    I couldn't say that there was for all the firearms, so

22   I don't know that.

23        Q.    You don't know.

24              Did you even take inventory of all the ammunition that

25   was in the house?

26        A.    No.

27        Q.    There was nothing illegal about the possession of the

28   firearms or the ammunition that you found, correct?
```

1      A.   Correct.

2      Q.   With regard to the two cases of shotgun shells that you

3  actually seized, you seized one case of 12 gauge buckshot,

4  correct?

5      A.   Yes.

6      Q.   And the other -- the other case had to do with 10 gauge

7  shotgun shells, correct?

8      A.   We -- yes.

9      Q.   And just so we're clear, 10 gauge ammunition wouldn't

10  fit into a 12 gauge chambered firearm, correct?

11     A.   No.  12 gauge would not fit into 10 gauge.

12     Q.   And vice versa?

13     A.   It would with an adapter.  The other way around it

14  would.

15     Q.   Okay.  So clarify that for me.

16     A.   10 gauge is actually a smaller diameter, so they are --

17  there are conversion kits where you can purchase and insert in

18  your 12 gauge shotgun, so you can shoot your 10 gauge or 12

19  gauge, you just have to take -- remove the adapter.  But it

20  doesn't work the other way around, because the barrel of the 10

21  gauge is, you just can't make it bigger.

22     Q.   You're not much of a shotgun, are you?

23     A.   I'm all right.

24     Q.   Okay.  You shoot a lot of shotguns?

25     A.   Shot since I was 16.

26     Q.   Are you familiar with a 20 gauge shotgun?

27     A.   I am.

28     Q.   Is that bigger or smaller in diameter than a 12 gauge?

1     A.   I would say -- I'm going to say I don't know.  I'm not
2  going to speculate.
3     Q.   Okay.  A 16 gauge.  Is that bigger or smaller than a 12
4  gauge?
5     A.   I have never heard of a 16 gauge.  But just because I
6  haven't heard of it, doesn't mean it doesn't exist.
7     Q.   10 gauge.  You're saying a 10 gauge is smaller than a
8  12 gauge, in your experience?
9     A.   That's the way I believe it to be, yes.
10    Q.   All right.
11         Okay.  So with regard to -- well, let's -- we'll leave
12  it at that.
13         I want to show you some photographs, see if you can
14  identify them.  Are you familiar with what's depicted in Exhibit
15  JJ for identification?
16    A.   Yes.
17    Q.   Is that a picture that was taken during the service of
18  the warrant?
19    A.   At the Canyon Lake residence?
20    Q.   Yes.
21    A.   Yes.
22    Q.   And does that appear to be taken in the closet of the
23  master bedroom belonging to Andrew Boji?
24    A.   It does.
25    Q.   I'm going to show you "II" for identification.  Does
26  that appear to be a view of the same room just a little bit
27  further back in the door looking in?
28    A.   That is correct.

1    Q.   And that was the closet attached to the room in which

2    you ultimately assembled all the various weapons that were

3    found, or that are depicted in Exhibit NN for identification,

4    correct?

5    A.   Yes.

6    Q.   I just wanted to highlight a few of the other items

7    that were found.  I'm going to show you Exhibit OO for

8    identification.  Does that appear to be a depiction, kind of a

9    close-up, of some of the pistols which are actually visible in

10   the back of NN displayed along the dresser?

11   A.   Yes.

12   Q.   And then PP for identification.  These are some of the

13   pistols, and down below you can see one or two of the rifles as

14   well just further down the drawers that you guys have laid these

15   firearms out on?

16   A.   Yes.

17   Q.   I'm going to show you LL for identification.  Is this a

18   shotgun and pistol in two separate boxes that were found during

19   your search of the Canyon Lake residence?

20   A.   Yes.

21   Q.   Now, you can't tell us, based on what you told me

22   earlier, you can't tell us how many, if any, of these

23   non-shotgun firearms had ammunition present in the house; is

24   that correct?

25   A.   That's correct.

26   Q.   You, under the terms of the warrant, you could have

27   photographed and catalogued every item of ammunition that you

28   found, right?

```
 1        A.    Yes.

 2        Q.    You chose not to do so?

 3        A.    Yes.

 4        Q.    Zooming in a little bit on the exhibit which is

 5   currently on the screen, which is "LL" for identification.  Is

 6   that pistol consistent with Heckler & Kock USP-type of weapon?

 7        A.    Yes.

 8        Q.    Based on your experience, at least?

 9        A.    Yes.

10        Q.    And it's a magazine there in the lower portion of the

11   box, correct?

12        A.    That's correct.

13        Q.    That's to be inserted inside that pistol?

14        A.    Yes.

15        Q.    Presumably.  I mean, it's in the box with that pistol?

16        A.    Correct.

17        Q.    And you can see that there's at least one and probably

18   two or more rounds of ammunition already inserted in that

19   magazine, correct?

20        A.    Yes.

21        Q.    That was not collected from the scene, correct?

22        A.    No, it was not.

23        Q.    And then when you were searching Houston Boji's

24   bedroom -- I'm going to show you "KK" for identification.  This

25   is the phone that you found, correct?

26        A.    That is a picture of the phone that was found.  I did

27   not find it.

28        Q.    You didn't find it, but your attention was called to it
```

1    after it was found, correct?

2        A.   Yes.

3        Q.   You were advised it was found tucked in between a

4    couple of mattresses?

5        A.   Yes.

6        Q.   Did you examine that phone as it was being collected?

7        A.   Examine it as to --

8        Q.   Just take a look at it?

9        A.   Yes, to make sure that it was a cell phone, yes.

10       Q.   Sure.

11            And it's not clear from this photograph, but did you

12   notice whether or not the screen was actually cracked?

13       A.   No.

14       Q.   You didn't notice?

15       A.   No, I didn't notice.

16       Q.   Can you see in the photograph?  I'll approach with the

17   People's exhibit of the same photo, of 226.  See if that helps

18   refresh your recollection.

19            Does that help refresh your recollection or not?

20       A.   No.

21       Q.   So you don't remember whether or not the screen was

22   cracked on that device when it was collected?

23       A.   That's correct.

24       Q.   You didn't bring it with you, by chance, did you?

25       A.   The cell phone?

26       Q.   Sure.

27       A.   No.

28       Q.   You weren't asked to?

```
 1      A.   No.
 2           MR. MOORE:   I have nothing further at this time, Your
 3   Honor.
 4           THE COURT:   Redirect?
 5                    REDIRECT EXAMINATION
 6   BY MS. FOSTER:
 7      Q.   When you collect evidence, do you assign it a barcode
 8   number?
 9      A.   Yes.
10      Q.   And is that so you can track it as different people
11   handle that piece of evidence?
12      A.   That is correct.
13      Q.   Did you assign a barcode number to the iPhone 6 taken?
14      A.   Yes.
15      Q.   Was that 1818647?
16      A.   I don't know.
17      Q.   Would it refresh your recollection to review your
18   report?
19      A.   No.
20      Q.   Did you document the number of the iPhone collected in
21   your report?
22      A.   Yes.
23      Q.   I'm going to ask you to look at page 3, lines 37 and
24   38.
25      A.   Okay.
26      Q.   On page 3 did you document the collection of that
27   iPhone?
28      A.   Yes, I did.
```

```
 1        Q.   And when you assigned numbers, did you assign them in a
 2   chronological order?
 3        A.   Yes.
 4        Q.   And did you assign a number to that iPhone?
 5        A.   Yes.
 6        Q.   And do you recall now if, based on your report, if you
 7   assigned it 1818647?
 8        A.   That is correct.
 9             MS. FOSTER:  I have nothing further.
10             THE COURT:  Defense?
11             MR. MOORE:  No questions, Your Honor.
12             THE COURT:  All right.  Thank you, sir.  You want to
13   return the exhibits to counsel, please?
14             THE WITNESS:  Thank you, Your Honor.
15             MS. FOSTER:  May I check outside real quick?
16             THE COURT:  Sure.
17             MS. FOSTER:  At this time the People will call Andrew
18   Boji.
19             THE COURT:  All right.
20             MS. FOSTER:  May I have a moment, Your Honor?
21             THE COURT:  Yes.
22             THE CLERK:  Sir, please raise your right hand to be
23   sworn.
24             Do you solemnly state that the evidence you shall give
25   in this matter shall be the truth, the whole truth, and nothing
26   but the truth, so help you God?
27             THE WITNESS:  I do.
28             THE CLERK:  Please be seated.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 522

```
 1            Please state and spell your first and last name for the
 2    record.
 3            THE WITNESS:  First name is Andrew, last name is Boji.
 4    A-n-d-r-e-w, B-o-j-i.
 5            MS. FOSTER:  I apologize, Your Honor.
 6            THE COURT:  All right.  The People may proceed.
 7            MS. FOSTER:  Thank you.
 8                          ANDREW BOJI,
 9    called as a witness by and on behalf of the Plaintiff, having
10    been first duly sworn, was examined and testified as follows:
11                       DIRECT EXAMINATION
12    BY MS. FOSTER:
13       Q.   Good afternoon.
14       A.   Good afternoon.
15       Q.   Mr. Boji, I just have a few questions for you.
16       A.   Fine.
17       Q.   Are you parent of Houston Boji?
18       A.   Yes.
19       Q.   That's your son; is that right?
20       A.   Yes.
21       Q.   And is your residence at 22190 Tumbleweed Drive in
22    Canyon Lake?
23       A.   Yes.
24            That was before, but we moved.
25       Q.   Okay.  Is that where you were living in November of
26    2015?
27       A.   Yes.
28       Q.   And do you recall November 10th of 2015 officers coming
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 523

```
 1    to your house to do a search warrant?

 2        A.   Of course.

 3        Q.   And on November 10th, 2015, did you speak with those

 4    officers?

 5        A.   Yes.

 6        Q.   And did you identify them -- for them some pieces of

 7    property that belonged to your son?

 8        A.   Yes.

 9        Q.   I'm going to show you what's been marked for

10    identification as People's 226.  Do you recognize what's in

11    People's 226?

12        A.   Yes.  Houston's phone number.  Of the telephone, sorry.

13        Q.   Now, did you also identify for officers -- let me do it

14    this way.

15             MS. FOSTER:  Can I -- I think it's People's 269.

16        Q.   BY MS. FOSTER:  Mr. Boji, while he's doing that, I'm

17    going to ask you a couple of questions.

18        A.   Go ahead.

19        Q.   Are you a person who avidly collects guns?

20        A.   Correct.

21        Q.   And you have guns that you legally possess; is that

22    right?

23        A.   Correct.

24        Q.   And you have several guns in your home at that time?

25        A.   Correct.

26        Q.   Are you well-trained in how to use those firearms?

27        A.   Correct.

28        Q.   Did you teach your son how to use those firearms?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 524

```
 1        A.   Yes.

 2        Q.   Did you take him out shooting?

 3        A.   Yes.

 4        Q.   Did you teach him firearm safety?

 5        A.   Yes.

 6        Q.   I'm showing you what's been marked for identification,

 7   I believe it's People's 269?

 8             THE COURT:  Yes.

 9             MS. FOSTER:  Thank you, Your Honor.

10        Q.   BY MS. FOSTER:  Do you recognize People's 269?

11        A.   Yes.

12        Q.   And what is it?

13        A.   That is a Mossberg 590 model.

14        Q.   Okay.

15        A.   12 gauge shotgun.

16        Q.   A 12 gauge shotgun?

17        A.   Correct.

18        Q.   And how do you know -- have you seen this gun before?

19        A.   Yes.

20        Q.   And who does that gun belong to?

21        A.   Me.

22        Q.   And had you given any firearms to your son?

23        A.   Yes.

24        Q.   What types of firearms did you give your son?

25        A.   He had a -- a 20 inch Beretta, skeet shoot it.

26        Q.   For skeet shooting, you said?

27        A.   Yes.

28        Q.   And what else?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 525

```
 1        A.   And also an AR.

 2        Q.   And what else?

 3        A.   And that would be it.  That was --

 4        Q.   Those two guns?

 5        A.   Yeah.

 6        Q.   And People's 269, was that a gun that you gave your son

 7   or one that belongs to you?

 8        A.   That belongs to me.

 9        Q.   And where did you keep People's 269 inside your

10   residence?

11        A.   This one was, in particular, in my closet.

12        Q.   And was it put away in your closet?

13        A.   Yes.

14        Q.   Was it contained in a case?

15        A.   I don't think so, no.

16        Q.   Did you keep ammunition for this gun inside your house?

17        A.   Yes.

18        Q.   Did you ever give your son permission to take that gun?

19        A.   No.

20        Q.   When was the last time you recalled seeing that gun

21   inside your house?

22        A.   Around November, you know.

23             MS. FOSTER:  I have nothing further.

24             THE COURT:  Cross?

25             MS. BLUMENTHAL:  May I have a moment, Your Honor?

26             THE COURT:  Sure.

27                      CROSS-EXAMINATION

28   BY MS. BLUMENTHAL:
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 526

```
 1       Q.    Good afternoon, Mr. Boji.

 2       A.    Good afternoon.

 3       Q.    How many weapons do you think -- when I say "weapons,"

 4   I'm talking firearms.  Do you think you own, or do you think you

 5   owned at that time?

 6       A.    Honestly, about 35.

 7       Q.    Okay.  And law enforcement came to your house on

 8   November 10th; is that correct?

 9       A.    Correct.

10       Q.    And they did an interview of you?

11       A.    Yes.

12       Q.    Okay.  You had told -- they had talked to you about the

13   gun in question, the one that you just -- the actual firearm you

14   just saw?

15       A.    Yes.

16       Q.    And you had told them at the time that you had not

17   given permission for your son to use that gun?

18       A.    No.

19       Q.    Now -- is that correct?

20       A.    Correct.

21       Q.    Okay.

22             That day, on November 10th, were you at home that

23   morning?

24       A.    Yes.

25       Q.    Okay.  At some point in time did you leave?

26       A.    No.

27       Q.    Did you ever leave to take any of your daughters to

28   school?
```

1      A.    The only time we left the house was around about 4

2   o'clock, approximately.

3      Q.    Okay.  Let me just go back one minute.

4      A.    Okay.

5      Q.    Do you recall the morning of November 10th?

6      A.    Yes.

7            MS. BLUMENTHAL:  If I might have a moment?

8      Q.    BY MS. BLUMENTHAL:  And do you recall those morning

9   hours of November 10th?

10     A.    Yes.

11     Q.    And do you recall what day of the week that was?

12           I don't expect you to know that.  Was it a week day?

13     A.    Houston actually had a college course in the morning.

14     Q.    Okay.  Now, at some point in time do you and/or your

15   wife leave in the morning, during the week, during the school

16   year to take your daughters to school?

17     A.    No.

18     Q.    How do they get to school?

19           MS. FOSTER:  Objection.  Relevance.

20           THE COURT:  Sustained on relevance.

21           MS. BLUMENTHAL:  Your Honor, during our afternoon

22   recess, maybe it's a topic that we can discuss.

23           THE COURT:  All right.  At this time it's still

24   sustained.

25           MS. BLUMENTHAL:  I understand.  Thank you.

26     Q.    BY MS. BLUMENTHAL:  Do you recall the last time that

27   you had seen your son on November 10th?

28     A.    In the morning.

```
 1        Q.    In the morning.  Do you recall about what time?

 2        A.    I would say around about 8 o'clock, you know.

 3        Q.    Okay.  Now, you were asked a question on

 4   cross-examination, I'm sorry, direct examination, if you taught

 5   your son gun safety?

 6        A.    Yes.

 7        Q.    And how long have -- did you first teach Houston how to

 8   shoot guns?

 9        A.    Of course, yes.

10        Q.    And do you recall approximately how old he was when you

11   first taught him how to shoot guns?

12        A.    Approximately about 16, 17 years old.

13        Q.    16 or 17 years old?

14        A.    Yes.

15        Q.    So back in November of 2015, Houston was 19 years old;

16   is that correct?

17        A.    Correct.

18        Q.    And how often would you take your son out to shoot

19   firearms?

20        A.    Like once a month.

21        Q.    About once a month?

22        A.    Yes.

23        Q.    Did you ever take any of his friends with you?

24        A.    Yes.

25        Q.    And specifically did you know Nicholas?

26        A.    Yes.

27              MS. FOSTER:  I'm going to object to outside the scope.

28              THE COURT:  It is outside the scope of direct.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 529

1      Q.    BY MS. BLUMENTHAL:   Whenever you would take your son

2    out shooting, did you talk to him about gun safety?

3      A.    Yes.

4      Q.    And how predominant was that topic when you would take

5    him out?

6      A.    To be honest, a lot.   Can I elaborate?

7      Q.    No.   You have to just answer questions.

8      A.    Okay.   Yes.

9      Q.    How often would you talk to him about gun safety?

10     A.    Approximately about at least five minutes.

11     Q.    Okay.   Is that every time you took him out?

12     A.    Yes.

13     Q.    Now, when you took him out -- let me back up.

14           Where in the house were the majority of these guns

15   kept?

16     A.    In my closet.

17     Q.    In your closet?

18     A.    Yes.

19     Q.    So you have most of the 30-some-odd guns in your

20   closet?

21     A.    Most of them in the closet and some of them --

22     Q.    And you say "some of them."   Where would the other guns

23   be?

24     A.    Altogether, they were in two different places.

25     Q.    And where were the two places?

26     A.    One of them was in the laundry room I used to assemble.

27     Q.    So you would put the guns together?

28     A.    They were not a hundred percent ready to go.

1      Q.   So the guns that were in the laundry room were guns
2  that you were working on?
3      A.   Yes.
4      Q.   And then the guns that were in your closet, the closet
5  in your bedroom?
6      A.   Yes.
7      Q.   And were those guns that were fully assembled and ready
8  to be used?
9      A.   Correct.  Yes.
10     Q.   Now, I'm going to show you what's been marked as
11  People's 230 for identification.  What -- what room of the house
12  is that?
13     A.   That's the living room.
14     Q.   That's the living room.
15          Is that a bedroom?
16     A.   No.
17     Q.   Okay.  So if somebody had identified that as a bedroom,
18  they would be mistaken?
19     A.   That's not a bedroom.
20     Q.   Okay.  Did you have guns that you had stored in the
21  living room?
22     A.   No.
23     Q.   Can you see the guns that are in this photograph?
24     A.   Yes.
25     Q.   Where would those guns have been located on November
26  10th of 2015?
27     A.   In my room.
28     Q.   That would have been in your bedroom?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 531

```
 1       A.   Yes.

 2       Q.   In your closet in your bedroom?

 3       A.   Correct.

 4       Q.   And you saw pictures.  There are pictures that were

 5  taken of guns laid out on a bed.  Defense NN for identification.

 6  And do you recall what room that would be in?

 7       A.   Master bedroom.

 8       Q.   That would be in your bedroom?

 9       A.   Correct.

10       Q.   Okay.  So those guns are laid out on a bed, correct?

11       A.   Correct.

12       Q.   And would that be your bed?

13       A.   What was that again?

14       Q.   Is that your bed?

15       A.   Yes.

16       Q.   The guns that we see in the photograph, would they have

17  been found in your closet in your bedroom?

18       A.   Correct.

19       Q.   Now, I'm going to show you 226 for identification.  And

20  you stated that this was, I believe you stated Houston's cell

21  phone?

22       A.   Yes.

23       Q.   Did you see it at the time that the law enforcement

24  found it in the residence?

25       A.   No.

26       Q.   Were you -- were you aware of whether or not the phone,

27  the case of the phone, that is the glass case, was broken?

28       A.   No.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 532

```
 1      Q.   You didn't see it that day that they seized it?

 2      A.   When they pulled it out, they showed him.

 3      Q.   Pardon me?

 4      A.   When they found it, the deputy found it.

 5      Q.   So the deputy found it.  Did he ask you whose phone

 6   that was?

 7      A.   Yes.

 8      Q.   And did you tell him it was Houston's phone?

 9      A.   Correct.

10      Q.   And were you able to take a look at the phone?

11      A.   No.

12      Q.   So they just kind of showed it to you from a distance?

13      A.   Yes.

14      Q.   Okay.  So you didn't have a chance to check out the

15   front portion of the phone at all?

16      A.   No.

17      Q.   Now, you said that Houston had two guns in his room?

18      A.   Correct.

19      Q.   And those, the way you described, those would be his

20   guns?

21      A.   Yes.

22      Q.   Were they registered to him or registered to you?

23      A.   Registered to me.

24      Q.   But you gave those guns to Houston?

25      A.   Correct.

26      Q.   And those two guns were a 20 inch?

27      A.   One of them was a skeet shooting shotgun, and the other

28   one was an AR-15.
```

```
 1      Q.   Okay.  So those two guns you were aware of.  And where
 2  did Houston keep those in his room?
 3      A.   Under his bed.
 4      Q.   Under his bed.
 5           When you kept the guns in your closet, did members of
 6  the family have access to it?
 7      A.   Yes.
 8      Q.   So did Houston have access to the guns in your closet?
 9      A.   Yes.
10      Q.   Did each of the guns in your closet have ammunition
11  that would fit that particular gun?
12      A.   No.
13      Q.   Did some guns not have ammunition fit it?
14      A.   We had no ammunition in the rifles.
15      Q.   Okay.  So what I'm saying is, were they -- was there
16  ammunition in the house?
17      A.   Yes.
18      Q.   Okay.  That's what I'm asking.
19      A.   Yes.
20      Q.   I'm not talking about in the weapon itself.
21      A.   Oh, okay.
22      Q.   Okay?
23           Did all of the guns that were -- let me go back.  Were
24  all of the guns that were in your closet, was there ammunition
25  for them somewhere in the house?
26      A.   Correct.
27      Q.   Had you shown Houston where the ammunition was?
28      A.   Yes.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 534

1    Q.   So were there any other guns that were in the house

2  that were already loaded?

3    A.   Yes.

4    Q.   And which guns were those?

5    A.   A couple pistols.

6    Q.   A couple of pistols.  And where were those kept?

7    A.   They were kept -- some of them was a place inside the

8  bed set, safe area.  One of them -- a couple of them, they were

9  kept inside.

10        MS. BLUMENTHAL:  Your Honor, at this time the People

11  would prefer our afternoon break.

12        THE COURT:  Yes.  Ladies and gentlemen, do not talk

13  about the case.  Keep an open mind.

14        We'll be back here at 3:15.  Court's in recess until

15  3:15.

16        All right.  Do you want to come back in 15 minutes?

17        THE WITNESS:  All right.

18        THE COURT:  Thank you.

19    (Proceedings were held out of the presence of the jury:)

20        THE COURT:  All right.  Out of the presence of the

21  jury.

22        You wanted to put something on the record?  Someone

23  wanted to put something on the record?

24        MS. BLUMENTHAL:  Yes.  There is something that is

25  coming up that I did not want to do in front of the jury.

26        On direct examination, Mr. Andrew Boji was asked about

27  teaching Mr. Houston Boji about gun safety, and, you know, what

28  gun safety is and the things you do and do not do with it.

1          We have a --

2          MR. MOORE:  There is a series of three or four videos

3   that were taken from Houston Boji's phone that we would like to

4   play to demonstrate his gun safety techniques or lack thereof.

5          MS. BLUMENTHAL:  We'd like the Court to take a look at

6   those.  They're not long.

7          THE COURT:  Well, who authored these tapes?  Who's in

8   the tapes, and what's --

9          MS. BLUMENTHAL:  They were on Mr. Houston Boji's phone.

10         THE COURT:  Is it from YouTube?  Is it Mr. Boji in the

11  tape?

12         MR. MOORE:  It's Mr. Boji.

13         MS. BLUMENTHAL:  Mr. Boji.  Mr. Houston Boji.

14         MS. FOSTER:  Is Andrew in the video teaching him?

15         MR. MOORE:  No.

16         MS. BLUMENTHAL:  No.

17         MS. FOSTER:  So these are just Houston Boji shooting by

18  himself?

19         MS. BLUMENTHAL:  It's the handling of weapons.

20         I can imagine in closing argument that she's going to

21  talk about teaching him gun safety, the things that you do with

22  a gun, how he handled the gun around Nicholas was unsafe, or he

23  would know better.  He would never do it unless he intended to

24  this.  And I can imagine that's going to be part of the argument

25  in closing arguments.

26         The father is testifying he has taught Mr. Houston Boji

27  gun safety.  We have some videos that were taken, specifically

28  one that was taken of Mr. Houston Boji that was on his phone

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 536

1    that's in evidence as to him handling the guns in his father's

2    closet, and the manner in which he is handling them.

3              THE COURT:  And his father is present?

4              MS. BLUMENTHAL:  No.  His father is not present.

5              THE COURT:  All right.  So what is the relevance of it

6    with this witness, showing the tape to this witness?

7              MS. BLUMENTHAL:  Is this how you told him or taught him

8    how to handle weapons?  If he would say, yes, it's okay to do it

9    that way; or, no, I would not teach him that, because I would

10   not want him doing it that way.

11             THE COURT:  All right.  Have you looked at the tape?

12             MS. FOSTER:  I've watched almost all the videos.  I

13   don't know which one specifically they're talking about.  There

14   are a lot of videos that show the way the defendant handles

15   guns.  I don't know that just -- if they were saying it was a

16   video where he's teaching him gun safety and teaching him

17   improperly, then I would have no objection to that, but he plays

18   around in the videos.  Of the ones that I've watched, he's

19   playing around with guns.  So I don't know that --

20             THE COURT:  I don't know which video.  I haven't seen

21   it.

22             MS. BLUMENTHAL:  We'd like to show it to the Court.

23             MS. FOSTER:  And, if I can, I don't see how this

24   witness, No. 1, would know when those videos were taken, if it's

25   before or after he taught him.  I don't think he can lay any

26   type of foundation for them.  He's not present in those videos.

27   He didn't record those videos.  I don't even know if he can even

28   associate time of when those videos were taken.

1          I think that if you want to establish something like

2     that, you need to have the person who is either recording the

3     videos or who is in the videos to establish that they're even

4     relevant given that when he may have taught him.  He said he

5     taught him around his 16th or 17th birthday.  I don't even know

6     when half of those videos are taken.

7          And then another thing about it is that if -- my

8     understanding is that he's saying "I taught him gun safety," and

9     then they're saying "We want to play these videos to show that

10    he didn't exercise gun safety."

11         THE COURT:  That's what I found with this witness,

12    because you're making him testify as an expert whether or not --

13    well, that's what you're trying to do, ask him questions whether

14    or not this is proper gun safety.  So I don't think from this

15    witness that's appropriate.

16         MR. MOORE:  Well, it was Miss Foster that opened this

17    topic up, and we would just like to ask him, do these videos

18    demonstrate the types of gun safety techniques that you taught

19    your son?

20         MS. BLUMENTHAL:  Correct.

21         MR. MOORE:  I mean, it's further questioning about how

22    he trained his son in gun safety.

23         THE COURT:  I'm not going to allow the video to be

24    played.  You may ask him questions, specific questions,

25    specifically, What type of gun safety?  What did you teach your

26    son about gun safety?  Did you teach him how to load a firearm?

27    How did you teach him how to load a firearm?  Did you teach him

28    not to point it at anyone?  Those are things that I think are

1    appropriate.

2         But playing the video, the witness was not present at

3    the making of the video.  We don't have a time.  This witness

4    cannot testify when this video was made or in that instance.

5    I'm not going to allow the video to be played.

6         MR. MOORE:  He can probably set a time frame based on

7    the weapons, or he might be able to set a time frame based on

8    the weapons that were displayed, and the age of his son.  He

9    knows the age of his son.

10        THE COURT:  The issue here is whether or not the

11   defendant received any type of gun safety.  So you can go into

12   as much detail about gun safety.

13        MR. MOORE:  Right.

14        THE COURT:  But not the playing of the video.  I don't

15   think it's appropriate from this witness.  And that's the

16   Court's ruling.

17        MS. BLUMENTHAL:  Is the Court saying from this witness

18   or from any witness?

19        THE COURT:  This witness.  That's what I have in front

20   of me right now and that's the call I'm making.  From this

21   witness.  But you could cross-examine him.  You could ask him

22   all the questions you want regarding gun safety, because he did

23   testify "I" on gun safety.  You can go into as much detail, you

24   know.  Revolvers are a little different than semiautomatic.

25   Shotguns are a little different than AR-15s.  Probably a

26   different, you know, specific gun safety to specific weapons.

27   You can go into all that detail.  All right?

28        MS. FOSTER:  Thank you.

```
 1          THE COURT:  That was just glossed over by the People's
 2  direct, but you could cross-examine how much detail or lack of
 3  detail.
 4          All right.  Court's in recess until 3:15.
 5                      (Recess.)
 6      (Proceedings were held in the presence of the jury:)
 7          THE COURT:  All right.  Back on the record.
 8          Defense?
 9          MS. BLUMENTHAL:  Yes.  Thank you.
10      Q.   BY MS. BLUMENTHAL:  The shotgun that was in Houston's
11  room, he had two guns, you said, correct?  What gauge shotgun
12  was that?
13      A.   It was 20 gauge.
14      Q.   A 20 gauge?
15      A.   Yes.
16      Q.   Okay.  And the AR that was in Houston's room, what type
17  of ammunition did that take?
18      A.   556.
19      Q.   556.  Was there 556 ammunition in the house?
20      A.   No.
21          Excuse me.  Can you repeat that?
22      Q.   Was there 556 ammunition in the house?
23      A.   Correct.
24      Q.   Was there?  It's either yes or no?
25      A.   Yes.
26      Q.   Okay.  Thank you.
27          MS. BLUMENTHAL:  No further questions, Your Honor.
28          THE COURT:  People?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 540

1                    REDIRECT EXAMINATION

2    BY MS. FOSTER:

3        Q.    You said that you had given your son a skeet shooting

4    shotgun?

5        A.    Correct.

6        Q.    What's the difference between a skeet shooting shotgun

7    and People's 269?

8        A.    Skeet shooting shotgun cannot shoot any magnum rounds

9    in it.

10       Q.    Okay.  So it's just for -- and what is skeet shooting,

11   just for those who don't know?

12       A.    A clay flies in and you zero on it and you shoot it.

13   That's a clay shooting.  That's what they call skeet shooting

14   shotgun.

15       Q.    So is that the best gun if you want to go skeet

16   shooting with, so the skeet shooting shotgun you gave him?

17       A.    Correct.

18       Q.    The gun in People's 269, you said that was -- was that

19   one of the guns that was loaded or was not loaded?

20       A.    Not loaded.

21             MS. FOSTER:  Nothing further.

22             THE COURT:  Defense?

23                       RECROSS-EXAMINATION

24   BY MS. BLUMENTHAL:

25       Q.    Is there a different type of ammunition used for skeet

26   shooting than there is for something else?

27       A.    Yes.

28       Q.    And what is the difference in the ammunition?

Christine M. DiCaro, CSR                                      534

```
 1        A.    Between the two weapons?

 2        Q.    No.   What is the -- yes.

 3        A.    That one is a 12 gauge, and the one that Houston, that

 4   he had under his bed is a 20 gauge, but the shells are smaller.

 5        Q.    Okay.   In the 20 gauge shotgun, are the shells smaller

 6   with that than what's used for skeet shooting?

 7        A.    Yes.

 8              MS. BLUMENTHAL:   No further questions, Your Honor.

 9              THE COURT:   People?

10              MS. FOSTER:   Nothing further.

11              THE COURT:   Thank you, sir.

12              Thank you.

13              MS. FOSTER:   May I have one moment, Your Honor?

14              THE COURT:   Sure.

15              Do you have additional witnesses for today?

16              MS. FOSTER:   Yes, I do.

17              People call Deputy Bellavia.

18              THE CLERK:   Please remain standing and raise your right

19   hand.

20              Do you solemnly state that the evidence you shall give

21   in this matter shall be the truth, the whole truth, and nothing

22   but the truth, so help you God?

23              THE WITNESS:   I do.

24              THE CLERK:   Please be seated.

25              Please state and spell your first and last name for the

26   record.

27              THE WITNESS:   Krysti Bellavia.   K-r-y-s-t-i, B, as in

28   boy, e-l-l-a-v, as in Victor, i-a.
```

```
1          THE COURT:  People?

2          MS. FOSTER:  Thank you.

3                        KRYSTI BELLAVIA,

4   called as a witness by and on behalf of the Plaintiff, having

5   been first duly sworn, was examined and testified as follows:

6                        DIRECT EXAMINATION

7   BY MS. FOSTER:

8       Q.   What is your occupation and assignment?

9       A.   I'm a deputy sheriff and currently I'm assigned to the

10  YAT program.

11      Q.   And how long have you been a sworn peace officer?

12      A.   Almost 11 years.

13      Q.   Were you on duty on November 10th, 2015?

14      A.   I was.

15      Q.   And were you assigned to participate and assist in the

16  investigation of a shooting death of Nicholas McCauley?

17      A.   I was.

18      Q.   And as part of your assignment, were you sent to 22190

19  Tumbleweed Drive?

20      A.   Yes.

21      Q.   And is that in the city of Canyon Lake?

22      A.   Correct.

23      Q.   Now, what was your role in assisting at the 22190

24  Tumbleweed Drive?

25      A.   I was helping to locate any possible evidence.

26      Q.   And at some point did you locate some boxes of

27  ammunition?

28      A.   I did.
```

1      Q.    And how many boxes of ammunition did you locate?

2      A.    I don't remember total.  There were a couple boxes full

3    of them.  I don't remember the total amount.

4      Q.    And at some point did you locate specifically shotgun

5    rounds?

6      A.    Yes.

7      Q.    And what type of shotgun rounds did you locate?

8      A.    I believe there were a couple of different kinds.  I

9    think there were -- I don't remember exactly, but I remember

10   they were a couple of different kinds.

11     Q.    Would it refresh your recollection to review your

12   report?

13     A.    Yes.

14     Q.    Do you have it in front of you?

15     A.    I do not.

16     Q.    I'm going to show you page 3 of your report.

17           MS. FOSTER:  With the Court's permission?

18           THE COURT:  Yes.

19     Q.    BY MS. FOSTER:  Direct you to lines 11 through 14.

20           Is your recollection refreshed?

21     A.    Yes.

22     Q.    How many boxes of ammunition did you locate?

23     A.    I don't know.  I didn't look at the boxes, I looked at

24   the type.

25     Q.    What type of ammunition?

26     A.    Federal was the brand.

27     Q.    And were they buckshot rounds or other type?

28     A.    Buckshot and another type as well.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 544

```
 1      Q.    And how many boxes of buckshot did you locate?

 2      A.    I don't remember.

 3      Q.    I'm going to leave paperwork of -- I'm going to leave

 4   you page 3 of your report with you, okay?

 5      A.    Yes.

 6      Q.    Would it refresh your recollection to review your

 7   report?

 8      A.    Yes.

 9      Q.    How many boxes of buckshot rounds did you locate?

10            Once your recollection is refreshed, can you just look

11   up?

12      A.    One.

13      Q.    And did you notice any missing rounds of buckshot

14   ammunition?

15            MS. BLUMENTHAL:  Could the record reflect she's reading

16   the report?

17      Q.    BY MS. FOSTER:  Are you refreshing your recollection?

18      A.    Yes.

19            THE COURT:  I'm sorry?

20            MS. BLUMENTHAL:  I was just asking if the record would

21   reflect that she was using the report to refresh her

22   recollection at that time.

23            THE COURT:  All right.  Yes.

24      Q.    BY MS. FOSTER:  Once you're done refreshing your

25   recollection, can you look up?  We don't want you to read from

26   the report, okay?

27            Did you notice whether there were any boxes missing?

28      A.    Yes.
```

```
1       Q.   And how many?

2       A.   Nine.

3       Q.   And is that of the buckshot rounds?

4       A.   Correct.

5            MS. FOSTER:  Nothing further.

6                          CROSS-EXAMINATION

7    BY MR. MOORE:

8       Q.   Now, did you only find one box or case of buckshot

9    ammunition, or did you only find one open box of buckshot

10   ammunition?

11      A.   I don't understand the question.  Like a whole

12   cartridge of it?

13      Q.   So let me ask this:  You found -- can we call these

14   cases of ammunition?

15      A.   Yes.

16      Q.   So you found a case of ammo that had been opened.  You

17   found inside many boxes of buckshot ammunition?

18      A.   Correct.

19      Q.   You counted how many boxes there were there, and thus

20   calculated how many were actually missing?

21      A.   Correct.

22      Q.   And with the buckshot there were nine boxes missing

23   from the case?

24      A.   Correct.

25      Q.   Total of 45 rounds had been taken out of that case?

26      A.   Correct.

27      Q.   Did you find any of the empty boxes that had been

28   removed from the case?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 546

1        A.   I did not.

2        Q.   Do you know were any empty boxes found inside the

3    house, to your knowledge?

4        A.   I don't know.

5        Q.   Okay.  So now let's talk about the case itself, right?

6    Did you only find one case of buckshot ammunition, or did you

7    only find one case of buckshot ammunition that had been opened?

8        A.   One that had been opened.

9        Q.   Were there other cases of buckshot ammunition?

10       A.   I don't recall.

11       Q.   Is it possible that there were?

12       A.   Yes, it is possible.

13       Q.   Is it possible, in fact, that there were other cases of

14   ammunition that had not been opened that were not documented in

15   your report?

16       A.   Yes.

17       Q.   You were only looking for opened boxes, correct?

18       A.   Correct.

19       Q.   So you found two opened boxes of shotgun ammunition?

20       A.   Correct.

21       Q.   Were you looking for opened boxes of, or, I'm sorry,

22   cases of rifle ammunition?

23       A.   I don't know if I was looking for opened boxes, but I

24   didn't locate any.

25       Q.   Did you -- well, do you recall if you located any cases

26   or boxes of rifle ammunition at all?

27       A.   I don't recall, no.

28       Q.   How about pistol ammunition?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 547

 1      A.   No.  I don't recall locating any.

 2      Q.   Okay.  You don't recall?

 3      A.   No.

 4      Q.   Can you say for certain that there weren't rifle

 5  ammunition?

 6      A.   I cannot.  No.

 7      Q.   Or pistol?

 8      A.   I cannot, no.

 9      Q.   So the only thing that you documented at all was the

10  opened boxes, I'm sorry, opened cases of shotgun ammunition?

11      A.   That I located.

12      Q.   And the turkey shot rounds with -- where there were

13  missing boxes from the case, those are 10 gauge; is that

14  correct?

15      A.   I don't remember what the gauge was on those.

16      Q.   And you didn't document that in your report, right?

17      A.   Document what?

18      Q.   The gauge of the rounds that you seized?

19      A.   I don't believe so.  Of the turkey, no.

20      Q.   Okay.  If I could show you Detective, or Investigator

21  Baeza's report, might that help refresh your recollection?

22      A.   Sure.

23      Q.   He was your case agent, right?

24      A.   He was.

25           MR. MOORE:  Page 7.

26           May I approach, Your Honor?

27           THE COURT:  Yes.

28      Q.   BY MR. MOORE:  I'm sorry.  Were you able to find what

```
 1   might help refresh your recollection?
 2        A.   Where do you want me to look on his report?
 3        Q.   That was rude of me.
 4             Right here.  Line 25.
 5             Did that help refresh your recollection?
 6        A.   Yes.
 7        Q.   And was it a 10 gauge case of ammunition with the
 8   turkey shot?
 9        A.   He stated it was, correct.
10        Q.   Did he get that information from you, according to him?
11        A.   I don't know if he got it from me or looking at it
12   himself.
13        Q.   Does that help refresh your recollection?
14        A.   No.
15        Q.   It does not?
16        A.   I do not recall, no.
17             MR. MOORE:  Nothing further, Your Honor.
18             THE COURT:  All right.  Thank you.
19             MS. FOSTER:  Nothing further.
20             THE COURT:  Thank you, Deputy.
21             MR. MOORE:  Subject to recall, please, Your Honor.
22             THE COURT:  Yes, subject to recall.
23             MR. MOORE:  Could I get that back?
24             THE COURT:  Just return it back to counsel table.
25             Thank you.
26             People's next witness?
27             MS. FOSTER:  Your Honor, the People call Investigator
28   Dean.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 549

1          THE CLERK:  Please remain standing and raise your right

2    hand.

3          Do you solemnly state that the evidence you shall give

4    in this matter shall be the truth, the whole truth, and nothing

5    but the truth, so help you God?

6          THE WITNESS:  Yes, I do.

7          THE CLERK:  Please be seated.

8          Please state and spell your first and last name for the

9    record.

10         THE WITNESS:  de Lesandro Dean.  That's small d-e,

11   capital L, e-s-a-n-d-r-o, last name Dean, D-e-a-n.

12                          de LESANDRO DEAN,

13   called as a witness by and on behalf of the Plaintiff, having

14   been first duly sworn, was examined and testified as follows:

15                          DIRECT EXAMINATION

16   BY MS. FOSTER:

17       Q.   Good afternoon.

18       A.   Good afternoon.

19       Q.   What is your current occupation?

20       A.   Well, actually, I'm retired from the sheriff's

21   department as of a year ago.

22       Q.   And how long were you a sworn peace officer?

23       A.   I was a sworn peace officer, my last -- I worked with

24   multiple agencies, but I worked 22 years for Riverside County

25   Sheriff's Department.

26       Q.   And were you on duty on November 10th, 2015?

27       A.   Yes, I was.

28       Q.   And did you participate in the investigation of the

1    death of Nicholas McCauley?

2         A.   Yes.  I was the primary investigator.

3         Q.   And what is your role as the primary investigator?

4         A.   Primary investigator basically takes the lead.  Will do

5    all the interviews, or the majority of the interviews.  Will

6    direct my, what we call the second, will basically shadow me and

7    assist me in the interviews and remind me of things I might be

8    missing.  And then we have a scene investigator that processes

9    the scene.  But I'm ultimately responsible for everything that

10   goes on.  It's basically done at my direction, or they notify me

11   of what they're doing.

12        Q.   And so in your role as the primary investigator, do you

13   direct different officers on different parts of the

14   investigation?

15        A.   Yes, I do.

16        Q.   And then do you actually oversee some of those parts of

17   the investigation after they complete their work?

18        A.   Correct.  Yes, I do.

19        Q.   Did you direct an Investigator Samosky to pull up

20   citywide cameras?

21        A.   Yes, I did.

22        Q.   And did you specify what areas or give him some

23   direction in what areas to look for?

24        A.   Yes, I did.  During the course of the investigation in

25   speaking with Houston Boji, I was trying to determine the route

26   he had taken that morning in coming to Nicholas's house.  And

27   upon getting that information, and knowing that Moreno Valley

28   has what's called city cams, they're in strategic locations

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 551

 1  throughout the city, I asked him to look at specific

 2  intersections to see if he could pick up the vehicle, or vehicle

 3  matching the description of Mr. Boji.

 4      Q.   And you said, "citywide cameras."  What is that?

 5      A.   The citywide camera, I can't tell you exactly when they

 6  started it, but they've had it for a couple of years now.  And

 7  they're not throughout the entire city, but they are in the main

 8  intersections throughout the city, because Moreno Valley has an

 9  extremely high crime rate, and this assists us with our

10  investigations in trying to locate suspects and to track their

11  path either coming to a crime and leaving the crime.

12      Q.   So where are these cameras typically located?

13      A.   They are going to be at the intersections, and they're

14  going to be mounted up high.  And they point down to the

15  intersections.  This particular day I was concerned about

16  specific intersections, so I asked him to look at those

17  particular intersections.

18      Q.   And what intersections did you direct, is it Deputy

19  Samosky?

20      A.   Investigator Samosky.

21      Q.   Investigator Samosky towards?

22      A.   I asked him to look at the intersection of Perris

23  Boulevard and Iris, and then to continue down Iris to the main

24  artery leading to the development that Mr. McCauley lived in.

25      Q.   And we're saying his name often.  Let me spelled it for

26  the record.  Is it S-a-m-o-s-k-y?

27      A.   I wouldn't know.  I know it has a lot of vowels and

28  consonants in it.  It's a long name.

```
 1          MS. FOSTER:  I think that's sufficient for the court
 2   reporter.
 3      Q.   BY MS. FOSTER:  So once you directed Investigator
 4   Samosky to look for, and you said -- you said, "Houston Boji,"
 5   but do you see that person in the courtroom today?
 6      A.   Yes, I do.
 7      Q.   Can you identify for the record where that person is
 8   seated and what they're wearing?
 9      A.   He's sitting at the defense table.  He's wearing a blue
10   jacket and a green necktie.
11          MS. FOSTER:  May the record reflect the witness has
12   identified the defendant?
13          THE COURT:  Yes.
14      Q.   BY MS. FOSTER:  So once you direct Investigator Samosky
15   to look for the defendant's car, was it actually found in the
16   citywide camera system?
17      A.   I can't say for sure that it was his vehicle, because
18   the license plate is not able to be read off of that particular
19   camera, but the vehicle type, the fact that there is a Camaro
20   with a dark color, and the time frame a vehicle is seen at that
21   intersection at 8:17 in the morning, and then continues to
22   travel east onto Iris, passing through Lasselle, and then
23   subsequently turning into the housing development where
24   Mr. McCauley lived.
25      Q.   And when you say "housing development," you saw the
26   photographs earlier that it was a double --
27      A.   Cul-de-sac.
28      Q.   Cul-de-sac.  Thank you.  The word just blew out of my
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 553

1    brain.

2          So it was a double cul-de-sac; is that what you're

3    saying?

4          A.    That is correct.

5          Q.    So did you watch also the frames from that video, from

6    that camera system?

7          A.    Yes, I did.

8          Q.    And were you able to follow the car matching the

9    description going into that cul-de-sac?

10         A.    Yes.  As I said earlier, we picked out the vehicle at

11   the intersection of Perris and Iris approximately 8:17 in the

12   morning, and then it made a right turn onto Iris.  And at that

13   point it would be traveling east.  And then we picked it up

14   again at the intersection of Lasselle and Iris at 8:18.  And

15   then the vehicle proceeded on and subsequently turned into

16   the -- you lose sight of it as it turns in, because the next --

17   the next intersection you can only see that intersection.  It

18   does not pan all the way down the street.  So it does not

19   proceed past that intersection.

20         Q.    Okay.  And so at what time is the last time you see it

21   before it goes into that double cul-de-sac?

22         A.    8:18.

23         Q.    Did you also have the description of Ana McCauley's

24   car?

25         A.    Yes, we did.

26         Q.    Were you also, on that citywide camera, able to

27   identify a vehicle matching the description of Ana McCauley's

28   car?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 554

1      A.    Actually, on that one I did not view that.

2  Investigator Samosky did.  But it showed --

3      Q.    And so -- let me stop you there.

4      A.    Okay.  I'm sorry.

5      Q.    For anything you didn't view.

6      A.    All right.

7      Q.    And as far as the citywide camera system, how do you

8  know the time?  You said at 8:18.  Where do you get that

9  information from?

10     A.    It is time stamped similar to a computer.  It is within

11  the Moreno Valley police station, and it is manned during the

12  daytime hours.  And Investigator Samosky is one of the

13  individuals who was trained on that, so he was able to go back

14  and kind of backtrack on that day and find that information and

15  download it onto a disk.

16          MS. FOSTER:  I have nothing further.

17          THE COURT:  Cross?

18                      CROSS-EXAMINATION

19  BY MR. MOORE:

20     Q.    So you viewed the camera information -- I'm sorry.

21  Good afternoon, Detective Dean.

22     A.    Good afternoon.

23     Q.    How are you?

24     A.    Good.

25     Q.    So you viewed the camera data that Detective Samosky

26  had found on it, correct?

27     A.    That is correct, sir.

28     Q.    And you indicated that you saw a car that was

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 555

```
 1    consistent with Houston Boji's northbound, initially northbound
 2    on Perris?
 3         A.   That is correct.
 4         Q.   Okay.  So coming up from the south, northbound on
 5    Perris, and it turns onto Iris?
 6         A.   That is correct.
 7         Q.   And you saw it turn onto Iris at 8:17?
 8         A.   I believe the intersection, is it Perris and Iris at
 9    8:17, and then it was Iris and Lasselle at 8:18.
10         Q.   Okay.  And correct me if I'm wrong.  Lasselle is
11    actually past the turn into Soaring Seagull; is it not?
12         A.   Yes, it is.
13         Q.   So you saw the car that you were following drive past
14    Lasselle?
15         A.   No.  At 8:18 Lasselle, and it is past, but Lasselle,
16    the intersection that leads into the track is close enough where
17    it goes off of camera.
18         Q.   Okay.  So you were actually able to see the car that
19    you were following turn onto the street that leads into Soaring
20    Seagull?
21         A.   That's correct.
22         Q.   And that's Pelican; is that correct?
23         A.   I'm not sure exactly the main artery there.
24         Q.   And that was at 8:18?
25         A.   That is correct.
26         Q.   So you were watching the camera on Lasselle looking
27    down towards the Soaring Seagull intersection.  Did you ever see
28    Miss McCauley's vehicle leave?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 556

1    A.   I did not view that part, no, sir.

2    Q.   Did you watch for it?

3    A.   I did not look for that, no.

4    Q.   Okay.  So you don't know if Miss McCauley left before

5    or after this vehicle that you were following turned into the

6    Soaring Seagull track?

7    A.   I could not testify to that, no.

8    Q.   All right.

9         MR. MOORE:  Thank you.  Nothing further.

10        THE COURT:  People?

11        MS. FOSTER:  Nothing further.

12        THE COURT:  All right.  Thank you, sir.

13        MS. FOSTER:  Subject to recall?

14        MR. MOORE:  Yes.

15        THE COURT:  Yes.

16        Any additional witnesses?

17        MS. FOSTER:  May we have a brief break, Your Honor, to

18   talk to the Court about scheduling?

19        THE COURT:  Let's go out in the back.

20         (Discussion held at sidebar, not reported.)

21        THE COURT:  All right.  Back on the record.

22        Ladies and gentlemen, we're ahead of schedule, and

23   there is a witness that's a potential witness that's out of --

24   that's not from the area, so that individual cannot be here

25   tomorrow.  That individual will be here Monday.  And then we'll

26   start with defense on Monday.

27        Once again, the defense does not have to prove anything

28   in this case, but if they wish to.  We'll start off with the

1  defense on Monday.  And it looks like this case will probably be

2  in your hands Wednesday or Thursday.  So we are ahead of

3  schedule.  All right?

4          So, remember, keep an open mind.  Do not discuss the

5  case.  You're not in session tomorrow.  You got the day off.

6  Hopefully, the judge could take a day off too, but we'll see.

7  But you guys are off.  All right?

8          So see you Monday at 9:00 a.m.  Monday at 9:00 a.m.

9  Thank you.

10          I'm sorry.  You will not be paid for tomorrow.

11     (Proceedings were held out of the presence of the jury:)

12          THE COURT:  All right.  Mr. Moore, what time would you

13  want this witness control?  Like what time?

14          MR. MOORE:  9:00 a.m.  That's when I anticipate

15  Mr. Crump will be here.

16          THE COURT:  All right.

17          All right.  Anything we need to put on the record?

18          All right.  My understanding is we have one witness

19  left, right?  And that witness is the one who is from

20  San Francisco, I believe?

21          MS. FOSTER:  Yes.

22          THE COURT:  All right.  And can we start up with the

23  defense, if there is a defense, can we start up also on Monday?

24          MR. MOORE:  Oh, yes.  We'll be ready.

25          THE COURT:  All right.  Thank you.

26                    (Proceedings concluded.)

27

28

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 558

```
 1                    RIVERSIDE, CALIFORNIA; JULY 9, 2018

 2                    BEFORE THE HONORABLE SAMUEL DIAZ, JR.

 3              THE COURT:  All right.  We're back on the record.  All

 4     parties are present.  All jurors are present.

 5                    At this time People may call your next witness.

 6              MS. FOSTER:  Thank you, Your Honor.  The People would

 7     rest subject to the admission of exhibits.

 8              THE COURT:  All right.  At this time -- at the break

 9     we'll take the issues with the exhibits at the break.

10                    People have rested their case at this time.

11                    Defense, would you like to make an opening statement?

12              MR. MOORE:  Yes, Your Honor.  Thank you.

13          (Opening statement by Mr. Moore, not transcribed.)

14              THE COURT:  Thank you, Counsel.

15                    Defense, call your first witness.

16              MR. MOORE:  Jim Crump.

17              THE CLERK:  Please remain standing and raise your right

18     hand.

19                    Do you solemnly state that the evidence you shall give

20     in this matter shall be the truth, the whole truth, and nothing

21     but the truth, so help you God?

22              THE WITNESS:  I do.

23              THE CLERK:  Please be seated.

24                    Please state and spell your first and last name for the

25     record.

26              THE WITNESS:  James Crump.  J-a-m-e-s, C-r-u-m-p.

27              THE COURT:  Defense?

28              MR. MOORE:  Thank you, Your Honor.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 559

```
 1                        JAMES CRUMP,

 2    called as a witness by and on behalf of the Defendant, having

 3    been first duly sworn, was examined and testified as follows:

 4                        DIRECT EXAMINATION

 5    BY MR. MOORE:

 6        Q.   Good morning, Mr. Crump.

 7        A.   Good morning.

 8        Q.   How are you doing today?

 9        A.   Fine, thank you.

10        Q.   Excellent.

11             Now, I'm going to direct you to a date of November 10th

12    back in 2015, several years ago, okay?

13        A.   Yes.

14        Q.   Do you remember that date?

15        A.   Yes.

16        Q.   What was the -- well, did you notice anything unusual

17    going on in your neighborhood that morning?

18        A.   Not as I was leaving to take my daughter to school, but

19    when I returned home, there was chaos everywhere, police cars,

20    ambulance.  I knew something had happened.

21        Q.   Sure.  And do you recall, more or less, what time you

22    left that morning to take your daughter to school?

23        A.   Approximately 6:45.  We usually leave the same time.

24    Her school is Indian Hills in Jurupa, near Riverside.

25        Q.   Okay.  So you leave at 6:45.  Do you remember what time

26    you got back, more or less?

27        A.   I'm guessing 9:30.

28        Q.   Okay.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 560

1      A.   I don't know for sure.  I don't remember.

2      Q.   So a little bit later in the morning?

3      A.   Yes.

4      Q.   And when you got home, did you see anyone sitting --

5 when you got home, did you see anyone sitting on the curb in the

6 neighborhood that caught your attention?

7      A.   Well, the first was all the police cars, the ambulance,

8 all the chaos that was going on.

9      Q.   Sure.

10     A.   Then I saw Houston sitting on the curb.

11     Q.   And when you say "Houston," you mean this man sitting

12 down here on the end of the table?

13     A.   Yes.  He's a friend of -- yeah.

14     Q.   Had you seen Nicholas -- I'm sorry.  Had you seen

15 Houston in the area prior to that date?

16     A.   Prior to that date?

17     Q.   Yes?

18     A.   Yes.  Him and Nicholas and A.J., they were friends and

19 they played together, talked together, so I seen him a lot.

20     Q.   You're referring to Nicholas?

21     A.   Yes.

22     Q.   Who is Nicholas, or who was Nicholas?

23     A.   Ana's son, the neighbor.  They live right across the

24 street from me.  So Ana's son, my neighbor, Nicholas.

25     Q.   And you knew Nicholas?

26     A.   Yes.

27     Q.   You knew him to be about 17, 18 years old?

28     A.   17.

1     Q.    So this is the day that Nicholas died?

2     A.    Yes.

3     Q.    Do you recall -- well, how often would you see Houston

4    over at that house in the months prior to Nicholas's death?

5     A.    Guessing, maybe two times a week.  Him, A.J., the three

6    of them were friends.

7     Q.    And I don't know, who is A.J.?

8     A.    A.J. is a third member.  He's an African-American,

9    approximately the same age, and all three of them are friends.

10    Q.    Did you ever see any sort of conflict?  Did you ever

11   see any sort of conflict between Houston and Nicholas?

12    A.    None.

13    Q.    When was the last time, if you recall, that you saw --

14   that you remember seeing Houston over at Nicholas's house prior

15   to the date that Nicholas died?

16    A.    I read my transcript of when I talked with the officer,

17   and it was approximately Sunday, halftime of the Raider game,

18   which was how I remember it, and it would be about 11:30 that

19   Sunday previous to.

20    Q.    When you say you read your transcripts, on the date

21   that Nicholas died, you spoke to the police; is that correct?

22    A.    Yes.

23          These transcripts.

24    Q.    Okay.  Understood.  Thank you.

25          You spoke to the police on the date -- on that day?

26    A.    I spoke to -- yes, because I was walking over to talk

27   to Houston, and I was going to ask him what happened, but before

28   I could get to him, an officer come over and asked me not to

1    talk to him.

2        Q.   Okay.  So when you say you read your transcript, did

3    that appear to be a transcript of your interview with the

4    officer?

5        A.   Yes.

6        Q.   Did that help you remember the things that you said to

7    him?

8        A.   Yes, but that's been quite a while ago.

9        Q.   Sure.

10       A.   Plus, I talk with Ana, but it's more in remorse and

11   sadness than about what actually happened at the time.

12       Q.   Sure.

13       A.   It's more comfort, like a neighbor comforting a

14   neighbor or a friend comforting a friend.

15       Q.   Understood.

16           And your recollection, at least when you were talking

17   to the police, was that Houston had been there the Sunday

18   before, about two days prior; is that correct?

19       A.   Yeah.  Yes.

20       Q.   Thank you.

21           And you were able to remember that just because of it

22   came up during the Raiders game that you were watching?

23       A.   Well, I take my dog out, Cookie, usually at halftime,

24   and that's how I remember was the last time that I seen them,

25   because the occasion was for me to take out Cookie during

26   halftime during the Raiders game.

27       Q.   And you're a Raiders fan?

28       A.   Raiders and Lakers, yes.  Warriors, yes.

1          MR. MOORE:  I have nothing further, Your Honor.

2          THE COURT:  People?

3                     CROSS-EXAMINATION

4    BY MS. FOSTER:

5      Q.   When you saw Nicholas and Houston, did you speak to

6    them?

7      A.   You mean prior to?

8      Q.   On Sunday?

9      A.   Oh, not that particular Sunday.  I just saw them across

10   the street.  I've seen them many times where I've spoke to them,

11   and I always take them a Brisk raspberry tea.

12     Q.   And on this particular Sunday, you didn't hear what

13   they were talking about; is that right?

14     A.   Oh, no, no.  They were across the street.

15     Q.   Okay.

16     A.   And I was just walking Cookie.  Didn't even walk, I

17   just let her out, she does her thing, and then she runs back in

18   the house.

19     Q.   And on this particular date, you don't know if they had

20   had a disagreement or not?

21     A.   Well, I would know, because it would have looked like

22   they had an argument, but none.

23     Q.   Did you know if they had a disagreement?

24     A.   No.  No disagreement that I could tell.  No.

25     Q.   Okay.  And you, in your interactions with them, they're

26   limited, right?  Because they're a group of friends, and they do

27   their own separate hanging out; is that right?

28          You don't all three hang out together?

Christine M. DiCaro, CSR                              559

1        A.   I'm not sure of the question.  Well, if Houston is

2   there by himself, then it's just him and Nicholas, otherwise

3   A.J. is there a lot.

4        Q.   But not you?  You're not --

5        A.   Oh, me?  No, no.  I'm just a neighbor across the

6   street.  I just say "Hello" and basically that's it.

7        Q.   Okay.  That's all.  Thank you.

8             THE COURT:  Defense?

9             MR. MOORE:  Yeah.  Just one or two questions.

10                       REDIRECT EXAMINATION

11   BY MR. MOORE:

12        Q.   So when you saw them on Sunday, there was nothing

13   unusual about how they were interacting with each other?

14        A.   No.  Just friends.  But then again, emphasize was

15   really just a brief moment.

16        Q.   Sure.

17        A.   But I didn't see anything that was wrong.  They

18   normally are friends, and they were acting like they would

19   normally act, like friends.

20        Q.   Thank you.

21             MR. MOORE:  Nothing further, Your Honor.

22             THE COURT:  Anything else from the People?

23             MS. FOSTER:  No, Your Honor.

24             THE COURT:  Thank you, sir.  Have a good day.

25             THE WITNESS:  Okay.

26             THE COURT:  Defense, call your next witness.

27             MS. BLUMENTHAL:  Yes, Your Honor.  We would next call

28   Houston Boji.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 565

```
 1            THE CLERK:  Please remain standing and rise your right

 2   hand.

 3            Do you solemnly state that the evidence you shall give

 4   in this matter shall be the truth, the whole truth, and nothing

 5   but the truth, so help you God?

 6            THE WITNESS:  I do.

 7            THE CLERK:  Please be seated.

 8            Please state and spell your first and last name for the

 9   record.

10            THE WITNESS:  First name Houston, last name Boji.

11   H-o-u-s-t-o-n, Boji, B-o-j-i.

12            THE COURT:  Go ahead.

13            MS. BLUMENTHAL:  Thank you, Your Honor.

14                         HOUSTON BOJI,

15   called as a witness by and on behalf of his own defense, having

16   been first duly sworn, was examined and testified as follows:

17                     DIRECT EXAMINATION

18   BY MS. BLUMENTHAL:

19       Q.   Good morning, Houston.

20       A.   Good morning.

21       Q.   Are you currently in custody?

22       A.   Yes, ma'am.

23       Q.   And how long have you been in custody?

24       A.   For a long time.  About two years.

25       Q.   Okay.  Have you been in custody ever since Nicholas

26   passed?

27       A.   Yes, ma'am.

28       Q.   Were you taken into custody that day?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 566

```
 1      A.   Yes, ma'am.

 2      Q.   And have you remained in custody since November 10th of

 3   2015?

 4      A.   Yes, ma'am.

 5      Q.   Now, take you back to that time period.  How long had

 6   you known -- on November --

 7           THE CLERK:  Hold on, please.

 8           THE DEPUTY:  Your Honor, she's having a hard time

 9   hearing.

10           THE COURT:  Miss Blumenthal, if you could speak up?

11           MS. BLUMENTHAL:  Sure.

12           THE COURT:  Thank you.

13      Q.   BY MS. BLUMENTHAL:  Pull the microphone towards you a

14   little bit.  Let's see if that helps.

15           As of November 10th, 2015, how long had you known

16   Nicholas?

17      A.   Two-and-a-half to three years.

18      Q.   And when did you first meet Nicholas?

19      A.   Sophomore year of high school.

20           MS. BLUMENTHAL:  And is that better for sound?

21      Q.   BY MS. BLUMENTHAL:  You met him in your sophomore year

22   of high school?

23      A.   Yes, ma'am.

24      Q.   Now, were you a year older than Nicholas?

25      A.   Yes, ma'am.

26      Q.   Were you in the same grade?

27      A.   Yes.

28      Q.   So even though you were a little bit older, you were in
```

```
 1   the same class together?
 2       A.   Yes.
 3       Q.   Did you become friends while you were in high school
 4   your sophomore year?
 5       A.   Yes.
 6       Q.   And how close of friends did you become?
 7       A.   We were best friends.
 8       Q.   Was he your very best friend?
 9       A.   Yes, ma'am.
10       Q.   Now, at what point in time, after meeting Nicholas, did
11   he become your very best friend?
12       A.   Oh, I guess, you know, like any friends, relationship
13   will gradually, you know, go on, and I guess we clicked
14   immediately, and we just became great friends within maybe a
15   couple months of high school.
16       Q.   Now, what types of things did you and Nicholas do when
17   you would be together?
18       A.   Sort of a way we worked out, we went fishing, we'd go
19   hiking, you know, we talked a lot about outdoor stuff, jogging.
20   We actually participate in like track and field in high school
21   together for a little bit for tryouts.  Fishing.  And we also
22   went shooting with my dad.  And just typically guy stuff.  We
23   played basketball, played football together and --
24       Q.   Now, when you say you would go shooting with your dad,
25   could you explain what that means?
26       A.   Well, I believe it was before 4th of July of 2014, we
27   invited, me and my dad, we invited Nicholas over to go shooting
28   with us.  And we set it all up, and where Ana dropped Nicholas
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 568

 1   over to my parents' place, and we ended up taking Nicholas to

 2   shooting with us.

 3       Q.   Now, when you say "Ana," are you referring to

 4   Nicholas's mother?

 5       A.   Nicholas's mother.

 6       Q.   Okay.  And is that what you called her?

 7       A.   Yes.  I called her Ana.

 8       Q.   Okay.  And how close were you to Ana?

 9       A.   I love Ana like my mother.

10       Q.   And did you -- how often during high school would you

11   go over to Nicholas's home?

12       A.   Quite often.  I mean, we went on vacation trips

13   together, we went to concerts together, you know, I slept over

14   their house plenty of times.

15       Q.   When you say you slept over their house, what do you

16   mean?

17       A.   Like I would go hang out with Nicholas, and then like

18   instead of driving back, I would just sleep over their house.

19       Q.   Was there a romantic relationship between you and

20   Nicholas?

21       A.   Absolutely not.

22       Q.   Did you ever talk with Ana about problems that Nicholas

23   was having?

24       A.   Yeah.

25       Q.   And without going into details of any of those

26   problems, how often would you talk with Ana about some of the

27   issues that Nicholas was having?

28       A.   Not too much.  Just, you know, whenever it came up.

1      Q.    Okay.  Now, I want to take you to a different area.
2   I'm going to talk about your familiarity with guns.
3      A.    Yes.
4      Q.    Were you raised with guns?
5      A.    In the time period when I was like 16 years when my dad
6   first began introducing me to firearms, yes.
7      Q.    So when you were 16 is when your father began to
8   introduce you to firearms?
9      A.    Yes.
10     Q.    And is that -- before you were 16, did it appear to you
11  that your father was involved in guns?
12     A.    Yes.
13     Q.    Or with guns?
14           Did you always -- were you raised with guns in the
15  house?
16     A.    Yes.
17     Q.    And what's the first thing you remember when you were
18  growing up ever seeing guns in the house?
19     A.    They were locked up and kept in like a certain place.
20  Ammunition was separate or together.  Just basic things like
21  that.
22     Q.    Okay.  And did your father teach you about gun safety?
23     A.    Yes, he taught me gun safety.  I mean --
24     Q.    Wait a minute.  Did he teach you gun safety?
25     A.    Yes.
26     Q.    Did you follow everything he taught you?
27     A.    As best as I could, yes.
28     Q.    Were there times that you played around with guns?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 570

1     A.    Plenty of times.

2     Q.    And did you play around with guns in a way that you

3  knew your father would not approve?

4     A.    Yes.

5     Q.    Did you ever play around with guns when Nicholas was

6  there?

7     A.    Yes.

8     Q.    And did you and Nicholas together play around with

9  guns?

10     A.    Yes.

11     Q.    And when you and Nicholas would play around with guns,

12  was this done in a way in which you knew your father would not

13  approve?

14     A.    Yes.

15     Q.    Now, going to November, were you going -- of 2015, were

16  you going to school at that time?

17     A.    Yes.

18     Q.    And where were you attending?

19     A.    MSC at the Menifee campus.

20     Q.    Of what?

21     A.    Community college.  It was the Mt. San Jacinto Menifee

22  campus, the college.

23     Q.    So you attended Mt. San Jacinto Community College?

24     A.    Yes.

25     Q.    At the Menifee campus?

26     A.    Yes.

27     Q.    And when had you graduated high school?

28     A.    I graduated the same year as Nick graduate, 2015.

1       Q.    So 2015.  So that June you and Nick had graduated high
2   school together?
3       A.    Not together.  We went to different schools.
4       Q.    You went to different schools?
5       A.    Yeah.
6       Q.    Did you meet in the same school?
7       A.    Yes, we met at the same school.
8       Q.    And did someone move?
9       A.    Yeah.  We both --
10      Q.    You went to different schools?
11      A.    Yeah, we both went to different schools.
12      Q.    Did you meet at the same school?
13      A.    Yes.
14      Q.    What school was that?
15      A.    That was Nuview Bridge Early College High School in
16  Nuevo.
17      Q.    And what happened that one or the other left that
18  school?
19      A.    What do you mean?
20      Q.    Where did you -- what high school did you graduate?
21      A.    I graduated Temescal Canyon at Elsinore.
22      Q.    So you left the school where you met Nicholas?
23      A.    Yes.
24      Q.    And what year were you when you left the school?
25      A.    2014, I believe.
26      Q.    Okay.  When you -- did you move?
27      A.    No.
28      Q.    Okay.  Did you keep in contact with Nicholas after you

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 572

```
 1    changed high schools?

 2        A.   Yes.

 3        Q.   And how much contact did you have with him after you

 4    changed high schools?

 5        A.   To be honest, probably just the same amount.  Of not

 6    seeing each other but visiting each other and whatnot.

 7        Q.   At that point in time did you have a car?

 8        A.   Yeah, I had a car.

 9        Q.   And what kind of car did you have?

10        A.   That would have been my first car my dad bought me.  It

11    was a 2010 Honda Accord.

12        Q.   And did you have access to that in order to drive to

13    Nicholas's home?

14        A.   Yes, ma'am.

15        Q.   Now, normally did you go to Nicholas's home or did he

16    go to your home?

17        A.   There were times where Nicholas went to our home, but

18    most of the times I went to Nicholas's home.

19        Q.   Why was that?

20        A.   I think Nicholas didn't -- he had a car, but then he

21    didn't have a car, and I had the car, what my dad bought me

22    that, and I would always drive over to Nicholas's house.

23        Q.   Was there usually somebody always home at your house

24    during the day?

25        A.   Yes.

26        Q.   How about at Nicholas's home?

27        A.   Ana.  Her mom -- his mom.

28        Q.   Was she home most days?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 573

1      A.    She was a teacher, so most days she was home at a

2   certain time period, but, you know, if it was on her break or

3   whatnot, or her vacation time, she would be home.

4      Q.    Now, were there -- getting closer to the time period of

5   November 10th.  What classes were you taking at that time?

6      A.    I was taking basic general ed.  I was taking, maybe,

7   four classes.

8      Q.    And what time were your classes?

9      A.    Usually most -- three of them, I would say, in the

10   morning, one late at night.

11      Q.    One late at night.  Was that an online class?

12      A.    No.  That was a class I went once a week, I think on

13   Fridays, I believe.  I can't really remember.

14      Q.    Okay.  On November 10th, did you have a college class?

15      A.    Yes.

16      Q.    Did you attend?

17      A.    No.

18      Q.    Did you cut class that morning?

19      A.    Yes.

20      Q.    And do you recall what class that was?

21      A.    That was anthropology.

22      Q.    Anthropology?

23      A.    Um-hum.

24      Q.    Now, on that particular day, on that Tuesday,

25   when before that Tuesday morning had you last seen Nicholas?

26      A.    When I was at his house.

27      Q.    And when were you at his house?

28      A.    I was at his house the day before all this happened,

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 574

1    Monday.

2        Q.    That Monday?

3        A.    Yes.

4        Q.    And when you were at his house on Monday, do you recall

5    approximately what time it was that you got there?

6        A.    Monday I had class, college, so at 12:30, I'd say

7    somewhere between 1:00 in the afternoon.

8        Q.    And did you go to his house before class or after?

9        A.    After class.

10       Q.    And when you went over there on Monday, was his mother

11   home?

12       A.    To my best memory, I don't think so.  I think she

13   was -- she was working as a teacher.

14       Q.    Do you have a specific recollection one way or the

15   other?

16       A.    I would say, no, she wasn't home.

17       Q.    Okay.  And when you went over there, was Nicholas home?

18       A.    Yes.

19       Q.    And what did you and he do?

20       A.    On that day, if I could remember, we talked, you know,

21   I think maybe ate some food, but we watched a movie for sure.

22       Q.    And what movie did you watch, if you recall?

23       A.    I think it was a zombie movie.  I think it was *Land of*

24   *the Living Dead*.

25       Q.    Do you have a specific recollection it was a zombie

26   movie?

27       A.    It was a zombie movie.

28       Q.    But you're not sure of what movie?

```
 1      A.   Yes.

 2      Q.   Now, how long were you at his house on Monday?

 3      A.   I'd say about three to four hours.

 4      Q.   Do you recall what time you left?

 5      A.   I'd say 4 to 5 o'clock.

 6      Q.   Now, did -- were there any dogs that were in Nicholas's

 7  home?

 8      A.   Yeah.  Nicholas had three pit dogs.

 9      Q.   And what kind of dogs?

10      A.   Nicholas had a white boxer.  Her name was Lola.

11  Nicholas had two pugs.  One was Sweet Pea, the other name was

12  Bam Bam.

13      Q.   And where did they normally stay?

14      A.   Inside the house.

15      Q.   Just roaming inside the house?

16      A.   Yes.

17      Q.   Anywhere?

18      A.   Yes.

19      Q.   Now, when -- did you become familiar with those dogs?

20      A.   Oh, yeah.  I loved them.

21      Q.   When you would go over there?

22      A.   Yes.

23      Q.   Now, before you had seen Nicholas on Monday, had you

24  seen Nicholas before that time?

25      A.   Yes.

26      Q.   And when was that?

27      A.   I want to say for sure Friday and Sunday.

28      Q.   So Friday before he passed, and Sunday before he
```

```
 1   passed; is that your testimony?
 2       A.   Yes.  Yes.
 3       Q.   And do you recall what time you went over there on, or
 4   when you went over there on Friday?
 5       A.   I'd say somewhere late night.
 6       Q.   When you say "late night," what is your definition of
 7   late night?
 8       A.   11 o'clock at night.
 9       Q.   And when you would go over there 11 o'clock at night,
10   what did you do?
11       A.   We'd just hang out, go get something, like a bite to
12   eat.  We'd meet up with people who have nice cars and race, and
13   all that stuff.
14       Q.   You said you would race?
15       A.   Yes.
16       Q.   And is that something that you were authorized to do?
17       A.   No.
18       Q.   You knew you should not be doing that?
19       A.   Yes.
20       Q.   Did you do it anyway?
21       A.   Yes.
22       Q.   And was Nicholas there with you?
23       A.   Yes.
24       Q.   Were there times that Nicholas drove your car?
25       A.   Yes.
26       Q.   In 2015 what was the car that you had?
27       A.   That was the time where my dad bought me a Camaro.
28       Q.   A Camaro?
```

1       A.   Yes.

2       Q.   What color was that Camaro?

3       A.   That was dark gray.

4       Q.   And when you were there on Friday, Friday evening when

5    you went over, did you and Nicholas then go out in your car?

6       A.   Yes.

7       Q.   And do you recall what time you came back?

8       A.   Came back home?

9       Q.   Came back to Nicholas's house?

10      A.   Oh, I'd say maybe like at 3:00 in the morning.

11      Q.   Okay.  And did you stay over, or did Nicholas just go

12   in the house and you went back?

13      A.   We probably went inside the house a little bit to grab

14   a drink or whatnot, but afterwards I went home.

15      Q.   Now, do you recall if you saw him on Saturday?

16      A.   To my best memory, no.

17      Q.   Now, do you recall that you sent him certain text

18   messages that had been discussed in this trial?

19      A.   Yes.

20      Q.   And did you send those?

21      A.   Yes.

22      Q.   And what did you mean by sending those?

23      A.   Just jokingly.

24      Q.   Did you and Nicholas joke in ways that were talking

25   about killing each other?

26      A.   Yeah.  Oftentimes.

27      Q.   And could you explain that?

28      A.   We would just, I guess, playing videos games, you would

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 578

```
 1    hear all this stuff.  And just being young, we'd just goof
 2    around.  We'd say like immature things to each other.
 3         Q.   And did both of you say it to each other?
 4         A.   Yes.
 5         Q.   What was your primary way of communicating with
 6    Nicholas if you were not physically together?
 7         A.   Phone calls.
 8         Q.   You would actually talk on the phone with each other?
 9         A.   Yes.  Yes.
10         Q.   And if you were going to communicate without talking
11    directly on the phone, what way would you have of communicating
12    with him?
13         A.   Without the phone, I guess you could say we used Skype
14    and text messaging.
15         Q.   And text messaging.
16              Did you ever message, for example, on Facebook?
17         A.   Yes.
18         Q.   And out of those types of things, without actually
19    talking on the phone, what was your predominant means of
20    communicating?
21         A.   It would be -- first it would be, of course, seeing
22    each other, but it would be phone calls.
23         Q.   And then after that what would be the most predominant
24    way that you two would communicate?
25         A.   Texting.
26         Q.   Texting on the phones itself?
27         A.   Yes.
28         Q.   And where did messenger and Facebook come in?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 579

1      A.   That came in during text messaging.  If he was on

2   Facebook, I would contact him on Facebook, or if I would just

3   use my basic phone text messaging, I would send those.

4      Q.   Now --

5           MS. BLUMENTHAL:  Your Honor, Mr. Moore is going to

6   assist me in playing some videos here in a minute.

7           THE COURT:  Sure.

8      Q.   BY MS. BLUMENTHAL:  Did you actually take some videos

9   of you and Nicholas racing your car?

10     A.   Yes.

11     Q.   And do you know when those were taken?

12     A.   I'd say, to my best memory, Friday.

13     Q.   That Friday before he passed?

14     A.   Yes.

15     Q.   And were you in your black Camaro that day?

16     A.   Gray Camaro, yes.

17     Q.   I'm sorry, gray Camaro?

18     A.   Yes.

19     Q.   And was Nicholas there with you?

20     A.   Yes.

21     Q.   And, in fact, do some of those videos show that

22   Nicholas was racing also?

23     A.   Yeah.

24          MS. BLUMENTHAL:  And, Your Honor, with the Court's

25   permission, we're trying to set this up here.

26          THE COURT:  What exhibit?

27          MR. MOORE:  This will be Exhibit X.

28     Q.   BY MS. BLUMENTHAL:  Were these videos taken on your

```
 1   phone?

 2       A.   Yes.

 3       Q.   Turn around and look at the screen behind you.

 4            MR. MOORE:  And just for the record, there's four movie

 5   files on this particular disk.  The first one -- one second.

 6            The first one is just a few seconds of darkness with a

 7   little bit of audio.  And that one is marked IMG1455.MOV.  The

 8   next one is IMG1456.MOV.

 9                 (CD being played, not reported.)

10       Q.   BY MS. BLUMENTHAL:  Who was talking?

11       A.   That would be Nicholas.

12       Q.   Nicholas?

13       A.   Yes.

14                 (CD being played, not reported.)

15            MR. MOORE:  That video was approximately one minute

16   long.

17            The next video is IMG1457.MOV.

18            THE COURT:  It's all part of Exhibit X, correct?

19            MR. MOORE:  Yes.  These are all on Exhibit X.

20            This one is only about ten seconds long.

21                 (CD being played, not reported.)

22            MR. MOORE:  And then the final file is IMG.14 -- I'm

23   sorry.  IMG1458.MOV.  And it is 13 seconds long.

24                 (CD being played, not reported.)

25       Q.   BY MS. BLUMENTHAL:  Is that your car?

26       A.   Yes.

27            MS. FOSTER:  I'm going to object as to foundation and

28   vague as to time.  We don't know when this video was from.
```

1          THE COURT:  All right.  We need to lay further

2     foundation.  If you want to pause it for a second.

3          MR. MOORE:  Sorry.

4          THE COURT:  As to time.

5     Q.   BY MS. BLUMENTHAL:  Do you know when this video was

6     taken?

7     A.   I think early in the morning.

8     Q.   When you say "early in the morning," what are you

9     talking about?

10    A.   Probably like 5:00 to 7:00 in the morning.

11    Q.   5:00 to 7:00 in the morning.

12         And what day of the week?

13    A.   I believe it would be -- it would be Saturday, I

14    believe.

15    Q.   It would be Saturday morning?

16    A.   Yes.

17    Q.   Saturday before Nicholas passed?

18    A.   Yes.

19    Q.   And is that approximately the same spot where you would

20    park the car when you would go to Nicholas's house?

21    A.   Yes.

22    Q.   And is the street that the car is parked in the video,

23    what street is that?

24    A.   I guess it would be Iris.

25    Q.   Okay.  Is that where Nick -- is that the street around

26    the street where Nicholas lives?

27    A.   Yes.

28    Q.   Okay.

```
 1          MR. MOORE:  I think that was done, Your Honor.  Should
 2   I play that again?
 3          THE COURT:  Go ahead.
 4          MR. MOORE:  Thank you.
 5              (CD being played, not reported.)
 6          MR. MOORE:  That's it.
 7     Q.    BY MS. BLUMENTHAL:  Now, at any time did Nicholas drive
 8   the car racing during the time periods that some of these videos
 9   were being taken?
10     A.    Yes.
11     Q.    And when Nicholas was talking, were you driving the car
12   at that time?
13     A.    Yes.
14     Q.    And that was on that Friday evening before he passed?
15     A.    Yes.
16     Q.    Did -- did you stay over that evening or were you guys
17   just out and about that night?
18     A.    Out and about that night.
19     Q.    Now, the next time that you went over there, I believe
20   you said was Sunday?
21     A.    Yes.
22     Q.    And do you recall what you did on Sunday?
23     A.    Sunday, I think we just hanged out.
24     Q.    Now, at any time when -- did you have basically total
25   access to your dad's guns during the 2015?
26     A.    Yes.
27     Q.    And where were the guns kept?
28     A.    They were kept, most of them, upstairs in my dad's
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 583

 1   closet area.

 2       Q.   Okay.  And when you say "upstairs," where was your

 3   bedroom?

 4       A.   My bedroom was downstairs.

 5       Q.   And would you at times go upstairs to your dad's closet

 6   area and either play with the guns or look at the guns or use

 7   the guns?

 8       A.   Yes.

 9       Q.   And did you ever take videos of the times that you

10   would goof around with these guns?

11       A.   Yes.

12       Q.   And when you did the videos, was that in the calendar

13   year 2015?

14       A.   Yes.

15       Q.   And was your father around when you did these videos?

16       A.   No.

17       Q.   And how did you happen to set up the camera, or your

18   phone to be able to take the videos of you goofing around with

19   these guns?

20       A.   I guess just put it against the wall or something like

21   that.

22            MS. BLUMENTHAL:  And, Your Honor, we have a couple of

23   those videos.

24            THE COURT:  Are they exhibits?

25            MR. MOORE:  This is Exhibit TT, Your Honor, for

26   identification.

27            MS. FOSTER:  We have no foundation for them.

28            MS. BLUMENTHAL:  Yes.

1    Q.   BY MS. BLUMENTHAL:  The videos that we're about to see,

2  are these the ones that were taken on your cell phone?

3    A.   Yes.

4    Q.   And were they taken by you?

5    A.   Yes.

6    Q.   And were they taken in 2015?

7    A.   Yes.

8    Q.   And is this you in the video?

9    A.   Yes.

10        MR. MOORE:  And for the record, Your Honor, this is

11  file IMG1411.MOV.  On the exhibit there is two files on this

12  particular exhibit.

13        THE COURT:  All right.

14             (CD being played, not reported.)

15    Q.   BY MS. BLUMENTHAL:  Now, what was the purpose of your

16  taking that video?

17    A.   I think I was like talking to Nicholas, and we're just,

18  I guess, just goofing around.

19    Q.   Would your father have approved of that?

20    A.   Most likely not.

21    Q.   In fact, did he tell you specifically "Don't play with

22  guns"?

23    A.   Yes.

24    Q.   And did you take more than that one video?

25    A.   I believe so.

26        MR. MOORE:  The second file is IMG1412.MOV.

27             (CD being played, not reported.)

28    Q.   BY MS. BLUMENTHAL:  Is that you in the still portion of

1    that video?

2         A.   Yes.

3         Q.   Was that taken at approximately the same time?

4         A.   Yes.

5         Q.   And would that have been in 2015?

6         A.   Yes.

7         Q.   And is the location where this was taken in your

8    father's closet?

9         A.   Yes.

10                   (CD being played, not reported.)

11        Q.   BY MS. BLUMENTHAL:  Now, was there another video yet

12   that you took where you had loaded a round in the chamber and

13   shot towards your hand?

14        A.   I believe so.

15             MS. BLUMENTHAL:  Your Honor, this would be --

16             MR. MOORE:  "SS" for identification.

17             And on this exhibit there is also two individual files.

18   The first one is MOV0571.MOV.

19        Q.   BY MS. BLUMENTHAL:  The video that we've been looking

20   at and the ones here that we're going to take a look at, were

21   those all taken on your phone?

22        A.   Yes.

23        Q.   And was that the phone that was seized by law

24   enforcement?

25        A.   Yes.

26        Q.   And do you recall when -- approximately when this

27   particular video was taken?

28             Would that have been in 2015?

1      A.   Probably nighttime.

2      Q.   Okay.  Nighttime in 2015, correct?

3      A.   Yes.

4      Q.   And you yourself caused this to be, basically, taken?

5      A.   Yes.

6                (CD being played, not reported.)

7      Q.   BY MS. BLUMENTHAL:  Now, was that a live round of

8  ammunition that you put in there?

9      A.   I couldn't see it.  I don't know if I was just joking

10  around, if I fake put it, or if I did put a real ammunition in.

11     Q.   Was it your intention to shoot a hole in your hand?

12     A.   No.

13     Q.   Would your father have approved of handling a weapon

14  that way?

15     A.   No.

16     Q.   A firearm that way?

17     A.   Absolutely not.

18     Q.   In fact, he specifically instructed you not to do that

19  kind of thing?

20     A.   Yes.

21     Q.   Did you frequently play with the weapons?

22     A.   Yes.

23     Q.   And did anything while you were playing with them ever

24  happen?

25     A.   No.

26     Q.   Would Nicholas also at times play with you with those

27  weapons?

28     A.   Yes.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 587

```
 1            MR. MOORE:  The second file on this particular exhibit
 2    is MOV4245.MOV, Judge.
 3        Q.   BY MS. BLUMENTHAL:  Now, did this video also come off
 4    of your cell phone?
 5        A.   Yes.
 6        Q.   Was it also taken close to the time that Nicholas
 7    passed?
 8        A.   Yes.
 9                 (CD being played, not reported.)
10        Q.   BY MS. BLUMENTHAL:  Was that you?
11        A.   Yes.
12        Q.   And was that a live round?
13        A.   Yes.
14        Q.   Why did you take videos of this stuff?
15        A.   Because it was just being stupid.
16        Q.   Now, I want to go to the day of November 10th, okay?
17             What time did you get up that morning?
18        A.   I believe I get up around late 7:00ish, early 8:00ish.
19        Q.   Do you have a specific recollection?
20        A.   No.
21        Q.   When you get up, is there anyone home?
22        A.   No.
23        Q.   Why wouldn't your parents have been there?
24        A.   Well, my dad takes my littlest sister to school, and my
25    two youngest sisters, they both go to high school together.
26        Q.   And where would your mom be?
27        A.   My mom would be with my dad.
28        Q.   That particular morning had you already made plans to
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 588

1    go see Nicholas?

2         A.   Yes.

3         Q.   And you normally would have class that morning?

4         A.   Yes.

5         Q.   Did you make plans not to go to class that morning?

6         A.   Yes.

7         Q.   And what were you and Nicholas going to be doing?

8         A.   Eventually, you know, I wanted to show off a shotgun of

9    my father's that he had and maybe go like, you know, shooting

10   with it.

11        Q.   Okay.  And did you go into your father's closet and get

12   that shotgun?

13        A.   Yes.

14        Q.   And did you get permission to take that shotgun?

15        A.   No.

16        Q.   Did you just take it?

17        A.   Yes.

18        Q.   Now, what did you do once you got the shotgun?

19        A.   Once I got the shotgun, that's when, you know, no one

20   was in the house.  And I know I was getting up to get ready, and

21   I dressed up really fast, and I took the shotgun and put it in

22   the back of like the car's trunk.

23        Q.   You took the shotgun and put it into the trunk of your

24   car?

25        A.   Yes.

26        Q.   And did you put it in anything?

27        A.   Yes.  It was in its soft foam case.

28        Q.   Soft foam case?

```
 1        A.    Yes.

 2        Q.    Okay.  And you left that morning then?

 3        A.    Yes.

 4        Q.    And where did you go?

 5        A.    And that's when I drove to Nicholas's house.

 6        Q.    You went immediately to Nicholas's house?

 7        A.    Yes.

 8        Q.    And had you made arrangements with him previously that

 9  you were going to be coming over that morning?

10        A.    Yes.

11        Q.    And when did you make those arraignments?

12        A.    That would be the last day.  That happened on Tuesday.

13  I was with him Monday.  I made arrangements the day before it

14  happened.

15        Q.    Now, during the time that you were making these

16  arrangement, was there a reason why you and he were going to go

17  shooting?

18        A.    Yeah.  I always brought it up to go shooting, you know,

19  like finally just things kind of ended up clicking together with

20  the movie we watched and whatnot, and it just proceeded forward.

21        Q.    Sometimes when Nicholas would ever get down or

22  depressed, would you spend more time with him?

23        A.    Regardless if he was down or depressed, I would spend a

24  lot of time with him.

25        Q.    Were there times that you would take him out shooting

26  because you thought it might raise his spirits?

27        A.    Not raise his spirits, but just having fun.

28        Q.    Okay.  That morning do you -- do you go over to
```

1    Nicholas's house then?

2        A.    Yes.

3        Q.    And do you know approximately -- are you looking at

4    your watch or your phone at all?

5        A.    No.

6        Q.    Where was your phone?

7        A.    My phone was at home.

8        Q.    And where was your phone at home?

9        A.    I believe it was in the side of my mattress.

10       Q.    Why would it have been there?

11       A.    Well, I usually keep them -- but two reasons.  Because

12   it was a new iPhone that my dad just bought me and I ended up

13   cracking the whole glass screen, so I always used to put it

14   somewhere my parents wouldn't find it, especially since, you

15   know, it was a new phone and it just got cracked.  So I'd always

16   put it either in my nightstand or under my covers.

17       Q.    So you had not told your parents, especially your

18   father, that the screen had been cracked?

19       A.    Yes.

20       Q.    Is that correct?

21       A.    Yes.

22       Q.    So you left your cell phone at your home?

23       A.    Yes.

24       Q.    Between your mattress and the box spring?

25       A.    Yes.

26       Q.    Now, so when you go to Nicholas's, you don't have any

27   phone with you, I take it?

28       A.    No.

1      Q.   Is that correct?

2      A.   Yes.

3      Q.   Did you -- you go to Nicholas's.  What happens when you

4   get there?

5      A.   What happens when I get there, you know, I start

6   knocking on the door, as usual, I ring the doorbell.  And

7   immediately what happens all the time once I go to Nicholas's

8   house, he's got three dogs and three dogs in the house.  And

9   that's how usually, you know, if Nick's sleeping, he gets woken

10  up by the dogs.

11          And there is a -- by the door is a window to the

12  left-hand side, and the dogs can peer through the window to see

13  who is there.  When they usually see me, they always, you know,

14  make a muck and a ruck.  And I waited a little bit.  That's when

15  Nicholas arrived at the door.

16     Q.   Okay.  When you say he arrived at the door, do you mean

17  he opened the door?

18     A.   Yeah.

19     Q.   And was he on the inside of the house?

20     A.   He was in the house.

21     Q.   And you were on the outside?

22     A.   Yes.

23     Q.   At that time when you went to the door, did you have

24  your gun with you?

25     A.   No.

26     Q.   Do you go inside?

27     A.   Yes.

28     Q.   And what happens when you go inside?

1      A.   Well, we go inside his house.  We usually just always

2  go to his room, and the dogs follow us, I mean, you know, I

3  always play with the dogs.  They're always -- they're really

4  fairly small dogs, so they're always by my feet.  And so we go

5  into his room and we just start talking a little bit.

6      Q.   Now, at some point in time do you go out and get the

7  gun?

8      A.   Yes.

9      Q.   For what purpose?

10      A.   Well, you know, I was there because I was excited, you

11  know, showing off the shotgun.  I told him, you know, like, hey,

12  I got -- remember the one movie that we watched.  And I ended up

13  bringing him the -- reminding him of the shotgun.  That's when I

14  went to go get it.

15      Q.   Was there a shotgun in the movie?

16      A.   Yes.

17      Q.   And was this shotgun that you were bringing over, was

18  it similar to the shotgun that was in the movie?

19      A.   Yes.

20      Q.   So you now go out to the car and get it?

21      A.   Yes.

22      Q.   And do you bring it into the house?

23      A.   Yes.

24      Q.   What happens when you bring it into the house?

25      A.   I bring it into the house and I just, you know, go

26  towards Nicholas's room again.  And that's where Nicholas was

27  laying down.  And I go inside his room and that's when I have

28  the shotgun.  It's still in the case.  And I remember I was just

1    looking at him and I opened the case.  And I started showing off

2    the shotgun towards Nicholas, you know.

3        Q.   Is he asleep at this time or is he awake?

4        A.   He's awake.

5        Q.   Is he talking to you?

6        A.   Yeah.

7        Q.   And so you pull the shotgun out and you're showing it

8    to him?

9        A.   Yeah.

10       Q.   And what happens next?

11       A.   Well, that's when I got -- started to be silly and

12   stupid again, you know.  I was showing off the shotgun and I

13   decided to start racking the shotgun.

14       Q.   What does it mean "to rack a shotgun"?

15       A.   Well, you just kind of like -- there is a little switch

16   by the trigger mechanism, and you kind of rack the shotgun to

17   pump like a shell in the tube.  But when you keep on racking it,

18   the shells keep on ejecting through the port.

19       Q.   So the gun -- when you got there that day, the shotgun

20   was loaded?

21       A.   It was like in the -- the shells were in the tube.  It

22   wasn't loaded loaded, but they were in the tube.

23       Q.   What does it mean that they were in the tube and it's

24   not loaded loaded?

25       A.   Well, I guess a tube from a shotgun, like it would hold

26   a certain amount of shells.  It doesn't have to be chambered,

27   the shells could be in the tube.

28       Q.   Now, when you say that a shell is chambered, that means

```
 1   it's in a firing position ready to go?

 2       A.   Yes.

 3       Q.   Okay.  When you took the shotgun over there, was there

 4   any rounds that were chambered?

 5       A.   No.

 6       Q.   So everything was in the extra tube?

 7       A.   Yes.

 8       Q.   And do you know how many rounds were in the tube?

 9       A.   My best memory, I thought it was like five or six.

10       Q.   The best of your recollection, you thought it was five

11   or six rounds?

12       A.   Yes.

13       Q.   So you started racking the gun.  You keep racking the

14   gun.  Does shells eject then from the weapon?

15       A.   Yeah.  I was acting almost just like the videos, you

16   know.  I was acting foolishly.  And I just started racking the

17   gun, you know, just kind of having fun like, you know, being a

18   goofball, and I started racking the shotgun, and all the shells

19   were flying out.

20       Q.   So the shells were coming out of the gun?

21       A.   Yes.

22       Q.   Do you recall how many were ejected from the gun?

23       A.   I can't recall any number, but I just know a whole

24   bunch of shells.  Well, in my best memory, I thought all the

25   shells went out.

26       Q.   At that point in time when you were racking the gun,

27   was it your belief that all the rounds had been ejected from the

28   gun?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 595

1    A.   Yes.

2    Q.   When you were holding the gun, did you believe it had

3    any rounds of ammunition in the gun at all after you got done

4    racking it?

5    A.   No.

6    Q.   So you believe the gun was empty?

7    A.   Yes.

8    Q.   What happened at that point in time?

9    A.   At that point in time, you know, that's when like me

10   and Nick were laughing, and like, you know, that's when it had

11   happened, everything really quick.  I end up lowering the

12   shotgun to have it rested on my side, and, again, like me and

13   Nick were just talking and laughing, and that's when I thought

14   in my best memory that, you know, there was no shotgun shells

15   inside the gun.  And I flicking the trigger, not thinking

16   anything particular would happen, but one shell was in there and

17   that's when the shot went off.

18   Q.   What happened when the shot went off?

19   A.   It was a terrible day.

20        When the shot went off, I immediately threw the

21   shotgun.  That's when everything just happened.  I saw Nicholas

22   and he was looking at me.  And immediately, you know, I heard

23   the blast.  And Nicholas kind of stepped, kind of standed

24   straight up a little bit, and that's where everything kind of

25   just happened where I saw blood.

26        I threw the shotgun down at the bed, and I grabbed

27   Nick.  And I started to go towards Nicholas.  And I see the

28   bleeding coming from the arm.  And I guess it would be his right

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 596

1   arm.  To my best memory it was his right arm.  When I get to

2   him, I could see he's bleeding tremendously from his arm, and I

3   grabbed his arm to try to stop the bleeding.  That's when Nick,

4   immediately when it happened, he fell unconscious at me.

5        Q.    When you say he fell unconscious at you, what do you

6   mean?

7        A.    He passed out like almost immediately when it happened.

8        Q.    Was he lying in his bed at that time?

9        A.    Yes.

10       Q.    When the shotgun went off, was he lying in bed?

11       A.    Yes.

12       Q.    And were you standing?

13       A.    Yes.

14       Q.    Now, after the shot goes off, you say you immediately

15   go to him.  What do you do beside grab his arm to try to stop

16   the bleeding?

17       A.    Well, Nick is a lot bigger than me.  He's really,

18   really heavy.  So he kind of leaned forward, you know, kind of

19   his weight almost overpowered me.  When I was grabbing his arm

20   and I was trying to stop the bleeding, he kind of fell forward

21   and I tried to -- he fell forward and I tried to get him to a

22   certain position and that's where, you know, like I got him off

23   the bed.  And I tried to like have him standstill upright

24   against the bed.  And he was unconscious.  And I was screaming

25   and yelling his name, and I was grabbing his arm to stop the

26   bleeding, and that's when I kind of gently laid him down on the

27   floor.  And he was unconscious.  And that's where, you know,

28   after holding his arm to try to stop the bleeding, I began doing

1    CPR.

2         Q.   When you say -- have you ever been trained in CPR?

3         A.   No, I have not been trained.

4         Q.   What is your exposure to CPR?

5         A.   My exposure to CPR would be just the basic instincts to

6    help Nicholas and just what I've learned from TV.

7         Q.   What did you do to start doing CPR on Nicholas?

8         A.   Well, after I tried to stop the bleeding from the hand

9    and couldn't, and when Nicholas was unconscious, that's when I

10   began doing CPR.  And that's when I began kneeling at his side

11   and putting my hands on his chest, and, you know, just like the

12   TV would, you know, you pump the chest and then you would

13   breathe into his mouth.

14        Q.   And did you do that?

15        A.   Yes.

16        Q.   Did he respond?

17        A.   No, he didn't.

18        Q.   What did you do then?

19        A.   Well, it felt like it was hours I was giving him CPR,

20   but I guess it was only minutes.  And after CPR didn't work and

21   I needed to get help, I ran toward -- I wanted to call the

22   police, 911, to get help.  And I remember clearly running

23   towards the sliding -- the window.  Well, it's a sliding door.

24   And I remember trying to push through it, but I couldn't.  It

25   was kind of barricaded.  I mean, the door didn't work properly.

26   The mechanism was jammed.  And immediately I ran to the door,

27   and that's when I went through the hallway and outside of his

28   room, and I went through the kitchen to grab the phone, the

1    house phone.

2         Q.   Did you know that there was a house phone?

3         A.   Yes.

4         Q.   And where did you believe the house phone was?

5         A.   The house phone was located by the back door.  It was

6    on the left-hand side.

7         Q.   And had you ever, ever when you had been over there,

8    used that phone?

9         A.   No.  Actually, I hadn't.

10        Q.   Did you believe that it was working?

11        A.   Yeah, I believed it was working.

12        Q.   Had you ever been told that it was not working or it

13   had been canceled?

14        A.   No.  No one told me.

15        Q.   Did you get into the kitchen?

16        A.   Through the kitchen, yes.

17        Q.   Did you find the phone?

18        A.   Yes.

19        Q.   And when you found the phone, what did you do?

20        A.   I grabbed the phone.

21        Q.   Is this a cordless phone?

22        A.   This is a cordless phone.

23        Q.   Okay.

24        A.   I grabbed the phone and I started running back.  And I

25   went through the kitchen aisles, and that's where you, I guess

26   you could see my handprint on the kitchen -- well, it's the

27   faucet.  And I was -- I was running really fast.  And I was

28   grabbing on something to get like a grip on.  And I ran to

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 599

1    Nicholas's room, but I went through the sliding door, because

2    it's easier to go in it than out of it.

3        Q.   In other words, to get into -- the sliding door works

4    to get into the room but doesn't work to exit the room?

5        A.   Yes.

6        Q.   Okay.  Did you go back into Nicholas's room?

7        A.   Yeah.  I go back into Nicholas's room.

8        Q.   And did you try to use the phone to call 911?

9        A.   Yeah.  I kneeled down on Nicholas's side and I grabbed

10   his arm with one of my hands, I believe it was my left hand, and

11   on the phone I tried to call like 911.

12       Q.   And at this point in time how are you feeling inside?

13       A.   Panic, scared, you know, frightened.  The realization

14   of just having this all happen.  But I knew that, you know, I

15   had to act, to do something for Nicholas.

16       Q.   And did you really care about Nicholas?

17       A.   I love him.

18       Q.   Did you realize that you may have just killed him?

19       A.   Yes.

20       Q.   Now, when you tried to call 911, did the phone work?

21       A.   Certain phones have a different like working mechanism.

22   Sometimes you press the number, then you press talk.  Sometimes

23   you press the number.  And I didn't know how this phone worked.

24   And I did try to call 911 and press the talk button, and it

25   wouldn't.  Nothing responded.  So when I waited for like five

26   seconds, that's when I dropped the phone and began doing CPR

27   again.

28       Q.   Now, is that the white phone that we saw on Nicholas's

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 600

```
 1   bed in the photographs?

 2       A.   Yes, the white house phone.

 3       Q.   After you couldn't get the phone working and you were

 4   giving Nicholas CPR, what did you do?

 5       A.   After I was giving Nicholas CPR for the second time and

 6   nothing happened, that's when I knew I really needed to get

 7   help, and that's when I went outside the door and went to the

 8   neighbors to go get help.

 9       Q.   And did you -- when you went outside, were you yelling

10   anything?

11       A.   I was screaming probably, yes, for help.  And that's

12   when I just started to go through three of the neighbors'

13   houses.

14       Q.   Were you hysterical at this time?

15       A.   Yes.

16       Q.   And did you finally get one of the neighbors to talk

17   with you?

18       A.   Yeah.  After my three attempts of knocking on each

19   house and no one responded to me, I just decided -- I was in the

20   middle of the street running back, and one of the neighbors

21   responded to me that she was going to call the police, like she

22   was getting help for me.

23       Q.   Okay.  And what did you do at that time?

24       A.   At that time that's when, to my best memory, that one

25   of the gentleman came outside, and he was following me in the

26   house.

27       Q.   And do you recall going into the house with the

28   gentleman with you?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 601

```
 1        A.   To my best memory, I couldn't, no.

 2        Q.   So as you talk today, you don't have a specific

 3   recollection of -- you heard the witness testify?

 4        A.   Yes.

 5        Q.   You don't have a specific recollection of him going in

 6   with you?

 7        A.   No.

 8        Q.   Do you recall going in and out of the house at all?

 9        A.   Yes.

10        Q.   And when you would go into the house, what would you

11   do?

12        A.   I would go into the house.  I guess the witness said,

13   you know, he saw me trying to hold onto Nicholas.

14        Q.   I'm asking you what you recall, not what the witness

15   said?

16        A.   Well, what I recall is the same thing, yeah, going

17   inside the house and just trying to stop the bleeding.

18        Q.   Now, at some point in time did you hear law enforcement

19   arrive?

20        A.   Yes.

21        Q.   And were you inside or outside when you heard that?

22        A.   I was inside the house.

23        Q.   And what did you hear that caused you to believe that

24   law enforcement arrived?

25        A.   The sirens on the car.

26        Q.   At any point in time when you were in the house and you

27   were fooling around with the gun, did you ever, ever intend to

28   kill Nicholas?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 602

1      A.   No.

2      Q.   Did you ever have that intent at all?

3      A.   No.

4      Q.   At the time that the gun discharged, was that

5   accidental?  Was that an accident?

6      A.   Yes.

7           MS. FOSTER:  Objection.  Calls for legal conclusion.

8           THE COURT:  Sustained.

9           MS. FOSTER:  Move to strike.

10          THE COURT:  If there was an answer, the answer will be

11   stricken.

12          MS. BLUMENTHAL:  Your Honor, maybe at the break we

13   could -- at the break we could discuss that?

14          THE COURT:  Yes.

15          MS. BLUMENTHAL:  Thank you.

16     Q.   BY MS. BLUMENTHAL:  At the time that you pulled the

17   trigger on that gun, did you intend to pull the trigger?

18     A.   Did I intend it?  It was just when I pulled the

19   trigger, I didn't think anything would be inside of it.

20     Q.   So at the time you pulled the trigger, was it your

21   belief that that gun was unloaded?

22     A.   Yes.

23     Q.   At the time you pulled the trigger, had you seen what

24   you thought all the rounds being ejected from that gun?

25     A.   Yes.

26     Q.   And how many rounds did you see ejected from that gun?

27     A.   I didn't count the rounds.  It's just when I was

28   pumping the shotgun, you know, I knew I did it many times, you

```
 1  know.  So, in my memory, I really believed that I cleared all

 2  the shotgun shells.

 3      Q.   Now, at any point in time did you give a statement to

 4  law enforcement?

 5      A.   Yes.

 6      Q.   And when you talked to law enforcement, did you

 7  initially tell them that Nicholas had committed suicide?

 8      A.   Yes.

 9      Q.   Why did you tell them that?

10      A.   I guess it was fear and panic, the realization of

11  something, I just did something terribly wrong.

12      Q.   So you lied?

13      A.   Yes.

14      Q.   Were you interviewed several times by law enforcement

15  through that day?

16      A.   Yes.

17      Q.   And how long did those interviews of that day go on?

18      A.   To the next day.

19      Q.   Till the next day?

20      A.   Yes.

21      Q.   And were you being talked to almost continuously

22  throughout that time?

23      A.   Yes.

24      Q.   Did you ever give law enforcement the truth?

25      A.   No.

26      Q.   Why?

27      A.   I guess fear, panic.

28      Q.   Fear of what?
```

1    A.    Fear of, you know, just coming to jail, realizing I did

2    something terribly wrong.

3    Q.    Now, are you scared as you sit here today?

4    A.    Yes.

5    Q.    Why should we believe you today when you're afraid, and

6    you lied to the cops when you were afraid?

7    A.    Being in here when I talk to, you know, my attorneys,

8    realizing the stupid error I've made, if I only just spoke the

9    truth and but the truth and what really did happen, I know I

10   wouldn't be here today.

11   Q.    Now, how badly do you feel about killing your best

12   friend?

13   A.    Terrible.  I miss him every single day.

14   Q.    Have you cried over it?

15   A.    Yes.

16   Q.    How often?

17   A.    You know, when I'm inside where I'm at, you know, when

18   I see certain memories approach, you know, about the times that

19   we had together, of course, it's hard.  You know, I'm in a

20   smaller room and sometimes memories do come back of memories I

21   had with Nick and with my father, or memories I had with Ana

22   and the concerts, you know, and the vacations that we took.

23         MS. FOSTER:  Objection.  Nonresponsive.

24         THE WITNESS:  It's very hard.

25         THE COURT:  I'll allow it.  Overruled.

26   Q.    BY MS. BLUMENTHAL:  Now, what were your emotions when

27   you watched Ana on the witness stand talking about the loss of

28   her son?

```
 1            MS. FOSTER:  Objection.  Relevance.

 2            THE COURT:  Sustained.

 3       Q.   BY MS. BLUMENTHAL:  As you sit here in court today, do

 4   you see Ana in the courtroom?

 5       A.   No, I do not.

 6       Q.   Did you want Ana to know the truth about what happened?

 7       A.   Absolutely.

 8            MS. BLUMENTHAL:  I have no further questions, Your

 9   Honor.

10            THE COURT:  All right.  Ladies and gentlemen, we'll

11   take a ten-minute break.  We'll be back at 10:30.

12            Remember, do not talk about the case.  Keep an open

13   mind.  Do not conduct any research.

14            Court's in recess until, let's make it 10:35.  10:35.

15       (Proceedings were held out of the presence of the jury:)

16            THE COURT:  All right.  Back on the record out of the

17   presence of the jury.

18            Defense wanted to put something on the record?

19            MS. BLUMENTHAL:  Yes, Your Honor.  I respect the

20   Court's ruling over using the term "accident."  I was not using

21   that term in a legal sense, merely in a civilian sense.  We all

22   use the term "accident," and not necessarily talking law, and

23   that was the means in which I was using it, not as a legal

24   description.

25            THE COURT:  All right.  Thank you.

26            Anything we need to put on the record at this time?

27            MS. FOSTER:  No, Your Honor.

28            THE COURT:  Defense?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 606

1          MS. BLUMENTHAL:  No, Your Honor.

2          THE COURT:  All right.  Court's in recess.  Thank you.

3                        (Recess.)

4     (Proceedings were held in the presence of the jury:)

5          THE COURT:  All right, ladies and gentlemen, we're

6     going to have to excuse the jury for about the next ten minutes.

7     Wait out in the lobby.  Do not discuss the case.

8       (Proceedings were held out of the presence of the jury:)

9          THE COURT:  Do you want to take the defendant back to

10    his seat?

11         At 10:38 madam clerk handed me a note.

12         Madam clerk, can you please read the note into the

13    record?

14         THE CLERK:  Do you want me to tell you who the note is

15    from?

16         THE COURT:  Yes.

17         THE WITNESS:  It's Alternant No. 1, [TAJ01].  "Juror

18    No. 6 is texting and has been since we started court today.  Not

19    right to no pay close attention to the witness."

20         THE COURT:  All right.  I'll have Juror No. 6 in my

21    chambers with counsel and the court reporter and ma'am clerk.

22         (The following proceedings were held in chambers:)

23                    (TJ06 brought into chambers.)

24         THE COURT:  Back on the record out of the presence of

25    the jury.

26         We have Juror No. 6 in chambers with defense counsel.

27    And I received a note, indicated -- I don't know if it's true or

28    not.  I have to inquire -- that you had your cell phone on and

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 607

1    you were texting.

2           TJ06:  I was trying to turn it off.

3           THE COURT:  All right.  Were you using it during the

4    trial at any time this morning?

5           TJ06:  Right before I came in.

6           THE COURT:  All right.  But not during the court,

7    during the testimony of any of the witnesses?

8           TJ06: No.  No.  No.

9           THE COURT:  All right.  Because I was informed that you

10   may have been texting during the trial this morning.  Is that

11   true or not?

12          TJ06:  No.  I was trying to turn it off.  My daughter

13   had -- I lost my rings and I'm packing and chaos is happening,

14   and she sent a message, and I was trying to turn it off, and so

15   I just put it under my leg.

16          THE COURT:  All right.  If you need to use the cell

17   phone, you need to let me know and we'll take a break, but we

18   cannot be texting during the trial.  Do you understand?

19          TJ06:  I do understand.

20          THE COURT:  And just for the record, were you texting

21   during any of the testimony?

22          And if you were, how long?

23          TJ06:  Less than a -- than two seconds to try and, you

24   know, turn it off, cut her off.

25          THE COURT:  All right.  Thank you for your honesty.

26   I'll have madam clerk take you back out in the lobby.

27          TJ06:  Am I in trouble?

28          THE COURT:  No.  We just have to make a clear record.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 608

1         TJ06:  I'm packing and moving and a lot is going on at

2    home.  Trying to keep myself straight here.  And I have young

3    girls that don't realize that I can't talk on the phone.

4         THE COURT:  It's okay, but this is a very important

5    case.

6         TJ06:  Yes.

7         THE COURT:  And we have to abide by all the rules.

8         TJ06:  My phone is off and I told them.

9         THE COURT:  All right.  Thank you very much.

10        We'll wait for you, madam.

11             (TJ06 excused from chambers.)

12        THE COURT:  All right.  People want to put anything on

13   the record?

14        MS. FOSTER:  No.  I -- just I wasn't clear.  Was she --

15   did she say she was texting or --

16        THE COURT:  She said for a second or two.  First she

17   said she wasn't, then I looked her straight in the eyes and she

18   said, "I may have been."  So for a second or two.  But I'm not

19   going to excuse her.  From what she told me, it was just for a

20   few moments.

21        MS. FOSTER:  I am concerned if she -- this is my

22   concern.  I think none of us really believe her.

23        MR. MOORE:  Yeah, I'll join with that.

24        MS. FOSTER:  And another juror said that she's been

25   texting much more than she admitted.  And I also don't know if

26   she's researching.  A lot of information has been given, and our

27   phones are basically a computer.  So it makes -- I don't know

28   how the Court feels, but makes me uncomfortable knowing that she

1    kind of lied to you a little bit.

2         THE COURT:  Well, I don't know if she did or not until

3    I bring the other juror in.

4         MS. BLUMENTHAL:  I think that would be a wise idea,

5    because my gut reaction that I know is the same with the other

6    counsel, is that she was lying to the Court when she was

7    answering that.  And if she has all that stuff going on at

8    home --

9         THE COURT:  Well, that's another issue.  You want to

10   bring the alternant juror?  Which one, for the record?

11        THE CLERK:  Alternate No. 1.

12        THE COURT:  All right.  Let's do that.

13        THE CLERK:  And will you assure her, Your Honor, that

14   we're not telling Juror No. 6 where this came from?

15        MR. MOORE:  That's going to be kind of obvious.

16        THE COURT:  It's going to be obvious.

17        MR. MOORE:  We can continue on at this point and talk

18   to Alternate 1 maybe at the noon hour.

19        THE COURT:  I want to make a decision.  I don't want to

20   waste time.

21        I guess we could do it that way.

22        Either way, they're going to find out, because I'm

23   going to ask Alternant Juror No. 1 to stick around at the noon

24   hour.

25        THE CLERK:  I have a suggestion.

26        THE COURT:  All right.  You want to go off the record?

27        THE CLERK:  Yes.

28             (Discussion held off the record.)

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 610

1          THE COURT:  All right.  Bring 5 in.

2                    (TJ05 brought into chambers.)

3          THE COURT:  Back on the record.  We have Juror No. 5

4     present.

5          Juror No. 5, you're not in trouble.  I just need some

6     information, because I need to make a right decision.  I was

7     informed that one of the jurors was using a cell phone during

8     the testimony of witnesses.  My question to you is:  One, did

9     you see a juror use a cell phone during any of the testimony

10    this morning?

11         TJ05:  Yes.

12         THE COURT:  Did you see that person texting?

13         TJ05:  I just see the light.  I didn't pay attention.

14         THE COURT:  Do you know -- do you recall, and once

15    again, I'm not going to mention your name, I just need

16    information to make a right decision.  Do you know how long that

17    individual was using the cell phone or texting?

18         TJ05:  No.

19         THE COURT:  Can you give me any more information?  Was

20    that person holding the phone for a while, or what did you see?

21         TJ05:  All I see was she had the phone.  The light came

22    on, so, of course, it caught my attention.  And then I see her

23    notes on top and that's it.  I didn't pay attention to it,

24    because I was listening.

25         THE COURT:  You didn't look over again?

26         TJ05:  Huh-uh.

27         THE COURT:  All right.  Thank you very much.

28         TJ05:  You're welcome.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 611

```
 1                    (TJ05 excused from chambers.)

 2          THE CLERK:  The other one?

 3          THE COURT:  Yes, please.

 4                    (TAJ01 brought into chambers.)

 5          THE COURT:  Back on the record.  We have Alternate

 6  Juror No. 1?

 7          THE CLERK:  Yes.

 8          THE COURT:  I did speak to another juror and I did

 9  speak to Juror No. 6.  I just wanted to give -- I need to make

10  the right decision, so I need you to tell me what you saw, how

11  long, if anything, in regards to Juror No. 6.

12          TAJ01:  You came into the courtroom this morning, and

13  we was told as we was walking in to turn off or phones.  We sat

14  down.  As soon as we sat down, there was a text going off.  She

15  was texting.  And she took her folder, her tablet and put it

16  over the top of her phone, not turning it off.  She then took it

17  up again and texted some more.  She proceeded to text throughout

18  the, I say, the first hour.  I'm not sure about it.

19          THE COURT:  She kept on texting off and on?

20          TAJ01:  Off and on.

21          THE COURT:  During the entire --

22          TAJ01:  The first, I'd say about the first hour.  It

23  was off and on.  It was -- it was kind of like in between him

24  calling the witness she would text, it seemed like.

25          THE COURT:  She had it on?

26          TAJ01:  Yeah.

27          And then one time it actually "beep, beep" and that's

28  when I kind of like, okay, Girl.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 612

1          THE COURT:  So it wasn't like a few seconds before we
2     started or maybe a few seconds while in the middle of Mr. what's
3     his name?
4          TAJ01:  Crump.
5          THE COURT:  Crump?
6          You're nodding your head.  You have to answer.
7          TAJ01:  I'm sorry.  I forget.  No.
8          THE COURT:  All right.  Thank you.  Thank you for your
9     honesty.  I have the right information now to make a decision.
10    Thank you very much.
11         THE CLERK:  And, Your Honor, did you want to admonish
12    her not to speak to --
13         THE COURT:  Yeah.  Please don't speak to anybody.
14         And I let the other juror know that already.
15         All right.  Thank you.
16                  (TAJ01 excused from chambers.)
17         THE COURT:  All right.  People?
18         Is there a stipulation?
19         MS. BLUMENTHAL:  Yes.
20         MS. FOSTER:  Yes.
21         THE COURT:  All right, then.
22         MS. BLUMENTHAL:  Did we think of that too long?
23         What's interesting is when she talked about putting the
24    tablet over, Juror No. 5 said the same thing.
25         THE COURT:  She didn't want to.
26         MR. MOORE:  Also, her attention would have been
27    directed away.
28         MS. BLUMENTHAL:  Correct.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 613

1          MS. FOSTER:  She would have had the best vantage point
2     where it wouldn't interfere with it.
3          THE COURT:  Can we go off the record how we're going to
4     do this?
5          Can we go off the record?
6          MR. MOORE:  Yeah.
7               (Discussion held off the record.)
8          THE COURT:  So back on the record.
9          The Court will go into the courtroom and call Juror No.
10    6 and then excuse her, and then we'll select one of the
11    alternate jurors to sit as Juror No. 6.
12         All right.  Thank you.  And that's by way of
13    stipulation?
14         MS. BLUMENTHAL:  Yes, it is.
15         MS. FOSTER:  Yes, Your Honor.
16         THE COURT:  All right.  Thank you.
17           (The following proceedings were held in the
18             courtroom out of the presence of the jury.)
19               (TJ06 brought into the courtroom.)
20         THE COURT:  Just stand right there.
21         Back on the record out of the presence of the jury.
22         Madam clerk, at this time I'm going to order that note
23    to be filed and made part of the record.
24         Juror No. 6, you are excused.  Thank you for your
25    service.  You'll need to go downstairs and turn in your badge.
26         TJ06:  Okay.
27         THE COURT:  All right.  Thank you.
28                          (TJ06 excused.)

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 614

```
1            THE COURT:  At this time, madam clerk, please select an
2   alternate juror to sit as Juror No. 6, please.
3            THE CLERK:  It's No. 1.
4            THE COURT:  Alternant No. 1 will be Juror No. 6.
5   Alternate No. 1 will be Juror No. 6.
6            All right.  Madam clerk, bring in the jurors.
7         (Proceedings were held in the presence of the jury:)
8            THE COURT:  All right.  Back on the record.  All
9   parties are present.
10            Alternant Juror No. 1, you will now be Juror No. 6.
11   Please take the appropriate seat.
12            THE CLERK:  Does she need to be resworn?
13            THE COURT:  Yes.
14            Juror No. 6, can you please stand up?
15            THE CLERK:  Please raise your right hand to be sworn.
16            Do you understand and agree that you will well and
17   truly try the cause now pending before this court and render a
18   true verdict according only to the evidence presented to you and
19   to the instructions of the Court?
20            TJ06:  I do.
21            THE CLERK:  Thank you.  You may be seated.
22            THE DEPUTY:  Your Honor, I want to get the notes.
23            THE COURT:  Oh, yes, please.
24            All right.  The defendant remains on the witness stand,
25   and I believe this is cross-examination.
26            MS. FOSTER:  Thank you.
27                       CROSS-EXAMINATION
28   BY MS. FOSTER:
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 615

```
 1        Q.   Good morning.

 2        A.   Good morning.

 3        Q.   So we're going to talk about a few things and try and

 4   get a little bit more detail, okay?

 5        A.   Okay.

 6        Q.   Now, you're telling us today that the reason you went

 7   to Nicholas's house is to show him a gun you saw in a zombie

 8   move; is that right?

 9        A.   Show him and then to go shooting.

10        Q.   And then to go shooting?

11        A.   Yes.

12        Q.   Now, what movie was that again?

13        A.   If my memory serves me correctly, it was a zombie

14   movie, but I think the movie itself was called The Land of the

15   Living Dead.

16        Q.   And in this movie there was a gun like one of your

17   father's guns?

18        A.   Yes.

19        Q.   Now, you said that you were going to Nicholas's house

20   to show him the gun as well as to go shooting?

21        A.   Yeah, that was the plan.

22        Q.   And you have been shooting with Nicholas before?

23        A.   Correct.

24        Q.   Skeet shooting, right?

25        A.   We didn't go skeet shooting, but it was just target

26   practicing.

27        Q.   This day you planned to go skeet shooting?

28        A.   Yes, to try to -- try to go skeet shooting.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 616

```
 1      Q.    And skeet shooting is when you shoot at the plates?

 2      A.    Yeah.  Any kind of object that you can kind of throw.

 3   It could be a like a plate or whatever is like lying around.

 4      Q.    And I don't want you to be uncomfortable leaning.  If

 5   you could just pull that microphone a little closer to you.

 6            Is that better?

 7      A.    Can you hear me?

 8      Q.    Yeah.

 9      A.    Okay.

10      Q.    All right.  So the plan was, you're saying now, the

11   plan was to go skeet shooting afterwards?

12      A.    Yes.

13      Q.    Now, one of the primary ways that you communicate with

14   Nicholas is via text message?

15      A.    I would say phone calls first, then via text messages.

16      Q.    And you text Nicholas a lot?

17      A.    Yes.

18      Q.    Within a short period of time, say, within a week, you

19   text him 20, 40 times?

20      A.    Probably even more.

21      Q.    And you text each other when you're making plans?

22      A.    I think it would be more phone call conversation.

23      Q.    But you text plans?

24      A.    Yes.

25      Q.    You text and let him know you're coming over?

26      A.    Yeah.

27      Q.    And you're both at this time 18 and 19 years old?

28      A.    Correct.
```

1    Q.   So 8 o'clock in the morning is pretty early for you

2  then?

3    A.   It's morning, yes.

4    Q.   And at this time Nicholas is not working?

5    A.   No.

6    Q.   He's not in school?

7    A.   No.

8    Q.   So 8 o'clock in the morning is very early?

9    A.   I guess, yes.

10   Q.   As a matter of fact, it's a time where he's not even

11 awake yet?

12   A.   That would be correct.

13   Q.   And so you're coming from Canyon Lake?

14   A.   Um-hum.

15   Q.   And you just have to say "yes" or "no."

16   A.   Yes.

17   Q.   And from Canyon Lake it takes you, what, about 20, 30

18 minutes to get there?

19   A.   I'd say 15, 20, yes.

20   Q.   15, 20 minutes?

21   A.   Um-hum.

22   Q.   And we're talking about on a Tuesday morning?

23   A.   Yes.

24   Q.   Kind of rush hour, right?

25   A.   Tuesday morning, I think not too many people are around

26 that time.  Usually everyone is already at school or already at

27 work.

28   Q.   At around 8 o'clock in the morning?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 618

```
 1      A.   Yes.  That route I take, no one is usually there.

 2      Q.   And the route you're taking, is that down the 215?

 3      A.   No.  I never take the freeways to get to Nick's house,

 4  I just take like the streets.

 5      Q.   So you're taking the back roads?

 6      A.   Yes.

 7      Q.   And it takes you 15 to 20 minutes to get to his house?

 8      A.   Yes.

 9      Q.   Now, at the age of 19 your cell phones are a pretty

10  important part of your life?

11      A.   Correct.

12      Q.   You use it for text messages?

13      A.   Yes.

14      Q.   You use it for phone calls?

15      A.   Yes.

16      Q.   You use the Internet on it?

17      A.   Yes.

18      Q.   You have an iPhone, right?

19      A.   Yes.

20      Q.   So on the iPhone you can look up things?

21      A.   Yes.

22      Q.   Look up directions?

23      A.   Yes.

24      Q.   You check out traffic?

25      A.   Yes.

26      Q.   You make videos on it?

27      A.   Yes.

28      Q.   You store those videos?
```

```
 1        A.   Yes.

 2        Q.   Upload those videos?

 3        A.   Yes.

 4        Q.   As a matter of fact, some of the videos that we saw,

 5   you upload them online for others to watch?

 6        A.   Yes.

 7        Q.   You check your phone constantly throughout the day,

 8   right?

 9        A.   Yes.

10        Q.   It's not something you usually leave at home?

11        A.   Correct.

12        Q.   But on November 10th you left your phone at your house?

13        A.   Yes.

14        Q.   And before you left your phone, you didn't let Nicholas

15   know you were on your way over?

16        A.   No.

17        Q.   You didn't make sure he'd be awake?

18        A.   No.

19        Q.   You didn't call him and tell him, hey, get up and get

20   dressed?

21        A.   No.

22        Q.   So if we look just at your phone, there is no

23   indication that Nicholas knew you were coming over on the 10th

24   that morning?

25             MR. MOORE:  Objection.  Speculation.

26             THE COURT:  Overruled.

27             THE WITNESS:  Correct.

28        Q.   BY MS. FOSTER:  So the only thing we have to tell us
```

```
 1    that Nicholas knew you were coming over is your word?

 2             MR. MOORE:  Argumentative.

 3             THE COURT:  Overruled.

 4             THE WITNESS:  Yes.

 5        Q.   BY MS. FOSTER:  Now, this time that you picked to come

 6    over, you planned to get there around 8:20; is that right?

 7        A.   Correct.

 8        Q.   You said you spent a lot of time at Nicholas's home?

 9        A.   Yes.

10        Q.   You knew his mother?

11        A.   Yes.

12        Q.   You thought of her like your own mother?

13        A.   Correct.

14        Q.   You knew her schedule?

15        A.   Yes.

16        Q.   You knew her habits?

17        A.   Yes.

18        Q.   You would come to the house when she wasn't there on

19    purpose?

20        A.   No, not on purpose.

21        Q.   So you knew when she'd leave for work?

22        A.   Yeah.  I have an idea, knowledge of her schedule.

23        Q.   So when you came there, you figured Ana would not be

24    there?

25        A.   I didn't really assume that, you know, I just know

26    that, you know, she'd be at school.

27        Q.   So you knew she wouldn't be there?

28        A.   Yes.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 621

1      Q.   This particular day you did not want to see Ana; isn't
2  that right?
3      A.   No.  If she was there, I'd be more than willing to see
4  her.
5      Q.   You'd be happy to see Ana that day?
6      A.   Yes.
7      Q.   Now, Ana told us that you're not allowed to bring guns
8  to her house?
9      A.   Correct.
10     Q.   That's a conversation that you've had with her, right?
11     A.   Correct.
12     Q.   You brought a gun before?
13     A.   Yes.
14     Q.   You showed it to her?
15     A.   Yes.
16     Q.   And she told you don't bring guns anymore?
17     A.   Yes.
18     Q.   On this day you're bringing a gun to Ana's house?
19     A.   Yes.
20     Q.   You did not want Ana to catch you with that gun; is
21  that right?
22     A.   Correct.
23     Q.   So you did not want Ana to see you that day?
24     A.   Most likely, yes.
25     Q.   So that wasn't true when you said before you would have
26  been happy to see her?
27          MR. MOORE:  Argumentative, Your Honor.
28          THE COURT:  Sustained as being argumentative.

1   Q.   BY MS. FOSTER:  You didn't want to run into Ana when

2   you got to the house; is that right?

3   A.   Like I say, you know, if she was there, I would be more

4   than happily to greet her and meet her.

5   Q.   And was the gun in your hand?

6   A.   No.

7   Q.   So when Ana's leaving the house, you're parked at the

8   top of the cul-de-sac; is that right?

9   A.   No.

10   Q.   You waited for Ana to leave?

11   A.   No.

12   Q.   And then you drove down the street?

13   A.   No.  I didn't see Ana that day at all.

14   Q.   In knowing Ana's habits, do you know her habit about

15   leaving the back door open?

16   A.   Yes, she left the back door open for the dogs.

17   Q.   So you knew the back door is always open?

18   A.   Not always open.

19   Q.   You knew she would leave the back door open?

20   A.   Occasionally, yes, for the dogs.

21   Q.   And that's something you had seen her do before?

22   A.   To my memory, I haven't seen her do it.

23   Q.   Well, you're familiar with that practice?

24   A.   Yeah.

25   Q.   When you get there, do you immediately know Ana's not

26   there?

27   A.   I believe I assume, yes, she would be at school.

28   Q.   So you walk up to the door with the gun?

1        A.    No.

2        Q.    You told police that you brought the gun to the front

3    door.  Do you remember telling them that?

4        A.    I did not bring the gun to the front door.  The second

5    when I left the house, that's when I brought the gun back.

6        Q.    Well, you talked to the police several times; is that

7    correct?

8        A.    Yes.

9        Q.    First you talked to Deputy Kurylowicz right there in

10   front of their house; is that right?

11       A.    Yes.

12       Q.    And then you talked to Investigator Dean at the

13   station; is that right?

14       A.    Correct.

15       Q.    And when you talked to Investigator Dean, you told him,

16   "He was very twitchy, you know -- "

17            MS. FOSTER:  And, I'm sorry.  I will point Counsel to

18   page 10.

19            MR. MOORE:  I don't think I have the transcripts.

20            MS. BLUMENTHAL:  We don't have your transcripts.

21            We don't have your transcripts.

22            MS. FOSTER:  Page 10 lines, 10 through 12.

23       Q.    BY MS. FOSTER:  You told Investigator Dean, "And we

24   started doing some small talk.  He was just in his boxers.  And

25   I had the gun with me because I didn't want it in my car."  Do

26   you remember telling him that?

27       A.    I believe I did.

28       Q.    So did you have the gun with you or was it in your car?

1      A.    When I first entered Nicholas's house, the gun was not

2   with me.

3      Q.    So when you told that to Investigator Dean, that was a

4   lie?

5      A.    Correct.

6      Q.    Now, let's go back to the skeet shooting, okay?  When

7   you're talking about the skeet shooting, your dad bought you a

8   couple of guns; is that correct?

9      A.    Just he kind of bought it himself and just kind of gave

10   it to me.

11      Q.    So you have guns that specifically belong to you?

12      A.    I guess you could say, yes.

13      Q.    And these were guns that you kept in your own bedroom;

14   is that right?

15      A.    Correct.

16      Q.    I'm going to show you what's been marked for

17   identification as People's 306.  Do you recognize what's in

18   People's 306?

19      A.    Yes.

20      Q.    Can you use that laser pointer and show us which one is

21   the skeet shooting shotgun?

22      A.    It would be right there.

23      Q.    And you used that gun before?

24      A.    Yes.

25      Q.    You've had that gun for about how long?

26      A.    A couple of years.

27      Q.    So you're familiar with it?

28      A.    Yes.

```
 1        Q.   You're familiar with its purpose?
 2        A.   Yes.
 3        Q.   You're familiar with the fact that it's specifically
 4   designed for skeet shooting?
 5        A.   Yes.
 6        Q.   You have ammunition for it?
 7        A.   I have myself personally probably not, no.
 8        Q.   In the house you have ammunition?
 9        A.   I think that's a 20 gauge shotgun.  I don't think we
10   had 20 gauge ammunition.
11        Q.   And you heard your dad testify?
12        A.   Yes.
13        Q.   And you heard him talk about there being ammunition for
14   that gun in the house?
15        A.   I'm not sure for that gun particularly, though.
16        Q.   And you know you can get ammunition at the range as
17   well, right?
18        A.   I believe so.
19        Q.   So the skeet shooting shotgun is the best gun for going
20   skeet shooting?
21        A.   It would be an ideal, yes, a shotgun for skeet
22   shooting.
23        Q.   But you leave this gun behind?
24        A.   Yes.
25        Q.   And instead you go and get the long-barrel shotgun out
26   of your dad's closet, right?
27        A.   Yes.
28        Q.   And this is a gun that you're not supposed to have?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 626

```
 1        A.    Yes.
 2        Q.    And just for clarity, you didn't take both guns with
 3   you?  You didn't take the skeet shooting gun at all?
 4        A.    No.
 5        Q.    So it wasn't a case where you were just planning to
 6   show the long barrel and then shoot with the skeet shooting gun?
 7        A.    No.
 8        Q.    And you say you've been skeet shooting before?
 9        A.    Yes.
10        Q.    With Nicholas?
11        A.    Target practicing with Nicholas, not skeet shooting.
12        Q.    And when you go target practicing, about how long do
13   you go?
14        A.    How long was I there for?
15        Q.    Yes.
16        A.    I'd say a guess, at least, me, Nicholas and my dad, we
17   spend two hours, two, three hours.
18        Q.    And this day you planned to go, you planned to go for a
19   couple of hours?
20        A.    If that.  Maybe about an hour or so.
21        Q.    About an hour?
22        A.    Yes.
23        Q.    And when you're -- you were planning on skeet shooting,
24   not target shooting, right?
25        A.    We planned on just doing something overall with both.
26        Q.    All right.  And when you do that, you take turns
27   shooting?
28        A.    Yeah, I guess you could say that.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 627

```
 1      Q.   And you said you were going to go for about an hour,
 2   maybe an hour or two?
 3      A.   Something like that.
 4      Q.   And each time you shoot off a shotgun, it takes, what,
 5   maybe a minute to load it, discharge it?
 6      A.   I guess if you keep going at it, yes.
 7      Q.   Okay.  And that was the plan to kind of keep going back
 8   and forth and see who hits what targets?
 9      A.   Yes.
10      Q.   And so in doing something like that for about two
11   hours, you need quite a bit of ammunition?
12      A.   Correct.
13      Q.   And this day you didn't take a box of ammunition with
14   you?
15      A.   No.
16      Q.   You didn't -- there was tons of ammunition in your
17   parents' house?
18      A.   Yes.
19      Q.   You took about nine rounds?
20      A.   Yes.
21      Q.   So you guys planned to shoot back and forth four times
22   each?
23      A.   No.  The purpose of it was we had money, and we were
24   planning to go to, you know, a sporting goods store or like, you
25   know, Walmart to buy more ammunition.
26      Q.   But there was ammunition at the house?
27      A.   Yes.
28      Q.   And this, about going to Walmart, this is the first
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 628

```
 1   time you're saying that, right?

 2        A.   Correct.

 3        Q.   So you only took nine rounds with you that day?

 4        A.   Um-hum.

 5        Q.   Is that "yes"?

 6        A.   Yes.

 7        Q.   And that's not enough for skeet shooting or target

 8   shooting for one to two hours?

 9        A.   For one to two hours, yes.

10        Q.   Nine rounds is not enough?

11        A.   Not enough.

12        Q.   And you only took nine rounds because you knew you

13   weren't going to need more than that?

14             MR. MOORE:  Argumentative and vague.

15             THE COURT:  Overruled.

16             THE WITNESS:  What do you mean?

17        Q.   BY MS. FOSTER:  You knew you weren't going to need more

18   than that because you weren't going target shooting; isn't that

19   right?

20             MR. MOORE:  Argumentative.

21             THE COURT:  Overruled.

22             MR. MOORE:  Misstates his testimony.

23             THE COURT:  Overruled.

24             THE WITNESS:  I'm not certain how to answer that.

25        Q.   BY MS. FOSTER:  We'll come back to it.

26             This gun that you took, you heard your dad say he keeps

27   it unloaded in his closet; is that correct?

28        A.   Yes.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 629

1    Q.   And when you found that gun, it was unloaded?

2    A.   No.  It was loaded.

3    Q.   Okay.  So you went into the gun and checked it out?

4    A.   Well, I knew it was there.

5    Q.   So you say that it was loaded.  When did you discover

6  it was loaded?

7    A.   It's always been loaded.

8    Q.   So when you got the gun, you knew it was a loaded gun

9  you were taking?

10    A.   It was not chambered, but, yes, it had ammunition in

11  it.

12    Q.   It had ammunition in the side saddle?

13    A.   Yes.

14    Q.   When you saw it?

15    A.   Yes.

16    Q.   And you had ammunition in the, you called it a tube,

17  right?

18    A.   Tube, yes.

19    Q.   And you decide to take this loaded gun without

20  unloading it over to Nicholas's house?

21    A.   Correct.

22    Q.   When you took the gun, did you sneak into your parents'

23  room?

24    A.   My parents were not there.

25    Q.   But you were sneaking into their room.  You didn't have

26  permission?

27    A.   Well, I kind of had access to their room.  They trusted

28  me.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 630

1      Q.    And when you took this loaded gun, you took this loaded

2   gun before you left Canyon Lake?

3      A.    Correct.

4      Q.    You took this loaded gun the morning of November 10th?

5      A.    Correct.

6      Q.    You took this loaded gun after you sent Nicholas a text

7   saying "I'm going to shoot you, I swear"?

8      A.    Correct.

9      Q.    If you're going skeet shooting afterwards, wouldn't it

10  have made more sense to take the skeet shooting gun along with

11  you too?

12     A.    It would have, but that was not the plan.

13     Q.    The plan wasn't to go skeet shooting?

14     A.    It was, but with a shotgun.

15     Q.    So what we have so far is that you leave the house with

16  a loaded gun, right?

17     A.    Yes.

18     Q.    You don't unload it; is that correct?

19     A.    Yes.  It's not chambered, but it has the ammunition in

20  the side and in the tube.

21     Q.    And so you take this loaded gun and you drive 15 to 20

22  minutes to Nicholas's house?

23     A.    Correct.

24     Q.    You leave your cell phone behind?

25     A.    Correct.  Well, I didn't purposely leave it behind.

26     Q.    You leave your cell phone behind?

27     A.    Yes.

28     Q.    And then you don't call or text Nicholas and let him

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 631

1    know you're on your way?

2        A.    Yes.

3        Q.    That's, no, you didn't?

4        A.    Yes.

5        Q.    Then when you get to Nicholas's house with the loaded

6    gun, you say you left it in the car?

7        A.    Correct.

8        Q.    But first in 2015 you told officers you took it with

9    you to the door?

10       A.    If the statement says that, yes, correct.

11       Q.    But that was just a lie?

12       A.    Correct.

13       Q.    So you're saying now that you go into the house, and

14   Nicholas answers the door in his underwear?

15       A.    Yes.

16       Q.    He's not dressed?

17       A.    Yes.

18       Q.    And you are dressed?

19       A.    Correct.

20       Q.    You're actually wearing a couple layers; is that

21   correct?

22       A.    Shirt and pants, and I think I had a pair of shorts

23   under.

24       Q.    You had basketball shorts; is that right?

25       A.    Yes.

26       Q.    And then you had underwear underneath that?

27       A.    Yes.

28       Q.    And you go into Nicholas's house?

```
 1        A.    Correct.

 2        Q.    This is what you're saying to us now?

 3        A.    Correct.

 4        Q.    And you go to his room?

 5        A.    Correct.

 6        Q.    The two of you talk?

 7        A.    Correct.

 8        Q.    And so you heard the testimony that you were seen on

 9   the camera coming into their street about 8:18, right?

10        A.    From Detective Dean?

11        Q.    Yeah?

12        A.    Yes.

13        Q.    How long did it take you to get from your car to the

14   door?

15        A.    From my car to the door?

16        Q.    Yeah.

17        A.    Probably take maybe like five seconds.  Six.

18        Q.    So you didn't sit in your car, you just got straight

19   out?

20        A.    Yes.

21        Q.    Then you said the dogs came to the door and they were

22   barking?

23        A.    After I rang the doorbell and knocked on the door.

24        Q.    How long were you standing there knocking on the door?

25        A.    I'd say probably 20, 30 seconds.

26        Q.    Then you say Nicholas comes to the door?

27        A.    Correct.

28        Q.    And lets you into the room?
```

```
1        A.    Correct.

2        Q.    And the two of you talk?

3        A.    Yeah.  We start, you know, just how we usually always

4    did it.

5        Q.    And at this time you said Nicholas lays back down?

6        A.    Well, that's when we go into his room.

7        Q.    And he lays back in the bed?

8        A.    He sits in the bed, yes.

9        Q.    Okay.  Now, when you testify, you said lay?

10       A.    Yes.  I mean kind of you first kind of sit and then you

11   would lay.

12       Q.    Okay.  So let us be very, very clear.  I'm going to

13   show you what's been marked for identification as People's

14   Exhibit 4.  You recognize People's 4?

15       A.    Yes.

16       Q.    That's Nicholas's bed?

17       A.    Yes.

18       Q.    Where was Nicholas laying in the bed when he laid back

19   down?

20       A.    I guess you would say to my left.

21       Q.    So right on the right side of the bed on the end

22   closest to the door?

23       A.    Yes.

24       Q.    And he's laying with his head where the pillow goes and

25   his feet --

26       A.    Correct.

27       Q.    -- towards the end?

28             And then the two of you talk?
```

1    A.   Yeah.  We chat how we usually.

2    Q.   And then you talk for about how long?

3    A.   I'd say a minute, minute and a half to two.

4    Q.   And now you're saying that at this time you decided to

5    go back to the car for the gun?

6    A.   Yes.  I tell him, you know, I have my pop's gun, and I

7    went to go get it.

8    Q.   Well, hold on.  You're confusing me.  You tell him you

9    have your dad's gun?

10   A.   Yes.

11   Q.   I thought you said that was the plan?

12   A.   Yes, that was the plan, but, of course, it came up

13   during the conversation.

14   Q.   Okay.  So you're saying that you tell him that you

15   brought the gun, as according to plan?

16   A.   Yes.

17   Q.   And then you go back outside?

18   A.   Yes.

19   Q.   And at this time when you go back outside, you know

20   you're going to get the gun?

21   A.   Correct.

22   Q.   Now, there was some discussion about you understanding

23   gun safety; is that right?

24   A.   I believe so.

25   Q.   And your dad taught you gun safety?

26   A.   Yes.

27   Q.   And you know that carrying around a loaded gun is

28   dangerous?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 635

```
 1      A.   Correct.

 2      Q.   It's also not allowed to carry around a loaded gun?

 3      A.   Correct.

 4      Q.   And so when you went back outside to the car, you

 5   unloaded the gun?

 6      A.   I did not unload it, I just grabbed it.

 7      Q.   You grabbed the loaded gun?

 8      A.   From my trunk, yes.

 9      Q.   And how long were you outside getting the gun?

10      A.   Probably, I'd say, ten seconds from going to -- ten to

11   12 seconds from going to the car and coming back to the house.

12      Q.   Now, when you get back into his room, the gun is in the

13   case?

14      A.   Correct.

15      Q.   So you decide to open it up?

16      A.   When I'm with Nicholas, yes.

17      Q.   And at this time you unload it?

18      A.   Unload it?

19      Q.   Yes.

20      A.   As in like --

21      Q.   You take the rounds out of the tube at this time,

22   right?

23      A.   Yes.

24      Q.   Like you physically take them out?

25      A.   No.

26      Q.   Okay.  So when you're showing Nicholas the gun, you're

27   showing it to him with it loaded?

28      A.   Yes.
```

1    Q.   Then you say that you were fooling around with the gun?

2    A.   Correct.

3    Q.   And what you mean by that is you're saying that you

4  were racking it and dropping off the ammunition that was in the

5  tube?

6    A.   Correct.

7    Q.   And that makes a loud sound with a shotgun; is that

8  right?

9    A.   Yes.  I mean, not crazy loud, but, yes, you could say

10 loud.

11   Q.   And you said you did that over and over again?

12   A.   Yes.  To my best memory, I did it multiple times.

13   Q.   How many times did you do it?

14   A.   I can't remember.  I can't tell you specific count, but

15 I just remember doing it multiple times.

16   Q.   And so you knew this gun was loaded?

17   A.   Correct.

18   Q.   And a loaded gun is dangerous?

19   A.   Correct.

20   Q.   And if you shoot a loaded gun, someone could get hurt?

21   A.   Correct.

22   Q.   Someone could die?

23   A.   Correct.

24   Q.   And you didn't count off or check to make sure all the

25 ammunition was out?

26   A.   No, ma'am.

27   Q.   That was reckless, right?

28        MR. MOORE:  Objection.  Argumentative.  Calls for a

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 637

```
 1   legal conclusion.

 2          THE COURT:  It's argumentative.  Sustained.

 3   Q.   BY MS. FOSTER:  That wasn't safe?

 4   A.   Correct.

 5          MR. MOORE:  Objection.  Argumentative.

 6          THE COURT:  Overruled.

 7   Q.   BY MS. FOSTER:  That wasn't safe?

 8   A.   Correct.

 9   Q.   That wasn't smart?

10   A.   Correct.

11   Q.   So you said that you did not load this gun; is that

12   right?

13   A.   Correct.

14   Q.   So you don't know how many rounds are in the tube?

15   A.   Correct.

16   Q.   So when you're clicking off rounds and assuming it's

17   empty, you have no basis to know whether it's empty or not?

18          MR. MOORE:  Objection.  Argumentative.  Misstates the

19   testimony.

20          THE COURT:  Overruled.

21          THE WITNESS:  Correct.

22   Q.   BY MS. FOSTER:  You didn't open it up and check to make

23   sure it was empty?

24   A.   Correct.

25   Q.   Now, the defense showed some videos of you talking to

26   Nicole.  Do you recall those?

27   A.   I believe so, yes.

28   Q.   And you had a revolver?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 638

1        A.    Correct.

2        Q.    And in those videos you can be seen pulling a bullet

3    out of the revolver?

4        A.    Correct.

5        Q.    And that's a little trick you know how to play with

6    that gun, right?

7        A.    Yes.

8        Q.    There is other videos of you playing with that gun as

9    well, right?

10       A.    Correct.

11       Q.    One where you put three bullets in the revolver.  Do

12   you recall that one?

13       A.    I believe so.

14       Q.    And you ask her "Is your favorite drink coffee or tea"?

15       A.    I believe so, yes.

16       Q.    And the idea is if she gets it wrong, you're going to

17   shoot yourself in the hand?

18       A.    Jokingly, yes.

19       Q.    And you say "jokingly," because you have no intention

20   of shooting yourself in the hand?

21       A.    Correct.

22       Q.    And you're not being reckless with it, because you know

23   you're not going to shoot yourself in the hand?

24            MR. MOORE:  Objection.  Argumentative as phrased.

25            THE COURT:  Overruled.

26            THE WITNESS:  I believe so, yes.

27       Q.    BY MS. FOSTER:  You're not playing Russian roulette in

28   those videos, right?  With your hand?

```
 1      A.   I guess in a way you could say, yes, I was.
 2      Q.   Well, there is no chance.  You know where the bullet
 3  is?
 4      A.   Yes.
 5      Q.   So this is not, you on those videos, just acting
 6  recklessly.  You're actually paying attention to where you put
 7  the bullet, spinning it, and making sure you don't shoot
 8  yourself in the hand?
 9           MR. MOORE:  Objection.  Argumentative as phrased.
10           THE COURT:  Overruled.
11           THE WITNESS:  Yes.  That was ideal.
12      Q.   BY MS. FOSTER:  And that's to keep yourself safe from
13  being shot?
14      A.   Correct.
15      Q.   In all the videos, and there are several videos, right,
16  of you playing with guns?
17      A.   Correct.
18      Q.   Different types of guns?
19      A.   Correct.
20      Q.   In your parents' house?
21      A.   Correct.
22      Q.   You never shoot yourself in any of those videos?
23      A.   Correct.
24      Q.   You never shoot anyone in any of those videos?
25      A.   Correct.
26      Q.   In those videos you actually take care to make sure
27  that either the gun is not loaded or a bullet is not where it
28  can actually hit you; is that correct?
```

```
 1        A.   Correct.

 2        Q.   You are exercising a measure of caution; is that right?

 3        A.   Correct.

 4             MS. BLUMENTHAL:  Your Honor, I'm going to object at

 5   this point as calling for a legal conclusion as phrased.

 6             THE COURT:  As phrased:  Overruled.

 7        Q.   BY MS. FOSTER:  You know it's important to look inside

 8   the gun and make sure that there is not one that's chambered?

 9        A.   Correct.

10        Q.   And you did that for yourself to keep yourself safe?

11        A.   Correct.

12        Q.   But the story you're telling us today, you didn't do

13   that for Nicholas?

14             MS. BLUMENTHAL:  Objection.  Argumentative as phrased.

15             MR. MOORE:  Argumentative.

16             THE COURT:  Overruled.

17             THE WITNESS:  Correct.

18        Q.   BY MS. FOSTER:  You were not careful when you were in

19   the bedroom with the gun with Nicholas?

20        A.   Correct.

21        Q.   Now, I'm trying to understand exactly where you were

22   positioned and where Nicholas is positioned.  So you said

23   Nicholas is laying down on the bed with his head towards the

24   wall?

25        A.   Correct.

26        Q.   Laying flat on the bed?

27        A.   Not flat.  Like lifted.

28        Q.   Show us what you mean.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 641

1      A.   Kind of like laying sideways like this.

2      Q.   So you're saying on his side?

3      A.   Yes.

4      Q.   And I don't want to misquote you.  Describe for us how

5  you mean on his side.

6      A.   Like can I show it?

7      Q.   Yes.

8      A.   Well, kind of almost like leaning down like this.  Like

9  facing me when he's talking to me.

10     Q.   So he's leaning down, and I'm kind of curving my body

11  to the right?

12     A.   Yeah.  Like he would be facing straight towards me,

13  like say his legs are straight, but pivot where he's facing me.

14     Q.   Okay.  And are you saying that his arm was facing down

15  towards the ground or towards the bed?

16     A.   Yeah.  It would be tucked at his side.

17     Q.   Tucked at his side?

18     A.   Yes.

19     Q.   Is it on the bed?

20     A.   Yes.

21     Q.   Where you can't see his arm?

22     A.   You can see his arm.

23     Q.   And how much of his arm can you see?

24     A.   A good majority of his arm, yes.

25     Q.   So he's more so on his back?

26     A.   No, not on his back.  He was up in an upward angle but

27  laying flat talking to me.  It was like his elbow was like down

28  the bed and kind of just relaxing.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 642

```
1        Q.    So you're saying he's sitting up?

2        A.    You can almost say sitting up but not exactly sitting

3   up.

4        Q.    Well, I don't want to say anything.  You tell us.

5        A.    Yeah.

6        Q.    Describe for us.  Is he in a seated position or a

7   laying back position?

8        A.    A laying back position but like pivoted towards me

9   where he's laying down on his elbow.

10        Q.    So he's laying on his back, but he's laying on his

11   elbow with his elbow in this sort of position?

12        A.    Yes.

13        Q.    And then you say that you're standing.  How far from

14   Nicholas -- and let me -- let me grab a photo.

15              I'm going to show you what's been marked for

16   identification as People's 284.  Do you see People's 284?

17        A.    Yes.

18        Q.    Where are you standing in that room when Nicholas is

19   laying on the bed?

20        A.    I was standing right here.

21        Q.    So you're in the opposite side of the room from the

22   entry, by numbers 19 and 20.  Is that what you said?

23        A.    Yes.  I believe 19 was a piano.

24        Q.    Let me show you People's 327.  Are you saying you're

25   back here back behind the bed?

26        A.    Yes.

27        Q.    And while you're back there, you say that you had the

28   gun at your side?
```

```
 1        A.   Yes.

 2        Q.   So you say that while you're back there you unrack the

 3    shells?

 4        A.   Yes, playingly unrack the shells.

 5        Q.   And then you think it's empty?

 6        A.   Correct.

 7        Q.   And then you put it down by your side?

 8        A.   Correct.

 9        Q.   That's what you said?

10        A.   Yes.

11        Q.   You set it on the ground?

12        A.   No.

13        Q.   You are still holding it up?

14        A.   Yes.

15        Q.   So show us -- can you stand up and show us how you're

16    holding it?

17        A.   After I was done racking it, then I kind of just held

18    it at my side like this.

19        Q.   Okay.  And it's pointing at Nicholas?

20        A.   Yes.

21        Q.   You're pointing a gun at him?

22        A.   Yes.

23        Q.   This wasn't to be silly?

24             MS. BLUMENTHAL:  Objection.  Argumentative.

25        Q.   BY MS. FOSTER:  Right?

26             THE COURT:  Overruled.

27             THE WITNESS:  My intention was not.  The process of it,

28    you know, I didn't mean to intend to point the gun at him, it
```

1    just kind of just dropped to my side while we were talking

2    together.

3        Q.    BY MS. FOSTER:  Okay.  Then you -- so you're saying you

4    accidentally pointed it towards him?

5        A.    Yes.  It -- I just had it and then it like rested on my

6    side and still talking to Nicholas.

7        Q.    Then you say you pulled the trigger?

8        A.    Yes.

9        Q.    So had you racked it one last time without a bullet

10   coming out?

11            Tell us the process.  Let me back up.  Tell us the

12   process of discharging this shotgun.

13       A.    As in like when it happened?

14       Q.    Yeah.  How do you shoot it?  You know, in general how

15   do you shoot this particular gun?

16       A.    You can put one in the tube.  If it's the one round,

17   you put one in the tube and then you rack the shotgun and the

18   tube would be in like a, in chambered inside the chamber, and

19   you click on the trigger and it would fire.

20       Q.    So describe for us now how you end up shooting

21   Nicholas?

22       A.    After I was done discharging the shells out, and I

23   believed in my memory that all the shells went out, then I took

24   the shotgun, I laid it down at my side, you know, and have it

25   rested, and I was talking to Nicholas, and in my best memory, I

26   clicked it without thinking, believing in my heart there was no

27   shells, no ammunition in it, in the shotgun, and one went off.

28       Q.    Okay.  So you pulled the trigger?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 645

1     A.    Correct.

2     Q.    You didn't click it, you actually pulled the trigger?

3     A.    Clicked it, yeah, pulled, yes.

4     Q.    And it takes some force to pull the trigger?

5     A.    It's a light trigger, so you can easily tap it and it

6     would go off.

7     Q.    And you tapped the trigger while pointing the gun at

8     Nicholas?

9     A.    My intention was not to point it, it's just how I had

10    it rested, and it ended up being pointed at him.

11    Q.    But that's what you did, you tapped the trigger while

12    pointing the gun at Nicholas?

13    A.    Yes.

14    Q.    Now, then you say after that that you -- that he stood

15    up?

16    A.    Not completely up.

17    Q.    So he sat up?

18    A.    Yes.

19    Q.    You also said at some point that he was standing and

20    you were holding him and he was over you?

21    A.    He was --

22          MR. MOORE:  Misstates the testimony, Your Honor.

23          THE COURT:  Overruled.

24          THE WITNESS:  He was over me.  I mean, he didn't stand

25    up completely, but he was over me.

26    Q.    BY MS. FOSTER:  So before when you said he was

27    standing, that's not true?

28    A.    Yes.

1          MS. BLUMENTHAL:  Objection.  Misstates his testimony --

2          THE COURT:  Overruled.

3          MS. BLUMENTHAL:  -- the way it's phrased.

4          THE COURT:  Overruled.

5     Q.   BY MS. FOSTER:  So you're saying to us that Nicholas

6     now was never standing?

7     A.   No, he wasn't standing.

8     Q.   He sits up on the bed, is that what you're saying?

9     A.   Yes.

10    Q.   And then he collapses on the bed?

11    A.   Well, when it happened, when the shot went out and like

12    when I heard the blast, that's when I started to see, I saw

13    Nick's hand and it was bleeding, and that's when he like --

14    everything all happened in seconds.

15    Q.   Okay.  So let's be clear.  You said before that he was

16    standing up and then he collapsed to the ground?  Is that not

17    true?

18    A.   I can't remember that.

19         MS. BLUMENTHAL:  Your Honor, I'm going to object.  That

20    misstates his testimony as to how he phrased it.

21         THE COURT:  Overruled.  The answer will remain.

22    Q.   BY MS. FOSTER:  So you're saying he was sitting on the

23    bed and then he collapses?

24         When he goes unconscious?

25    A.   In my arms, yes.

26    Q.   And then you lift him up and put him down on the floor?

27    A.   I kind of grabbed him, and I wanted to put him on the

28    floor, yes.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 647

```
 1        Q.   And Nicholas is six-seven?

 2        A.   Yes.

 3        Q.   Almost as big as LeBron James?

 4        A.   Yes.

 5        Q.   And you're about how tall?

 6        A.   Five foot nine.

 7        Q.   Nicholas is about 250, 260?

 8        A.   240.

 9        Q.   And you're?

10        A.   160.

11        Q.   Then you say that you went through the hallway and into

12   the kitchen?

13        A.   Yes.  My first attempt to reach the phone was to go

14   through the sliding door, but I was blocked because, you know,

15   the mechanism on the door does not work.

16        Q.   Let me pause you right there.

17             So you say your first attempt was to go through the

18   double doors?

19        A.   This door right here.

20        Q.   That's the double doors?

21        A.   That's the double doors.

22        Q.   And at that time Nicholas is already shot?

23        A.   Yeah.  Nicholas is on the ground.

24        Q.   He's already bleeding?

25        A.   Yes.

26        Q.   You're in shoes, right?

27             You're wearing shoes?

28        A.   Yes.
```

1    Q.   You're wearing shoes the whole time?

2    A.   Yes.

3    Q.   Never barefoot?

4    A.   Never barefoot.

5    Q.   You walk past Nicholas to those double doors?

6    A.   Yes.  That's when I went --

7    Q.   So you're already stepping in blood?

8    A.   Yes.

9    Q.   And then you say you go back through the hallway

10   because you couldn't get the doors open; is that right?

11   A.   Well, like I said, my first attempt to reach a phone

12   was through here.  Then I couldn't.  Then I went through the

13   door outside the room.

14   Q.   Through the hallway?

15   A.   Yeah, through the hallway.

16   Q.   And at this time you're going through the hallway, you

17   already have the blood on your shoes?

18   A.   Correct.

19   Q.   And --

20        MR. MOORE:  Speculation.  Foundation.

21        THE COURT:  Overruled.  He answered the question.

22   Q.   BY MS. FOSTER:  You walk through the hallway and you

23   said you head towards the kitchen?

24   A.   Correct.

25   Q.   And you're saying Nicholas never left that room?

26   A.   Correct.

27   Q.   Show you what's been marked for identification as

28   People's 48.  Do you recognize People's 48?

1      A.   Correct.

2      Q.   That's the hallway?

3      A.   Yes.

4      Q.   And you see the blood stains going all through the

5   hallway?

6      A.   Yes.

7      Q.   You're saying that those are all blood from you?

8      A.   Correct.

9      Q.   From your hands?

10      A.   From my hands.

11      Q.   And you never washed your hands, right?

12      A.   No.

13      Q.   So you're saying your hands were covered in so much

14   blood that they left these large blood stains?

15      A.   Yes.

16      Q.   And you said when you got to the kitchen that you

17   leaned towards the sink; is that right?  And I'm showing you

18   People's 34.  Is that right?

19      A.   I remember I was running really, really fast, and I was

20   grabbing anything to kind of just like kind of help me be

21   stable.

22      Q.   So you're saying you left these blood stains as well?

23      A.   Correct.

24      Q.   I'm going to show you People's 24.  You recognize

25   People's 24?

26           That's the hallway right outside Nicholas's door; is

27   that right?

28      A.   Correct.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 650

1   Q.   I'm sorry?

2   A.   Outside his door?  Yes.

3   Q.   And you're saying that you left that spray there too?

4   A.   Yes.

5   MR. MOORE:  Objection.  Argumentative as to the term

6   "spray."

7   THE COURT:  Overruled.  I'll allow it.

8   Q.   BY MS. FOSTER:  Just give me one second.

9   A.   Yes, ma'am.

10  Q.   Well, we seen the photograph earlier of the stove.  Do

11  you remember seeing that photograph?

12  A.   It would help if you could show it to me.

13  Q.   All right.  I'm trying.

14  MS. FOSTER:  Madam clerk, do we have all the

15  photographs?

16  THE CLERK:  I'll double-check.

17  THE COURT:  All right.  What we'll do is we'll take an

18  early lunch.  We'll keep the lawyers here, because we have to

19  discuss some issues regarding the exhibits.  Come back here at

20  1:25.

21  Remember, do not talk about the case or about any of

22  the people.  Do not conduct any research.  Keep an open mind.

23  All jurors are ordered to appear at 1:25 out in the hallway.

24  1:25.

25  (Proceedings were held out of the presence of the jury:)

26  THE COURT:  All right.  Let's talk about the exhibits.

27  The People rested and we were supposed to do that before the

28  lunch hour anyway.  And then -- and then you can just look for

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 651

```
 1   the exhibit that you're looking for.
 2          All right.  At this time People's -- are you ready to
 3   move in the exhibits?
 4          MS. FOSTER:  Yes.
 5          THE COURT:  Do you want to take a moment, because we
 6   had a lot of them.
 7          MS. FOSTER:  May we have a moment so we can look at the
 8   reporter's, I mean, the clerk's list, and then separate to make
 9   sure?
10          THE COURT:  Sure.
11                        (Brief pause.)
12          MS. FOSTER:  There is no objections.
13          MS. BLUMENTHAL:  Your Honor, we had no objection to any
14   of the exhibits that were actually used.
15          THE COURT:  All right.  Well, we'll need to put that on
16   the record.  So if you want to take a look at the list.
17          MS. BLUMENTHAL:  I believe the ones that were used
18   madam clerk had marked that specifically on the exhibit list.
19          THE CLERK:  I tried to keep up with it.
20          THE COURT:  Deputy, if you want to take the defendant
21   back to his seat.
22          I'll take a quick break.  I'll be back out in about
23   five minutes.  We can do it right before the lunch hour.
24          THE CLERK:  Okay.
25          THE COURT:  All right.
26          MS. BLUMENTHAL:  Or, Your Honor, if we can work into
27   the lunch hour, and we can put it on the record right when we
28   get back.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 652

```
 1              THE COURT:  If you promise me it will be done right at
 2    1:30.
 3              MS. BLUMENTHAL:  Yes.  Promise.
 4              THE COURT:  Okay.  Then based upon counsel's
 5    representation, both counsels', we'll do it at 1:30.  So work on
 6    it during the lunch hour then.
 7              MS. BLUMENTHAL:  Thank you, Your Honor.
 8              MS. FOSTER:  Thank you, Your Honor.
 9              THE COURT:  Court's in recess.
10                         (Noon recess.)
11         (Proceedings were held in the presence of the jury:)
12              THE COURT:  Back on the record.  All jurors are
13    present, all parties are present.
14              THE COURT:  Go ahead.
15       Q.   BY MS. FOSTER:  So I think we left off talking about
16    you going into the kitchen.  Do you remember?
17       A.   Yes.
18       Q.   So you're saying that, and I'm going to show you
19    People's 32.  That all of this blood on People's 32 came from
20    your hands?
21       A.   Correct.
22       Q.   And, again, you were wearing tennis shoes when you
23    walked through the house; is that correct?
24       A.   Correct.
25       Q.   Now, all the blood that you got -- you weren't injured,
26    right?
27       A.   Correct.
28       Q.   You had no injuries to yourself?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 653

1      A.   Correct.

2      Q.   So all the blood is off of Nicholas?

3      A.   Correct.

4      Q.   And most of the blood was still on Nicholas and coming

5   from Nicholas; is that right?

6           MR. MOORE:  Objection.  Argumentative.

7           THE COURT:  Overruled.

8           THE WITNESS:  The blood that came from Nicholas was all

9   from his hand, the wound, but from me doing CPR and touching his

10  chest.

11     Q.   BY MS. FOSTER:  Well, from the arm?

12     A.   Yes.

13     Q.   And most of the blood was --

14          MS. BLUMENTHAL:  Objection.  That misstated his

15  testimony just now.

16          THE COURT:  All right.  I just came back from lunch.  I

17  got to start paying more close attention.  You put me on the

18  spot.

19          Madam court reporter, could you read the question,

20  please?

21               (Record read as requested.)

22          THE WITNESS:  Correct.

23          THE COURT:  Overruled.

24     Q.   BY MS. FOSTER:  And you said, "on his hand."  You meant

25  on his arm, right?

26     A.   Yes.

27     Q.   Now, between the time that you were touching Nicholas

28  and walking through and touching the house, you're saying that

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 654

```
 1    your hands had enough blood to leave all those smears around?

 2         A.   Correct.

 3         Q.   And you didn't wash your hands before going to get

 4    help, right?

 5         A.   No.

 6         Q.   And you didn't wash your hands before the police

 7    arrived?

 8         A.   No.

 9         Q.   Showing you what's been marked for identification as

10    People's 256.  Do you recognize what's depicted in People's 256?

11         A.   Correct.

12         Q.   That's the top of your hand, right?

13         A.   Yes.

14         Q.   It's not covered in blood?

15              MR. MOORE:  Argumentative.

16              THE COURT:  Overruled.

17              MR. MOORE:  And Counsel is testifying as phrased.

18              THE COURT:  Overruled.

19         Q.   BY MS. FOSTER:  It's not covered in blood, is it?

20         A.   There is blood on my fingers, fingernails.

21         Q.   But your hand is not covered in blood, is it?

22         A.   The top of the hand.

23         Q.   I'm sorry?

24         A.   The top of the hand.

25         Q.   Is covered in blood?

26         A.   No.

27         Q.   Your hand is not covered in blood, is it?

28         A.   The top of the hand, yes.
```

```
 1        Q.   You're saying the top of your hand is covered in blood?

 2        A.   No, it's not.

 3        Q.   Show you People's 255.  Do you recognize what's

 4   depicted in People's 255?

 5        A.   Yes.

 6        Q.   And that's your other hand?

 7        A.   Yes.

 8        Q.   And that hand is not covered in blood?

 9        A.   No.  You can see blood.

10        Q.   There is blood on it, right?

11        A.   Yes.

12        Q.   But it's not covered in blood?

13             MR. MOORE:  Argumentative.

14             THE COURT:  Overruled.

15             THE WITNESS:  I guess you could say that, yes.

16        Q.   BY MS. FOSTER:  Showing you People's 254.  It's your

17   hand again, right?

18        A.   Yes.

19        Q.   And it's the underside of your hand?

20        A.   Yes.

21        Q.   And that side of your hand has some blood on it but

22   it's not covered in blood?

23             MR. MOORE:  Argumentative.

24             THE COURT:  Overruled.

25             THE WITNESS:  Correct.

26        Q.   BY MS. FOSTER:  Showing you -- that's the underside of

27   your other hand; is that correct, your left hand?

28        A.   Correct.
```

```
 1        Q.    And that, again, is not covered in blood?
 2        A.    In the lighting you can't really tell, but that would
 3   be correct, it's not covered.
 4        Q.    Is that better?
 5        A.    There is blood but not covered.
 6        Q.    There is not large amounts of blood on your hand?
 7              MR. MOORE:  Your Honor, Counsel is testifying.
 8              THE COURT:  Overruled.
 9        Q.    BY MS. FOSTER:  Is that right?
10        A.    There is a good amount to me.
11        Q.    I'm going to show you what's been marked for
12   identification as People's 55.
13              Now, you see the room that day in People's 55, right?
14        A.    Yes.
15        Q.    And you see all the blood on the bed?
16        A.    Yes.
17        Q.    And that blood all came from Nicholas; is that right?
18        A.    Yes.
19        Q.    And you could see Nicholas's body?
20        A.    Yes.
21        Q.    And Nicholas is covered in blood?
22        A.    Yes.
23        Q.    And the blood that's on the bed, that's from Nicholas?
24        A.    Yes.
25        Q.    So you explained that you were frantic and holding
26   yourself steady to hold the counter.  I'm showing you People's
27   32.  And there is blood all over the stove.
28              MS. BLUMENTHAL:  Objection.  Counsel is testifying.
```

```
 1    There is no question.
 2            THE COURT:  Overruled.
 3        Q.  BY MS. FOSTER:  Is that right?
 4        A.  Yes.
 5        Q.  And when you told us your entire story of what
 6    happened, you didn't mention touching the stove?
 7            MS. BLUMENTHAL:  Your Honor, I'm going to object to the
 8    use of the word "story" as being argumentative.
 9            THE COURT:  As phrased, it's argumentative.  Do you
10    want to rephrase it?
11        Q.  BY MS. FOSTER:  When you just told us your third or
12    fourth version of what happened --
13            MR. MOORE:  Argumentative.
14            THE COURT:  Overruled.
15        Q.  BY MS. FOSTER:  Your third or fourth version of what
16    happened, you didn't mention touching the stove?
17            MR. MOORE:  And vague as to what she's referring to by
18    "third or fourth version."
19            MS. BLUMENTHAL:  And also stating that they didn't ask
20    any questions about touching the stove.
21            THE COURT:  Overruled.
22        Q.  BY MS. FOSTER:  You didn't mention touching the stove?
23        A.  No.
24        Q.  And now you're saying that this is you that touched the
25    stove?
26        A.  Yes.
27        Q.  And you were holding yourself up here as well?
28        A.  Yes.  Like I said, when I got the phone, I ran with
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 658

1    everything I have.  And I know most likely I did touch the stove

2    when I was running to balance myself.

3         Q.   You don't have no memory of touching the stove?

4         A.   I do remember reaching out and grabbing things

5    frantically.  I did push myself off to run faster.

6         Q.   Were you grabbing the knobs as well?

7         A.   Not grabbing it, most likely touching.

8         Q.   And you're saying "most likely."  Are you saying that

9    because you're guessing that that's what you did or --

10        A.   No.  I believe.

11        Q.   The only thing is, she has to type what both of us say,

12   so you have to let me finish.

13        A.   Okay.

14        Q.   So are you guessing that's what you did or you know

15   that's what you did?

16        A.   I know that's what I did.

17        Q.   And you left that out when you were telling us this

18   version, why?

19             MS. BLUMENTHAL:  Objection.

20             MR. MOORE:  Argumentative.

21             THE COURT:  Overruled.

22             THE WITNESS:  To me it may be important but --

23             THE COURT:  I'm sorry.  There is no question pending.

24             MR. MOORE:  But there is.

25             MS. FOSTER:  The question was:  Why?

26             THE COURT:  Oh, I'm sorry.  I didn't hear that.

27             MS. FOSTER:  I apologize.

28             THE COURT:  All right.  You may answer the question if

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 659

 1    you understand it.

 2         THE WITNESS:  The most important thing for me was

 3    getting towards Nicholas.  And if I can remember if I did touch

 4    something to balance myself, detail is not important because I

 5    was going to get Nicholas.

 6         Q.   BY MS. FOSTER:  Well, you want to tell us the whole

 7    truth, right?

 8         A.   Yes.

 9         MS. BLUMENTHAL:  Objection, Your Honor.  Argumentative.

10         THE COURT:  Do you want to finish the question?

11         MS. FOSTER:  That was the question and the answer.

12         THE COURT:  Overruled.

13         Q.   BY MS. FOSTER:  And each detail is important, right?

14         A.   Yes.

15         Q.   Are there more details that you want to tell us that

16    you left out?

17         A.   No.

18         Q.   So let's talk about the 911 call, okay?  Let's talk

19    about when you left that room.  You said that you were frantic

20    and that you went outside yelling for neighbors' help; is that

21    correct?

22         A.   Correct.

23         Q.   And then you said that a neighbor told you they were

24    going to call the police?

25         A.   Correct.

26         Q.   And then another neighbor came along and followed you

27    inside?

28         A.   Correct.

```
 1        Q.   And you heard the testimony of that neighbor?

 2        A.   Correct.

 3        Q.   Alan Juarez, right?

 4        A.   Correct.

 5        Q.   And when Mr. Juarez followed you inside, you were

 6   emotional?

 7        A.   Correct.

 8        Q.   You appeared to be crying?

 9        A.   Correct.

10        Q.   You grabbed Nicholas's body?

11        A.   Correct.

12        Q.   And so everything he's saying is true of what you

13   recall happening?

14             MS. BLUMENTHAL:  Objection, Your Honor.  That calls for

15   speculation on the witness's testimony.

16             THE COURT:  As phrased, it's sustained.  If you want to

17   rephrase the question.

18             MS. FOSTER:  Okay.

19        Q.   BY MS. FOSTER:  You recall Alan Juarez saying you

20   grabbed Nicholas's body, right?

21        A.   Yes.

22        Q.   And that's true?

23        A.   Yes.

24             MS. BLUMENTHAL:  Objection, Your Honor.

25             THE COURT:  Overruled.

26        Q.   BY MS. FOSTER:  You recall Alan Juarez saying that you

27   were trying to do CPR on Nicholas's body?

28        A.   Correct.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 661

```
1        Q.    And that's true?

2        A.    Correct.

3        Q.    And then you heard Alan Juarez say that you told him

4   your friend shot hisself?  You heard him say that?

5        A.    He said that, yes.

6        Q.    And that's true?

7        A.    No.

8        Q.    So you did not tell Alan Juarez that Nicholas committed

9   suicide?

10             MS. BLUMENTHAL:  Objection, Your Honor.  That misstates

11   the way the question was formed previously.

12             THE COURT:  Yes.  Rephrase that question.  Sustained.

13             MS. FOSTER:  Okay.

14        Q.    BY MS. FOSTER:  What did you tell Alan Juarez that

15   happened in that room?  How did you tell -- let me clarify.  How

16   did you tell him Nicholas died?

17        A.    I can't remember that.

18        Q.    Okay.  You don't recall telling him that Nicholas shot

19   hisself?

20        A.    No.

21        Q.    And you do recall telling that to the police officer?

22        A.    My memory, if I did, I would have to see the reports,

23   but I can't remember.

24        Q.    Well, you heard us play the tape --

25        A.    Yes.

26        Q.    -- of your interview -- let me finish.

27             You heard us play the tape of your interview with

28   Deputy Kurylowicz, right?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 662

```
 1        A.   Yes.

 2        Q.   And you heard your voice on the tape?

 3        A.   Correct.

 4        Q.   And that was you?

 5        A.   Yes.

 6        Q.   And you heard what you told Deputy Kurylowicz?

 7        A.   Yes.

 8        Q.   Okay.  So you told him that Nicholas shot hisself,

 9   right?

10        A.   Correct.

11        Q.   You do remember that?

12        A.   From the video, yes.

13        Q.   Well, it was audio, you remember?

14        A.   Yes.

15        Q.   So you remember telling him Nicholas shot hisself?

16        A.   Yes.

17        Q.   That was your first story, right?

18        A.   Yes.

19        Q.   And you told Alan Juarez the same thing, that Nicholas

20   shot himself?

21        A.   I can't remember if I told him that, but I do remember

22   from the video, the audio.

23        Q.   And Deputy Kurylowicz arrives at the house less than 40

24   minutes after you get there, right?

25        A.   Correct.

26        Q.   And within that 40 minutes your friend dies, right?

27        A.   Correct.

28        Q.   And 911 is called, right?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 663

```
 1        A.   Correct.

 2        Q.   And in 40 minutes is kind of a short amount of time,

 3   right?

 4             MR. MOORE:  Vague.

 5             MS. BLUMENTHAL:  Objection.  Argumentative and vague.

 6             THE COURT:  Sustained as to argumentative.

 7        Q.   BY MS. FOSTER:  And in that 40 minutes you had already

 8   decided to tell the police a lie; isn't that right?

 9        A.   Correct.

10        Q.   And you stated that you were frantic, right?

11        A.   Correct.

12        Q.   But during that time that you're frantic and emotional

13   in front of Alan Juarez, you're coming up with this lie?

14        A.   Correct.

15        Q.   So you weren't just focusing on Nicholas, you were

16   focusing on yourself; is that right?

17        A.   After I did everything I could for Nicholas and I was

18   by myself, yes.

19        Q.   You started to come up with a lie?

20        A.   Yes.

21        Q.   And the lie that you decided to tell was to blame

22   Nicholas for his own death?

23        A.   Yes.

24        Q.   And when you're telling Deputy Kurylowicz this lie,

25   you're emotional?

26        A.   Yes.

27        Q.   You're sad?

28        A.   Of course.
```

```
1      Q.   You're crying at points?

2      A.   Yes.

3      Q.   But you're still lying?

4      A.   Yes.

5      Q.   And you decided to tell this lie because you knew there

6  were no other witnesses to say something different, right?

7      A.   Yes.

8      Q.   You knew the only other witness was dead; is that

9  right?

10     A.   Correct.

11     Q.   So you said when you were by yourself after you tried

12 to save him, that's when you came up with the lie, right?

13     A.   I didn't come up with it, it just came out.

14     Q.   That's when you formed it in your brain?

15     A.   I believe that's when I believe I formed that when the

16 officers arrived.

17     Q.   Okay.  Just a moment ago you said when you were by

18 yourself, after you did everything you could for him, that's

19 when you came up with this lie?  Do you remember saying that?

20     A.   I remember after saying after I did everything I could

21 for Nicholas, then the officer came to me.

22     Q.   That's when you came up with the lie?

23     A.   Yes.

24     Q.   Now, this lie was pretty detailed, right?

25     A.   I believe so.

26     Q.   And you talk about Nicholas's mother, Ana McCauley, as

27 like a second mom to you, right?

28     A.   Yes.
```

1    Q.   And you included Ana McCauley in that lie, didn't you?

2    A.   I can't remember if I did.

3    Q.   Do you remember telling Deputy Kurylowicz that the

4    reason Nicholas was depressed was because he had been fighting

5    with his mother?

6    A.   I believe so.

7    Q.   You told him that she had told you about him being

8    depressed.  Do you recall that?

9    A.   Yes.

10   Q.   And so in telling Deputy Kurylowicz this, you're

11   telling him that Nicholas is depressed to further confirm your

12   lie, right?

13        To make it sound more realistic?

14        MR. MOORE:  Objection.

15        I'll withdraw the objection.

16        THE WITNESS:  Yes.

17   Q.   BY MS. FOSTER:  So you're trying to make Nicholas look

18   bad in order to take the attention away from you having shot

19   him?

20   A.   No, not to make him look bad, just trying to escape the

21   situation.

22   Q.   You told Deputy Kurylowicz within the first five

23   minutes of your recorded conversation, page 1, line 20, "He's

24   diagnosed with, you know, the whole mental facility and all."

25   You told him that, right?

26   A.   Yes.

27   Q.   He didn't ask you that, you volunteered it, right?

28   A.   Yes.

1    Q.   And then he asked you "What is he diagnosed with?"  And

2    you replied "Probably depression," right?

3    A.   Yes.

4    Q.   So this is within an hour of your best friend dying

5    that you are telling this story?

6    A.   Yes.

7    Q.   And then you were specific in telling him that he went

8    to Chino Hospital, right?

9    A.   Yes.

10    Q.   So you used a lot of detail to make it sound like

11    Nicholas killed hisself out of depression?

12    A.   Yes.

13    Q.   And when you were telling this to Deputy Kurylowicz,

14    you were trying to trick him, right?

15    A.   No.

16    Q.   You were trying to get him to believe that the death

17    was a suicide?

18    A.   At the time, yes.

19    Q.   Matter of fact, you went so far as to completely remove

20    yourself from the room when you told that first version, right?

21    A.   I don't understand what you mean.

22    Q.   Okay.  So you told Deputy Kurylowicz that you went into

23    the kitchen to grab a Pepsi?

24    A.   Yes.

25    Q.   And that you had left the gun on a table; is that

26    right?

27    A.   Yes.

28    Q.   And you told him that you were at the refrigerator,

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 667

```
 1    right?
 2        A.   Yes.
 3        Q.   And that Nicholas and the gun were in the room?
 4        A.   Yes.
 5        Q.   And you even told him that he must have loaded it?
 6        A.   Yes.
 7        Q.   And that's all a lie?
 8        A.   Yes.
 9        Q.   Then you told him that when you were getting your Pepsi
10    that you heard the gun racking.  Do you recall telling him that?
11        A.   Correct.
12        Q.   And you said you heard it rack three or four times?
13        A.   Correct.
14        Q.   And that's all a lie?
15        A.   Correct.
16        Q.   Then you said after you heard a racking, you get your
17    Pepsi and you start heading back to the bedroom, right?
18        A.   Correct.
19        Q.   And you told him you heard a blast?
20        A.   Correct.
21        Q.   And then you enter the room?
22        A.   Correct.
23        Q.   And that's all a lie?
24        A.   Correct.
25        Q.   Now, you repeated that story to Deputy Kurylowicz
26    during your conversation about three or four times, right?
27        A.   I believe so, yes.
28        Q.   And the entire time you're telling him this detailed
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 668

1    lie, you're still emotional?

2         A.   Of course.

3         Q.   And you're still sad?

4         A.   Of course.

5         Q.   But you're lying?

6         A.   Not about my feelings.

7         Q.   Now, today's version also differs from the first

8    version what you told Deputy Kurylowicz, in that you told Deputy

9    Kurylowicz you were just going there to go skeet shooting; is

10   that right?

11        A.   Correct.

12        Q.   You didn't mention any zombie movie; is that right?

13        A.   Correct.

14        Q.   You didn't mention stealing your dad's gun?

15        A.   Correct.

16        Q.   You didn't mention coming just to show Nicholas a gun,

17   right?

18        A.   I did not mention that, no.

19        Q.   And that part doesn't -- doesn't make you look bad,

20   right?

21             MS. BLUMENTHAL:  Objection.  Argumentative?

22             THE COURT:  Overruled.

23             THE WITNESS:  I guess not.

24        Q.   BY MS. FOSTER:  So why would you lie about that?

25        A.   Just, you know, overall fear and panic and realization

26   I did something horribly wrong.

27        Q.   So you just decided to lie to him about all the

28   details; is that right?

```
1        A.    In that conversation with him, yes.

2        Q.    And you did that because you were scared to get in

3   trouble?

4        A.    Of course.

5        Q.    And your details went as far as to set the stage for

6   why Nicholas would kill himself; is that right?

7        A.    I believe so.

8        Q.    You told Deputy Kurylowicz that him and his mom are

9   clashing, and that he's dealing with a lot of problems, and he

10  really needed you to take him skeet shooting?

11       A.    Correct.

12       Q.    And that was all a lie?

13       A.    Correct.

14       Q.    And you told him that so he would believe your story

15  about Nicholas committing suicide?

16       A.    Correct.

17       Q.    You went further talking about Ana and saying that his

18  mom was pushing him to the edge.  Do you remember telling him

19  that?

20             MR. MOORE:  Asked and answered.

21             THE COURT:  Overruled.

22             THE WITNESS:  Correct.

23       Q.    BY MS. FOSTER:  Do you remember even telling him that

24  he had mentioned killing his mother?

25       A.    Correct.

26       Q.    And that was all a lie?

27       A.    Correct.

28       Q.    And you just said that so that Deputy Kurylowicz would
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 670

 1   believe Nicholas committed suicide?

 2       A.   Correct.

 3       Q.   You never once told Deputy Kurylowicz that you guys

 4   were just playing around with a gun?

 5       A.   Correct.

 6       Q.   You never once told him that your finger just slipped

 7   and hit the trigger?

 8       A.   Correct.

 9       Q.   Your story to him was that Nicholas shot himself?

10            MS. BLUMENTHAL:  Objection.  Asked and answered by now,

11   Your Honor.

12       Q.   BY MS. FOSTER:  Is that right?

13            THE COURT:  Overruled.

14            THE WITNESS:  Correct.

15       Q.   BY MS. FOSTER:  And you -- your story to him was that

16   Nicholas shot himself because he was depressed; is that right?

17       A.   Correct.

18       Q.   But Nicholas is not dead because he was depressed,

19   correct?

20       A.   Correct.

21       Q.   He's dead because you shot him?

22       A.   Accidentally, yes.

23       Q.   But he's dead because you shot him?

24       A.   Yes.

25       Q.   You even further tried to substantiate this version of

26   suicide to Deputy Kurylowicz by saying that Nicholas talked

27   about committing suicide, but said he would never do it, but his

28   mom and pills and medication will push him to the edge?

1          MS. BLUMENTHAL:  Objection.  Compound question.

2          THE COURT:  It is compound, but I'll allow it.

3  Overruled.

4          THE WITNESS:  Correct.

5     Q.   BY MS. FOSTER:  And you added that fact so you could

6  substantiate your lie about suicide?

7     A.   Correct.

8     Q.   Now, you tell this story, or this version where

9  Nicholas commits suicide because of his mother.  That's the

10  version you told Deputy Kurylowicz on November --

11          MS. BLUMENTHAL:  Objection.  Asked and answered several

12  times.

13          THE COURT:  I'm sorry.  Can you finish the question?

14     Q.   BY MS. FOSTER:  That's the version of the story that

15  you're telling Deputy Kurylowicz on November 10th, 2015?

16          THE COURT:  Overruled.

17          THE WITNESS:  Yes.

18     Q.   BY MS. FOSTER:  And when you told the story, you knew

19  Ana had been gone to work, right?

20     A.   Ana was at work at the time, yes.

21     Q.   As a matter of fact, you knew she would be gone to work

22  before you even left the house?

23     A.   I can't say so.  You know, some days she may have the

24  day off.  I don't know her schedule completely.

25     Q.   But you testified earlier you knew she wouldn't be

26  there?

27     A.   Yeah, most likely she wouldn't be there for school.

28     Q.   When you're talking to Deputy Kurylowicz, you never

```
1   once tell him about your text messages; is that right?

2       A.   Correct.

3       Q.   You never once tell him that you told Nicholas you were

4   going to shoot him?

5       A.   Correct.

6       Q.   You never once told him that you had texted Nicholas

7   about a cold sore in your mouth?

8       A.   Correct.

9       Q.   And Deputy Kurylowicz asked you if you had been texting

10  each other all day and night, and you said, "No"; is that right?

11      A.   I can't remember if I did or not.

12      Q.   Would it refresh your recollection to read the

13  transcript of your interview?

14      A.   Yes.

15           MS. FOSTER:  Directing the Court and Counsel to line --

16  page 22.  Page 22, lines 17 through 19.

17           May I approach?

18           THE COURT:  Yes.

19      Q.   BY MS. FOSTER:  If you could just read lines 17 through

20  19 to yourself and look up when your memory is refreshed.

21           Is your memory refreshed?

22      A.   Yes.

23      Q.   Deputy Kurylowicz asked you if you've been texting all

24  day and night, and you said, "No"?

25      A.   Well, I believe he was referring to that particular

26  day.  It doesn't say like if he was referring to yesterday or

27  the day before that.

28      Q.   Did you tell him about any of your texts?
```

1     A.   No.

2     Q.   You said, "No."

3          You don't refer to any texts, right?

4          You never mentioned to him that you had been sending

5     Nicholas threatening text messages?

6     A.   No.

7     Q.   You didn't want the police to know about those text

8     messages?

9     A.   Not like I didn't want them to know.  It's wasn't a big

10    thing.

11    Q.   You didn't want the police to know about those text

12    messages, did you?

13         MS. BLUMENTHAL:  Objection.  Asked and answered.

14         THE COURT:  Overruled.

15         THE WITNESS:  That wasn't on my mind at that point.

16    Q.   BY MS. FOSTER:  Now, you repeated this suicide version

17    to Deputy Kurylowicz four different times during that interview;

18    is that right?

19    A.   I believe so.

20    Q.   And during the fourth time, you admit or change and say

21    the gun was loaded.  Do you recall that?

22    A.   I believe so.

23    Q.   And you go back and forth about whether it was loaded

24    or whether it was -- or Nicholas loaded it himself, right?

25    A.   Yes.

26    Q.   So within the conversation with Deputy Kurylowicz

27    you're changing your story?

28    A.   Correct.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 674

1    Q.   And your entire story to Deputy Kurylowicz is lies?

2    A.   Correct.

3         MR. MOORE:  I'm going to object as argumentative and

4    vague as to "the entirety."

5         THE COURT:  Sustained on vagueness.

6         MR. MOORE:  Motion to strike.

7         THE COURT:  If there was an answer, it will be

8    stricken.  Or you could rephrase the question.

9    Q.   BY MS. FOSTER:  Now, when you're lying to Deputy

10   Kurylowicz, you're lying to save yourself from getting into

11   trouble; is that right?

12        MR. MOORE:  Argumentative.

13        THE COURT:  Overruled.

14        THE WITNESS:  Yes.

15   Q.   BY MS. FOSTER:  And are you lying to save yourself from

16   getting in trouble now?

17   A.   No.

18   Q.   You don't just talk to Deputy Kurylowicz, you go to the

19   station and you talk to Investigator Dean; is that right?

20   A.   Correct.

21   Q.   And when you get to the station and talk to

22   Investigator Dean, you start off by telling him that same

23   suicide story; is that right?

24   A.   Correct.

25   Q.   So you get to the station, you sit down and you -- in a

26   room, and you talk to Investigator Dean, right?

27   A.   Correct.

28   Q.   And you have an opportunity to tell the truth?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 675

```
 1        A.   Correct.

 2        Q.   And you don't take this opportunity but instead lie

 3    again?

 4        A.   Correct.

 5        Q.   And, again, you blame Nicholas; is that right?

 6        A.   Correct.

 7        Q.   You continue to say that Nicholas was depressed, right?

 8        A.   Correct.

 9        Q.   And you continue to blame his mother?

10        A.   Correct.

11        Q.   And that's all lies?

12        A.   Correct.

13        Q.   And you lied straight to his face?

14        A.   Correct.

15        Q.   And at that time even at the station you were

16    emotional?

17        A.   Correct.

18        Q.   And some crying?

19        A.   Yes.

20        Q.   And you actually still have Nicholas's blood on you?

21        A.   Yes.

22        Q.   But you're lying?

23        A.   Yes.

24        Q.   At some point while you're talking to Investigator

25    Dean, he comes back and tells you "The scene doesn't lie."  Do

26    you remember him saying that to you?

27        A.   I don't remember.

28        Q.   And he tells you that Nicholas's wound is in his arm,
```

```
 1   right?

 2        A.   Correct.

 3        Q.   And he tells you that it couldn't be suicide?

 4        A.   Correct.

 5        Q.   And you start to change your story?

 6        A.   Yes.

 7        Q.   So the first version is suicide, right?

 8             MS. BLUMENTHAL:  Objection.  Counsel is testifying.

 9   Also this has been asked and answered many times on that

10   particular phrase.

11             THE COURT:  Overruled.

12        Q.   BY MS. FOSTER:  Now we're going into the second

13   version, right?

14        A.   Correct.

15        Q.   And in this second version, you basically claim that

16   the two of you were touching the gun and it was an accident?

17        A.   Correct.

18        Q.   Similar to here, but not the same; is that right?

19             MS. BLUMENTHAL:  Objection.  It's argumentative as

20   phrased.

21             THE COURT:  Overruled.

22             THE WITNESS:  Correct.

23        Q.   BY MS. FOSTER:  And you don't tell this second version

24   until after you've been told that they don't believe it's

25   suicide, right?

26        A.   Right.

27             MS. BLUMENTHAL:  Asked and answered, Your Honor.

28             THE COURT:  Overruled.
```

 1      Q.   BY MS. FOSTER:  You tell Detective Dean that "I still
 2   didn't pull the trigger, but like accidental discharged."
 3   That's what you change your story to, right?
 4      A.   I believe so.
 5      Q.   You tell Investigator Dean that you had pointed it and
 6   didn't know that a round was chambered, and then you clicked it?
 7      A.   Correct.
 8      Q.   And that's similar to what you said today?
 9      A.   Correct.
10      Q.   You told him that you guys were playing with the gun,
11   right?
12      A.   Correct.
13      Q.   And that he pumped the shells, right?
14      A.   Right.
15      Q.   But today you're saying you pumped the shells?
16      A.   Yes.
17      Q.   And you told Investigator Dean that he pumped it and he
18   took -- he took it.  And that part is true.  Is that what you
19   said?
20      A.   On the statements?
21           MR. MOORE:  Vague as to what the question reads.
22           MS. FOSTER:  I apologize.
23           THE COURT:  Yes.  Sustained on vagueness.  If you want
24   him to refresh his memory, you're allowed to approach the
25   witness.
26           MS. FOSTER:  Thank you.
27      Q.   BY MS. FOSTER:  In your second story, in your second
28   version when you were talking to Investigator Dean, you told him

 1    that Nicholas pumped it and you took it, and that part is true,
 2    right?
 3        A.   I believe so, yes.
 4        Q.   And when you say "that part is true," you're saying
 5    that part of your original story was true?
 6            MR. MOORE:   I'm going to object as to vague and
 7    argumentative.
 8            THE COURT:   The way it's phrased, it is vague.   You
 9    want to rephrase it?
10        Q.   BY MS. FOSTER:   In the suicide story -- in the suicide
11    version, I'm sorry, you said that Nicholas was the one who
12    pumped the gun, right?
13        A.   Yes.
14        Q.   When you're talking to Investigator Dean, you again say
15    "Nicholas is the one who pumped the gun," and you go as far as
16    to say "that part is true"; is that correct?
17        A.   I believe so.
18        Q.   And that you saying that that part of the original
19    version was true?
20        A.   I believe so, yes.
21        Q.   And so this is, when you're telling this second
22    version, this is the time where you're supposed to be coming
23    clean to Investigator Dean?
24            MR. MOORE:   Argumentative.
25            THE COURT:   Sustained on argumentative.
26        Q.   BY MS. FOSTER:   When you tell the second version, this
27    is the point where you decide to tell Investigator Dean you're
28    going to tell him the whole story; is that right?

```
 1        A.    Correct.

 2        Q.    I'm sorry?

 3        A.    Correct.

 4              MR. MOORE:  Again, that's argumentative, Your Honor.

 5              THE COURT:  Overruled.

 6        Q.    BY MS. FOSTER:  But you tell him this lie that Nicholas

 7   was the one who pumps the gun; is that correct?

 8        A.    Correct.

 9        Q.    So in your second version you're still not being

10   truthful with Investigator Dean?

11        A.    That's correct.

12        Q.    Now, you go on to say in the second version that after

13   Nicholas pumped the shells out, that he gives the gun back to

14   you; is that correct?

15        A.    Correct.

16        Q.    And you then say that you didn't know another shell was

17   in there?

18        A.    Correct.

19        Q.    And then you go on to say that it was pointed at him

20   and you accidentally pulled the trigger?

21        A.    Correct.

22        Q.    Believing that all the shells were out of the gun,

23   right?

24        A.    Correct.

25        Q.    And it clicked and went "Boom"?

26        A.    Right.

27        Q.    And that's a lie?

28        A.    Correct.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 680

1          MR. MOORE:  Vague as to which part and, essentially, a
2    compound question as phrased.
3          THE COURT:  It's sustained on vagueness.  If you want
4    to rephrase the question.  Be more specific.
5          MR. MOORE:  Motion to strike.
6      Q.  BY MS. FOSTER:  What you told --
7          THE COURT:  If there was an answer -- I'm sorry.  If
8    there was an answer, the answer will be stricken.
9      Q.  BY MS. FOSTER:  What you told Investigator Dean about
10   how it happened, how Nicholas was shot in that room was a lie?
11     A.  Yes.
12     Q.  And at the time that you were telling the second
13   version, you were telling Investigator Dean that it was just an
14   accident, right?
15     A.  Yes.
16     Q.  And today you're saying that it was just accidental?
17     A.  Yes.
18     Q.  So why didn't you tell him this same accidental version
19   that you told us?
20     A.  I guess you could say every one lie just kind of had
21   the snowball effect and it was just coming out of me.
22     Q.  So you're saying when you tell one lie, it's a
23   snowballing, you end up telling more lies?
24     A.  Yes.  I should have came out straight honest, but I
25   didn't.
26     Q.  And you're not being honest now?
27         MS. BLUMENTHAL:  Objection.  Argumentative.
28         THE COURT:  Sustained on argumentative as phrased.

1        Q.   BY MS. FOSTER:  You are not being honest will this jury

2    today?

3             MS. BLUMENTHAL:  Objection, Your Honor.  It's

4    argumentative and it's prejudicial as phrased.

5             THE COURT:  Sustained.  If you want to rephrase the

6    question.

7        Q.   BY MS. FOSTER:  You're telling another version of that

8    lie today?

9             MS. BLUMENTHAL:  Objection.  Argumentative.

10            THE COURT:  Overruled.

11            THE WITNESS:  No.  I'm telling the truth.

12       Q.   BY MS. FOSTER:  You're telling us that now you were

13   holding the gun down to the ground and you accidentally pulled

14   the trigger?

15            MR. MOORE:  Misstates the testimony, Your Honor.

16            THE COURT:  Overruled.

17            THE WITNESS:  Not down to the ground, at my side.

18       Q.   BY MS. FOSTER:  And then you accidentally pulled the

19   trigger?

20       A.   Correct.

21       Q.   Now, when you were talking to Investigator Dean, he

22   talked to you about gun safety.  Do you remember that?

23       A.   I believe so.

24       Q.   And you told him that you had been handling guns for

25   years?

26       A.   Yes.

27       Q.   And when you're telling -- well, let me back up.

28            Why didn't you just tell Investigator Dean that you

1  were in the room the entire time?

2     A.  I can't really remember my report if I did tell him

3  that, but I guess you could say, you know, fear and guilt and

4  just overall, you know, realizing again what I had just done.

5     Q.  And you're telling him a lie about doing it as an

6  accident, right?

7         MS. BLUMENTHAL:  Your Honor, objection.  Asked and

8  answered.  Also vague as phrased.

9         THE COURT:  Overruled.

10        THE WITNESS:  I don't understand.

11    Q.  BY MS. FOSTER:  You're telling Investigator Dean a lie

12  about how it happened as an accident, right?

13        MS. BLUMENTHAL:  Objection.  That's ambiguous as to the

14  way it's phrased as to which portion of it.

15        THE COURT:  If he understands the question, overruled.

16        THE WITNESS:  I don't understand.

17    Q.  BY MS. FOSTER:  You told Investigator Dean it was an

18  accident, and you were lying about that, right?

19        MS. BLUMENTHAL:  Objection.  Vague as to what point in

20  time.

21        THE COURT:  Yes.  Sustained.

22    Q.  BY MS. FOSTER:  In the same interview we've been

23  talking about, the second version with Investigator Dean, you

24  told him that it was accidental, that you grabbed the gun from

25  Nicholas, right?

26    A.  Yes.

27    Q.  And you told him a lie saying it was accidental, right?

28        MS. BLUMENTHAL:  Objection as to the way that it's

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 683

 1    phrased.

 2            THE COURT:  Overruled.

 3            THE WITNESS:  I don't really know how to answer that

 4    question.

 5        Q.   BY MS. FOSTER:  Just truthfully.

 6        A.   Well, it was an accident.

 7        Q.   And you made up a lie about an accident version, right?

 8        A.   How that version went down, yes.

 9        Q.   And you told that lie about it being an accident -- the

10    specific lie you told Investigator Dean in your second version,

11    you told that lie about it being an accident because you were

12    afraid?

13        A.   Yes.

14        Q.   And you told that lie about it being an accident to

15    Investigator Dean because you didn't want to get into trouble?

16        A.   Correct.

17        Q.   And the entire time you're talking to Investigator

18    Dean, you never mention the text messages?

19        A.   No.

20        Q.   You never tell him that there were threats sent by you

21    to Nicholas?

22            MS. BLUMENTHAL:  Objection.  That assumes facts not in

23    evidence.  In fact, it misstates what this witness has said

24    those texts were.

25            THE COURT:  Overruled.

26            THE WITNESS:  Could you ask that again?

27        Q.   BY MS. FOSTER:  You never tell him that there were

28    threats that you sent to Nicholas?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 684

```
 1        A.   No.
 2        Q.   You never tell Investigator Dean that you told Nicholas
 3   "I will shoot you, I swear"?
 4        A.   No.
 5        Q.   You never tell Investigator Dean about the text
 6   regarding the cold sore?
 7        A.   No.
 8        Q.   Showing what's been marked as People's 288.  That's a
 9   text message that you sent to Nicholas, right?
10        A.   Yes.
11        Q.   And when you were speaking to Investigator Dean, you
12   never told him about this text message?
13        A.   Yes.
14        Q.   And in this text message, you tell Nicholas, "Bro, you
15   gave me a cold sore.  My upper mouth region hurts"?
16        A.   Yes.
17        Q.   Now, you know the officers are doing an investigation
18   on the death of Nicholas McCauley, right?
19        A.   Yes.
20        Q.   And you know there is important information that they
21   need to know, right?
22        A.   Yes.
23        Q.   And you leave out these messages, right?
24        A.   Yes.
25        Q.   And I'm showing you People's Exhibit 290.
26             THE COURT:  I'm sorry.  290?
27             MS. FOSTER:  290.
28        Q.   BY MS. FOSTER:  "Okay.  You shut your phone off."  And
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 685

1  is that "idc," I don't care?

2      A.   Yes.

3      Q.   "I don't care, but I'm serious, I will shoot you when I

4  see you, mother fucker"?

5      A.   Yes.

6      Q.   And you leave those text messages out when you're

7  talking to Investigator Dean?

8      A.   Yes.

9      Q.   You don't tell him about them?

10     A.   It never got brought up.

11     Q.   But they did get brought up when you were talking to

12 Samuel Murillo?

13     A.   I believe so.

14     Q.   You told Samuel Murillo that you were afraid the police

15 would find those text messages?

16     A.   I can't remember saying that.

17     Q.   Well, Samuel Murillo wasn't part of that text message

18 chain, right?

19     A.   The witness that took the stand?

20     Q.   Yes.

21     A.   The message chain?

22     Q.   Yeah.  He wasn't part of that text message chain, it

23 was just you and Nicholas, right?

24     A.   Yeah.

25     Q.   So you told him, that's how he knows about the text

26 messages?

27          MS. BLUMENTHAL:  Objection.  That assumes facts not in

28 evidence.

```
 1            THE COURT:  As phrased, sustained.
 2      Q.    BY MS. FOSTER:  You heard Samuel Murillo testify; is
 3  that right?
 4      A.    Yes.
 5      Q.    And your bunks were in close proximity to each other in
 6  the jail; is that right?
 7      A.    Correct.
 8      Q.    And you had conversations with Samuel Murillo?
 9      A.    I believe I have.  I can't remember.
10      Q.    And you're the one who told him about your text
11  messages that you were afraid the officers would find?
12      A.    I can't remember that.
13      Q.    Now, you said you've been in jail for a couple of
14  years?
15      A.    Correct.
16      Q.    And over that time you've talked to people; is that
17  right?
18      A.    Of course.
19      Q.    You talked about your case?
20      A.    Vaguely.
21      Q.    You talked about your case?
22      A.    Yes.
23      Q.    You told them about Nicholas's death?
24      A.    Told who?
25      Q.    People you got to know in jail?
26            MS. BLUMENTHAL:  Your Honor, this calls for hearsay.
27            THE COURT:  Overruled.
28            THE WITNESS:  I believe so.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 687

```
 1        Q.   BY MS. FOSTER:  You, as a matter of fact, told someone
 2   in jail that Nicholas had rejected your advances?
 3        A.   I don't remember that at all.
 4        Q.   You spent a lot of time with Nicholas, right?
 5        A.   Correct.
 6        Q.   Someone you loved?
 7        A.   Yes.  Like a brother.
 8        Q.   And you knew that Nicholas had tendencies towards being
 9   bisexual?
10        A.   Not at all.
11        Q.   You spoke to Nicholas's mother one night.  Do you
12   recall that, about sexuality?
13        A.   I can't remember.
14        Q.   You asked Ana if Nicholas were gay what would she do.
15   Do you recall that?
16        A.   No, I don't.
17        Q.   And you recall hearing her talk about that, right?
18        A.   Yes.
19        Q.   And she answered that she would love him anyway.  Do
20   you recall that?
21        A.   No, I don't.
22        Q.   And do you recall telling her that your dad would not
23   feel that way if you were gay?
24        A.   I can't remember that conversation at all.
25        Q.   Do you remember telling Samuel Murillo that Nicholas
26   called you a faggot?
27        A.   No.
28        Q.   It's a derogatory term, though, right?
```

```
 1        A.   I don't know what you mean by that.

 2        Q.   It's a negative term, bad?

 3        A.   I guess so.

 4        Q.   You -- let me ask you this:  I'm showing you what's

 5   been marked for identification as People's Exhibit 248.  Do you

 6   recognize what's depicted in People's 248?

 7        A.   Yes.

 8        Q.   And that's you on November 10th, right?

 9        A.   Correct.

10        Q.   And you see there is blood on your clothing?

11        A.   Yes.

12        Q.   And showing you People's 250.  You see there is blood

13   on your clothing as well?

14        A.   Correct.

15        Q.   And showing you People's 252.  And that's you again,

16   right?

17        A.   Correct.

18        Q.   And there is blood.

19             BY MS. FOSTER:  Your Honor, with the Court's

20   permission, when I finish cross, can we have a break so we can

21   reorganize?

22             THE COURT:  Sure.

23             BY MS. FOSTER:  I know they're worried about the --

24             THE COURT:  Yes.

25        Q.   BY MS. FOSTER:  Now, this is the front of your jeans;

26   is that right?

27        A.   Correct.

28        Q.   And your zipper is unzipped?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 689

1      A.   Appears to be, yes.

2      Q.   And there is blood on your clothing as well?

3      A.   Correct.

4      Q.   All of Nicholas's blood?

5      A.   Correct.

6      Q.   And going back to People's 248.  You have blood on your

7  clothing, but you're not drenched in blood; is that right?

8           MR. MOORE:  Argumentative and vague.

9           THE COURT:  Overruled.

10          THE WITNESS:  It looks like I'm drenched in blood.

11     Q.   BY MS. FOSTER:  I'm going back to 250.  You think you

12 look drenched in blood in 250 as well?

13     A.   There is a lot of blood on me, yes.

14     Q.   And you said you had on layers of clothes that day; is

15 that right?

16     A.   Yes.

17     Q.   And by those layers, you had on basketball shorts?

18     A.   Yeah.

19     Q.   And you had on underwear?

20     A.   Yes.

21     Q.   Boxers underwear?

22     A.   What was that?

23     Q.   Boxers?

24     A.   Um-hum.

25     Q.   Yes?

26     A.   Did I have boxers on?

27     Q.   Yes.

28     A.   Yes.

1      Q.   And the police collected all those pieces of clothing;

2   is that correct?

3      A.   Correct.

4      Q.   And there was blood on your basketball shorts

5   underneath your jeans; is that right?

6           MS. BLUMENTHAL:  Objection.  Assumes facts not in

7   evidence.

8           THE COURT:  Overruled as phrased.

9      Q.   BY MS. FOSTER:  There was blood on your basketball

10  shorts under your jeans; is that right?

11     A.   I can't remember that.

12     Q.   And there was even blood on your underwear; is that

13  right?

14     A.   I can't remember that.

15     Q.   Now, you told us everything that happened in that room

16  on November 10th, right?

17          MS. BLUMENTHAL:  Objection.  That assumes facts not in

18  evidence.  He's answering questions.

19          THE COURT:  Overruled.

20          MR. MOORE:  It's also vague and, essentially, compound.

21          THE COURT:  Overruled.

22          THE WITNESS:  What was the question again?

23     Q.   BY MS. FOSTER:  You told us everything, the details of

24  what happened in that room on November 10th, right?

25     A.   Correct.

26     Q.   At no point did your pants come off?

27     A.   No.

28     Q.   And did your basketball shorts come off?

1        A.    No.

2        Q.    Now, you said you were at the house the day before; is

3   that right?

4        A.    Correct.

5        Q.    And Ana was not there at the house on Monday?

6        A.    I don't know if she was.  If she was, she would be

7   inside the house or, I can't remember.

8        Q.    So you don't -- you don't recall seeing Ana there on

9   Monday?

10            MS. BLUMENTHAL:  Objection.  That misstates his

11   testimony.

12            THE COURT:  Overruled.

13            THE WITNESS:  I can't recall.

14        Q.    BY MS. FOSTER:  So as far as Monday goes, it's just you

15   and Nicholas?

16            MS. BLUMENTHAL:  Objection.  That misstates his

17   testimony.

18            THE COURT:  That's a question.  Overruled.

19            THE WITNESS:  Correct.

20        Q.    BY MS. FOSTER:  And there's no text messages saying

21   "I'm coming over Monday afternoon"; is that right?

22        A.    No.

23        Q.    So the only thing to verify that you were there on

24   Monday is your statement?

25        A.    Correct.

26        Q.    Mr. Boji, you told another version to officers as well;

27   is that right?

28        A.    I may have, yes.

```
 1        Q.   And so at this point you told officers at least three
 2   different versions; is that correct?
 3        A.   I believe so, yes.
 4        Q.   And they were all lies?
 5        A.   Correct.
 6        Q.   And so a person who tells lies is a liar; is that
 7   right?
 8             MR. MOORE:  Argumentative.
 9             THE COURT:  Sustained on argumentative.
10        Q.   BY MS. FOSTER:  You tell lies to keep yourself out of
11   getting into trouble?
12             MS. BLUMENTHAL:  Argumentative.
13             THE COURT:  Overruled.
14             THE WITNESS:  No.  Usually I don't.  I just fell into a
15   very bad situation when I did lose my friend, and I was scared
16   and I was panicked.
17        Q.   BY MS. FOSTER:  And you're still lying today?
18             MS. BLUMENTHAL:  Objection.  Argumentative.  Your
19   Honor, I'm going to ask for an admonishment on this now.
20             THE COURT:  Sustained on argumentative.
21        Q.   BY MS. FOSTER:  You're not telling us the truth, the
22   whole truth?
23             MS. BLUMENTHAL:  Objection, Your Honor.  Argumentative.
24   He's answering questions.
25             THE COURT:  As phrased, overruled.
26             THE WITNESS:  I am telling the truth.
27             MS. FOSTER:  May I have one moment, Your Honor?
28             THE COURT:  Yes.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 693

1     Q.   BY MS. FOSTER:  And when you talked to Investigator

2   Dean, you, in the first, I'm sorry, in the second version, you

3   continued to tell him that the reason you brought the gun was

4   because you were going skeet shooting; is that right?

5     A.   Correct.

6     Q.   And you went on to say that you knew better than to

7   point a gun at someone?

8     A.   Correct.

9     Q.   But based on today's version, you're saying that's what

10  you did, you pointed it at Nicholas?

11    A.   Not purposely.

12    Q.   Well, you're saying you did point it at Nicholas?

13         MS. BLUMENTHAL:  Objection.  That misstates his

14  testimony.

15         THE COURT:  Do you want to rephrase it?

16    Q.   BY MS. FOSTER:  You had the gun in your hand, right?

17         Is that right?

18    A.   Yes.

19    Q.   And it was pointed at Nicholas?

20    A.   I guess you could say it was pointed.  It was not my

21  intention to have it pointed at Nicholas.

22         MS. FOSTER:  Now, can we retrieve People's 269?

23    Q.   BY MS. FOSTER:  And while we're getting that, when you

24  saw Nicholas, he didn't have any shoes on, right?

25    A.   Correct.

26    Q.   He was in the house in his bare feet?

27    A.   Correct.

28    Q.   I'm going to show you what's been marked for

```
 1   identification as People's Exhibit 330.
 2          And you see the blood on the bottom of Nicholas's feet,
 3   right?
 4   A.   Yes.
 5          MS. BLUMENTHAL:  I'm going to object to that last
 6   statement as being "blood on the bottom of his feet," as
 7   misstating.
 8          THE COURT:  Overruled.
 9   Q.   BY MS. FOSTER:  Now, People's 269 is the gun that you
10   had in that room; is that right?
11   A.   Correct.
12   Q.   And this is the gun that you shot Nicholas with?
13   A.   Correct.
14   Q.   Did you take a look at it?
15   A.   Yes.
16   Q.   And you said you were holding that gun at your waist;
17   is that right?
18   A.   Correct.
19   Q.   And if the deputy wouldn't mind demonstrating, how low
20   did you have that gun?
21          MS. BLUMENTHAL:  Your Honor.  I'm going to object at
22   this time as improper demonstrative evidence.
23          THE COURT:  All right.  I'll have the lawyers in the
24   back with the court reporter at this time.
25          Ladies and gentlemen of the jury, if you want to
26   stretch out, you may.
27      (Proceedings were held out of the presence of the jury:)
28          THE COURT:  Back on the record out of the presence of
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 695

1    the jury.

2        I think the line of questioning was the defendant was

3    answering that he wasn't pointing the weapon at the victim, or

4    pointed it down, or pointed it accidentally at him.  It's very

5    unclear.  And I think at this point the weapon was shown to the

6    defendant, and then there was an objection.

7        What were you going to ask him to do?

8        MS. FOSTER:  I was going to ask him how high or low,

9    with the deputy showing it.  Typically I would ask a witness to

10   show me themselves, but we can't give him the gun, and so that's

11   why I'm asking the deputy to show, to move it in the direction

12   that the defendant describes.

13       THE COURT:  All right.

14       MS. BLUMENTHAL:  I would object as improper

15   demonstrative evidence in that you're not sitting.  You don't

16   have a bed nearby.  You don't have a person even lying on the

17   bed on their side or whatever, and it's improper demonstrative

18   evidence.  They can bring an expert in.  They chose not to.

19   They rested their case without it.

20       I think it is inappropriate to try to do this

21   demonstrative evidence, to have a deputy who may or may not be

22   showing it in exactly the same way, and you got a person who is

23   accused of doing some -- trying to guide him on where to point

24   the gun.  It's highly prejudicial.  I think it's improper

25   demonstrative evidence, because it's not going to be showing

26   what happened.

27       THE COURT:  Well, actually, the defendant is on the

28   witness stand.  He can tell exactly how he pointed or not

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 696

1    pointed it.  Maybe he pointed it up in the room.  Maybe he

2    pointed it down on -- he's testifying.  This is -- this is

3    exactly -- this is an issue in contention, and he can either

4    explain it away or not answer the question or not explain it.

5           But I think it is a proper question as to what angle,

6    how the shotgun was held, how it was pointed.  Was it pointed

7    toward the bed?  Was it pointed toward the floor?  Up in the

8    ceiling?  I mean, he said it was an accident.  This is his

9    opportunity to describe in detail.

10          And you have an opportunity on redirect to clarify any

11   issues.  I mean, this is proper.  This is exactly the

12   contention.  Either it was purely accidental or not.  He's

13   testifying that, I don't know, I'm trying to figure out how he's

14   testifying.  One version is it was he didn't intend to point the

15   weapon toward the victim, the other version was it was toward

16   the ground, so.

17          MR. MOORE:  I don't think he ever testified that it was

18   pointed toward the ground.  I believe that was Miss Foster's

19   statement, and I objected to that.

20          MS. FOSTER:  No, I never said -- I never believed that

21   he said it was pointed towards the ground, or I never believed

22   it was pointed to the ground, so I did not say that.  I don't

23   recall him saying that either.

24          THE COURT:  All right.  Well, this is his opportunity.

25   I think it's proper, the line of questioning is proper as to how

26   the weapon was held.

27          MS. BLUMENTHAL:  And just for purposes of the record,

28   Your Honor, I think it's obviously prejudicial under 352 to go

1    through this, especially if we're going to follow up, Is this

2    another lie?  Is this another lie?  Is this another lie?

3    Because we've had this so much, I believe it becomes 352,

4    especially if you have the gun out in front of the jury.

5         MS. FOSTER:  Just for the record, he told three

6    different stories filled with lies, so I'm bringing up lies

7    because I'm going through each thing.

8         THE COURT:  The defendant did admit that the first two

9    or three versions were lies.  I mean, those are his own words.

10        MS. BLUMENTHAL:  My thing is, I will go back because

11   now that what the Court kept out earlier has become relevant,

12   because many of the things he said in there were true, they just

13   didn't have anything to do with the shooting.  He said the

14   victim had been depressed, the victim had been committed for

15   depression.  The victim had talked to him about all of these

16   things, it just those things, though, were not he didn't commit

17   suicide, but those facts are all true.

18        Now, when we tried to bring it in before, the Court

19   kept it out.  Now that she's going through it saying are these

20   lies, they're not lies.  The facts are true, it's just that they

21   had nothing to do with the shooting.

22        THE COURT:  You have to put it in the right context.

23   The right context is he committed -- the first version is he was

24   depressed, he had blah, blah, blah, and then you got suicide.

25        MS. BLUMENTHAL:  She asked him -- the reason I

26   respectfully disagree with the Court, Your Honor, she asked him,

27   "Was it true that he was depressed?"  "Was it true that he

28   threatened suicide?"  All of those statements are true.  He did

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 698

1    do those things.

2           THE COURT:  All right.  All right.  I'm, obviously, I'm

3    not allowing the defendant to hold the weapon, because that

4    would be highly prejudicial, but asking questions how the weapon

5    was pointed, I think that's representative.  It's probative and

6    it's not highly prejudicial.  So I'll allow that.

7           The other issue is depression and all that other stuff,

8    it's not really relevant, because at the end of the day, this

9    was not a suicide.  We know that now through the defendant's own

10   words.  We know that, so it's a collateral issue.  And --

11          MS. BLUMENTHAL:  Except she asked him was that a lie.

12          MS. FOSTER:  No.  I said, "Did you use this to

13   substantiate your lie?"

14          MS. BLUMENTHAL:  I disagree.  Maybe we can have read

15   back.

16          THE COURT:  We will have the court reporter look it up

17   at the appropriate time, but we're not even going to get to

18   redirect probably today, so we'll have an opportunity to look at

19   the record.  All right.

20          All right.  Thank you.

21        (Proceedings were held in the presence of the jury:)

22          THE COURT:  All right.  The objection is overruled.

23   Q.   BY MS. FOSTER:  You see People's 269 again?

24   A.   Correct.

25   Q.   Can you describe for us where you were holding the gun

26   heightwise?  How high or how low were you holding it?

27   A.   I would say I had it like my shoulder, my armpit.  Had

28   it generally lower.

1    Q.    So was it straight or was it --

2    A.    Probably lower.

3    Q.    Let me finish.  Was it -- were you holding it straight

4    forward or were you holding it with the butt slightly down?

5    A.    Direct opposite.  Muzzle was a little bit down.  So I

6    had it high in my armpit, the stock, and I was holding it down.

7    Q.    So you're holding it high under your armpit?

8    A.    Um-hum.

9    Q.    And you have the muzzle facing down?

10   A.    Not completely down.  It was just kind of level with me

11   like where my hand was.

12   Q.    Okay.  So you're saying that when you're holding the

13   gun, the butt is up, and I noticed you're touching at your

14   armpit?

15   A.    Yes.

16   Q.    Towards your armpit?

17   A.    Yes.

18   Q.    And the muzzle is down?

19   A.    Not completely all the way down.  When it discharged,

20   no.

21   Q.    So the muzzle is not pointing towards the ground?

22   A.    No.

23   Q.    It's pointing towards where Nicholas is on the bed?

24   A.    Correct.

25   Q.    So at an angle?

26   A.    Yes.

27   Q.    Now, when you're racking that gun, you don't need to

28   touch the trigger; is that correct?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 700

1    A.    No.

2    Q.    So based on everything you were doing with the gun,

3    there was no need for you to touch the trigger?

4    A.    Correct.

5          MS. FOSTER:  And then, Deputy, if you could turn so we

6    could see the side of the gun?

7    Q.    BY MS. FOSTER:  Now, the area that you were talking

8    about racking and then shooting out the ammunition, that's this

9    sort of second black piece towards the top of the gun; is that

10   correct, to the right?  Am I being clear?

11         Or can you tell us where it is where that portion is

12   that you were pulling to eject ammunition?

13   A.    If I remember correctly, when you pump the -- when you

14   pump it down, a shell would eject out.  One would be chambered,

15   yes, so it would come out of the little black port.

16   Q.    So as we look at the gun, tell us what you did.

17   A.    Well, when I was holding it, I was pumping the shells

18   out just like this.

19   Q.    And you're doing the motion with your two fists.  You

20   have one thumb forward?

21   A.    Correct.

22   Q.    And you're pulling them back and forth together?

23   A.    Yeah.  My right hand would be like on the lower end of

24   the grip, and my left hand would be holding it, holding the top.

25         And when I was goofing around, messing around, I would

26   just load it up and rapidly pumping it and watching the shells

27   fly out.

28   Q.    And at that point after you're pumping it, well, when

Christine M. DiCaro, CSR                                    696

1    you're pumping it, are you holding it like the deputy is holding

2    it, or are you holding it different?

3         A.   Different.

4         Q.   How are you holding it?

5         A.   I was just holding it like this.

6         Q.   So across the front of you?

7         A.   Correct.

8         Q.   With the barrel in the air?

9         A.   Correct.

10        Q.   Away from Nicholas?

11        A.   Correct.

12        Q.   And then you say that you lowered it pointing at

13   Nicholas?

14        A.   Yeah.  After I was done pumping it rapidly, and to me I

15   believed it was empty, because I could have swore I double

16   racked it.  And after I pumped the one out and I watched all

17   these shells fly out, you know, it was multiple shells.  I

18   didn't count how many, but I typically thought maybe five or six

19   were loaded.

20        Q.   Let me ask you my question.  Maybe it's not clear.  You

21   lowered it and pointed it at Nicholas?

22        A.   After I was done pumping it, I lowered it and put it to

23   my side like at a resting position.

24        Q.   And pointed it at Nicholas?

25        A.   I personally did not point it at Nicholas that's just

26   where the barrel of the weapon was at.

27        Q.   And then you say you moved your hand to the trigger?

28        A.   Well, after I'm done pumping it and I kind of have it

1    just rested, I have it rested on my shoulder with my index

2    finger already on the trigger, basically.

3         Q.   And is that safe?

4         A.   No.

5              MS. FOSTER:  Thank you, Deputy.

6         Q.   BY MS. FOSTER:  Now, the version that you told to

7    Investigator Dean, that was very detailed as well.  Similar to

8    how the first version was very detailed, that was very detailed

9    as well, right?

10        A.   I believe so, yes.

11        Q.   In that version you tell Investigator Dean that he did

12   not get out of bed after you shot him; is that right?

13        A.   I can't remember if I did say that.

14        Q.   Would it refresh your recollection to review your

15   transcript?

16        A.   Correct.

17        Q.   Show you page 12 and 13.

18             THE COURT:  Is this a good time to take a break?

19             MS. FOSTER:  It is.

20             MS. BLUMENTHAL:  Yes.

21             THE COURT:  All right.  Ladies and gentlemen of the

22   jury, let's be back here at 3:15.

23             Keep an open mind.  Do not share information or conduct

24   any research.

25                         (Recess.)

26             THE COURT:  All right.  Back on the record.  All

27   parties are present.

28             Madam prosecutor?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 703

```
 1              MS. FOSTER:  Thank you.

 2      Q.   BY MS. FOSTER:  So in this --

 3              THE COURT:  I'm sorry.  We left off with the

 4      transcript.

 5              MS. FOSTER:  Oh, yes.  We settled all of that.

 6      Q.   BY MS. FOSTER:  I'm going to go back to your interview

 7      at the station with Investigator Dean, okay?

 8      A.   Okay.

 9      Q.   And I'm going to go into the third version, okay?

10              You tell Investigator Dean that you and Nicholas are

11      playing with the weapon?

12              MS. BLUMENTHAL:  What page, Counsel?

13              MS. FOSTER:  I'm just asking him questions.

14      Q.   BY MS. FOSTER:  You tell him that you and Nicholas are

15      playing with the weapon?

16      A.   Correct.

17      Q.   And you're just having fun playing around with it?

18      A.   Correct.

19      Q.   And that he racks the weapon?

20      A.   Correct.

21      Q.   And you thought he emptied the shells, and you didn't

22      know that the safety was off?

23              Is that right?

24      A.   Correct.

25              MR. MOORE:  Object as to vague as to time.  Are we

26      still talking about this particular statement?

27              THE COURT:  I'm sorry.  Which interview?  You want to

28      clarify it?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 704

1          MS. FOSTER:  Yes.

2     Q.   BY MS. FOSTER:  And I started off with you that during

3     your about third version, into the third version to Detective

4     Dean, right?  Do you understand what we're talking about?

5          Sir?

6     A.   Correct.

7     Q.   And then you tell him it was just a stupid, simple

8     accident, right?

9     A.   Correct.

10    Q.   You give him some detail about this version.  You say

11    that he didn't get out of bed after you shot him, right?

12    A.   I can't remember if I did or not.

13    Q.   And I think this is where we left off.  Would it

14    refresh your recollection to review page 12 of your statement in

15    track 6?

16    A.   Yes.

17         MS. FOSTER:  May I approach?

18         THE COURT:  Yes.

19    Q.   BY MS. FOSTER:  Do you want to read page 12 to yourself

20    silently and then look up.

21         Is your recollection refreshed?

22    A.   Correct.

23    Q.   He asked you if he got out of bed after you shot him,

24    and you said, "No, he didn't"?

25    A.   Correct.

26    Q.   And you instead said that he fell back into the bed?

27    A.   Correct.

28    Q.   Are you saying now that that's not true that he fell

```
 1    back into the bed, that's not true?
 2            MS. BLUMENTHAL:  Counsel, could I ask what page and
 3    line for that, please?
 4            MS. FOSTER:  It's still page 12, line 20 through 21.
 5       Q.   BY MS. FOSTER:  Are you now saying he never fell back
 6    into the bed?
 7       A.   Are you talking about like this version?
 8       Q.   Well, in the truth, did he ever fall back into the bed?
 9       A.   No, he didn't fall back in bed.
10       Q.   So you telling Detective Dean that he fell into the
11    bed, that was a lie?
12       A.   Correct.
13       Q.   Then you went on to tell Detective Dean that he was
14    sitting in the bed, not laying in the bed; is that correct?
15       A.   I believe I did.
16       Q.   And you said he was sitting down; is that right?
17       A.   I believe I read the statements that I said he was
18    laying down.
19       Q.   Would it refresh your recollection to review the
20    statement again?
21       A.   Yes.
22       Q.   I put some checks by the numbers, so disregard those.
23    You can read lines 23 through 33, or the end of the page.
24       A.   You said, "23"?
25       Q.   Yes.
26            Is your memory refreshed?
27       A.   Yes.
28       Q.   You told Detective Dean that he was sitting down?
```

1       A.    I think the next part I said, "He was laying down."

2       Q.    Let's go to line 23.  Detective Dean said:

3             "You said he was already laying in the bed when you

4       shot him?

5             Boji:  Yes.  He was.  He was sitting like this.

6             Dean:  No.  You said he was laying in the bed.

7             Boji:  Yes, sitting like sitting down like."

8             Do you remember that part of the conversation?

9       A.    Correct, but I believe I meant to say "laying" though.

10      Q.    So when he's asking you if he's laying and you're

11      saying "No, he's sitting," you meant to say, "yes"?  Is that

12      what you're saying?

13            MR. MOORE:  Argumentative, Your Honor.

14            THE COURT:  Overruled.

15            THE WITNESS:  In my opinion I believe I may be confused

16      about like, you know, almost like laying down, but almost like

17      the way I describe it to be.

18      Q.    BY MS. FOSTER:  Then you go on to shift in that story

19      and say that --

20            MS. BLUMENTHAL:  Objection.  Argumentative as to the

21      phraseology of the question "shift."

22            THE COURT:  Rephrase the question, please.

23            MS. FOSTER:  I didn't even finish it.

24            THE COURT:  Go ahead.

25      Q.    BY MS. FOSTER:  You changed that from sitting, and you

26      changed it to, "Okay.  He was laying down and he got in a

27      comfortable position"; is that right?

28      A.    I believe so.

1      Q.   So even as you're talking to Investigator Dean, you're
2   changing back and forth; is that right?
3          MS. BLUMENTHAL:  Argumentative, Your Honor.  And in
4   taking this out of context with the misunderstanding that was
5   occurring during the conversation.
6          THE COURT:  Overruled.  No speaking objections.
7      Q.   BY MS. FOSTER:  And then you tell Investigator Dean
8   that you shoot him from back to front; is that correct?
9      A.   I don't know what you mean.
10          MS. BLUMENTHAL:  Objection.  That misstates.
11          MS. FOSTER:  I'm asking him.  He's the best person to
12   tell us.
13          THE COURT:  Overruled.
14          MS. FOSTER:  Thank you.
15      Q.   BY MS. FOSTER:  Did you tell Investigator Dean that you
16   shot him from back to front?
17      A.   I don't know what that would mean "back to front."
18      Q.   Meaning you were behind him and shot forward?
19          MS. BLUMENTHAL:  Objection.  That misstates.  I'd ask
20   to be heard on this.  Misstates the transcript.
21          THE COURT:  We'll do that at the break.  If you want to
22   refresh his memory, you may do so.  You have a copy of the
23   transcript.  If he does not recall.
24      Q.   BY MS. FOSTER:  And when you talked to Investigator
25   Dean, you're getting into specifics describing where you're
26   standing; is that right?
27      A.   I believe so, yes.
28      Q.   And you're getting into specifics on how the shooting

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 708

```
 1   occurred; is that right?
 2        A.   I believe so.
 3        Q.   And you're actually giving him detail?
 4        A.   I believe so.
 5        Q.   And in your conversation with Detective Dean, you're
 6   going back and forth about where and how Nicholas was shot; is
 7   that correct?
 8             MR. MOORE:  Argumentative.
 9             THE COURT:  Overruled.
10             THE WITNESS:  I believe so.
11             MS. BLUMENTHAL:  What page, Counsel?
12             MS. FOSTER:  It wasn't a page, it was just a question.
13        Q.   BY MS. FOSTER:  Now, when you're talking to
14   Investigator Dean, you're telling him "What I'm telling you is
15   the truth," right?
16        A.   I believe so.
17        Q.   You specifically say to him "I'm telling you the
18   truth"?
19        A.   I believe so.
20        Q.   As a matter of fact, do you tell him at one point "Why
21   would I lie"?
22             MS. BLUMENTHAL:  Counsel, page and line number?
23             THE COURT:  Do you want to refresh his memory?
24             MS. FOSTER:  I'm not refreshing his memory, I'm just
25   asking.
26             THE COURT:  All right.  Can you assist Counsel with
27   what page of the transcript?
28             MS. FOSTER:  He says it on line -- page 18, on line 14.
```

1    Line 11 through 14.

2         THE COURT:  I'm sorry.  You could ask the question

3    again, please.

4         Q.   BY MS. FOSTER:  You specifically said, "Why would I lie

5    about this," right?

6         A.   I believe so.

7         Q.   And that's you in an effort to get him to believe

8    you're telling the truth?

9         A.   I believe so.

10        Q.   But you were not telling him the truth?

11        A.   Correct.

12        Q.   You talk about the text messages just being a joke.  Do

13   you recall that?

14        A.   Correct.

15        Q.   And you said the two of you talk like that often,

16   right?

17        A.   Correct.

18        Q.   And you guys have talked like that in the past, right?

19        A.   Correct.

20        Q.   And that's the lighthearted sort of way you feel

21   like -- you're saying you interact?

22        A.   Correct.

23        Q.   Where you'll say "I'll shoot you" or "I'll kill you"?

24        A.   Correct.

25        Q.   And any of the time that you've said, "I'll shoot you"

26   or "I'll kill you" in the past, have you ever actually shot

27   Nicholas?

28        A.   Never.

1      Q.   This is the only time where you make the threat and

2  then Nicholas ends up dead?

3           MS. BLUMENTHAL:  Objection.  Argumentative as phrased.

4           THE COURT:  Overruled.

5           THE WITNESS:  I believe so.

6           MS. FOSTER:  I have nothing further.

7           THE COURT:  Redirect?

8           MS. BLUMENTHAL:  Yes.

9                     REDIRECT EXAMINATION

10  BY MS. BLUMENTHAL:

11     Q.   When you saw Nicholas lying on the floor, did you ever

12  look at his feet?

13     A.   No.

14     Q.   Let me show you what's been marked as 329 for

15  identification.  And I'm going to ask you, I want to ask you to

16  take a look at is that how Nicholas was lying in the bedroom?

17          Let me go back a little farther.

18          I am not IT fluent.

19          Does that look like the position that Nicholas was in

20  lying on the floor of his bedroom?

21     A.   Correct.

22     Q.   Now, if you take a look at his feet on here, does there

23  appear to you to be blood on the bottom of, say, here, his right

24  foot?  I'm sorry.  His left foot?

25     A.   The bottom part?

26     Q.   Correct.  On his feet itself?

27     A.   Right here?

28     Q.   Correct.

1      A.    It doesn't look like to be blood.

2      Q.    Let me ask you this:  Did Nicholas ever walk -- Counsel

3  is asking you questions as though it's Nicholas who was walking

4  around the house.  Did he ever walk around the house after he

5  was shot?

6            MS. FOSTER:  Objection.  Counsel is testifying and --

7            MS. BLUMENTHAL:  I'll rephrase it, Your Honor.

8      Q.    BY MS. BLUMENTHAL:  Did Nicholas ever walk around the

9  house after he was shot?

10     A.    No.

11     Q.    Did he ever stand up in an upright position after he

12  was shot?

13     A.    No.

14     Q.    You were trying to describe how he was lying in the bed

15  at the time he was shot?

16     A.    Correct.

17     Q.    Was he lying flat in the bed?  Was he partial sit up

18  and lying?  Was he fully sitting up?  Could you describe how he

19  was in the bed at the time that the gun went off?

20     A.    Like I told Sharunne Foster, he was just laying flat on

21  his bed, you know, with his head towards the -- towards the

22  pillow, the feet would be towards the back door.  And he was

23  kind of just like, you know, kind of relaxing but sitting and

24  pivoting his body towards me, talking towards me with resting on

25  his elbow.

26     Q.    Okay.  Now, is that lying flat on his back or was he

27  kind of bent slightly on his elbow like maybe partially sitting

28  up a little bit and lying flat with the rest of the body?

```
 1            MS. FOSTER:  Objection.  Leading.

 2            THE COURT:  Overruled.

 3            THE WITNESS:  Correct.

 4       Q.   BY MS. BLUMENTHAL:  And is that what you were trying to

 5  explain to Investigator Dean when you were trying to describe

 6  how he was positioned on the bed?

 7       A.   Correct.

 8       Q.   Now, when you were trying to describe to Investigator

 9  Dean how Nicholas was positioned on the bed, were you lying to

10  him about that variable?

11       A.   No.

12       Q.   I'm going to show you what have been shown to you

13  previously.  It's 259 for investigation -- identification,

14  excuse me, which shows the front of your clothing that day; is

15  that correct?

16       A.   Correct.

17       Q.   Now, if we go back a little bit and look at your feet,

18  were those the shoes that you were wearing that day?

19       A.   Correct.

20       Q.   There appears, at least in looking at the photograph,

21  to be a significant amount of blood on your knees and thighs.

22  Was there?

23       A.   Correct.

24            MS. FOSTER:  Objection.  Leading.

25            THE COURT:  As phrased it is leading, but I'll allow

26  it.  This is redirect.

27       Q.   BY MS. BLUMENTHAL:  And there appears to be some sort

28  of markings on your shirt.  Do you know what that was?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 713

1    A.    Probably from loss of blood.

2    Q.    Were you leaning against him to the extent that that

3 blood could have gotten on you?  When I say "leaning," I'm

4 talking about performing CPR?

5    A.    Yeah, of course, yes.

6    Q.    I'm going to show you what's been marked for

7 identification as 261 for identification.  Is that a picture of

8 your face?

9    A.    Yes.

10    Q.    What's on your face?

11    A.    It's blood.

12    Q.    Now, at some point in time -- I'm going to show you 260

13 for identification.  There appears to be markings on the front

14 of your shirt?

15    A.    Correct.

16    Q.    And what is that?

17    A.    It's blood.

18    Q.    When you were doing CPR, how were you performing that

19 on Nicholas?

20    A.    My best memory how I was doing CPR was, you know, I was

21 right next to him, what probably would be his right side.  Yes.

22 And I would kneel down, like my leg would be on the ground, and

23 I would have both my hands on top of his chest to what you would

24 kind of typically see in movies.

25    Q.    Okay.  Now, you're shown pictures of your hands.  I

26 show you 256.  Is there blood on your hand that's indicated in

27 this picture?

28    A.    Yes.

1    Q.    Now, how soon after you gave Nicholas CPR were law

2    enforcement taking pictures of you?

3    A.    That was after, you know, I went to go get help from

4    the neighbors, and that was after when the cop directed me to go

5    get the dogs and -- the dogs, and that was at the end.

6    Q.    Okay.  Let's talk about the dogs a minute.  You said

7    that there were three dogs?

8    A.    Yes.  Correct.

9    Q.    Correct?

10         At some point in time when the officers come there,

11   what is happening with the dogs?

12         MS. FOSTER:  Objection.  Relevance.

13         THE COURT:  Sustained on relevance.

14   Q.    BY MS. BLUMENTHAL:  At some point in time did you have

15   to pick up the dog after you had given CPR?

16   A.    Yes, correct.

17   Q.    And when you picked up the dog, did you have -- before

18   that point in time, did you have blood on your hands?

19   A.    Yes.

20   Q.    And what did you do with the dog when you picked him

21   up?

22   A.    I held him close towards me.

23   Q.    And why did you hold him?

24   A.    The deputy told me to go get him.

25   Q.    To go get the dog?

26   A.    Yes.

27   Q.    And what did you do with -- after you got the dog and

28   you were holding him, what did you do with the dogs?

 1     A.   To my best memory, I know I was holding onto them, and
 2  I put him down in the grass, and I think that's when Animal
 3  Control came.
 4     Q.   Okay.  Now, did any of the blood that you had on your
 5  hands wipe off on the dogs?
 6     A.   Yes.
 7     Q.   Let me show you what's been marked as 254 for
 8  identification.  Is that the palm of your hand?
 9     A.   Yes.
10     Q.   It appears as though you have something on the palm
11  down towards the wrist.  Do you know what that is?
12     A.   That was probably from me having my hands by the dirt.
13     Q.   Do you have specific recollection?
14     A.   No.
15     Q.   At any point in time did you intentionally wash your
16  hands or wipe them off on anything?
17     A.   No.  I never washed my hands.
18     Q.   When you went into the kitchen, I believe you testified
19  that you were looking around for the phone?
20     A.   Yes.
21     Q.   Did you touch the counters?
22          The countertops?
23     A.   Of the phone?
24     Q.   No.  Of the kitchen, I'm sorry?
25     A.   I believe so.
26     Q.   Did you touch -- there are countertops there, I take
27  it, and there's shelving and so on?
28     A.   Yes.

1    Q.   And you touched the oven, or stove?

2    A.   Yes.

3    Q.   At any point in time after Nicholas was shot, did you

4  see Nicholas lose consciousness?

5    A.   Yes.

6    Q.   And where was he positioned at the time he lost

7  consciousness?

8    A.   That would be when -- when it occurred.  Immediately

9  when he passed out, and he kind of leaned forward and I grabbed

10 him.

11   Q.   You said, "he kind of leaned forward."  Was he -- at

12 the time he was shot, was he -- when you say "leaned forward,"

13 in what direction was he leaning?  You're indicating -- by

14 leaning forward, was he standing?  Was he sitting up?  Can you

15 explain?

16   A.   Almost sitting up.

17   Q.   Almost sitting up?

18   A.   Yes.

19   Q.   Full sitting up or almost?

20   A.   Almost.

21   Q.   Did you go over towards him at that time?

22   A.   Yes.  Correct.

23   Q.   And what did you do when you went over towards him?

24   A.   Well, immediately I saw where the blood was coming from

25 and that was the arm.

26   Q.   And what did you try to do when you saw the blood

27 coming out of his arm?

28   A.   I tried to squeeze his arm as hard as I can.

```
 1        Q.    What was -- I'm sorry.   What?

 2        A.    To stop the bleeding.

 3        Q.    To stop the bleeding.   That was the purpose of

 4   squeezing the arm as hard as you can?

 5        A.    Yeah.

 6        Q.    And what happened when you squeezed the arm as hard as

 7   you could?

 8        A.    A lot of blood was coming out.

 9        Q.    Now, at any point in time did you try to pick him up

10   off of the bed?

11        A.    Yes.

12        Q.    At what point in time did you try to pick him up off

13   the bed?

14        A.    Well, after he lost consciousness, he kind of fell

15   towards me, because I rushed to get him, and I grabbed his arm.

16   And like him being a lot heavier, I grabbed him off the bed and

17   tried to set him up against the bed.

18        Q.    Now, when he fell towards you, and you say he fell

19   towards your chest?

20        A.    Yes.

21        Q.    And when he fell towards you, in what position were

22   you?

23        A.    I was almost kind of crouching grabbing him.

24        Q.    And when he fell toward you, did you start to lose your

25   balance?

26        A.    Yes.

27        Q.    And what did you do in response to that?

28        A.    To me, you know, I tried to use all my strength to
```

```
 1   position him, you know, to stand up, to lean against the bed
 2   upright.
 3        Q.   And did that work?
 4        A.   No.
 5        Q.   What happened?
 6        A.   Well, after that happened, you know, when I tried my
 7   best to have him like, you know, trying to have him upright and
 8   he was too heavy, I kind of gently put him down.
 9        Q.   You put him down where?
10        A.   On the floor.
11        Q.   On the floor.
12             Pictures that we see of Nicholas throughout the course
13   of this trial has him lying on the floor?
14        A.   Yes.
15        Q.   Did you put him in that position?
16        A.   Yes.
17        Q.   And how soon was he in that position after the shot
18   went off?
19        A.   I'd say almost ten seconds.
20        Q.   So very quickly?
21        A.   Yes.  Once the shot rang off and I tried to grab him
22   and set him against the bed, and I'd say a couple of seconds
23   later I had gently put him on the floor.
24        Q.   Was he moving at all?
25        A.   No.
26        Q.   After you were trying to give him CPR, was he moving at
27   all?
28        A.   No.
```

1    Q.   Did you ever see him move while he was lying on -- from

2    the time he got on the floor till the time you last saw him, did

3    he ever move at all?

4    A.   No, ma'am.

5    Q.   Was there anyone else in the house who walked around or

6    ran around the house itself while you were there?

7    A.   No.

8    Q.   Were you the only person who was there going around the

9    house?

10   A.   Yes.

11   Q.   The blood that we have seen on the photographs in the

12   kitchen, was that blood that had been on you?

13   A.   Yes.

14   Q.   And how -- how can you be assured of that?

15        I can put one up here.  Hang on.

16        Let me show you what's been marked as the defense next

17   in order.

18        THE CLERK:  "VV."

19        MS. BLUMENTHAL:  "BB."

20        MR. MOORE:  "V" like Victor.

21        MS. BLUMENTHAL:  "VV," excuse me.

22   Q.   BY MS. BLUMENTHAL:  And I'm going to ask you to take a

23   look at that.  Why would there have been blood on the stove or

24   the range?

25   A.   Well, after I grabbed the phone, I ran through the

26   kitchen aisle.  And I know I was running as fast as I could.

27   And I was trying to keep my balance, and that's when I put my --

28   positioned my hand, you know, to keep balance.

1       Q.    Now, what color was the known?

2       A.    The phone, I think it was yellow, white.

3       Q.    Okay.  I'm going to show you what's been marked as 54

4   for identification.  And there appears to be something white,

5   like what appears to have blood on it, lying on the bed.  Do you

6   know what that is?

7       A.    I believe that's the phone.

8       Q.    Does that appear to be the phone to you?

9       A.    Yes.

10       Q.    After you couldn't get the phone to work, what did you

11   do with it?

12       A.    I pretty much put it on the bed.  Tossed it on the bed.

13       Q.    Did Nicholas ever touch that phone that particular

14   morning?

15       A.    No.

16       Q.    I'm going to show you what's been marked as 215 for

17   identification.  Do you recognize the guns in this photograph?

18            Do you recognize those?

19       A.    Yes.

20       Q.    And are you familiar with all the guns in that

21   photograph?

22       A.    Most of -- not all of them.

23       Q.    Not all of them, but most of them?

24       A.    Some of them, yes.

25       Q.    Are there any guns that are much more powerful than the

26   gun in this case?

27       A.    I believe so.

28       Q.    Do you know for a fact that they would be?

 1      A.   I don't know for a fact, but I do believe so.

 2      Q.   Okay.

 3           At any time did you take any of these other guns to go

 4      over to Nicholas's that morning?

 5      A.   No.

 6      Q.   When you were going over to Nicholas's that morning,

 7      was it your intention to shoot him?

 8      A.   No.

 9      Q.   Did you ever have any intention to kill him on November

10      10th of 2015?

11      A.   No.

12      Q.   When you kept telling the investigator that day, "You

13      have to believe me.  I'm telling you the truth.  I'm not a

14      killer," do you remember saying that?

15      A.   I believe so.

16      Q.   Do you have a specific -- how many hours were you

17      interviewed?

18      A.   Plenty of hours, but I can't really remember, but like

19      I'd say more than eight.

20      Q.   More than eight.  Could it have been more than 15?

21      A.   Could be.

22      Q.   And do you remember all of the discussions that took

23      place that you were being interviewed?

24      A.   No.

25      Q.   How tired were you?

26      A.   I was very tired.

27      Q.   Now, I'm going to show you what's been marked as 36 for

28      identification.  And I'm going to ask if you're familiar with

1    the contents of that photograph?

2        A.   Yes.

3        Q.   And what is that?

4        A.   That's my car.

5        Q.   And is that where you would normally park your car when

6    you went over to visit Nicholas?

7        A.   Yeah, that's where I would normally park my car.

8        Q.   And did you park your car there that morning?

9        A.   Yes.

10       Q.   And did you ever move your car after you arrived at

11   Nicholas's home?

12       A.   No.  I never moved my car.

13       Q.   I'm going to show you what's been marked as 235 for

14   identification, which appears -- is this the same area which you

15   normally park your car?

16       A.   Yes.

17       Q.   And there appears to be skid marks there?

18       A.   Yes.

19       Q.   Did you leave those skid marks, or did you attempt to

20   leave Nicholas's house at all on November 10th?

21       A.   No.

22       Q.   Did you stay at Nicholas's house?

23       A.   On that day, yes.

24       Q.   Yes.

25            Did you have opportunity to jump in your car and leave?

26       A.   Yes.

27       Q.   Did you do that?

28       A.   No.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 723

1    Q.   The videos that we saw earlier that showed you and

2    Nicholas with the car, it sounded -- did you ever leave skid

3    marks?

4         When you were like in the videos a few nights before?

5    A.   Yeah.

6    Q.   And were those some of the skid marks that we see in

7    the photograph?  Were those some of the skid marks that you left

8    behind when you were there like that Friday evening?

9    A.   Yes.

10   Q.   Now, sometimes on some of your text messages you would

11   say such things as "Meet me at Jacks"?

12   A.   Yes.

13   Q.   What does that mean?

14   A.   Well, it would be like short, you know, we had a

15   particular place we would always meet up, and it would be like

16   Jack in the Box, and that would be the place like where, you

17   know, we would always meet up.

18   Q.   And is there a Jack in the Box near Nicholas's home?

19   A.   Yeah, and almost directly across the street.

20   Q.   And is that what you were referencing when you say

21   "Meet me at Jacks"?

22   A.   Yes.

23   Q.   One of the texts that was shown to you said, "Bro, you

24   gave me a cold sore."  This is 288 for identification.  Do you

25   recognize this?

26   A.   Yes.

27   Q.   And this was said, it appears by the time on it, Friday

28   evening at 6:30 p.m.?

```
1      A.   Yes.

2      Q.   Friday the 6th.

3           Did you see Nicholas that Friday after this was sent?

4      A.   I believe so, yes.

5      Q.   And did you see him that Saturday?

6      A.   Yes.

7      Q.   And did you see him Sunday?

8      A.   I believe, yes, I saw him Sunday.

9      Q.   Okay.  And you saw him after this text message was

10    sent, I take it?

11     A.   Yeah.

12     Q.   What did you mean when you said, "Bro, you gave me a

13    cold sore"?

14     A.   Well, me and Nick, we shared almost everything.  You

15    know, we shared the same food, we shared the same drinks, and

16    sometimes we would share the same cigarettes.  And if he ate out

17    of the same plate, I ate out of the same plate with the same

18    utensils.  So, you know, we shared the same cups for sodas, or

19    the same cups for drinks, and for food, and for many things like

20    that.

21     Q.   Okay.  What did this have to do with your getting a

22    cold sore?

23     A.   Well, you know, at the time I think Nick had a cold

24    sore from a girl, and, you know, I would always eat from the

25    same food as him.  Like his mom would cook food, and like we'd

26    have one plate, and I'd eat from him.  If he like cracked open a

27    can of soda, I'd drink from it, out of it with him, you know.

28    Once, like I said, we'd share the same cigarette, and I thought
```

1   in my mind most likely I got it from eating or drinking

2   something.

3       Q.   Were you at all saying that you had been physically

4   intimate with him when you sent this text message?

5       A.   No.

6       Q.   Had you been?

7       A.   Never.

8       Q.   Now, when you were going through, as you would say

9   "racking the gun," that the shells were being ejected, why did

10  you think the gun was empty?

11      A.   In my mind I remember having like only five or six

12  shells in the tube.  And when I was ejecting it, I could swore

13  to myself, and I ejected it so many times that it was almost

14  impossible for there to be an extra shell.

15      Q.   Is there anything about the way a gun feels when you

16  are ejecting it that makes you believe that the tube is empty?

17      A.   Yeah.  It would have a little particular sound.

18      Q.   It what have what?

19      A.   A little particular sound to it.

20      Q.   A particular sound to it?

21      A.   Yes.

22      Q.   And did it appear to you that that sound was there?

23      A.   To me, yes, because most of it -- most of it was based

24  on because I racked it so many times that like in my heart I

25  really believed that there was no other shells in there.

26      Q.   Now, you were asked questions about the revolver.  Did

27  you always know where the -- when you were pointing it towards

28  your hand, okay?  Did you always know where that bullet was?

```
 1          Or were you kind of guessing or --
 2      A.   Yeah.  I think like my all possible ability to make
 3  sure I knew where it was, but sometimes, you know, I'd be a
 4  little bit careless.
 5      Q.   You never shot yourself?
 6      A.   Never shot myself.
 7      Q.   And did you ever try to do that with a rifle or
 8  shotgun?
 9      A.   I think maybe a shotgun.
10      Q.   Do you recall when that may have been?
11      A.   No, I don't.
12      Q.   Okay.  Now, when you were talking about going shooting
13  that day, did you specifically say you were going to -- did you
14  say what kind of shooting you were going to be doing?
15          MS. FOSTER:  Objection.  Vague as to when.
16          MS. BLUMENTHAL:  I apologize.
17          THE COURT:  Yes.  Vague as to time.
18      Q.   BY MS. BLUMENTHAL:  When you were going shooting on
19  Tuesday, the day that he passed, did you specifically talk about
20  what type of shooting you would be doing?
21      A.   With Nicholas?
22      Q.   Yes.
23      A.   Yeah.
24      Q.   And what was that?
25      A.   It was, you know, we wanted to go skeet shooting, but
26  like almost any shooting would do.
27      Q.   Okay.  Skeet shooting, but almost any shooting would
28  do?
```

```
 1        A.    Yes.

 2        Q.    And you said there were places that you could go to buy

 3   more ammunition?

 4        A.    Yes.

 5        Q.    Now, did you look for ammunition around your house?

 6        A.    No, I did not.

 7        Q.    And why was that?

 8        A.    I think I was just in a rush and I was just trying to

 9   leave as fast as I can.

10        Q.    You're trying to leave as fast as you can.  Would that

11   be because you were taking the gun with you?

12        A.    Yes.

13        Q.    And is that because your dad did not know you were

14   taking the gun?

15        A.    Correct.

16              MS. FOSTER:  Objection.  Leading.

17              THE COURT:  Yes, it is leading.  Sustained.

18        Q.    BY MS. BLUMENTHAL:  Did your father know you were

19   taking the gun?

20        A.    No.

21        Q.    Were you concerned about it that he would know you were

22   taking the gun without his permission?

23        A.    Yeah, I was a little concerned.

24        Q.    Now, Counsel used the term "steal," that you stole your

25   father's gun.  Were you stealing your father's gun that day?

26        A.    No.

27        Q.    You were taking it without permission?

28        A.    Yes.
```

1    Q.    Were you planning on bringing it back?

2    A.    Yes.

3    Q.    When you were being asked some of the questions of some

4    of the statements that you had made to law enforcement, was

5    everything you told law enforcement a lie?

6    A.    Most of it, yes.

7    Q.    Were there facts that were real in there?

8    A.    Yes.

9    Q.    For example, was Nicholas depressed?

10         MS. FOSTER:  Objection.  Outside the scope of this

11   witness's ability to categorize.

12         THE COURT:  Sustained.

13         MS. BLUMENTHAL:  May I rephrase it, Your Honor?

14         THE COURT:  No.

15         MS. BLUMENTHAL:  Okay.

16   Q.    BY MS. BLUMENTHAL:  You were asked questions on

17   cross-examination.  Did you lie when you said Nicholas was

18   depressed?

19         Do you recall that?

20   A.    Yes.

21   Q.    Were you lying about that?

22   A.    No.

23   Q.    You were asked questions on cross-examination if you

24   lied -- if you had told the officers that there were problems

25   between Nicholas and his mother.  Do you recall that, being

26   asked that question?

27   A.    Yes.

28   Q.    And you were asked, did you lie about that?

```
 1            MS. FOSTER:  Objection.  Misstates the question.
 2            THE COURT:  Overruled.
 3       Q.   BY MS. BLUMENTHAL:  Did you lie about it?
 4       A.   No.
 5       Q.   Were there some issues?
 6       A.   Yeah.
 7       Q.   Okay.
 8            So some of the things that you told law enforcement did
 9  have some truth to it?
10       A.   Yes.
11       Q.   And were you -- at that time were you trying to take a
12  lot of things that were true and incorporate it into why he
13  would have committed suicide?
14       A.   Yes.
15       Q.   Now, you were saying -- you were asked questions about
16  you didn't tell the officers about the text messages, the ones
17  "I'm going to shoot you."  Do you recall being asked that
18  question?
19       A.   Yes.
20       Q.   Were you ever asked questions from law enforcement
21  about text messages?
22       A.   No.  I don't believe so, no.
23       Q.   Were you -- were you lying at that time, or not, when
24  you were giving the information in response to their questions
25  to you?
26       A.   What was that?
27       Q.   I'll rephrase that.
28            The times that you were being interrogated, did anyone
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 730

1    ever ask you about the text messages?

2        A.   I cannot remember.

3        Q.   Now, do you recall being asked questions on

4    cross-examination about not sending -- about there being no text

5    messages sent back and forth on Monday, that is the day before

6    he passed?

7        A.   Yes.

8            MS. FOSTER:  Objection.  Misstates the questions.

9            THE COURT:  Overruled.

10       Q.   BY MS. BLUMENTHAL:  Do you recall sending text messages

11   to Nicholas on Monday?

12       A.   I believe so, yes.

13       Q.   I'm going to show you Exhibit W.  It talked about

14   Exhibit W, text No. 293 out of 296.  I'm going to ask you if

15   you're familiar with that text message.  It appears to have, at

16   least at the top it will say "11:04 a.m. on Monday, November

17   9th."  Do you see that?

18       A.   Yeah.

19       Q.   And who is that being sent from?

20       A.   I sent that.

21       Q.   And who did you send -- to whom did you send it?

22       A.   To Nicholas.

23       Q.   And your statement there is "Almost there."  What is

24   meant by that?

25       A.   Coming to his house.

26       Q.   And that is on Monday you were talking about going to

27   his house?

28       A.   Yeah.

1    Q.   So, to the best of your recollection, was this text

2    about going to his house on Monday?

3    A.   Yeah.

4    Q.   I'm going to show you text No. 294 of 296.  It appears

5    to have been sent Monday evening at 9:07.  And whom is that text

6    sent to?

7    A.   That was to me.

8    Q.   Okay.  From?

9    A.   From Nicholas.  I remember that I was -- that was

10   probably when I was at the college class.

11   Q.   You normally had class on Monday evening?

12   A.   I believe so, yes.

13   Q.   And this is one that you received from him; is that

14   correct?

15   A.   Um-hum.  Yes.

16        MR. MOORE:  And just for the record, these are all from

17   Exhibit W.  The first one displayed was text 293 of 296.  The

18   current one is 294 of 296.

19        THE COURT:  All right.  Defense W, right?

20        MS. BLUMENTHAL:  Yes.

21        THE COURT:  All right.

22        MS. BLUMENTHAL:  Thank you.

23   Q.   BY MS. BLUMENTHAL:  Now, this is text No. 295 out of

24   296, and it says "From Houston to."  And it just says "To."  Do

25   you know what this was?

26   A.   I don't know particularly.

27   Q.   I'm going to show you 296 out of 296 sent at 10:00 --

28   Exhibit W.  10:21 p.m. on Monday from you.  To whom are you

1    sending this?

2         A.   That's to Nicholas.

3         Q.   And what do you say there?

4         A.   "This night," which pretty much means good night.

5         Q.   So you did have communication, then, with Nicholas on

6    text messages on Monday before he passed?

7         A.   Yes.

8         Q.   Now, on Monday evening -- on Monday evening, did you

9    speak with, on the telephone, did you speak with Nicholas?

10        A.   I'm sure I did, yes.

11        Q.   I'm going to show you No. S for identification, which

12   has been previously foundation laid for this.  I'm going to show

13   you -- let's see if we can see it.

14             There we go.

15             That highlighted.  No. 26 incoming.  Where is that

16   coming from?  Do you recognize that phone number?

17        A.   Yes.

18        Q.   And whose number is that?

19        A.   That's, I believe, is Nicholas's phone number.

20        Q.   Okay.  And that is on November 9th at 7:41 p.m.; is

21   that correct?

22        A.   Yes.

23        Q.   It says here that you talked for approximately 27

24   minutes and 55 seconds the evening before he passed?

25        A.   Yes.

26        Q.   And was it during that conversation at all that you and

27   he discussed getting together the next morning?

28        A.   Yes.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 733

```
 1      Q.   Did you periodically call each other faggots?

 2      A.   Yes.

 3      Q.   And was that meant as an insult?

 4      A.   No.  Just jokingly.

 5      Q.   Just jokingly?

 6      A.   Yes.

 7      Q.   Did you mean it to be true?

 8      A.   Huh?

 9      Q.   Did you mean that word to be true to the other person?

10           When you would say "faggot" to him, were you teasing

11   him or were you serious?

12      A.   I was just joking.  Yeah, you could say "teasing."

13      Q.   And would he send you the same types of texts?

14      A.   Yeah.

15      Q.   Now, you stated that when you first got to Nicholas's

16   house on the morning of November 10th, you left the gun in the

17   trunk of your car?

18      A.   Yes.

19      Q.   Why did you do that?

20      A.   Just wanted to go to talk to Nicholas, you know, just

21   approach the door as usual, I would always be.

22      Q.   At the time you first went there, did you know if his

23   mother was home or not?

24      A.   I believe his mother was at school.  She's a teacher,

25   so I would, you know, probably assume she would be at class

26   teaching.

27      Q.   Did you know for sure?

28      A.   Not for sure.
```

```
 1        Q.    Is that one of the reasons why you left the gun in the
 2   car?
 3        A.    No.
 4        Q.    Okay.  So you went in and talked to Nicholas, right?
 5        A.    Yes.
 6        Q.    Did you then go back out after talking with Nicholas
 7   for a short while?  Did you then go back out and get the gun out
 8   of your trunk?
 9        A.    Yes.
10        Q.    And what was it in?
11        A.    It was in a soft case.
12        Q.    In a soft case.  Is that how you left your parents'
13   house, was the gun in a soft case?
14        A.    Yes.
15        Q.    And when you had spoken to Nicholas the night before,
16   did you two talk about getting together on Tuesday morning?
17        A.    Yes.
18        Q.    And did you make arrangements that you would meet each
19   other?
20        A.    Yes.  I would always meet him.
21        Q.    And did you normally go over to his house?
22        A.    All the time, yes.
23        Q.    Would he frequently be in bed when you went over to his
24   house?
25        A.    Would he be frequently in bed?
26        Q.    Correct.
27        A.    Sometimes, yes.
28        Q.    Not all the time?
```

```
 1        A.    Yeah.
 2        Q.    Did anyone ever ask you about other text messages, such
 3   as we just saw here, that were sent on Monday to you?
 4        A.    I don't believe so, no.
 5        Q.    And did anyone ever ask you about the phone calls that
 6   you made to Nicholas, or that was made from either Nicholas or
 7   to Nicholas?
 8        A.    No.
 9        Q.    While you were in Nicholas's home, did you ever take
10   your jeans off?
11        A.    No.
12        Q.    Now, you said under the jeans you also had a pair of
13   basketball shorts?
14        A.    Yes.
15        Q.    Did you ever take those off?
16        A.    No.
17        Q.    Did you ever take your boxer shorts off?
18        A.    No.
19        Q.    When you were holding the gun, you said initially you
20   were holding it more in an upright position and you were
21   ejecting the shells?
22        A.    Correct.
23        Q.    Is that correct?
24        A.    Yes.
25        Q.    Where did those shells go when they were being ejected?
26        A.    They were flying around.  They were mostly, you know,
27   going around hitting the floor.
28        Q.    Mostly going around hitting the floor?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 736

 1     A.   Yes.

 2     Q.   You got to the point that you thought everything was

 3  ejected?

 4     A.   Yes.

 5     Q.   At the time that you were ejecting the shells, where

 6  was Nicholas?

 7     A.   Nicholas was laying down like facing to me.  We were

 8  laughing.

 9     Q.   So was he flat on his back when you say "lying down,"

10  or --

11     A.   No.  He wasn't flat.  Like how I described it like

12  almost pivoted.  Laying down but pivoted facing towards me.

13     Q.   Okay.  At that point in time what were you -- do you

14  recall what you were talking about with him?

15     A.   I remember before I took the shotgun, I remember we

16  were just chit-chatting about like not having any money, you

17  know, to go out, whether we were going to go get ammo or food.

18     Q.   Okay.  And after you thought that the gun was

19  completely unloaded, how did you hold -- you said you held the

20  gun where the butt of the gun was more towards your shoulder?

21     A.   Yes.

22     Q.   Or under your shoulder?

23     A.   Yes.

24     Q.   Towards the armpit?

25     A.   Yes.

26     Q.   And that the front of the gun, the end of the barrel of

27  the gun was pointed in the general direction of the bed?

28     A.   Yes.

```
 1        Q.   Not down all the way to the floor?

 2        A.   No.

 3        Q.   Is that correct?

 4             Not up high?

 5        A.   Yes.

 6        Q.   But kind of down and just a slanted position?

 7        A.   Correct.

 8        Q.   At that point in time were you meaning to point the gun

 9   at Nicholas?

10        A.   No, not at all.

11        Q.   Were you aiming that gun at Nicholas?

12        A.   No, not at all.

13        Q.   At the time the gun was discharged, was it your

14   intention to have that gun fire at Nicholas?

15        A.   No, not at all.

16        Q.   At the time that gun was discharged, did you intend to

17   kill him?

18        A.   No, not at all.

19             MS. BLUMENTHAL:  No further questions, Your Honor.

20             THE COURT:  All right.  Ladies and gentlemen, we're

21   taking our afternoon -- we'll be done for the day.  It's 4:05.

22   I think I need to conduct some matters with the attorneys.  I'll

23   need to speak with the attorneys just for scheduling purposes

24   for tomorrow, in the back really quick.

25             (Discussion held at sidebar, not reported.)

26             THE COURT:  All right.  Back on the record.

27             There were some issues with witnesses.  We'll start

28   tomorrow at 9:30.  Tomorrow at 9:30.  We're still ahead of
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 738

1    schedule.

2            Keep an open mind.  Do not discuss the case.  All

3    jurors are ordered to appear in the lobby at 9:30 tomorrow

4    morning.  9:30.

5        (Proceedings were held out of the presence of the jury:)

6            THE COURT:  What I'd like to do tomorrow, usually when

7    the People rest their case, that's when exhibits are admitted.

8    That's what they taught me in law school, but that was 20

9    years -- 30 years ago, maybe more than that.  I was a young kid

10   at the time.  So I want to do it before I forget to ask again.

11           So tomorrow at 9:15, I'd like the lawyers to get here

12   at 9:15 on the dot, so we can move the exhibits, People's

13   exhibits into the record, the specific ones, because there is a

14   lot of them.

15           MS. FOSTER:  Yes.

16           THE COURT:  And if there is any objections to specific

17   ones, I need to -- from the defense.

18           And then -- and then the defendant remains on the

19   witness stand, but my understanding, it's not going to take too

20   long, and then we'll jump into the next defense witness.

21           If there is any stipulations, I'd like the stipulations

22   to be done in order accordingly.

23           MS. FOSTER:  In writing.

24           THE COURT:  Like if there is a stip regarding a

25   witness, I'd like that to be in writing.  It doesn't have to be

26   typed out.  It can be handwritten.  I'll review it, you guys

27   sign off on it, and then someone will read it into the record,

28   okay?

1          MS. FOSTER:  Thank you, Your Honor.

2          THE COURT:  Anything else?

3          MR. MOORE:  No, Your Honor.

4          THE COURT:  All right.  Thank you.  Court's adjourned.

5                    (Proceedings concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 740

```
 1                    RIVERSIDE, CALIFORNIA; JULY 10, 2018

 2                    BEFORE THE HONORABLE SAMUEL DIAZ, JR.

 3            THE COURT:  Good morning, everyone.

 4            (All jurors responded "Good morning.")

 5            THE COURT:  Back on the record.  All parties are

 6    present.

 7            Ladies and gentlemen, no cell phones, all right?  You

 8    don't see the judge having a cell phone on top of his bench.

 9    You don't see the judge texting.  I picked up some bad habits

10    when I was a lawyer.  When I practiced in Federal Court across

11    the street, they didn't even let you bring a cell phone into the

12    courthouse.  So, and, believe me, my wife sometimes texts me and

13    goes, "I've been texting you for two hours."  "Well, honey, I've

14    been on the bench."

15            So, please, no cell phones.  If you need to use your

16    phone, just raise your hand.  We'll take a break.  We take a lot

17    of breaks here, have you noticed?

18            All right.  Serious.  Let's not do this.  We only have

19    one alternate juror left, okay?

20            And another thing, too, I might as well tell you now.

21    When you go back into the jury deliberation room and you're

22    actually going to talk about the case, and all together, turn

23    off your cell phones.  Don't turn them on.  If someone needs to

24    use the cell phone, whoever the foreperson is, says "Okay, we

25    need to take a break," because all of you have to discuss the

26    case together.  If one of you have to step away and use your

27    cell phone, you're not discussing the case together.  All right?

28    We've had issues in the past.
```

```
 1            All right.  No more lectures from the judge.
 2            With that, People?
 3            MS. FOSTER:  Thank you.
 4                          HOUSTON BOJI,
 5  called as a witness by and on his own behalf, having previously
 6  been first duly sworn, was examined and testified as follows:
 7                       RECROSS-EXAMINATION
 8  BY MS. FOSTER:
 9       Q.   Good morning, Mr. Boji.
10       A.   Good morning.
11       Q.   You were asked a few questions on rebuttal about your
12  time being interviewed by the police.  Do you recall that?
13       A.   I believe so.
14       Q.   And you said you were interviewed about eight hours,
15  but it could have been more?
16       A.   Correct.
17       Q.   Now, you were with law enforcement for about eight
18  hours during that time period, but you weren't interviewed the
19  entire time; is that correct?
20       A.   I was with law enforcement for a little bit, but to my
21  memory, I was interviewed for the most part of it.
22       Q.   During that time you took naps; is that right?
23       A.   I didn't sleep, but I just tried to rest.
24       Q.   And there were several times long extensive time
25  periods where you were in the room by yourself?
26       A.   Correct.
27       Q.   And during those times, you were given a blanket at
28  points and laid on the floor?
```

1      A.    Correct.

2      Q.    And then you at times where you took breaks to get

3   food?

4      A.    No, I never got food.

5      Q.    You never went to Taco Bell and got food?

6      A.    That was after the whole interview and investigation.

7      Q.    Okay.  So you weren't -- there was not time periods

8   where you're eating and drinking?

9      A.    Only at the end of it.

10     Q.    So there were times where you did eat and drink?

11     A.    Just once.

12     Q.    And there were times where you were given water, soda,

13  right?

14     A.    Correct.

15     Q.    Now, during your cross -- redirect, sorry.  You said

16  that you believed that there were only five or six rounds inside

17  of the gun when you racked it to let the ammunition out?

18     A.    Correct.

19     Q.    But you did not load the gun?

20     A.    Correct.

21     Q.    So you had no idea how many rounds were actually in

22  there?

23     A.    Correct.

24     Q.    Now, you said on redirect that the text about a cold

25  sore, you were referencing sharing food and drinks?

26     A.    Correct.

27     Q.    That's the first time you have ever said that; is that

28  right?

```
 1        A.   Correct.

 2        Q.   And when you were speaking to Samuel Murillo, you said

 3   that you talked to him about getting an STD?

 4             MS. BLUMENTHAL:  Objection.  Assumes facts not in

 5   evidence with this witness.

 6             THE COURT:  Overruled.

 7        Q.   BY MS. FOSTER:  When you talked to Samuel Murillo, you

 8   talked to him about getting an STD?

 9        A.   I never talked about that.  I can't remember.

10        Q.   You can't remember?

11        A.   In my honest opinion, I never talked about that ever.

12        Q.   And you know what an STD is, right?

13        A.   Yes.  I believe so, yes.

14        Q.   Sexually transmitted disease?

15        A.   Yes.

16        Q.   And you don't call getting a cold sore from eating or

17   drinking a sexually transmitted disease, do you?

18        A.   Could you repeat that?

19        Q.   You wouldn't call getting a cold sore for eating or

20   drinking after someone a sexually transmitted disease, right?

21        A.   Correct.

22        Q.   When you were talking to Samuel Murillo about the text

23   messages, you didn't tell him they were just a joke?

24             MS. BLUMENTHAL:  Objection.  Assumes facts not in

25   evidence with this witness who denies it.

26             THE COURT:  Overruled.

27             MS. FOSTER:  I'm asking for no speaking objections,

28   Your Honor.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 744

```
 1              THE COURT:  Yes.  I'll take that up at the break.
 2       Q.   BY MS. FOSTER:  Now, I'm sorry.  My question, I think,
 3  was:  When you were talking to Samuel Murillo about the text
 4  messages, you didn't tell him that it was a joke?
 5       A.   In my honest memory, I never talked to Samuel Murillo
 6  about that at all.
 7       Q.   Okay.  Now, before when I asked you about that, you say
 8  you don't recall.  Are you saying you recall now not talking
 9  about it?
10              MS. BLUMENTHAL:  Objection.  Ambiguous question as
11  phrased.
12              THE COURT:  Overruled.
13              THE WITNESS:  I don't remember talking to Samuel
14  Murillo at all about that.
15       Q.   BY MS. FOSTER:  Now, you said that when you -- after
16  you shot Nicholas, you put the gun on the ground; is that
17  correct?
18       A.   Not on the ground, on the bed.
19       Q.   On the bed?
20       A.   Yes.
21       Q.   So the gun is sitting on the bed, and when the police
22  arrive, the gun was no longer on the bed?
23       A.   Correct.
24       Q.   You told the police that before they came, you emptied
25  the gun and then you put it away?
26       A.   Correct.
27       Q.   Did you empty the gun again?
28              MS. BLUMENTHAL:  Objection.  Ambiguous as phrased.
```

1          THE COURT:  Overruled.

2          THE WITNESS:  Well, the only time I -- after the

3    shotgun went off and I put it on the bed, and after I did all

4    the CPR and went to go get help, and I went back inside the

5    house to do CPR again, and I heard the police car coming, so I

6    took the shotgun and I chambered it, and that one shell fell

7    out, and I put it back inside the shell -- the case for the

8    safety of the officer.

9      Q.   BY MS. FOSTER:  So there was another round, you're

10   saying?

11     A.   The one that fired off.

12     Q.   Okay.  So just the empty shell fell out?

13     A.   Correct.

14     Q.   And that's not what you originally told the police.

15   You told the police originally that you racked the gun and all

16   the shells came out?

17     A.   Well, I believe that's what I said right now.  Well,

18   through this testimony.

19     Q.   And when you originally talked to the police, you

20   didn't tell them anything about watching a movie together; is

21   that right?

22          MS. BLUMENTHAL:  Objection.  Outside the scope of the

23   redirect.

24          THE COURT:  Overruled.

25          THE WITNESS:  We didn't watch a movie on that day, but

26   the day before we watched a movie.

27     Q.   BY MS. FOSTER:  And when you originally talked to

28   police, you didn't tell them that you watched a movie together,

1  right?  You told them you hung out at a park?

2      A.   Correct.

3      Q.   So you lied about hanging out at a park, or you just

4  left out the movie?

5      A.   We hanged out at a park, but I just left out the movie

6  part.

7      Q.   So you're saying on Monday, in addition to watching a

8  movie, you hung out at a park?

9      A.   Of course, yes.

10      Q.   And that's something you didn't tell us before.  So

11  you're saying in today's version, or yesterday's version, you

12  hung out at a park and then watched the zombie movie?

13          MS. BLUMENTHAL:  Objection.  Argumentative as phrased.

14          THE COURT:  Overruled.

15          THE WITNESS:  In my honest memory, I know I was hanging

16  out with Nick at his house and we watched a movie.  And we went

17  out, and I do believe in my honest memory that we went to a

18  park, and we went to get something to eat.

19      Q.   BY MS. FOSTER:  But you didn't tell us that yesterday,

20  that part about going to a park and getting something to eat?

21      A.   I believe so.

22      Q.   When Nicholas got -- was laying on the bed, did he get

23  back in the bed like to lay down?

24          MR. MOORE:  Vague as to time, Your Honor.

25          THE COURT:  If you want to be a little clearer as to

26  time.  Sustained.

27      Q.   BY MS. FOSTER:  Before you shot Nicholas, when you were

28  talking -- when you were just playing around with the gun, you

```
 1   said he was laying back in the bed; is that right?
 2       A.   Correct.
 3       Q.   Did he get back inside the bed like under the covers
 4   and everything?
 5       A.   No.
 6       Q.   So he wasn't under any sheets?
 7       A.   No.
 8            MS. FOSTER:  I have nothing further.
 9            THE COURT:  Defense?
10            MS. BLUMENTHAL:  If I could have one moment?
11            THE COURT:  Sure.
12            MS. BLUMENTHAL:  Nothing further, Your Honor.
13            THE COURT:  Deputy?
14            All right.  Defense, call your next witness.
15            MR. MOORE:  Your Honor, at this point in time, I think
16   I just have one additional witness, who will be Investigator
17   Dean.  I need to get some technology squared away.  It looks
18   like we're all set, but it will take me a few minutes to get him
19   set up, because we had a little hiccup.
20            THE COURT:  All right.  What do you mean "a few
21   minutes"?  Three minutes?
22            MR. MOORE:  Ten, 15.
23            THE COURT:  Three minutes?
24            Lawyer time or 15 minutes real time?
25            MR. MOORE:  Three minutes lawyer time, 15 minutes real
26   time.
27            THE COURT:  All right.  I'm sorry, ladies and
28   gentlemen.  My apologies.  Court's in recess.  We'll let you
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 748

```
 1   know.  Just wait out in the lobby.  Thank you.
 2                        (Recess.)
 3          THE COURT:  All right.  Back on the record.  All
 4   parties are present.
 5          Defense, call your next witness.
 6          MR. MOORE:  Thank you, Your Honor.  We'd call
 7   Investigator Dean.
 8          THE COURT:  Investigator, you're still under oath.  Do
 9   you understand?
10          THE WITNESS:  Yes, sir.
11          THE COURT:  Thank you.
12          Defense?
13          MR. MOORE:  Thank you, Your Honor.
14                        de LESANDRO DEAN,
15   called as a witness by and on behalf of the Defendant, having
16   previously been first duly sworn, was examined and testified as
17   follows:
18                     DIRECT EXAMINATION
19   BY MR. MOORE:
20      Q.   Investigator Dean, I just wanted to ask you a few
21   questions to kind of clarify some issues that came up in your
22   testimony the other day.
23          You talked about reviewing some traffic cameras; is
24   that correct?
25      A.   That's correct, sir.
26      Q.   So you actually had a chance to review one or more
27   traffic cameras at the request of the DA's office, right?
28      A.   Yes.
```

1    Q.   And that was, at least in part, because the task

2    investigator, the investigator that had been assigned to do that

3    initially was unavailable for this proceeding?

4    A.   That is correct.

5    Q.   So it was an assignment that was initially given to

6    Investigator Samosky while you were the lead investigator, and

7    you reviewed his work and the cameras that he reviewed, correct?

8    A.   That is correct.

9    Q.   So is it fair to say that your understanding was he

10   reviewed all the Moreno Valley traffic cameras that might have

11   relevant images to see if he could see one or more vehicles that

12   might be related to this case, correct?

13   A.   Yes, sir.

14   Q.   And then he isolated little snippets from cameras where

15   he found vehicles that appeared to be consistent with the ones

16   that he was looking for, right?

17   A.   That is correct.

18   Q.   So he was looking for two specific vehicles, right?

19   A.   That is correct.

20   Q.   We had Mr. Boji, Houston Boji's gray Camaro that we've

21   seen in photographs, correct?

22   A.   Yes, sir.

23   Q.   And he was also informed that Ana McCauley was driving

24   a white Jetta of a specific year, correct?

25   A.   Yes, sir.

26   Q.   So he was looking for both of those cars on various

27   traffic cameras, right?

28   A.   That is correct.

```
 1      Q.   Okay.  And did you have a chance to sit down with me

 2  and go over some of those cameras a little bit earlier this

 3  morning?

 4      A.   Yes, sir.

 5      Q.   And did that help kind of refresh your recollection as

 6  to what Investigator Samosky found and isolated on those

 7  systems?

 8      A.   That is correct.

 9      Q.   Okay.  So I'm going to show you what has been marked as

10  Exhibit WW.  It's going to be on the screen behind you, and it

11  may be in front of you as well.

12           Can you tell us what we're looking at here?

13      A.   This is going to be the intersection of Perris and

14  Iris.  The camera, this is facing east.  This is going to be

15  south.  So this would be as if you're coming -- you're coming up

16  Perris Boulevard, say, out of the city of Perris.  And as you

17  travel east on Iris, this is going to be heading towards where

18  the McCauleys live.

19      Q.   Okay.  So just so the record's clear if anyone ever has

20  to read this stuff, if you come in from the right of the screen

21  towards the center or moving to the left --

22      A.   Right.

23      Q.   -- you're coming north on Perris?

24      A.   That is correct.

25      Q.   And then if you -- if a car travels, say, from the

26  bottom to the top of the screen, that would be going east on

27  Iris?

28      A.   That is correct.
```

1    Q.   Okay.  So, and this is actually a portion of the video;
2  is that correct?

3    A.   Yes, sir.

4    Q.   And is this one of the clips that Investigator Samosky
5  isolated at your request?

6    A.   Yes, it was.

7    Q.   Okay.  So I'm just going to roll forward a little bit,
8  and you can see the bar moving at the bottom; is that correct?

9    A.   That is correct.  Right down here.

10   Q.   As the bar moves forward, is that moving forward in
11  time?

12   A.   Yes, it is.

13   Q.   And there is a time index right here next to my mouse
14  pointer?

15   A.   Yes, sir.

16   Q.   And that's 8:17 a.m.?

17   A.   That is correct, yes, sir.

18   Q.   And that's November 10th, 2015?

19   A.   That is correct.

20   Q.   So as I roll it forward, do you see the vehicle that
21  Investigator Samosky apparently identified?

22   A.   This vehicle here we believed to be Mr. Boji's vehicle.

23   Q.   And that's turning the corner from northbound on Perris
24  onto eastbound Iris at 8:17 and 41 seconds?

25   A.   Yes, sir.

26   Q.   Okay.  That's where I have it stopped at least.

27        Now, you're not actually able to individually identify

28  the vehicles that are captured in this video, correct?

1       A.   No, sir.

2       Q.   You can't isolate the license plates or anything?

3       A.   No, sir.

4       Q.   On the other hand, is this vehicle consistent with the

5  one you know to be Houston Boji's?

6       A.   Yes, that's correct.

7       Q.   So I'm going to eject this disk.

8            Now, you also looked at a disk that had a brief video

9  taken from, I believe it's Pedrorena Park in Moreno Valley?

10      A.   Yes, sir.

11      Q.   And that was -- is it true that that was a portion of

12  the video that was isolated a few minutes later by Investigator

13  Samosky?

14      A.   Correct.

15      Q.   Did I say that name right?

16      A.   Yes.

17      Q.   Okay.

18           And that had a vehicle, it was a little bit grainier

19  than this one, but, again, it was consistent with the car driven

20  by Houston Boji?

21      A.   That is correct.

22      Q.   So I'm going to play Exhibit ZZ.

23           I can hear it.  It's gone, so hopefully everything is

24  moving.

25           So does this appear to be videos from the same camera

26  system that you guys use in Moreno Valley that had been shown in

27  Exhibit XX, the Perris -- I'm sorry.  Exhibit WW, the Perris and

28  Iris intersection?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 753

```
 1        A.    Yes, sir.

 2        Q.    There's two different videos in this particular

 3   exhibit; is that correct?

 4        A.    That is correct.

 5        Q.    Is this just two views of the same intersection at the

 6   same time from two different cameras?

 7        A.    Yes.  This is going to be the intersection of Iris and

 8   Lasselle.  This camera is going to be looking east going up

 9   Iris, and then this camera is now looking north up Lasselle.

10        Q.    Okay.  So the video that comes up on the left is east

11   on Iris, and the video that comes up on the right is north on

12   Lasselle?

13        A.    That is correct.

14        Q.    So I'm going to highlight the east on Iris one.

15              And down here at the bottom we have the same slider

16   bar, which is the time code, correct?

17        A.    That is correct.

18        Q.    The timeline?

19        A.    Yes.

20        Q.    And this is the isolated part of the video that

21   Investigator Samosky gave to you?

22        A.    That is correct.

23        Q.    And the green part, is that a place where he is

24   artificially, or he's highlighted that segment of the video?

25        A.    Yes.

26        Q.    So I'm going to scroll forward just a little bit and

27   let the device catch up with me here.

28              I'm actually scrolling backwards.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 754

 1          So here we are.  And if you look at my mouse pointer,

 2   again, we're on November 10th, 2015.  This is now 8:16 and 53

 3   seconds a.m., correct?

 4      A.   That is correct.

 5      Q.   And this is a direction that is actually away from

 6   Soaring Seagull, correct?

 7      A.   Right.  This is going to be traveling east on Iris away

 8   from the residence.

 9      Q.   Okay.  And is it fair to say that Investigator Samosky

10   appears to have isolated this portion of the video -- I've

11   highlighted it -- based on this white car that I'm circling

12   that's in the middle of the screen at 8:16:54?

13      A.   Correct.  This vehicle here has the characteristics of

14   a white Jetta.

15      Q.   Okay.  And that was consistent with Ana McCauley's

16   vehicle?

17      A.   That is correct.

18      Q.   Now, he wasn't just looking at these specific time

19   frames or these specific cameras, he had the ability to look in

20   a much wider time frame if he chose to do so?

21      A.   That is correct.

22      Q.   Do you know what sort of time frames Investigator

23   Samosky looked at?

24      A.   I believe we were just working backwards from the 911

25   call.  And based on her time, Ana's arriving at school between

26   what she believed, you know, 8:10 or 8:15, we said, okay, let's

27   take that window.  Let's go back from the 911 call, I believe it

28   was at 8:36, and just go back.  And so you kind of limit

1    yourself to, let's say, 8 o'clock to 8:36, or if you don't find

2    it, you can go back further.

3        Q.   Okay.  And just to clarify, some of your testimony from

4    the other day, if I was understanding it right, correct me if

5    I'm wrong, I heard you say that in these cameras you were

6    actually able to see back to the Soaring Seagull intersection of

7    Iris?

8        A.   Correct.  That was my understanding based on the camera

9    system and looking at Perris and Iris.  I was under the

10   assumption that he was looking back towards the residence, when

11   in actuality, he's looking away from the residence.

12       Q.   Okay.

13       A.   So with the car traveling, obviously, it's not going to

14   go past Lasselle if it's going into the actual housing

15   development.

16       Q.   Sure.  And I'll put up a map in just a second so we can

17   get oriented, but, so after reviewing the disks that we have

18   available today, are you comfortable saying that you actually

19   did not ever look at a video that showed the entrance to the

20   Soaring Seagull address off of Iris?

21       A.   That is correct.

22       Q.   And based on your review of Samosky's, Investigator

23   Samosky's reports, that's not something that either he was able

24   to pull up, or at least he did not pull up?

25       A.   It didn't appear that he documented it, so I can't

26   testify as to what he saw.

27       Q.   Okay.  And based on your review of the evidence that we

28   have, was there ever any documentation or camera that captured

1     the moment when the car consistent with Mr. Boji's turned onto

2     the entrance to the Soaring Seagull address?

3         A.    No.

4         Q.    So let's switch over now.

5               And just so we're clear, the video that's in ZZ there

6     that was on the screen until the deputy did what I asked him to

7     do, that was an accurate representation of what Investigator

8     Samosky gave you, correct?

9         A.    That is correct.

10        Q.    All right.

11              I'm going to show you Exhibit AAA for identification.

12              There we go.

13              Do you recognize what's depicted in this exhibit?

14        A.    Yes.  This is an overhead map.  This is going to be

15    showing you -- here is the intersection of Iris and Lasselle.

16    This is Soaring Seagull where the residence, the McCauleys live,

17    and Pelican is the main artery into the housing development

18    there.

19        Q.    Okay.  And are you familiar with this area?

20        A.    Yes, I am.

21        Q.    Is there actually a Jack in the Box over here across

22    the street near the Starbucks, to your knowledge?

23        A.    Yes, there is.

24        Q.    And we see a CVS marked up here just on the top right

25    corner of the intersection of Iris and Lasselle?

26        A.    That is correct.

27        Q.    And so is it fair to say that the camera that we were

28    just focusing on in Exhibit ZZ was pointing somewhat in this

 1   direction?  I wrote a blue arrow kind of across the

 2   intersection.

 3        A.   Yeah, that is correct.

 4        Q.   So you can actually see the CVS in that camera,

 5   correct?

 6        A.   Yes, sir.

 7        Q.   And you testified that you viewed some brief video from

 8   Pedrorena Park, right?

 9        A.   That's correct.

10        Q.   And that's down here on the left of this particular

11   exhibit?

12        A.   Yes.  The camera is going to be facing north, capturing

13   traffic that's traveling east and westbound on Iris.

14        Q.   And that was just kind of a quick, grainy view of a car

15   that was consistent with the Camaro?

16        A.   That's correct.

17        Q.   I'm going to go to page 2 of the map.  Is this just

18   kind of a zoomed-out version of this, well, depiction of the

19   same general area?

20        A.   Correct.  This is basically a larger portion, because I

21   believe this is going to be the park there.  And so if you go

22   back here, this is going to be Perris Boulevard.  This is Iris.

23   And this is the path that you would be taking to get into the

24   development.

25        Q.   So we had a camera -- we actually saw the camera that

26   was at this intersection here, and that was pointing in this

27   direction, drawing a blue arrow.  Is that generally, correct?

28        A.   That's correct.

1    Q.   And that was the intersection of Iris and Perris.

2         And then the second video that we watched was this

3    intersection I'm circling here, which is Iris and Lasselle,

4    right?

5    A.   That is correct.

6    Q.   Okay.  Thank you very much.  That will conclude that

7    portion of the testimony.

8         I do have a few more pictures that I want to go over

9    with you from the crime scene, the investigation scene.

10        I'm going to show you what's been marked as BBB, like

11   boy, for identification.  Can you tell us, in fact, is that a

12   picture that was taken in the course of the investigation that

13   you were lead detective of?

14   A.   Yes, it is.

15   Q.   And that's Nicholas McCauley.  At this point we know

16   that, right?

17   A.   That's correct.

18   Q.   Can you tell us at what point in the investigation this

19   would have been taken?

20   A.   When we do what's called an initial walk-through, when

21   I arrive on scene with my partner, as well as the third

22   investigator that's going to process the scene, we do what's

23   called an initial walk-through.  The first deputy on scene will

24   kind of brief us and tell us what they've seen.  They then will

25   walk myself and my partner and the forensic tech into the actual

26   crime scene.  More times than not the pathologist will come

27   through as well.  We walk through the scene, try not to

28   contaminate it.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 759

1        This photo, basically, would be looking in through the
2    accordion doors, which would be on the west side of the room.
3    And you could see Mr. McCauley's laying on the floor on his
4    back.
5        Q.   And we can see there is a couple of disks that are
6    faintly visible down here on the tops of his thighs, and a
7    couple more up here on his shoulders.  That's consistent with
8    some sort of EMS?
9        A.   Correct.
10       Q.   Making sure that there's no lifesaving needed at that
11   point?
12       A.   Right.  That would be done prior to my arrival.
13       Q.   And at this point is it safe to say that there hasn't
14   been any significant evidence collection that's started?  This
15   is at the beginning stages of the processing, correct?
16       A.   Correct.
17       Q.   Now, I'm going to show you Exhibit CCC for
18   identification.  This is once the processing has started, right?
19       A.   That is correct.  As you can see the ruler, which he
20   put in for scale, is going to have Investigator Corey's name on
21   it.  He was the crime scene investigator.  And then the placard
22   for the evidence item.  And then this is the particular item
23   that they are collecting, the expended shell casing.
24       Q.   And that's the single expended shell casing that was
25   recovered from the scene, correct?
26       A.   That is correct.
27       Q.   And then finally from this series we have DDD for
28   identification.  And is that -- that's the lower half of

```
 1    Mr. McCauley's body at the same, basically, the same stage of

 2    processing as in BBB?

 3        A.    That is correct.

 4        Q.    So very early on, correct?

 5        A.    Yes, sir.

 6        Q.    And then the last one I got for you is EEE.  And this

 7    is just Mr. Boji's car as it was found positioned outside the

 8    McCauley residence that day; is that correct?

 9        A.    That is correct.

10            MR. MOORE:  Your Honor, I have nothing further at this

11    time.

12            THE COURT:  People?

13                        CROSS-EXAMINATION

14    BY MS. FOSTER:

15        Q.    For the two cars that you observed through Investigator

16    Samosky, were you able to identify the license plates for either

17    one?

18        A.    No.

19        Q.    So both cars are just fitting the description of the

20    car type?

21        A.    That is correct.

22        Q.    And in the videos as you watched them, well, did you

23    watch videos or stills?

24        A.    I actually saw stills.

25        Q.    So those are like photographs, right?

26        A.    Correct.

27        Q.    Of the video?

28        A.    Yes.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 761

1    Q.   Is that how it originally comes?  Does it come in a
2    video and stills were given to you?
3    A.   No.  Investigator Samosky is actually looking at the
4    cameras, and then he captures however large of a period.  And
5    then for my part of the investigation, he basically just handed
6    me, he says "This is what I found at this intersection.  This is
7    what I found at this intersection."  And I kind of looked at
8    that and went from there.
9    Q.   And so what time frame did you have Samosky pull?
10   A.   As I told defense counsel, we went backwards from the
11   911 call and based off of the statements that Mr. Boji game me
12   approximate time that he left his residence, trying to gage the
13   time it would take him to drive from Canyon Lake to Moreno
14   Valley.  We gave ourselves like a 25-, 35-minute window.  So if
15   you go from the 911 tape at 8:37, you know, say we go back to 8
16   o'clock.  So we're looking in that time frame.
17   Q.   Is that specifically the time frame you told him?
18   A.   I can't say specifically the time frame, no, but I'm
19   just saying as a round number that's what we would start with.
20   Q.   Okay.  Do you recall specifically the time frame that
21   you gave him?
22   A.   No, I don't.
23   Q.   Do you know specifically what time frame he watched?
24   A.   No.
25   Q.   Do you know if any other white Jettas were seen --
26   scratch that.
27        Were you given only this one particular white Jetta
28   that you saw?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 762

1      A.   Yes.

2      Q.   Do you know if any other white Jettas were seen on the

3    cameras?

4      A.   I do not know, no.

5      Q.   And just because we were looking at stills, and we have

6    a map thanks to Mr. Moore, I'm going to show you Defense Exhibit

7    AAA.  Do you see the pattern of which you observed the Camaro

8    take, or the direction you seen the Camaro take on AAA?

9      A.   Yes.  This is Perris Boulevard traveling northbound.

10   This is the intersection of Perris and Iris.  You make a right

11   turn on Iris, you'd be traveling eastbound.  This is Pedrorena

12   Park.  I don't know if I'm pronouncing that correctly.  And then

13   here is the housing development where the McCauleys lived.

14     Q.   And did you see -- and you said you couldn't see it

15   after a certain point.  When is the last time -- where was the

16   last time you saw that Camaro?

17     A.   The vehicle was picked up, well, what we believe to be

18   the vehicle was picked up at a camera here at Pedrorena Park,

19   which is facing northbound, capturing traffic traveling east and

20   westbound.

21     Q.   And that's the last video we see at 8:18?

22     A.   Correct, that's it.

23     Q.   And you were shown Defense Exhibit DDD.  And on Defense

24   Exhibit DDD in the center of Nicholas's legs there appears to be

25   two stickers.  Is that from medical intervention?

26     A.   That is correct.

27     Q.   So does that mean Defense Exhibit DDD is after medical

28   services arrived and attempted to revive him?

```
1        A.   Yes, that's correct.

2        Q.   So someone else had come into the scene and attempted

3   to revive Nicholas based on DDD?

4        A.   Correct.

5        Q.   So DDD is not taken before the first officers arrived?

6             I'm sorry.  At the time that the first officer arrived,

7   like Kurylowicz?

8        A.   No.

9        Q.   And that's the same for BBB; is that correct?  This is

10  also indicating the top of Nicholas's shoulder.  That this was

11  taken after medical intervention?

12       A.   That is correct.

13       Q.   And do we know if during medical intervention any of

14  the scene was disturbed?

15       A.   I have no knowledge of that.

16            MS. FOSTER:  I have nothing further.

17            THE COURT:  Defense?

18            MR. MOORE:  Just briefly.

19                         REDIRECT EXAMINATION

20  BY MR. MOORE:

21       Q.   In situations like this, are you familiar with the

22  medical intervention that is given to someone in Mr. McCauley's

23  condition?

24       A.   No, sir.

25       Q.   Are you aware of any reports that would indicate that

26  any sort of lifesaving techniques were used on Mr. McCauley when

27  he was contacted by EMS?

28       A.   No, sir.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 764

1    Q.   Those -- those pads that are left behind, are you

2  familiar with what those are?

3    A.   No.

4    Q.   Are they consistent with sensors that pick up cardiac

5  movement?

6    A.   I believe so, yes, sir.

7    Q.   Have you seen EMS use that type of sensor in the past?

8    A.   When I was on patrol, yes.

9    Q.   Is that something they'll do to try and detect if there

10  is any heart activity in somebody who may be deceased?

11   A.   Yes, sir.

12   Q.   It's a way of, essentially, pronouncing somebody dead?

13   A.   Correct.

14   Q.   That way they can leave the decedent, the body behind

15  without having to transport it for a doctor to declare it dead?

16   A.   That is correct.

17   Q.   With regard to Investigator Samosky, when Investigator

18  Samosky was tasked with looking for vehicles related to or

19  potentially related to this investigation, he was aware of -- he

20  was given information about the types of vehicles to look at,

21  right?

22   A.   That is correct.

23   Q.   He was also given information about what the

24  investigation had uncovered as to the relevant time frames,

25  correct?

26   A.   That is correct.

27   Q.   So he was providing information about when

28  Miss McCauley, the best information available at least, about

1    when Miss McCauley had arrived or believed she had arrived at

2    work, right?

3         A.   That's correct.

4              MR. MOORE:  Nothing further.

5              THE COURT:  People?

6              MS. FOSTER:  No further questions.

7              THE COURT:  All right.  Thank you, sir.  You may return

8    to your seat.

9              THE WITNESS:  Thank you, Your Honor.

10             THE COURT:  All right.  Defense, call your next

11   witness.

12             MR. MOORE:  Your Honor, at this time we'll rest subject

13   to introduction of exhibits.

14             THE COURT:  All right.  We'll take that right before

15   lunch.

16        And at this time the defense has rested, and it's

17   rebuttal.  Any rebuttal evidence at this time?

18             MS. FOSTER:  At this time the People will call Ana

19   McCauley.

20                       (Brief pause.)

21             MS. FOSTER:  I think she stepped away to use the

22   restroom.  May I have one moment, Your Honor?

23             THE COURT:  Yes.

24             MS. BLUMENTHAL:  Your Honor, while she's waiting for

25   the witness, would it be a good time that we can talk with the

26   Court in the back?

27             THE COURT:  Why not?

28        All right.  You know, ladies and gentlemen, I'm really

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 766

```
 1   much more efficient in other trials.  Somehow this trial has had
 2   its ups and downs.
 3            All right.  Let's go in the back.  With the court
 4   reporter or without the court reporter?
 5            MS. BLUMENTHAL:  Without for right now.
 6            THE COURT:  All right.  Thank you.
 7              (Discussion held at sidebar, not reported.)
 8            THE COURT:  All right.  People?
 9            All right, ma'am, just in abundance of caution, madam
10   clerk?
11            THE CLERK:  Please raise your right hand.
12            Do you solemnly state that the evidence you shall give
13   in this matter shall be the truth, the whole truth, and nothing
14   but the truth, so help you God?
15            THE WITNESS:  I do.
16            THE CLERK:  Please be seated.
17            Please state and spell your first and last name for the
18   record.
19            THE WITNESS:  Ana, A-n-a, McCauley, M-c, capital C,
20   a-u-l-e-y.
21            THE COURT:  People?
22            MS. FOSTER:  Thank you.
23                            ANA McCAULEY,
24   called as a witness by and on behalf of the Plaintiff, having
25   been first duly sworn, was examined and testified on Rebuttal as
26   follows:
27                          DIRECT EXAMINATION
28   BY MS. FOSTER:
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 767

1      Q.   Miss McCauley, just a couple of quick questions.

2           When you -- you said when you left on the morning of

3    November 10th that your son was still in bed?

4      A.   Yes.

5      Q.   When he was -- you said he was laying flat in the bed;

6    is that correct?

7      A.   That's what I recall.

8      Q.   And you describe him with his right side to the edge of

9    the bed?

10     A.   Yes.

11     Q.   And was he laying under the covers?

12     A.   He was covered partially.

13     Q.   Okay.  And what was he covered by?

14     A.   His blanket.

15     Q.   And do you recall what that blanket looked like?

16     A.   Yes.

17     Q.   What did it look like?

18     A.   It has blue and black and gray zigzag stripes.  It was

19   his comforter.

20     Q.   I'm going to show you a photograph that's been marked

21   for identification as People's -- I'm sorry.  Defense DDD.  Do

22   you recognize what's depicted in Defense DDD?

23     A.   Yes.

24     Q.   And what is that, I'm sorry?

25     A.   That's his leg and the comforter.

26     Q.   And is that the blanket you described that he was

27   laying in when you left?

28     A.   Yes.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 768

1           MS. FOSTER:  I have nothing further.

2           THE COURT:  Defense?

3           MS. BLUMENTHAL:  No questions.

4           THE COURT:  Thank you, ma'am.

5           THE WITNESS:  Thank you.

6           MS. FOSTER:  And, Your Honor, is she no longer subject

7   to recall?

8           THE COURT:  She's excused.

9           MS. FOSTER:  Thank you.

10          At this time I'd recall Investigator Dean.

11          THE COURT:  Yes.

12          Sir, you're still under oath.

13          THE WITNESS:  Yes, Your Honor.

14          THE COURT:  People?

15          MS. FOSTER:  Thank you.

16                         de LESANDRO DEAN,

17   called as a witness by and on behalf of the Plaintiff, having

18   previously been first duly sworn, was examined and testified on

19   Rebuttal as follows:

20                        DIRECT EXAMINATION

21   BY MS. FOSTER:

22      Q.   Investigator Dean, you conducted interviews of Houston

23   Boji; is that correct?

24      A.   That is correct.

25      Q.   And do you recall what time you started interviewing

26   Mr. Boji?

27      A.   No.  I couldn't tell you that.

28      Q.   So based on your participation in this investigation,

```
 1   where did you go first?
 2        A.   I went to the scene.
 3        Q.   Okay.  And about how long were you at the scene?
 4        A.   Probably 45 minutes.
 5        Q.   And at that time do you walk around the scene?
 6        A.   Correct.
 7        Q.   And then what do you do after that?
 8        A.   After we complete our walk-through at the scene, I then
 9   travel more times than not to the station where the suspect
10   and/or witnesses are located.
11        Q.   And when you arrive at the station, at some point do
12   you interview Houston Boji?
13        A.   Yes, I do.
14        Q.   And where do you interview him?
15        A.   In one of the interview rooms inside of the detective
16   bureau.
17        Q.   And about how long would you say you interviewed
18   Mr. Boji?
19        A.   That day off and on eight-plus hours, maybe ten hours.
20        Q.   And were you the primary in conducting all the
21   interviews?
22        A.   Yes, I was.
23        Q.   And during that off-and-on period, was Mr. Boji given
24   breaks?
25        A.   Yes, he was.
26        Q.   And do you recall about how long those breaks were?
27        A.   They vary, because I could take a break for -- to
28   change the battery in my recorder.  I could take a break because
```

1    I want to take a break myself.  And I always, no matter who I'm

2    talking to, I try to give them breaks, feed them if I can, give

3    them water, give them bathroom breaks.

4            In this instance when I initially contacted him, he was

5    covered in blood, so I did not want to conduct an interview like

6    that in his present condition.  Because when I make contact with

7    someone, I walk up to them and I shake their hand.  In this

8    instance I couldn't, because he was covered in blood, just

9    because I didn't want to get blood on myself.

10           So I allow him some time to get cleaned up.  And in

11   this case cleaning up was basically processing him, swabbing his

12   hands, collecting his clothing.  And then when he's in a

13   comfortable state, I then go back in the room and start my

14   investigation.

15       Q.   And so my question was:  How long were the breaks that

16   you gave the defendant?

17       A.   They could be anywhere between five minutes to 20

18   minutes.  It just depends.

19       Q.   And were there times where you left the room to the

20   point that the lights went out?

21       A.   Yes.

22       Q.   Were there times where he was able to take a nap?

23       A.   Yes.

24       Q.   And do you recall how many times that you left the room

25   to stop interviewing?

26       A.   No, I do not know.

27       Q.   During the course of that eight to ten hours, did you

28   have to ever return to the scene?

```
 1        A.   Yes, I did.

 2        Q.   And so you actually leave the station and stop the

 3   interview?

 4        A.   Yes.

 5        Q.   And then how long were you gone at that point?

 6        A.   Travel time to and from the scene, probably 25 minutes.

 7   I was at the scene probably, I'd say safe to say, another half

 8   hour or so.  So gone for at least an hour.

 9        Q.   So there was at least one period where he wasn't being

10   questioned for at least an hour?

11        A.   That is correct.

12        Q.   Now, the interviews that you conducted, were they

13   recorded?

14        A.   Yes, they are.

15        Q.   And have you had an opportunity to review the

16   recordings or transcripts of those interviews?

17        A.   Yes.

18        Q.   And were they true and accurate depictions of the

19   interviews you conducted?

20        A.   Yes, they were.

21        Q.   And during the time that you were interviewing the

22   defendant, did he tell you different versions of what happened?

23        A.   Yes, he did.

24        Q.   And can you tell us about how many different versions

25   of what occurred did he give you?

26        A.   I was given three different versions.

27        Q.   And what was the basics of the first version that was

28   given to you?
```

1    A.   The first version was the suicide by Mr. McCauley.

2    Q.   And then what about the second version?

3    A.   The second one was he talked about them both handling

4    the gun.  Mr. McCauley handed him the gun back, but first

5    meaning the stock is going to be facing Mr. Boji and the barrel

6    is going to be facing Mr. McCauley, and Mr. Boji grabbing the

7    shotgun, and then Mr. McCauley pulling back, and then the gun

8    going off accidentally.

9    Q.   So in that second version he is saying that

10   Mr. McCauley pulled the gun back from him and that's how it went

11   off?

12   A.   That is correct.

13   Q.   And then what about the third version?

14   A.   The third version was, again, they're both handling the

15   gun, loading and unloading it.  He retrieves the gun back from

16   Mr. McCauley.  He believes that the shotgun is empty and

17   unloaded with the safety on.  There is a button near the handle

18   that you can press in and out that will make the gun unoperable.

19   He believed the gun to be empty and the safety on.  Points the

20   gun at Mr. McCauley and then pulls the trigger.

21   Q.   Now, you heard the defendant's testimony yesterday?

22   A.   Yes, I did.

23   Q.   Did he ever tell you that version?

24   A.   No, he did not.

25   Q.   Did you give him opportunities to tell you whatever

26   version he wanted?

27   A.   Yes, I did.

28   Q.   Did you ask him to tell you the truth?

```
 1        A.    Absolutely, yes.

 2        Q.    I have in my hand what appear to be two transcripts

 3   attached to tapes, and I'm marking the bottom of one 331-A, and

 4   the bottom of the other 332-A.  I'm marking on the disk bottom

 5   right corner 331 and 332.

 6             MS. FOSTER:  Approaching defense counsel.

 7             Your Honor?

 8             THE COURT:  Yes.

 9             MS. FOSTER:  At this time defense is requesting a 402.

10             THE COURT:  All right.  We'll have that out in my

11   chambers.  And did you bring enough transcripts for everyone?

12   For the jurors?

13             MS. FOSTER:  Yes.

14             THE COURT:  All right.  I'll have the court reporter

15   and the parties back in my chambers.

16             Stand up.  Stretch out, but don't leave the courtroom.

17   Court's in recess.

18      (Proceedings were held out of the presence of the jury:)

19             THE COURT:  Back on the record out of the presence of

20   the jury.

21             Defense is requesting a 402, and you wanted to play

22   back some of the interview.  And could you be specific, because

23   it was a lengthy interview broken up in different parts.

24             MS. FOSTER:  So there are multiple interviews that the

25   Court observed.  I don't intend to play all of the interviews.

26   I have four different interviews.  Because there is mention of

27   the polygraph, two are still being edited, to make sure that all

28   of the -- any reference to the poly is --
```

1      THE COURT:  Just discuss the ones that you have right

2  now in front of you.

3      MS. FOSTER:  So the ones that I have in front of me

4  right now are, I think it was referenced to the Court as like

5  three of five, or something to that originally.

6      THE COURT:  Is this the one at the Moreno Valley police

7  station?

8      MS. FOSTER:  This is at the Moreno Valley police

9  station after the polygraph where the defendant goes through one

10  of his stories, which Investigator Dean described as the second

11  version.  So this is after poly version of with Nicholas

12  grabbing the gun.

13      THE COURT:  All right.  Let's be a little specific.

14  After the polygraph exam, the polygraph examination did not

15  occur at the Moreno Valley police station, it occurred at the

16  San Bernardino Sheriff's Department, I believe, in the county of

17  San Bernardino.  Did this interview, was it there in

18  San Bernardino, or was it already back in Moreno Valley?

19      MS. FOSTER:  This is back in Moreno Valley.

20      THE COURT:  All right.  And if you have an objection --

21      MS. BLUMENTHAL:  I do.

22      THE COURT:  And what is your objection?

23      MS. BLUMENTHAL:  The objection is these questions were

24  asked "Did you lie?" and he said, "Yes."  There is -- he agreed

25  when he was on the witness stand on cross-examination that he

26  had lied to this.  And playing this is not impeaching him in any

27  way.  It is cumulative.  She's already asked him the questions,

28  and he's already agreed that he lied.  And so it doesn't do

```
 1    anything except just add more time playing in there when she's
 2    already asked the questions.
 3            MS. FOSTER:  I think every -- I think these tapes were
 4    already ruled relevant by the Court.
 5            THE COURT:  Yes.
 6            MS. FOSTER:  And I don't have to play them for the sole
 7    purpose of impeachment, however, there are things in those that
 8    are inconsistent with his testimony, but it's also an admission
 9    by party opponent.  So they don't have to be inconsistent or
10    specifically for impeachment, as well as the fact that they go
11    to show that when he's lying, they actually have video attached
12    to them.  So he's lying.  He's in an emotional state.  He's in a
13    state also similar to the state in which he testified.  They can
14    look at that to determine whether or not he's lying in their
15    observations as well.
16            MS. BLUMENTHAL:  Your Honor?
17            THE COURT:  Hold on.
18            MS. BLUMENTHAL:  If it were case in chief, it would be
19    different than in rebuttal.  Rebuttal has to go directly
20    against --
21            THE COURT:  She couldn't do it in case in chief,
22    because the defendant did not testify in the People's case in
23    chief.  It's coming in as rebuttal.  I think it's relevant.
24    Well, I know it's relevant.  It's probative.  It comes in for
25    inconsistent statements, consciousness of guilt.  Defendant
26    testified.  It just snowballed.  He testified over and over.  It
27    just snowballed.  So watching the defendant's demeanor during
28    the interview the way he explained these stories is probative.
```

1    And so I'm going to overrule your objection as to that

2    interview.

3            And which exhibit is that, so it can be clear on the

4    record?

5            MS. FOSTER:  That is 331.

6            THE COURT:  All right.  And then you have another one?

7            MS. FOSTER:  And I just put, for the Court's reference,

8    I believe 331 has now been narrowed down to about 30 minutes.

9            THE COURT:  All right.

10           MS. FOSTER:  The other one is 332.  332 is like the

11   second half of that same interview.  So they take a break and

12   then Dean comes back to talk to him and basically tells him that

13   the story that he started in San Bernardino and ends in 331 is

14   not consistent with the scene, and that's when he alters to the

15   third version.

16           THE COURT:  All right.

17           MS. FOSTER:  Which Investigator Dean describes where he

18   then starts to say more, so that it was an accident, where he

19   accidentally pulls the trigger.

20           MS. BLUMENTHAL:  I'm going to object to any reference

21   to San Bernardino.

22           THE COURT:  Well --

23           MS. BLUMENTHAL:  Because I don't think it's necessarily

24   uncommon that that's where the sheriff's department takes

25   everybody to get polygraphs done, is in San Bernardino.  And

26   it's not relevant to this case, and I would have an objection to

27   San Bernardino, because the jury is going -- would be wondering

28   why are they in San Bernardino.  So I object to that as not

1  being relevant.  And I think you're skating on some dangerous

2  territory there, because that is where they went to do a

3  polygraph.

4          THE COURT:  Well, the jurors don't know that.  There is

5  no evidence of that.  All that evidence is going to be excluded.

6  But it's a time frame.  I don't know, time for the defendant to

7  come up with another version.  It goes into context about the

8  lapse of time, the transporting time.  Him leaving that same

9  room to another car, patrol car, going outside, getting into a

10  car, driving to another location.

11          I think all that shows his demeanor.  It shows the time

12  that he had to come up with a different version.  I think I'm

13  not going to cut the People off on that.  I think it is

14  relevant.  It is probative and it's inconsistent, so.  And it's

15  a statement against his penal interest.  Again, it's not

16  cumulative because he's coming up with another story.

17          MS. BLUMENTHAL:  Then the other ones that she's talking

18  about --

19          THE COURT:  So my ruling as to these two, it is

20  relevant, probative, and the Court will allow it over the

21  defense objection.

22          MS. FOSTER:  Okay.  And the one that is currently being

23  edited and should be ready any moment, but I want

24  Miss Blumenthal to have a chance to review it before it's

25  played, because there were references to a polygraph, and that

26  has been removed.

27          THE COURT:  Right.  And that one was at the

28  San Bernardino County Sheriff's Department, and there was a

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 778

```
 1   polygrapher that is present.
 2          MS. FOSTER:  I'm not referring to that one right now,
 3   I'm referring to the one before they went to the poly.  So there
 4   was one before they went to the poly where he's telling his
 5   first story.  And, really, my goal is just to narrow these down.
 6   That's why I didn't pull all of them to him telling his three
 7   different versions of the story.
 8          And the other tapes he tells them again, but I don't
 9   need every time he tells it, I just want to show he told the
10   suicide, he told that Nicholas and he were playing with it, and
11   then he told it was an accident by hisself.  So the one that's
12   being brought over is the story, the suicide story he tells
13   before they go over to San Bernardino for the polygraph.
14          THE COURT:  Now who is in that videotape?
15          MS. FOSTER:  Investigator Dean.
16          THE COURT:  All right.
17          MS. BLUMENTHAL:  My other concern, the last one,
18   though, is the polygrapher who is doing the interview.  And
19   there are a lot of statements made throughout, like "I'm not on
20   this case."  "I don't have anything to do with this case," and
21   I'm very concerned about that particular --
22          MS. FOSTER:  Well, then, let's eliminate that one.
23          THE COURT:  I'm not saying eliminate.
24          MS. FOSTER:  I don't know.  I don't --
25          THE COURT:  What I'm saying is we have time to litigate
26   that after lunch, because these two tapes, the other one is
27   going to take -- it's 11 o'clock.  It's going to take more than
28   an hour, I believe --
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 779

1          MS. FOSTER:  Yes.

2          THE COURT:  -- to play these tapes.  So have the

3    defense have an opportunity to review the edited version, and

4    then we could have another hearing, you know, at 2 o'clock,

5    2:30, and I'll make a ruling.

6          MS. BLUMENTHAL:  These two I've seen, but I don't have

7    the other two edited ones you're talking about.

8          THE COURT:  My ruling is it's not cumulative.  The

9    defendant has an opportunity, like, to tell the truth.  And what

10   you're presenting, your defense, you're presenting your case is

11   the defendant was offered many opportunities to be truthful, and

12   each of these opportunities he failed to do so.  That becomes

13   inconsistent and shows consciousness of guilt.  Shows his

14   demeanor, his state of mind.  All that is relevant, because the

15   defendant did testify.  He took the stand.  All that becomes

16   admissible.

17         MS. BLUMENTHAL:  And he admitted, just for purposes of

18   the record, Your Honor, he admitted on each of those cases, if

19   he was asked by the prosecutor "Did you tell the truth?" he

20   admitted that he lied.  He admitted that over and over again,

21   and that's why I don't believe that this is impeachment, because

22   he already gave those admissions that he had lied on all those.

23   And that's just for purposes of the record.

24         THE COURT:  All right.  Thank you.

25         MS. FOSTER:  Thank you.

26      (Proceedings were held in the presence of the jury:)

27         THE COURT:  All right.  Back on the record.  All

28   parties are present.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 780

1          People?

2          MS. FOSTER:  Thank you, Your Honor.

3          At this time the People are requesting to play People's

4     Exhibit 331.

5          THE COURT:  All right.  Ladies and gentlemen, remember,

6     it's the audio portion that is the evidence.  The transcript is

7     there to help you, help you follow, assist you, but that is not

8     evidence.  It is the audio portion that is evidence.

9          And is there a stipulation that the court reporter can

10    take a break during this?

11         MS. FOSTER:  Stipulated.

12         MS. BLUMENTHAL:  So stipulated.

13         THE COURT:  Thank you.

14         And for the record what exhibit?

15         MS. FOSTER:  331.

16         THE COURT:  You may proceed.

17         MS. FOSTER:  I'm sorry, Your Honor, it's 332.

18         THE COURT:  I'm sorry?

19         MS. FOSTER:  It's 332.

20         THE COURT:  You want to make sure we have the right

21    transcript?

22         I'm going to give the deputy --

23         Can you hand this to the investigator -- to the

24    witness?  To the witness.

25         MS. FOSTER:  Do you want to get the screen?

26     Q.   BY MS. FOSTER:  Investigator, do you see a clip on the

27    screen behind you?

28     A.   Yes, I do.

Christine M. DiCaro, CSR                        776

```
 1      Q.   And can you describe for us what we're looking at?

 2      A.   This is the camera in the interview room at Moreno

 3  Valley, and you have Mr. Boji, who is laying on the floor

 4  asleep.

 5      Q.   And is this right before the interview 1 of the

 6  interviews you conducted?

 7      A.   Yes, it is.

 8           MS. FOSTER:  Is the volume on, Deputy?

 9           THE DEPUTY:  Yes.

10           THE COURT:  It's a little low.

11           MR. MOORE:  May I breach the well, Your Honor?

12           THE COURT:  Yes.

13           MR. MOORE:  Thank you.

14           Here we go.

15           MS. FOSTER:  Thank you.

16           MR. MOORE:  Yeah.

17           MS. FOSTER:  Are we able to turn that up?

18           THE DEPUTY:  Yes.

19           MS. FOSTER:  Thank you.

20                (CD being played, not reported.)

21      Q.   BY MS. FOSTER:  Do you see yourself on that video?

22      A.   Yes, I do.

23      Q.   And who is with you?

24      A.   That is Investigator Posson.

25      Q.   And is that the officer that was your second?

26      A.   That is correct.

27                (CD being played, not reported.)

28      Q.   BY MS. FOSTER:  And I'm going to pause it one minute.
```

1           Is this the first interview that you conducted with the

2    defendant?

3        A.   No.

4        Q.   So you told us earlier on direct that there were three

5    different versions?

6        A.   That is correct.

7        Q.   Is this after the first version?

8        A.   Yes, it is.

9               (CD being played, not reported.)

10       Q.   BY MS. FOSTER:  I'm going to pause it real quick and

11   ask you a quick question.

12          You asked the defendant "How long have you been around

13   guns?"  Is that correct?

14       A.   Yes, I did.

15       Q.   And his response was "Ten years"?

16       A.   That is correct.

17       Q.   You heard him testify yesterday?

18       A.   Yes, I did.

19       Q.   And when he talked about only having dealt with guns

20   since he was 16, did he ever tell you that?

21          MS. BLUMENTHAL:  Objection.  That misstates the

22   defendant's testimony on the witness stand.

23          THE COURT:  Overruled.

24          THE WITNESS:  No, he did not.

25          MS. FOSTER:  And I will resume the tape.

26               (CD being played, not reported.)

27       Q.   BY MS. FOSTER:  Investigator Dean, now, that was one of

28   your interviews with the defendant; is that right?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 783

```
 1        A.    That is correct.
 2        Q.    And that is the interview where he's describing what
 3   you said was the second version?
 4        A.    That is correct.
 5        Q.    Now, after that interview, you continued to speak with
 6   him; is that right?
 7        A.    Yes, I did.
 8        Q.    And then he gives you another version?
 9        A.    Yes, he does.
10        Q.    And that's what you described as the third version?
11        A.    That is correct.
12              MS. FOSTER:  I don't know if the Court wants me to
13   start?
14              THE COURT:  Yes.
15              MS. FOSTER:  I have in my hand what's been marked for
16   identification as People's 331.  At this time I'd like to play
17   People's 331.  And we have the transcripts.
18              THE COURT:  Deputy?
19              Do you want to gather the other transcript?
20              THE DEPUTY:  Yes, Your Honor.
21              MS. FOSTER:  At this time, Your Honor, the People are
22   requesting to play People's 331.
23              THE COURT:  All right.
24              MS. BLUMENTHAL:  Your Honor, there is a portion of that
25   that the defense would be objecting to.
26              THE COURT:  All right.  Let's have the lawyers in the
27   back with the court reporter.
28        (Proceedings were held out of the presence of the jury:)
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 784

 1              THE COURT:  Back on the record out of the presence of

 2      the jury.

 3              The Court is reviewing -- what exhibit is this?

 4              THE CLERK:  331.

 5              THE COURT:  331, the transcript.  Which portion are you

 6      objecting?

 7              MS. BLUMENTHAL:  Yes, Your Honor.  On page 3.

 8              THE COURT:  The entire page 3?

 9              MS. BLUMENTHAL:  No, but the section "Do I have a right

10      to have a lawyer?  Do I have a right to have a lawyer," and

11      talking about the reading of rights.

12              MS. FOSTER:  Specifically it says --

13              THE COURT:  I'm sorry.  What line?

14              MS. BLUMENTHAL:  I'm sorry.  Line 4 through line 14.

15              MS. FOSTER:  And it says:

16              "And I do -- I do have a right to a lawyer, I believe,

17      right?

18              "Answer from Dean:  Yes.

19              "Boji:  And an attorney?

20              "Dean:  Right.  Oh, yeah, absolutely, cause that's when

21      I read you your rights, you say you understood them.  And I'm

22      just telling you, you know, you're being charged and you're

23      going to be booked and you're going to jail tonight, okay?  Or

24      this morning."

25              THE COURT:  What's your objection?

26              MS. BLUMENTHAL:  That it's prejudicial the way it's

27      being presented, and that it's not -- does not need to be

28      presented to the jury.  We're talking about asking for a lawyer.

1          THE COURT:  People?

2          MS. FOSTER:  This is a transcript that we did send

3    yesterday.  We did not edit the tape to remove this portion.

4    It's not -- this is not the portion that I'm seeking to enter,

5    however, I don't understand where that's prejudicial in that

6    he's speaking to law enforcement.

7          THE COURT:  Yeah, he did waive his Miranda rights, so

8    you could lay further foundation, but he did waive his rights,

9    and this is just a confirmation that he was aware of his rights.

10   So I don't think it's prejudicial.

11         MS. BLUMENTHAL:  I don't believe that's something

12   that's supposed to go in front of the jury in dealing with the

13   rights.  I think that's information for courts to have to make

14   rulings on, but I don't think that goes to the jury.

15         THE COURT:  I don't think it's prejudicial.  I don't

16   think it's too prejudicial to exclude it.

17         MS. FOSTER:  Okay.

18         THE COURT:  All right.

19       (Proceedings were held in the presence of the jury:)

20         THE COURT:  All right.  The objection is overruled.

21              (CD being played, not reported.)

22         MS. FOSTER:  Your Honor, it appears I may have mixed up

23   the disks, so I don't want to play it until I'm sure what disk

24   it is.  Is it too early for us to take our morning break for

25   lunch?

26         THE COURT:  All right.  I'm going to go talk to the

27   lawyers off -- without the court reporter.

28              (Discussion held at sidebar, not reported.)

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 786

1           THE COURT:  Back on the record.

2           You know, sometimes it's like pulling teeth when I ask

3   my staff is it all right if we start a little early.  So we're

4   going to cut early for lunch, but we're going to come back at

5   1:15.  And we're going to probably be in session all day till

6   about 4:30, 4:45, all right?  So if you have other plans, cancel

7   that.  We're going to move this along, okay?

8           All right.  Do not discuss the case.  Keep an open

9   mind.  1:15.  1:15.  Thank you.

10     (Proceedings were held out of the presence of the jury:)

11          THE COURT:  All right.  The Court's taking its noon

12  recess at this time.  Court's in recess.

13                      (Noon recess.)

14          MS. BLUMENTHAL:  I had received at 12:32, 12:45 a copy

15  of the polygraph transcript that was being cut and so on.  I got

16  it printed out at about ten minutes of.  I've been able to go

17  through it.  I was objecting to many of these.  I've just been

18  told that at --

19          THE COURT:  We're off the record, right?  Because I

20  haven't looked at any transcript.

21          MS. BLUMENTHAL:  What I'm saying is that at -- I truly

22  got sent two more, one at 1:11 and one at 1:04, when I'm on my

23  way over here, which I have no way of printing out.  Luckily

24  they're bringing it, but I have no way of viewing it is the

25  problem.

26          THE COURT:  All right.  Well, this tape is how long?

27          MS. FOSTER:  This tape is --

28          THE COURT:  Like 30 minutes, 40 minutes?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 787

```
 1            MS. FOSTER:  I think we have one here 30 minutes.
 2            THE COURT:  Then we'll take a break.
 3            MS. FOSTER:  Then there is another tape that she
 4   already has, not the one she's referencing, that is probably
 5   about 45 minutes.
 6            THE COURT:  Can we -- can you play that next?
 7            MS. FOSTER:  Yes.
 8            THE COURT:  Okay.  And then we'll take a break and go
 9   over the 30 minute one.
10        (Proceedings were held in the presence of the jury:)
11            THE COURT:  Back on the record.  All parties are
12   present.  All jurors are present.
13            I'm sorry, madam prosecutor, what exhibit are you about
14   to play?
15            MS. FOSTER:  This will be 331.
16            THE COURT:  And everyone has the transcripts, the
17   jurors?
18            And the witness remains on the witness stand.
19            Go ahead.
20                 (CD being played, not reported.)
21     Q.   BY MS. FOSTER:  Investigator Dean, is this one of the
22   moments where you were out of the room for that space?
23     A.   Yes.
24            MS. FOSTER:  I'm going to attempt to fast forward
25   through some of the dead space, if I can.
26            THE COURT:  Do we have a stipulation how much time?
27            MR. MOORE:  At this point we've been looking at dead
28   space, silence on the video for between five to ten minutes, I'd
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 788

1   guess.  We can certainly fast forward, if that's what she wants
2   to do.
3          MS. FOSTER:  And now it appears to have frozen.  That's
4   what I was afraid of.
5                  (CD being played, not reported.)
6          MR. MOORE:  Your Honor, just for the record, what I'm
7   going to do is copy the digital file from the CD, which is the
8   exhibit, onto the hard drive of the computer, just to play it.
9   It should be a little more stable playing from the hard drive.
10         THE COURT:  Stipulate?
11         MS. FOSTER:  Yes, Your Honor.
12         THE COURT:  All right.  Go ahead.
13         MR. MOORE:  Looks like it's just going to take a bit to
14  move it over, and I apologize.
15         MS. FOSTER:  I apologize.  My fault.
16         MR. MOORE:  Fix it.
17                    (Brief pause.)
18         THE COURT:  Are you having issues?
19         MS. FOSTER:  There is an issue with this tape, Your
20  Honor.  I'm going to ask a new track be brought over.  In the
21  meantime, I'll move on to a different one, and I'll be fine.
22         THE COURT:  All right.  Just for the record, which tape
23  was displayed?
24         MS. FOSTER:  That was Exhibit 331.
25         THE COURT:  So you're going to be bringing another
26  copy?
27         MS. FOSTER:  Yes, if I may.
28         THE COURT:  All right.  And, Deputy, why don't you

1    gather the exhibits, I'm sorry, the transcript at this time.

2           And which other exhibit?

3           MS. FOSTER:  I have People's 333, and I'm going to ask

4    a couple questions of the officer first.

5           THE COURT:  Do you have the transcripts for that?

6           MS. FOSTER:  Yes, I do.

7           THE COURT:  Deputy, do you want to hand out the

8    transcripts for Exhibit 333; is that correct?

9           MS. FOSTER:  Yes, Your Honor.

10          THE COURT:  Before we hand out the transcripts, just to

11   be safe, can you make sure it plays?

12          MS. FOSTER:  Yes.

13          THE COURT:  And, madam prosecutor, for the record, how

14   long is this exhibit?

15          MS. FOSTER:  Your Honor, if I could just have one

16   moment?  I want to take the computer in the back.  I don't want

17   to do it in the presence of the jury.

18          THE COURT:  Yes, that's fine.

19                         (Brief pause.)

20          MS. FOSTER:  Okay.  It works.

21          THE COURT:  I'm sorry.  Again, what is the exhibit, and

22   how long is the exhibit?

23          MS. FOSTER:  Yes, Your Honor.  This is Track 2,

24   People's Exhibit 333 and 333-A.

25          THE COURT:  Please, don't read newspapers in the

26   courtroom.

27          All right.  Let's start.

28      Q.   BY MS. FOSTER:  Investigator Dean, do you recognize

 1    what's depicted on the screen as Exhibit 333?

 2        A.   Yes.   This is the interrogation room of Moreno Valley.

 3    Seated is Houston Boji.   The gentleman standing up with his back

 4    to you, that's going to be forensic tech Devore.   And then the

 5    gentleman, you can see the top of his head, that is going to be

 6    Investigator Posson.

 7        Q.   And is that your --

 8        A.   My partner.   Yes.

 9        Q.   And is this before the track that we watched earlier

10    before Exhibit 332?

11        A.   Yes, it would be.   Yes.

12        Q.   And is this actually before you had the defendant

13    change clothes?

14        A.   That is correct.

15        Q.   Okay.   And at this point is this when the defendant was

16    still telling you the first version of his story?

17        A.   Well, he hadn't told us the story yet.   I hadn't spoken

18    to him.   At this point I walked in, made an initial

19    introduction.   And the fact that he had so much blood on him, on

20    his hands and on his clothing, we chose to process the clothing

21    at that point and to attempt to clean up his hands a little bit

22    before we started talking.

23            MS. FOSTER:   At this point I would ask the Court's

24    permission to play Exhibit 333.

25            THE COURT:   All right.   You may.

26                (CD being played, not reported.)

27            MS. FOSTER:   I'm sorry.   The Court had previously

28    inquired as to the time.   I believe it's about an hour and 20

```
 1   minutes.
 2           THE COURT:  An hour and 20 minutes?
 3           MS. FOSTER:  Yes.
 4           THE COURT:  All right.  Thank you.
 5                  (CD being played, not reported.)
 6           MR. MOORE:  I have an objection.
 7           THE COURT:  I'm sorry?
 8           MR. MOORE:  I have an objection.
 9           THE COURT:  All right.  Let's take a quick ten-minute
10   break.
11           Ladies and gentlemen, keep an open mind.  Court's in
12   recess until 2:45.  2:45.  Just a quick break, ten minutes.
13       (Proceedings were held out of the presence of the jury:)
14           THE COURT:  All right.  Out of the presence of the
15   jury.
16           All right.  You wanted to interpose an objection.  I'm
17   sorry.  I was working on other things.  So go ahead.
18           MR. MOORE:  That's okay.
19           Yeah, Your Honor.  Page 49 of the transcript, I
20   couldn't tell if it was actually playing on the tape, but on
21   page 49 they just start talking about the polygraph.
22           THE COURT:  I'm sorry.  I don't have that copy of the
23   transcript.  Can I take a look at yours?
24           MS. FOSTER:  Here is the exhibit, the copy.  Let's turn
25   to that page.
26           THE COURT:  I'm sorry.  Page 49?
27           MR. MOORE:  49.
28           MS. BLUMENTHAL:  Line 8.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 792

 1            MR. MOORE:  It looks like there is some stuff cut out.

 2            MS. BLUMENTHAL:  Because it did not flow.  I thought

 3   the whole thing was a little --

 4            THE COURT:  All right.  Did you hear something or did

 5   you read something?

 6            MS. BLUMENTHAL:  It's on the --

 7            MS. FOSTER:  It's not on the audio, it's on the

 8   transcript.

 9            THE COURT:  I'm sorry.  It's page 49.  What line?  I'm

10   sorry.

11            MR. MOORE:  It starts at line 8.

12            MS. BLUMENTHAL:  Eight.

13            MR. MOORE:  The word "polygraph" is never mentioned,

14   but it's quite clear.

15            THE COURT:  All right.  So what is your objection?

16            MR. MOORE:  351.1, I believe, or .5.

17            THE COURT:  I'm sorry.  And let's read what's in the

18   transcript.  It says, "Cause, again, it's not admissible in

19   court, you know that."

20            I don't see any word that there was a polygraph exam or

21   anything like that on page 49.

22            MR. MOORE:  Well, if you listen to the tape, watch the

23   tape.

24            MS. BLUMENTHAL:  And going down to line 20.

25            MR. MOORE:  Please.

26            And I will just assert to the Court that this is a

27   discussion of the polygraph that's been partially redacted.  And

28   then the transcript, apparently, picks up before it should.  And

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 793

1    it starts -- what they're talking about here is the polygraph.

2    That is just what they're talking about.  And I know that

3    because I've read it and I've watched it.  But I also know that

4    just based on the context.  It's quite clear.

5           THE COURT:  All right.  The Court did inform the jury

6    that the transcript is not evidence, it's the audiotape that is

7    evidence.  And my understanding is that the audiotape has been

8    redacted and it's not on the audiotape; is that correct?

9           MS. FOSTER:  That is correct, Your Honor.  And full

10   disclosure.  We did discuss this portion, and it was supposed to

11   be removed.  I am looking at page 50, and page 50 is how it

12   should have read, however, it looks like page -- something

13   happened when they printed it.  And so it's clear it does not

14   reference polygraph.  It says --

15          THE COURT:  Here.  I'll give it back to you, your

16   exhibit.

17          MS. FOSTER:  After the officer is talking about "It's

18   hard to remember a lie," and he goes into a discussion about how

19   he doesn't want to have to explain to 12 people that he's lying,

20   then it goes in to, "Yes, sir -- " I'm sorry.  The last thing

21   that was said on the tape is, "It's hard to remember a lie, all

22   right?  So that's all I'm trying to get you to do.  When I ask

23   you certain questions, there is a reason I ask the questions,

24   because it helps me get to the next point."

25          Then the next page reads:

26          "Yes, sir."

27          "Okay.  I understand, because, again, it's not

28   admissible in court.  Did you know that?"

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 794

```
1              "Hm?"  And that's "h-m" with a question mark.

2              "It's not even admissible in court."

3              "What does that mean?"

4              "It means it can't be introduced into evidence.  It's

5     just a tool."

6              "For what then?  What is it used for?"

7              "Just a tool.  It goes back to being honest or

8     dishonest."

9              "Oh, okay."

10             "You know what I'm saying?"

11             "Yes, sir."

12             "That's all it is."

13             "Yes, sir.  All right.  Yes, sir."

14             THE COURT:  All right.

15             MR. MOORE:  So in the latter part of that discussion is

16    then talking about a polygraph.  And what's going on here is

17    there has been a portion of the video that's been removed.  And

18    I don't think that anything relating to the polygraph was

19    actually included on the video, but a good portion of what

20    Miss Foster just read into the record was left in the transcript

21    erroneously.

22             And it's very clear what its reference is.  I don't

23    know if the jury has read it.  I mean, clearly, they have to

24    know that things have been redacted.  And if they have a brain

25    in their head, they know what's being talked about.

26             THE COURT:  All right.  So your objection is noted.

27    And are you making a motion for mistrial at this time or just

28    objecting?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 795

1          MR. MOORE:  So moved.

2          THE COURT:  The Court did admonish the jury at the very

3   beginning that it's the audiotape that is the evidence and not

4   the transcript.  The transcript is used just for -- to help you

5   guide.  I think I admonished the jury that the real evidence is

6   the audiotape.  And that was redacted; is that correct?

7          MS. FOSTER:  Yes, Your Honor.

8          THE COURT:  All right.  Is there anything else on that

9   transcript that I should have taken out, or just have them all

10  returned back?

11         MS. FOSTER:  I think we should take them back and

12  remove page 49.

13         MR. MOORE:  I agree.

14         And the problem is, Your Honor, these were, apparently,

15  just emailed to us.  This is what Virginia was talking about,

16  Miss Blumenthal was talking about prior to resuming.  We got

17  these as we were coming into court, essentially.

18         MS. FOSTER:  That's not correct on this one.

19         MS. BLUMENTHAL:  What I got was different than this.

20         MR. MOORE:  And if I recall correctly -- I stand

21  corrected.  But if I do recall correctly, this was a highlighted

22  portion that was supposed to be excised.  We had not seen the

23  completed.

24         MS. FOSTER:  The completed one, this exact one was the

25  one that was dropped off here before lunch and was given before

26  lunch, so.

27         THE COURT:  All right.  Why don't you guys get together

28  again and go through the ones that we have.  Stipulate to if

1    there is a stipulation to remove some more.  If not, I'm just

2    going to take all the transcripts back and they're just going to

3    have to listen, because that's the real evidence.

4            I've done that before in other trials where I just have

5    them sit and listen to the entire audio portion, and let them

6    know that they can take it back there during deliberations and

7    listen to it.  Usually that's what I do, because that's the real

8    evidence.  The transcript is just used as a guide.

9            But if we can't agree what is going to be on that

10   transcript, then I'll just have them sit and listen to the

11   entire tape.  Because, once again, the entire tape is the real

12   evidence.  And that clears up any confusion in the future.

13           So take another 5, 10 minutes, look through that

14   exhibit.  You said page 49.  If there is other pages, do so.  If

15   not, I'll just gather all the transcripts, admonish the jury

16   again that the real evidence is the audio portion and not the

17   transcript, and the Court's making an executive decision to take

18   the transcript away at that point.  All right.

19           All right.  Court's in recess.

20                   (Recess.)

21           THE COURT:  All right.  Back on the record.  All jurors

22   are present.  All parties are present.  The witness remains on

23   the witness stand.

24           Ladies and gentlemen, like I said before, those

25   transcripts, they're not the real evidence.  It's the audio

26   portion.  Well, some things are missing from the transcripts, so

27   I'm going to have you all pass it down to the deputy, and we're

28   not going to use the transcripts.  We're going to listen and

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 797

1    watch the real evidence.

2          All right.  Once again, the transcripts were there just

3    to help you.

4          And, once again, all this evidence is going to be in

5    the deliberation room.  So you'll have another opportunity to

6    take your time and view it at that time.

7          All right.  At this time, madam prosecutor, can we

8    proceed with Exhibit No. --

9          MS. FOSTER:  333.

10         THE COURT:  All right.

11         MS. FOSTER:  And we left off at 38 and 38.

12         THE COURT:  38 minutes and 38 seconds into the CD; is

13   that correct?

14         MS. FOSTER:  I'm putting it at 38 and 29 seconds, is

15   the closest I can get.

16         THE COURT:  All right.  Thank you.

17               (CD being played, not reported.)

18         MS. FOSTER:  Your Honor, we're observing a space where

19   the officers appear to have left the room and the defendant's

20   just sitting there.  I've spoken to counsel, and we've agreed to

21   attempt to find where officers reenter.

22         THE COURT:  Where are you going to stop the tape at?

23         MS. FOSTER:  We're currently at 53:59.

24         THE COURT:  Stipulate?

25         MR. MOORE:  Yes, Your Honor.

26         THE COURT:  And we're going to move to what section?

27         MS. FOSTER:  I'm checking.

28         Your Honor, it appears any attempt to go further causes

```
1    it to freeze, so I'm just going to let it play.
2              THE COURT:  All right.
3              MS. FOSTER:  And we're resuming at 53:33.
4              I'm sorry.  Where did we stop?
5              MR. MOORE:  53:59.
6              MS. FOSTER:  53:59.  I'm going to try to get back
7    there.
8              We're at 54:02.
9              THE COURT:  All right.  And you can have permission to
10   text someone from IT from your office to be here.  We can't
11   continue to do this for the next hour and a half.
12                   (CD being played, not reported.)
13             MS. FOSTER:  It appears it's frozen at 54:20.  So I did
14   text someone, and we're going to stop the video there with the
15   Court's permission.
16             THE COURT:  All right.  Do you have any questions for
17   the investigator at this time or should we take a break?
18             MS. FOSTER:  Unless the Court needs, unless we need to
19   take the afternoon recess, I can move forward until we get that
20   resolved.
21             THE COURT:  All right.  Go ahead.
22        Q.   BY MS. FOSTER:  So based on what we just observed in
23   People's 333, was that the first interview you had with the
24   defendant?
25        A.   Yes, it is.
26        Q.   And is that the interview where he tells you that first
27   version of the story regarding suicide?
28        A.   Yes, it is.
```

1     Q.   And through the rest of that interview, was that the
2     only version that he gave you?
3     A.   Correct.
4     Q.   And we stopped at 54 minutes, but the duration, is that
5     anymore interview or is that just wrapping up?
6     A.   It's wrapping up.
7     Q.   So the part regarding the version of the story of
8     suicide, that is what we've already observed in 333; is that
9     correct?
10    A.   That is correct.
11    Q.   Now, earlier we attempted to watch People's 331.  Do
12    you remember that?
13    A.   Yes, I do.
14    Q.   And you said that that was the final portion of your
15    interview; is that correct?
16    A.   That is correct.
17         MS. FOSTER:  Now, Your Honor, we have reviewed the
18    transcript for 331, and we have the original version for 331.
19    May we play 331, attempt to play 331 again as well?
20         THE COURT:  And have both of you reviewed it?
21         MR. MOORE:  Yes, I believe so.  Yes.
22         THE COURT:  All right.  Yes.
23         MS. FOSTER:  We'll return the transcripts to the
24    deputy.
25         Your Honor, there is dead space, since this is the
26    original version, and the parties have agreed to areas where we
27    will stop and start the tape.
28         THE COURT:  All right.  Just put that on the record at

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 800

```
 1    the appropriate time.
 2             MS. FOSTER:  Okay.  The tape is started.  It appears
 3    the screen is black.  It's dark and just fuzz.  I'm going to
 4    start at time frame of 14:34.
 5             And parties agree that it is dead space until that
 6    point?
 7             MR. MOORE:  Yes.
 8                  (CD being played, not reported.)
 9             MS. FOSTER:  Your Honor, I'm pausing the tape at 18:52.
10    There is going to be another dead space until 34:34.
11             The parties agree to move to that portion?
12             MR. MOORE:  That's fine.
13             MS. FOSTER:  Resuming the tape at 34:32.
14                  (CD being played, not reported.)
15             MS. FOSTER:  I'm going to pause it right here.
16        Q.   BY MS. FOSTER:  Investigator, is this the third story
17    that you were talking about?  Third version, I'm sorry?
18        A.   Yes, it is.
19        Q.   And at this point when you're talking to the defendant,
20    do you actually have him physically demonstrate?
21        A.   Yes, I do.
22        Q.   Okay.  So he physically demonstrates what he's
23    describing?
24        A.   Yes.
25        Q.   Okay.
26             MR. MOORE:  And, for the record, what's the time code
27    at this point?
28             MS. FOSTER:  We're at 40:46.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 801

```
 1                    (CD being played, not reported.)
 2        Q.   BY MS. FOSTER:  Investigator Dean, in all the
 3   interviews that you conducted, did the defendant ever tell you
 4   the version that we heard yesterday?
 5        A.   No, he did not.
 6        Q.   And in all the interviews that you conducted, did the
 7   defendant ever tell you about the text messages?
 8        A.   No, he did not.
 9             MS. FOSTER:  I have nothing further.
10             THE COURT:  Defense?
11                       CROSS-EXAMINATION
12   BY MS. BLUMENTHAL:
13        Q.   Good afternoon, Investigator Dean.
14        A.   Good afternoon.
15        Q.   He made a statement that he had some GSR testing done;
16   is that correct?
17        A.   That's correct.
18        Q.   And what is GSR testing?
19        A.   It's gunshot residue that basically it's a kit that all
20   law enforcement has.  And what we do is either myself or a
21   forensic tech can go in, we open it up, and you dab into the
22   thumb or the well of their hands to try to collect and see if
23   indeed they had fired a weapon.
24        Q.   And you saw that that test was being done on Mr. Boji,
25   correct?
26        A.   That is correct.
27        Q.   Was that ever analyzed?
28        A.   No, it was not.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 802

1      Q.   Did you ever ask to have it analyzed?

2      A.   No.

3      Q.   There were also -- and you were the lead investigator,

4  correct?

5      A.   Yes, ma'am.

6      Q.   And it's still your case even though you've retired?

7      A.   That is correct.

8      Q.   Is that a fair statement?

9      A.   Yes, it is.

10     Q.   You were also asking questions about people walking

11  around the house; is that correct?

12     A.   That is correct.

13     Q.   And you had taken a look at some either footprints or

14  shoe prints that were blood covered?

15     A.   That is correct.

16     Q.   You had directed that some pictures be taken of those?

17     A.   That is correct.

18     Q.   Now, at the time that you ever took those pictures, did

19  you ever -- you took Mr. Boji's shoes; is that correct?

20     A.   Yes, we did.

21     Q.   Did you ever take those shoes and compare them to the

22  footprints that were left?

23     A.   No, I did not.

24     Q.   Did you ever ask to have them analyzed to do a

25  comparison of the shoe prints and what you found at the house?

26     A.   No, I did not.

27     Q.   Did you ever get the size of Nicholas's feet?

28     A.   No, I don't believe so.

1      Q.   He's six-seven, correct?

2      A.   That's correct.

3      Q.   Did you ever have anyone measure Nicholas's feet to any

4  of the other places that you said you saw shoe prints or

5  footprints?

6      A.   No, I did not.

7      Q.   Now, I'm going to show you what's been marked as FFF,

8  FFF.  And can you tell me what that is?

9      A.   It looks like part of the accordion doors, the west

10  facing doors.

11      Q.   Okay.  And if I could show you the first of three

12  pictures.  HHH.  Does that appear to be this No. 7 here?

13      A.   That is correct, yes.

14      Q.   So those were fingerprints that you had seen on the

15  side of the door into Nicholas's bedroom, correct?

16      A.   That's correct.

17      Q.   And did you ever have anyone analyze those

18  fingerprints?

19      A.   No.

20      Q.   Did you ever have -- ask to have them compared to

21  Houston Boji?

22      A.   No.

23      Q.   Did you ever ask to have them compared to Nicholas's

24  fingerprints?

25      A.   No.

26      Q.   I'm going to show you Exhibit 1 marked for

27  identification.  Are you familiar with that?

28      A.   Yes.  That's the cordless phone.

1    Q.    That's the cordless phone that was found on the bed,
2    correct?
3    A.    That's correct.
4    Q.    And that appears to be covered in blood?
5    A.    That is correct.
6    Q.    And it appears to have fingerprints on it, or what
7    could be fingerprints?
8    A.    That is correct.
9    Q.    Did you ever ask to have that phone analyzed or have
10   the fingerprints on that phone analyzed?
11   A.    No.
12   Q.    Did you ever ask to have the fingerprints that were on
13   there compared to Houston Boji's fingerprints?
14   A.    No.
15   Q.    Did you ever ask to have the fingerprints on that phone
16   compared to Nicholas's fingerprints?
17   A.    No.
18   Q.    Now, you've asked for fingerprints before, I'm
19   presuming, in your -- in the 22 years that you were active law
20   enforcement?
21   A.    Of course, yes.
22   Q.    Were all those 22 years spent with Riverside Sheriff's
23   Department?
24   A.    My last 22 were with Riverside County.
25   Q.    With Riverside County.
26         You were in law enforcement before that time?
27   A.    Actually, I started with Riverside County.  I was here
28   for two years.  I left.  I went to Pasadena.  I left Pasadena.

```
 1    I went to Perris.  I came back from Perris to the sheriff's
 2    department.
 3        Q.   Okay.  So how many total years of law enforcement do
 4    you have?
 5        A.   27.
 6        Q.   Okay.  27.
 7             During that time, I take it, you have done numerous
 8    investigations?
 9        A.   Correct.
10        Q.   And during that time, I'm assuming, you've asked to
11    have numerous fingerprints analyzed?
12        A.   That is correct.
13        Q.   And that's not an unusual occurrence for you; is that
14    correct?
15        A.   No, it's not.
16        Q.   Now, I'm going to show you 261 for identification and
17    ask, you're familiar with the contents of that photograph,
18    correct?
19        A.   Yes.  That photograph was taken prior to me arriving on
20    scene.
21        Q.   Correct.
22             Did -- is this what Mr. Boji looked like, what Houston
23    looked like when you first saw him, or similar?
24        A.   Similar.
25        Q.   I'm going to show you what's been marked as 29 for
26    identification.  And I'm going to ask if you're familiar with
27    the contents of that photograph?
28        A.   Yes.  That looks like the hallway to the north of the
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 806

1    bedroom.

2         Q.   And there also looks like there was fingerprints here.

3    I believe it's No. 32 is the evidence marker?

4         A.   That is correct.

5         Q.   Okay.  Did you ever ask to have that analyzed to see if

6    they were fingerprints and who they could have been matched to?

7         A.   No, I did not.

8         Q.   Now, you were asking questions about Nicholas roaming

9    around the house after he was shot?

10        A.   That is correct.

11        Q.   And did you think it was important that if you thought

12   these were his fingerprints or there were footprints that you

13   not have those analyzed?

14        A.   In the contents of that question, yes.

15        Q.   But you didn't do it?

16        A.   No, I did not.

17        Q.   I'm going to show you what's been marked as 31 for

18   identification.  And I'm assuming you're familiar with the

19   contents of that photograph?

20        A.   Yes, I am.

21        Q.   The front of this stove appears to have blood on it,

22   correct?

23        A.   That is correct.

24        Q.   And it appears to have fingerprints on it?

25        A.   That is correct.

26        Q.   I'm going to show you a close-up of that, 32 for

27   identification.  Does that to you fairly depict the blood and so

28   on that was on this stove on November 10th?

```
 1        A.    I don't quite understand the question.
 2        Q.    Well, does that accurately depict what you saw on the
 3   stove when you were out at the house investigating?
 4        A.    Yes.
 5        Q.    There appears to be fingerprints on the stove?
 6        A.    That is correct.
 7        Q.    And did you ever have those fingerprints analyzed?
 8        A.    No, I didn't.
 9        Q.    There appears to be fingerprints all over the house
10   that were bloody?
11        A.    That is correct.
12        Q.    And did you have any of those fingerprints analyzed to
13   see if they matched Houston Boji?
14        A.    No.
15        Q.    Did you have any of those fingerprints analyzed to see
16   if they matched Nicholas McCauley?
17        A.    No, I did not.
18        Q.    Now, you're familiar that there were unspent shells
19   that were found in Nicholas's bedroom?
20        A.    That is correct.
21        Q.    And are you familiar with where they were found?
22        A.    I know they were in the bedroom, yes.
23        Q.    Do you know where in the bedroom they were found?
24        A.    Yes.  They were found on the floor, some to the east,
25   eastern portion of the bedroom, some to the north, and some in
26   close proximity to the victim.
27        Q.    Okay.  And did you see those?
28        A.    Yes, I did.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 808

1    Q.   And were they marked with -- I'm going to show you 284

2    for identification.  Are you familiar with this diagram?

3    A.   Yes.  That is a sketch that is completed by the

4    forensic tech.

5    Q.   Are you personally familiar with the numbers that were

6    assigned?

7    A.   No, I'm not.

8    Q.   So you don't know which of those numbers represent the

9    unexpended shotgun shells?

10    A.   Just based on his testimony.

11    Q.   You're not personally familiar with it?

12    A.   That is correct.

13    Q.   Do you know how many -- did you ever see any of that

14    collected?

15    A.   No, I did not.

16    Q.   Now, do you -- are you familiar -- you heard some of

17    the testimony, though, as to where they were located and the

18    numbers?

19    A.   Yes.

20    Q.   Were you familiar with where the spent shell was found?

21    A.   No.

22    Q.   Now, I'm going to show you -- I believe you would

23    probably recognize Mr. Boji's clothing; is that correct, or at

24    least his shoes?

25    A.   Yes.

26    Q.   Okay.  I'm going to show you what's been marked as

27    Defense GGG.  GGG.  And I'm going to ask you if you recognize

28    these shoes?

```
 1           They seem to be awfully dark here.

 2           I've just been told where the auto tune button is, so

 3   that's helping.

 4           Are you familiar with those?

 5   A.    Yeah.  They look like his shoes.

 6   Q.    They look like the shoes that -- did you personally

 7   take the shoes off of Houston?

 8   A.    No, I did not.

 9   Q.    They look like the shoes that he was wearing, correct?

10   A.    Yes.

11   Q.    Did you look at those shoes?

12   A.    No.

13   Q.    I'm going to show you again another part of GGG.

14           MS. FOSTER:  May I see?

15           MS. BLUMENTHAL:  I'm sorry.

16           MS. FOSTER:  I'm going to object as lacks foundation.

17           THE COURT:  I'm sorry?

18           MS. FOSTER:  Objection.

19           THE COURT:  What exhibit is this?

20           MS. BLUMENTHAL:  GGG.

21           THE COURT:  All right.  I haven't looked at GGG.  Let's

22   go out in the back really quick.

23      (Proceedings were held out of the presence of the jury:)

24           THE COURT:  Back on the record out of the presence of

25   the jury.

26           There is several photographs that, I guess, were added

27   as new exhibits today.

28           THE CLERK:  Yes.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 810

1          MS. BLUMENTHAL:  That's correct.

2          THE COURT:  So the Court has not had an opportunity to

3     review it.  So, just for the record, what is GGG?

4          MS. BLUMENTHAL:  GGG shows the evidence tag for Houston

5     Boji's pair of tennis shoes and his tennis shoes.  One of the

6     pages of that is the front of the tennis shoe, the other side is

7     the back of the tennis shoe.

8          THE COURT:  And the objection was?

9          MS. FOSTER:  This witness just testified that he had

10    not ever looked at his shoes.

11         THE COURT:  Did he collect the shoes?

12         MS. FOSTER:  And he did not collect the shoes.  And now

13    defense counsel is attempting to put onto the screen the backs

14    of the shoes, which if he didn't look at them, he didn't collect

15    them --

16         THE COURT:  So your objection is foundation?

17         MS. FOSTER:  Yes.

18         THE COURT:  It will be sustained on foundation.

19         MS. BLUMENTHAL:  May I respond --

20         THE COURT:  Yeah.

21         MS. BLUMENTHAL:  -- a little bit, please?

22         THE COURT:  Well --

23         MS. BLUMENTHAL:  What I want to do is take a look.  I

24    will lay a foundation that these are the backside of his shoes

25    with another witness tomorrow.  Our investigator went out and

26    took pictures of it.  But if I could make the next connection?

27         THE COURT:  Okay.  Go ahead.

28         MS. BLUMENTHAL:  I'm going to ask if he ever looked at

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 811

1    these.  Okay.  That doesn't mean it's admitted.  Then I'm going

2    to take a look at the foot and/or shoe print that he found and

3    ask if he ever did a comparison.

4            THE COURT:  Who is "he"?

5            MS. BLUMENTHAL:  The witness.

6            THE COURT:  He didn't do it.

7            MS. BLUMENTHAL:  Well, I need to be able -- these have

8    definite designs on them, and I want to show that if you go

9    through these exhibits that he's -- he's calling some of these

10   footprints and they're obviously shoe prints.  And his whole

11   theory and Counsel's theory has been that Nicholas is up roaming

12   around after he's been shot.

13           MS. FOSTER:  First of all, nobody has expressed that

14   theory.

15           MS. BLUMENTHAL:  He has.

16           MS. FOSTER:  Second, there is a space where there is

17   something that appears to be a foot present with a print that

18   was testified by Investigator Corey, but the problem remains

19   that defense counsel is attempting to use a photograph in which

20   this witness cannot lay foundation and show it to the jury

21   without the proper foundation having been laid.

22           So, and then even once that is done, this witness

23   doesn't have the expertise to do a comparison, even looking at

24   photographs to do his own analysis.  That's a question for the

25   jury.  And if the defense counsel wants to bring in another

26   witness to say these are the defendant's shoes and that he found

27   them like this, and lay the proper foundation, the jury can

28   decide whether that shoe pattern, but this witness cannot look

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 812

1    at the blood pattern on the floor and do a comparison.  That's

2    not within his expertise.  And no foundation is laid that he has

3    any ability to do that.

4            MS. BLUMENTHAL:  I'm asking him why he didn't have it

5    done.

6            MS. FOSTER:  And I believe that question was asked and

7    he said he didn't have it done.

8            THE COURT:  Right, he didn't have it done.

9            MS. BLUMENTHAL:  I don't think I asked him about shoe

10   comparisons yet.

11           THE COURT:  Well, he's an investigator.  He can't

12   testify under Evidence Code section 801 with shoe print

13   comparisons.

14           MS. BLUMENTHAL:  I understand.

15           THE COURT:  And I don't think he has enough -- you

16   don't have enough to lay a foundation for even lay opinion,

17   because he doesn't even know.  As to foundation, he can't

18   testify this is the defendant's shoes or not.

19           So, as to foundation, it is sustained.  If tomorrow

20   there is a stipulation that those shoes were retrieved from

21   evidence and chain of custody, we don't -- maybe we could bypass

22   a witness.

23           MS. BLUMENTHAL:  What I'm saying is, I could have -- I

24   have an investigator.  He's going to give me -- he and Jeff went

25   out and took pictures of the actual evidence, and all I'm

26   showing is that I'm agreeing he can't make that.  That's why I

27   asked him "Did you have an expert do any analysis of it?"

28           THE COURT:  And the answer was "No."  No, he didn't

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 813

1    send it out for comparison.

2         MS. BLUMENTHAL:  I don't think I've gotten that part

3    yet as far as the footprint.  We did as far as the handprint,

4    but not footprints.

5         THE COURT:  Simple foundational issue.  It's sustained

6    on foundation as to that exhibit.  Any other exhibits, if we

7    have -- if there is a stipulation tomorrow --

8         MR. MOORE:  I understand.

9         THE COURT:  -- that this was retrieved from -- from the

10   evidence locker.  But right now it's foundation.

11        MR. MOORE:  I fully agree with your decision, I just

12   think it's ludicrous that we're having a foundational issue with

13   the defendant's own shoes that were seized by the police on the

14   video.  But I do agree with your decision.

15        THE COURT:  And I'm just ruling on that.  And if there

16   is any other ones that this officer wasn't involved, this

17   investigating officer in retrieving the evidence, then it will

18   be sustained on foundation.  But if there is a stipulation, and

19   if you want to present it another way, because I'm assuming the

20   other officers are not here, are not going to be present here,

21   and the trial has been going on for a while.

22        MS. FOSTER:  Your Honor, I'm kind of blindsided.  I

23   didn't see any of these.  I talked yesterday to Mr. Moore about

24   Investigator Corey being gone and what photographs he wanted to

25   have me agree to, and we agreed to that.  And I thought that was

26   done.  I had no idea about this.  I have no idea what HHH is.

27        THE COURT:  All right.

28        MS. FOSTER:  So I think we need to -- I can't even

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 814

1    stipulate to something I have no idea what the source of it is.

2         THE COURT:  Let me just -- I'm the one with the robe

3    here.  Let me make -- I'm not forcing anyone to enter into any

4    stipulation.  Obviously, the Court did not have an opportunity

5    to review these additional exhibits.  We did not have any 402

6    hearings on these additional exhibits.  I'm saying, if there is

7    an objection on foundation, it's going to be sustained based

8    upon this witness testifying today.  This witness.  That's all

9    I'm saying.  All right.

10        MS. BLUMENTHAL:  Your Honor, we've been a little

11   blindsided by saying we have not stipulated to releasing any

12   witnesses per se.  They were all subject to recall.  We were

13   told yesterday that the one witness that we're going to need for

14   something like this is leaving to go wherever.

15        THE COURT:  And I assumed there was going to be some

16   stipulations, but I'm not forcing anyone to stipulate.

17        MR. MOORE:  Understood.  So --

18        MS. FOSTER:  And just so we're clear, the record is

19   clear, because I don't know if that was put on the record

20   yesterday.  I texted the witness to come back.  He stayed in a

21   holding pattern for several hours waiting to hear before leaving

22   for Texas.  I went to both counsel and I said, "Do you want him

23   here tomorrow?"  He waited to find out.  They said, "Not if we

24   can agree on some photographs."  I asked which photographs.

25   They showed me the photographs.  These were not included in

26   those photographs.

27        So there is no attempt by me to let witnesses go that

28   they still needed to use.  From my knowledge everything that was

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 815

1   a photograph was used earlier with Investigator Dean when

2   defense called him.  And I didn't make any objections to

3   anything regarding those photographs.

4          MR. MOORE:  Well, but that's fine.  If we need Corey

5   here, I'm sure he can find a flight today from Texas.  He's on

6   call in this trial.  He can be here tomorrow.  And that's my

7   request if that's what we're going to be fighting about.

8          MS. FOSTER:  And, Your Honor, the defense released him,

9   so I don't know if that's going to be at their expense or his,

10  because we did have this discussion yesterday at the end of the

11  day if he could be released, and that's what they agreed to.

12  And --

13         MS. BLUMENTHAL:  That word "released" was never used.

14         MR. MOORE:  That's correct.  I said he did not have to

15  come in today.

16         THE COURT:  All right.  Let's see if we can work out

17  some stipulations, because I think it's just a foundational

18  issue.  But let's see if we could do that.

19         MR. MOORE:  Sure.

20         THE COURT:  And if we couldn't, if there is any motions

21  or stuff.

22         MS. BLUMENTHAL:  Maybe we could ask that Investigator

23  Dean go and actually bring the evidence in.  It's in storage

24  right now that they have in their custody.  And they can bring

25  it in tomorrow.

26         MR. MOORE:  Actually, I meant to get to that.  It was

27  represented yesterday by Miss Foster that actually she was

28  bringing in the clothes today.  I expected the clothes to come

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 816

1    in today.

2          MS. FOSTER:  Underwear.  Underwear and boxer shorts is

3    what I represented.  I did not represent shoes or anything else.

4    I didn't even know you wanted them.  If you told me you wanted

5    them, I would have definitely have gotten them for you when they

6    went to get underwear and shorts.  If you guys request these

7    things, I'd be more than accommodating.  I'm not trying to

8    withhold or make it hard for you.  I tried to make everything

9    the easiest possible.  Nobody told me or I would have had them

10   here.

11         And it's still -- the fact still remains that he cannot

12   lay the foundation.  If the shoes we're here, if he picked up

13   the shoes, he still hasn't looked at the shoes during the

14   investigation to lay the foundation for those photographs.

15         MS. BLUMENTHAL:  They are in their evidence bag, is my

16   understanding.

17         THE COURT:  I know, but it's sustained.  Sustained on

18   foundation.  He can't lay the foundation.  Someone else took the

19   photographs.  Someone else took it.  So if we could just have a

20   stipulation on that.  But I can't move forward at this time

21   since there is an objection.

22         MR. MOORE:  Right.

23      (Proceedings were held in the presence of the jury:)

24         THE COURT:  Back on the record.  All parties are

25   present.

26         Based upon this witness, the objection is sustained for

27   lack of foundation.

28         All right.  Ladies and gentlemen, it's 4:30.  There is

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 817

1    additional issues the Court needs to discuss with the lawyers.

2         At this time Mr. Moore has a previous engagement.  He

3    will not be here for the rest of the trial.  I'm just going to

4    admonish you that you are not to hold that against the defense

5    one way or the other.  He has a previous commitment that he has

6    to attend to.

7         At this time do not discuss the case.  Keep an open

8    mind.  Do not share information.  Do not conduct any research at

9    all.

10        And what time can we start tomorrow?  Hopefully -- we

11   need time to discuss some stipulations.

12        MS. BLUMENTHAL:  9:30.

13        MS. FOSTER:  9:30.

14        THE COURT:  9:30.  9:30 tomorrow.  Thank you.

15     (Proceedings were held out of the presence of the jury:)

16        THE COURT:  All right.  Back on the record out of the

17   presence of the jury.

18        The Court's adjusted that these type of objections are

19   foundational, an issue.  They're not really -- I've made a

20   suggestion that maybe we could have some stipulation in regards

21   to chain of custody or, but we need to have something written

22   how these -- how the shoes came into evidence, who took them,

23   who photographed them, instead of bringing -- my suggestion is

24   not to bring in the witness, if that's the only purpose.  But if

25   it becomes obvious that this investigator lacks the foundation

26   to bring these additional defense exhibits into evidence.

27        Is there anything you want to put on the record,

28   Mr. Moore, at this time?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 818

1          MR. MOORE:  Nothing constructive.

2          THE COURT:  All right.  Let's see if we could work

3    together on these stipulations.  And I'll need them -- it

4    doesn't have to be fancy.  When I was a lawyer, I used to write

5    them all out on a legal pad and have the lawyers sign them.  And

6    that was good enough for the old timers, and it's good enough

7    for this judge too.  So if it's foundational issues, let's try

8    to work out some stipulations.

9          All right.  We're going to be in session all day

10   tomorrow.  Friday I'm hoping that we could close.

11         MR. MOORE:  Tomorrow is Wednesday.

12         THE COURT:  Tomorrow is Wednesday.  We're already ahead

13   of -- I'm hoping we could close by Friday.  Is that still a

14   possibility?

15         MS. BLUMENTHAL:  I was hoping to close on Thursday.

16         MS. FOSTER:  I was expecting to close Thursday.

17         MS. BLUMENTHAL:  Things could change.

18         THE COURT:  I know things could change.

19         I have 14 matters on Friday, but I mean, that's still a

20   go.  If we need to be in session on Friday, we'll be in session

21   on Friday, okay?

22         MS. FOSTER:  As we sit today, because I think we're

23   probably going to be wrapping up probably by 10:00, 10:30

24   tomorrow.  Is there any expectation to close tomorrow?  Are you

25   expecting us to close tomorrow?

26         THE COURT:  No, because we have to go over the jury

27   instructions.

28         MR. MOORE:  And the exhibits.

Christine M. DiCaro, CSR                                    814

```
 1            THE COURT:  Yes, and the exhibits.  But we need to go
 2   over the jury instructions, okay?
 3            MS. FOSTER:  Okay.
 4            THE COURT:  And we need to go over in extreme detail
 5   over the jury instructions.  So we need to take at least a half
 6   a day to go over the jury instructions.
 7            MS. FOSTER:  Okay.
 8            THE COURT:  Okay?
 9            MS. FOSTER:  All right.
10            THE COURT:  All right.  Anything else?
11            MR. MOORE:  Yes, Your Honor.
12            THE COURT:  Yes, Mr. Moore?
13            MR. MOORE:  You announced to the jury that I'm going to
14   be gone, and I'm departing trial this morning.  We're still
15   engaged in the, well, what amounts to the case in chief.  We're
16   not in the argument.  We're not closed to evidence.  It
17   certainly wasn't my intention to be departing the trial at this
18   phase.
19            I do feel the need to put it on the record that I did
20   discuss this possibility with my client before we ever started.
21   I also discussed it with both the Court and Counsel.  And I
22   believe we were all in agreement that if we got to this point,
23   however unexpectedly if we got to this point, that it wasn't
24   fatal to the trial, and that my client was in agreement with
25   that.
26            THE COURT:  All right.  And, Mr. Boji, are you -- did
27   your lawyer in fact inform you of that fact that he may have to
28   leave early --
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 820

```
 1              THE DEFENDANT:  Yes, sir.

 2              THE COURT:  -- during the trial?

 3              THE DEFENDANT:  Yes, sir.

 4              THE COURT:  And are you consenting?

 5              THE DEFENDANT:  Yes.

 6              THE COURT:  All right.  Anything else, Mr. Moore?

 7              MR. MOORE:  No, Your Honor.  Thank you.

 8              THE COURT:  All right.  Thank you.

 9              MR. MOORE:  I guess I should put on the record, but,

10    obviously, I've been working in close contact with

11    Miss Blumenthal throughout this entire process, and we've been a

12    team, and I have full faith in her to complete the process.

13              THE COURT:  Both of you were ganging up on me on these

14    objections.

15              All right.  Thank you.

16              Have a good night.

17              MR. MOORE:  Thank you, sir.

18                        (Proceedings concluded.)

19

20

21

22

23

24

25

26

27

28
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 821

1                    RIVERSIDE, CALIFORNIA; JULY 11, 2018

2                    BEFORE THE HONORABLE SAMUEL DIAZ, JR.

3              THE COURT:  Good morning, everyone.

4              (All jurors responded "Good morning.")

5              THE COURT:  All parties are present.  All jurors are

6    present.

7              At this time, Miss Blumenthal, would you please

8    introduce your colleague to the jurors, please?

9              MS. BLUMENTHAL:  Yes.  Thank you.

10             Good morning, ladies and gentlemen.

11             (All jurors responded "Good morning.")

12             MS. BLUMENTHAL:  Joining me at counsel table is

13   attorney Heather Green from Blumenthal Law Offices.

14             THE COURT:  And, Miss Blumenthal, can you also read the

15   stipulation into the record?

16             Ladies and gentlemen of the jury, yesterday there was

17   an objection, and I sustained the objection.  Today we have an

18   agreement, a stipulation.  The Court has accepted that

19   stipulation, so there is no disagreement at this time in regards

20   to this particular objection.

21             And could you read that stipulation into the record,

22   please?

23             MS. BLUMENTHAL:  Yes.  Thank you very much.

24             Exhibits GGG through NNN are all items of clothing

25   collected from the defendant on November 10th, 2015.  All of the

26   items represented in the photographs are true and accurate

27   depictions of the clothing that was collected on that day.

28             And that was stipulated to and by both sides of the

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 822

1    prosecution and the defense.

2         THE COURT:  Madam prosecutor; is that correct?

3         MS. FOSTER:  Yes, Your Honor.

4         THE COURT:  And that stipulation has been accepted and

5    will be made part of the record.

6         All right.  Miss Blumenthal, you may proceed.

7         MS. BLUMENTHAL:  Thank you, Your Honor.

8                        de LESANDRO DEAN,

9    called as a witness by and on behalf of the Plaintiff, having

10   previously been first duly sworn, was examined and testified

11   further on Rebuttal as follows:

12                    CROSS-EXAMINATION (Resumed)

13   BY MS. BLUMENTHAL:

14        Q.   We'll start with some of those exhibits, but before I

15   display them, I'm going to show you the exhibit that we had just

16   discussed.

17        MS. BLUMENTHAL:  If I might approach, Your Honor?

18        THE COURT:  Yes.

19        Q.   BY MS. BLUMENTHAL:  I'm going to show you what's being

20   marked as actually LLL and GGG.  I'm going to show you first

21   GGG.  That has an evidence tag on it that indicates that what

22   was contents of that bag was Houston's shoes and white socks.

23        Could you look at those photographs, and does that

24   appear to depict that?

25        A.   Yes, they do.

26        Q.   And here appear to be the white socks taken from the

27   same envelope, which is LLL.

28        And does that appear to depict?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 823

1    A.   Yes, they do.

2    Q.   I'm going to show you now NNN and ask you if you could

3    describe the contents of those photographs?

4    A.   These are the blue jeans that were worn by the

5    defendant.  It's basically a picture of the front, the back, and

6    inside of them.

7    Q.   Okay.  Now I'm going to show you what's been marked as

8    MMM and ask if you could describe the content of those

9    photographs?

10   A.   These are a pair of blue Nike basketball shorts that

11   were worn underneath the blue jeans by the defendant.

12   Q.   And would that have been on top of his underwear?

13   A.   That is correct.

14   Q.   I'm going to show you now JJJ and ask if you're

15   familiar with the contents of those photographs?

16   A.   This is the front and back of the T-shirt he was

17   wearing on that day.

18   Q.   Okay.  I'm going to show you III and ask if you're

19   familiar with the contents of those photographs?

20   A.   These are the gray underwear that were worn underneath

21   the boxer shorts which were underneath the jeans.

22   Q.   When you say "boxer shorts," you're talking about --

23   A.   I'm sorry.  The basketball shorts.

24   Q.   Okay.  Now let's display these.

25        We'll go back to LLL.  And LLL appears to be the white

26   socks.  We'll go through each of these.  Does that appear to

27   be -- does that depict, what you are taking a look at, depicting

28   the white socks that Houston Boji was wearing on November 10th?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 824

1      A.    Yes, that is correct.

2      Q.    And each of the pictures that we are seeing, I take it,

3   it's from one side and then another side.  Would that be a fair

4   statement?

5      A.    Yes.

6      Q.    And then inside out?

7      A.    That is correct.

8      Q.    Then we go to the third photograph in that package.

9   Does that appear to be the socks inside out?

10     A.    That is correct.

11     Q.    And then the other, the last photograph would be

12   another side of those socks inside out; is that correct?

13     A.    Yes, that is correct.

14     Q.    Did you have these socks analyzed in any way?

15     A.    No, I did not.

16     Q.    And I'm going to show you GGG and ask if these appear

17   to be -- I wish I would have somebody to operate this for me.

18           These appear to be the shoes that Houston Boji was

19   wearing on November 10th of 2015?

20     A.    That is correct.

21     Q.    And they've been marked as such; is that correct?

22     A.    That is correct.

23     Q.    Into evidence?

24           And this would be a picture of the -- there we go.

25           Of the soles of those shoes; is that correct?

26     A.    That is correct.

27     Q.    And that would be a picture of the backside of the

28   shoes that he was wearing, the third picture in this packet?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 825

1     A.   Yes, that's correct.

2     Q.   And this would be a picture of the two shoes together,

3     kind of like on top of each other, but -- but the one side of

4     the shoe.  And then the next picture they're being held

5     together.  Would be the other side of the pair of shoes; is that

6     correct?

7     A.   Yes, that's correct.

8     Q.   Now, were these shoes analyzed in any way?

9     A.   No, they were not.

10    Q.   Was there ever a comparison done of the shoes to any of

11    the markings in the house on the floor?

12    A.   No.

13    Q.   Now, in the courses that you have taken as an

14    investigator, and for homicide investigation, you are taught as

15    an investigator, not that you do the analysis, but to have a

16    forensic technician either gather evidence or submit it for

17    analysis.  Would that be a fair statement?

18    A.   That is correct.

19    Q.   And some of the things that you're taught is when you

20    have certain evidence, like on -- like blood on the floors where

21    there appears to be either a footprint or shoe print, that you

22    could either take photographs or have those specifically

23    analyzed to see what they are; is that correct?

24    A.   That is correct.

25    Q.   And you were taught that?

26    A.   Yes.

27    Q.   And my understanding from your testimony is you did not

28    do that in this case?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 826

```
 1        A.   That is correct.

 2        Q.   I'm going to show you NNN.  And as we go through these,

 3   what do they -- what do these photographs depict?

 4        A.   These are the blue jeans that the defendant was wearing

 5   on that day.

 6        Q.   And there are several pictures of those blue jeans

 7   within this packet; is that correct?

 8        A.   That is correct.

 9        Q.   And they are all showing close-ups of what appears to

10   be blood stains on there?

11        A.   That is correct.

12        Q.   Did you ever have -- did you have any of the clothing

13   analyzed at all to see if they were blood stains or not?

14        A.   No, I did not.

15        Q.   As we take a look at each of those pictures, that would

16   be the backside of the jeans?

17        A.   That is correct.

18        Q.   And the bottom portion of the jeans, the backside?

19        A.   Yes.

20        Q.   And then up close to the pockets in the rear; is that

21   correct?

22        A.   That is correct.

23        Q.   And then the inside of the waistband area of the jeans?

24        A.   That is correct.

25        Q.   Now, MMM, I believe you stated that it depicts the,

26   what we call Nike basketball shorts.  Is that what you called

27   them?

28        A.   Yes, that's correct.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 827

1    Q.   And the pictures in this packet, would that depict --

2  now, Houston had on a pair of blue jeans.  Underneath the blue

3  jeans were these Nike basketball shorts, and underneath the Nike

4  basketball shorts will be the underwear, correct?

5    A.   That is correct.

6    Q.   So he had three layers on?

7    A.   Yes.

8    Q.   And what we're taking a look at here is the front side

9  of the Nike basketball shorts; is that correct?

10   A.   That is correct.

11   Q.   And there is another view of those shorts.

12        And then we have the backside of those particular

13 shorts; is that correct?

14   A.   That is correct.

15   Q.   And each of these, then we have the evidence label; is

16 that correct?

17   A.   Yes, that is correct.

18   Q.   Now, when evidence is -- how is evidence stored?

19 Things like this, how is that stored?

20   A.   Depending on if the blood on the pants were still

21 considered wet or damp, they would be put in the dry locker,

22 which is just outside of the evidence lockers.  But if they are

23 dry, then they are packaged in paper.  So they're allowed to dry

24 naturally, and then they are stored, in this case, at Moreno

25 Valley, and eventually they were transferred to Perris, because

26 that's where Moreno Valley houses their evidence.

27   Q.   So during the pendency of this case, they had changed

28 their storage to Perris; is that correct?

1    A.   No.  It has always been at Perris.

2    Q.   Okay.

3    A.   It's been there for several years, but we book it in

4  initially.  We always book in at the station that we are working

5  at.  And wherever they decide where they store their evidence,

6  it is then moved from that point to the other point.

7    Q.   Now, when you had the file number, it had "MV."  I

8  presume that stands for Moreno Valley?

9    A.   That is correct.

10    Q.   And that's where you would initially give the evidence

11  for them to store, and then they store it where they store their

12  evidence?

13    A.   That is correct.

14    Q.   I'm going to show you JJJ.  And that being the evidence

15  tag which says "One blue shirt on the front."  And is this the

16  blue T-shirt that Houston Boji was wearing on November 10th?

17    A.   Yes, it is.

18    Q.   And is this the front side of it?

19    A.   Yes, it is.

20    Q.   And then it appears to be the backside of that same

21  T-shirt; is that correct?

22    A.   That is correct.

23    Q.   And I'm going to show you what's been marked as III for

24  identification.  And it says that the evidence tag which

25  identifies it as being one pair of gray underwear, correct?

26    A.   Yes.

27    Q.   And the packet of photographs that was in there, then

28  does this depict the gray underwear that Houston Boji was

1    wearing that day?

2        A.   Yes, it does.

3        Q.   And is that, the next picture, the backside of the gray

4    underwear that Houston Boji was wearing that day?

5        A.   That is correct.

6        Q.   And is this the underwear that Houston Boji was wearing

7    that day where it appears as though a technician is holding the

8    underwear open so a photograph can be taken of the inside?

9        A.   Yes, that's correct.

10       Q.   And then does this appear to be the last photograph of

11   Houston Boji's gray underwear that he wore that day?

12       A.   Yes, it is.

13       Q.   Now, I'm going to go through No. 285 -- 284 for

14   identification.  And you recognize this diagram?

15       A.   Yes.  This is a sketch that is prepared by a forensic

16   tech.

17       Q.   And did that -- did that have the placement of certain

18   pieces of evidence that were discovered throughout the house?

19       A.   Yes, it does.

20       Q.   Now, I want to talk specifically, and I know that we

21   had discussed this earlier, specifically where the expended

22   casing was located.  There was an expended shell located, that

23   is one that had been fired?

24       A.   That is correct.

25       Q.   And is that indicated on the diagram where that

26   expended shell was found?

27       A.   Yes.  That's going to be -- that was evidence item 13,

28   which is between the decedent's right arm and his body.

1     Q.   And if I mark here, circle it as No. 13, that would be

2     the expended shell casing, correct?

3     A.   That is correct.

4     Q.   And I'm going to show you what's been previously marked

5     as CCC for identification.  And that appears to have the

6     evidence marker No. 13, and it appears to also contain in that

7     photograph an expended shell casing, correct?

8     A.   That is correct.

9     Q.   And that was near Nicholas; is that correct?

10    A.   Yes, it is.

11    Q.   In fact, as indicated by the diagram, that basically

12    was found by his arm, also indicated in that photograph?

13    A.   That is correct.

14    Q.   The upper portion of that photograph would be

15    Nicholas's arm; is that right?

16    A.   That is correct.

17    Q.   Now, there were some other unexpended shell cases, in

18    other words, just live ammo?

19    A.   Yes.

20    Q.   That would have been for that same gun; is that

21    correct?

22    A.   That is correct.

23    Q.   Now, I'm going to show you 328 for identification.  And

24    it appears as though No. 11 is over a round, an unexpended shell

25    casing?

26    A.   That's correct.  That's a live round.

27    Q.   Thank you.  A live round?

28    A.   Yes, ma'am.

1        Q.    And is that also then indicated on the diagram itself?

2        A.    Yes, it is.

3        Q.    And is that indicated here in No. 11 as being a live

4   round?

5        A.    Yes.

6        Q.    And the next live round would be what number, if you

7   recall?

8        A.    You have items 20 and 19 are live rounds.

9        Q.    Okay.  I'm going to show you what's been marked as 12

10  for identification.  They seem to have the evidence tags 19 and

11  20.  Is that what you're indicating are two unexpended rounds,

12  two live rounds?

13       A.    That is correct.

14       Q.    And on the diagram, would those be indicated with these

15  two, 19 and 20?

16       A.    Yes, that's correct.

17       Q.    Now, on that photograph No. 12 there appears to be --

18  in the contents of that photograph there is, obviously, a guitar

19  and what appears to be a piano?

20       A.    Yes.

21       Q.    If I bring it down a little bit farther there.

22             And down on the floor appears to be a large amount of

23  blood?

24       A.    That's correct.

25       Q.    Is that a fair statement?

26             Now, we also have some other unexpended rounds.  And do

27  you recall what those numbers are?

28       A.    It's going to be evidence item 18, which is, I believe

1    it's on the mattress and the box spring.

2        Q.   I'm going to show you photograph No. 3.  And that

3    appears to indicate the evidence tag No. 18.  And there appears

4    to be a live round that is on that bed between the mattress and

5    the box spring?

6        A.   Yes, that's correct.

7        Q.   And here is another view of that photograph, No. --

8    identified as No. 7, also the evidence tag.  And does that

9    fairly depict where that live round is located?

10       A.   Yes, it does.

11       Q.   And if we circle No. 18 on the diagram, that would be

12   where that round was located, correct?

13       A.   That is correct.

14       Q.   Now, there is still a few more live rounds, a couple

15   more, I believe, and that one would be No. 17?

16       A.   That is correct.

17       Q.   I'm going to show you what has been previously marked

18   as 6 for identification, and ask you if that represents the live

19   round that you're referencing?

20       A.   Yes.  17 is underneath the bed, and I'm guessing that's

21   why it's not depicted in the overall sketch.

22       Q.   Okay.  Underneath the bed.  So basically it would be

23   around this general area; is that correct?

24       A.   That is correct.

25       Q.   And then we also have No. 16?

26       A.   That is correct.

27       Q.   And I'm going to show you what has been marked as 327

28   for identification.  That indicates evidence marker No. 16.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 833

1    There appears to be a live round right in front of that evidence

2    marker?

3        A.   That is correct.

4        Q.   And that was located actually near -- I'll write the

5    No. 16 here.  Near the decedent's leg; is that correct?

6        A.   That is correct.

7        Q.   But by the time we were done, there were then six live

8    rounds and one spent round?

9        A.   That is correct.

10       Q.   I'm going to show you -- the terms both "castoff" and

11   "aspiration" has been used throughout the trial.  Are you

12   familiar with either one of those terms?

13       A.   Yes, I am.

14       Q.   What is castoff?

15       A.   Castoff can happen in a various scenario.  It can be,

16   say someone is hit with a blunt object.  The first time they're

17   struck, you're actually opening up the wound.  The second time

18   they're struck, you're now collecting, or blood is now going to

19   be on that item.  And when they pull back, blood will be on the

20   ceiling or the wall.

21            So when you have castoff in a, say a fight where

22   someone is hit, you have to assume that there is at least two

23   strikes.  Castoff with, say, being shot, you have the force of

24   the projectile going into that person's body and either exiting

25   or causing blood to exit that person's body, and that's where

26   you get the castoff, whether it be on the wall, the floor, or on

27   the bed.

28       Q.   What is aspiration?

1     A.   Aspiration is -- can happen both in a, say a person who
2     is -- I had a case where a person was stabbed and they're
3     walking and their lungs are filling up with blood, and as they
4     breath, blood is coming out of their mouth.  And so it gets kind
5     of a misty kind of appearance on the wall.  It's not your
6     normal, say, castoff where you have large blood droplets and you
7     start to get the striations that come off of them.  The
8     aspiration almost looks like a mist.
9         If it's on, in this case, the defendant's face, and
10    he's running through the house and he's breathing, obviously,
11    and blood is coming off of him, you're going to get that same
12    effect.  You're going to get that misty kind of appearance.
13    It's going to hit the wall and the floor.
14    Q.   Now, when we talked about how much blood he had on his
15    face, I'm going to show you No. 261 for identification.  Is that
16    what you're referencing?
17    A.   Yes.
18    Q.   It appears to be a significant amount of blood on his
19    face?
20    A.   That is correct.
21    Q.   And this photograph was taken before you had arrived;
22    is that correct?
23    A.   That is correct.
24    Q.   This appears to be similar to when you first saw him?
25    A.   That is correct.
26    Q.   But this is after law enforcement has arrived,
27    obviously?
28    A.   That is correct.

 1      Q.    And has separated him out from other people?

 2      A.    That is correct.

 3      Q.    Now, I'm going to show you -- oh, I'm sorry.  And is

 4  this type of amount of blood that you see here that a person is

 5  either running or breathing hard that you can have the

 6  aspiration spray?

 7      A.    That is correct.

 8      Q.    I'm going to show you what's been previously marked as

 9  23 for identification and has evidence tag No. 29 on it.  And if

10  we get real close, there appears to be -- appear to be marking

11  some evidence, but appears to be more like an aspiration spray.

12  Would that be correct?

13      A.    Yeah, it could be.  I'd say it's more of a castoff,

14  because you have the -- you have the larger circular, and that

15  means that you have a larger amount of blood that's coming off

16  of an object.  It's hitting the wall, and it basically just

17  dries in that sense.  But if it was aspirated, it would be

18  harder to see.  It would have more of a mist kind of appearance.

19      Q.    Did you ever have -- and this has got evidence tag No.

20  29 on that; is that correct?

21      A.    That is correct.

22      Q.    Did you ever have this analyzed?

23      A.    No.

24      Q.    I'm going to show you what's been marked as 21 for

25  identification.  This has evidence tag No. 28 on it.  Did

26  this -- at the time, at least, you did not have this analyzed, I

27  take it?

28      A.    No, I did not.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 836

1    Q.    So it may appear to be blood, but we're not -- it was

2    never analyzed as to whether it was or not?

3    A.    No.

4    Q.    Would that be a fair statement?

5    A.    That's correct.

6    Q.    But at least it was significant enough at the time that

7    at least the forensic technicians put an evidence number on it?

8    A.    Correct.

9    Q.    And took a photograph of it?

10   A.    Well, if it's an evidence item number, it's actually

11   photographed and collected.  So they do what's called a

12   blood/alcohol sample.  They will do a -- take a Q-tip and swab

13   the blood.  That is booked in and they do a control, which is

14   going to be next to, or what they believe to be blood.  So we

15   have two samples that are collected for evidence item 28.

16   Q.    Okay.  So evidence item 28 would indicate that the

17   blood sample was collected?

18   A.    That is correct.

19   Q.    Was anything ever analyzed or done with the blood

20   sample?

21   A.    No, it was not.

22   Q.    And I take it the same for No. 29?

23   A.    That's correct.

24   Q.    Since the evidence tag is there?

25   A.    That is correct.

26   Q.    Now, when it has the yellow evidence tag, that means

27   that something was done with it?

28   A.    Any numeric placard, that item was collected.  If you

Christine M. DiCaro, CSR                                    834

1    have a letter, that is a photograph point.  You take a

2    photograph of it.

3        Q.   Okay.  So if it's a numeric number, that means evidence

4    was physically collected.  If it has a letter like on the floor

5    or something like that, that means the evidence was a photograph

6    that was taken of that area?

7        A.   That is correct.

8        Q.   And with that information I'm going to show you what's

9    been marked as 322 for identification.  And on this -- let's go

10   to the top one first.  This indicates an area on the floor; is

11   that correct, with the evidence item No. 3?

12       A.   That is correct.

13       Q.   Now, when you take a look at that area, there is a

14   photograph attached below to it which would probably indicate a

15   closer up of that.  Does that indicate that that item was

16   collected as evidence?

17       A.   Correct, it was.

18       Q.   Now, does that mean the actual tile would have been

19   collected or blood sample would have been collected?

20       A.   A blood sample.

21       Q.   At the bottom of that same exhibit -- there appears to

22   be at the bottom portion of this a close-up of what is No. 3; is

23   that correct?

24       A.   That is correct.

25       Q.   And there appears, if we could, if we zoom it a little

26   bit more, it appears to be some blood that's on the floor?

27       A.   Yes, that's correct.

28       Q.   Now, what would have been collected on that?

1    A.   Basically swabbing the item.  And it's basically when

2    it's collected, it's what appears to be blood.  We don't assume

3    it's blood.  So we collect it and then we do a controlled sample

4    directly next to that particular item as well.

5    Q.   And was that ever analyzed?

6    A.   No, it was not.

7    Q.   I'm going to show you 319 for identification.  And this

8    appears to be also blood on -- I'm not saying it is blood, but

9    it appears to be blood on the tile; is that correct?

10   A.   That is correct.

11   Q.   Now, were any of the shoes or feet ever compared to

12   these photographs?

13   A.   No.

14   Q.   Is there a forensic way of taking shoes and comparing

15   the bottom of the shoes to photographs to see if they appear to

16   be a match?

17   A.   Yes.

18   Q.   And was that done in this case?

19   A.   No, it was not.

20   Q.   Now, when shoes have particular types of soles, the

21   more unusual kind of soles, as opposed to a flat, does that make

22   it, generally speaking, easier to identify whether or not

23   something is a shoe print?

24   A.   Yes.

25        MS. FOSTER:  Objection.  Calls for speculation.  Lacks

26   foundation.

27        THE COURT:  Sustained on foundation.

28        MS. FOSTER:  Move to strike.

1          THE COURT:  If there was an answer, the answer will be

2     stricken.

3          Q.   BY MS. BLUMENTHAL:  You took, Investigator, you had

4     special homicide investigation and so on.  You took courses in

5     forensics as to what you're supposed to be doing in gathering

6     evidence; is that correct?

7          A.   That is correct.

8          Q.   And one of the things that you were taught in forensics

9     is to take a look at the soles of shoes to see if they are very

10    identifiable; is that correct?

11         A.   Correct.

12         Q.   And one of the things that you were taught for doing

13    investigation and to do certain comparisons is to at least, not

14    that you could make the determination, but you can gather the

15    evidence so that you can see if the soles of shoes match

16    certain, what appears to be prints on floors; is that correct?

17         A.   That is correct.

18         Q.   I'm going to show you what's been previously marked as

19    GGG for identification.  And this you had identified

20    previously -- there we go.  Thank you -- as the soles of Houston

21    Boji's shoes.  Those appear to have a pattern that is

22    semi-unique, for lack of a better word?

23         A.   Yes.

24         Q.   In other words, they would be a definite kind of

25    pattern as opposed to being flat?

26         A.   Correct.

27         Q.   Did you ever take these soles and compare them to any

28    of the impressions, what appear to be blood pattern impressions

 1   that were left on the floor?

 2        A.   No.

 3        Q.   Or the tile?

 4             They had several kinds of tile in the house, I take it.

 5   One was a wood pattern, one was more of a tile tile?

 6        A.   That is correct.

 7        Q.   I'm going to show you what's been marked as HHH for

 8   identification.  And I'm going to ask if you're familiar with

 9   the contents of that photograph?

10        A.   Yes.  That's -- that's going to be the entryway to the

11   house.

12        Q.   Okay.

13        A.   The yellow letters are going to be photographic points.

14   The numeric placards are going to be items that were collected.

15        Q.   And the items that would be collected there appear,

16   because of where they're located, appear that they would

17   probably have been blood samples; is that correct?

18        A.   That is correct.

19        Q.   Now, I'm going to show you the next photograph "B."

20   Now, you see "B."  "B" is located near the front door; is that

21   correct?

22        A.   That is correct.

23        Q.   And "B" was a photograph that was taken; is that

24   correct?

25        A.   That is correct.

26        Q.   And that appears to be some sort of a print that would

27   be made with a foot or a shoe; is that correct?

28        A.   That is correct.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 841

1      Q.   And was there ever a comparison requested of this

2   particular print that was left there, a comparison of that and

3   the sole of Houston Boji's shoe?

4      A.   No.

5      Q.   Were you taught that you can have photographs and have

6   the shoe, the actual shoe and photographs of it and do a

7   comparison between the two?

8      A.   Yes.

9      Q.   I'm going to show you another photograph in that packet

10   that has the evidence marker "C," which means the photograph

11   only was taken, correct?

12      A.   That is correct.

13      Q.   And that is another foot shoe print that was left on

14   the floor near the front entryway?

15      A.   Yes.

16      Q.   And I'm going to show you that same packet which has

17   been marked as "D."  And that was a photograph that was taken of

18   a print that was left in that area, correct?

19      A.   That is correct.

20      Q.   And that appears to have a pattern within the print

21   itself, at least what's depicted in the photograph?

22      A.   Yes.

23      Q.   And if I turn GGG in a little different direction, and

24   you take a look at the pattern that is on the sole of the foot,

25   I'm not asking for an expert opinion, but does that appear to be

26   similar to you to what's in "D"?

27      A.   Yes.

28      Q.   Did you ever ask to have a forensic expert opinion

1    rendered on that?

2         A.   No.

3         Q.   I'm going to show you 29 for identification.  Now, this

4    has a numeric evidence label in it.  And where is the location

5    of the contents of that photograph?

6         A.   That's going to be the hallway north of the bedroom

7    where the decedent was.

8         Q.   If we pull it out a little bit, as we look off to the

9    left side of the photograph, what is that room back in there?

10        A.   That is the kitchen.

11        Q.   That's the kitchen?

12        A.   Correct.

13        Q.   And where would Nicholas's bedroom have been in

14   relationship?

15        A.   It would be to the left or south of that location.

16        Q.   To the left or south.  So you're talking in this

17   general area down in here?

18        A.   Correct.

19        Q.   No. 32 indicates there appears to be almost like a

20   handprint or something similar to?

21        A.   It's blood or what appears to be blood on the wall.  I

22   can't say it's a handprint.

23        Q.   Appears to be blood on the wall?

24        A.   That is correct.

25        Q.   Was there any -- to the best of your knowledge are

26   there any closer-up pictures taken than that?

27        A.   I'm sure.  There were a lot of pictures taken.

28        Q.   As we've seen in this trial?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 843

```
 1        A.    Yeah.
 2        Q.    Did you have any of the markings on that wall analyzed?
 3        A.    No.
 4        Q.    Did you have -- take a look at to see if there were any
 5   fingerprints on that wall?
 6              MS. FOSTER:  Objection.  Asked and answered.
 7              THE COURT:  Overruled.
 8              THE WITNESS:  No.
 9        Q.    BY MS. BLUMENTHAL:  When you took a look at the
10   kitchen, were you able to see -- did you ever locate a base to a
11   phone?
12        A.    Yes.
13        Q.    Cordless phone?
14        A.    Yes.
15        Q.    Pardon me?
16        A.    Yes.  There was a base.  I believe it was located to
17   the right of the refrigerator.
18        Q.    Okay.
19              MS. BLUMENTHAL:  If I could approach the witness, Your
20   Honor?
21              THE COURT:  Yes.
22        Q.    BY MS. BLUMENTHAL:  I'm going to approach you with No.
23   284 for identification.  And I'm just going to ask you if you
24   could put a "PB," phone base, on there where you think that that
25   base was located?
26        A.    (Witness complies.)
27        Q.    Thank you.
28              Now, if we put this diagram back up here, we can --
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 844

1    we'll bring it.

2         You put "PB," phone base, which is on the other side of

3    what would be the fridge; is that correct?

4    A.    That is correct.

5    Q.    Now, if a -- how far is the stove, the sink and -- and

6    the sink from where the phone base was located?

7    A.    I'd say the stove might be ten feet, 12 feet from the

8    phone base.  The sink is probably either eight to six feet away.

9    Q.    I'm going to show you what's been marked as 33 for

10   identification.  And that appears to be the sink and the

11   refrigerator; is that correct?

12   A.    That is correct.

13   Q.    And the table that you're referencing is right on the

14   other side of the refrigerator?

15   A.    That is correct.

16   Q.    Now, there also appears to be in the front of the sink

17   area along the tile blood markings, correct?

18   A.    That is correct.

19   Q.    There's an evidence tag No. 34.  What would that

20   indicate what was gathered?

21   A.    They would take a sample, and they would also take a

22   controlled sample.

23   Q.    What's the difference between a sample and a controlled

24   sample?

25   A.    A sample is the actual item, a controlled sample is

26   you're assuming an area that is clean, that does not look like

27   it has what you believe to be either blood or some other foreign

28   substance.

1    Q.   Okay.  And most kitchens don't, it's pretty common

2  knowledge, would not have this on the countertop, I take it?

3    A.   That is correct.

4    Q.   At least that's the assumption that would be made?

5    A.   Correct.

6    Q.   Was that ever analyzed?

7    A.   No, it was not.

8    Q.   Did the blood -- and when you went through the house,

9  and you went through there several times, correct?

10   A.   Correct.

11   Q.   You got an opportunity to take a look at all of these

12 evidence markings and what they would indicate?

13   A.   That's correct.

14   Q.   I'm not saying you studied them, but you got a good

15 opportunity to at least take a look at where they were and where

16 they were laid out?

17   A.   Correct.

18   Q.   And I take it that this is the type of marking that was

19 predominant or prevalent in the kitchen when you saw it?

20        For example, on the stove and so on?

21   A.   They were the same if you're saying they were swipes or

22 appear to be swipes or put on with another object, yes.

23   Q.   Okay.  When you say "swipes," you're talking about like

24 a hand or an arm or something like that?

25   A.   Correct.

26   Q.   Okay.  Show you 32 for identification.  And we did talk

27 about this a little bit yesterday.  Is that the type of swiping

28 that you're talking about that was in the kitchen?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 846

```
 1      A.   That is correct.
 2      Q.   And, again, that's another numeric evidence tag, so
 3   that would suggest to you that some of that was taken as
 4   evidence?
 5      A.   Correct.
 6      Q.   But, again, no analysis was ever done?
 7      A.   No, it was not.
 8      Q.   And fingerprints, can you take, from your experience,
 9   have you gathered or directed fingerprints to be collected or
10   analyzed?
11      A.   I've done both.
12      Q.   And is it possible to collect fingerprints off of a
13   stove like this?
14      A.   Off of a stove, yes.
15      Q.   Okay.  Was that -- did you order that or do it?
16      A.   No.
17           MS. BLUMENTHAL:  If we can have just one moment here,
18   Your Honor?
19           THE COURT:  Sure.
20           MS. BLUMENTHAL:  I have no further questions, Your
21   Honor.
22           THE COURT:  People?
23                     REDIRECT-EXAMINATION
24   BY MS. FOSTER:
25      Q.   I'm going to go through a couple of photos with you.
26           Showing you what's been marked for identification as
27   Defense NNN.  Do you see what's depicted as Defense NNN?
28      A.   Yes, I do.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 847

 1        Q.    And would this be the inside of the defendant's jeans?

 2        A.    That is correct.

 3        Q.    And do you see an area that indicates blood?

 4              What appears to be blood?

 5        A.    You have this area here, which would be on the left

 6   pant leg inside.

 7        Q.    Showing you what's marked for identification as Defense

 8   MMM.  And can you see an area on MMM that has what appears to be

 9   blood?

10        A.    Looks like it's on the right pant leg on the outside of

11   the Nike shorts.

12        Q.    I'm showing what's been marked for identification as

13   Defense III.  Do you recognize III?

14        A.    Yes.  These are the boxer shorts or underwear that was

15   worn by the defendant.

16        Q.    And do you see what appears to be blood in Defense III?

17        A.    Looks like on the white pant leg there appears to be a

18   small amount.

19        Q.    You looked at some photographs of the -- what was

20   indicated earlier by Investigator Corey as shoe prints.  Do you

21   recall that?

22        A.    That is correct.

23        Q.    I'm showing you Defense HHH.  During your

24   investigation, did you make a determination as to what you

25   believed those items to be that were marked with the letters

26   near the front door?

27              MS. BLUMENTHAL:  Objection.  Calls for speculation.

28   Also, outside this witness's expertise as far as making a

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 848

1    determination what they are.

2         THE COURT:  Sustained on foundation.  If you want to

3    lay further foundation.

4         Q.   BY MS. FOSTER:  You just testified that you have been

5    trained in analyzing and observing what appear to be shoe

6    prints; is that correct?

7         A.   That is correct.

8         Q.   Describe your training for us in that area?

9         A.   I went to a blood splatter class, which is a 40-hour

10   training in analyzing blood spatter, blood drops, footprints,

11   things of that nature.  I also attended an 80-hour homicide

12   class which had a portion, again, which dealt with processing a

13   crime scene, looking at footprints, shoe prints, things like

14   that.

15        And just, I mean, being a male that has a lot of shoes

16   himself, I know what the bottom of certain shoes look like.  I

17   have an affinity for Nike's.  I know what they look like.

18        And I think just through walking through crime scenes,

19   I was out on 115 different crime scenes.  I think that would

20   give me a comfortable level in processing certain items.

21        Q.   And during your investigation, did you make a

22   determination that items A, B, C, and D were shoe prints?

23        MS. BLUMENTHAL:  Your Honor, I'd object for giving an

24   expert opinion.

25        THE COURT:  Overruled.

26        THE WITNESS:  I can't say for sure that they were shoe

27   prints looking at this particular picture, but in walking

28   through the crime scene, and based on the defendant's own

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 849

```
 1    testimony and witnesses' testimony --

 2           MS. BLUMENTHAL:  Your Honor, this I would object as to

 3    improper opinion.  That's not based upon the physical evidence

 4    alone.

 5           THE COURT:  Overruled.

 6           THE WITNESS:  -- that both the defendant and witness

 7    both entered and exited out the front door.  The defendant --

 8           MS. BLUMENTHAL:  Your Honor, I'm going to object at

 9    this time and ask to be heard on the record.

10           THE COURT:  All right.  Let's go out in the hallway.

11    I'll have the court reporter with me.

12       (Proceedings were held out of the presence of the jury:)

13           THE COURT:  All right.  On the record out of the

14    presence of the jury.

15           There was an objection lack of foundation.

16           Defense?

17           MS. BLUMENTHAL:  Your Honor, what he is doing up here

18    is he's consolidating all the evidence he has heard, and he's

19    giving an opinion as to how they moved throughout the house.

20    He's talking about the deceased.  He's talking about the

21    defendant.  And that's outside of any witness's prerogative.

22           And he's not an expert.  He is going to be giving a

23    statement here.  This, I apologize for interrupting, because I

24    thought it was way too prejudicial to let him continue on giving

25    an opinion on how he feels the deceased was moving around the

26    house after he was shot, as they had gone out through the front

27    door, and that's not an expert opinion that can be given here.

28    That is telling the jury what he believes the facts are, and
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 850

1   that invades the providence.  I believe it's highly prejudicial.

2       And he's making his statement that he's also basing it

3   upon witnesses' statements that he's heard.  That, I think, is

4   extremely prejudicial.  I think -- I don't think he's allowed to

5   give that kind of an opinion.

6       THE COURT:  People?

7       MS. FOSTER:  Just so we're clear, he didn't talk about

8   the deceased's movements at all.

9       THE COURT:  Right.

10      MS. FOSTER:  He talked about the witness the night

11  when, I believe, he's referring to the 911 caller.

12      THE COURT:  Yes.

13      MS. FOSTER:  And the defendant saying that they moved

14  in and out of the house.  And when police are doing their

15  analysis, they use those witness statements to see if they're

16  consistent with the evidence at the scene.

17      And, further, I hadn't moved into the territory, but

18  during the cross-examination of him, defense laid a foundation

19  for him to do a comparison and analysis of the defendant's shoe

20  to the -- to the shoe print on the ground.  And my question is

21  simply, "Do you determine or believe that this was a shoe

22  print?" which she's already laid the foundation that it is a

23  shoe print.

24      Now, I will say this, that I think my question is much

25  more simple than the answer that he's giving.  So we can ask him

26  to just -- I can repeat my question and he can answer just the

27  question, but --

28      THE COURT:  Right.  I think there is enough foundation

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 851

1    laid.  I'm assuming he was talking about the 911 call, the first

2    witness, not the decedent.  So we could clarify that, if you

3    can.

4          So at this time the objection as to lack of foundation

5    is overruled.  All right.

6          MS. BLUMENTHAL:  Well, as nonresponsive?

7          THE COURT:  That it's nonresponsive.  And if you want

8    to rephrase the question.

9          MS. FOSTER:  Okay.

10         THE COURT:  All right.

11      (Proceedings were held in the presence of the jury:)

12         THE COURT:  All right.  The objection is sustained as

13   nonresponsive.  Do you want to rephrase the question?

14      Q.   BY MS. FOSTER:  And my question is just simply, did you

15   believe those, during your investigation, to be shoe prints?

16      A.   Yes, I did.

17      Q.   And you just had an opportunity with the defense to

18   look at the bottom of the defendant's shoes; is that correct?

19      A.   That is correct.

20      Q.   And then defense had you on HHH, the fourth page, to

21   look at what appears to be a bloody shoe print; is that correct?

22      A.   That is correct.

23      Q.   And then defense had you compare and give it a lay or

24   expert opinion as to whether or not the shoe print indeed

25   appeared the same as the marking on the defendant's shoes?

26         MS. BLUMENTHAL:  Objection.  That misstates the

27   evidence to the questions that were asked.

28         THE COURT:  Overruled.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 852

```
 1            THE WITNESS:  Yes.
 2       Q.   BY MS. FOSTER:  So you had an opportunity to look at
 3   the pattern at the bottom of the defendant's shoe?
 4       A.   Yes, I did.
 5       Q.   And you were also shown by defense Exhibit 319.
 6            Is that correct?
 7       A.   That is correct.
 8       Q.   And did you see that same pattern in Exhibit 319?
 9       A.   Yes, I did.
10       Q.   Do you see the pattern from the bottom of the
11   defendant's shoes in 319?
12       A.   No, I do not.
13       Q.   You talked in cross-examination about the castoff.  Do
14   you remember those questions?
15       A.   Yes.
16       Q.   And you were shown Exhibit 284.  Do you recall that?
17       A.   Yes.
18       Q.   Now, the castoff that you observed, where is that in
19   relationship to Exhibit 284?
20       A.   It's going to be evidence item, I believe it was 29 you
21   had the castoff.
22       Q.   So is that, from your walk-through of the house, is
23   that area right outside the door of the victim's bedroom?  I'm
24   sorry.  Of Nicholas's bedroom?
25       A.   Yes, it is.
26       Q.   Now, you were asked some questions about whether or not
27   you analyzed the shoes and any possible footprints.  Do you
28   recall those questions?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 853

```
 1        A.   Yes.
 2        Q.   And based on the information that you had, how many
 3   people were present during the -- during the shooting?
 4             MS. BLUMENTHAL:  Your Honor, I'm going to object as
 5   calling for speculation.  Also, everything is based on hearsay
 6   at this time.
 7             THE COURT:  Overruled.
 8             THE WITNESS:  Two.
 9        Q.   BY MS. FOSTER:  And how many of those two had shoes,
10   based on the information that you observed or were given by the
11   defendant?
12             MS. BLUMENTHAL:  Same objection, Your Honor.
13             THE COURT:  He's testifying as an expert.  Overruled.
14             THE WITNESS:  One.
15        Q.   BY MS. FOSTER:  And how many, based on your
16   observations, had no shoes?
17        A.   One.
18        Q.   Did you feel you needed an analysis to -- for the --
19   well, let me back up.  Why didn't -- therefore, why didn't you
20   get an analysis for the prints on the ground?
21        A.   Based on the decedent's injuries, I didn't believe he
22   could have walked out of the bedroom.  He didn't have on shoes.
23   The defendant was the only one that had on shoes.  And then my
24   initial walk-through, the shoe prints, or what we believed to be
25   shoe prints were pointed out to me.  And then when speaking to
26   the defendant, I had the opportunity to look on the bottom of
27   his shoes.
28        Q.   So why didn't you get an analysis?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 854

```
 1         A.   I didn't feel the need.
 2         Q.   You went into some expended and live rounds that were
 3    found in the room.  Do you remember having that discussion on
 4    cross-examination?
 5         A.   That is correct.
 6         Q.   I'm sorry?
 7         A.   Yes.
 8         Q.   Now, the expended round, that's the round that was --
 9    the only expended round that was found in the room; is that
10    correct?
11         A.   That is correct.
12         Q.   And so after Nicholas is shot there would be one round
13    that is expended; is that correct?
14         A.   That is correct.
15         Q.   And based off of People's 269, have you seen that type
16    of weapon before?
17         A.   Yes, I have.
18         Q.   Have you fired that type of weapon?
19         A.   Yes, I have.
20         Q.   How do the rounds eject from those types of weapons?
21         A.   They eject out through the slide port.
22              MS. FOSTER:  I'm going to ask to see People's 269.
23              I'll move on until that's ready.
24         Q.   BY MS. FOSTER:  Showing you Defense CCC.  Is that the
25    expended round that was located?
26         A.   Yes.
27         Q.   And that's the only one that was located?
28         A.   That is correct.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 855

```
 1      Q.   I'm showing you People's 327.  Of all the expended
 2   rounds that were located, were any of them underneath Nicholas's
 3   body?
 4      A.   No.
 5      Q.   Based on your observation of the expended rounds, is
 6   there any indication of when -- I'm sorry.  Not the expended
 7   rounds, the live rounds.  Is there any indication just based off
 8   of the scene of when those live rounds were ejected?
 9           MS. BLUMENTHAL:  Your Honor, I'm going to object at
10   this time.  It calls for expert opinion.  Also calls for
11   speculation as phrased.
12           THE COURT:  Overruled.
13           MS. BLUMENTHAL:  I'd ask to take the witness on voir
14   dire as to his area regarding this particular weapon.
15           THE COURT:  Overruled.  No speaking objections.
16           THE WITNESS:  Based on where the shell casings are,
17   there is no way to determine when they were ejected.
18      Q.   BY MS. FOSTER:  Now, when you're talking about rounds
19   coming out of the side, and correct me if I'm saying that wrong,
20   coming out of the side of this type of shotgun?
21      A.   Correct.
22      Q.   Do they fly out or do they drop to the ground?
23           MS. BLUMENTHAL:  Objection.  Lack of foundation as to
24   this gun.
25           THE COURT:  Overruled.
26           THE WITNESS:  They're going to come out, like I said,
27   the slide port.  Most guns normally eject to the right and up
28   over your shoulder.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 856

1       Q.   BY MS. FOSTER:  I'm showing you People's 284.  The

2   rounds that were collected, were they centralized only in one

3   area of the bedroom?

4       A.   No.

5            MS. FOSTER:  I have nothing further.

6            THE COURT:  Defense?

7            MS. BLUMENTHAL:  Yes.

8            THE COURT:  Oh, I'm sorry.  You still wanted to show

9   the exhibit?  269?

10           MS. FOSTER:  Do they have it?

11           THE COURT:  Yes.  Hold on.  I'm sorry, Miss Blumenthal.

12           MS. BLUMENTHAL:  That's okay.

13      Q.   BY MS. FOSTER:  Have you had an opportunity to view

14   People's 269?

15      A.   Yes, I have.

16      Q.   Do you see the area where live rounds can be ejected?

17      A.   Yes.  The gun is basically made safe with a white zip

18   tie.

19           MS. FOSTER:  I'm going to ask if the deputy doesn't

20   mind stepping back so that all the jurors can see.

21           THE WITNESS:  And you see the circle, the hole where

22   the zip tie is going through, that's where the live or expended

23   round will come out.

24           MS. FOSTER:  All right.  Thank you.  Nothing further.

25           THE COURT:  All right.  Defense?

26           MS. BLUMENTHAL:  He can stay there.

27           THE COURT:  Yeah, I assumed that.

28           MS. BLUMENTHAL:  Thank you.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 857

RECROSS-EXAMINATION

BY MS. BLUMENTHAL:

     Q.   Every gun is still unique; isn't that correct?

     A.   Absolutely.

     Q.   That's why you normally have an expert actually test
fire the gun?

     A.   That is correct.

     Q.   Did you test fire this gun?

     A.   No, I did not.

     Q.   Now, while it ejects out the side, the amount of force
with which it ejects, or some of the directions in which it goes
can vary from gun to gun, even though the guns are the same
model?

     A.   Absolutely.

     Q.   And you don't know for this particular gun exactly how
it ejects, in which direction they go.  Is that a fair
statement?

     A.   That is correct.

     Q.   Thank you.

          MS. BLUMENTHAL:  Thank you.  We don't need that
anymore.

     Q.   BY MS. BLUMENTHAL:  When -- you had been at the scene
when emergency response had to come in to render aid to an
injured person; is that correct?

     A.   Yes, I have.

     Q.   And when they come in to, especially on an emergency
situation where they may be trying to save a person's life, do
they always take care of the scene?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 858

```
 1       A.   I'd say 99 times out of a hundred, no.
 2       Q.   Okay.  So if there is a shotgun shell that's on the
 3  floor and emergency response personnel is, say, working on
 4  Nicholas's body, you're not giving an opinion as to whether or
 5  not that shell has been moved or kicked around by the emergency
 6  response people.  Would that be a fair statement?
 7       A.   Correct.
 8       Q.   And we know that emergency response personnel were
 9  present because of some of the hookups on Nicholas's body?
10       A.   That is correct.
11       Q.   Now, you were asked about castoff and aspiration.  We
12  both had asked you about that.  Are there experts who study
13  that, who will give an expert opinion as to whether something is
14  a castoff or an aspiration?
15       A.   Yes.
16       Q.   Are you qualified?  Have you been certified to give
17  those kind of opinions?
18       A.   No, I am not.
19       Q.   Did you ask anybody who is certified to give that type
20  of an opinion to do an analysis of it?
21       A.   We had the Department of Justice come out.
22       Q.   You had them come out?
23       A.   Yes, but my understanding they never completed a report
24  or gave us any analysis on the blood spatter.
25       Q.   So we had no information on it then; is that correct?
26       A.   That is correct.
27            MS. FOSTER:  Objection.  Misstates the evidence.
28            THE COURT:  Overruled.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 859

```
 1        Q.   BY MS. BLUMENTHAL:  Now, you've been asked questions on
 2   what appears to be blood stains.  I'm going to show you NNN for
 3   identification.  And you were asked specifically that appeared
 4   to be a blood stain inside of Houston's jeans; is that correct?
 5        A.   That is correct.
 6        Q.   When you saw Houston, how wet were his jeans?
 7        A.   I couldn't answer that question.
 8        Q.   You didn't touch him, I take it?
 9        A.   Oh, no.
10        Q.   It appears to be blood, not tested, but -- but in your
11   opinion that appeared to be blood, correct?
12        A.   That is correct.
13        Q.   When we had looked at -- you were asked to look on
14   redirect at MMM, you were shown a pair of the Nike basketball
15   shorts.  You indicated that there appeared to be blood stains on
16   the right side of those shorts, at least a minimum at the right
17   side?
18        A.   That is correct.
19        Q.   Did you ever do, or did anyone ever do a match up
20   between where the blood is found on the basketball shorts and
21   where the blood was found on the jeans?
22        A.   No.
23        Q.   Was anyone ever asked to do an analysis to see if the
24   wet blood went through the jeans and onto the basketball shorts?
25        A.   No.
26        Q.   You were asked on redirect and shown III, and you were
27   asked if there was anything that appeared to be blood to you on
28   the shorts; is that correct?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 860

```
 1        A.    That is correct.

 2        Q.    Was there ever an analysis done on that underwear to

 3   see if it was blood?

 4        A.    No.

 5              MS. FOSTER:  Objection.  Asked and answered.

 6              THE COURT:  Overruled.

 7              I'm sorry.  Can you answer the question?

 8              THE WITNESS:  No.

 9        Q.    BY MS. BLUMENTHAL:  It was not done?

10        A.    No.

11        Q.    In looking at it here was there ever any analysis done

12   to see where this at least stain appeared on the underwear and

13   how that relates to the basketball shorts and the jeans?

14        A.    No.

15              MS. BLUMENTHAL:  I have no further questions, Your

16   Honor.

17              THE COURT:  People?

18              MS. FOSTER:  No.  No further questions.

19              THE COURT:  All right.  Thank you, sir.

20              THE WITNESS:  Thank you, Your Honor.

21              THE COURT:  Any additional witnesses?

22              MS. FOSTER:  No, Your Honor.  People rest.

23              THE COURT:  All right.  Defense?

24              MS. BLUMENTHAL:  No witnesses, Your Honor.  Subject to

25   the admission of the exhibits.

26              THE COURT:  All right.  Let me talk to the lawyers out

27   in the back.

28              I've been working on the jury instructions.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 861

```
1              (Discussion held at sidebar, not reported.)
2              THE COURT:  All right.  Back on the record.
3              Both parties have rested.  We have to go over -- the
4    Court will need to go over the jury instructions with both
5    parties.  The Court has to prepare the jury instructions for
6    both parties and go over it.  And that's going to take a few
7    hours.
8              So I think, the Court believes that 9 o'clock tomorrow
9    morning will be closing arguments.  So we'll have closing
10   arguments at 9 a.m. tomorrow.
11             The case, evidence has -- both parties have rested.
12   There is no additional evidence.  I'll go over the law with the
13   lawyers this afternoon.  We'll finalize it and give you the
14   final version at 9 o'clock in the morning.
15             So, and that way instead of having you come back here
16   and not know for sure whether or not we're going to have closing
17   arguments, just play it safe and just come back tomorrow morning
18   at 9 o'clock.  All right?
19             All right.  At this time keep an open mind.  Do not
20   conduct any research or share information.  All jurors are
21   ordered to appear out in the lobby at 9 a.m. tomorrow.  9 a.m.
22   Thank you.
23          (Proceedings were held out of the presence of the jury:)
24             THE COURT:  On the record.  All right.
25   Miss Blumenthal, you discussed your client's right to be present
26   during the discussions of jury instructions; is that correct?
27             MS. BLUMENTHAL:  That's correct, Your Honor.  And he's
28   agreed, and we agree that his presence can be waived.
```

```
 1            THE COURT:  All right.  Are you in agreement, sir?
 2            THE WITNESS:  Yes, sir.
 3            THE COURT:  All right.  You'll be transported here
 4   tomorrow for closing arguments, all right?
 5            All right.  Thank you.
 6                      (Noon recess.)
 7            THE COURT:  Back on the record in the matter of People
 8   versus Houston Michael Boji, RIF1502741.  The defendant is not
 9   present.  The attorneys are present, and madam prosecutor is
10   present.
11            At this time -- and the defendant's presence has been
12   waived.
13            At this time, madam prosecutor, which exhibits do you
14   seek to introduce?
15            MS. FOSTER:  The People are seeking to introduce
16   People's Exhibit 1 through 13, 16 and 17.
17            THE CLERK:  What?
18            MS. FOSTER:  I'm sorry.  1 through 13, 16 and 17, 19
19   through 23, 25 through 38, 40 and 41.  45.  48.  52 through 55.
20   62 and 63.  73.  75.  79.  96.  104.  107.  109.  128.  137
21   through 141.  143.  145.  147 and 148.  153 through 156.  159.
22   203.  206 and 207.  215.  226.  228 through 230.  235.  248.
23   250 through 256.  259 through 261.  269.  271 through 281.  284
24   through 291.  293.  2 --
25            THE CLERK:  Not 293-A?
26            MS. FOSTER:  Not 293-A.  294 through 311.  312 through
27   330.  331.  Not 331-A.  332.  Not 332-A.  And 333.  Not 333-A.
28            I want to specify that 283 was used in opening but is
```

```
 1   not requested.
 2          THE COURT:  Are there any objections?  Do you need more
 3   time?
 4          MS. BLUMENTHAL:  No, Your Honor.  No objections.  We've
 5   gone through those.
 6          THE COURT:  At this time those exhibits will be
 7   admitted.
 8          Moving toward to the defense.  In regards to the
 9   defense, their requests?  Your requests?
10          MS. BLUMENTHAL:  Yes, Your Honor.  I'm just making
11   notes of the ones that I know are being objected to, so I can
12   pull those aside.
13          THE COURT:  Make sure you pull those aside, so I
14   can review them.
15          MS. BLUMENTHAL:  We have.  We have pulled those aside.
16          THE COURT:  Thank you.
17          MS. BLUMENTHAL:  Is that correct?
18          MS. FOSTER:  Yes.
19          MS. BLUMENTHAL:  "D" -- no.  I'm sorry.  That was
20   rejected.
21          THE COURT:  These are the ones -- I'm sorry.  These are
22   the ones you're seeking to introduce?
23          MS. BLUMENTHAL:  Yes.
24          THE COURT:  All right.  Yes.
25          MS. BLUMENTHAL:  "E" through "R."  "S" is being
26   objected to, so we've got those pulled separately.
27          THE COURT:  So your request is to admit at this time
28   "E" through "R"; is that correct?
```

```
 1            MS. BLUMENTHAL:  Yes.

 2            THE COURT:  As to "E" through "R," any objection from

 3   the People?

 4            MS. FOSTER:  No, Your Honor.

 5            THE COURT:  Those will be admitted.

 6            MS. BLUMENTHAL:  And "S," but we have that pulled aside

 7   because there is an objection.

 8            "T," and I don't believe there is an objection to that.

 9            MS. FOSTER:  No.

10            MS. BLUMENTHAL:  "U" we are moving.  There is an

11   objection.

12            THE COURT:  There is?

13            MS. FOSTER:  Yes.

14            THE COURT:  Let's handle the objections first.  You're

15   seeking to introduce "S"; is that correct, Miss Blumenthal?

16            MS. BLUMENTHAL:  Yes, Your Honor.

17            THE COURT:  And you said there is an objection to "S"?

18            MS. FOSTER:  Yes.

19            THE COURT:  All right.  I need to take a -- I'm sorry.

20   Do you have them?

21            MS. BLUMENTHAL:  I have it.

22            THE COURT:  I need to take a look at them.  There is so

23   many, I can't --

24            MS. FOSTER:  There is only three objections.  There is

25   to "S," "U," and "W."  And I think they're handing you "S" and

26   "U," and the clerk has "W."

27            MS. BLUMENTHAL:  Yes.

28            MS. FOSTER:  And the --
```

1             THE COURT:  I'm sorry.  I can't --

2             MS. FOSTER:  The basis of the --

3             THE COURT:  "S," "U" and --

4             MS. FOSTER:  "W."  And the basis of the objection is

5       that "S" and "U" --

6             THE COURT:  Let's do "S" first.  I'm sorry.  There's

7       got to be a clear record.  What's the objection to "S"?

8             MS. FOSTER:  Only one or two of the pages out of "S"

9       were used.

10            MS. BLUMENTHAL:  But foundation was laid for the entire

11      package, Your Honor.

12            THE COURT:  And you want to introduce the entire

13      Exhibit S, which contains call logs?

14            21 pages.  And you want to introduce all 21 pages, and

15      the defense is objecting to the introduction of the entire 21

16      pages?

17            MS. BLUMENTHAL:  The other way around.

18            MS. FOSTER:  The People are objecting to the

19      introduction of all the pages that were not used.  They include

20      images and refer to things that occurred well before the crime

21      occurred.  And the images, I think, some of them have

22      pornographic images, images of other people.

23            THE COURT:  I'm sorry.  "S" is just the call logs.

24            MS. FOSTER:  Oh, I'm sorry.

25            THE COURT:  It's 21 pages.

26            MS. FOSTER:  I thought you were looking at --

27            THE COURT:  No, just "S."

28            MS. FOSTER:  "S," on "S" I believe only the first page

1   or first and second page were used in reference to calls between

2   what's named as "Big Man" and the defendant.  The other pages

3   consist of call logs to multiple other people.  They were not

4   explained.  They were not documented or introduced.  I don't

5   think they have any relevant information to add, and so I don't

6   want the jury to look at those call logs and start using that

7   for interpretations of things that occurred when they were never

8   introduced or discussed.

9       THE COURT:  All right.  I see several pages that have

10  been highlighted.  Were each of the highlighted pages shown to

11  the jury?  There's highlights.

12      MS. BLUMENTHAL:  They were shown to the witness.

13      THE COURT:  Or to the witness?

14      MS. BLUMENTHAL:  Yes.

15      THE COURT:  Do you recall that?  I'm sorry.

16      MS. BLUMENTHAL:  Mr. Moore did that.

17      MS. FOSTER:  I don't recall him using all of the

18  highlights.  I know he showed the entire package to the witness

19  to lay foundation.

20      THE COURT:  All right.  At this time there are

21  highlighted portions.  I do remember the defense attorney

22  showing the highlighted portions and some other portions to the

23  witness.  The Court's ruling is to allow Exhibit S, but just the

24  first page, the second page, the third page, the fourth page.

25  All the other pages have not been highlighted.  So it will be

26  four pages that were shown to the jury.

27      MS. BLUMENTHAL:  Okay.

28      THE COURT:  All right.  And I'll note your objection.

```
 1   So only four.  And do you want to note your objection for the
 2   record?
 3              MS. BLUMENTHAL:  Yes.  Thank you.
 4              THE COURT:  All right.  Thank you.
 5              THE CLERK:  How do we handle that, Your Honor?
 6              MS. BLUMENTHAL:  I think what we do is we have --
 7              THE COURT:  We're off the record.
 8                   (Discussion held off the record.)
 9              THE COURT:  Back on record.
10         So by way of stipulation, the four pages that are going
11   to be shown of the call logs shown to the jury will be Exhibit
12   "S."  The one that the Court has ruled upon will be "S-1" for
13   appellate purposes.  Any objection?
14              MS. FOSTER:  No objection.
15              MS. BLUMENTHAL:  Without waiving our previous
16   objection, no objection to this.
17              THE COURT:  All right.
18              MS. BLUMENTHAL:  Given the Court's ruling.
19              THE COURT:  And then at this time defense is also
20   moving into "T."  Any objection as to "T"?
21              MS. FOSTER:  No.  "T."
22              THE COURT:  Exhibit T will be admitted.
23         And the Court is reviewing Exhibit U.  The defense is
24   seeking to introduce Exhibit U.  Is there an objection from the
25   People?
26              MS. FOSTER:  Yes, Your Honor.
27              THE COURT:  And just for the record Exhibit U consists
28   of 15, 15 or 16 pages.  And was Exhibit U, Miss Blumenthal,
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 868

 1   shown to one of the witnesses or any of the witnesses?

 2          MS. BLUMENTHAL:  Yes.  Foundation was laid through the

 3   expert, and that's where we have the videos that we played.

 4          THE COURT:  All right.  I think there were some videos

 5   of him playing with a revolver.  Is that what you're --

 6          MS. BLUMENTHAL:  Yes.  I believe that there were three

 7   videos that were played on that, along with the videos of the

 8   car.  There are several videos of car racing.

 9          THE COURT:  Right.

10          MS. FOSTER:  And so my objection is that the area where

11   the videos that were played, I think it's towards the back of

12   that exhibit, but there's several pages with irrelevant

13   information with images, some of them images that are

14   pornographic in nature.  And those were not introduced or

15   discussed.

16          So I think that the images that were introduced do

17   lay -- the foundation was properly laid, and they're relevant

18   because they do show the time and dates of those videos.  But

19   the main pages don't serve any relevant purpose.

20          THE COURT:  Was this actually shown to the witness or

21   was it the video?  I remember there was some videos.

22          MS. FOSTER:  He showed both, because my understanding

23   was he was laying a foundation for when those videos were taken.

24          THE COURT:  All right.  I'm going to hand back "U" to

25   defense.  There is a lot of -- what do you want to call this

26   "U"?  What did we label it, madam clerk?

27          MS. BLUMENTHAL:  Videos information.

28          THE COURT:  Video information.  There is also a lot of

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 869

1    other information that's contained in "U" that was not played,

2    or, I'm sorry, shown to the witnesses, any of the witnesses.  At

3    this time the Court will allow only portions of Exhibit U that

4    was actually shown to any of the witnesses during the trial.  I

5    don't recall exactly which one.

6           MS. BLUMENTHAL:  If we can take a look at that when we

7    go through the rest of these, then we can see what we can do.

8           THE COURT:  There is a couple that look familiar, but I

9    don't know exactly which ones.  Or I can't recall which ones.

10          All right.  So I'll take that under submission as to

11   "U."

12          Any other ones?

13          MS. BLUMENTHAL:  Yes.  "V" is we're moving in.  There

14   is no objection.  "W" there is an objection.

15          THE COURT:  "V" no objection will be admitted, correct,

16   madam prosecutor?

17          MS. FOSTER:  Yes, Your Honor.

18          THE COURT:  And, I'm sorry, the other one?

19          MS. BLUMENTHAL:  "W" there is an objection.

20          THE COURT:  Defense is seeking "W," and there is an

21   objection from the People.  People's objection?

22          MS. FOSTER:  Yes, Your Honor.  The objection is "W" is

23   the large binder with, I think, almost all 290-some-odd text

24   messages.

25          MS. BLUMENTHAL:  Only 283.

26          MS. FOSTER:  283 text messages.  That was never shown

27   or used with the witness.  I don't know if any pieces of "W"

28   were ever used, but --

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 870

1          THE COURT:  There were a couple.  I remember during the
2    trial the People used a few out of "W."

3          MS. FOSTER:  No, I didn't use any out of "W."  Mine are
4    here and separately marked.

5          THE COURT:  Okay.  Defense used a few.  They didn't --
6    I just -- I'm sorry.  I don't remember.  There are so many.  I
7    don't remember which specific ones.  The Court did make -- I
8    remember being out in the hallway and indicating to Mr. Moore
9    that the entire 283 pages of "W" is not relevant as to this
10   particular witness.  I forgot which witness was testifying.

11         MS. BLUMENTHAL:  I can probably go through and pull out
12   the ones that I know were used.

13         THE COURT:  But my ruling is that the ones that were
14   used, shown to the witness, that will be allowed.  And I think
15   it was shown to another witness.  I don't know if it was the
16   same one.  But there were other text messages also shown to
17   another witness, I just don't recall if they were the same one.
18   Once again, Exhibit W consists of over 283 texts.

19         MS. BLUMENTHAL:  Not over, just 283.

20         THE COURT:  I'm going to give it back to you.  There
21   was a lot.  You should have tabbed it for us.

22         MS. BLUMENTHAL:  I will go through, because I have a
23   recollection, because what we did also when they were saying
24   that there was no contact between Mr. Boji and Nicholas the
25   Monday before, we were able to go through and show that there
26   had been contact and things like that.

27         THE COURT:  Yeah, and we did -- the Court did allow
28   that.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 871

```
 1            MS. BLUMENTHAL:  Yes.

 2            THE COURT:  So I just don't know which ones

 3    specifically at this time.

 4            MS. BLUMENTHAL:  Okay.  So then what I would suggest is

 5    we do, as with the others, is we pull out those that were used,

 6    not that I'm agreeing with the Court's decision.

 7            THE COURT:  No, of course.  You're objecting.

 8            MS. BLUMENTHAL:  Yes.  But pull out the ones that were

 9    used and mark those as "W" and the balance of the binder "W-1."

10            THE COURT:  All right.  We could do that.  No

11    objections?

12            MS. FOSTER:  Yes, so stipulated.

13            THE COURT:  All right.  For appellate purposes.

14            MS. BLUMENTHAL:  And then "X" through "HH" there will

15    be no objection.

16            MS. FOSTER:  No objection.

17            THE COURT:  All right.  "X" through "HH" will be

18    admitted into evidence.  There is no objection.

19            MS. BLUMENTHAL:  "QQ" and "RR."

20            THE COURT:  "QQ" and "RR," any objection from the

21    People?

22            MS. FOSTER:  No.

23            THE COURT:  It will be admitted into evidence.

24            MS. BLUMENTHAL:  And I don't believe the balance of the

25    ones we have there is any objection.

26            THE COURT:  Then just read them into the record.

27            MS. BLUMENTHAL:  "WW" -- I'm sorry.  "VV" and "WW."

28            THE COURT:  Keep on going.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 872

```
 1           MS. BLUMENTHAL:  "ZZ" through "NNN."

 2           THE COURT:  "NNN," as in Nancy, no objection?

 3           MS. FOSTER:  No objection.

 4           THE COURT:  Those will be admitted into evidence.

 5           So we just have to work on "W" and the other one.

 6           MS. BLUMENTHAL:  Yes.

 7           THE CLERK:  "S" and "U."

 8           THE COURT:  "S" and "U."

 9           All right.  Let's move on to -- make sure you -- you

10   have all the exhibits?

11           MS. FOSTER:  Yes.  They're all stacked and in order.

12           THE COURT:  All right.  Let's turn those in first.

13           We're off the record.

14                         (Brief pause.)

15           THE COURT:  Back on the record.

16           In regards to Exhibit 333, which is an audio CD of one

17   of the interviews between the defendant and the investigating

18   officer, and it was during either rebuttal or prosecution's

19   witness, I believe it was rebuttal --

20           MS. BLUMENTHAL:  Rebuttal.

21           THE COURT:  -- that it did not play properly.  Is there

22   a stipulation, and what is that stipulation?

23           MS. BLUMENTHAL:  The stipulation is that even though

24   that item 333 has been admitted into evidence, that it may be

25   released to Counsel to go back to her office to make a copy that

26   will play, and then substitute it in for the actual disk.

27           THE COURT:  All right.

28           MS. FOSTER:  And just so the record is clear, we only
```

1    watched until 54:02, so I'm going to have it cut off at 54:02.

2              THE COURT:  Any objection?

3              MS. BLUMENTHAL:  No.  So stipulated.

4              THE COURT:  In abundance of caution, can you show that

5    to Miss Blumenthal before you actually give it back?

6              MS. FOSTER:  Yes.

7              THE COURT:  And if there is an objection at that point,

8    let me know.  But at this time the Court will accept that

9    stipulation.

10             MS. FOSTER:  Thank you.

11             THE COURT:  All right.

12             MS. FOSTER:  That's exhibits.  We made it.

13             THE COURT:  Now there was an issue brought to the

14   Court's attention in regards to the Information.  And I'll let

15   you make a record of that.

16             MS. BLUMENTHAL:  We are objecting in that it is the

17   defense's position that the way the Information is pled, it is

18   pled as a second degree, that there are no words there that are

19   used whatsoever that indicate anything with first degree.

20             Counsel sent us and the Court two cases that she claims

21   supports that position.  I'd like to speak to each of the cases,

22   because I don't think it addresses this issue as set forth.

23             The pleading that in the *People versus Terry* case that

24   the Court said gave sufficient notice with the Penal Code

25   sections provided still said, "willfully and unlawfully and

26   feloniously with malice aforethought."  Those words are used.

27   Those do not appear in our Information whatsoever.  And it's the

28   defense's position that without that terminology, that it does

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 874

1   not allege the first degree murder.

2          Now, when we talk about the *Walker* case, the *Walker*

3   case specifically refers to the felony murder rule.

4          THE COURT:  Right.  I didn't review *In re Walker*,

5   because I looked at the heading and it was felony murder, so I

6   didn't -- I didn't think it was applicable.

7          MS. BLUMENTHAL:  Right.  And I don't believe it does

8   apply.  The wording that has been used in this 1962 case, the

9   *Terry* case, it's the defense's position that it needs a minimum

10  of what was worded in the context of that case.  The Court found

11  that that was sufficient, but that has much more than what we

12  have in ours.  The word "murder" is used and that's it.  There

13  is nothing about feloniously with malice aforethought.  It is

14  not used at all in our Information.

15         THE COURT:  Defense?  I'm sorry.  People?

16         MS. FOSTER:  And a reading of *Terry* does not make the

17  requirement that defense is suggesting.  It does say that

18  willfully, unlawfully, and feloniously with malice aforethought

19  was in that case, but that's not the requirement.  The

20  Information following the short form prescribed by Penal Code

21  sections 951 and 952 are what the Court found to be acceptable.

22  And if we look at 951 and 952, the short form does not require

23  any specific language in regards to the murder.

24         THE COURT:  All right.  And, also, isn't the People

25  able to amend the Information anytime according to proof?  And

26  wasn't the theory, or one of the theories of the People to

27  proceed on a theory of, I believe it was first degree based upon

28  not only the People's opening statement, but some of the

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 875

1   evidence that was presented.  Is that correct?

2          MS. BLUMENTHAL:  I disagree with the Court's -- I

3   disagree with that statement by the Court.  I don't believe that

4   the People can amend at any time according to proof and elevate

5   the charges that they have pled.  I don't think you can take,

6   for example, something that is a type of a misdemeanor, increase

7   the value of it and make it a felony.  I don't believe that's

8   possible.

9          And what was quoted here was they didn't give -- what

10  the defense was alleging here was that they didn't give with

11  specificity the specific allegations or circumstances raising

12  the level from second degree to first degree.  But they at least

13  pled that much.  That's not in our case what we have.  And I

14  don't believe that they, at this stage after the resting of

15  evidence and so on, that they can now decide to amend and make

16  it a first degree.  I don't think that that's due process.  I

17  think they are stuck with, I mean, this case has been around for

18  how long?

19         THE COURT:  Two years.

20         MS. BLUMENTHAL:  Well, almost three.  And it's

21  been pled --

22         THE COURT:  I was in the VCD calendar.

23         MS. BLUMENTHAL:  It's been pled exactly as the

24  Complaint was pled.

25         MS. FOSTER:  And I'll just further emphasize that the

26  Complaint is pled with a 187, and the degrees do not have to be

27  proved at the level of preliminary hearing.  And, as a normal

28  custom and practice in the DA's office, which I did verify, they

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 876

1    never alleged premeditation, deliberation.

2         As a matter of fact, I even spoke to clerical in

3    regards to it, and they said they wouldn't even know how to add

4    that into one of our Informations.  And when I spoke to writs

5    and appeals, they directed me back to sections 951 and 952,

6    which are cited in the Supreme Court case of *People v. Terry* 57

7    Cal.2d 538.  And the short forms shown under sections 951 and

8    952 are the same as what's been alleged by the People.

9         THE COURT:  I know this issue has been already resolved

10   many times, I just --

11        I understand the defense argument, one of notice and

12   due process.  And the People's argument is by alleging 187,

13   we're placing the defense on notice that it's murder, and we can

14   proceed on any theory of murder during trial, first degree,

15   second degree, voluntary, involuntary.  The issue is whether the

16   People could do that or not.  I think there is case law on point

17   that they can do that, elect to do that.

18        So at this time the Court will cite *People versus Terry*

19   and Penal Code section 951 and 952, and make a finding that the

20   defense was placed on proper notice.  And then, of course,

21   defense objection will be noted for the record, and that will be

22   an issue on appeal.

23        MS. BLUMENTHAL:  I was hoping we don't have to

24   go there.  I'm sorry.  I shouldn't have said that.  It's been a

25   long trial, Your Honor.  I'm sorry.

26        THE COURT:  All right.  All right.  So I made my

27   ruling, and, of course, this will be an issue on appeal.  And

28   we'll see if the Court of Appeals agrees with the trial court,

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 877

1    whether or not sufficient notice has been presented to the

2    defense.

3          All right.  As to the jury instructions.

4          MS. FOSTER:  The Court should have a packet up there.

5    There were some edits made in the packet, but the substantive

6    issues are left for us to decide, and then they can be

7    corrected.

8          THE COURT:  For the record, the Court received a new

9    request for jury instructions by the defense, I believe it was

10   today, so it will be ordered filed with today's date, July 11th.

11         And then the People's request was filed --

12         MS. FOSTER:  Yesterday.

13         THE COURT:  July 10th, 2018.  So the Court has reviewed

14   both requests.  And let me go over my notes.

15         And for the record the Court did pre-instruct on 100,

16   101, 103, 202, 220, 223, and 226.  The Court pre-instructed on

17   that.  The Court has already given that.  And the Court will

18   continue to give those and to give 200, 201, 202, 124 the Court

19   gave continuously.  220 will be given.  222, 223.  The People

20   are requesting 224.

21         MS. BLUMENTHAL:  I think both sides.

22         THE COURT:  Both of you.

23         MS. BLUMENTHAL:  Both sides are requesting 224.

24         THE COURT:  All right.  224 will be given.

25         MS. BLUMENTHAL:  And I don't think the Court can give

26   225.

27         THE COURT:  I'm sorry.  The People are requesting 225.

28         MS. BLUMENTHAL:  We would be requesting 224 and

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 878

```
 1   objecting to 225.  I don't think the Court can give both.
 2          THE COURT:  No, the Court cannot give both.
 3          MS. FOSTER:  I'll withdraw 225.
 4          THE COURT:  You're withdrawing 225?
 5          MS. FOSTER:  Yes.
 6          THE COURT:  225 is withdrawn.
 7          So in abundance of caution, once again, 220, 222, 223,
 8   224.  The People withdrawing 225, correct?
 9          MS. FOSTER:  Yes, Your Honor.
10          THE COURT:  226 will be given.
11          All right.  We'll skip over 250 for now, depending what
12   additional requests for other crimes.
13          MS. BLUMENTHAL:  Okay.
14          THE COURT:  So we'll skip over those right now.
15          300 will be given.  301.  302.
16          MS. BLUMENTHAL:  Just a second.  I'm trying to catch up
17   here.
18          THE COURT:  Sure.
19          Defense did not make a request for 302.
20          MS. BLUMENTHAL:  We don't have any objection to 302.
21          THE COURT:  I'm sorry.  302 -- I'm sorry.
22          All right.  Defense did make a request for 302.  People
23   did not make a request for 302.  Any objection?
24          MS. FOSTER:  No objection.
25          THE COURT:  302 will be given.
26          People made a request for 318.
27          MS. BLUMENTHAL:  We would be objecting.  This is, I
28   don't believe relates to the defendant's statements prior to
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 879

 1  trial in which they're both saying, basically, he lied in

 2  statements before trial.

 3          THE COURT:  People?

 4          Well, we do have prior statements made before trial.

 5  We have the defendant's statements to the officers.

 6          MS. BLUMENTHAL:  Right.  I'm saying the one that said

 7  he was suicide.  So if they're saying you can use that

 8  information, those earlier statements as true, and I don't

 9  believe this applies to -- to defendant in this particular case,

10  the circumstances of this case.  I don't think that.

11          MS. FOSTER:  "You have heard the evidence the

12  statement -- of statements that a witness made before trial.  If

13  you decide that the witness made those statements, you may use

14  those statements in two ways."

15          I don't see --

16          THE COURT:  All right.  I'm going to give it, because

17  in the use notes, bench notes it says "Use this instruction when

18  a testifying witness has been confronted with a prior

19  inconsistent statement."  We have different prior inconsistent

20  statements.  And he was confronted, and he was allowed to

21  explain those while he was testifying.  So it was still given.

22  So I'm going to give 318.  Is that the People's request?

23          MS. FOSTER:  Yes, Your Honor.

24          MS. BLUMENTHAL:  My concern with that -- this is for

25  purposes of the record, Your Honor -- is that as evidence that

26  the information of those earlier statements is true.

27          THE COURT:  Well, he did give a statement that it

28  was -- it could have been an accident.  One of the versions was

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 880

1    it was an accident.

2          MS. BLUMENTHAL:  But it was still inconsistent with

3    what he gave in court.  And I don't think the People are

4    claiming that those earlier statements are true.

5          MS. FOSTER:  They're not saying in the instruction that

6    they have to use it to show they're true, they're saying you can

7    use it in two ways:  1.  To evaluate whether the witness's

8    testimony in court was believable --

9          MS. BLUMENTHAL:  "And."

10         MS. FOSTER:  "And 2."

11         MS. BLUMENTHAL:  Both.

12         MS. FOSTER:  And it says "You may use."  You don't have

13   to.  You may use it in two ways to evaluate whether the

14   witness's testimony in court is believable, and as evidence that

15   the information in those earlier statements is true.

16         THE COURT:  Well, the Court's ruling --

17         MS. BLUMENTHAL:  Are the People trying to prove that

18   those earlier statements are true?  This is only if you're

19   giving a different statement and you want the first statement

20   they gave us, really.  This is when a witness goes sideways.

21         THE COURT:  All right.  The Court has made its ruling.

22   The Court will give 318 over the defense objection.  Defense

23   objection is noted for the record.

24         330 -- 332 is requested by the People, not requested by

25   the defense.  Any objection as to 332?

26         MS. BLUMENTHAL:  No, Your Honor.  I'm assuming this is

27   applying to Dr. Hunt and the expert on the --

28         MS. FOSTER:  You're talking about Grotefend?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 881

```
 1          MS. BLUMENTHAL:  Right.  Grotefend, who was the expert
 2   on the cell phone IT.
 3          THE COURT:  Yes, but you have no objection because you
 4   didn't make a request?
 5          MS. BLUMENTHAL:  Correct.  We have no objection as
 6   applied to those two experts.
 7          THE COURT:  How about --
 8          MS. FOSTER:  332 doesn't specify.
 9          THE COURT:  Yeah, it doesn't.
10          All right.  333, lay opinion, defense did not make a
11   request.  People did.  Any objection by the defense?
12          MS. BLUMENTHAL:  No, Your Honor.
13          THE COURT:  333 will be given.
14          And then the Court in reviewing the jury instruction
15   reviewed 336.  None of the parties requested that.  It's not
16   really a sua sponte one, but we did have a witness, I forgot his
17   name.  He was in custody, and the defendant was in custody at
18   the time also.
19          "View the statement of an in-custody informant against
20   the defendant with caution and close scrutiny.  In evaluating
21   such a statement or testimony, you should consider the extent to
22   which it may have been influenced by the receipt of, or
23   expectation of, any benefits.  This does not mean that you may
24   arbitrarily disregard such testimony, but you should give this
25   the weight of which you find it to be entitled in light of all
26   the evidence.
27          "An in-custody informant is, other than a co-defendant,
28   a percipient witness, or accomplice, whose statement is based on
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 882

```
 1    a statement the defendant allegedly made while both the

 2    defendant and the informant were held in a correctional

 3    institution."

 4             That's what we have here.

 5             MS. BLUMENTHAL:  Yes.  I agree with you.  We overlooked

 6    that.  We would be requesting it and thank the Court for

 7    bringing it to our attention.

 8             THE COURT:  All right.  Any objection?

 9             MS. FOSTER:  The Court told me this one and I forgot to

10    request it, that's why it's not in the packet.  So I'll send an

11    email now.  And if you don't mind, I'll have it sent to your

12    clerk, so she can print it out for you.

13             THE COURT:  But do you have an objection?

14             MS. FOSTER:  No objection.

15             THE COURT:  336 will be given.

16             Then the People are making a request for 350 -- I'm

17    sorry.

18             357.  The People are making a request for 357.  The

19    defense is not making a request for 357.

20             People?

21             MS. FOSTER:  May I have one moment, Your Honor?

22             THE COURT:  Sure.

23             Do you want the jury instructions too?  I can get

24    you --

25             MS. FOSTER:  I have the CALCRIM with me.

26             THE COURT:  Oh, you have it?

27             Do you have yours?

28             MS. BLUMENTHAL:  Yes.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 883

```
 1              THE COURT:  Okay.

 2              MS. BLUMENTHAL:  We were prepared.

 3              THE COURT:  I always have extra copies here.

 4         So 357 we need to discuss.  People requesting, defense

 5    did not request.

 6              MS. BLUMENTHAL:  And, in fact, defense would be

 7    objecting.

 8              MS. FOSTER:  I'm withdrawing 357.

 9              THE COURT:  All right.  357 is withdrawn by the People.

10         358.  Evidence of Defendant's Statement.  Both parties

11    are requesting it.  The Court will give it.  359.  Both parties

12    requesting it.  The Court will give it.  360.  People made a

13    request for 360.

14              MS. BLUMENTHAL:  We would object.  I don't think it

15    applies in this case.

16              THE COURT:  And defense did not make a request.  And

17    let me look up 360.

18              MS. FOSTER:  It's withdrawn.

19              THE COURT:  360 is withdrawn.

20         The Court had an issue with 361 and 362.  None of the

21    parties requested it, but the Court did review it.  And let me

22    review it again.  And both of you, if you could both review 361

23    and 362.  None of the parties requested it.

24         I don't believe it's a sua sponte, but let me make

25    sure.

26              MS. FOSTER:  Your Honor, the People are requesting 361

27    and 362 after evaluating both of them.

28              MS. BLUMENTHAL:  We would be objecting to both.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 884

1          Especially 361.

2          THE COURT:  The Court reviewed 361.  The Court, over

3    the People's objection, will not give 361, but will note the

4    People's objection.  The Court did review the instructional

5    duty, the bench notes.

6          As to 362, the Court did review 362 and the bench

7    notes.  And the Court is making a finding the false statements

8    that were made were for self-protection.  So 362, over the

9    defense objection, will be given.  So 362 will be given, 361 not

10   given.

11         So you want to put that down on the list?

12         MS. FOSTER:  Yes.

13         THE COURT:  All right.  370.

14         370 both parties requested?

15         MS. BLUMENTHAL:  Yes.

16         THE COURT:  It will be given.

17         MS. FOSTER:  And, Your Honor, 362 is at the back of the

18   packet.  I didn't print it off.

19         THE COURT:  I'm just looking through the list first.

20         MS. FOSTER:  Oh, okay.

21         THE COURT:  All right.  370.

22         All right.  We'll just go over the basics.  3550 will

23   be given.  3577 and 3590.

24         MS. BLUMENTHAL:  I'm sorry, the Court said 35 --

25         THE COURT:  I'm sorry.  3550, 3577, and 3590.  These

26   are just the basic ones we're going over right now.

27         MS. BLUMENTHAL:  Oh, okay.

28         THE COURT:  Now, as to the People's request for

```
 1    specific jury instructions as to Count 1, the People are
 2    requesting 520 and 521; is that correct?
 3           MS. FOSTER:  Yes, Your Honor.
 4           THE COURT:  Let's see.  Do you have any -- we noted --
 5    I noted your objection before as to not having sufficient notice
 6    as to first degree murder, so the Court overruled your
 7    objection.  Your objection continues for giving jury instruction
 8    520 and 521.  So your record is preserved on that.
 9           I just need to take a look at it again.
10           MS. BLUMENTHAL:  Your Honor, I believe that there are
11    other instructions for first degree, but I need to check that
12    out first.
13           THE COURT:  All right.  People's theory on first
14    degree?  Do you want to --
15           MS. FOSTER:  Premeditation, deliberation.
16           THE COURT:  And what's the evidence?  What sufficient
17    evidence was presented?
18           MS. FOSTER:  The evidence presented is the text
19    messages that were sent, as well as the defendant equipping
20    himself with a weapon, making sure the weapon is loaded, going
21    to the victim's house without notice, waiting until the victim's
22    mother is gone, going inside and the victim being killed within
23    18 minutes of his arrival.
24           THE COURT:  All right.  So your theory is under
25    deliberation and premeditation, not one of torture.  So you'll
26    make those changes.
27           MS. BLUMENTHAL:  And lying in wait.
28           MS. FOSTER:  And lying in wait, I think there is
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 886

1    evidence of that.  There is also evidence of that with the
2    mother's testimony that she saw the defendant's car at the top
3    of the cul-de-sac, and that the back door was open, and that the
4    victim was in bed, and that he continued to have the sheets on
5    him and appeared to be in bed.
6         THE COURT:  And the defense objection is to even give
7    this entire 525.
8         MS. BLUMENTHAL:  That's correct.  And I believe also
9    that some of the things we found out were mistaken by their,
10   while we may have put it on, their evidence that showed where
11   the defendant's car was through the testimony when he said that
12   it was at a completely different spot.  It was not at that area.
13   And the defendant came there at 8:18.  The Jetta was at a -- had
14   already gone through.
15        THE COURT:  Well, there was sufficient -- I think in
16   the People's case there was evidence presented of lying in wait.
17   It's up to the jury to decide whether if it's true or not.  But
18   by way of evidence, testimony, it was given.  So the Court will
19   give 520, 521 under (a) deliberation, premeditation, (c) lying
20   in wait.  Any other, People?
21        MS. FOSTER:  No other.
22        THE COURT:  All right.  All the others will be deleted
23   from 520, 521.  Can you make those changes, please, for the
24   Court?
25        MS. FOSTER:  Yes, Your Honor.
26        THE CLERK:  And, Your Honor?
27        THE COURT:  Yes?
28        THE CLERK:  I just received by email and printed out

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 887

```
 1   336 and 362.  Do you need me to make copies or --

 2           THE COURT:  Yes.  For the packet.

 3           THE CLERK:  One packet or --

 4           THE COURT:  Well, for --

 5           THE CLERK:  Three?

 6           THE COURT:  Yes.

 7           MS. FOSTER:  We already have a copy of 362, so just

 8   336.

 9           THE COURT:  People also making a request for --  we

10   could be off the record for a moment.

11                          (Brief pause.)

12           THE COURT:  All right.  Let's go back on the record.

13           People are also making a request CALCRIM 3149.  Any --

14   let me see.  Let me look at that one.

15           MS. BLUMENTHAL:  I'm sorry, what was that number?

16           THE COURT:  3149.  It's at the bottom.  The use

17   allegation.

18           MS. BLUMENTHAL:  Oh.

19           THE COURT:  Any objection from the defense?

20           MS. BLUMENTHAL:  Submit.

21           THE COURT:  All right.  People, you're requesting 3149?

22           MS. FOSTER:  Yes, Your Honor.

23           THE COURT:  Defense?

24           MS. BLUMENTHAL:  Submit.

25           THE COURT:  The Court will give 3149.

26           All right.  Just for the record, just make it abundance

27   of caution, the People also moving forward on a theory of

28   implied malice or express malice, or both?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 888

1              MS. FOSTER:  Yes, Your Honor.

2              THE COURT:  All right.  I'm looking at 520, CALCRIM

3      520.  The defendant acted with implied malice if:

4              He intentionally committed an act;

5              The natural probable consequences of the act were

6      dangerous to human life;

7              At the time he acted, he knew, or that the act was

8      dangerous to human life; and

9              Deliberately acted with conscious disregard for human

10     life.

11             MS. FOSTER:  Yes, Your Honor.

12             THE COURT:  All right.  That will be also given over

13     the defense objection.

14             Any requests for additional jury instructions by the

15     defense?

16             MS. BLUMENTHAL:  Yes.  The involuntary manslaughter,

17     Your Honor.

18             THE COURT:  Let me look at that one.  That's 580.

19             MS. BLUMENTHAL:  Correct.

20             THE COURT:  And People have any objection to the

21     lesser?

22             MS. FOSTER:  No objection.

23             THE COURT:  Of course, if there is no malice implied or

24     express, there is no first or second.  And this is not a case

25     involving voluntary manslaughter, because we have no evidence of

26     sudden heat of passion or quarrel.  So this is appropriate to

27     give 580.  The Court will give CALCRIM 580.

28             MS. FOSTER:  I believe the defense also requested 640,

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 889

```
 1   and there is no objection to it.
 2            THE COURT:  All right.  Hold on.  Let me look it up
 3   really quick.
 4            It's been a while since I did a murder case, so I'm not
 5   as familiar with these.
 6            All right.  At this time the Court will make a finding
 7   that the Court will give CALCRIM 580.  Sufficient evidence was
 8   presented if the jury believes that it lacks malice, that malice
 9   is lacking in this case.
10            All right.  I'm sorry.  640?
11            MS. BLUMENTHAL:  Your Honor, actually, I don't believe
12   we're going to be requesting 640, because --
13            THE COURT:  Hold on.  Let me look at 640 really quick.
14   I'm not familiar with that one.
15            MS. BLUMENTHAL:  I don't believe the defense requested
16   640.
17            THE COURT:  Hold on.  Let me -- it's a long one.
18            MS. BLUMENTHAL:  Yes, it was here.  What we wanted,
19   though, was the completion of the verdict forms, the Stone
20   instruction.  And this is reading without it, I believe.
21            With the Stone instruction, which means you complete.
22            THE COURT:  All right.  The law is very clear if the
23   People are moving on a theory of murder, the jury must decide,
24   has to decide which degree of murder.  They don't get to decide,
25   I think in abundance of caution, it becomes second degree or
26   what other degree.  But do you want to take the time to look at
27   640?  There is some case law on that one.
28            MS. BLUMENTHAL:  Well, Your Honor, this is the *Stone*
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 890

1     decision.  And this particular -- this is one I happen to be an

2     expert on, because we've been up in the Supreme Court, the

3     California Supreme Court for five years on this.

4              But there is California law, current law on *Stone* is

5     that they -- if the defense requests to give -- let's assume

6     that they agree it's not guilty of first degree, but they are

7     tied and cannot decide between second degree or invol, then you

8     are -- they can sign a verdict of not guilty as to first degree.

9              And that's what this particular instruction says.  If

10    they find that they're not guilty of murder in the first degree

11    or second degree, they could find not guilty of that, and let's

12    say they're hung on involuntary manslaughter and not guilty,

13    then if it goes to retrial again, it only goes as to invol,

14    because they found him not guilty of the first two.  And that's

15    what the defense is requesting.

16             And I believe that that specifically talks about the

17    *Stone*.

18             THE COURT:  You are requesting 640, right?

19             MS. BLUMENTHAL:  We are requesting the lesser not

20    guilty verdicts if they get that.

21             MS. FOSTER:  I'm confused.  Are you requesting 640 or

22    not?

23             MS. BLUMENTHAL:  Hang on here.  What we're trying to do

24    is request the *Stone* decision.

25             THE COURT:  The jury must unanimously decide whether

26    the crime is murder and as to what degree.  Does 640 provide

27    that information to the jury?  I know what the jury has to do, I

28    just have to find out if this is the right jury instruction.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 891

1          MS. BLUMENTHAL:  Well, yes, because this says "Jury is

2     given not guilty forms for each level of homicide."  Involuntary

3     manslaughter is a homicide.

4          THE COURT:  Yes.

5          So then if the defense is asking for 640, the Court's

6     tentative is to give 640, because the Court will be citing

7     *People versus Dixon*, a 1979 case, 24 Cal.3d 43.  Says "The jury

8     must unanimously decide as to what degree of murder.

9     Furthermore, if the jury failed to fix the degree of murder, it

10    will be deemed to be the lesser degree.  Penal Code section

11    1157."

12         MS. BLUMENTHAL:  Your Honor, what we were requesting is

13    that not guilty forms be submitted to the jury on murder in the

14    first degree, murder in the second degree, and involuntary

15    manslaughter pursuant to *People versus Stone*.

16         MS. FOSTER:  So they will be submitted, but are you

17    concerned about the order, in that typically if they find guilty

18    in first, they don't have to move onto the lessers.

19         MS. BLUMENTHAL:  That's correct.  They don't have to

20    move on to the next degree.

21         MS. FOSTER:  There is an intention.  I already

22    requested verdicts forms for not guilty and guilty for first,

23    second, and invol.

24         MS. BLUMENTHAL:  Correct.

25         THE COURT:  Can the Court review that?

26         MS. FOSTER:  They're requested.  They're not done.

27         THE COURT:  All right.  So you want 640, just for the

28    record?

1          MS. BLUMENTHAL:  Yes.

2          THE COURT:  640 will be given.

3          All right.  Any other ones?  By the defense?

4          MS. BLUMENTHAL:  Well, we discussed 580.

5          Oh, yes.  We have 3404, Accident; and 3406, Mistake of

6    Fact.

7          MS. FOSTER:  3404 is not the correct accident for

8    murder.  I'd be objecting to that.

9          THE COURT:  Hold on.  Hold on.

10         I remember looking that up during the trial.  I did

11   some work up here too.

12         MS. BLUMENTHAL:  And we're appropriately impressed.

13         We're off the record.

14               (Discussion held off the record.)

15         THE COURT:  All right.  People made an objection on the

16   record in regards to the accident instruction.  And that's 3404;

17   is that correct?

18         MS. FOSTER:  Yes, Your Honor.

19         And 510.  You did request it.

20         MS. BLUMENTHAL:  Okay.

21         THE COURT:  I'm sorry, 510 and --

22         MS. FOSTER:  So 3404 is accident except in murder, and

23   510 is accident in murder.

24         THE COURT:  In regards to 3404 --

25         MS. BLUMENTHAL:  I think I asked for both in an

26   abundance of caution.  I just want the word "accident"

27   throughout.

28         THE COURT:  And as to 3404, People?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 893

1          MS. FOSTER:  The People object to 3404.  No objection
2     to 510.
3          THE COURT:  At this time 3404 will not be given, and
4     then -- over defense objection.  And then which is the other
5     one?  580?
6          MS. FOSTER:  510.
7          THE COURT:  510.
8          MS. BLUMENTHAL:  510.
9          THE COURT:  The Court will also give five -- the Court
10    will give 510.  Do you have an objection, People?
11         MS. FOSTER:  No, Your Honor.
12         THE COURT:  510 will be given.  And, of course, that
13    will be given in conjunction with 580, which is voluntary
14    manslaughter.
15         MS. BLUMENTHAL:  And 3406, Mistake of Fact.
16         MS. FOSTER:  No objection.
17         THE COURT:  Hold on.  Let me look at it.
18         MS. FOSTER:  Sorry.
19         THE COURT:  Even if you don't have an objection, still
20    my jury instructions, so hold on.  Let me take a look at it.
21         I'm sorry.
22         MS. BLUMENTHAL:  That's okay.
23         THE COURT:  What number again?
24         MS. BLUMENTHAL:  3406.
25         THE COURT:  All right.  Miss Blumenthal, can you state
26    for the record the substantial evidence supporting the 3406
27    instruction?
28         MS. BLUMENTHAL:  First of all, I don't believe there is

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 894

1    an objection.  Secondly, it is the belief that the gun was

2    unloaded.

3            THE COURT:  Mistake of fact is not a defense to the

4    following crimes under the circumstances described below:

5            Involuntary manslaughter.

6            MS. BLUMENTHAL:  Well, that's the difference.  The gun

7    can be fired, but mistake of fact is whether or not there is

8    ammunition in the gun.

9            THE COURT:  All right.  I'm going to have to take this

10   one under submission.  I got to read *People versus Velez*,

11   V-e-l-e-z.  And I have to read a little bit.

12           MS. BLUMENTHAL:  And I believe that that has been

13   entirely consistent with the defense that has been presented

14   throughout the entire trial.

15           THE COURT:  Yeah.  I don't feel comfortable right now

16   making a ruling on it.  Just give me -- I'll give you a ruling

17   before 4 o'clock.  I just need to take a look at a couple --

18   just take a look at one or two cases, all right?

19           All right.  So we'll take that under submission.

20   People's request -- defense request for 3406, the Court will

21   take under submission.  The Court will read carefully the bench

22   notes in *People versus Velez* and provide both parties its ruling

23   before 4 o'clock.

24           All right.  Any other requests by the defense?

25           MS. FOSTER:  I put in 3515, but I'm withdrawing that.

26   I don't know if we addressed it.

27           THE COURT:  No, I didn't.  I thought it was a mistake.

28           MS. FOSTER:  It is.

```
1              THE COURT:  3515 withdrawn?
2              MS. FOSTER:  Yes.
3              THE COURT:  All right.  It will be withdrawn.
4         All right.  Any other requests by the defense?
5              MS. BLUMENTHAL:  No, Your Honor.
6              THE COURT:  Any other additional requests by the
7    People?
8              MS. FOSTER:  No, Your Honor.
9              THE COURT:  All right.  So what we'll do is, let's try
10   to -- we already finalized it.  Let's get the packet together.
11   And then give me about 10, 15 minutes and I can do some quick
12   research on 3406, and I'll come back out and give you my
13   decision, all right?
14             MS. FOSTER:  And then if the Court has a second to
15   review the packet, some of the instructions have already been --
16   begin to be corrected, but I will need a consensus on how to
17   do -- we want to do 250 and 252, and how we're going to do 640.
18             And then how defense wants to do the voluntary with
19   what things you want to fill in.
20             Involuntary, I'm sorry.  580.
21             THE COURT:  All right.  Court's in recess.
22                       (Recess.)
23             THE COURT:  All right.  Miss Blumenthal, so your
24   request is for mistake of fact as to murder, first degree,
25   express or implied; is that correct?
26             MS. BLUMENTHAL:  We have a request for all of them,
27   however, however, that request being said, specifically for the
28   murder charge.
```

```
 1              THE COURT:  All right.  And I have no problem with that
 2         People's position?
 3              MS. FOSTER:  On the murder charge I think that the case
 4    law supports a mistake of fact as to murder.  I think there is a
 5    case on point.
 6              THE COURT:  And that's People versus Goodman, the Court
 7    is citing.
 8              All right.  As to the voluntary manslaughter, you're
 9    still -- involuntary, I'm sorry.
10              MS. BLUMENTHAL:  Involuntary.
11              THE COURT:  Involuntary, you're requesting 3406?
12              MS. BLUMENTHAL:  That's correct.
13              THE COURT:  And the Court reviewed People versus Velez.
14    The Court's tentative is not to give it based upon People versus
15    Velez, V-e-l-e-z, 1983, 144 Cal.App.3d 558.  It's just a
16    tentative.  I'm not saying I'm not going to give it.  At 8:45
17    tomorrow morning, if there is any case that you can show me,
18    otherwise, both People or Defense, I'll make a decision.
19              But I'm just taking it under submission, because I
20    still want to do more work on it.  My tentative is not to give
21    it because of the case People versus Velez.  That's just a
22    tentative.  I'm going to have to make a final ruling tomorrow
23    before closing arguments, okay?
24                   (Discussion held off the record.)
25              THE COURT:  Back on the record.
26              As to the wording of 250, CALCRIM 250.  Union of Act
27    and Intent, this is general intent.  What is the proposition by
28    both parties?
```

1          MS. FOSTER:  "The lesser charge of involuntary

2     manslaughter requires proof of the union, or joint operation, of

3     act and wrongful intent.

4          "For you to find a person guilty of the lesser crime of

5     involuntary manslaughter, that person must not only commit the

6     prohibited act, but must do so with wrongful intent.  A person

7     acts with wrongful intent when he or she intentionally does a

8     prohibited act; however, it is not required that he or she

9     intend to break the law.  The act required is explained in the

10    instruction for involuntary manslaughter."

11         THE COURT:  Any objection by the defense?

12         MS. BLUMENTHAL:  No.  We'd stipulate.

13         THE COURT:  Then the Court will accept that

14    stipulation.

15         And the request for 251?

16         251?

17         MS. FOSTER:  Yes.  And for 251 the proposed language

18    is:  "The crime of murder charged in this case requires proof of

19    the union, or joint operation, of act and wrongful intent.

20         "For you to find a person guilty of the crime of

21    murder, as charged in Count 1, or the enhancement of personal

22    use of a firearm, that person must not only intentionally commit

23    the prohibited act, but must do so with a specific intent.  The

24    act and the specific intent required are explained in the

25    instruction -- " instructions, it should be.  No.  I'm sorry.

26    Instruction for those crimes.

27         MS. BLUMENTHAL:  "For that crime and allegation."

28         MS. FOSTER:  "Instruction for that crime and

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 898

```
 1   allegation."  I apologize.

 2        "The specific intent required for the crime of murder

 3   is the intent to kill."

 4        THE COURT:  All right.  And, once again --

 5        MS. BLUMENTHAL:  Stipulate.

 6        THE COURT:  -- People's theory is one of premeditation,

 7   deliberation, and then express or implied malice.  And I think,

 8   People, you said, "Lying in wait"?

 9        MS. FOSTER:  Yes.

10        THE COURT:  All right.  And that seems appropriate.

11        All right.  So the only issue left, the Court has taken

12   under submission, is 3406.  And the Court's going to do a little

13   bit more research on that.

14        All right.  Anything else at this time?

15        MS. FOSTER:  I think I need language from defense on

16   involuntary manslaughter, but I can get that from her directly.

17        THE COURT:  That's 580.

18        MS. FOSTER:  And then I don't know what language we're

19   using for 654.

20        That one is pretty long.

21        THE COURT:  Yeah, 640 is pretty long, so we'll work

22   on -- if both of you can meet and confer and come up with some

23   suggestions.  If not, the Court will draft one up.

24                    (Proceedings concluded.)

25

26

27

28
```

Christine M. DiCaro, CSR                                    896

```
1                    RIVERSIDE, CALIFORNIA; JULY 12, 2018

2                    BEFORE THE HONORABLE SAMUEL DIAZ, JR.

3        (Proceedings were held out of the presence of the jury:)

4                    THE COURT:  Back on the record in the matter of People

5        versus Houston Boji.  We're still finalizing the jury

6        instructions.  The defendant's presence was waived.

7                    In regards to CALCRIM 580, defense is making a request

8        to modify a portion of CALCRIM 580.  And that portion is -- I

9        think I returned it back.  Could you read that into the record?

10       I'm sorry.

11                   MS. BLUMENTHAL:  Yes, Your Honor.  The concern that the

12       defense had was that 580, the standardized version, talks about

13       the unlawful killing done in conscious disregard of risk is

14       voluntary manslaughter or murder.

15                   We're not giving the voluntary manslaughter

16       instruction, so I felt that that would be very confusing for the

17       jury.  So what we had done is modify that, and we had struck

18       that entire sentence, second paragraph of 580, and left sentence

19       No. 1 of the second paragraph, struck sentence two and kept

20       sentence three, and then finished the rest of the modification.

21                   THE COURT:  And you did show the proposed modification

22       to the People.  People have any objection to the proposed

23       modification?

24                   MS. FOSTER:  Submit it.

25                   THE COURT:  The Court will allow the proposed

26       modification as to -- as to CALCRIM 580.

27                   MS. FOSTER:  And then does the Court have the decision

28       on 3406?
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 900

1          THE COURT:  Yes.  As to 3406, in regards to involuntary

2    manslaughter, the Court read the *Velez* case.  The Court will not

3    give -- as to 3406, mistake -- I'm sorry.  As to Mistake of

4    Fact --

5          MS. BLUMENTHAL:  Correct.

6          THE COURT:  -- the Court will not give that.  It's not

7    applicable to involuntary manslaughter, but is applicable to

8    murder.

9          MS. FOSTER:  Yes.  Thank you, Your Honor.

10         THE COURT:  Anything else?

11         MS. FOSTER:  Can we have a moment, because I was

12   waiting for that to change two things on here.

13         THE CLERK:  Your Honor, there was something I wanted to

14   bring up regarding the exhibits yesterday.

15         THE COURT:  On the record?

16         THE CLERK:  Yes.  So counsel both worked together

17   yesterday on "W," "S," and "U."  They came up with 48 pages out

18   of the 283 of "W" that is now marked "W."  The rest of it is

19   "W-1."

20         THE COURT:  All right.  And that will be by way of

21   stipulation; is that correct?

22         MS. BLUMENTHAL:  Yes, Your Honor.

23         MS. FOSTER:  Yes, Your Honor.

24         THE COURT:  All right.  The Court will accept that

25   stipulation.

26         THE CLERK:  And "U" now consists of two pages that they

27   agreed on.  The rest of it is marked "U-1."

28         THE COURT:  By stipulation?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 901

```
 1              MS. BLUMENTHAL:  Yes.

 2              MS. FOSTER:  Yes.

 3              THE COURT:  The Court will accept that stipulation.

 4              THE CLERK:  And then "S" now consists of four pages

 5      that they agreed on, and the remaining that are not being used

 6      is "S-1."

 7              THE COURT:  By way of stipulation?

 8              MS. BLUMENTHAL:  Yes.

 9              MS. FOSTER:  Yes.

10              THE COURT:  Court accepts the stipulation.

11              Anything else?

12              THE CLERK:  No, thank you.

13              THE COURT:  Court's in recess.

14              MS. FOSTER:  Oh, there is one more thing.

15              THE COURT:  Court's not in recess.

16              MS. FOSTER:  Exhibit 333 has been returned and

17      modified.  And if we can, before it goes back to the jury, just

18      review it together?

19              THE COURT:  Yes, that's fine.  And the Court did accept

20      that stipulation yesterday.

21              Court's in recess.

22              MS. FOSTER:  Thank you.

23          (Proceedings were held in the presence of the jury:)

24              THE COURT:  Good morning, everyone.

25                  (All jurors responded "Good morning.")

26              THE COURT:  Sorry for the delay.  There is a lot of

27      exhibits in the trial, and our job is to make sure that

28      everything is marked correctly and in order.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 902

1          And, also, we did review over -- we did finalize the

2    jury instructions.

3          At this time we're going to start with opening

4    statements.  I'm going to give you some of the instructions now,

5    and at the end I'll give you some more instructions.  You'll

6    have one packet, only one, so when you go back in the jury

7    deliberation room, make sure you share.

8          Also, when you go back in the jury deliberation room

9    sometime today, it's very important that you take your notebooks

10   with you.  Leave your notebooks in the jury room.  Do not take

11   them home.  Once the trial is completed, they will be destroyed.

12   Each of these notebooks will be collected and destroyed.

13         Also, we talked about this, once again, about cell

14   phones.  Please, please, please, do not turn on your cell phones

15   at all while all of you are in the jury room and all of you are

16   deliberating.  If you need to make a phone call, then I'm going

17   to ask whoever the foreperson is to stop the deliberations and

18   take a break, notify the deputy, and we'll take a break.  You

19   cannot, cannot use your cell phone.

20         Some of the judges, actually, it was a couple of judges

21   when I was a trial lawyer that actually had collected each of

22   the juror's cell phones.  But we're all adults here, so I don't

23   think I have to do that.

24         All right.  With that I'll start.

25         All right.  Members of the jury, I will now instruct

26   you on the law that applies to this case.  I will give you a

27   copy of the instructions to use in the jury room.  The

28   instructions that you receive may be printed, typed, or written

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 903

1    by hand.  Certain sections may have been crossed out or added.

2    Disregard any deleted sections and do not try to guess what they

3    might have been.  Only consider the final version of the

4    instructions in your deliberations.

5         You must decide what the facts are.  It is up to all of

6    you, and all of you alone, to decide what happened, based only

7    on the evidence that has been presented to you in this trial.

8         Do not let bias, sympathy, prejudice, or public opinion

9    influence your decision.  Bias includes, but is not limited to,

10   bias for or against the witnesses, attorneys, defendant or

11   alleged victim, based on disability, gender, nationality,

12   national origin, race or ethnicity, religion, gender identity,

13   sexual orientation, age, or socioeconomic status.

14        You must follow the law as I explain it to you, even if

15   you disagree with it.  If you believe the attorneys' comments on

16   the law conflict with my instructions, you must follow my

17   instructions.

18        Pay careful attention to all of these instructions and

19   consider them together.  If I repeat any instruction, do not

20   conclude that it is more important than any other instruction or

21   idea just because I repeated it.

22        Some words or phrases used during this trial have legal

23   meanings that are different from their meanings in everyday use.

24   These words and phrases will be specifically defined in these

25   instructions.  Please be sure to listen carefully and follow the

26   definitions that I give you.  Words and phrases not specifically

27   defined in these instructions are to be applied using their

28   ordinary, everyday meanings.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 904

1          Some of these instructions may not apply, depending on

2     your findings about the facts of the case.  Do not assume just

3     because I give a particular instruction that I'm suggesting

4     anything about the facts.  After you have decided what the facts

5     are, follow the instructions that do apply to the facts as you

6     find them.

7          Do not use the Internet, a dictionary, or any other

8     source in any way in connection with this case, either on your

9     own or as a group.  Do not investigate the facts or the law or

10    do any research regarding this case, either on your own, or as a

11    group.  Do not conduct any tests or experiments, or visit the

12    scene of any event involved in this case.  If you happen to pass

13    by the scene, do not stop or investigate.

14         You have been given notebooks and may have taken notes

15    during the trial.  You may use your notes during deliberations.

16    Your notes are for your own individual use to help you remember

17    what happened during the trial.  Please keep in mind that your

18    notes may be inaccurate or incomplete.

19         If there is a disagreement about the testimony and any

20    stipulations at trial, you may ask that the court reporter's

21    record be read to you.  It is the record that must guide your

22    deliberations, not your notes.  You must accept the court

23    reporter's record as accurate.

24         Please do not remove your notes from the jury room.

25         At the end of the trial, your notes will be collected

26    and they will be destroyed.

27         The fact that a criminal charge has been filed against

28    a defendant is not evidence that the charge is true.  You must

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 905

1    not be biased against the defendant just because he's been

2    arrested, charged with a crime, or brought to trial.

3         A defendant in a criminal case is presumed to be

4    innocent.  This presumption requires that the People prove a

5    defendant guilty beyond a reasonable doubt.  Whenever I tell you

6    the People must prove something, I mean they must prove it

7    beyond a reasonable doubt, unless I specifically tell you

8    otherwise.

9         Proof beyond a reasonable doubt is proof that leaves

10   you with an abiding conviction that the charge is true.  The

11   evidence need not eliminate all possible doubt, because

12   everything in life is open to some possible or imaginary doubt.

13        In deciding whether the People have proved their case

14   beyond a reasonable doubt, you must impartially compared and

15   consider all the evidence that was received throughout the

16   entire trial.  Unless the evidence proves the defendant guilty

17   beyond a reasonable doubt, he is entitled to an acquittal and

18   you must find him not guilty.

19        Evidence is the sworn testimony of witnesses, the

20   exhibits admitted into evidence, and anything else I've told you

21   to consider as evidence.

22        Nothing the attorneys say is evidence.  In their

23   opening statements and closing arguments, the attorneys discuss

24   the case, but their remarks are not evidence.  Their questions

25   are not evidence.  Only the witnesses' answers are evidence.

26   The attorneys' questions are significant only if they helped you

27   understand the witnesses' answers.  Do not assume that something

28   is true just because one of the attorneys asked a question that

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 906

1   suggested it was true.

2        During the trial, the attorneys may -- during the

3   trial, the attorneys have objected to questions or moved to

4   strike answers given by the witnesses.  I have ruled on the

5   objections according to the law.  If I sustain an objection, you

6   must ignore the question.  If the witness was not permitted to

7   answer, do not guess what the answer might have been or why I

8   ruled as I did.  If I ordered testimony stricken from the

9   record, you must disregard it and must not consider that

10  testimony for any purpose.

11       You must disregard anything you saw or heard when the

12  court was not in session, even if it was done or said by one of

13  the parties or witnesses.

14       During the trial, you were told that the People and the

15  defense agreed or stipulated to certain facts.  This means that

16  you both accept those facts as true.  Because there is no

17  dispute about those facts, you must also accept them as true.

18       The court reporter has made a record of everything that

19  was said during the trial.  If you decide that it is necessary,

20  you may ask the court reporter's record be read to you.  You

21  must accept the court reporter's record as accurate.

22       Facts may be proved by direct or circumstantial

23  evidence or by a combination of both.  Direct evidence can prove

24  a fact by itself.  If a witness testifies he saw it raining

25  outside before he came into the courthouse, that testimony is

26  direct evidence that it was raining.

27       Circumstantial evidence may be called indirect

28  evidence.  Circumstantial evidence does not directly prove the

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 907

1   fact to be decided, but is evidence of another fact or a group

2   of facts for which you may logically and reasonably conclude the

3   truth of the fact in question.  For example, if a witness

4   testifies that he saw someone come inside wearing a raincoat

5   covered with drops of water, that testimony is circumstantial

6   evidence, because it may support a conclusion that it was

7   raining outside.

8          Both direct and circumstantial evidence are acceptable

9   types of evidence to prove or disprove the elements of a charge,

10  including intent and mental state and acts necessary to a

11  conviction.  Neither is necessarily more reliable than the

12  other.  Neither is entitled to any greater weight than the

13  other.  You must decide whether a fact in issue has been proved

14  based on all the evidence.

15         Before you may rely on circumstantial evidence to

16  conclude that a fact necessary to find the defendant guilty has

17  been proved, you must be convinced that the People have proved

18  each fact essential to that conclusion beyond a reasonable

19  doubt.

20         Before you may rely on circumstantial evidence to find

21  the defendant guilty, you must be convinced that the only

22  reasonable conclusions supported by the circumstantial evidence

23  is the defendant is guilty.  If you can draw two or more

24  reasonable conclusions from the circumstantial evidence, and one

25  of those reasonable conclusions points to innocence and another

26  to guilt, you must accept the one that points to innocence.

27  However, when considering circumstantial evidence, you must

28  accept only reasonable conclusions and reject any that are

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 908

1  unreasonable.

2       You alone must judge the credibility or believability

3  of the witnesses.  In deciding whether testimony is true and

4  accurate, use your common sense and experience.  You must judge

5  the testimony of each witness by the same standards, setting

6  aside any bias or prejudice you may have.

7       You may believe all, part, or none of a witness's

8  testimony.  Consider the testimony of each witness and decide

9  how much of it you believe.

10      In evaluating a witness's testimony, you may consider

11 anything that reasonably tends to prove or disprove the truth or

12 accuracy of that testimony.  Among the factors that you may

13 consider are:

14      How well could the witness see, hear, or otherwise

15 perceive the things about which the witness testified?

16      How well was the witness able to remember and describe

17 what happened?

18      What was the witness's behavior while testifying?

19      Did the witness understand the questions and answer

20 them directly?

21      Was the witness's testimony influenced by a factor such

22 as bias or prejudice, a personal relationship with someone

23 involved in the case, or personal interest in how the case is

24 decided?

25      What was the witness's attitude about the case or about

26 testifying?

27      Did the witness make a statement in the past that is

28 consistent or inconsistent with his or her testimony?

1    How reasonable is the testimony when you consider all

2    the other evidence in the case?

3    Did other evidence prove or disprove any fact about

4    which the witness testified?

5    Did the witness admit to being untruthful?

6    Has the witness been convicted of a felony?

7    Do not automatically reject testimony just because of

8    inconsistencies or conflicts.  Consider whether the differences

9    are important or not.  People sometimes honestly forget things

10    or make mistakes about which they remember.  Also, two people

11    may witness the same event yet see or hear it differently.

12    If you do not believe a witness's testimony that he or

13    she no longer remembers something, that testimony is

14    inconsistent with the witness's earlier statement on that

15    subject.

16    If you decide that a witness deliberately lied about

17    something significant in this case, you should consider not

18    believing anything that witness says.  Or, if you think the

19    witness lied about some things but told the truth about others,

20    you may simply accept the part that you think is true and ignore

21    the rest.

22    The lesser charge of involuntary manslaughter requires

23    proof of the union, or joint operation, of act and wrongful

24    intent.

25    For you to find a person guilty of the lesser crime in

26    this case of involuntary manslaughter, that person must not only

27    commit the prohibited act, but must do so with wrongful intent.

28    A person acts with wrongful intent when he intentionally does a

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 910

1   prohibited act; however, it is not required that he intend to

2   break the law.  The act required is explained in the instruction

3   for involuntary manslaughter.

4         The crime of murder charged in this case requires proof

5   of the union, or joint operation, of act and wrongful intent.

6         For you to find a person guilty of the crime of murder,

7   as charged in Count 1, or the enhancement of personal use of a

8   firearm, that person must not only intentionally commit the

9   prohibited act, but must do so with the specific intent.  The

10  act and the specific intent required are explained in the

11  instruction for this crime and allegation.

12        The specific intent required for the crime of murder is

13  the intent to kill.

14        Neither side is required to call all witnesses who may

15  have information about the case or to produce all physical

16  evidence that might be relevant.

17        The testimony of only one witness can prove any fact.

18  Before you conclude that the testimony of one witness -- one

19  witness proves a fact, you should carefully review all the

20  evidence.

21        If you determine there is a conflict in the evidence,

22  you must decide what evidence, if any, to believe.  Do not

23  simply count the number of witnesses who agree or disagree on a

24  point and accept the testimony of the greater number of

25  witnesses.  On the other hand, do not disregard the testimony of

26  any witness without a reason or because of prejudice or a desire

27  to favor one side or the other.  What is important is whether

28  the testimony or any other evidence convinces you, not just the

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 911

1    number of witnesses who testify about a certain point.

2         You have heard evidence of statements that a witness

3    made before the trial.  If you decide that the witness made

4    those statements, you may use those statements in two ways:

5         1.  To evaluate whether the witness's testimony in

6    court is believable; and

7         2.  As evidence that the information in those earlier

8    statements are true.

9         Witnesses were allowed to testify as experts and to

10   give their opinions.  You must consider the opinions, but you

11   are not required to accept them as true or correct.  The meaning

12   and importance of any opinion are for you to decide.   In

13   evaluating the believability of an expert witness, follow the

14   instructions of witnesses generally.  In addition, consider the

15   expert's knowledge, skill, experience, training, education, the

16   reasons the expert gave for an opinion, and the facts or

17   information on which the expert relied in reaching your opinion.

18   You must decide whether information on which the expert relied

19   was true and accurate.  You may disregard any opinion that you

20   find unbelievable, unreasonable, or unsupported by the evidence.

21        An expert witness may be asked a hypothetical question.

22   A hypothetical question asks the witness to assume certain facts

23   are true and to give an opinion based on the assumed facts.  It

24   is up to you to decide whether an assumed fact has been proved.

25   If you conclude that an assumed fact is not true, consider the

26   effect of the expert's reliance on the fact in evaluating the

27   expert's opinion.

28        Witnesses who were not testifying as experts gave their

1    opinions during the trial.  You may, but are not required to,

2    accept those opinions as true and correct.  You may give the

3    opinions whatever weight you think is appropriate.  Consider the

4    extent of the witness's opportunity to perceive the matters on

5    which his or her opinion is based, the reasons the witness gave

6    for any opinion, and the facts or information on which the

7    witness relied in forming that opinion.  You must decide whether

8    information on which the witness relied was true and accurate.

9    You may disregard all or any part of the opinion that you find

10   unbelievable, unreasonable, or unsupported by the evidence.

11        You have heard evidence that the defendant's made oral

12   or written statements before the trial.  You must decide whether

13   the statements made -- I'm sorry.  You must decide whether the

14   defendant made any of these statements in whole or in part.  If

15   you decide that the defendant made such statements, consider the

16   statements, along with all the other evidence, in reaching your

17   verdict.  It is up to you to decide how much importance to give

18   the statements.

19        Consider with caution any statement made by the

20   defendant to show his guilt unless the statement was written or

21   otherwise recorded.

22        The defendant may not be convicted of any crime based

23   on his out-of-court statements alone.  You may rely on the

24   defendant's out-of-court statements to convict him only if you

25   first conclude that other evidence shows that the charged crime

26   or a lesser included offense was committed.

27        The other evidence may be slight and need only be

28   enough to support a reasonable inference that a crime was

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 913

1   committed.

2          This requirement of other evidence does not apply to

3   proving the identity of the person who committed the crime and

4   the degree of the crime.  If other evidence shows that the

5   charged crime or a lesser included offense was committed, the

6   identity of the person who committed it and the degree of the

7   crime may be proved by the defendant's statement alone.

8          You may not convict the defendant unless the People

9   have proved his guilt beyond a reasonable doubt.

10          If the defendant made a false or misleading statement

11   before this trial relating to the charged crime, knowing that

12   the statement was false or intended to mislead, that conduct

13   must show he was aware of his guilt of the crime, and you may

14   consider it in determining his guilt.

15          If you conclude that the defendant made the statement,

16   it is up to you to decide its meaning and importance.  However,

17   evidence that the defendant made such a statement cannot prove

18   guilt by itself.

19          The People are not required to prove the defendant had

20   a motive to commit any of the crimes charged.  In reaching your

21   verdict, you may, however, consider whether the defendant had a

22   motive.

23          Having a motive may be a factor tending to show that

24   the defendant is guilty.  Not having a motive may be a factor

25   tending to show the defendant is not guilty.

26          View the testimony of an in-custody informant against

27   the defendant with caution and close scrutiny.  In evaluating

28   such testimony, you should consider the extent to which it may

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 914

1  have been influenced by the receipt of, or expectation of, any

2  benefits.  This does not mean that you may arbitrarily disregard

3  such testimony, but you should give it the weight you find it to

4  be entitled in light of all the evidence in the case.

5          An in-custody informant is someone, other than a

6  co-defendant, or percipient witness, or an accomplice, or

7  co-conspirator, whose testimony is based on a statement the

8  defendant allegedly made while both the defendant and the

9  informant were held within a correctional institution.  If you

10  decide that a -- if you decide that a witness was not an

11  in-custody informant, then you should evaluate his statement or

12  testimony as you would that of any case.

13          If you decide that a witness was an in-custody

14  informant, then you may not convict him of the charges based on

15  the statement or testimony of that in-custody informant alone.

16  Nor may you find a -- if you decide that an in-custody

17  informant -- if you decide that a witness was an in-custody

18  informant, you may convict him of the -- the defendant of the

19  charges based on his testimony of that in-custody informant

20  alone.

21          You may use the testimony of an in-custody informant

22  only if:

23          1.  The testimony is supported by other evidence that

24  you believe;

25          2.  The supporting evidence is independent of his

26  testimony;

27          3.  That supporting evidence connects the defendant to

28  the commission of the crime.  The supporting evidence is not

1    sufficient if merely shows that the charged crime was committed.

2           Supporting evidence, however, may be slight.  It does

3    not need to be enough, by itself, to prove the defendant is

4    guilty of the charged crime, and it does not need to support

5    every fact about which the witness testified.

6           On the other hand, it is not enough if the supporting

7    evidence merely shows that a crime was committed or the

8    circumstances of its commission.  The supporting evidence must

9    tend to connect the defendant to the commission of the crime.

10          All right.  At this time I'll have the People commence

11   with their opening statements, and I'll give the final

12   instructions after closing arguments.

13          People ready to proceed?

14          MS. FOSTER:  Just one moment.

15          Good morning.

16          The truth never changes.  The truth does not change.

17   And the defendant has not told the truth yet.  The truth is on

18   November 10th, 2015, Nicholas McCauley's last day of life, that

19   he was in his bedroom alone with his best friend when he shot

20   him.  And Nicholas spent his last seconds of life as his chest

21   filled with blood wondering how and why the person that was

22   supposed to be his friend killed him.

23          The truth is that in the early morning hours of

24   November 10th, 2015, the defendant sneaks into his father's

25   closet and takes this 12 gauge shotgun.  And it's a massive

26   weapon.  And he sneaks this gun out of the house with buckshot

27   ammo.

28          The truth is that the defendant loaded that weapon and

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 916

1    that he headed from Canyon Lake to Moreno Valley.

2          The truth is that the defendant is the one that knew

3    the McCauleys' patterns.  He knew when Ana McCauley would be

4    gone for work.  He knew that she leaves that back door open, and

5    he knew that in the early morning hours Nicholas would likely be

6    asleep.

7          The truth is the defendant is the one that takes this

8    gun loaded into their home and shoots Nicholas McCauley.

9          The truth is the defendant's the one that killed him.

10         And we can't ignore what happens before Nicholas is

11   killed.  We can't ignore the defendant's threats.  On November

12   6th, 2015, the defendant sends a text message that says "Bro,

13   you gave me a cold sore.  My mouth hurts."

14         The truth is the defendant follows that text message

15   with "I'm going to shoot you.  I swear."  And when there is no

16   response, he sends another text message.  "I see you shut your

17   phone off.  I don't care.  I'm going to shoot you, mother

18   fucker."

19         They must make up or hang out.  We'll never know the

20   full extent of how everything transpired, because there is only

21   two people that know and two people present that day.  One of

22   them is dead, and one of them lied.  But they make up and they

23   hang out on the 7th, and we watched those videos of them with

24   the cars, but by the 8th the defendant is sending other text

25   messages "I'm going to make you my bitch."  And that's what he

26   does.

27         The truth is that the defendant has been lying for two

28   years about what happened on this date.  He's been shifting and

1  sliding his story to try and fit whatever he thought the

2  evidence was.  He's been lying since the moment he left that

3  room.

4         The truth is that within 18 minutes of the defendant

5  arriving at Nicholas's house, Nicholas is dead.  And he wants us

6  to ignore all the facts that we've heard in this case that

7  support that the defendant killed Nicholas McCauley, not

8  accidentally, and we know it wasn't suicide, but that he killed

9  him on purpose.

10         He wants us to ignore those text messages and call them

11  just a joke, or that's just the way we banter.  But we can't

12  ignore them, because he lied about them to the police.  He

13  covered them up.  You got to listen and watch the tapes where he

14  said, "No.  There is no text messages.  There is never any

15  threats.  I never said anything that could be interpreted as a

16  threat."  He tells those lies because he doesn't want us to know

17  the truth.

18         He wants us to ignore the testimony of Samuel Murillo,

19  who was with him in jail, and who he told that he had told

20  Nicholas about having an STD, not getting a cold sore from

21  eating some food, but an STD.  And he wants us to ignore that he

22  told Samuel Murillo that he knew there were text messages that

23  were threats where he said he was going to shoot Nicholas and

24  that he didn't want the police to find out about them.

25         As we go through this case, we're going to go through

26  not only all the evidence that supports that the defendant is

27  guilty of murdering Nicholas McCauley, we're also going to go

28  through all of his lies.  And you're going to hear how the law

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 918

1    supports a verdict of guilty.

2         Houston Boji is charged with murder and personal use of

3    a firearm.  There are two types of murder.  First degree murder,

4    which means you cause death with malice aforethought, that is

5    unlawful, and with premeditation and deliberation.

6         Then second-degree murder.  Caused death, malice

7    aforethought, and it was unlawful.

8         So as you can see, first degree murder has an extra

9    element.  So we're going to try and transition and talk about

10   second first and why it's more than a second and it's first.

11        So let's talk about malice and aforethought.

12        There is two types.  Express malice.  That means the

13   intent to kill.  You want someone dead and you kill them.

14        Is there express malice in this case?

15        The second type is implied malice.  Intentionally act.

16   Natural and probable that the act was dangerous.  Knew the act

17   was dangerous and you disregarded human life.

18        So express malice.  When you ask yourself did he intend

19   to do it, look at how he did it.  And let's think about what we

20   know.  There are over 30 guns in his parents' house.  The

21   defendant has two guns that belong to him.  He has a skeet

22   shooting gun and he has a rifle.  He has ammunition throughout

23   the house.

24        And the defendant's original story was that they were

25   going skeet shooting.  That's what he said until he came here

26   after two years of knowing what's coming.  And his original

27   story was he went skeet shooting.  That didn't fit because he

28   didn't take the skeet shooting gun.  He takes a 12 gauge shotgun

Christine M. DiCaro, CSR                                        916

1    out of his father's closet.  He loads that not with bird shot to

2    go hunting or disk shooting, he loads that with buckshot.

3           And what does he do with that gun?  He takes that gun

4    to Nicholas's house.  He takes the gun after Ana has left for

5    work.  And he doesn't just bring the gun over.  He doesn't leave

6    it outside.  He takes this loaded gun inside the house.  He

7    brought the loaded gun in the house and it ends up pointed at

8    Nicholas?  That's what you're expected to believe?  He points

9    that gun at Nicholas.  And he shot Nicholas with that shotgun.

10          The defendant is not a person who doesn't know guns.

11   He's experienced with guns.  He knows how to load guns.  He

12   knows how to rack it, and he knows how to fire them.

13          And let me just summarize this for a moment.  When

14   you're talking about express malice and an intent to kill, you

15   look at the entire picture of what occurred.  And sometimes when

16   we're inundated in this courtroom with different pieces of law,

17   we sometimes forget to use our common sense.

18          The person who threatened to shoot Nicholas, armed

19   himself with a gun, went to his house, and shot Nicholas.  We

20   don't have to guess what his intent was, because he told us in

21   the text messages.  We don't have to guess what his intent was,

22   because he told us in his actions.

23          It's no different than that example of the car during

24   voir dire where we watched the actions of man go up to the door

25   of a car, jiggle the handle, get inside the car, hot-wire it,

26   put on a seat belt, and we knew he was stealing the car.

27          Here we have more.  The defendant tells us that they're

28   having some kind of argument or fight.  And we're not going to

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 920

1   get to know it all.  But that he threatens to shoot Nicholas and

2   then comes back and says it again, and then he arms himself, and

3   then he comes over there after Ana's gone, he takes that gun in

4   the house, and he shoots him.

5          Why did he do it?  Well, we have some evidence as to

6   why he'd do it, but I'm going to tell you right now there is no

7   way a hundred percent you can know exactly why he did it.  Two

8   people know why.  He killed one of them and he's lying about

9   everything ever since.

10          But we can look to the relationship.  It is not most

11   guys that text their best friend "Bro, you gave me a cold sore."

12   It is not most guys that are going to say they don't remember

13   whether they told someone in the jail that they were rejected by

14   their best friend.  It is not just anyone that's going to

15   approach Nicholas's mother and ask her how she would receive

16   Nicholas being gay, and then say that their father would never

17   accept them as being gay.

18          So we can look to the evidence and see that there is

19   something different about the relationship between Nicholas and

20   the defendant.

21          He also brought up to the officers, and it was kind of

22   weird how he did it, that he thought Ana and Nicholas were

23   fighting because she thought he was gay.  And that was after he

24   testified to us that he never heard anything like that, when you

25   listen to him on the tape say the opposite.

26          And that's the text message.  "Bro, you gave me a cold

27   sore and my upper mouth region hurts."

28          Then he told Sam Murillo not that he got it from

1    drinking after Nicholas's food, like he tried to tell us in
2    here, which was the first time that had been said.  He says "I
3    got an STD."  And I asked him "What does that mean?  You know
4    that means sexually transmitted disease?"  And he says, "Yes."
5    And I said, "You wouldn't call getting a cold sore from eating
6    food a sexually transmitted disease?"  And he said, "No, I
7    wouldn't."  That's because there is this relationship.
8          And why he did it, we also know that he's afraid for
9    the police to find out about those series of text messages.  He
10   tells Samuel Murillo "I'm afraid the police are going to see
11   those messages and find out."  And he sent these other messages
12   about shooting him and confirming "I'll shoot you."  And we know
13   he's afraid for the police to find out, because he lies to them
14   about it.
15         Now, you can go through express malice and that's
16   sufficient to find murder.  But you also have the option of
17   implied malice.  And implied malice requires an intentional act.
18   The defendant took a loaded gun, that he brought it inside the
19   house, and that he shot Nicholas.
20         Implied malice requires that he knew it was dangerous.
21   How do we know it was dangerous?  Well, we all have common
22   sense.  We know taking a loaded gun into a house is dangerous.
23   He also knew at the time that he took it that it was loaded.
24         And this is not just anyone.  This is not me handling
25   guns.  This is an experienced person with guns.  This is a man
26   whose father taught him how to shoot.  And now, again, we are
27   stuck between not sure how long, because he tells the officers
28   on the tape he's been shooting guns for ten years, but then he

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 922

```
 1   told us in court that he's only been shooting since he's 16.

 2            But we know this is a person who's raised around guns.

 3   He knows how to load them, he knows how to fire them.  He knew

 4   it was dangerous.

 5            And he also knows guns are dangerous because even

 6   though he played around with guns, he's been real careful not to

 7   shoot himself.  He had guns and literally took it to his hand, a

 8   revolver, spun it around, and pulled the trigger.  He knows how

 9   guns work.  He knows gun safety, and he knows even when you fool

10   with guns not to fool with them to the extent that he would hurt

11   himself.

12            This is not a person who doesn't know about

13   accidentally putting their finger on the trigger.  He's not a

14   person that wouldn't think about not pointing the gun at

15   someone.  He knew it was dangerous.

16            We also know because immediately he lies about

17   Nicholas's death.

18            Implied malice also requires conscious disregard for

19   human life.  Well, how did he disregard human life?  He took a

20   loaded gun into the house.  He knew it was loaded.  He never

21   makes sure it was unloaded.  Even according to his fourth

22   version, which is a lie, even according to his fourth version he

23   says "I thought maybe there were five rounds.  I figured it was

24   empty, and I pointed it, put it under my shoulder and

25   accidentally shot him."  Even according to his own version.  He

26   didn't make sure that this had been unloaded.  He said he didn't

27   even know how many rounds were inside the gun.

28            Conscious disregard for human life.  And that it was
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 923

```
 1   pointed at Nicholas.  And that his finger was anywhere near the
 2   trigger.  And the fact that he pulled the trigger is a conscious
 3   disregard.
 4          Now that gets you through second-degree murder.  But
 5   this is more than a second-degree murder.  It's a first-degree
 6   murder.  And what does first-degree murder mean?  You kind of
 7   heard these terms:  Deliberate.  Meaning he deliberated.  He
 8   considered the choice.  And premeditated.  That he considered
 9   that choice beforehand.  Thought about killing before he did it.
10   It doesn't require any certain time frame.  The decision to kill
11   can be made very quickly.
12          So was it deliberate and premeditated?  Did he consider
13   it beforehand?  Well, how do we know?  It's not just me talking.
14   Look back to the evidence.  Don't ignore those threats.  He made
15   the threats.  And then he complained to Nicholas about getting
16   an STD.  He threatened to shoot him.  Then they hang out again.
17   We know that from that car video defense played.  That was on
18   the 7th into the early morning hours of the 8th.
19          And then after that the threats start again and
20   Nicholas's responses are different.  They're just "Bro.  I'm
21   going to bed."
22          And the defendant is still texting him.  "I'm a sole
23   eater.  I'm going to eat your sole.  Let's hang out."
24          "I'm going to bed."
25          And then the defendant says "I'm going to make you my
26   bitch," and then he sends that weird text message with Donald
27   Trump and says "It's going to be huge."
28          Don't disregard the threats.  Those are his admissions.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 924

1    Those are your opportunity to look into his mind before he

2    starts creating stories, before he starts lying.

3         Those texts come in, the last texts, November 8, 9:32

4    "I'll make you my bitch."

5         How else do we know that those threats are part of his

6    premeditation, are part of his motive?  Well, his statements to

7    Sam about the STD.  He's reconfirming that, yes, this "Bro, I

8    got a cold sore" is referring to a sexually transmitted disease.

9    The fact that he's telling Sam in the jail about those threats

10   is him confirming that this is something he's worried about,

11   because he knows how the police will interpret it, because he

12   knows how it sounds, because he knows what it meant.

13        The fact that he's afraid the police will find out and

14   the fact, most importantly, that I found striking, he never

15   calls those threats a joke.  He never said that until he comes

16   here to tell his fourth version.

17        And he just lies about them.  He says they don't exist.

18        How else do you know he considered it beforehand?

19   Well, he arms himself.  He took the 12 gauge shotgun.  There

20   were handguns, there were revolvers, there were skeet shooting

21   guns.  He doesn't choose any of those.  He takes a 12 gauge.

22   And that is a giant gun.  It is about almost half my size.  He

23   tucks it into bag and he brings ammunition.

24        And he takes about seven rounds on the ground and, I

25   think, four or five in the saddle.  That is not enough to go

26   skeet shooting.  That is not enough to go target shooting.  What

27   were they going to do, target shoot for about four minutes and

28   then leave?

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 925

1          There is ammo throughout that house.  You were shown

2     pictures of boxes and boxes of ammo.  He takes just enough for

3     his purpose.  He doesn't need ten rounds or 20 rounds.  He only

4     needs one.

5          The fact that it's buckshot and not bird shot or

6     anything used for targets, he's taking a powerful, as told by

7     the pathologist, a powerful piece of ammo that once it goes into

8     the body has large metal rounds that literally spread tearing

9     Nicholas apart.

10          Considered it beforehand.  We're talking about an 18

11    and 19 year old.  Nicholas doesn't have a job and is not in

12    school, and the defendant's coming to his house at 8 o'clock in

13    the morning without calling, without letting him know.  Those

14    are all things you can continue to consider.  He gets there

15    after Ana's gone with this loaded gun.  That drive to Nicholas's

16    house, that going there, that is time to deliberate.  That's

17    time to think about it.

18          He comes at a time when Nicholas would be asleep.  And

19    he takes that loaded shotgun into the house.  And one thing I

20    cannot tell you, I can't tell you how he enters.  Ana says she

21    leaves the back door open.  Defendant says that Nicholas opened

22    the door for him.  I'm not going to be able to resolve that one

23    for you.  And it doesn't matter.  It doesn't matter if he came

24    in and acted like everything was fine and shot him.  It doesn't

25    matter if he snuck in through the back and shot him while he was

26    still laying down asleep.

27          Even though there is a lot of indication that Nicholas

28    was still laying down, we're talking about a boy who was

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 926

1    six-seven.  He's almost as tall as LeBron James.  He's 250

2    pounds.  And we know for sure that it wasn't attack where

3    Nicholas was awake against him, because that would have been a

4    fight that he couldn't have won.

5         We know also that Nicholas's arms were down.  They're

6    either down flat like this, or it's down to his side.  His

7    mother said that when she left the house Nicholas was laying in

8    that bed with his right arm down, flat on his back asleep.  And

9    that's one way that is consistent with what the pathologist said

10   in how he was shot.  And it's important to remember Nicholas's

11   arm was not up like this, don't point that gun at me, as if they

12   were playing around.  Nicholas's arm is down.  Comfortable.

13   Rested.

14        The defendant points the gun at Nicholas.  When you're

15   going through premeditation and deliberation in any type of

16   case, whether it's a stabbing or a shooting, walk through each

17   action that shows that someone thought about it before they do

18   it.  Even just carrying the gun in and deciding at that moment

19   that you point the gun that "I'm going to kill you," that's time

20   to deliberate.  That's time to decide.

21        Nicholas was defenseless.  He was unarmed, and he was

22   laying down in his bed.  And he shot him.  He didn't have to

23   pull that trigger.

24        And I want to stop here because, and we'll talk about

25   his lies a little bit more, but really picture this situation.

26   Defendant's car is seen around 8:18 passing the park.  So that

27   means it took a little bit to get into the cul-de-sac, park that

28   car and get in the house.

1          By 8:36 is the dispatch saying that there is a

2     suspicious death.  That means within 18 minutes of defendant

3     passing that park, Nicholas is dead.  And we have to back that

4     time up from 18 minutes, because you have time for him to run

5     outside and get someone to call 911 and Alan to follow him into

6     the house.

7          In about a 15-minute window Nicholas is dead.  That

8     means when the defendant walked into that house, within 15

9     minutes Nicholas is already shot.  That's not a lot of time for

10    something else to occur.  That's not a lot of time for an

11    accident to occur.

12         And also consider this when I talk about immediately

13    said, "suicide."  He wants us to believe that within 15 minutes

14    or 18 minutes of him walking in that house, that he had a fully

15    developed suicide story.  Not just my friend shot himself, but a

16    detailed suicide story blaming Nicholas for his own death.  And

17    you can use that as an indication that he was already planning.

18         First-degree murder has two theories that you can use.

19    Premeditation and deliberation, or lying in wait.  Meaning he

20    concealed his purpose, waited for an opportunity to attack, and

21    made a surprise attack.  And lying in wait is here because you

22    have the option based on the evidence to determine if you

23    believe that when he sent those text messages and hung out with

24    Nicholas, that he still had that same intent.  Or that when he's

25    rejected by Nicholas, he still has that same intent but he

26    conceals it until the time is right.

27         Now, those two theories exist, and you don't have to

28    agree on which theory, but you all must agree that it was

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 928

1    first-degree murder.

2         When you're thinking about murder, consider the

3    evidence as it's given to you, but you also have CALCRIM 362.

4    Consciousness of Guilt.  And the judge read the whole thing to

5    you, but I pulled out a part.  And part of it says "If the

6    defendant made a false or misleading statement, that conduct may

7    show that he's aware of his guilt."

8         So the law is telling you, if you believe he lied, then

9    that shows he's aware of his guilt.

10        CALCRIM 226 is Witnesses.  And the judge also read that

11   full instruction to you.  And I pulled this part:  "If you

12   decide a witness deliberately lied about something, you should

13   consider not believing anything that witness said."  And that's

14   what the judge read to you.  So you can completely disregard the

15   defendant's testimony if you believe that he deliberately lied.

16        You can't trust a word that he says.  And the law says

17   you don't have to.  You don't have to pick at his story and pull

18   parts of it.  If he's just lying, you can throw it away and look

19   at the evidence and make your determination that way.  And

20   that's what you should do, because he's lied since the

21   beginning.

22        Now we're going to go through his lies.  Lie No. 1 was

23   a suicide story.  He immediately tells the neighbor that my

24   friend shot himself.  And I wanted you to just kind of picture

25   this, because the defense went through it kind of detailed about

26   how emotional he was.

27        And remember the witness Mr. Juarez testified, and he

28   even seemed distraught.  Like this is something he would never

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 929

```
 1   forget.  He saw the defendant sobbing over Nicholas, grabbing
 2   Nicholas's body, trying to lift him, pushing on him, trying to
 3   give him CPR.
 4          The defendant says he gave him mouth-to-mouth
 5   resuscitation.  He's doing all of this in front of Alan Juarez,
 6   and he's saying "My friend shot hisself."  That's some
 7   cold-blooded stuff.  He's standing there grabbing him, sobbing
 8   over him and lying on him.
 9          And he tells a detailed story to Deputy Kurylowicz.
10   "My friend is depressed."  He goes into Nicholas going to mental
11   hospitals.  And then he goes into -- and let me just back up.
12   This is his best friend.  And we all know that this story is a
13   lie.  And he says, talks about him being depressed, talks about
14   him using drugs, talks about him going to a mental hospital just
15   to get the blame off of him.  Had nothing to do with how
16   Nicholas died.  It was just to distract and get the blame off of
17   him.  And he does this in detail immediately.
18          Then he tells him "We were supposed to skeet shoot."
19   Now, he told us that they were going to check out this rifle
20   like a zombie movie and then maybe go shoot around with it.  But
21   he tells Deputy Kurylowicz "We're going to skeet shoot."  That's
22   a lie he didn't even have to tell if what he's saying now is
23   true, but it's not.  He just keeps lying.  He says "We were
24   supposed to skeet shoot."
25          Then he tells Deputy Kurylowicz, "I walk in the house
26   and I put the gun on the table, and then I go get myself a
27   Pepsi."  He says he wasn't even in the room when Nicholas did
28   it.
```

1          And then he goes further.  He tells Deputy Kurylowicz

2    that Nicholas told him "Thank you so much.  I really needed

3    this."  And then Nicholas must have loaded the gun.

4          And he says while he's all the way in the kitchen and

5    Nicholas is in the bedroom with the gun, that he hears the chu,

6    chu, chu, chu, racking, and then he hears a blast go off.

7    That's his original story that he's telling within 30 minutes of

8    Nicholas's death.  In detail.

9          He even goes so far to say "I thought it just

10   discharged to the ceiling.  And I saw him bleeding, and that he

11   was looking up at me.  And he fell and I fell on top of him."

12   All this is a lie.  It's a lie that he had ready because he had

13   already been thinking about this.  Because he had already been

14   planning it.  Because he already knew that people would believe

15   Nicholas committed suicide.  But the evidence didn't support

16   that.

17         He keeps with this lie and doesn't change it out of the

18   goodness of his heart, out of like, let me help the officers.

19   He sticks with this lie until he's caught in it.  He tells

20   Investigator Dean at the station the exact same lie.  He tells

21   him "We started small talking right way."  And he further goes

22   into it with Dean.  "He was twitchy.  He's been taking crystal

23   meth."  Just digging Nicholas in the dirt and running that bus

24   over him.

25         "I had the gun with me because I didn't want it left in

26   the car," which is totally different than what he told us in

27   court in his fourth version.  And then he again says "I put it

28   on the table, got me a Pepsi.  Nicholas must have grabbed the

1   gun."  Then he says "Nicholas closed the bedroom door.  I heard

2   him rack it four times.  I was playing in the kitchen with the

3   dogs when I suddenly heard a gunshot."

4        That's the story that he tells Investigator Dean, and

5   he's sticking to that suicide and he's committed to it, and he's

6   got it in details.  It's not like something fresh he's making

7   up.

8        He saw the gun on the ground and saw Nicholas on the

9   ground.  And he sticks with that story until Investigator Dean

10  says "Well, that's not possible.  He didn't shoot himself."

11  Then he modified.  Then he starts to tell his first accident

12  story.

13       And if you remember in that tape, Investigator Dean

14  tells him, there is three ways this could have happened.  It

15  could have be suicide, it could have been accident, or it's

16  murder.  So when they told him no to suicide, he shifts and he

17  goes to accident.  And he knows he's only got two things left,

18  accident or murder.  So he stays right in accident for the next

19  three versions of his story.

20       Lie No. 2.  The first accident story.  Tells

21  Investigator Dean another lie.  He says first Nicholas let's him

22  in.  And he goes into detail on this.  Mind you, we watched that

23  video.  He's had time to rest, he's had time to eat, he's in

24  that room by himself, and he's got his next story ready.

25       Nicholas let's him in.  And then he says "I went back

26  out to the car for the gun."  And Nicholas sits on the bed

27  facing the piano.  Nicholas takes the gun, and he says that

28  Nicholas starts playing with it, and he creates this picture

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 932

1    where they're just playing around and Nicholas is checking out

2    the gun.  Totally different than the first story.

3           And then he says "I hear him charge the weapon, but I

4    didn't know he had a shell in the chamber."  Because, remember,

5    this is an accident story he's creating.  "So I start to take it

6    away from him."  And he paints this image where he's pulling the

7    gun from Nicholas.

8           And we watched on the video as he and Investigator Dean

9    were trying to figure out how this is possible.  And Dean's

10   like, well, if he's pulling the gun, then the shot would be in

11   here.  But that's not where it is.

12          He says Nicholas hands him the gun with the barrel

13   pointed at himself.  That big ole gun like this.

14          And defendant says again, "Oh, I accidentally got my

15   finger near the trigger, but Nicholas pulls the gun from me and

16   then the gun goes off."

17          And we watched on that video as he tried and tried,

18   and, mind you, I played the video and I played some of those

19   sections where there wasn't talking so you could see his

20   actions.  He's acting emotional.  He's acting upset.  And the

21   first story he's literally telling that lie covered in

22   Nicholas's blood.  He's acting sincere.  He's saying "You got to

23   believe me.  I'm telling the truth," just as sincere as he acted

24   when he testified here.

25          And while he's telling this second story, he's going

26   through everything trying to make it work, but there is no way

27   that Nicholas could have pulled that gun and shot himself on the

28   outside of his arm.  And that's what the doctor, Dr. Hunt even

1    said, "impossible."  And Investigator Dean told him it's

2    impossible.

3           And then Investigator Dean said, "I told you.  Suicide,

4    accident, or murder.  And that accident doesn't make sense.

5    That's not what happened.  So that's it, you're under arrest."

6    And he said, "No, no, no, no.  You got to believe me.  I'm not a

7    murderer."

8           And here comes version No. 3.  The modified accident

9    story.  Tells Investigator Dean another lie.  "Okay.  I got it

10   now.  We were playing with it.  Nicholas pumped the shells."

11   And he starts saying, and this part was true, and about the

12   dogs, that part was true, because he's just lying.

13          He says Nicholas gave him back the gun this time, and

14   then Nicholas was laying down.  And you remember on the video he

15   kind of poses in a way that he believes Nicholas was laying

16   down.  And he says, like similar to the version he told in

17   court, he didn't know that there was a shell.  And that he

18   pointed the gun at Nicholas accidentally, didn't know there was

19   another shell in there, and accidentally pulled the trigger.

20   That was his third story.  That was his modified story.  But it

21   still didn't fit the evidence.

22          So when he came in here, we got version No. 4 with many

23   more details.  And think about the details that were filled in.

24   We knew it wasn't skeet shooting, because we know he has a skeet

25   shooting gun now.  So now he gave an explanation for why he took

26   the shotgun, because it was in a zombie movie.  And that's the

27   first time we're hearing that.

28          How else did the story change?  The story changed to

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 934

1    make sure that Nicholas was in the right position, after he sat

2    here like all of us and listened to Dr. Hunt.

3            And I'll repeat for you CALCRIM 226.  If you decide a

4    witness deliberately lied about something, you should consider

5    not believing anything, anything the defendant has to say.

6            You can't trust a word that he says.  You don't have

7    to.

8            Also CALCRIM 200.  So now I'm going to go into the

9    lessers.  And before I go into the lessers, I want you to know

10   something about these instructions.  The judge, the very first

11   instruction he read to you was CALCRIM 200.  Duties of Judge and

12   Jury.  And at the bottom part of CALCRIM 200, it says "Some of

13   these instructions may not apply, depending on your findings

14   about the facts of the case."  And then it goes on to say later

15   on "After you have decided what the facts are, follow the

16   instructions that do apply."

17           So let's talk about the next two instructions.  CALCRIM

18   3406.  Mistake of Fact.  Now, why do you think the defendant has

19   been telling you a story that he didn't know the gun was loaded?

20   It was for this instruction right here.  CALCRIM 3406.  Mistake

21   of fact only applies to murder.  And it requires the conduct

22   that would have been lawful.  That the defendant reasonably and

23   mistakenly believed no shells were in the chamber.  And that you

24   have a reasonable doubt as to a specific intent.

25           So in order for you to believe mistake of fact, you

26   would have to believe the person who has lied repeatedly.  You

27   would have to believe that he had no idea that he was mistaken

28   in his belief that there were no rounds in the chamber.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 935

1          Now, this is the instruction you have, but under

2     CALCRIM 200, you don't have to apply it if you don't believe

3     that and if you don't believe him.  And he's the only one that's

4     saying it.  None of the evidence supports that.  It's just his

5     word.

6          The other instruction is Involuntary Manslaughter.  And

7     I gave you murder.  I gave you first-degree murder.  But the

8     other option you have, if you find the defendant not guilty of

9     first-degree murder, not guilty of second-degree murder, is

10    involuntary manslaughter.

11         And involuntary manslaughter is the same line, and it

12    doesn't fit the facts in this case.  Defendant committed a

13    lawful act.  So it's saying he took that loaded shotgun into

14    Nicholas's house, is that's the lawful act.  That he did it in

15    an unlawful manner in saying that maybe he was playing with the

16    gun or something, I don't know.  And that when he was doing that

17    lawful act, that he did it with negligence, criminal negligence,

18    and that that caused Nicholas's death.  But what the defendant

19    has done is so much more.

20         Consider this:  There is no reasonable doubt as to the

21    facts in this case.  No other reasonable explanation for what

22    happens to Nicholas unless you believe that the defendant is

23    literally the unluckiest man in the world.  Because this is what

24    he wants us to believe.

25         He wants us to believe that it's just a coincidence

26    that he sent threatening text messages threatening specifically

27    to shoot Nicholas.  Not stab him, not cut him, but shoot him.

28    He wants you to believe that it's just a coincidence that he

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 936

1    ends up taking a 12 gauge over there instead of the skeet

2    shooting gun.

3         He wants you to believe that it's a coincidence that he

4    didn't know how many rounds were inside the gun.  He wants you

5    to believe that when he racked it, if that's what he did, that

6    it was just a coincidence that one still was inside.

7         He wants you to believe that on this day it was just a

8    coincidence that he didn't check and make sure the gun was

9    unloaded.  He wants us to believe that it's a coincidence that

10   he rests that big ole gun under his arm instead of setting it

11   down in all those spaces, or putting it back, and that it's just

12   a coincidence that it was pointed in all the places right at

13   Nicholas.

14        And he wants us to believe on top of all of those

15   coincidences that he just happened, an experienced person with

16   guns, to put his finger by the trigger.  And then it's just a

17   coincidence that that finger by the trigger accidentally touched

18   and it and shot Nicholas.

19        That's not reasonable.  And you only have to consider

20   what is reasonable.

21        Now I've come to the conclusion of my closing.  And I

22   want you should remember and consider all the facts in this

23   case.  And make sure they make sense.  And consider the fact

24   that you can reject the defendant's testimony because he's lied

25   over and over and over again.

26        And if you determine that he lied, I mean, anything

27   else you can disregard.  And if you disregard what he has to

28   say, then those jokes, that theory that it's jokes is

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 937

1    disregarded.  That theory that he didn't mean to do this is

2    disregarded, because the only things that say they were there to

3    hang out, the only things that say they hung out the day before

4    are him.

5          Now, I just want to leave you with this.  There were a

6    lot of things that were discussed in this trial.  There were

7    things brought up about maybe if Nicholas walked, maybe if he

8    didn't, who spread the blood.  And you notice I didn't go

9    through them in my closing, because those aren't what is

10   significant in this case.

11         There are things that happened in that room that we

12   will never know the answer to.  We'll walk away wondering if he

13   was awake, why was he in his underwear.  We may walk away

14   wondering did the underwear on his -- the blood on his underwear

15   soak through, or was it there for some other reason.

16         We may walk away wondering what was their relationship.

17   What were those boys doing.  Only two people know the answer to

18   that.  One of them is dead, and one of them lied.  But it

19   doesn't matter for the truth of this case.  It doesn't matter,

20   because we have substantial evidence to show beyond a reasonable

21   doubt that the defendant threatened Nicholas, that he carried

22   out that threat, and that he killed Nicholas McCauley.

23         And I would ask you to find the defendant guilty of

24   first-degree murder of Nicholas McCauley and of personally using

25   a firearm, and that he discharged it and caused Nicholas's

26   death.

27         Thank you.

28         THE COURT:  Thank you, Counsel.

```
 1              Ladies and gentlemen, we're going to take a 15-minute
 2      break.  All jurors are to return at 11:10.
 3              Keep an open mind.  Do not talk about the case or
 4      conduct any research.
 5              Court is in recess until 11:10.
 6                           (Recess.)
 7              THE COURT:  All right.  Back on the record.  All
 8      parties are present, all jurors are present.
 9              Defense, you may proceed.
10              MS. BLUMENTHAL:  Thank you.
11              Good morning, ladies and gentlemen.
12              (All jurors responded "Good morning.")
13              MS. BLUMENTHAL:  First thing I want to do is I want to
14      thank you.  I want to thank you for your willingness to serve as
15      jurors on this case.  We all saw how many people chose not to,
16      for whatever reason.  And we really want to thank you for the
17      time that you have put in and for your agreeing to serve as
18      jurors on this case.  That's part of what makes this country so
19      great.
20              I also want to thank you, and we want to thank you for
21      the attentiveness that you have shown throughout the
22      presentation of evidence.  I know some days you would sit here
23      and you'd leave the courtroom and you'd say, boy, am I tired,
24      and all I did was listen.  Listening is hard work.  It really
25      is.  And the attentiveness that each of you displayed throughout
26      the trial is very, very much appreciated.
27              We also want to thank you for what you're about to
28      undertake, and that is jury deliberations, the agreement to go
```

1    into deliberating with each other to try to reach a verdict on

2    this case with 11 other jurors.  We thank you for that energy

3    and effort.  It's, again, what makes our country great and makes

4    us the greatest judicial system in the world.

5          Now, you're going to find out throughout the course of

6    this trial that the prosecution has the first argument, the

7    closing argument.  We call it the opening argument.  We give our

8    closing, and they have a final summation.

9          And we all know how human beings work, and the

10   legislature does too.  When you listen to one side, you kind of

11   sway to that side.  And when you listen to the other side, you

12   kind of sway to the other side.  And if you go hear the first

13   side again, you kind of sway back.  And in spite of all of that,

14   they give the prosecution the first and last say so in the

15   closing argument in a criminal case here.

16         Now, why does that happen?  Why?  Well, first off, the

17   legislature knows that attorneys never know when to stop, and if

18   they don't have rules set forth on how many times they can

19   speak, they're going to keep on going.  But more importantly is

20   because the prosecution has the burden of proof of beyond a

21   reasonable doubt.

22         Now, those are some pretty powerful words that are

23   used.  We don't always know what they mean, even though the

24   judge has read it now twice, once at the beginning of the trial,

25   once again here.  But I want to go through it with you, at least

26   some of the pertinent sections.  And since I'm not the younger

27   generation with new techy and stuff, I go back to my old

28   teaching days.  And I want to go through some of it.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 940

1            Reasonable doubt.  Proof beyond a reasonable doubt is
2     proof that leaves you with an abiding conviction that the charge
3     is true.  The evidence need not eliminate all possible doubt
4     because everything in life is open to some possible or imaginary
5     doubt.
6            In deciding whether the People have proved their case
7     beyond a reasonable doubt, you must impartially compare and
8     consider all the evidence that was received throughout the
9     entire trial.  Unless the evidence proves the defendant guilty
10    beyond a reasonable doubt, they are entitled to an acquittal and
11    you must find them not guilty.
12            What is the powerful words?
13            Proof beyond a reasonable doubt is proof that leaves
14    you with an abiding conviction that the charge is true.
15            What is "an abiding conviction"?  Abiding.  Abiding is
16    that which withstands the test of time.  Something that lasts
17    forever.  I like to do the comparison with antique furniture.
18    And I usually use the antique furniture that's found in Europe,
19    because it's hundreds of years old and not the antique furniture
20    in Southern California that's 50 or 75 years old.
21            But if you take a look at the antique furniture when
22    it's put together, the dowels fit.  They didn't use nails.  And
23    you hold it up and to this day no light shines through.  It's
24    abiding.  It withstands the test of time.
25            What is a conviction?  A conviction is that which we
26    really believe.  We live our lives based upon our convictions.
27    We raise our children based upon our convictions.
28            An abiding conviction that the charge is true, that is

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 941

```
 1    the level that you must have before you could ever return a
 2    guilty verdict.  And given that standard of proof, I'd like to
 3    discuss some of the evidence with you, but I'd also like to go
 4    through and show you the verdict sheets and how you're supposed
 5    to go about it, as the judge will instruct you in the next phase
 6    of instructions.
 7            You will be given verdict sheets, and they will tell
 8    you -- the Court will tell you, and each of these you will have
 9    to sign, that if at the conclusion of your deliberations, or
10    during the deliberations, all 12 of you agree, all 12 of you
11    would have to agree that Mr. Houston Boji is guilty of
12    first-degree murder, and we're going to discuss all the elements
13    and everything, you would then sign and return the following
14    form:
15            We, the jury in the above-entitled action, find the
16    defendant, Houston Michael Boji, guilty of violation of 187,
17    subdivision (a), of the Penal Code, first-degree murder as
18    charged under Count 1.
19            There is only one count in this.  There is one count.
20    It's a charge of murder.  What you're going to find is you have
21    four possible, actually, three possible charges to consider
22    under that one count, and that's what we're going to kind of
23    discuss.
24            Now, if you find him guilty of first degree murder,
25    that's all you do.  You don't take a look at any of the other
26    guilt or not guilty forms until you come to the what they call
27    the special allegation.  And it's a finding.  And we'll discuss
28    that in a minute here.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 942

1          But as far as guilt or not, if you find him guilty of

2     first degree, you set that aside.  You decide no other verdict

3     forms itself.

4          But let's assume as you discuss things you're going,

5     you know, we just don't find the premeditation.  We don't find

6     that there.  We're just not buying the first degree.  So then

7     you would say, all 12 agree it's not first degree.  That does

8     not mean you have decided anything else yet.  You then would

9     sign the form, We, the jury in the above-entitled action, find

10    the defendant, Houston Boji, not guilty.  And this would be of

11    murder in the first degree.

12         After you would find him not guilty of murder in the

13    first degree, and let's assume you did that, you would then go

14    to what the next charge is, so to speak, even though there is

15    only one count, and that would be second-degree murder.  If you

16    all 12 would agree that Houston is guilty of second-degree

17    murder, you would then sign the form that finds him guilty of

18    second-degree murder.

19         Now, by this time if you signed it, you would have

20    already signed one other verdict sheet.  That would have been

21    not guilty of first degree.  If you all agree to that, you go to

22    second degree.

23         Now, let's assume, however, that you don't agree on

24    second-degree murder, in fact, all of you disagree on

25    second-degree murder but just don't think it's there, you would

26    then sign the verdict form that you would find him not guilty of

27    murder in the second degree.

28         So by then you would have two verdict forms signed.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 943

 1   And I'm showing you the actual copies of the verdict sheets that

 2   will be submitted to you.

 3          And let's assume now you're going to involuntary

 4   manslaughter to consider.  Before you go to involuntary

 5   manslaughter, basically, to actually take a look at the verdict,

 6   you would have already signed two not guilty forms, and that

 7   would be for first and second-degree murder.  If you would

 8   unanimously agree that he is guilty of involuntary manslaughter,

 9   then you would sign the form that said he was guilty of

10   involuntary manslaughter.

11          But let's assume that all of you agreed that it was a

12   straight accident and that those elements were there, and you

13   did not find that he was guilty of involuntary manslaughter,

14   then you would sign the last form which was not guilty of

15   involuntary manslaughter.

16          Now, what the Court will also ask you to do is if you

17   have any guilty verdicts at all, guilty of first-degree murder,

18   guilty of second-degree murder, guilty of involuntary

19   manslaughter, then you're supposed to go to the finding.  This

20   finding is whether or not there was personal use of a discharged

21   a firearm.  I'm going to show you what it is in the finding.

22   And we're going to discuss what elements are needed for this

23   finding.

24          We, the jury in the above-entitled action, find the

25   defendant, Houston Michael Boji, in the commission and attempted

26   commission of the offense charged under Count 1 of the

27   Information, or of any of the lesser offenses necessarily

28   included therein, that means the murder of first degree, second

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 944

1    degree, or involuntary manslaughter, that he did personally and

2    intentionally discharged a firearm and proximately cause great

3    bodily injury or death to another person, not an accomplice.

4    That would be signed.

5         But if you found that he did not intentionally do that,

6    let's assume you found him guilty of, say, involuntary

7    manslaughter, that you found that there was some things that did

8    not fit, we're going to go through that in a minute, under the

9    personal discharge of a firearm, then you would sign the last

10   finding which would say that he did not, and this is what is in

11   bold, personally and intentionally discharge a firearm.

12        Those are the verdict sheets that you will be given.

13   And it's attempting, of course, the goal is to reach a verdict

14   of any jury.  That is the goal, is to be able to render a

15   verdict, whatever that verdict may be.

16        But we go through now, and I want to talk about some of

17   the jury instructions and some of the elements that are needed.

18   And I want to preference some of my remarks with what you heard

19   in the opening argument by the prosecution is, well, if you

20   don't like this theory, and not all of you have to agree, then

21   some of you might like this theory of prosecution.

22        And what we know, ladies and gentlemen, at this time

23   whether you believe Houston Boji or not, and we have admitted on

24   the side of the defense the whole way through, he did lie.

25   There is no doubt about it, he did lie.

26        But we know several things, and we're going to go

27   through and start applying the facts, facts that are undisputed

28   that you cannot lie about.

1          The scene.  The physical properties that were there.

2    What was found that you cannot lie about.  And it's from those

3    areas that we're going to take a look at the elements of the

4    crimes that are being alleged.

5          We know that there were over 30 guns probably, if you

6    take a look at it, or more, in that house.  And we know that --

7    we're going to discuss the first-degree murder -- that if we're

8    going to go over and we're planning on killing someone, we're

9    going to make it look like a suicide, you're not going to take a

10   shotgun.  What are you going to do?  You're going to take one of

11   those powerful handguns that you saw there that there was ammo

12   for.  You're going to use that.

13         If you're planning on going over and you're going to

14   kill him, you put a shot in his head if he's lying in the bed,

15   and you leave.  And you don't take any ammunition that ejects,

16   that anything that is left behind that you could trace it to a

17   gun, and you leave.  Right away you leave.  You don't hang

18   around for anybody.  You don't park your car out in front of the

19   house, a car that everybody knows, because they see it over

20   there all the time.  You don't park it out front, but you leave.

21   We know that didn't happen in this case.  We know that.

22         We also know, here are some of the facts, Houston did

23   not leave.  We know that Nicholas died.  We know that Nicholas

24   died because of something that happened, something that Houston

25   did.  There is no doubt about that.  It's called what did he do?

26         If you're going to commit murder, do you try to save

27   that person's life?  If you're going to commit murder, do you

28   hang around?  If you're going to commit murder, are you going to

1    go to the neighbors and say "call 911"?  Are you going to leave

2    any evidence of you being there at all?  Logically speaking, no.

3         Now, I know Counsel used the phrase of "He's got to be

4    one of the most unluckiest people around."  And at this stage of

5    my life, I know there are times I say that if individuals don't

6    have bad luck right now, they don't seem to have any luck.

7    Those things can happen.

8         We're going to go through each of these, and we're

9    going to analyze some of the physical evidence where no one is

10   giving the testimony.

11        But I also want to talk about the motivation that

12   they're talking about, because they're saying if you don't like

13   this theory, use another here.  They're trying to say, first

14   off, they're trying to equate a cold sore with sexually

15   transmitted disease is STD.  They're not one in the same.  I

16   don't know who made that one up along the way, but they're not.

17        They're also trying to say that there were other

18   motives.  And they're trying to look at what you were told in

19   the case in chief is that there was a zipper pulled down on

20   Houston's jeans.  But at that time you were never told that

21   right underneath those jeans was Nike basketball shorts that had

22   no zipper in the front, if you take a look at those photographs.

23   And underneath that was a set of underwear.

24        What the inferences have been is that he, Houston goes

25   over and wants to get some, he is rejected or refused and

26   decides to kill him.

27        You were also told about certain text messages that

28   were sent several days before that said, "I'm going to shoot

1   you."  Now, we all know how 18 and 19 year olds can say and do
2   things that they don't mean, but they sound big and tough.

3        But what they didn't show you, and they had access to
4   the same evidence, in fact, as was pointed out during the
5   presentation of evidence.  We got ours from what we discovered
6   by law enforcement.  What they never showed you was the text
7   messages after the fact.  They stop with the text messages "I'm
8   going to shoot you" on the 6th.  They show you no text messages
9   whatsoever that were sent after the 6th.  And we saw there were
10  numerous ones.

11       They wanted you to believe there was no contact at all.
12  They wanted you to believe that after "I'm going to shoot you"
13  text message, the next thing that happened a few days later,
14  Houston goes over with his shotgun, kills him and planned on
15  doing it because of the text messages.

16       Nowhere did they show you the phone calls that were
17  analyzed by law enforcement to show you the number of telephone
18  calls that were made between Houston and Nicholas between the
19  time that those text messages were sent to the time that
20  Nicholas passed away.

21       They led you to believe there was no communication
22  between them until the defense pointed out -- the defense
23  pointed out that on November 9th at 7:41 p.m., the evening
24  before, that Houston and Nicholas were on the phone for 27
25  minutes and 55 seconds.  Each of these, as was pointed out
26  during the evidence that are from or to Big Man N, being
27  Nicholas, are communications and telephone calls between Houston
28  and Nicholas.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 948

1          That wasn't the way the prosecution presented the

2     evidence to you in their case in chief.  They wanted you to

3     believe that the last contact before Nicholas died was the "I

4     will shoot you" text.  And, ladies and gentlemen, that's just

5     not true.

6          This has nothing to do with whether Houston is lying or

7     not.  These are the facts that was developed by law enforcement

8     and was pulled out of the cell phone at that time and put into

9     report form.  That's what we are giving you to show you that

10    there was, in fact, communication between the two of them.

11         The amount of text messages that we showed to you, and

12    this was -- these were all sent after the text messages about "I

13    will shoot you."  It's Exhibit S, the one that had the telephone

14    calls.

15         Exhibit W shows the amount of text messages there were

16    after November 6th, which is from Houston where it says "To:

17    Bro."  It says "Bro."  I'm sorry.  That's to Houston.  To

18    Houston from Nicholas.  So Nicholas contacting Houston on

19    Saturday, November 7th.  Houston responds "Bro."  Houston

20    responds a little bit more that says "Dude."  And then he gets

21    back to him and says "One second."  And then Houston says

22    "Tonight."  Probably indicating that they were going to get

23    together tonight.

24         And, if you recall, we played videos that were on the

25    same phone that law enforcement analyzed.  Those same videos

26    were available to the prosecution.  They led you to believe that

27    there was no contact whatsoever between Houston and Nicholas

28    between the "I will shoot you, Dude.  I'll shoot you" until the

1   time he passed, and that's not true.

2          There are three videos that show Houston and Nicholas

3   racing Houston's car up and down the street, which is probably

4   where the skid marks came from, as you can see how they were

5   racing it.

6          They continued to communicate with basically smilie

7   faces.

8          Sunday before Houston goes over, and we know that

9   Houston was there because of the neighbor witness that came and

10  testified that saw Houston there.  If you recall, he went

11  outside to walk his dog during, I think it was a Raiders game,

12  and saw Houston and them together and was surprised there was

13  not a threesome, because there were three guys that hung out a

14  lot.

15         But it was just Houston and Nicholas, and that was on

16  Sunday, the same time period that Houston is sending Nicholas,

17  it says "What's up in the hood, you faggot?"  That's not

18  suggesting they had a gay relationship, that's suggesting that

19  they may not talk proper.  That they may razz and tease each

20  other, not suggesting that anyone is gay or not gay.  I'm not

21  suggesting that it's an issue with them.

22         Houston says back "Bro, I'm board."  At 3:21 on that

23  Sunday text to Houston "Bro."  From Houston "Bro."  Later that

24  Sunday as they're teasing each other back and forth, Houston

25  says "I make you my bitch."  And they're still seeing each other

26  all through this, because we know that he was over there on

27  Monday also.

28         And we know from the timing of it, and my heart goes

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 950

1    out to Ana, Nicholas's mother.  She does not remember Houston

2    being over there at all that weekend before he passed, and I can

3    understand that.  My heart goes out to her because no parent

4    should ever lose a child.  I cannot imagine the grief that

5    someone goes through with that.

6              MS. FOSTER:  Objection.  Improper argument.

7              THE COURT:  Sustained.

8              MS. BLUMENTHAL:  But we know.  We have videos, and we

9    have a neighbor that saw Houston over there that knows that he

10   was there.

11             We also know that the pattern has been that Houston

12   went over there at least several times a week, if not every day

13   during the day while Ana was at work.

14             That Sunday evening he sends out more that says "Bro."

15   From Houston again.  "I will slowly take over your sole."  And

16   Counsel said they're suggesting that somehow that is a threat or

17   a sexual overtone.

18             Sunday evening.  "I am the sole eater.  Be out Jacks at

19   11:00."  If you recall, directly across the area is a Jack in

20   the Box.  And what you heard is that's where they would meet

21   frequently is out by Jack in the Box.

22             Later that evening it says "Tonight."  Confirmed

23   tonight.  These are all the communications that still kept going

24   back and forth between the two of them.  From Houston "Tonight,"

25   a smilie face, and then same evening, Sunday evening to let

26   Nicholas know where he is "Just passed Perris High."

27             Another one from Houston that same time.  I'm sorry.

28   This is on Monday evening when he said he's going to be there.

 1   "Almost there."  To Houston "Bro."  Monday evening, the night

 2   before he passes, "To."  From Houston "Night."  This is a sample

 3   of the communications, not considering the amount of phone

 4   calls, that there were back and forth.

 5         Now, given that, let's take a look at the jury

 6   instruction for first-degree murder.  And what you're hearing

 7   said was that as long as you adopt one of them and come back

 8   with first degree, you guys don't all have to agree on the

 9   theory.  And what they're saying is that there are two.

10         One is deliberation.  Okay.  Each of the theories of

11   first-degree murder has different requirements, and I will

12   instruct you on both.  And this is what the Court has already

13   read to you.  He said, "The defendant has been prosecuted for

14   first-degree murder under two theories.  The murder was willful,

15   deliberate, and premeditated; and (2) the murder was committed

16   by lying in wait."  It's kind of like if you don't like one, we

17   can have the other.  Deliberation and premeditation, and lying

18   in wait.

19         Deliberation and premeditation is basically what

20   they're saying here is that take a look at the text messages.

21   This shows that it was deliberate.  This shows it's

22   premeditated.  We went out and got a gun ahead a time and we're

23   going over.  And this is what we're planning on doing.  We're

24   going to go over and we're going to kill Nicholas.  That is what

25   they're saying is the deliberate and premeditation.

26         Lying in wait theory is that he goes over there or

27   makes plans, but that he's waiting outside until mother leaves.

28   The problem with that theory is it goes against the evidence

1    that was testified to by Investigator Dean when they had the

2    cameras that they were taking a look at the intersections that

3    he was turning into that area at 8:18 in the morning.  It does

4    not show him on that street.  It does not show him waiting for

5    her to leave.  It shows him driving at 8:18.  It also showed a

6    car that was like Ana's leaving that area at 8:17 before

7    Houston, what appeared to be Houston's car got there.

8         That's not lying in wait.  The evidence that was

9    presented through law enforcement shows that Houston was not

10   over there waiting ahead of time.  It shows that Ana had already

11   left before Houston's car approached that area.  His car

12   approached that area a little over a minute after Ana had

13   already left, driving up to that area.  That is not lying in

14   wait.

15        I don't know what Ana saw as far as the car that was on

16   the street that she thought could have been, she later decided

17   could have been Houston's, but, obviously, it was not because

18   the camera that law enforcement found showed that it was not his

19   car that was there.

20        Now, it goes on to say, gives some of the details here

21   is that how a person can conceal what their purpose is.  But

22   basically those are the two theories that would have to be

23   presented.

24        They also talk about second-degree murder, and there is

25   another jury instruction for second-degree murder with malice.

26   It talks about the defendant is charged in Count 1 with murder

27   in violation of Penal Code section 187.

28        To prove that the defendant is guilty of this crime,

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 953

```
 1    the People must prove that:
 2            1.  The defendant committed an act that caused death of
 3    another human being; and
 4            2.  When the defendant acted, he had a state of mind
 5    called malice aforethought; and
 6            3.  He killed without lawful excuse or justification.
 7            There are two types of malice aforethought.  We have
 8    express malice and implied malice.  Proof of either is
 9    sufficient.
10            The defendant acted with express malice if he
11    unlawfully intended to kill.  If he unlawfully intended to kill.
12    And I want to discuss that in just a minute by the facts that
13    were presented.
14            The defendant acted with implied malice if he
15    intentionally committed an act;
16            The natural and probable consequences of the act were
17    dangerous to human life;
18            3.  At the time he acted, he knew his act was dangerous
19    to human life; and
20            4.  He deliberately acted with conscious disregard for
21    human life.
22            And it goes down to give some clarification.
23            Now, one is you have to have the specific intent.  And
24    you talk about specific intent and act that if he unlawfully
25    intended to kill.
26            And I think one of the reasons that regardless of what
27    you think happened, and I don't think there is any facts at all
28    that support a first-degree murder, absolutely none.  I think
```

1    one of the issues in this case and the reason that he was so

2    overcome with everything is he killed -- he killed Nicholas.  I

3    think it's undisputed that this was his very best friend.  I

4    think it's undisputed that he loved Nicholas as a brother.  That

5    he loved Ana as a mother.  That they got along incredibly well

6    the whole way.

7            And if any of us would do something, whether we were

8    reckless or not, but we were the cause of the death of a family

9    member or a close friend, whether you're justified or not, I

10   think you would go histrionic.  I think we hate ourselves.  I

11   think we can't handle the fact that we caused it.

12           I mean, how many times have we all been involved in a

13   close call in a car accident and we weren't really looking, and

14   we had our kids or grandkids in the backseat knowing what could

15   have happed to them.  And we're like, oh my God, I got to be

16   careful.  We almost get it would have been our fault.

17           But let's assume you're in some sort of an accident

18   anyway where you didn't react suddenly enough to turn the car

19   away.  It wasn't necessarily your fault, but someone in the

20   backseat dies.  You take personal responsibility for that.  You

21   go through your own grief.  And if you're 19 years old and you

22   just lost your best friend, you go histrionic.  I'm not too sure

23   you know everything that is going on at that time.

24           If you're going to commit first degree premeditated

25   murder lying in wait, you're not going to hang around to see if

26   you can give him CPR.  If you've been over there premeditative

27   with a specific intent to kill, you're not going to try to go

28   out and find a phone in the kitchen and try to call 911.  You

1    don't know the phone's not working, but you're trying to call

2    911.

3            If you intend to kill, premeditation, malice

4    aforethought, if you had that type of specific intent and such a

5    careless disregard, you don't go around knocking on the

6    neighbor's door, pounding and pounding, please call the cops.

7    Please get help.  That's not -- if you had that type of

8    malicious state, that's not the behavior after.

9            Now, what physical evidence shows that everything

10   occurred in that bedroom?  If you take a look at the blood

11   samples that are around, and whether you believe Houston's story

12   or not, some of it is completely consistent with the physical

13   evidence that is there, and that's what we'll have to take a

14   look at.

15           Now, when they talk about the mental state, what

16   they're talking about is at the time that the act occurs, and

17   they're talking about first-degree murder.  At the time that the

18   act occurred, you have to have a specific mental state.  You

19   have to be thinking a thought.  The most common one for

20   first-degree murder is an intent to kill.  At the time that act

21   occurs, you have to have a specific intent to kill.  And if you

22   don't have an intent to kill, it's not first-degree murder,

23   regardless of what you've done, if you don't have an intent to

24   kill.

25           On second-degree murder, you either have to have an

26   intent to kill, or it gives you the other criteria, and if you

27   don't have that, you don't have second-degree murder.  And it

28   has to be at the time that the act occurs.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 956

1    The Court read you the instruction that's called Union
2    of Act and Intent.  Specific Intent or Mental State.  The crime
3    of murder charged in this case requires proof of the union, or
4    joint operation, of act and wrongful intent.
5    To find a person guilty of the crime of murder as
6    charged in Count 1, or the enhancement of personal use of a
7    firearm, that person must not only intentionally commit the
8    prohibited act, but he must do so with the specific intent.  The
9    act and specific intent required are explained in the
10   instruction for the crime and allegation.
11   The specific intent required for the crime of murder is
12   the intent to kill.
13   And I think the fact that Nicholas was killed was what
14   so startled, so startled Houston that he couldn't believe that
15   happened.
16   For the crime of involuntary manslaughter it is not the
17   intent to kill, it's what they call a general intent.  It's not
18   an intent to kill.  You have to have the intent to do the act.
19   Let me explain, if I can.
20   Union of Act and General -- and Intent: General Intent.
21   The lesser charge of involuntary manslaughter requires proof of
22   the union, or joint operation, of act and wrongful intent.
23   For you to find a person guilty of the lesser crime in
24   this case of involuntary manslaughter, that person must not only
25   commit the prohibited act, but must do so with wrongful intent.
26   A person acts with wrongful intent when he or she intentionally
27   does a prohibited act; however, it is not required that he or
28   she intend to break the law.  The act required is explained in

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 957

1    the instruction for involuntary manslaughter.

2          And here is the full instruction.  You'll be given a
3    copy of all of these instructions when you are in the jury
4    deliberation room.  I believe that there is one set that is sent
5    back there.  And even though there seems to be a lot of
6    legalese, it really is explanatory.  But that's why I wanted to
7    go through some of these with you, that if you see it ahead of
8    time, it doesn't seem, I don't find it to be quite as
9    cumbersome.

10         When a person commits an unlawful act but does not
11   intend to kill and does not act with conscious disregard for
12   human life, then the crime is involuntary manslaughter.

13         The difference between other homicide offenses and
14   involuntary manslaughter depends on whether the person was aware
15   of the risk to life that his or her actions created and
16   consciously disregarded that risk.  An unlawful killing
17   resulting from a willful act committed without intent to kill
18   and without consciousness disregard of the risk to human life is
19   involuntary manslaughter.

20         The defendant committed involuntary manslaughter if:
21         The defendant committed a lawful act in an unlawful
22   manner;
23         The defendant committed the act with criminal
24   negligence; and
25         The defendant's acts caused the death of another
26   person.
27         The People also allege that the defendant committed the
28   following lawful act with criminal negligence.  And they're

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 958

1    alleging possession of a firearm.  In other words, possession of

2    a firearm is a lawful act, and what they are alleging is that he

3    committed that act, the possession of the firearm, with criminal

4    negligence.

5         Criminal negligence involves more than ordinary

6    carelessness, inattention, or mistaken in judgment.  A person

7    acts with criminal negligence when:

8         He or she acts in a reckless way that creates a high

9    risk of death or great bodily injury; and

10        A reasonable person would have known that acting in

11   that way would create such a risk.

12        In other words, a person acts with criminal negligence

13   when the way he or she acts is so different from the way an

14   ordinarily careful person would act in the same situation that

15   his or her act amounts to disregard for human life or

16   indifference to the consequences of that act.

17        In order to prove murder of voluntary manslaughter, the

18   People have the burden of proving beyond a reasonable doubt that

19   the defendant acted with intent to kill or with conscious

20   disregard for human life.  If the People have not met either of

21   these burdens, you must find the defendant not guilty of murder

22   and not guilty of voluntary manslaughter.

23        What they're saying here is it's an involuntary

24   manslaughter that comes into play if a person is acting with

25   criminal negligence, and that's where I'm sure some of the

26   argument can be made.

27        If you're a conscious person, and we saw the videos of

28   how semi-irresponsible a 19 year old, and I don't care if he's a

1    full-time college student or not, acts with handguns.  And we
2    saw the videos of that.  You saw how he had them down his
3    underwear and pulling them out.  And he videoed himself of this.
4         None of us parents want our kids to be doing that.
5    People who are around guns don't want you to be doing that.
6    Will say it's just absolutely careless.  You always treat every
7    gun as though it's loaded.  I mean, these are all the things
8    that we were all raised with or heard.  That doesn't mean that
9    doing it, however, is criminal negligence.
10        But there is an argument that could be made, and it's
11   the one thing that Houston never lied about, and that is, he's
12   not a murderer.  He's not a murderer.  He didn't want to kill
13   him.  He didn't want him to die.  That he maintained the whole
14   way through.
15        And I think some of the lies is when you try to
16   distance yourself.  I'm not saying they're excusable.  I think
17   they're wrong, but that's not what we're talking here as far as
18   whether something is morally wrong or not.  What we're talking
19   about is, do you have the evidence beyond a reasonable doubt?
20   Do you have an abiding conviction that Houston had an intent to
21   kill?  Do you have an abiding conviction that he wanted to do
22   that?
23        Now, you don't always need a motive, and I'm not too
24   sure what motive they're talking about here, because none of
25   them seem to really carry a lot of weight.  They say that
26   motive -- I can't find anything, that's why I have to have
27   somebody handing me stuff.
28        They say that motive is not required.  Well, let's take

1    a look at what the Court read.

2           The People are not required to prove that the defendant

3    had a motive to commit any of the crimes charged.  In reaching

4    your verdict, you may, however, consider whether the defendant

5    had a motive.

6           Having a motive may be a factor tending to show the

7    defendant is guilty.  Not having a motive may be a factor

8    tending to show the defendant is not guilty.

9           Ladies and gentlemen, I suggest that there has been no

10   motive here presented whatsoever to show that Houston Boji

11   wanted to kill Nicholas, his best friend, his brother in life.

12   There is no evidence of that whatsoever, unless you want to

13   extrapolate and play make-believe.

14          Now, let's assume Houston had no motive.  They were

15   together every day since the time that text was sent.  They were

16   hanging out.  They're watching zombie movies.  And we know that

17   they went over there and watched movies a lot.  And let's assume

18   he had no motive.  Then you may use that as a reason to find

19   Houston Boji not guilty of murder.  And I'm not saying that for

20   the involuntary manslaughter, but as far as the intent to kill,

21   he had no motive for that whatsoever.  They were still planning

22   things.  They were still doing things every day.

23          If, however, if you don't need it for involuntary

24   manslaughter, there were other variables that you can take into

25   consideration.

26          And, Your Honor, does the Court want to take --

27          THE COURT:  Yes.

28          Ladies and gentlemen, we're taking our noon recess.  If

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 961

1    you want to, let's be back here at 1:25.  1:25.

2          Keep an open mind and do not share information.  Do not

3    discuss the case.

4          1:25.  Court's in recess.

5          All right.  Court is in recess.

6                    (Noon recess.)

7          THE COURT:  All right.  Back on the record.  All jurors

8    are present.  All parties are present.

9          Defense, you may continue.

10         MS. BLUMENTHAL:  Thank you, Your Honor.

11         Lunch breaks are always interesting to try to pick up

12   where you left off, because my memory no longer goes that long.

13         The last thing we talked about was motive, there not

14   really being any motive, and the evidence not being there for

15   that.

16         What I want to talk about next is some of the

17   consistencies with the physical evidence.  We know there was

18   only one round expended.  Only one.  That goes along with the

19   theory of an accidental discharge.  And let me show you why, and

20   why we know they were expended before the shooting took place.

21   It wasn't like Houston fired accidentally or otherwise and then

22   decided to eject all the rounds.  Those were beforehand, and

23   I'll show you why.

24         First off, we recall our discussion there was six --

25   there was one expended round and there were six unexpended

26   rounds, which is logical when you have six rounds, when you

27   think there are six rounds and you've ejected them, why you

28   think there's only six in there, and you haven't realized that

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 962

1     one has been chambered.

2          But let's take a look at some of those.  We know that

3     No. 17 was under the bed.  And if you'll notice, it's not around

4     any blood or anything along that line.  By the time it would

5     have been expended afterwards, Nicholas would have been on the

6     floor, because he went on the floor almost immediately

7     afterwards.

8          This is almost a case when the round went off, and, you

9     know, if you're going over and the idea is you're going to

10    intend to kill, you know, you'd think you'd go over with like a

11    smaller gun.  You'd feel a little more powerful.  You put a

12    bullet in the head, you put a bullet in the head.  You put a

13    bullet in their chest, you put a bullet in their chest.  You put

14    a bullet in their arm when you want to kill someone, that's not

15    a normal scenario for anyone who's been around guns at all.

16         If we take a look at number -- and I want to talk about

17    some of the blood.  No. 16.  You can see that it is right there.

18    And if you look at it close, and what you can do in the jury

19    deliberation room also, you'll see that there is no blood on

20    that round, that unexpended round.  It is lying there.

21    Obviously, it was put out before the blood went.

22         No. 18 is between the mattress and the box spring.

23    Back in a little bit.  But there is no blood on that.

24         No. 19 and 20, it's over by the guitar.  No blood there

25    in spite of the massive amount of blood that there is on the

26    side.

27         Now, if we take a look at it logically, when you have

28    shotgun pellets going into an arm, going into the chest,

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 963

```
 1    initially you're not going to have, even in spite of the fact
 2    that the arm almost exploded, you're not going to have a lot of
 3    blood going out initially because the holes are a lot smaller.
 4              When you start doing CPR on a person and you start
 5    pushing, and you push that chest hard, that is what causes blood
 6    to expend out.  That goes out more swiftly out of the holes that
 7    are there, and that's when you'll see large massive amounts of
 8    blood being discharged from his body.
 9              We have No. 13, which is the expended round, which is
10    lying there.  Of course, that's the one that was discharged at
11    the time.
12              Now, we have another one here, which is No. 11.  You
13    can see that by some of the other markings when they put it up.
14    They hadn't put up the evidence markers yet.  That's lying on
15    top of the shoe.  That is lying right next to the blanket that
16    Nicholas was -- had around him.
17              There is another round that when they moved the
18    blanket, that was underneath the blanket itself.  Now, that
19    could not have been discharged from the gun, expended from the
20    gun after the shot had already been fired, because it would not
21    be below the blanket when you pull Nicholas off the bed.
22              We take a look at some of the physical evidence.
23              Now, a couple more instructions that I want to go
24    through.  Counsel spoke about witnesses lying.  And there is no
25    doubt that Houston lied and lied and lied in this case.  But
26    does that mean you reject all the testimony?  Because there has
27    been certain consistencies in everything that he said that is
28    supported by the evidence.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 964

1          What the instruction says in its entirety is that:  If

2     you decide that a witness deliberately lied about something

3     significant in this case, and we stipulate Houston lied about

4     significant things in this case when he was out giving

5     statements that's on the video, you should consider not

6     believing anything that witness says.  Or, if you think the

7     witness lied about some things but told the truth about others,

8     you may simply accept the part you think is true and ignore the

9     rest.

10          You do not have to reject all testimony, especially

11     when we can show you certain corroborating evidence, such as,

12     Counsel made the statement that the only person you heard it

13     from that they were together over the weekend was Houston.

14     Well, that's not true.  We heard it from Mr. Crump, the

15     neighbor.  We saw it on the videos.  There's other corroborating

16     evidence besides Houston that made those statements that they

17     were together between the time the text messages were sent and

18     the time that Nicholas passed away.

19          Now, there are certain other jury instructions that I

20     want to talk about.  One is Mistake of Fact.  Now, mistake of

21     fact only applies to the murder charge.  Mistake of fact does

22     not apply to the involuntary manslaughter charge.

23          Mistake of FACT.  The defendant is not guilty of murder

24     if he did not have the intent or mental state to commit the

25     crime -- required to commit the crime because he reasonably did

26     not know a fact or reasonably and mistakenly believed a fact.

27          If the defendant's conduct would have been lawful under

28     the facts as he reasonably believed them to be, he did not

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 965

1   commit murder.

2          If you find the defendant believed that no shells were

3   in the chamber, he did not have the specific intent or mental

4   state required for murder.

5          If you have reasonable doubt about whether he had the

6   specific intent or mental state required for murder, you must

7   find him not guilty.

8          This only applies to the murder charge.  It does not

9   apply to the involuntary manslaughter charge.

10         There is also, however, another jury instruction called

11  Excusable Homicide: Accident.  The defendant is not guilty of

12  murder or manslaughter if he killed someone as a result of

13  accident or misfortune.  Such a killing is excused, and

14  therefore not unlawful if:

15         The defendant was doing a lawful act in a lawful way;

16         The defendant was acting with usual and ordinary

17  caution; and

18         The defendant was acting without any unlawful intent.

19         A person acts with usual and ordinary caution if he or

20  she acts in a way that a reasonably careful person would act

21  under the same or similar situation.

22         The People have the burden of proving beyond a

23  reasonable doubt that the killing was not excused.  They have

24  the burden to prove it was not excused.  If they have not met

25  this burden, you must find the defendant not guilty of murder or

26  manslaughter.

27         What we're taking a look at, if you go over the

28  theories that are being used for murder, I think you'll find

Christine M. DiCaro, CSR                                963

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 966

1    that none of those apply, given the physical evidence.

2           If you take a look at a person who is going over to

3    kill and in fact a gun is discharged and a piece of ammunition

4    hits the person and they die, you don't -- and if you're

5    planning on killing them, you don't normally run around the

6    house covered with blood.

7           And you can see that it was Houston that did it, that

8    went over the walls looking for the phone, going through the

9    kitchen, because you're going to see prints that appear to be

10   right-handed handprints.  Well, we know that Nicholas could not

11   have done that, because his right arm, well, first off, it would

12   have been 15 seconds or thereabouts, he would have been

13   unconscious.

14          Secondly, his right arm, basically, was completely

15   nonfunctional, had been exploded.  He could never have been

16   moving his right arm around that would have left bloody palm

17   prints in the kitchen and on the walls going around.

18          The person who has done a shooting on that and they're

19   frantic to call 911, they're frantic to find a phone because

20   their phone was not there, it was at home, and that's what you

21   will see if you take a look at the photographs and the physical

22   evidence.

23          So if we go back and review a few theories, and I want

24   to go through one last instruction and that is the Personally

25   Used Firearm on the manslaughter charge.  And this, my

26   directions would be, you would not -- if you find Houston not

27   guilty of involuntary manslaughter, you would never get to this

28   instruction.  You do not get to the use allegation if you find

 1    him not guilty as far as the special finding.

 2            Well, I want to go through this a minute.  This is if

 3    you would find Houston guilty of involuntary manslaughter.

 4            If you find the defendant guilty of the crime charged

 5    in Count 1, and this would be -- my comments are specifically to

 6    involuntary.  You must then decide if the People have proved the

 7    additional allegation that the defendant personally and

 8    intentionally discharged a firearm during the crime causing

 9    death.

10            To prove this allegation the People must prove that:

11            1.  The defendant personally discharged a firearm

12    during the commission of that crime;

13            2.  The defendant intended to discharge a firearm; and

14            The defendant's act caused the death of a person.

15            A firearm is any device designed to be used as a weapon

16    from which a projectile is discharged or expelled through a

17    barrel by force or explosion or other form of combustion.

18            An act causes death if the death is the direct and

19    natural and probable consequence of the act and the death would

20    not have happened without the act.

21            And I think that's reasonable because he would not have

22    passed away, Nicholas would not have passed away if he had not

23    been hit by the bullet that was discharged from the shotgun.

24            The People have -- a natural and probable consequence

25    is one that a reasonable person would know is likely to happen

26    if nothing unusual intervenes.  In deciding whether a

27    consequence is natural and probable, consider all the

28    circumstances established by the evidence.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 968

1          The People have the burden of proving each allegation

2     beyond a reasonable doubt.  If the People have not met this

3     burden, you must find the allegation has not been proved.

4          If you take a look at the intent required, the

5     defendant intended to discharge a firearm, what is the

6     definition of discharge of a firearm?  If you have an unloaded

7     gun, if you have an unloaded gun and you pull a trigger or your

8     hand slips on it accidentally or whatever, you're not -- it does

9     not discharge.  In other words, to discharge a firearm, you have

10    to have ammunition in it.

11         This requires an intent to discharge the firearm.  It's

12    the defense's position that he did not intend to discharge a

13    firearm.  He did not intend for a projectile to go through that

14    weapon.

15         Let's go back over a couple other theories.

16         And the physical evidence is there for you to look at.

17         Did Houston text Nicholas that he was going to go over

18    there and kill him on Friday, November 6th?  Yes, he did.  Was

19    it a threat?  Absolutely not.  Absolutely not.  When you take a

20    look at what kids text these days and the things they call each

21    other, and I'm going to kill you, I'm going to do this or that.

22    And I think the subsequent behavior the rest of the weekend

23    shows it.

24         On Saturday morning after these threats, those boys

25    were going around kind of hotdogging it in Houston's car,

26    leaving skid marks and so on, ending with a final video that you

27    saw taken in front of McCauley's residence.  They continued to

28    text for the rest of the weekend, including on Sunday morning,

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 969

1    and they were together, as seen by Mr. Crump, the neighbor.

2    They hung out on Monday.

3          Now, we know that Houston is a bit spoiled.  He's,

4    obviously, immature, and he plays with guns.  He's been taught

5    gun safety, but it's hard -- I don't think by 2015 when he's

6    barely 19 years old, he had yet internalized what gun safety was

7    all about.  Sometimes I think you can get so used to something

8    being around it, that it's just not internalized what that

9    means.

10         And I think the videos of him jumping around in his

11   underwear, pulling guns out from the backside of his underwear

12   and so on, and struggling to pull the gun because it wasn't

13   coming out of his boxers, makes the responsible gun owner

14   cringe.  It's just something that you have a second nature.

15         The videos of him, whether you're a responsible gun

16   owner or not, putting ammunition into the .44 Magnum and pulling

17   the trigger makes you physically cringe, like, oh my God, what's

18   going to happen here?  We can't always say that's responsible,

19   but if an individual is not looking at it that way, they're

20   playing games.  We can say that responsibile people don't do it,

21   but responsible people do a lot of these kinds of things without

22   ever intending to cause any damage.

23         When you put these things together, and I want to go

24   over one last instruction.  It's called Circumstantial Evidence.

25   Before you may rely on circumstantial evidence to conclude that

26   a fact necessary to find the defendant guilty has been proved,

27   you must be convinced that the People have proved each fact

28   essential to that conclusion beyond a reasonable doubt.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 970

```
1              Also, before you may rely on circumstantial evidence to
2    find the defendant guilty, you must be convinced that the only
3    reasonable conclusion supported by the circumstantial evidence
4    is that the defendant is guilty.  If you can draw two or more
5    reasonable conclusions from the circumstantial evidence, and one
6    of those conclusions is reasonable -- I'm sorry.  And one of
7    those reasonable conclusions points to innocence and another to
8    guilt, you must accept the one that points to innocence.
9    However, when considering circumstantial evidence, you must only
10   accept reasonable conclusions and reject any that are
11   unreasonable.
12             And I think that stands as a pretty standard fact, we
13   reject the unreasonable.
14             But if you had two reasonable interpretations, you can
15   take a look at some other facts surrounding it.  And one of
16   those reasonable interpretations says Houston is not guilty,
17   that's the interpretation that must be accepted.  That is the
18   one that you have to accept.
19             When you put all of these facts together and all of the
20   circumstances and take a look at the physical evidence and the
21   photographs, when you put all of this together, the scene, there
22   is really only one interpretation of some of it.  On November
23   10th, 2015, Houston Boji shot his best friend.  He shot his
24   brother from another mother.  He ended the life of someone he
25   viewed to be his brother.  And he did it with no intent to kill.
26   He did not want to kill his best friend and his brother.
27             You can almost see him trying to get to Nicholas
28   before the pellets hit him.  Trying to do something immediately.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 971

1    Starting the CPR.  Trying to do whatever.  He suffered the worst

2    nightmare of any gun owner.  And this is where you're pro gun or

3    not pro gun, but he suffered the worst nightmare of any gun

4    owner.  He pulled the trigger on an empty chamber that wasn't

5    empty.  He is a killer, and he cannot change that as much as he

6    wants to.

7            But he was right about a different word that he used.

8    He kept saying he's not a murderer, and he's not.  There was no

9    reasonable interpretation of the evidence that can point to

10   guilt on murder.  There are reasonable interpretations to show

11   that he is not guilty.  And we suggest to you, ladies and

12   gentlemen, that there is no abiding conviction, and that's what

13   you have to have inside of you.  There is no abiding conviction

14   of the truth of these charges.  We're asking you to return a

15   verdict of not guilty.

16           THE COURT:  Thank you, Counsel.

17           Any rebuttal from the People?

18           MS. FOSTER:  Yes.  May I have a moment, Your Honor?

19           THE COURT:  Yes.

20           MS. FOSTER:  Thank you, Your Honor.

21           As you sit and listen to that, as you sit and listen to

22   the defense, I started looking over here.  And I kept thinking

23   about that last version that the defendant gave, and the thought

24   that you real continuously through your head is why should we

25   believe him now?

26           He had opportunity after opportunity to tell the truth.

27   He sat there with Investigator Dean and had just about the

28   nicest interaction with law enforcement a suspect could have.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 972

1    He had hours where they bought him food and drinks and told him

2    the evidence at the scene, and he not once ever tells the truth.

3    So why should we believe him now?

4         He said that "I lied because I'm scared."  "I lied

5    because I didn't want to get into trouble."  And he testified

6    that he's scared now and he doesn't want to get into trouble

7    now.  And he's still lying.  And I'm not saying that as if it's

8    my own testimony, because that's not my job.  I'm saying he's

9    still lying because what he said still doesn't make any sense.

10        He had an opportunity to tell the truth.  Because what

11   they're saying is that it's purely an accident.  Purely an

12   accident.  He didn't know the gun was still loaded.  He didn't

13   even purposely pull the trigger.  So they're saying it's not

14   even reckless in that he pulled the trigger like with his own

15   hand.  They're saying his finger slipped.  If that's the truth,

16   if that's what really happened in that room, then why didn't he

17   tell it from the beginning?

18        Okay.  Let's give him the benefit of the doubt.

19   Suicide came to his head for whatever reason.  And he told that

20   story first.  As soon as he's caught in that lie and he decides

21   to tell them it was an accident, why, if it was really an

22   accident, didn't he tell the truth?

23        See, the defendant has been painted as just a silly

24   kid.  And it's been said, and it kind of takes you aback that

25   this is what kids do.  They threaten to shoot each other.  They

26   say they're going to kill.  They play around with guns.  Excuse

27   me?  That is not normal kid behavior.  That is not what kids do.

28        Putting your hand up while you're on the phone and

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 973

1    putting a bullet in a revolver and letting the person on the

2    other end think you're playing Russian roulette, that's not

3    normal kid behavior.

4            And this is not just some innocent kid.  And when you

5    look at him, he looks like it.  He looks young.  He looks sad.

6    And defense wants you to believe because that he looks young and

7    he looks sad and this was his best friend, and he probably does

8    regret it, that he never intended to kill.

9            But his behavior shows something different.  It shows

10   something way more sophisticated.  Because she painted an

11   imagery of a gun owner's worst nightmare.  And she said a gun

12   owner's worst nightmare is to think that a gun is unloaded and

13   then accidentally shoot and hurt someone.  We could all picture

14   that, right?

15           But a gun owner who does that reaction does not go and

16   blame that person and claim it's suicide.  Not if they're

17   innocent.  Not if it was an accident.  A gun owner's reaction

18   for killing their friend is not to tell lie after lie and deny

19   that anything that paints this as a murder ever even existed.

20           Now, this is rebuttal.  And I really try and keep it to

21   just rebutting what the defense said and not go off into

22   everything else, because you're probably tired of us talking

23   after a month.  I do get the last word, and I always take that

24   opportunity, at home and at work.  But I'm going to try and keep

25   this quick and flow through things the way they were presented.

26           And like I said, the defense goes through and calls the

27   defendant a dumb kid, but he's not a dumb kid.  He's actually

28   quite sophisticated.  And I don't say that as in sophisticated

1    like someone who plans some huge bank robbery or something, but

2    he was at the police department being questioned by a detective

3    who had been doing this for decades for ten-plus hours and he

4    never told the truth.  He didn't break.  That's not some silly

5    dumb kid.  That's not some silly scared kid.

6            He tells an accident story, but he keeps modifying it

7    trying to fit the evidence until he picks a story here for us

8    that now fits the evidence.  And that's why I said you can use

9    instruction 362 and disregard it.  You don't have to.  You're

10   not forced to plug that into all the evidence that you know to

11   be true.

12           Defense talks some about his reaction in the house.

13   And you'll notice that in my first closing I didn't go through

14   who took that path through the house, because we may never know

15   if Nicholas ever stepped a foot out of the house.  We have what

16   appears to be a footprint, but law enforcement didn't test it.

17   So there are these things that we will never know because only

18   two people were in that house.  No cameras.  Right?

19           But what we do know is that the defendant at least

20   behaved remorseful.  And it is natural that someone who kills

21   someone they cared about will regret it afterwards.  And I just

22   want to point out for you that someone regretting it afterwards

23   doesn't change premeditation, deliberation, and intending to

24   kill.  Regretting something afterwards is natural.  It's human

25   nature, especially when you know punishment can come next.

26           And he was -- appeared to be very remorseful in that

27   scene.  When we watched that video, he didn't look too

28   remorseful as he's sitting there covered in Nicholas's blood

1    calling Nicholas a meth addict and blaming Nicholas for his own

2    death.

3              Defense said some things about the text messages, and

4    you were all -- you were all at the trial, so I don't have to

5    reiterate it all, but you remember the deputy, there was a tech

6    guy, Grotefend, testified, and I went through every text message

7    from the 6th to the 8th or 9th, whatever was the last one.

8    Every text message until before Nicholas died.

9              We didn't just highlight certain text messages.  We've

10   always accepted that there were messages.  And then there was

11   the videos on the 7th where they're hanging out.  And then there

12   were messages and phone calls.

13             And that does not change anything about the motive or

14   their argument, because people are complicated.  Relationships

15   are complicated.  It would be a nice clean simple case that's

16   totally unrealistic if you just said, "I'm going to shoot you,"

17   and then drove over there and shot them.  We'd love that, right?

18             But that's not human nature.  People fight and they

19   make up and then they still stay mad about things.  And we don't

20   know the dynamic of what happened on that 27-minute phone call,

21   because that's one thing nobody talked about.  The defendant got

22   up there.  He could have told us the truth about what happened

23   on that call, but he doesn't tell the truth.  So we don't know

24   if they were fighting or if they were unhappy with each other or

25   anything.

26             But what we do know -- and if you're tired, we can take

27   a break.

28             What we do know is that the defendant takes this gun to

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 976

1    Nicholas's house and he kills him with it.

2            Now, defense went on to talk about his gun choice.  And

3    people use different weapons for different reasons.

     Miss Blumenthal makes great arguments about why she would have

5    taken which gun, but that's not what the defendant said.  What

6    Counsel can't do is testify and become new evidence.  As a

7    matter of fact, if you try and read our closing arguments, you

8    won't get them back, because they're not evidence.  We're not

9    the testimony.

10           And she said some great things, but the defendant

11   didn't say them.  See, the defendant didn't say that he's

12   reckless with guns that's why he's like that.  He did this like

13   he did that video.  That's not at all what he's saying.

14           So why did we watch those videos?  We watched them so

15   they would make you think he's a dumb kid.  He said that what

16   happened in that room had nothing to do with the behavior that

17   was shown on those videos.  That is the defense trying to insert

18   testimony, insert new facts.

19           Another new fact is why he would have chosen a handgun.

20   She says if you were going to secretly kill someone, you would

21   have taken a handgun.  But people kill people with different

22   weapons that they have access to.  They choose bats.  They

23   choose to hang people.  They choose stabbings.  And we never

24   know exactly what's in a killer's mind unless they tell us, and

25   this one won't tell us.

26           But what we do know is for whatever reason, he chose

27   that shotgun, and he chose to take buckshot rounds over there.

28   And that indicates what he's going to do with it when he has a

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 977

1    skeet gun and he has access to bird shot.

2         The defense also goes into that he didn't leave and

3    saying that, well, the fact that he's still there instead of

4    running off means that he -- that it really was an accident.

5         Well, what did he stay there and do?  If he stayed

6    there and truly just tried to help Nicholas and told what had

7    happened, then, yes, we could believe that.

8         But if you stay there and already have a lie together

9    where you say it's suicide and you blamed him, then that's just

10   as bad as leaving.  That shows consciousness of guilt just like

11   leaving would have.  And that's why the Court has that

12   instruction.

13        And this is another moment where I thought Counsel is

14   testifying, making up things that never occurred, never

15   interpreted.  She said that our theory is Houston wants to get

16   some and goes over and kills him after being rejected.  It's the

17   first time any of us heard anything like that.  No one said

18   Houston was coming over there to get some.  I'm assuming she

19   means sex.

20        What we know about the nature of their relationship is

21   just what's included in those messages and how he interprets it

22   when he talks to Samuel Murillo.  The defense says that a cold

23   sore can be interpreted different ways.  But how did the

24   defendant interpret it when he's not in court and having a

25   motive to lie?  How did he interpret it when he's talking to

26   Samuel Murillo?  He interpreted it as an STD that he told

27   Nicholas about.

28        The defense said that I never talked about any of the

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 978

1     text messages after the one sent on November 6th.  But you'll

2     remember you were shown Exhibit 285, which were on the 6th

3     through the 8th, Instagram messages that Ana McCauley saw.

4     Exhibit 286, which shows the 8th.  And I talked about and showed

5     Exhibit 287, which is also sent on the 8th.

6          Then I went through all of the text messages from

7     Nicholas's phone from the 6th through the 8th.  So that's just

8     simply not true.  I'm not trying to hide from it.  The evidence

9     is what it is.

10          The defense also said that -- that we argued that they

11     didn't see each other all weekend, and that's not true.  And we

12     didn't argue that they -- that there is no evidence that they

13     saw each other on the weekend.  That's not true.  What I said is

14     the only evidence that the defendant and the victim hung out on

15     Monday before his death is the defendant's word, and he's a

16     liar.

17          Defense discussed the lying in wait instruction.  And

18     you'll get all the instructions.  I'm not going to belabor the

19     point.  And she said lying in wait means that a person's sitting

20     there waiting.  That the defendant would have had to have been

21     sitting there waiting in the car for Ana McCauley to leave.

22          But you read lying in wait and what it requires, that

23     he concealed his purpose from the person killed.  He waited and

24     watched for an opportunity to act, and then from a position of

25     advantage, he intended to and did make a surprise attack on the

26     person killed.

27          Nowhere does it say he was sitting outside in his car.

28     And in nowhere is that required.  And never did I make that

1    argument for you.

2              Based on their relationship, and if he still held an

3    intent to shoot Nicholas, which he ends up doing, and didn't

4    tell Nicholas that, you could see why Nicholas responds and

5    continues to hang out with him.  And you can use that as one of

6    your theories for how you determine first-degree murder.

7              Defense also said that someone in the defendant's

8    position would be so remorseful they become hysterical.  And she

9    used the word "histrionic."  Something like that.  I probably

10   can't say it right, but they would become hysterical.  And that

11   that hysteria is what led him to lie.

12             Hysteria does not lead people to lie.  Lying requires a

13   thought and thinking.  And to give a detailed lie like he did,

14   it requires processing and thinking.  If you're hysterical,

15   you're just going to tell the truth.  But the defendant never

16   wants to tell the truth, because he doesn't want to get into

17   trouble.

18             Defense goes on to say that there is not enough to show

19   intent to kill.  And that the text messages are just a joke.

20   And now I'm saying remember the text messages.  I don't think

21   you should disregard any piece of evidence.  But those text

22   messages are not the end-all to be-all in how you know that he

23   intended to kill him.

24             Even without the text messages, a case where a man arms

25   himself, takes shotgun rounds, goes to someone's house when no

26   one else is going to be home and shoots him, that's still enough

27   to show premeditated murder.  And then you have additional

28   things that help support that.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 980

1          Defense talks about there is no motive, but that means
2     you're totally disregarding everything you know about what the
3     defendant texted to Nicholas and about what he told Samuel
4     Murillo.  And there is no reason for you to disregard that
5     evidence.  And I don't have to prove to you a motive, as the
6     instruction says.  But the motive can help you in understanding
7     why something may have been done.
8          But you'll never know for a hundred percent sure why
9     the defendant did this, because he won't tell us and Nicholas is
10    not alive to tell us.
11         Defense went on to say that the physical evidence
12    supports the idea that all the rounds were expended after
13    Nicholas was shot because there was no blood on them.
14         MS. BLUMENTHAL:  Objection.  That's not what I said.
15         THE COURT:  Overruled.
16         MS. FOSTER:  Because there was no blood on them.  I'm
17    showing you People's 18.  I'm sorry.  People's 7.  And it was
18    Exhibit 18.
19         And this is why it's important that you don't just
20    listen to the words of counsel, but you look at the evidence for
21    yourself.  Because there is definitely red, what could possibly
22    be blood on the cap of that bullet.
23         And the point I make there is Counsel was saying things
24    about pools of blood and where the bullets are after having
25    heard that medical intervention was had and things could have
26    been moved, and after having heard testimony from Investigator
27    Dean that large pool of blood probably came from his arm.  And
28    that's why Counsel is not the expert.  Counsel is not the

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 981

```
 1    witness.  Follow the evidence and not what the arguments you
 2    heard.
 3              Defense also showed Mistake of Fact.  And that's
 4    CALCRIM 3406 that the Court's going to give you.  And she was
 5    correct in mistake of fact does not apply to murder.  And she
 6    read it to you, so I'm not going to read it all again, but for
 7    mistake of fact, you have to find that the defendant believed
 8    that no shells were in the chamber, and he did not have a
 9    specific intent or mental state for murder.
10              What evidence is there that the defendant believed
11    there were no shells in the chamber?  His word.  That's it.  His
12    word.  The person in here with a motive to lie.  The person who
13    has lied repeatedly before.  His word is the evidence that he
14    didn't know there was a round in the gun.
15              We already talked about that you can reject his word,
16    and you should reject his word because he's repeatedly lied.
17    And there is no reason for us to believe he's telling the truth
18    now.
19              Defense also put up CALCRIM 510, which is Excusable
20    Homicide: Accident, meaning it's excusable.  You can kill this
21    person because it was an accident.
22              The defendant was doing a lawful act in a lawful way.
23              The defendant was acting with the usual and ordinary
24    caution.
25              And the defendant acting without any unlawful intent.
26              Everything in this case says the opposite of those
27    three elements.  Even the defendant's own words that he put the
28    gun facing Nicholas under his arm and had his finger near the
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 982

```
1    trigger is not acting with usual and ordinary caution.  This is
2    not an excusable homicide.
3         The defense talks about two reasonable interpretations
4    and that if you find that there is two reasonable
5    interpretations of the evidence, like it says on her chart, and
6    one points to innocence and one points to guilt, you must accept
7    the one that points to innocence; however, when considering --
8    I'm sorry.  It's the other one.
9         Hold on.
10        It goes on to say that you only have to accept what is
11   reasonable.  You don't have to accept things that are
12   unreasonable.  And is the defendant's accident story reasonable
13   after he's told multiple accident stories?  It's not.  Because
14   if it was the truth, he would have told it the first time he
15   told the story about it being an accident.
16        Defense emphasized that he told one truth.  Or one of
17   the truths that she says he told was that he kept saying "I'm
18   not a murderer.  I'm not a murderer."  And let's remember the
19   circumstances of that.  That was on Track 6.  That was on his
20   third version of the story.
21        He was telling the officers as they told him he was
22   going to be arrested for murder "I'm not a murderer.  I'm not a
23   murderer.  You said that it could be a suicide, accident or
24   murder.  You have to believe me.  I'm not a murderer."  And as
25   he's saying that, he's lying.  He even admits that he was lying
26   when he said that.  He was lying about another accident story
27   that is still different from the one he gave in court.
28        And the thing that stands out a lot during this case is
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 983

```
 1   the defendant's lies.  Right?  And why should we believe him
 2   now?
 3           But in the mist of that, you shouldn't forget that
 4   Nicholas McCauley lost his life on November 10th.  Too many
 5   times jurors sit in the courtroom and they just sit here and
 6   they're looking at the defendant day after day, and they forget
 7   about the victim in the crime.  They forget that Nicholas
 8   McCauley was only an 18-year-old boy when he was shot.
 9           MS. BLUMENTHAL:  I'm going to object as to this line of
10   argument.
11           THE COURT:  Overruled.
12           MS. FOSTER:  That Nicholas McCauley was only an
13   18-year-old boy when he was shot and it went through his chest,
14   tearing apart his insides, his heart and his lungs, and that his
15   life was ended that day.  No future for him.
16           And Nicholas McCauley was shot by who he thought was
17   his best friend.  No matter what argument they had, no matter
18   what disagreements, no matter what relationship, he was shot by
19   someone that he did not suspect.
20           And the defendant's actions are not excusable.  They're
21   not justifiable.  And they do not excuse murder, the murder that
22   he committed.
23           And now we're done.  We're done talking to you.  This
24   is your opportunity, and we just ask you to deliberate properly.
25   That means don't bring out any outside information.  Stay open
26   and listen to each other.  Don't use things that were not in
27   evidence.  And use your common sense in determining whether or
28   not the defendant is guilty of murder in the first degree and
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 984

 1    personally using a firearm.  Thank you.

 2           THE COURT:  Thank you, Counsel.

 3           All right, ladies and gentlemen.  I have a couple more

 4    jury instructions to give you at this time.

 5           Homicide is the killing of one human being by another.

 6    Murder and manslaughter are types of homicide.  The defendant is

 7    charged with murder.  Manslaughter is a lesser offense to

 8    murder.

 9           A homicide can be lawful or unlawful.  If a person

10    kills with a legally valid excuse or justification, the killing

11    is lawful and he has not committed a crime.  If there is no

12    legally valid excuse or justification, the killing is unlawful

13    and, depending on the circumstances, the person is guilty of

14    either murder or manslaughter.  You must decide whether the

15    killing in this case was unlawful and, if so, what specific

16    crime was committed.  I will now instruct you in more detail on

17    what is legally permissible excuse or justification for

18    homicide.  I will instruct you on the different types of murder

19    and manslaughter.

20           The defendant is not guilty of murder or manslaughter

21    if he killed someone as a result of accident or misfortune.

22    Such a killing is excused, and therefore not unlawful if:

23           1.  The defendant was doing a lawful act in a lawful

24    way;

25           2.  The defendant was acting with usual and ordinary

26    caution; and

27           3.  The defendant was acting without any lawful --

28    unlawful intent.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 985

1          A person acts with usual and ordinary caution if he

2     acts in a way that a reasonably careful person would act in the

3     same or similar circumstance or situation.

4          The People have the burden of proving beyond a

5     reasonable doubt that the killing was not excused.  If the

6     People have not met this burden, you must find the defendant not

7     guilty of murder or manslaughter.

8          The defendant is charged in Count 1 with murder in a

9     violation of Penal Code section 187.

10          To prove the defendant is guilty of this crime, the

11     People must prove that:

12          1.  The defendant committed an act that caused the

13     death of another person; and

14          2.  When the defendant acted, he had a state of mind

15     called malice aforethought; and

16          3.  He killed without lawful excuse or justification.

17          There are two kinds of malice aforethought, express

18     malice and implied malice.  Proof of either is sufficient to

19     establish the state of mind required for murder.

20          The defendant acted with express malice if he

21     unlawfully intended to kill.

22          The defendant acted with implied malice if:

23          He intentionally committed an act;

24          2.  The natural and probable consequences of the act

25     were dangerous to human life;

26          3.  At the time he acted, he knew his act was dangerous

27     to human life; and

28          4.  He deliberately acted with conscious disregard for

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 986

1   human life.

2        Malice aforethought does not require hatred or ill will

3   toward the victim.  It is a mental state that must be formed

4   before the act that causes death is committed.  It does not

5   require deliberation or the passage of any particular period of

6   time.

7        If you decide the defendant committed murder, it is

8   murder of the second degree, unless the People have proved

9   beyond a reasonable doubt that it's murder of the first degree

10  as defined in jury instruction 521.

11       521.  The defendant has been prosecuted for

12  first-degree murder under two theories:  The murder was willful,

13  deliberate, and premeditated; and, 2, the murder was committed

14  by lying in wait.

15       Each theory of first-degree murder has different

16  requirements, and I will instruct you on both.

17       You may not find the defendant guilty of first-degree

18  murder unless all of you agree that the People have proved the

19  defendant committed murder.  But all of you do not need to agree

20  on the same theory.

21       A.   Deliberation and premeditation.

22       The defendant is guilty of first-degree murder if the

23  People have proved that he acted willfully, deliberately, and

24  with premeditation.  The defendant acted willfully if he

25  intended to kill.  The defendant acted deliberately if he

26  carefully weighed the considerations for and against his choice

27  and, knowing the consequences, decided to kill.  The defendant

28  acted with premeditation if he decided to kill before completing

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 987

1    the acts that caused death.

2         The length of time the person spends considering

3    whether to kill does not alone determine whether the killing is

4    deliberate and premeditated.  The amount of time required for

5    deliberation and premeditation may vary from person to person

6    and according to the circumstances.  A decision to kill made

7    rashly, impulsively, or without careful consideration is not

8    deliberate and premeditated.  On the other hand, a cold,

9    calculated decision to kill can be reached quickly.  The test is

10   the extent of the reflection, not the length of time.

11        B.   Lying in wait.  The defendant is guilty of first

12   degree murder if the People have proved that the defendant

13   murdered while lying in wait or immediately thereafter.  The

14   defendant murders by lying in wait if:

15        1.   He concealed his purpose from the person -- from

16   the person killed;

17        2.   He waited and watched for an opportunity to act;

18   and

19        3.   Then from a position of advantage, he intended to

20   and did make a surprise attack on the person killed.

21        The lying in wait does not need to continue for any

22   particular period of time, but its duration must be substantial

23   enough to show a state of mind equivalent to deliberation or

24   premeditation.  Deliberation means carefully weighing the

25   considerations for and against a choice and, knowing the

26   consequences, decided to act.  An act is done with premeditation

27   if the decision to commit the act is made before the act is

28   done.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 988

1          A person can conceal his purpose even if the person

2     killed is aware of the person's physical presence.

3          A concealment can be accomplished by ambush or some

4     other secret plan.

5          The requirements for second-degree murder based on

6     express or implied malice are explained in CALCRIM 520.  First

7     or second-degree murder with malice aforethought.

8          The People have the burden of proving beyond a

9     reasonable doubt that the killing was first-degree murder rather

10    than a lesser crime.  If the People have not met this burden,

11    you must find the defendant not guilty of first-degree murder

12    and the murder is second-degree murder.

13         When a person commits an unlawful killing but does not

14    intend to kill and he does not act with conscious disregard for

15    human life, then the crime is involuntary manslaughter.

16         The difference between other homicide offenses and

17    involuntary manslaughter depends on whether the person was aware

18    of the risk to life that his actions created and consciously

19    disregarded that risk.  An unlawful killing resulted from the

20    willful act committed without intent to kill and without

21    conscious disregard of the risk to human life is involuntary

22    manslaughter.

23         The defendant committed involuntary manslaughter if:

24         1.  The defendant committed a lawful act in an unlawful

25    manner;

26         2.  The defendant committed the act with criminal

27    negligence; and

28         3.  The defendant's acts caused the death of another

1   person.

2          The People also allege the defendant committed the

3   following unlawful act with criminal negligence:  Possession of

4   firearm.

5          Criminal negligence involves more than ordinary

6   carelessness, inattention, or mistake in judgment.  A person

7   acts with criminal negligence when:

8          1.  He acts in a reckless way that creates a high risk

9   of death or great bodily injury; and

10          2.  A reasonable person would have know the act -- that

11   acting in that way would create such a risk.

12          In other words, a person acts with criminal negligence

13   when the way he acts is so different from the way an ordinary

14   careful person would act in the same situation that his act

15   amounts to disregard to human life or indifference to the

16   consequences of that act.

17          In order to prove more -- murder, the People have the

18   burden of proving beyond a reasonable doubt the defendant acted

19   with intent to kill or with conscious disregard for human life.

20   If the People have not met either of these burdens, you must

21   find the defendant not guilty of murder.

22          You will be given verdict forms for --

23          The defendant is not guilty of murder if he did not

24   have the intent or mental state required to commit the crime

25   because he reasonably did not know a fact or reasonably

26   mistakenly believed a fact.

27          If the defendant's conduct would have been lawful under

28   the facts as he reasonably believed them to be, he did not

1  commit murder.

2       If you find the defendant believed that no shells were

3  in the chamber, he did not have the specific intent or mental

4  state required for murder.

5       If you have a reasonable doubt about whether the

6  defendant had the specific intent or mental state required for

7  murder, you must find him not guilty.

8       You will be given verdict forms for guilty and not

9  guilty of first-degree murder, second-degree murder, and

10  involuntary manslaughter.

11      You may consider these different kinds of homicide in

12  whatever order you wish, but I can only accept a verdict of

13  guilty or not guilty of second-degree murder only if all of you

14  have found the defendant not guilty of first-degree murder, and

15  I can accept a verdict of guilty or not guilty of involuntary

16  manslaughter only if all of you have found the defendant not

17  guilty of both first and second-degree murder.

18      As with all the charges in this case, to return a

19  verdict of guilty or not guilty on a count, you must agree on

20  that decision.

21      You must all agree on that decision.

22      Follow these instructions before you give me any

23  completed and signed verdict forms.  Return the unused verdict

24  forms to me unsigned.

25      1.  If all of you agree that the People have proved

26  beyond a reasonable doubt that the defendant is guilty of

27  first-degree murder, complete and sign that verdict form.  Do

28  not complete or sign any other verdict forms.

```
1          2.  If all of you cannot agree whether the defendant is
2     guilty of first degree murder, inform me that you cannot reach
3     an agreement and do not complete or sign any verdict forms.
4          3.  If all of you agree the defendant is not guilty of
5     first-degree murder, but also agree the defendant is guilty of
6     second-degree murder, complete and sign the form for not guilty
7     of first degree murder and the form for guilty of second-degree
8     murder.  Do not complete or sign any other verdict forms.
9          4.  If all of you agree the defendant is not guilty of
10    first-degree murder, but cannot agree whether the defendant is
11    guilty of second-degree murder, complete and sign the form for
12    not guilty of first-degree murder, and inform me that you cannot
13    reach further agreement.  Do not complete or sign any other
14    verdict forms.
15         If all of you agree the defendant is not guilty of
16    first-degree murder, and not guilty of second-degree murder, but
17    also agree the defendant is guilty of involuntary manslaughter,
18    complete and sign the forms for not guilty of first-degree
19    murder and not guilty of second-degree murder and the form for
20    guilty of involuntary manslaughter.  Do not complete or sign any
21    other verdict forms.
22         If all of you agree the defendant is not guilty of
23    first-degree murder and not guilty of second-degree murder, but
24    cannot agree whether the defendant is guilty of involuntary
25    manslaughter, complete and sign the forms for not guilty of
26    first-degree murder and not guilty of second-degree murder, and
27    inform me that you cannot reach further agreement.  Do not
28    complete or sign any other verdict forms.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 992

1        If all of you agree the defendant is not guilty of

2   first-degree murder, not guilty of second-degree murder, and not

3   guilty of involuntary manslaughter, complete and sign the forms

4   for not guilty for each crime.  Do not complete or sign any

5   other verdict forms.

6        If you find the defendant guilty of the crime in charge

7   1 (sic), you must then decide whether the People have proved the

8   additional allegation the defendant personally and intentionally

9   discharged a firearm during the crime causing death.

10        To prove this allegation, the People must prove that:

11        1.  The defendant personally discharged a firearm

12   during the commission of that crime;

13        2.  The defendant intended to discharge the firearm;

14   and

15        3.  The defendant's act caused the death of a person.

16        A firearm is any device designed to be used as a weapon

17   from which a projectile is discharged or expelled through a

18   barrel by the force of an explosion or from combination.

19        An act causes death if the death is the direct,

20   natural, and probable consequence of the act and the death would

21   have not happened without the act.  A natural and probable

22   consequence is one that a reasonable person would know is likely

23   to happen if nothing unusual intervenes.  In deciding whether a

24   consequence is natural and probable, consider all the

25   circumstances established by the evidence.

26        The People have the burden of proving each allegation

27   beyond a reasonable doubt.  If the People have not met this

28   burden, you must find that the allegation has not been proved.

1        When you go to the jury room, the first thing you

2   should do is choose a foreperson.  That foreperson should see to

3   it that your discussions are carried out in an organized way and

4   that everyone has a chance to be heard.

5        It is your duty to talk to one another and to

6   deliberate in the jury room.  You should try to agree on a

7   verdict, if you can.  Each of you must decide the case for

8   yourself, but only after you discussed the evidence with the

9   other jurors.  Do not hesitate to change your mind if you become

10  convinced that you are wrong.  But do not change your mind just

11  because other jurors disagree with you.

12       Keep an open mind.  Openly exchange your thoughts and

13  ideas about this case.  Stating your opinions too strongly at

14  the beginning or immediately announcing how you plan to vote may

15  interfere with an open discussion.  Treat one another

16  courteously.  Your role is to be an impartial judge of the

17  facts, not to act as an advocate for one side or the other.

18       As I've told you at the beginning of the trial, do not

19  talk about the case or about any of the people or any subjects

20  involved in it with anyone, including, but not limited to, your

21  spouse, family, friends, spiritual leaders or advisors, or

22  therapists.  You must discuss the case only in the jury room and

23  only when all jurors are present.  Do not discuss your

24  deliberations with anyone.  Do not communicate using the

25  Internet or social media during deliberations.  Keep your cell

26  phones turned off.

27       It is very important that you do not use the Internet,

28  a dictionary, or any other source of information in any way in

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 994

```
 1    connection with this case during deliberations.

 2           During the trial, several items were received in

 3    evidence as exhibits.  You may examine whatever exhibits you

 4    think will help you in your deliberations.  These exhibits will

 5    be sent -- well, actually, these exhibits will be sent in the

 6    jury deliberation room when you begin to deliberate except

 7    Exhibit 269.  That is the shotgun.  If you want to make a

 8    request to view and examine the shotgun, you must make that

 9    request in writing, and we'll make sure you have an opportunity

10    to do so.  That's the only exhibit that will not be provided at

11    this time.

12           THE CLERK:  Your Honor, there is also the shotgun

13    shells.

14           THE COURT:  And what exhibit is that?

15           THE CLERK:  271 through 281.

16           THE COURT:  And Exhibits 271 through 281 will not be

17    sent with you in the jury deliberation room.  If you want to

18    make a request, that's fine, make that request and we'll figure

19    it out.  We'll have you an opportunity to look at it and touch

20    it and view it.  Those are the only two exceptions.

21           If you need to communicate with me while you're

22    deliberating, send a note through the bailiff signed by the

23    foreperson or by one or more members of the jury.  To have a

24    complete record of this trial, it is important that you do not

25    communicate with me except by written note.  If you have

26    questions, I will talk with the attorneys before I answer them,

27    so it may take some time.

28           I have a busy schedule tomorrow.  I have over 16 case,
```

1    eight motions.  So if you do have a question, it's going to take

2    some time.  Continue deliberating.  You should continue

3    deliberations while you wait for my answer.  I will answer any

4    questions in writing or orally here in open court.

5          Do not reveal to me or anyone else how the vote stands

6    on the question of guilt or issues in this case unless I

7    personally ask you to do so.

8          Your verdict on each count and any special findings

9    must be unanimous.  That means that to return a verdict of -- to

10   return a verdict, all of you must agree to it.  Do not reach a

11   decision by the flip of a coin or any similar act.

12         It has not been my role to tell you what your verdict

13   should be.  Do not take anything I've said or done during the

14   trial as an indication of what I think about the facts, the

15   witnesses, or what your verdict should be.

16         You must reach your verdict without any consideration

17   of punishment.

18         You will be given verdict forms.  As soon as all the

19   jurors have agreed on a verdict, the foreperson must date, sign

20   the appropriate verdict forms, and notify the deputy.  If you

21   have -- if you are able to reach an unanimous decision on only

22   one or on some of the charges, fill in that verdict form only

23   and notify the deputy.  Return any unsigned verdict forms.

24         All right.  At this time I'm going to ask the deputy to

25   be sworn in.

26         THE CLERK:  Please raise your right hand.

27         Do you solemnly swear that you will take and keep this

28   jury in some private and convenient place for deliberation and

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 996

1  that you will allow no one to communicate with them or do so

2  yourself on any subject connected with this case, except to ask

3  them if they have arrived at a verdict, or when ordered to do so

4  by the Court, so help you God?

5          THE DEPUTY:  I do.

6          THE CLERK:  Thank you.

7          THE COURT:  Jurors 1 through 12, gather your personal

8  belongings and your notebooks and follow the deputy to the jury

9  deliberation room.

10              (Jurors excused to deliberate.)

11          THE COURT:  To the alternat juror:  The jury is now --

12  will begin deliberating, but you are still an alternate juror

13  and are bound by my earlier instructions about your conduct.

14          Do not talk about the case or about any of the people

15  or any subject involved in it with anyone, not even your family

16  or friends.  Do not have any contact with the deliberating

17  jurors.  Do not decide how you would vote if you were

18  deliberating.  Do not form or express an opinion about the

19  issues in this case unless you are substituted for one of the

20  deliberating jurors.

21          However, if you're called, you need to come back here

22  within 30, 45 minutes to begin deliberating.  If you don't

23  receive a call from us, we will let you know the outcome of this

24  case, all right?

25          So with that, I want to thank you for your patience.

26  This was a long trial.  It had a lot of ups and downs.  We had a

27  lot of breaks.  So I want to thank you for your service at this

28  time.  Thank you.

```
 1                    (Alternate juror excused.)
 2          THE COURT:  All right.  Back on the record.  We do have
 3    your numbers?
 4          MS. FOSTER:  Yes.
 5          MS. BLUMENTHAL:  Yes.
 6          THE COURT:  All right.  So anything that we need to put
 7    on the record at this time?
 8          MS. FOSTER:  No.  Just Counsel and I need to review
 9    this video for 333.
10          THE COURT:  All right.
11          MS. BLUMENTHAL:  The other thing we probably do need to
12    put on the video -- put on the record is if there are questions
13    that come from the jury and we are able to resolve them between
14    counsel and the Court, there would be no need to have Mr. Boji
15    present.
16          THE COURT:  All right.  I'll accept that stipulation.
17          People?
18          MS. FOSTER:  And the People are leaving the laptop for
19    audio visual purposes.
20          THE COURT:  Yes, because we don't have one in the back.
21          MS. FOSTER:  And it is cleared, and defense counsel can
22    verify that.
23          THE COURT:  Do we have all the exhibits, madam clerk?
24          THE CLERK:  No.  They have them.
25          THE COURT:  All right.  We need to gather all the
26    exhibits.  All right.  Thank you.
27          MS. FOSTER:  Thank you.
28          MS. BLUMENTHAL:  Thank you, Your Honor.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 998

1          THE CLERK:  I need 333 separate, because I need to mark

2   it.

3                    (Proceedings concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 999

```
 1              RIVERSIDE, CALIFORNIA; JULY 17, 2018
 2              BEFORE THE HONORABLE SAMUEL DIAZ, JR.
 3              THE COURT:  Back on the record.  All parties are
 4   present.  All jurors are present.
 5              Who is the foreperson?  Juror No. 6?
 6              TJ06:  Yes.
 7              THE COURT:  Juror No. 6, has the jury reached a
 8   verdict?
 9              TJ06:  We have, your Honor.
10              THE COURT:  All right.  I want you to take a seat and
11   make sure all the paperwork is signed appropriately.  Make sure
12   it's signed with the correct date that the jury -- when the
13   jury decided the case.  And if everything is signed
14   appropriately, hand it to the deputy, please, with the
15   exhibits.
16              And then just for the record, it's Juror No. 6,
17   (TJ06).
18              Is that correct?
19              TJ06:  That is correct.
20              THE COURT:  Thank you.
21                              (Pause.)
22              THE COURT:  I'm asking the defendant and defense
23   counsel to please stand up for the verdict.
24              Madam Clerk, please read the verdict.
25              THE CLERK:  Superior Court of California, County of
26   Riverside.  The People of the State of California, plaintiff,
27   versus Houston Michael Boji, defendant, Case No. RIF1502741.
28   Verdict:  We, the jury, in the above-entitled action, find the
```

997

Jane E. Brugger, CSR

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 1000

1   defendant, Houston Michael Boji, not guilty of a violation of
2   section 187, subdivision (a), of the Penal Code, first-degree
3   murder, as charged under Count 1 of the information.  Dated,
4   7/16/2018.  Signed, Jury Foreperson Juror No. 6.
5           Ladies and gentlemen of the jury, is this your
6   verdict?
7           THE JURORS:  Yes (collectively).
8           THE CLERK:  Verdict:  We, the jury, in the
9   above-entitled action, find the defendant, Houston Michael
10  Boji, guilty of a violation of section 187, subdivision (a), of
11  the Penal Code, second-degree murder, as charged under Count 1
12  of the information.  Dated, 7/16/2018.  Signed, Jury Foreperson
13  Juror No. 6.
14          Ladies and gentlemen of the jury, is this your
15  verdict?
16          THE JURORS:  Yes (collectively).
17          THE CLERK:  Finding:  We, the jury, in the
18  above-entitled action, find the defendant, Houston Michael
19  Boji, in the commission and attempted commission of the offense
20  charged under Count 1 of the information, or of any of the
21  lesser offenses necessarily included therein, did personally
22  and intentionally discharge a firearm and proximately caused
23  great bodily injury or death to another person, not an
24  accomplice, within the meaning of Penal Code section 12022.53,
25  subdivision (d), and 1192.7, subdivision (c), subsection (8).
26  Dated, 7/16/2018.  Signed, Jury Foreperson Juror No. 6.
27          Ladies and gentlemen of the jury, is this your
28  finding?

998

```
 1              THE JURORS:  Yes (collectively).
 2              THE COURT:  All right.  Counsel and defendant, please
 3    take a seat.
 4              Madam Clerk, would you please poll the jurors?
 5              THE CLERK:  Ladies and gentlemen, as I call your
 6    number, please indicate if the verdict as read is your
 7    individual verdict.
 8              Juror No. 1?
 9              TJ01:  Yes.
10              THE CLERK:  Juror No. 2?
11              TJ02:  Yes.
12              THE CLERK:  Juror No. 3?
13              TJ03:  Yes.
14              THE CLERK:  Juror No. 4?
15              TJ04:  Yes.
16              THE CLERK:  Juror No. 5?
17              TJ05:  Yes.
18              THE CLERK:  Juror No. 6?
19              TJ06:  Yes.
20              THE CLERK:  Juror No. 7?
21              TJ07:  Yes.
22              THE CLERK:  Juror No. 8?
23              TJ08:  Yes.
24              THE CLERK:  Juror No. 9?
25              TJ09:  Yes.
26              THE CLERK:  Juror No. 10?
27              TJ10:  Yes.
28              THE CLERK:  Juror No. 11?
```

999

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 1002

```
 1              TJ11:  Yes.

 2              THE CLERK:  Juror No. 12?

 3              TJ12:  Yes.

 4              THE CLERK:  Please answer "yes" or "no" if the finding

 5    is your individual verdict.

 6              Juror No. 1?

 7              TJ01:  Yes.

 8              THE CLERK:  Juror No. 2?

 9              TJ02:  Yes.

10              THE CLERK:  Juror No. 3?

11              TJ03:  Yes.

12              THE CLERK:  Juror No. 4?

13              TJ04:  Yes.

14              THE CLERK:  Juror No. 5?

15              TJ05:  Yes.

16              THE CLERK:  Juror No. 6?

17              TJ06:  Yes.

18              THE CLERK:  Juror No. 7?

19              TJ07:  Yes.

20              THE CLERK:  Juror No. 8?

21              TJ08:  Yes.

22              THE CLERK:  Juror No. 9?

23              TJ09:  Yes.

24              THE CLERK:  Juror No. 10?

25              TJ10:  Yes.

26              THE CLERK:  Juror No. 11?

27              TJ11:  Yes.

28              THE CLERK:  Juror No. 12?
```

Jane E. Brugger, CSR

1      TJ12:  Yes.

2      THE COURT:  Madam Clerk, please record the verdict and

3  the allegation and the finding.

4      Ladies and gentlemen, I want to thank you for your

5  service.  I know this wasn't easy.  It's not easy to be a

6  judge, and this wasn't an easy trial.  We had a lot of times

7  where we were not in session and you had to review all the

8  evidence basically from the very beginning, so thank you for

9  your patience.

10     There's one jury instruction that I must give to all

11  of you at this time, and I'll read it into the record.

12     You've now completed your jury service in this case.

13  On behalf of all the judges, please accept my thanks for your

14  time and effort.

15     Now that the case is over, you may choose whether or

16  not to discuss the case and your deliberations with anyone.

17     Let me tell you about some rules the law puts in place

18  for your convenience and for your protection.  The lawyers in

19  this case, the defendant, or their representatives, may now

20  talk to you about the case, including your deliberations or

21  verdict.  Those discussions must occur at a reasonable time and

22  place and with your consent.  Please inform me, tell me

23  immediately if anybody unreasonably contacts you without your

24  consent.  Anyone who violates these rules is violating a court

25  order.

26     I now order that your personal identifying

27  information, including your names, your telephone numbers, your

28  address, be sealed until further order of the court.  If in the

1001

1  future the court is asked to decide whether this information

2  will be released, notice will be sent to any juror whose

3  information is involved.  You may oppose the release of this

4  information and ask any hearing on the release be closed to the

5  public.  The court will decide whether and under what

6  conditions any information may be disclosed.

7          At this time, I want to thank you for your service

8  again.  You have now -- you are now discharged.  Thank you very

9  much.  Thank you.

10   (Proceedings out of the presence of the jury as follows:)

11          THE COURT:  Back on the record.

12          We need to set a sentencing date.  The Court will

13  refer this matter to probation for a full report.  It's usually

14  20 calendar days.

15          If you want to waive time, we can do that,

16  Ms. Blumenthal, in order to also comply with Marsy's Law.

17          Both of you want to discuss a date?  So 20 calendar

18  days is August 6th.  That's the statutory period for

19  sentencing.

20          MS. BLUMENTHAL:  Your Honor, I believe that we would

21  be willing to waive time and have this set on Friday,

22  August 10th.  Although --

23                      (Counsel confer.)

24          THE COURT:  It's usually better on a Friday.  This is

25  going to be probably a lengthy sentencing.

26          MS. BLUMENTHAL:  That's what I was taking a look at

27  here, your Honor.  Friday, the 10th, would be a good date.

28          THE COURT:  Friday, the 10th.

```
 1              So, Mr. Boji, you have a right to be sentenced within
 2    20 judicial days from today's date.  Your lawyer wants to go
 3    beyond that date.  The last day for sentencing under the law is
 4    August 6th.  Your lawyer wants to extend that to August 10th.
 5    Do you understand your right?
 6              MS. BLUMENTHAL:  Your Honor, I believe that the 20
 7    days takes it to August 15th.
 8              THE COURT:  I'm sorry.
 9              Madam Clerk?
10              THE CLERK:  I'm sorry?
11                      (Court confers with clerk.)
12              THE COURT:  So it's within the statutory period.  You
13    want August 10th.  It's within the statutory period.  Do you
14    still want to keep that date?
15              THE CLERK:  August 14th.
16              THE COURT:  August 14th is the last day.
17                              (Pause.)
18              MS. BLUMENTHAL:  Maybe, with the Court's permission,
19    we would ask for the date of September 7th.  Mr. Boji is
20    willing to waive time until that date.
21              And I'm wondering because of the length of sentencing
22    if it might not be appropriate that we set it for 10:00, or
23    10:30, or something --
24              THE COURT:  That's fine.  We'll be here in the
25    morning, so let me know.  All right.  I'll be here doing other
26    things.
27              MS. FOSTER:  That's fine.
28              THE COURT:  Mr. Boji, at this time you have a right to
```

1003

Jane E. Brugger, CSR

1    be sentenced within 20 judicial days from today's date.  Your
2    lawyer wants to go beyond that.  Are you in agreement?
3             THE DEFENDANT:  Yes, sir.
4             THE COURT:  You agree your sentencing will be held
5    timely if it's held within -- if it's held on September 7th at
6    10:00 a.m.?
7             THE DEFENDANT:  Yes, sir.
8             THE COURT:  Counsel join?
9             MS. BLUMENTHAL:  Join.
10            THE COURT:  At this time, the Court will set no bail.
11   The defendant is pending sentencing.  The matter will be
12   referred to sentencing for a full report.  Thank you.
13            MS. BLUMENTHAL:  Thank you, your Honor.
14            MS. FOSTER:  Thank you.
15            THE COURT:  You're welcome.
16                      (Proceedings concluded.)
17
18
19
20
21
22
23
24
25
26
27
28

                                                              1004

Jane E. Brugger, CSR

```
 1              RIVERSIDE, CALIFORNIA; SEPTEMBER 7, 2018

 2              BEFORE THE HONORABLE SAMUEL DIAZ, JR.

 3         THE COURT:  All right.  Calling the matter of People

 4    versus Houston Boji, RIF1502741.

 5         Parties, please state your appearances.

 6         MR. MOORE:  Jeff Moore and Virginia Blumenthal for

 7    Mr. Boji.  He is present in custody.

 8         MS. FOSTER:  Sharunne Foster for the People.

 9         THE COURT:  Defense?

10         MR. MOORE:  Your Honor, we did have a request of the

11    Court to have Mr. Boji unshackled for the duration of the

12    sentencing hearing.

13         THE COURT:  All right.  I'll allow it.

14         Deputy?

15         THE DEPUTY:  Yes, Your Honor.

16                        (Brief pause.)

17         THE COURT:  All right.  Back on the record.  Defendant

18    is unshackled.

19         The matter is set for sentencing today.

20         Any legal cause?  Waive arraignment?

21         MR. MOORE:  Yes.  No legal cause.  We do waive formal

22    arraignment.

23         THE COURT:  All right.  People ready to proceed?

24         MS. FOSTER:  Yes, Your Honor.

25         THE COURT:  The Court has reviewed its notes during the

26    trial.  The Court has also reviewed and considered the probation

27    officer's sentencing recommendation.  And the Court is also in

28    receipt of defendant's -- defense counsel's invitation to
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 1008

1    exercise discretion pursuant to Penal Code section 1385 and

2    12022.53, subdivision (h).

3           Counsel, People, did you receive a copy of the request?

4           MS. FOSTER:  Yes, I did.

5           THE COURT:  All right.  The Court will order the

6    petition -- the request will be ordered filed with today's date.

7           People, do you want to proceed?

8           MS. FOSTER:  Yes, Your Honor.

9           Does the Court have an indicated for us prior to

10   beginning?

11          THE COURT:  The Court's indicated is to follow the

12   probation officer's recommendation.

13          MS. FOSTER:  I would submit on the probation officer's

14   recommendation.  I did want to point out to the Court the

15   vulnerability of this victim.  The nature of their relationship

16   put him in a particular vulnerable position in allowing the

17   defendant to be in the house.  And the callousness of this

18   crime.

19          There are several family members and friends that are

20   here to speak to the Court, and so if the Court would allow,

21   we'd call them at this time.

22          THE COURT:  Yes.  Pursuant to Marsy's Law, yes.

23          MS. FOSTER:  First, Your Honor, we have Carlos Alcala.

24          THE COURT:  Can you spell the last name for the record,

25   for madam court reporter?

26          MR. ALCALA:  A-l-c-a-l-a.

27          THE COURT:  Go ahead, sir.

28          MR. ALCALA:  Ever since about the 4th grade, Nicholas,

1    I never knew him then, but I'm describing just the method of

2    madness on the playground.  Something that day, ever since, you

3    know, there was a bond between me and him.  And ever since after

4    that, you know, it's been a brotherhood.  I consider lots of

5    people my brothers, but Nick, he definitely has a place in my

6    heart.

7           As an individual he seemed to, you know, not, you know,

8    the norm, you know.  That's how I was too.  But he was such a

9    cerebral person.  And like the way he conversed made him seem

10   that, you know, what?  Like what is he talking about?  But he

11   was just beyond intellectual wise.  And that I appreciated.  You

12   know, he gave it to you straight.

13          Seemed like he always had a plan, you know, that he

14   always reached for the top.  And that I admired about him.

15          And ever since we started playing football in our 8th

16   grade year and -- excuse me.  And ever since that, he was just

17   so -- he was just so helpful.  They treated me as family from

18   day one, and I never, you know, they were -- they were strangers

19   to me and I never expected them to treat me as kindly,

20   persevering to somebody just, you know, they just met barely a

21   few weeks ago prior to that in our 8th grade year.

22          And he always, always wanted to help.  Like I always

23   asked him questions like, hey, when they wanted me to switch to

24   offensive line, like, "Hey, Nick.  What do I do here?  What do I

25   do there?"  Like he could have been selfish and been like, well,

26   you know, dig in your playbook.  Learn for yourself.  But he

27   took the time and, you know, taught me firsthand and what to do.

28   And just the little things that he's done I appreciated.

```
 1          And just -- excuse me.  And just the fact that -- I'm
 2   sorry.  Well, what he's really meant to me was that, that beyond
 3   blood, beyond all that.  That he was -- he tried -- he treated
 4   everybody not how you're supposed to treat somebody, but he
 5   treated them how you wanted to be treated.  And that I'll never
 6   forget about him.
 7          There was just an aura around him that like, you know,
 8   you felt like it was, like you were going to get through it or
 9   whichever like situation.  Like we were trying to get home and
10   he thought everything out.  And I was, well, like how are we
11   supposed to get home?  How are we supposed to do this?  But he
12   stuck to his wits and that was -- that was one thing that really
13   stands out to him.
14          There is time that, you know, it's sort of been
15   difficult like, like personally myself.  I don't really ask for
16   help, but with Nick, I felt like, you know, he -- he wouldn't
17   mind, you know, that, oh, you know, like I didn't want to burden
18   people, but with Nick it felt just -- it felt right.  And that
19   I'll always remember about him.
20          THE COURT:  Thank you.  Thank you, sir.
21          MS. FOSTER:  Your Honor, next up who would like to
22   speak is Dr. Veronica Santee.  S-a-n-t-e-e.
23          DR. SANTEE:  Good morning.
24          THE COURT:  Good morning.
25          DR. SANTEE:  I'd like to say thank you for allowing me
26   to address the Court.
27          This morning I dropped my son off at RCC.  He got out
28   of the car.  And I rolled my window down and said, "Hey."  He
```

1    looked back and said, "Huh?"  And I said, "I love you."  He

2    said, "I love you too, mom."  Nick can't say that to Ana

3    anymore.

4           My heart is broken because Ana's heart is broken.

5    There are thousands of us.  My mom, she's very sad.  It hurts.

6    As a mom, it hurts.  That's my friend.  She'll never be the

7    same.  I work really hard, let's just go to the movie.  Let's go

8    shopping.  Let's do this.  Sometimes she's good.  Sometimes she

9    does.  She comes to my house.  She eats.  And then I made her

10   vegan food a couple weeks ago.  And some days, "I can't.  I

11   can't go outside.  I can't breathe."  I'm like, breath.  Just

12   breathe.  I just need you to fight for Nick.

13          I went to New York a couple years ago.  She said he's

14   never been.  So I'm going to go for him.  So I journaled Nick

15   every day.  And I went to a restaurant, and I'm like, oh, my

16   God, he would have loved this place, because they had big

17   everything, and he liked food.  And it was huge.  He would have

18   loved this place.  Everywhere I went, I journaled him every day,

19   because he never got a chance to see it.  So I saw it for him.

20          One of my friends said, "Who's Nick?"  So I told her

21   who Nick was.  He was 18 years old three years ago.  He's still

22   18.  It hurts.  My son is going to come home tonight, God

23   willing, and we're going to sit down.

24          We had a little crazy -- we weren't arguing, but it was

25   while my mom was on the phone in the car.  And he said, "Where

26   is -- you know where RCC is?"  I said, "I don't know where RCC

27   is.  I've never been there."  He said, "I've never been there

28   either, but I know where it is."  I'm like, "But I never had the

```
 1   need to go."  He said, "Me either, but I know where it is."  My
 2   mom says "You guys are so silly."
 3            Ana doesn't get to do that anymore.  Ever.  She can
 4   borrow my son, but it won't be the same.
 5            She loved that boy so much, and I, in my heart, I know
 6   if that was my son, I wouldn't be the same either.  It hurts so
 7   bad.  And it's not just with me, but everybody I speak to,
 8   people on our job, because we work together.  And we have other
 9   teachers and, you know, our coworkers with children, and it
10   breaks all of our hearts to know that she's so broken right now.
11            And Nick was given a death sentence for no reason.  And
12   for us, it hurts.  And, you know, we wouldn't want that.  I
13   wouldn't want that.  I don't believe that I would want that to
14   happen here, but I just think that justice has to be served, and
15   it has to be for Ana's sake and for our family, because we're
16   still family.  We may not look alike, but we're still family.
17   And we'll always be -- I'll always be there for her.
18            But holidays, birthdays, those days are never going to
19   be the same.  And we know if that was my son, and if you say
20   that to yourself, if that was my son, would I ever be the same?
21   No.  But what can we do about it?  And, you know, we just want
22   to make sure that whatever happens that she's going to be okay
23   with it.  That's all I ask.  Thank you.
24            THE COURT:  Thank you.
25            MS. FOSTER:  Next, Your Honor, is Miss Kim Williams.
26            And that's W-i-l-l-i-a-m-s.
27            MS. WILLIAMS:  Good morning, everybody.
28            THE COURT:  Good morning.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 1013

```
 1          MS. WILLIAMS:  Houston, I never thought I was going to

 2   meet you today this way.  I heard so much about you.  And he

 3   told me that you were his best friend and his brother and that

 4   you guys went to Hawaii together and that you really meant a lot

 5   to him.

 6          I will never forget the call that I got from my mother

 7   telling me that my brother was murdered in his bedroom.  And the

 8   whole thing just completely tore me apart, because he was the

 9   only thing that -- the only person that I had of my father,

10   which he is not in the picture.  I'm not much of a public

11   speaker, you can't tell, but I'm doing this today for my

12   brother.

13          Houston, I know that you've had plenty of time to think

14   about what you did, but that's the thing, you have time to think

15   and you ended time for my brother.

16          I had to make it in today avoiding -- from Phoenix

17   avoiding speeding tickets and having my partner by my side get

18   me here, because I wasn't mentally stable enough to really make

19   it in here today.

20          I wanted to meet the boy that murdered my brother.  I

21   had to look at you in the face, Houston, and you need to --

22   that's at least what I deserve is look at the guy that killed my

23   brother.

24          Not only did you rob me from a brother, but you robbed

25   Ana from a son, and you robbed Ana's entire family and our

26   family from a man that was truly going to be someone.

27          And Nicholas was extremely intelligent.  That guy could

28   play every damn instrument.  He was amazing.  He had such a
```

```
1    great spirit, and he -- one thing he believed in was justice and
2    the justice system.  He was a really good person, and he had a
3    very, very bright future.  His intelligence scared me.  I was a
4    little jealous of how smart he was.  When I met him, I was like,
5    damn, I didn't get that part.
6         When I met Nicholas, my heart was so warm and it's
7    thanks to you, Ana, for really making that happen.  It was the
8    best time of my life.
9         And I've never seen a guy eat so many hamburgers in his
10   life.  He was such -- he was so -- he literally looked like the
11   guy version of me and it was great.  At least I know the guy
12   version of me was very handsome.
13        I say "boy" because, Houston, you are one.  The only
14   man in this equation is the man that called you a brother and a
15   best friend before you decided to break into his home, tie up
16   the doors, and murder my 18-year-old brother in his fucking
17   sleep.  Excuse my language.  I'm sorry.
18        I'm so sorry.  You have no idea what you did to this
19   woman, Ana.  You killed her too in my eyes, because Ana was
20   absolutely amazing.  I had an absolute amazing time with her.
21        The only peace that I'm getting today is watching you
22   go away.  I don't need an apology, Houston, but the least you
23   can do is turn around and give this woman one.  I really hope
24   that you realize that your life can change in a blink of an eye,
25   just as Nicholas's life changed in a blink of an eye.
26        To me I believe you're sentenced to life as well.  When
27   you get out, you know that you're going to have a hard time
28   looking for a place and getting a job.  I don't know why you did
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 1015

1  what you did, but this just goes to show you again that your

2  life can always change with every decision you make.

3          I have nothing else to say, but I really hope you can

4  apologize to Ana.

5          THE COURT:  Thank you.

6          MS. WILLIAMS:  Thank you.

7          MS. McCAULEY-FOUNTAN:  My name is Susan

8  McCauley-Fountan.  I'm Nicholas's aunt.  And my brother is

9  Nicholas's father's.

10          MS. FOSTER:  Can you spell your last name?

11          MS. McCAULEY-FOUNTAN:  Yes.  My last name is

12  M-c-C-a-u-l-e-y hyphen F-o-u-n-t-a-n.

13          I too like Ana am a teacher, so we work closely

14  together.  And to lose a child is one of the worst things that

15  can happen to anybody.  My parents lost two of their kids and it

16  ruined them.  They lost their lives because they lost their son.

17  And this is like this cycle just needs to stop.

18          And what people can do to one another, Nick, how you

19  can do that to Nick, buddy, I don't know.  He was your friend

20  and you murdered your own friend.  That is just beyond sick.

21  And now you have the rest of your life to pay for it.  And

22  Buddha says "All life is suffering and then we reach nirvana,"

23  but you're never going to get your vana.  You're going down the

24  grease pole to you know where.

25          MR. MOORE:  Your Honor?

26          MS. McCAULEY-FOUNTAN:  I can't believe that you would

27  do this to someone and ruin Ana's life.  She had such promise in

28  this child.

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 1016

1          MR. MOORE:  Your Honor, I'd ask that the comments be

2     directed to the Court.

3          MS. McCAULEY-FOUNTAN:  Okay.  Sorry.  I'm a little

4     emotional.  I was going to do a script, but I thought that might

5     not work, so.

6          Like everyone said, Nick was a fabulous guy.  He had a

7     lot of promise.  He was very intelligent.  He was the apple of

8     Ana's eye.  He was the pride of his grandparents, and, you know,

9     now we're just all left with a really hollow feeling.  With a

10    hollow feeling.  And it's never going to get fixed.  This isn't

11    justice.  It's just never going to get fixed.

12         THE COURT:  Thank you.

13         MS. COSIDOR:  Good morning, Your Honor.

14         Okay.  My name is Orquidia Cosidor, the grandmother of

15    Nicholas McCauley.  My only grandson.  The apple of my eye.  The

16    best present that God gave me for me to fulfill a little bit in

17    my small family of only four.  Ana has lost five pregnancies

18    before.  My whole family was very happy with Nicholas.  But one

19    day everything changed.  The beauty in his eyes went away.

20    Wait.

21         Without thinking that the person was the person that he

22    called his brother, how wrong he was.  You committed treason,

23    against Nicholas, against Ana, my family.  Since Nicholas is not

24    here, our whole lives have changed.  We no longer have

25    Christmas, we no longer have Thanksgiving, we no longer have

26    birthdays.

27         I miss him a lot.  I miss his hugs, his kisses, his

28    smile.  His beautiful eyes.  I miss the good child he used to

```
 1   be.  A respectable boy.  Servicing.  He used to love sports,
 2   music, animals.
 3           You didn't think of the damage it was going to do to
 4   all of us, my family, and the pain you would cause to Ana.  You
 5   made her miss the biggest thing, which is the love of a son,
 6   which is the biggest thing in her life.  We lost everything for
 7   a bad decision that you took.
 8           I think you will remember Nicholas for your whole life
 9   because of what you did to him.  He used to tell me that you
10   were his brother.  With everything you did to my family, even
11   so, I do not wish any ill to you, but I also don't know when or
12   how I can give you my forgiveness.  Thank you.
13           THE INTERPRETER:  Your Honor, do you need the
14   interpreter's information?
15           THE COURT:  Yes, please.
16           THE INTERPRETER:  Milagro Rivas, court certification
17   No. 301507, Spanish language.  My oath is on file.
18           THE COURT:  Gracias.
19           MR. RODRIGUEZ:  Hi.  My name is Giovanni Rodriguez.  I
20   remember the first time I met Nicholas, me and my wife had just
21   moved into our home a couple houses away from Ana, and we get a
22   knock on the door.  I open it and there is this kid, little kid
23   selling chocolates.  And he was trying to raise money for his
24   band.  He was in his local school band.  And I'm real supportive
25   of any children being artistic.  So I said, "Yeah, you know,
26   give me a couple of chocolates."
27           A year later my wife and I had our first kid.  Her name
28   is Sienna.  And Nicholas and Ana were so supportive of us being
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 1018

1    new parents.  Anytime Sienna would be outside and would see

2    Nicholas walking his dogs, she would get so excited.  He would

3    come by and he'd spend time and play with Sienna.

4            Nicholas, he was bigger than life, literally.  He grew

5    up so tall and handsome.  And my daughter would always get so

6    excited to see Nicholas.  And he would always take the time to

7    stop by and play with her.  He had such a big heart.  So

8    intelligent.

9            And my daughter still asks about him.  And I don't have

10   the heart to tell her what happened.  What am I supposed to tell

11   her?  It's hard for me to tell her what happened to him knowing

12   how much she loved him.

13           He had so much potential.  I remember one of the last

14   times I saw him he came over because he needed a job application

15   printed.  He came over and asked if I could print it for him

16   because his printer ran out of ink.  And I remember he was

17   wearing this super nice suit.  And I was really impressed.  I

18   was like, wow, you're really going out for this interview.

19           And he asked me for some advice.  I sat down with him

20   and told him, whenever you have an interview, please, look at

21   the person in the eye.  Make eye contact.  Don't look away.

22   Don't be nervous.  Don't fiddle with your fingers.  Just be

23   yourself.  And he ended up getting that job.

24           And he had so much potential.  One of the smartest,

25   most gifted kids I've ever known.  And Ana was lucky to have

26   him.  And we were lucky to know him and have him be part of our

27   lives.

28           That's all I got to say.  I just really hope you take

```
 1    the time and really think about the potential this kid had and
 2    how many people he made a difference, a positive difference in
 3    their life.  Thanks.
 4             THE COURT:  Thank you.
 5             MS. FOSTER:  Your Honor, the last person to speak is
 6    Miss Ana McCauley.
 7             MS. McCAULEY:  Good morning, Your Honor.
 8             THE COURT:  Good morning.
 9             MS. McCAULEY:  My name is Ana McCauley.  I am the
10    mother of Nicholas McCauley.
11             Houston, you cannot know the pain I experience every
12    day, as I do not know yours.  But this is what you chose.  I
13    didn't choose it.  Nicholas didn't choose it.  You chose this
14    for all of us.
15             I loved my Nicholas.  He was my whole life, my only
16    son, my only child.  On November 10th, I woke up knowing I
17    shouldn't go to work.  The feeling of dread ran so deep, I felt
18    sick as I drove to work and thought of any and every reason to
19    return home, but I didn't.  And I will never forgive myself for
20    that.  I thought I had time.  The next day was Veteran's Day and
21    I'd have the day off of work to deal with what I had seen on the
22    message threatening to shoot Nicholas.
23             I hate writing you these words, because there are no
24    words in the language to express my loss.  I lost everything.  I
25    was so grateful for Nicholas.  I had had six miscarriages.  And
26    I always wanted a large family, but was blessed with only one
27    son.  One beautiful, handsome, funny, intelligent, gifted, and
28    bright son.
```

```
 1            You took him from me.  My family was small.  Nicholas

 2    was the only grandchild.  I don't think you'll ever be able to

 3    comprehend what you took from us, but, then again, you were

 4    there.  You were there to see my love and devotion and

 5    admiration for my son Nicholas.

 6            You betrayed me, Houston.  You betrayed Nicholas, and

 7    you betrayed your family.

 8            My heart breaks every day, not only for myself but for

 9    your family and for you.

10            On that hateful day, you made your stand when you took

11    that gun in my home.  Houston, every year is harder than the one

12    before.  When I was being told Nicholas was murdered, I couldn't

13    wrap my mind around it.  It had to be something else, someone

14    else, but it wasn't.  It was Nicholas dead and you the shooter.

15            I went into a weird state where I functioned but was

16    not present.  On December 26th, 2015, that's when it hit me that

17    my Nicholas was dead.  He was never coming back.  He was never

18    going to go back to school.  He was never going to hug me.  He

19    was never going to tell me he loved me, and he was never going

20    to call me mamacita.  It was over and that's when the reality

21    hit.

22            I couldn't work.  I didn't work for a year.  I couldn't

23    get out of bed.  I couldn't even shower.  I couldn't take care

24    of myself.  I prayed for death every night and couldn't believe

25    it when I woke up that I hadn't been taken.

26            The sadness was so deep, so heavy that I couldn't get

27    out of bed.  I planned every which way to kill myself.  I was

28    alone.  I'm still alone, and I still struggle to make it through
```

1    each day.  I still miss weeks of work at a time because I cannot

2    get out of bed.  I miss my Nicholas.

3         Houston, you will never know my loss.  I no longer want

4    to grow old.  I always feared being old with no family to take

5    care of me, and that's what I'm now facing.  Nicholas will never

6    marry, never have children.  I will never be a grandmother.  And

7    as a mother, I wondered if I could still call myself a mother

8    without a son.

9         When you killed Nicholas, you killed me too.

10        I'm grateful for one thing.  God spoke to me the night

11   before Nicholas died.  I was laying in bed ready to go to sleep

12   when suddenly I had the feeling I should get up and go to

13   Nicholas.  I followed my instinct.  I went to his room, I hugged

14   him, and I told him how much I loved him and how proud I was of

15   him.  I hugged him tightly.  He told me, "I love you, mamacita."

16   And what I felt odd was that I stopped hugging first.

17        The next morning I couldn't shake the feeling that

18   something was wrong.  I didn't want to go to work, but I did,

19   and I will never be able to forgive myself for that.  I live

20   every day asking myself why I didn't just stay home.  It's

21   torture.  I feel responsible.  I hate that I didn't follow my

22   instinct, because not 15 minutes later my only son was gone.

23        You chose to make this his last day on earth.  You

24   chose to make this his destiny, my destiny, and your destiny.

25        His room is still the same.  His clothes are hanging in

26   his closet, underwear in his drawers, musical instruments,

27   speakers, and all schoolwork all in its place.  I can't let go.

28   I won't let go.  He is still in his room.  I couldn't afford to

```
 1   bury him.  I couldn't leave him alone.  I had to cremate him and
 2   bring him home with me.
 3        Now I struggle knowing it's time to lay him to rest.
 4   It's time to lay him down for eternity, alone, until I am placed
 5   with him in one plot.  One headstone, one mother, one son.
 6   Together through the end of time.
 7        The only thing I look forward to is seeing my son
 8   again.  I still call out his name.  I still kiss his ashes every
 9   day.  I play music for him.  I hug his urn, and I pray over the
10   area where he passed, and all I can ask for is that he be at
11   peace, because I never will as long as I'm alive.
12        My life, my love, my breath, my heart gone.  Nicholas,
13   you will forever be remembered as long as I am here to say your
14   name.  Nicholas Jeremiah McCauley.  Born July 30th, 1997, died
15   on November 10th, 2015, betrayed by his brother.
16        I love you, Houston, and I do forgive you.  I forgave
17   you the day that it happened.
18        Thank you.
19        THE COURT:  Thank you.
20        MS. FOSTER:  There is no one else that would like to
21   make a statement to the Court.
22        I do know that the Court has an option under 1385 to
23   dismiss the gun charge, and I would ask the Court not to
24   exercise that discretion based on all that has been said.  I
25   think they could say it better than I could ever articulate
26   before the Court.  Thank you.
27        THE COURT:  Defense?
28        MR. MOORE:  Your Honor, it was not my privilege to know
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 1023

1    Mr. McCauley.  I feel like I've come to know at least a part of

2    him through the statements that we've heard today, through the

3    evidence in the case, through the discovery, through the

4    statements of Mr. Boji himself.

5         I think it's very clear that the community is

6    diminished by his loss, and I don't want to minimize that in any

7    way by what we are requesting.

8         I'd note that under 1385(c) the Court has the

9    discretion not just to dismiss the gun enhancement, but to

10   strike -- to strike the punishment imposed.  And we would ask

11   the Court to exercise its discretion for the reasons that I set

12   out in our request.

13        We would simply ask the Court to recognize that there

14   were two men in that room that day.  One of them is now dead.

15   But they were both, essentially, boys.  One was 18.  Nicholas

16   was just 18, Houston was just 19.

17        And the Houston Boji that was revealed through the

18   evidence, through the probation officer's report was just a boy.

19   He had just recently graduated high school.  Through the videos

20   what we saw is that these two boys were, essentially, still just

21   playing together.  He was in Houston's car.  We saw Houston

22   playing with guns.

23        And the Houston that stood before Nicholas on November

24   10th of 2015 and took his life, I would argue is not the Houston

25   that will be imprisoned, that will be in prison for at least the

26   next 15 years under the second-degree murder conviction.

27        And it would be our position that the Court can use its

28   discretion to recognize that Houston can grow beyond the person

Christine M. DiCaro, CSR                                    1021

```
 1   that took Nicholas McCauley's life through that terrible moment,
 2   that terrible cascade of bad decisions.
 3        But I'd also point out that the jury expressly found
 4   that this was not a willful and premeditated act.  That inherent
 5   in their finding was that this was an act of wanton disregard
 6   for human life as opposed to an act where someone's life was
 7   intentionally taken.  I think that's born out by all of the
 8   evidence.
 9        I'd ask the Court to allow Mr. Boji a chance, Houston a
10   chance to demonstrate that he can be rehabilitated, that he has
11   been rehabilitated, and vest the parole board, the Department of
12   Corrections with the authority to review him for release at a
13   time sometime after 15 years have passed.  That is our request.
14   And I would submit on that.
15        I believe Mr. Boji has a brief statement to make.
16        THE COURT:  I'll allow it.
17        MR. MOORE:  Should he stand or sit?
18        THE COURT:  He can stand up.
19        THE DEFENDANT:  Your Honor, I do apologize to Ana and
20   to her family and to everybody for everything I did.  I'm sorry
21   for their loss.
22        THE COURT:  Thank you.
23        MR. MOORE:  I'll submit.
24        THE COURT:  People, you want to respond?
25        MS. FOSTER:  Just briefly, Your Honor.
26        The request that's being made is to basically disregard
27   the gun enhancement.  This is a new area of law, and so we don't
28   have a lot to look towards for making that determination.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 1025

```
 1   However, in this specific case, there is no reason based on the
 2   facts of the case that would say the gun enhancement should not
 3   be applied.
 4           What we're looking at is 15 years versus 40 years.  And
 5   I think one of the speakers put it the best.  Nicholas McCauley
 6   got a life sentence.  The defendant will still be able to stand
 7   before the parole board, but after a sentence for what he's done
 8   and in completeness, not just murdering Nicholas McCauley but
 9   the way he did it.
10           And the legislators have decided to enhance murder or
11   allow an enhancement for 25 years to life because of the nature
12   of guns and dangerousness of guns, and the fact that you are
13   basically defenseless when faced with a gun, especially the type
14   of gun that was used in this case.
15           And so I'd ask the Court to have the defendant be
16   punished for what he did, and that's using a gun to kill
17   Nicholas McCauley, and not to just dismiss the gun because he's
18   young and possibly could rehabilitate himself.
19           I think what is clear by the speakers from the family
20   is that they want to see justice served.  And I don't think it
21   would be a just sentence to dismiss the gun for little to no
22   basis.
23           MR. MOORE:  Your Honor, if I may?
24           Are you done?
25           MS. FOSTER:  I am.
26           MR. MOORE:  If I may respond just briefly?
27           THE COURT:  Yes.
28           MR. MOORE:  Thank you.
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 1026

1          The law is very clear that the Court is welcome to

2     consider like the basically extraneous circumstances.  There's

3     circumstances related specifically to the defendant.  We have a

4     young man with a supportive family and no prior criminal history

5     standing before the Court.  Those are certainly things that the

6     Court can use to base its discretion upon.

7          Additionally, Miss Foster raised the issue that there

8     is no real legal grounds to consider our request to strike or

9     dismiss the enhancement.  I disagree.

10          Based on the jury's finding of second-degree murder and

11     the implicit finding that this is a willful, or, I'm sorry, a

12     wanton disregard for human life, part and parcel of that is the

13     reason it was wanton disregard for human life was because of the

14     way the gun was being used, because of the way the gun was being

15     handled.

16          Implicit within this murder charge is the use of the

17     firearm.  It is included within the conviction for the crime

18     itself.  While I'm not necessarily putting forward the argument

19     that this is, essentially, double punishment, I am saying that

20     the Court can consider that, that the use enhancement was

21     intended to criminalize, I would argue, the intentional use of a

22     firearm to commit a crime.

23          In this case the use of the firearm, the handling of

24     the firearm is the basis for the crime itself.  This murder

25     could not have been committed if Mr. Boji was not using a

26     firearm in an irresponsible manner.

27          The sentence that would be imposed for just the

28     second-degree murder is a life sentence.  It is -- there is no

1    doubt that under the law this is a life sentence, and Mr. Boji

2    could very well spend the rest of his life in state prison on

3    the second-degree murder charge with or without the gun

4    enhancement.

5         What striking the gun enhancement would do, or

6    dismissing it would do, would recognize that the act itself was

7    tied up within the crime.

8         And the person that stands before you does stand a very

9    good chance of proving rehabilitation at some point in time.

10   But that's not a certainty.  It's still something that he would

11   have to earn.  He could spend the rest of his life in state

12   prison.  He would have to earn his way out.  And that is what we

13   were asking the Court to consider.

14        THE COURT:  All right.  I know the defendant does not

15   have a record.  I know that he's young.  But what bothered the

16   Court, and I think what bothered the jury was so many stories.

17   So many stories.  Two wasted lives here today.

18        The Court is not going to exercise its discretion.  The

19   Court will sentence the defendant for violating Penal Code

20   section 187, subdivision (a), second-degree murder, 15 years.

21        For the enhancement, Penal Code section 12022.53(b), 25

22   years to run consecutive, for a total of 40 years to life in

23   state prison.

24        Defendant's credits are 1,032 days actual, no good

25   time.

26        The Court will impose a restitution fine.  Restitution

27   fine in the amount of $10,000.

28        Parole restitution fine in the amount of 10,000 is

```
 1   suspended.

 2            The Court will strike the booking fee.

 3            The Court will strike the presentence incarceration.

 4            Defendant has 60 days from today's date to file a

 5   notice of appeal.

 6            Anything else from the People?

 7            MS. FOSTER:  Yes, Your Honor.  Just ask for restitution

 8   to be determined for the victim's family.

 9            THE COURT:  So ordered.

10            Anything else from the defense?

11            MS. BLUMENTHAL:  Yes, Your Honor.  I believe there will

12   be a stipulation between the prosecution and defense that the

13   firearm that was seized in this case, with the exception of the

14   firearm that was introduced into evidence, may be returned to

15   the defendant's father, Mr. Andrew Boji, who is present in court

16   today.

17            THE COURT:  Any objection?

18            MS. FOSTER:  No, Your Honor.

19            THE COURT:  So ordered.

20            All right.  Thank you.

21            MR. MOORE:  Thank you.

22                      (Proceedings concluded.)

23

24

25

26

27

28
```

EXHIBITS IN SUPPORT OF VERIFIED PETITION FOR WRIT OF HABEAS CORPUS - 1029

# CERTIFICATE OF SERVICE

Case Name: Houston Boji on Habeas Corpus

I hereby certify that on April 11, 2022, I electronically filed the following document with the Clerk of the Court using the CM/ECF system:

**Verified Petition for Writ of Habeas Corpus; Memorandum of Points and Authorities**

I also served Petitioner's **Verified Petition for Writ of Habeas Corpus; Memorandum of Points and Authorities**, by causing to be placed a true copy thereof, enclosed in a sealed envelope with postage thereon fully prepaid, in the United States mail, addressed as follows:

> LEGAL MAIL
> Houston Michael Boji, CDCR No. BH3410
> Wasco State Prison
> Housing: A5-220U
> PO Box 4400
> Wasco, CA 93280
> **Via US Mail**

I declare under penalty of perjury that the foregoing is true and correct, and this declaration was executed at Los Angeles, California, on April 11, 2022.

/s/ Aaron Spolin
_____
Aaron Spolin